IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

———————

No. 3:21-CV-01585-S

———————

**IN RE: HIGHLAND CAPITAL MANAGEMENT, L.P.,**
**Debtors.**

**THE CHARITABLE DAF FUND, L.P. AND CLO HOLDCO, LTD.,**

**Appellants,**

**v.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**

**Appellee.**

———————

**APPENDIX IN SUPPORT OF APPELLANTS'**
**MOTION TO STAY OR ABATE APPEAL**

———————

APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS, CASE NO. 19-34054-sgj11

Mazin A. Sbaiti
Jonathan Bridges
SBAITI & COMPANY PLLC
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX  75201
T: (214) 432-2899
F: (214) 853-4367
MAS@sbaitilaw.com
JEB@sbaitilaw.com

*Counsel for Appellants The Charitable DAF Fund, L.P. and CLO Holdco, Ltd.*

1

| Exhibit | Description | App. Pages |
|---------|-------------|------------|
| 1 | Fifth Circuit Order granting motion for leave to appeal (May 4, 2021) | App. 1 – App. 3 |
| 2 | Petition for Direct Appeal Under 28 U.S.C. § 158(d) (Apr. 14, 2021) | App. 4 – App. 269 |
| 3 | Petition for Permission to Appeal (Direct Appeal from Bankruptcy Court, 28 U.S.C. § 158(d)) (Mar. 31, 2021) | App. 270 – App. 518 |

Dated: September 22, 2021.

By: */s/ Mazin A. Sbaiti*
    Mazin A. Sbaiti
    Texas Bar No. 24058096
    Jonathan Bridges
    Texas Bar No. 24028835
    SBAITI & COMPANY PLLC
    J.P. Morgan Chase Tower
    2200 Ross Avenue, Suite 4900W
    Dallas, TX  75201
    Telephone: (214) 432-2899
    Facsimile: (214) 853-4367

    *Counsel for Appellants The Charitable DAF Fund, L.P. and CLO Holdco, Ltd.*

2

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 22, 2021, I caused a copy of the foregoing document to be served by Electronic Case Filing System for the United States District Court for the Northern District of Texas.

*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti

# EXHIBIT 1

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 4, 2021

Lyle W. Cayce
Clerk

———————

No. 21-90011

———————

In re: Highland Capital Management, L.P.,

*Debtor,*

NexPoint Advisors, L.P.; Highland Capital Management
Fund Advisors, L.P.; Highland Income Fund; NexPoint
Strategic Opportunities Fund; Highland Global
Allocation Fund; NexPoint Capital, Incorporated;
James Dondero; The Dugaboy Investment Trust; Get
Good Trust,

*Petitioners,*

*versus*

Highland Capital Management, L.P.,

*Respondent.*

———————————————————

Motion for Leave to Appeal
Pursuant to 28 U.S.C. § 158(d)

———————————————————

Before Dennis, Southwick, and Engelhardt, *Circuit Judges.*

Per Curiam:

App. 2

No. 21-90011

IT IS ORDERED that the motion of NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P. for leave to appeal under 28 U.S.C. § 158(d) is GRANTED.

**App. 3**

# EXHIBIT 2

# No. _____

IN THE

# United States Court of Appeals for the Fifth Circuit

_____

In Re: HIGHLAND CAPITAL MANAGEMENT, L.P.

Proposed Appeal of Highland Income Fund, NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund and NexPoint Capital, Inc.

_____

*On petition for direct appeal from the United States Bankruptcy Court*
*for the Northern District of Texas at No. 19-34054; Appeal pending in the United States*
*District Court for the Northern District of Texas at No. 3:21-cv-00539-N*

_____

## PETITION FOR DIRECT APPEAL UNDER 28 U.S.C. § 158(d)

_____

A. Lee Hogewood, III
**K&L GATES LLP**
4350 Lassiter at North Hills Ave.
Suite 300
Raleigh, N.C. 27609
(919) 743-7306
lee.hogewood@klgates.com

Artoush Varshosaz
**K&L GATES LLP**
1717 Main St.
Suite 2800
Dallas, TX 75201
(214) 939-5659
artoush.varshosaz@klgates.com

David R. Fine
**K&L GATES LLP**
Market Square Plaza
17 North Second St.
18th Floor
Harrisburg, PA 17101
(717) 231-5820
david.fine@klgates.com

*Counsel for Petitioners*

# CERTIFICATE OF INTERESTED PERSONS

**Appellants**

Highland Income Fund; NexPoint Strategic Opportunities Fund; Highland Global Allocation Fund and NexPoint Capital, Inc.

*Counsel:*

K&L GATES LLP
A. Lee Hogewood, III
Artoush Varshosaz
David R. Fine

**Appellee**

Highland Capital Management, L.P.

*Counsel:*

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz
John A. Morris

HAYWARD PLLC
Melissa S. Hayward
Zachery Z. Annable

**Other Appellants:**

1.     James Dondero

*Counsel:*

BONDS ELLIS EPPICH SCHAFER JONES LLP
D. Michael Lynn
John Y. Bonds, III
Clay M. Taylor
Bryan C. Assink

i

2.     Get Good Trust
       The Dugaboy Investment Trust

*Counsel:*

HELLER, DRAPER & HORN, L.L.C.
Douglas S. Draper
Leslie A. Collins
Greta M. Brouphy

3.     NexPoint Advisors, L.P.
       Highland Capital Management Fund Advisors, L.P.

*Counsel:*

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina

**App. 7**

# TABLE OF CONTENTS

INTRODUCTION.................................................................................1

FACTUAL AND PROCEDURAL HISTORY .......................................................3

QUESTIONS PRESENTED ............................................................... 11

REASONS FOR THE COURT TO GRANT THIS PETITION.........................12

    A. The Bankruptcy Court correctly determined that an immediate appeal would  materially advance the progress of the case. ..................................... 13

    B. The Bankruptcy Court's Confirmation Order involves questions of law on which lower courts have differed such that this Court's resolution is necessary. ................................................................................ 14

    C. The Bankruptcy Court's determination that certain protections afforded to a creditors' committee and its members should be extended to "other parties in a particular chapter 11 case that perform similar roles to a creditors' committee and its members" raises a question of law as to which there is no controlling authority ................................................................. 20

CONCLUSION................................................................................ 22

App. 8

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of N.Y. Trust Co., N.A. v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009) ...................................*passim*

*Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*,
   No. 3:17-CV-1958-G, 2018 WL 5113124 (N.D. Tex. Oct. 19, 2018) ....... 16, 17, 19

*In re MPF Holding U.S. LLC*, 444 B.R. 719 (Bankr. S.D. Tex. 2011) ...................... 13

*In re MPF Holding U.S. LLC*, 701 F.3d 449 (5th Cir. 2012) ................................... 14

*In re OCA, Inc.*, 552 F.3d 413 (5th Cir. 2008) ....................................................... 13

*In re Patriot Place, Ltd.*, 486 B.R. 773 (Bankr. W.D. Tex. 2013) ........................16, 19

*In re Pilgrim's Pride Corp.*, 08-45664-DML-11, 2010 WL 200000
   (Bankr. N.D. Tex. Jan. 14, 2010) ....................................................................... 18

**Statutes**

11 U.S.C. § 524(e) .................................................................................................. 18

11 U.S.C. § 1103(c) ................................................................................................20

28 U.S.C. § 158(d) ............................................................................................. 1, 12

28 U.S.C. § 158(d)(2)(A)(i) ................................................................. 2, 12, 13, 21

28 U.S.C. § 158(d)(2)(A)(ii) ........................................................2, 12, 13, 15, 20

28 U.S.C. § 158(d)(2)(A)(iii) ............................................................... 1, 11, 13, 14

iv

# INTRODUCTION

Section 158(d)(2) allows a direct appeal from a bankruptcy court to the court of appeals if at least one of four conditions is met. *See* 28 U.S.C. § 158(d). The bankruptcy court order at issue here, which confirmed a complex plan and included a number of contested provisions, independently meets three of Section 158(d)(2)'s provisions.

*First*, as the Bankruptcy Court held when it certified its confirmation order for direct appeal, a direct appeal "may materially advance the progress of the case" because (1) the interests at stake guarantee that the case will ultimately be appealed to this Court, (2) the parties have significant interests in obtaining this Court's prompt review so that they can order their affairs accordingly in light of certain future actions Highland Capital Management, L.P. (the "Debtor"), proposes to take and (3) the parties will collectively spend hundreds of thousands of dollars in district-court proceedings that will almost certainly be unnecessary in light of this Court's ultimate review. *See* 28 U.S.C. § 158(d)(2)(A)(iii).

*Second*, the confirmed plan includes broad exculpation and injunction provisions the Funds believe *Bank of N.Y. Trust Co., N.A. v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009), plainly

prohibits.[1] A number of district courts and bankruptcy courts in this Circuit read *Pacific Lumber* as the Funds do, but the Bankruptcy Court read the case more narrowly. Accordingly, there is a conflict among the "lower" courts on a question of law that requires this Court's resolution. *See* 28 U.S.C. § 158(d)(2)(A)(ii).

*Third*, the Bankruptcy Court held that the protections the Bankruptcy Code affords to creditors' committees and their members may be extended to "other parties in a particular chapter 11 case that perform similar roles to a creditors' committee and its members." Neither this Court nor the Supreme Court has addressed or approved such a protection-by-analogy holding, and, so, there is no controlling authority on that legal question. *See* 28 U.S.C. § 158(d)(2)(A)(i).

The Confirmation Order meets the requirements of Section 158(d)(2) in three independent ways, and the Funds request that the Court allow a direct appeal.[2]

---

[1] The Funds, who are the petitioners, include Highland Income Fund, NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund and NexPoint Capital, Inc.

[2] As other aggrieved parties have noted in their separate petition for permission, there are issues for review beyond the exculpation and injunction issues. Because of space constraints, the Funds focus here on those issues that most plainly demonstrate that the confirmation order should be directly appealed; the Funds reserve the right to raise additional issues should the Court accept the direct appeal.

## FACTUAL AND PROCEDURAL HISTORY

The Bankruptcy Court fairly noted that this is not a garden-variety bankruptcy case. However, while the facts and procedural history are complex, the Funds believe the Court needs only a summary to understand this petition.

James Dondero co-founded Highland Capital Management L.P. (the "Debtor") in 1993.[3] The Debtor provided services to and support for an extensive network of investment entities, trusts, other ventures and investment advisers.[4] The Debtor invested and managed billions of dollars on behalf of itself, its subsidiaries and affiliates and other unaffiliated entities.[5] The Debtor provided such services to collateralized loan obligation vehicles ("CLOs").[6] The CLOs own assets, generally securities at this stage, and the Debtor manages them pursuant to a series of portfolio-management agreements between itself and the CLOs.[7]

---

[3] Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief (the "Confirmation Order") at ¶ 4 (attached at Tab "A").

[4] Confirmation Order at ¶ 6.

[5] *Id.*

[6] *Id.*

[7] Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) (the "Plan") at Exh. B (attached at Tab "B").

The Debtor filed for Chapter-11 bankruptcy protection in Delaware in October 2019.[8]

The Debtor and the Official Unsecured Creditors' Committee (the "Committee") had a difficult relationship from the start.[9] First, the Committee moved for a change of venue to the Northern District of Texas (which was granted).[10] Second, the Committee and, ultimately, the bankruptcy trustee pushed for appointment of a Chapter-11 trustee.[11]

On January 9, 2020, the Debtor, the Committee and Mr. Dondero entered into a stipulation and consent order (the "January 9 Order").[12] The January 9 Order provided, among other things, for the removal of Mr. Dondero from the management of the Debtor, replaced him with a board of independent directors (the "Independent Directors) and prohibited Mr. Dondero from causing "Related Entities" to terminate contracts with the Debtor.[13]

---

[8] *Id.* at ¶ 4.

[9] *Id.* at ¶ 11.

[10] *Id.*

[11] *Id.*

[12] *Id.* at ¶ 12.

[13] *Id.* The Independent Directors include James P. Seery, Jr.; John S. Dubel and retired bankruptcy judge Russell Nelms. *Id.*

Among other things, Mr. Dondero beneficially owns two investment advisers, Highland Capital Management Fund Advisors, L.P., and NexPoint Advisors, L.P. (the "Advisors"), because he owns their general partners.[14]

Petitioners are several retail investment funds (the "Funds"). The Funds invest more than $1 billion for the benefit of thousands of investors/shareholders. In doing so, the Funds receive advice and services from the Advisors. The Advisors and the Funds are subject to the regulatory regime established pursuant to the Investment Company Act of 1940 and the Investment Advisers Act of 1940. Among other investments, the Funds hold interests in a number of the CLOs described above.

Because Mr. Dondero is a beneficial owner, the Advisors are "Related Entities" under the January 9 Order. At the time of the January 9 Order, each of the Advisors was a party to a shared-services agreement with the Debtor. Under the respective shared-services agreements, the Debtor was required to provide a wide range of services and support to the Advisors (and by extension, to the Funds), including accounting, legal, clerical, valuation and other "back-office" services, as well as office space, in exchange for a fee. The Advisors' compliance with their

---

[14] The Advisors have filed a separate appeal from the Confirmation Order and have filed a separate petition seeking permission to appeal directly to this Court. That petition is docketed at No. 21-90011.

5

regulatory and fiduciary obligations to the Funds was facilitated by their access to shared services provided by the Debtor.

While the January 9 Order limited Mr. Dondero's ability to cause the Advisors to terminate agreements, the Debtor was not so limited. Thus, the Debtor notified the Advisors on November 30, 2020, that the shared-services agreements would be terminated effective January 31, 2021 (as extended, through February 28). In December 2020, the Advisors advised—and the Funds agreed—that the Advisors should seek limited relief from the Bankruptcy Court with respect to the Debtor's role as portfolio manager of the CLOs. Specifically, the Advisors and the Funds requested that the Bankruptcy Court prohibit the Debtor from trading or disposing of CLO assets pending the confirmation hearing on the Debtor's plan.[15] After the Bankruptcy Court denied the motion, the Advisors and the Funds requested that the Debtor not trade in CLO assets on a voluntary basis. The Debtor denied that request.

Outside of the bankruptcy context, the Funds collectively hold the majority of preference shares in three CLOs for which the respective portfolio-management agreements allow them to remove the Debtor as portfolio manager "for cause." While the Debtor remained in bankruptcy and before confirmation of the Plan, the

---

[15] The CLO assets are not property of the bankruptcy estate; they are, instead, assets under the Debtor's management and for which the Debtor is paid a management fee.

Bankruptcy Court would have had to approve any such removal in the form of relief from the automatic stay. After confirmation, the general rule is that contracts may be terminated according to their terms, if those contracts have been assumed.

Over objections from the Funds and others, the Bankruptcy Court confirmed the Plan on February 22, 2021. The Debtor's representatives presented the Plan as an "asset-maximization plan." Under the confirmed Plan, the reorganized Debtor intends to liquidate its assets over the course of an approximate two-year period. In addition to liquidating its assets, the Debtor, having assumed the portfolio-management agreements, continues to manage the assets of others, including the CLOs. It similarly intends to liquidate the assets of others within the same period.

As noted, the Debtor assumed the portfolio-management agreements. However, the Plan goes further than merely assuming and reinstating those agreements and binding the parties to their written terms.

The Plan, as approved over objections by the Funds and others, includes a number of disputed provisions. Article IX includes both exculpation and injunction provisions:

> **C. Exculpation**
> Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the

7

Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided*, *however,* the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.[16]

Article I.B of the Plan defines "Exculpated Parties" broadly:

"*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii) ...[17]

---

[16] *See* Plan at IX.C.

[17] *Id*. at I.B.

Thus, the approved Plan exculpates not only the Debtor but also the Independent Directors, employees of the Debtor, officers and directors of the Debtor and professionals retained by the Debtor—among others. That exculpation extends not only to creditors' direct claims but to the negotiation, administration and implementation of the Plan as well as to ordinary business matters and post-confirmation matters related to plan implementation.[18]

The accompanying Plan injunction is broad as well. It provides, among other things, that "all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan."[19] ("Enjoined Parties" is defined broadly to include, among others, all entities that "have held, hold, or may hold claims against the Debtor's equity interests and any entity "that has appeared and/or filed any motion, objection, or other pleading" in the Chapter-11 case.[20]) The Confirmation Order bars any Enjoined Party from commencing or pursuing a claim or cause of action against

---

[18] To be clear, the exculpation is not a full release but imposition of a particularly high burden of proof on anyone seeking to assert a claim against an Exculpated Party. Essentially, an Exculpated Party is released unless its acts or omissions "constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct ..." Plan at IX.C. That heightened burden is material in that, among other things, it releases that large group of persons and entities from claims for negligence.

[19] Plan at IX.F.

[20] *Id*. at I.B.

any "Protected Party" unless the Bankruptcy Court first determines that the claim or cause of action is "colorable."[21] ("Protected Parties" is defined broadly to include, among others, the Debtor, the Debtor's employees, the Committee and its members and professionals retained by the Debtor and the Committee in the Chapter-11 case.[22])

The Funds believe that the exculpation and gatekeeper/channeling-injunction provisions exceed the scope of what this Court has previously permitted. The Funds contend that these provisions restrict their ability to act quickly and appropriately in fulfillment of their investment objectives and impair their ability to protect their retail investors. The issue is of critical and practical importance to the Funds because they invest in a number of illiquid assets with a long-term investment horizon. On the other hand, the Debtor's liquidation plan anticipates a short, two-year window for the Debtor to liquidate its assets as well as those assets it manages. Thus, the Debtor's short-term liquidation goal conflicts with the Funds' plan to hold the assets for a longer term. Were the Debtor to sell the CLO assets as planned, it would act against the Fund's wishes, and the Funds believe the challenged Plan terms

---

[21] Plan at IX.F.

[22] *Id*. at I.B.

improperly interfere with the Funds' right and ability to remove the manager in such a situation.

## QUESTIONS PRESENTED

1.    Whether the Court should accept direct review of the Bankruptcy Court's Confirmation Order because an immediate appeal may materially advance the progress of the case, *see* 28 U.S.C. § 158(d)(2)(A)(iii), since—

a.    all parties concur that the interests at stake in this bankruptcy matter are such that, if the appeals are heard in the District Court, it is all but certain that the non-prevailing party or parties will then take an appeal or appeals to this Court;

b.    all parties concur that, in light of the inevitability of this Court's review, requiring the parties to pursue appeals first in the District Court would delay finality of the Plan for the Debtor, creditors and other interested parties by a year or more; and

c.    all parties concur that, in light of the inevitability of this Court's review, requiring the parties to pursue appeals first in the District Court would cause the parties collectively  to incur hundreds of thousands of dollars in attorneys' fees for ultimately unnecessary proceedings in the District Court.

2.      Whether the Court should accept direct review of the Bankruptcy Court's Confirmation Order because that order involves a question of law requiring resolution of conflicting decisions since a number of cases in this Circuit have interpreted *Pacific Lumber* to prohibit inclusion in a bankruptcy plan of broad exculpation and injunction provisions such as those the Bankruptcy Court approved in this case. *See* 28 U.S.C. § 158(d)(2)(A)(ii).

3.      Whether the Court should accept direct review of the Confirmation Order because the Bankruptcy Court's holding that the protections the Bankruptcy Code affords to creditors' committees and their members may be extended to "other parties in a particular chapter 11 case that perform similar roles to a creditors' committee and its members" is a question of law as to which there is no controlling decision of this Court or the Supreme Court. *See* 28 U.S.C. § 158(d)(2)(A)(i).

## REASONS FOR THE COURT TO GRANT THIS PETITION

Section 158(d)(2) of Title 28 of the U.S. Code provides that a bankruptcy court may certify an order for direct appeal to the court of appeals when the order (1) involves a controlling issue of law as to which there is no controlling decision of the court of appeals or the Supreme Court, (2) the order involves a question of law requiring resolution of conflicting decisions or (3) an immediate appeal from the order may materially advance the progress of the case or proceeding in which the

12

appeal is taken. *See* 28 U.S.C. § 158(d)(2)(A)(i)-(iii); *In re OCA, Inc.*, 552 F.3d 413, 418 (5th Cir. 2008). If the bankruptcy court certifies the order, the would-be appellant must then file a petition with the court of appeals seeking permission to appeal under the same standard. *Id.*

The parties jointly asked the Bankruptcy Court to certify its confirmation order for direct appeal to this Court, and the Bankruptcy Court did so.[23]

## A.    *The Bankruptcy Court correctly determined that an immediate appeal would materially advance the progress of the case.*

In granting the parties' joint motion for certification, the Bankruptcy Court agreed that "a direct appeal may materially advance the progress of the case or proceeding in which the appeal is taken."[24] The Funds agree.

In *In re MPF Holding U.S. LLC*, 444 B.R. 719 (Bankr. S.D. Tex. 2011), a bankruptcy court held that a direct appeal would be appropriate because the stakes were sufficiently high that it was particularly likely that any decision by the district court would ultimately be appealed to this Court such that requiring the parties first to appeal to the district court would unnecessarily delay a final resolution of the

---

[23] *See* Order Certifying Appeals of the Confirmation Order for Direct Appeal to the United States Court of Appeals for the Fifth Circuit (the "Certification Order") (Tab "C").

[24] *Id.* at 2.

bankruptcy. *Id.* at 727. This Court accepted and decided the appeal. *See* 701 F.3d 449 (5th Cir. 2012).

Moreover, as the parties informed the Bankruptcy Court in requesting its certification for direct appeal, the parties, creditors and others would benefit from a direct appeal in that they would have this Court's decision that much sooner and the bankruptcy case could be fully administered and closed. Among other things, as noted above the Debtor intends to take certain steps in the next two years—steps the Funds believe may impair their interests and those of the CLOs—and the Funds believe the Plan as confirmed leaves them with an insufficient remedy. When it reviews the Plan, this Court will of course either reject or allow the challenged provisions, but the progression of events and the Debtor's plans make it important for the parties to have that resolution sooner rather than later.

Thus, the case meets the requirements of Section 158(d)(2)(A)(iii), and the Funds request that the Court grant permission for a direct appeal from the Bankruptcy Court's Confirmation Order.

**B.**    ***The Bankruptcy Court's Confirmation Order involves questions of law on which lower courts have differed such that this Court's resolution is necessary.***

On at least one of the principal issues on which the Funds seek permission to appeal, the Bankruptcy Court's interpretation of the law conflicts with that of other

14

courts. While the Funds believe the Bankruptcy Court erred in not following *Pacific Lumber* such that its Confirmation Order should be reversed, they will focus here on detailing the conflict rather than arguing the ultimate merits because the conflict is the focus under § 158(d)(2)(A)(ii).

In this Circuit, *Pacific Lumber* is important—and, in the Funds view, controlling—authority regarding the permissible scope of exculpation provisions and related injunctions. The procedural background of *Pacific Lumber* is lengthy and complex, but the facts relevant here are neither. The bankruptcy court approved a plan that included an exculpation provision that protected not just the debtor but a number of other persons and entities, including the debtor's personnel, the current owners of the reorganized debtor (MRC and Marathon) and two entities created by the plan (Newco and Townco) into which certain of the debtor's assets were transferred as well as the personnel of those parties. On direct appeal from the bankruptcy court, this Court rejected the exculpation of non-debtor parties:

> The plan releases MRC, Marathon, Newco, Townco, and the Unsecured Creditors' Committee (and their personnel) from liability—other than for willfulness and gross negligence—related to proposing, implementing, and administering the plan. The law states, however, that "discharge of a debt of the debtor does not affect the liability of any other entity on such debt." 11 U.S.C. § 524(e).
>
> ***
>
> We see little equitable about protecting the released non-debtors from negligence suits arising out of the reorganization. In a variety of contexts, this court has held that Section 524(e) only releases the

debtor, not co-liable third parties. *See, e.g.*, *In re Coho Resources, Inc.*, 345 F.3d 338, 342 (5th Cir. 2003); *Hall v. National Gypsum Co.*, 105 F.3d 225, 229 (5th Cir. 1997); *Matter of Edgeworth*, 993 F.2d 51, 53-54 (5th Cir. 1993); *Feld v. Zale Corporation*, 62 F.3d 746 (5th Cir. 1995). These cases seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions.

*** 

There are no allegations in this record that either MRC/Marathon or their or the Debtors' officers or directors were jointly liable for any of Palco's or Scopac's pre-petition debt. They are not guarantors or sureties, nor are they insurers. Instead, the essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose.

584 F.3d at 251-52 (footnotes omitted). A number of courts have interpreted *Pacific Lumber* broadly to reject exculpation provisions that reach beyond the debtor itself and the creditors' committee. For example, in *In re Patriot Place, Ltd.*, 486 B.R. 773 (Bankr. W.D. Tex. 2013), the court wrote that this Court "takes a very restrictive approach to non-debtor releases in bankruptcy cases" and cited *Pacific Lumber* for the proposition that "[t]he Fifth Circuit cases seem 'broadly to foreclose non-consensual non-debtor releases and permanent injunctions.'" 486 B.R. at 882. In *Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, No. 3:17-CV-1958-G, 2018 WL 5113124 (N.D. Tex. Oct. 19, 2018), the district court rejected an exculpation clause much like the one in the Plan in this case and offered the following analysis:

16

In *In re The Pacific Lumber Company*, the plan in question released the debtor and its personnel from liability, other than for willfulness and gross negligence, "related to proposing, implementing, and administering the plan." *In re The Pacific Lumber Company*, 584 F.3d at 251. There, the Fifth Circuit determined that the broad exculpation provision contained in the plan was designed "to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy" which the fresh start provision in Bankruptcy Code section 524(e)[14] was not intended to do. *Id.* at 252. Here, Thru's plan releases Thru, its officers, directors, and various other personnel from liability, except for acts or omissions made in bad faith, "in connection with or related to formulating, negotiating, implementing, confirming, or consummating" the plan, disclosure statement, or any plan document. Modified Chapter 11 Plan at 25, ¶ 9.7 (emphasis added).

The appellees' attempts to distinguish their plan's exculpation language from that of the language used in *In re The Pacific Lumber Company* are unpersuasive.

*Id.* at *22-*23. The court also rejected an injunction provision that was "broad enough to cover non-debtor third parties ..." because the court read *Pacific Lumber* to preclude such an injunction. *Id.* at *21 (citing *Pacific Lumber*, 584 F.3d at 252 (Fifth Circuit authority "seems broadly to foreclose non-consensual non-debtor releases and permanent injunction.").

A judge in the same bankruptcy court from which this matter arises understood *Pacific Lumber* to preclude non-consensual third-party exculpation:

The plan in *Pacific Lumber* provided numerous third parties with protection from liability for their negligent conduct during the course of the chapter 11 case including liability related to proposing, implementing, and administering the plan. The third-party protections in *Pacific Lumber* applied to the debtors' officers and directors as well as

17

the companies that proposed the plan and that ultimately acquired majority ownership of the reorganized debtors. Although a third-party exculpation provision arguably might be defended as justified by the bankruptcy court's equitable powers given by Code § 105, Chief Judge of the Fifth Circuit Court of Appeals Edith Jones struck the exculpatory provisions because the Court saw "little equitable about protecting the released non-debtors from negligence suits arising out of the reorganization." *Id.* at 252.

***

Debtors and the Equity Committee argue that the ruling in *Pacific Lumber* is limited to the facts of that case. The court disagrees. Chief Judge Jones wrote that "non-debtor releases are most appropriate as a method to channel mass claims toward a specific pool of assets." *Id.* at 252. Chief Judge Jones also cited to several prior Fifth Circuit decisions ... stating that, "these cases seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions." *Id.* These statements persuade the court that the ruling in *Pacific Lumber* is not limited to its facts. Indeed, there is nothing in the *Pacific Lumber* opinion which, in the court's view, can reasonably be read to limit its ruling to the facts of that case.

*In re Pilgrim's Pride Corp.*, 08-45664-DML-11, 2010 WL 200000 at *4-*5 (Bankr.

N.D. Tex. Jan. 14, 2010).

The Bankruptcy Court in this matter understood *Pacific Lumber* differently.[25]

The court held that *Pacific Lumber* focused on 11 U.S.C. § 524(e) but that the case

---

[25] The Bankruptcy Court wrote that certain earlier orders in the case, including the January 9 Order described in the statement of the case, above, and a July 16, 2020, order had already exculpated the Independent Directors and Mr. Seery and were due *res judicata* effect. *See* Confirmation Order at ¶ 73. When the merits are before this Court, the Funds will demonstrate that the Bankruptcy Court was mistaken in that determination, and in any event those orders would not shield the exculpation and injunction provisions from appellate review.

does not prohibit all exculpations under the Bankruptcy Code and the court in such case specifically approved the exculpations of a creditor's committee and its members on the grounds that "11 U.S.C. § 1103(c), which lists the creditors' committee's powers, implies committee members have qualified immunity for actions within the scope of their duties. ... [I]f members of the committee can be sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case, it will be extremely difficult to find members to serve on the committee. *Pacific Lumber*'s rationale for permitted exculpation of creditors' committees and their members (which was clearly policy based and based on creditors' committee qualified immunity flowing from their duties under section 1103(c) of the Bankruptcy Code and their disinterestedness and importance in chapter 11 cases) does not preclude exculpation to other parties in a particular chapter 11 case that perform similar roles to a creditors' committee and its members.[26]

Thus, the Bankruptcy Court read *Pacific Lumber* as rejecting only third-party exculpations in the Section-524(e) context but not in others. That holding is plainly in conflict with cases like *Patriot Place*, 486 B.R. at 882 ("[t]he Fifth Circuit cases seem 'broadly to foreclose non-consensual non-debtor releases and permanent injunctions.'"), and *In re Thru,* 2018 WL 5113124 at *22.

The Bankruptcy Court also overruled the Funds' objection that the Plan's channeling injunction is foreclosed by *Pacific Lumber* because it extends impermissibly to protect third parties.[27] As noted, *In re Thru* understood *Pacific*

---

[26] Confirmation Order at ¶ 74(a).

[27] *Id*. at ¶¶ 75-76.

19

*Lumber* to prohibit non-consensual, permanent injunctions in favor of non-debtors. *See In re Thru*, 2018 WL 5113124 at *21.

While the Funds believe this Court will confirm that *Pacific Lumber* should be read more broadly than the Bankruptcy Court did, the Court need not decide that issue now. It is enough for the Court to decide that there are conflicting decisions in need of this Court's resolution. *See* § 158(d)(2)(A)(ii). There are.

**C.** *The Bankruptcy Court's determination that certain protections afforded to a creditors' committee and its members should be extended to "other parties in a particular chapter 11 case that perform similar roles to a creditors' committee and its members" raises a question of law as to which there is no controlling authority.*

As noted in the previous section, in its discussion of *Pacific Lumber*, the Bankruptcy court held that

> *Pacific Lumber*'s rationale for permitted exculpation of creditors' committees and their members (which was clearly policy based and based on creditors' committee qualified immunity flowing from their duties under section 1103(c) of the Bankruptcy Code and their disinterestedness and importance in chapter 11 cases) does not preclude exculpation to other parties in a particular chapter 11 case that perform similar roles to a creditors' committee and its members.[28]

The Funds believe that protection-by-analogy holding is wrong under both *Pacific Lumber* and Section 1103(c), but for present purposes it is sufficient to say that the

---

[28] *Id*. at ¶ 74(a).

20

Bankruptcy Court appears to be the first court to reach that holding and that neither this Court nor the Supreme Court has addressed it.

Section 158(d)(2)(A)(i) permits a direct appeal when the bankruptcy court's order "involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States ..." The legal question of whether parties "that perform similar roles to a creditors' committee and its members" should be entitled to the same protections as creditors' committees and their members is such a question.

# CONCLUSION

Accordingly, the Funds respectfully request that the Court grant this petition and allow a direct appeal to this Court from the Bankruptcy Court's Confirmation Order.

Respectfully submitted,
**K&L GATES LLP**

A. Lee Hogewood, III
4350 Lassiter at North Hills Ave.
Suite 300
Raleigh, N.C. 27609
(919) 743-7306
lee.hogewood@klgates.com

/s/ David R. Fine
David R. Fine
Market Square Plaza
17 North Second St.
Harrisburg, PA 17101
(717) 231-5820
david.fine@klgates.com

Artoush Varshosaz
1717 Main St., Suite 2800
Dallas, TX  75201
(214) 939-5659
artoush.varshosaz@klgates.com

*Counsel for Petitioners*
April 13, 2021

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel certifies that this brief:

(i)    complies with the type-volume limitation of Federal Rule of Appellate Procedure 5(C)(1) because it contains 4,912 words, including footnotes and excluding the cover, certificate of interested persons, table of contents, table of authorities, certificate of compliance and certificate of service.

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2010 and is set in Equity font in a size equivalent to 14 points or larger.

/s/ David R. Fine

## CERTIFICATE OF SERVICE

I certify that, on April 13, 2021, I filed the attached document with the Court's

CM/ECF system and that I also e-mailed a copy with exhibits to the following:

Jeffrey Pomerantz, Esq. (jpomerantz@pszlaw.com)
John A. Morris, Esq. (jmorris@pszlaw.com)
*Counsel for the Debtor*

John Bonds, Esq. (john@bondsellis.com)
Clay Taylor, Esq. (clay.taylor@bondsellis)
*Counsel for J. Dondero*

Douglas Draper, Esq. (ddraper@hellerdraper.com)
*Counsel for the Dugaboy Investment Trust*

Davor Rukavina, Esq. (drukavina@munsch.com)
*Counsel for the Advisors*


                                    /s/ David R. Fine

# Tab "A"



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed February 22, 2021**

_____
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

In re:                                    )    Chapter 11
                                          )
HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]     )    Case No. 19-34054-sgj11
                                          )
                        Debtor.           )

### ORDER (I) CONFIRMING THE FIFTH AMENDED
### PLAN OF REORGANIZATION OF HIGHLAND CAPITAL
### MANAGEMENT, L.P. (AS MODIFIED) AND (II) GRANTING RELATED RELIEF

The Bankruptcy Court[2] having:

a.   entered, on November 24, 2020, the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Scheduling A Hearing to Confirm the Fifth Amended Plan of Reorganization (C) Establishing Deadline for Filing Objections to Confirmation of Plan, (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures, and (E) Approving Form and Manner of Notice* [Docket No. 1476] (the "Disclosure Statement Order"), pursuant to which the Bankruptcy Court approved the adequacy of the *Disclosure Statement Relating to the Fifth*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as defined below). The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.

*Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1473] (the "<u>Disclosure Statement</u>") under section 1125 of the Bankruptcy Code and authorized solicitation of the Disclosure Statement;

b. set January 5, 2021, at 5:00 p.m. prevailing Central Time (the "<u>Objection Deadline</u>"), as the deadline for filing objections to confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (*As Modified*) [Docket No. 1808] (as amended, supplemented or modified, the "<u>Plan</u>");

c. set January 5, 2021, at 5:00 p.m. prevailing Central Time, as the deadline for voting on the Plan (the "<u>Voting Deadline</u>") in accordance with the Disclosure Statement Order;

d. initially set January 13, 2021, at 9:30 a.m. prevailing Central Time, as the date and time to commence the hearing to consider confirmation of the Plan pursuant to Bankruptcy Rules 3017 and 3018, sections 1126, 1128, and 1129 of the Bankruptcy Code, and the Disclosure Statement Order, which hearing was continued to January 26, 2021, at 9:30 a.m. prevailing Central Time and further continued to February 2, 2021;

e. reviewed: (i) the Plan; (ii) the Disclosure Statement; and (iii) *Notice of (I) Entry of Order Approving Disclosure Statement; (II) Hearing to Confirm; and (III) Related Important Dates* (the "<u>Confirmation Hearing Notice</u>"), the form of which is attached as <u>Exhibit 1-B</u> to the Disclosure Statement Order;

f. reviewed: (i) the *Debtor's Notice of Filing of Plan Supplement for the Third Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1389] filed November 13, 2020; (ii) *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1606] filed on December 18, 2020; (iii) the *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1656] filed on January 4, 2021; (iv) *Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications)t* dated January 22, 2021 [Docket No. 1811]; and (v) *Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified)* on February 1, 2021 [Docket No. 1875]; (collectively, the documents listed in (i) through (v) of this paragraph, the "<u>Plan Supplements</u>");

g. reviewed: (i) the *Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on December 30, 2020 [Docket No. 1648]; (ii) the *Second Notice of (I) Executory Contracts and*

*Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 11, 2021 [Docket No.1719]; (iii) the *Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 15, 2021 [Docket No. 1749]; (iv) the *Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791]; (v) the *Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on January 27, 2021 [Docket No. 1847]; (vi) the *Notice of Hearing on Agreed Motion to (I) Assume Nonresidential Real Property Lease with Crescent TC Investors, L.P. Upon Confirmation of Plan and (II) Extend Assumption Deadline* filed on January 28, 2021 [Docket No. 1857]; and (vii) the *Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on February 1, 2021 [Docket No. 1873] (collectively, the documents referred to in (i) to (vii) are referred to as "List of Assumed Contracts");

h.       reviewed: (i) the *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1814] (the "Confirmation Brief"); (ii) the *Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management*; [Docket No. 1807]; and (iii) the *Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1772] and *Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1887] filed on February 3, 2021 (together, the "Voting Certifications").

i.       reviewed: (i) *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505]; (ii) the *Certificate of Service* dated December 23, 2020 [Docket No. 1630]; (iii) the *Supplemental Certificate of Service* dated December 24, 2020 [Docket No. 1637]; (iv) the *Second Supplemental Certificate of Service* dated December 31, 2020 [Docket No. 1653]; (v) the *Certificate of Service* dated December 23, 2020 [Docket No. 1627]; (vi) the *Certificate of Service* dated January 6, 2021 [Docket No. 1696]; (vii) the *Certificate of Service* dated January 7, 2021 [Docket No. 1699]; (viii) the *Certificate of Service* dated January 7, 2021 [Docket No 1700]; (ix) the *Certificate of Service* dated January 15, 2021 [Docket No. 1761]; (x) the *Certificate of Service* dated January 19, 2021 [Docket No. 1775]; (xi) the

3

*Certificate of Service* dated January 20, 2021 [Docket No. 1787]; (xii) the *Certificate of Service* dated January 26, 2021[Docket No. 1844]; (xiii) the *Certificate of Service* dated January 27, 2021 [Docket No. 1854]; (xiv) the *Certificate of Service* dated February 1, 2021 [Docket No. 1879]; (xv) the *Certificates of Service* dated February 3, 2021 [Docket No. 1891 and 1893]; and (xvi) the *Certificates of Service* dated February 5, 2021 [Docket Nos. 1906, 1907, 1908 and 1909] (collectively, the "Affidavits of Service and Publication");

j.      reviewed all filed[3] pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and confirmation of the Plan, including all objections, statements, and reservations of rights;

k.      conducted a hearing to consider confirmation of the Plan, which commenced on February 2, 2021, at 9:30 a.m. prevailing Central Time and concluded on February 3, 2021, and issued its oral ruling on February 8, 2021 (collectively, the "Confirmation Hearing);

l.      heard the statements and arguments made by counsel in respect of confirmation of the Plan and having considered the record of this Chapter 11 Case and taken judicial notice of all papers and pleadings filed in this Chapter 11 Case; and

m.      considered all oral representations, testimony, documents, filings, and other evidence regarding confirmation of the Plan, including (a) all of the exhibits admitted into evidence;[4] (b) the sworn testimony of (i) James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer and a member of the Board of Directors of Strand Advisors, Inc. ("Strand"), the Debtor's general partner; (ii) John S. Dubel, a member of the Board of Strand; (iii) Marc Tauber, a Vice President at Aon Financial Services; and (iv) Robert Jason Post, the Chief Compliance Officer of NexPoint Advisors, LP (collectively, the "Witnesses"); (c) the credibility of the Witnesses; and (d) the Voting Certifications.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor,

the Bankruptcy Court hereby makes and issues the following findings of fact and conclusions of

law:

---

[3] Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in this Chapter 11 Case, as applicable.

[4] The Court admitted the following exhibits into evidence: (a) all of the Debtor's exhibits lodged at Docket No. 1822 (except TTTTT, which was withdrawn by the Debtor); (b) all of the Debtor's exhibits lodged at Docket No. 1866; (c) all of the Debtor's exhibits lodged at Docket No. 1877; (d) all of the Debtor's exhibits lodged at Docket No. 1895; and (e) Exhibits 6-12 and 15-17 offered by Mr. James Dondero and lodged at Docket No. 1874.

4

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      **Findings of Fact and Conclusions of Law.**  The findings and conclusions set forth herein, together with the findings of fact and conclusions of law set forth in the record during the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.      **Introduction and Summary of the Plan.** Prior to addressing the specific requirements under the Bankruptcy Code and Bankruptcy Rules with respect to the confirmation of the Plan, the Bankruptcy Court believes it would be useful to first provide the following background of the Debtor's Chapter 11 Case, the parties involved therewith, and some of the major events that have transpired culminating in the filing and solicitation of the Plan of this very unusual case.  Before the Bankruptcy Court is the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, filed on November 24, 2020, as modified on January 22, 2021 and again on February 1, 2021.  The parties have repeatedly referred to the Plan as an "asset monetization plan" because it involves the orderly wind-down of the Debtor's estate, including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds, subject to the oversight of the Claimant Trust Oversight Board.  The Plan provides for a Claimant Trust to, among other things, manage and monetize the Claimant Trust Assets for the benefit of the Debtor's economic stakeholders.  The Claimant Trustee is responsible

for this process, among other duties specified in the Plan's Claimant Trust Agreement.  There is also anticipated to be a Litigation Sub-trust established for the purpose of pursuing certain avoidance or other causes of action for the benefit of the Debtor's economic constituents.

3.      **Confirmation Requirements Satisfied.**  The Plan is supported by the Committee and all claimants with Convenience Claims (*i.e.*, general unsecured claims under $1 million) who voted in Class 7.  Claimants with Class 8 General Unsecured Claims, however, voted to reject the Plan because, although the Plan was accepted by 99.8% of the amount of Claims in that class, only 17 claimants voted to accept the Plan while 27 claimants voted to reject the Plan. As a result of such votes, and because Mr. Dondero and the Dondero Related Entities (as defined below) objected to the Plan on a variety of grounds primarily relating to the Plan's release, exculpation and injunction provisions, the Bankruptcy Court heard two full days of evidence on February 2 and 3, 2021, and considered testimony from five witnesses and thousands of pages of documentary evidence in determining whether the Plan satisfies the confirmation standards required under the Bankruptcy Code.  The Bankruptcy Court finds and concludes that the Plan meets all of the relevant requirements of sections 1123, 1124, and 1129, and other applicable provisions of the Bankruptcy Code, as more fully set forth below with respect to each of the applicable confirmation requirements.

4.      **Not Your Garden Variety Debtor**.  The Debtor's case is not a garden variety chapter 11 case.  The Debtor is a multibillion-dollar global investment adviser registered with the SEC, pursuant to the Investment Advisers Act of 1940.  It was founded in 1993 by James Dondero and Mark Okada.  Mark Okada resigned from his role with Highland prior to the

bankruptcy case being filed on October 16, 2019 (the "Petition Date").  Mr. Dondero controlled

the Debtor as of the Petition Date but agreed to relinquish control of it on or about January 9, 2020,

pursuant to an agreement reached with the Committee, as described below.  Although Mr. Dondero

remained with the Debtor as an unpaid employee/portfolio manager after January 9, 2020, his

employment with the Debtor terminated on October 9, 2020.  Mr. Dondero continues to work for

and/or control numerous non-debtor entities in the complex Highland enterprise.

        5.      **The Debtor**.  The Debtor is headquartered in Dallas, Texas.  As of the

Petition Date, the Debtor employed approximately 76 employees.  The Debtor is privately-owned:

(a) 99.5% by the Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment

Trust, a trust created to manage the assets of Mr. Dondero and his family; (c) 0.0627% by Mark

Okada, personally and through family trusts; and (d) 0.25% by Strand, the Debtor's general

partner.

        6.      **The Highland Enterprise.**  Pursuant to various contractual arrangements,

the Debtor provides money management and advisory services for billions of dollars of assets,

including collateralized loan obligation vehicles ("CLOs"), and other investments.  Some of these

assets are managed by the Debtor pursuant to shared services agreements with certain affiliated

entities, including other affiliated registered investment advisors. In fact, there are approximately

2,000 entities in the byzantine complex of entities under the Highland umbrella.  None of these

affiliated entities filed for chapter 11 protection.  Most, but not all, of these entities are not

subsidiaries (direct or indirect) of the Debtor.  Many of the Debtor's affiliated companies are

offshore entities, organized in jurisdictions such as the Cayman Islands and Guernsey. *See Disclosure Statement*, at 17-18.

7. **Debtor's Operational History.** The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates. For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course, primarily through a brokerage account at Jefferies, LLC. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and cause those proceeds to be distributed to the Debtor in the ordinary course of business. The Debtor's current Chief Executive Officer, James P. Seery, Jr., credibly testified at the Confirmation Hearing that the Debtor was "run at a deficit for a long time and then would sell assets or defer employee compensation to cover its deficits." The Bankruptcy Court cannot help but wonder if that was necessitated because of enormous litigation fees and expenses incurred by the Debtor due to its culture of litigation—as further addressed below.

8. **Not Your Garden Variety Creditor's Committee**. The Debtor and this chapter 11 case are not garden variety for so many reasons. One of the most obvious standouts in this case is the creditor constituency. The Debtor did not file for bankruptcy because of any of the typical reasons that large companies file chapter 11. For example, the Debtor did not have a large, asset-based secured lender with whom it was in default; it only had relatively insignificant secured indebtedness owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank. The Debtor also did not have problems with its trade vendors or landlords.

The Debtor also did not suffer any type of catastrophic business calamity. In fact, the Debtor filed for Chapter 11 protection six months before the onset of the COVID-19 pandemic. Rather, the Debtor filed for Chapter 11 protection due to a myriad of massive, unrelated, business litigation claims that it faced—many of which had finally become liquidated (or were about to become liquidated) after a decade or more of contentious litigation in multiple forums all over the world. The Committee in this case has referred to the Debtor—under its former chief executive, Mr. Dondero—as a "serial litigator." The Bankruptcy Court agrees with that description. By way of example, the members of the Committee (and their history of litigation with the Debtor and others in the Highland complex) are as follows:

a. **The Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee")**. This Committee member obtained an arbitration award against the Debtor in the amount of $190,824,557, inclusive of interest, approximately five months before the Petition Date, from a panel of the American Arbitration Association. It was on the verge of having that award confirmed by the Delaware Chancery Court immediately prior to the Petition Date, after years of disputes that started in late 2008 (and included legal proceedings in Bermuda). This creditor's claim was settled during this Chapter 11 Case in the amount of approximately $137,696,610 (subject to other adjustments and details not relevant for this purpose).

b. **Acis Capital Management, L.P., and Acis Capital Management GP, LLC ("Acis")**. Acis was formerly in the Highland complex of companies, but was not affiliated with Highland as of the Petition Date. This Committee member and its now-owner, Joshua Terry, were involved in litigation with the Debtor dating back to 2016. Acis was forced by Mr. Terry (who was a former Highland portfolio manager) into an involuntary chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of Texas, Dallas Division before the Bankruptcy Court in 2018, after Mr. Terry obtained an approximately $8 million arbitration award and judgment against Acis. Mr. Terry ultimately was awarded the equity ownership of Acis by the Bankruptcy Court in the Acis bankruptcy case. Acis subsequently asserted a multi-million dollar claim against Highland in the Bankruptcy Court for Highland's alleged denuding of Acis to defraud its creditors—primarily Mr. Terry. The litigation involving Acis and Mr. Terry dates back to mid-2016 and has

continued on with numerous appeals of Bankruptcy Court orders, including one appeal still pending at the Fifth Circuit Court of Appeals. There was also litigation involving Mr. Terry and Acis in the Royal Court of the Island of Guernsey and in a state court in New York. The Acis claim was settled during this Chapter 11 Case, in Bankruptcy Court-ordered mediation, for approximately $23 million (subject to other details not relevant for this purpose), and is the subject of an appeal being pursued by Mr. Dondero.

c. **UBS Securities LLC and UBS AG London Branch ("UBS").** UBS is a Committee member that filed a proof of claim in the amount of $1,039,957,799.40 in this Chapter 11 Case. The UBS Claim was based on a judgment that UBS received from a New York state court in 2020. The underlying decision was issued in November 2019, after a multi-week bench trial (which had occurred many months earlier) on a breach of contract claim against non-Debtor entities in the Highland complex. The UBS litigation related to activities that occurred in 2008 and 2009. The litigation involving UBS and Highland and affiliates was pending for more than a decade (there having been numerous interlocutory appeals during its history). The Debtor and UBS recently announced an agreement in principle for a settlement of the UBS claim (which came a few months after Bankruptcy Court-ordered mediation) which will be subject to a 9019 motion to be filed with the Bankruptcy Court on a future date.

d. **Meta-E Discovery ("Meta-E").** Meta-E is a Committee member that is a vendor who happened to supply litigation and discovery-related services to the Debtor over the years. It had unpaid invoices on the Petition Date of more than $779,000.

It is fair to say that the members of the Committee in this case all have wills of steel. They fought hard before and during this Chapter 11 Case. The members of the Committee, all of whom have volunteered to serve on the Claimant Trust Oversight Board post-confirmation, are highly sophisticated and have had highly sophisticated professionals representing them. They have represented their constituency in this case as fiduciaries extremely well.

9. **Other Key Creditor Constituents.** In addition to the Committee members who were all embroiled in years of litigation with Debtor and its affiliates in various ways, the Debtor has been in litigation with Patrick Daugherty, a former limited partner and employee of the Debtor, for many years in both Delaware and Texas state courts. Mr. Daugherty filed an amended

proof of claim in this Chapter 11 Case for $40,710,819.42 relating to alleged breaches of employment-related agreements and for defamation arising from a 2017 press release posted by the Debtor.  The Debtor and Mr. Daugherty recently announced a settlement of Mr. Daugherty's claim pursuant to which he will receive $750,000 in cash on the Effective Date of the Plan, an $8.25 million general unsecured claim, and a $2.75 million subordinated claim (subject to other details not relevant for this purpose).  Additionally, entities collectively known as "HarbourVest" invested more than $70 million with an entity in the Highland complex and asserted a $300 million proof of claim against the Debtor in this case, alleging, among other things, fraud and RICO violations.  HarbourVest's claim was settled during the bankruptcy case for a $45 million general unsecured claim and a $35 million subordinated claim, and that settlement is also being appealed by a Dondero Entity.

10.     **Other Claims Asserted.**  Other than the Claims just described, most of the other Claims in this Chapter 11 Case are Claims asserted against the Debtor by: (a) entities in the Highland complex—most of which entities the Bankruptcy Court finds to be controlled by Mr. Dondero; (b) employees who contend that are entitled to large bonuses or other types of deferred compensation; and (c) numerous law firms that worked for the Debtor prior to the Petition Date and had outstanding amounts due for their prepetition services.

11.     **Not Your Garden Variety Post-Petition Corporate Governance Structure**.  Yet another reason this is not your garden variety chapter 11 case is its post-petition corporate governance structure.  Immediately from its appointment, the Committee's relationship with the Debtor was contentious at best.  First, the Committee moved for a change of venue from

11

Delaware to Dallas.  Second, the Committee (and later, the United States Trustee) expressed its then-desire for the appointment of a chapter 11 trustee due to its concerns over and distrust of Mr. Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and perhaps worse).

12.     **Post-Petition Corporate Governance Settlement with Committee.**  After spending many weeks under the threat of the potential appointment of a trustee, the Debtor and Committee engaged in substantial and lengthy negotiations resulting in a corporate governance settlement approved by the Bankruptcy Court on January 9, 2020.[5]  As a result of this settlement, among other things, Mr. Dondero relinquished control of the Debtor and resigned his positions as an officer or director of the Debtor and its general partner, Strand.  As noted above, Mr. Dondero agreed to this settlement pursuant a stipulation he executed,[6] and he also agreed not to cause any Related Entity (as defined in the Settlement Motion) to terminate any agreements with the Debtor. The January 9 Order also (a) required that the Bankruptcy Court serve as "gatekeeper" prior to the commencement of any litigation against the three independent board members appointed to oversee and lead the Debtor's restructuring in lieu of Mr. Dondero and (b) provided for the exculpation of those board members by limiting claims subject to the "gatekeeper" provision to those alleging willful misconduct and gross negligence.

---

[5] This order is hereinafter referred to as the "January 9 Order" and was entered by the Court on January 9, 2020 [Docket No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").

[6] *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Docket No. 338] (the "Stipulation").

13.   **Appointment of Independent Directors.**   As part of the Bankruptcy Court-approved settlement, three eminently qualified independent directors were chosen to lead Highland through its Chapter 11 Case.  They are:  James P. Seery, Jr., John S. Dubel (each chosen by the Committee), and Retired Bankruptcy Judge Russell Nelms.  These three individuals are each technically independent directors of Strand (Mr. Dondero had previously been the sole director of Strand and, thus, the sole person in ultimate control of the Debtor).   The three independent board members' resumes are in evidence.  The Bankruptcy Court later approved Mr. Seery's appointment as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative.   Suffice it to say that this settlement and the appointment of the independent directors changed the entire trajectory of the case and saved the Debtor from the appointment of a trustee.  The Bankruptcy Court and the Committee each trusted the independent directors.  They were the right solution at the right time.  Because of the unique character of the Debtor's business, the Bankruptcy Court believed the appointment of three qualified independent directors was a far better outcome for creditors than the appointment of a conventional chapter 11 trustee.  Each of the independent directors brought unique qualities to the table.  Mr. Seery, in particular, knew and had vast experience at prominent firms with high-yield and distressed investing similar to the Debtor's business.  Mr. Dubel had 40 years of experience restructuring large complex businesses and serving on boards in this context.  And Retired Judge Nelms had not only vast bankruptcy experience but seemed particularly well-suited to help the Debtor maneuver through conflicts and ethical quandaries.  By way of comparison, in the chapter 11 case of Acis, the former affiliate of Highland that the Bankruptcy Court presided over and which company was

much smaller in size and scope than Highland (managing only 5-6 CLOs), the creditors elected a chapter 11 trustee who was not on the normal trustee rotation panel in this district but, rather, was a nationally known bankruptcy attorney with more than 45 years of large chapter 11 experience. While the Acis chapter 11 trustee performed valiantly, he was sued by entities in the Highland complex shortly after he was appointed (which the Bankruptcy Court had to address). The Acis trustee was also unable to persuade the Debtor and its affiliates to agree to any actions taken in the case, and he finally obtained confirmation of Acis' chapter 11 plan over the objections of the Debtor and its affiliates on his fourth attempt (which confirmation was promptly appealed).

14. **Conditions Required by Independent Directors.** Given the experiences in Acis and the Debtor's culture of constant litigation, it was not as easy to get such highly qualified persons to serve as independent board members and, later, as the Debtor's Chief Executive Officer, as it would be in an ordinary chapter 11 case. The independent board members were stepping into a morass of problems. Naturally, they were worried about getting sued no matter how defensible their efforts—given the litigation culture that enveloped Highland historically. Based on the record of this Case and the proceedings in the Acis chapter 11 case, it seemed as though everything always ended in litigation at Highland. The Bankruptcy Court heard credible testimony that none of the independent directors would have taken on the role of independent director without (1) an adequate directors and officers' ("D&O") insurance policy protecting them; (2) indemnification from Strand that would be guaranteed by the Debtor; (3) exculpation for mere negligence claims; and (4) a gatekeeper provision prohibiting the commencement of litigation against the independent directors without the Bankruptcy Court's prior authority. This gatekeeper provision was also

14

App. 48

included in the Bankruptcy Court's order authorizing the appointment of Mr. Seery as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative entered on July 16, 2020.[7]  The gatekeeper provisions in both the January 9 Order and July 16 Order are precisely analogous to what bankruptcy trustees have pursuant to the so-called "Barton Doctrine" (first articulated in an old Supreme Court case captioned *Barton v. Barbour,* 104 U.S. 126 (1881)). The Bankruptcy Court approved all of these protections in the January 9 Order and the July 16 Order, and no one appealed either of those orders.  As noted above, Mr. Dondero signed the Stipulation that led to the settlement that was approved by the January 9 Order.  The Bankruptcy Court finds that, like the Committee, the independent board members have been resilient and unwavering in their efforts to get the enormous problems in this case solved.  They seem to have at all times negotiated hard and in good faith, which culminated in the proposal of the Plan currently before the Bankruptcy Court.  As noted previously, they completely changed the trajectory of this case.

15.     **Not Your Garden Variety Mediators.**  And still another reason why this was not your garden variety case was the mediation effort.  In the summer of 2020, roughly nine months into the chapter 11 case, the Bankruptcy Court ordered mediation among the Debtor, Acis, UBS, the Redeemer Committee, and Mr. Dondero.  The Bankruptcy Court selected co-mediators because mediation among these parties seemed like such a Herculean task—especially during COVID-19 where people could not all be in the same room.  Those co-mediators were:  Retired

---

[7] *See Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020 (the "July 16 Order")

15

Bankruptcy Judge Alan Gropper from the Southern District of New York, who had a distinguished career presiding over complex chapter 11 cases, and Ms. Sylvia Mayer, who likewise has had a distinguished career, first as a partner at a preeminent law firm working on complex chapter 11 cases, and subsequently as a mediator and arbitrator in Houston, Texas.  As noted earlier, the Redeemer Committee and Acis claims were settled during the mediation—which seemed nothing short of a miracle to the Bankruptcy Court—and the UBS claim was settled several months later and the Bankruptcy Court believes the ground work for that ultimate settlement was laid, or at least helped, through the mediation.  And, as earlier noted, other significant claims have been settled during this case, including those of HarbourVest (who asserted a $300 million claim) and Patrick Daugherty (who asserted a $40 million claim).  The Bankruptcy Court cannot stress strongly enough that the resolution of these enormous claims—and the acceptance by all of these creditors of the Plan that is now before the Bankruptcy Court—seems nothing short of a miracle. It was more than a year in the making.

16.     **Not Your Garden Variety Plan Objectors (That Is, Those That Remain**).  Finally, a word about the current, remaining objectors to the Plan before the Bankruptcy Court.  Once again, the Bankruptcy Court will use the phrase "not your garden variety", which phrase applies to this case for many reasons.  Originally, there were over a dozen objections filed to the Plan.  The Debtor then made certain amendments or modifications to the Plan to address some of these objections, none of which require further solicitation of the Plan for reasons set forth in more detail below.  The only objectors to the Plan left at the time of the Confirmation Hearing

DOCS_SF:104487.21 36027/002

were Mr. Dondero [Docket No. 1661] and entities that the Bankruptcy Court finds are owned

and/or controlled by him and that filed the following objections:

    a.    *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* (filed by Get Good Trust and The Dugaboy Investment Trust) [Docket No. 1667];

    b.    *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670];

    c.    A *Joinder to the Objection filed at 1670 by:  NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing* [Docket No. 1677];

    d.    *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; and

    e.    *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676].  The entities referred to in (i) through (v) of this paragraph are hereinafter referred to as the "Dondero Related Entities").

    17.    **Questionability of Good Faith as to Outstanding Confirmation**

**Objections.**  Mr. Dondero and the Dondero Related Entities technically have standing to object to

the Plan, but the remoteness of their economic interests is noteworthy, and the Bankruptcy Court

DOCS_SF:104487.21 36027/002

**App. 51**

questions the good faith of Mr. Dondero's and the Dondero Related Entities' objections.  In fact, the Bankruptcy Court has good reason to believe that these parties are not objecting to protect economic interests they have in the Debtor but to be disruptors.  Mr. Dondero wants his company back.  This is understandable, but it is not a good faith basis to lob objections to the Plan.  As detailed below, the Bankruptcy Court has slowed down plan confirmation multiple times and urged the parties to talk to Mr. Dondero in an attempt to arrive at what the parties have repeatedly referred to as a "grand bargain," the ultimate goal to resolve the Debtor's restructuring.  The Debtor and the Committee represent that they have communicated with Mr. Dondero regarding a grand bargain settlement, and the Bankruptcy Court believes that they have.

18.     **Remote Interest of Outstanding Confirmation Objectors.**  To be specific about the remoteness of Mr. Dondero's and the Dondero Related Entities' interests, the Bankruptcy Court will address them each separately.  First, Mr. Dondero has a pending objection to the Plan.  Mr. Dondero's only economic interest with regard to the Debtor is an unliquidated indemnification claim (and, based on everything the Bankruptcy Court has heard, his indemnification claims would be highly questionable at this juncture).  Mr. Dondero owns no equity in the Debtor directly.  Mr. Dondero owns the Debtor's general partner, Strand, which in turn owns a quarter percent of the total equity in the Debtor.  Second, a joint objection has been filed by The Dugaboy Trust ("Dugaboy") and the Get Good Trust ("Get Good").  The Dugaboy Trust was created to manage the assets of Mr. Dondero and his family and owns a 0.1866% limited partnership interest in the Debtor.  *See* Disclosure Statement at 7, n.3.  The Bankruptcy Court is not clear what economic interest the Get Good Trust has, but it likewise seems to be related to Mr. Dondero.  Get Good

filed three proofs of claim relating to a pending federal tax audit of the Debtor's 2008 return, which

the Debtor believes arise from Get Good's equity security interests and are subject to subordination

as set forth in its Confirmation Brief. Dugaboy filed three claims against the Debtor: (a) an

administrative claim relating to the Debtor's alleged postpetition management of Multi-Strat

Credit Fund, L.P., (b) a prepetition claim against a subsidiary of the Debtor for which it seeks to

pierce the corporate veil, each of which the Debtor maintains are frivolous in the Confirmation

Brief, and (c) a claim arising from its equity security interest in the Debtor, which the Debtor

asserts should be subordinated. Another group of objectors that has joined together in one

objection is what the Bankruptcy Court will refer to as the "Highland Advisors and Funds." *See*

Docket No. 1863. The Bankruptcy Court understands they assert disputed administrative expense

claims against the estate that were filed shortly before the Confirmation Hearing on January 23,

2021 [Docket No. 1826], and during the Confirmation Hearing on February 3, 2021 [Docket No.

1888]. At the Confirmation Hearing, Mr. Post testified on behalf of the Highland Advisors and

Funds that the Funds have independent board members that run the Funds, but the Bankruptcy

Court was not convinced of their independence from Mr. Dondero because none of the so-called

independent board members have ever testified before the Bankruptcy Court and all have been

engaged with the Highland complex for many years. Notably, the Court questions Mr. Post's

credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in

October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request,

and he is currently employed by Mr. Dondero. Moreover, Dustin Norris, a witness in a prior

proceeding (whose testimony was made part of the record at the Confirmation Hearing), recently

testified on behalf of the Highland Advisors and Funds in another proceeding that Mr. Dondero owned and/or controlled these entities.  Finally, various NexBank entities objected to the Plan.  The Bankruptcy Court does not believe they have liquidated claims against the Debtor.  Mr. Dondero appears to be in control of these entities as well.

19.     **Background Regarding Dondero Objecting Parties.**  To be clear, the Bankruptcy Court has allowed all these objectors to fully present arguments and evidence in opposition to confirmation, even though their economic interests in the Debtor appear to be extremely remote and the Bankruptcy Court questions their good faith.  Specifically, the Bankruptcy Court considers them all to be marching pursuant to the orders of Mr. Dondero.  In the recent past, Mr. Dondero has been subject to a temporary restraining order and preliminary injunction by the Bankruptcy Court for interfering with Mr. Seery's management of the Debtor in specific ways that were supported by evidence.  Around the time that this all came to light and the Bankruptcy Court began setting hearings on the alleged interference, Mr. Dondero's company phone, which he had been asked to turn in to Highland, mysteriously went missing.  The Bankruptcy Court merely mentions this in this context as one of many reasons that the Bankruptcy Court has to question the good faith of Mr. Dondero and his affiliates in raising objections to confirmation of the Plan.

20.     **Other Confirmation Objections.**  Other than the objections filed by Mr. Dondero and the Dondero Related Entities, the only other pending objection to the Plan is the *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1671], which objected to the Plan's exculpation, injunction, and

**App. 54**

Debtor release provisions.  In juxtaposition, to these pending objections, the Bankruptcy Court

notes that the Debtor resolved the following objections to the Plan:

a.   *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph VV of the Confirmation Order;

b.   *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph QQ of the Confirmation Order;

c.   *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph 82 and paragraphs RR and SS of the Confirmation Order;

d.   *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666] and the amended joinder filed by Davis Deadman, Paul Kauffman and Todd Travers [Docket No. 1679].  This Objection and the amended joinder were resolved by agreement of the parties pursuant to modifications to the Plan filed by the Debtor;

e.   *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraphs TT and UU of the Confirmation Order; and

f.   *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678].  This objection was resolved by the parties pursuant to the settlement of Mr. Daugherty's claim announced on the record of the Confirmation Hearing.

21.   **Capitalized Terms.**  Capitalized terms used herein, but not defined herein,

shall have the respective meanings attributed to such terms in the Plan and the Disclosure

Statement, as applicable.

22.     **Jurisdiction and Venue.**  The Bankruptcy Court has jurisdiction over the Debtor's Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Chapter 11 Case is proper in this district and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

23.     **Chapter 11 Petition.**  On the Petition Date, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, which case was transferred to the Bankruptcy Court on December 19, 2019.  The Debtor continues to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Chapter 11 Case.  The Office of the United States Trustee appointed the Committee on October 29, 2019.

24.     **Judicial Notice.**  The Bankruptcy Court takes judicial notice of the docket in this Chapter 11 Case maintained by the clerk of the Bankruptcy Court and the court-appointed claims agent, Kurtzman Carson Consultants LLC ("KCC"), including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during this Chapter 11 Case, including, without limitation, the hearing to consider the adequacy of the Disclosure Statement and the Confirmation Hearing, as well as all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings held before the Bankruptcy Court or the District Court for the Northern District of Texas in

DOCS_SF:104487.21 36027/002

connection with an adversary proceeding or appellate proceeding, respectively, related to this Chapter 11 Case.

25. **Plan Supplement Documents.**  Prior to the Confirmation Hearing, the Debtor filed each of the Plan Supplements.  The Plan Supplements contain, among other documents, the Retained Causes of Action, the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Senior Employee Stipulation, the Related Entity List, the Schedule of Employees, the Reorganized Limited Partnership Agreement, supplements to the Liquidation Analysis/Financial Projections, the Schedule of Contracts and Leases to be Assumed, and the other Plan Documents set forth therein (collectively, the "Plan Supplement Documents").

26. **Retained Causes of Action Adequately Preserved.**  The Bankruptcy Court finds that the list of Retained Causes of Action included in the Plan Supplements sufficiently describes all potential Retained Causes of Action, provides all persons with adequate notice of any Causes of Action regardless of whether any specific claim to be brought in the future is listed therein or whether any specific potential defendant or other party is listed therein, and satisfies applicable law in all respects to preserve all of the Retained Causes of Action. The definition of the Causes of Action and Schedule of Retained Causes of Action, and their inclusion in the Plan, specifically and unequivocally preserve the Causes of Action for the benefit of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust, as applicable.

27. **Plan Modifications Are Non-Material.**  In addition to the Plan Supplements, the Debtor made certain non-material modifications to the Plan, which are reflected in (i) the *Redline of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*

23

*(as Modified)* filed on January 22, 2021 [Docket No. 1809], and (ii) Exhibit B to the *Debtor's Notice of Filing of Plan Supplement to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* filed on February 1, 2021 [Docket No. 1875] (collectively, the "Plan Modifications").  Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation so long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  None of the modifications set forth in the Plan Supplements or the Plan Modifications require any further solicitation pursuant to sections 1125, 1126, or 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, because, among other things, they do not materially adversely change the treatment of the claims of any creditors or interest holders who have not accepted, in writing, such supplements and modifications.  Among other things, there were changes to the projections that the Debtor filed shortly before the Confirmation Hearing (which included projected distributions to creditors and a comparison of projected distributions under the Plan to potential distributions under a hypothetical chapter 7 liquidation).  The Plan Supplements and Plan Modifications did not mislead or prejudice any creditors or interest holders nor do they require that Holders of Claims or Equity Interests be afforded an opportunity to change previously cast votes to accept or reject the Plan. Specifically, the Amended Liquidation Analysis/Financial Projections filed on February 1, 2021 [Docket No. 1875] do not constitute any material adverse change to the treatment of any creditors or interest holders but, rather, simply update the estimated distributions based on Claims that were settled in the interim and provide updated financial data.  The filing and notice of the Plan Supplements and Plan Modifications were appropriate and complied with the requirements of

DOCS_SF:104487.21 36027/002

section 1127(a) of the Bankruptcy Code and the Bankruptcy Rules, and no other solicitation or disclosure or further notice is or shall be required.  The Plan Supplements and Plan Modifications each became part of the Plan pursuant section 1127(a) of the Bankruptcy Code.  The Debtor or Reorganized Debtor, as applicable, is authorized to modify the Plan or Plan Supplement Documents following entry of this Confirmation Order in a manner consistent with section 1127(b) of the Bankruptcy Code, the Plan, and, if applicable, the terms of the applicable Plan Supplement Document.

28.     **Notice of Transmittal, Mailing and Publication of Materials.**  As is evidenced by the Voting Certifications and the Affidavits of Service and Publication, the transmittal and service of the Plan, the Disclosure Statement, Ballots, and Confirmation Hearing Notice were adequate and sufficient under the circumstances, and all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to the confirmation of the Plan) have been given due, proper, timely, and adequate notice in accordance with the Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and such parties have had an opportunity to appear and be heard with respect thereto.  No other or further notice is required. The publication of the Confirmation Hearing Notice, as set forth in the *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505], complied with the Disclosure Statement Order.

29.     **Voting.**  The Bankruptcy Court has reviewed and considered the Voting Certifications.  The procedures by which the Ballots for acceptance or rejection of the Plan were

distributed and tabulated, including the tabulation as subsequently amended to reflect the settlement of certain Claims to be Allowed in Class 7, were fairly and properly conducted and complied with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

30.     **Bankruptcy Rule 3016(a).**  In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtor as the proponent of the Plan.

31.     **Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**  As set forth below, the Plan complies with all of the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

32.     **Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).**  Section 1122 of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class.  The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Equity Interests.

33.     **Classification of Secured Claims.**  Class 1 (Jefferies Secured Claim) and Class 2 (Frontier Secured Claim) each constitute separate secured claims held by Jefferies LLC and Frontier State Bank, respectively, and it is proper and consistent with section 1122 of the Bankruptcy Code to separately classify the claims of these secured creditors.  Class 3 (Other

Secured Claims) consists of other secured claims (to the extent any exist) against the Debtor, are not substantially similar to the Secured Claims in Class 1 or Class 2, and are also properly separately classified.

34. **Classification of Priority Claims.** Class 4 (Priority Non-Tax Claims) consists of Claims entitled to priority under section 507(a), other than Priority Tax Claims, and are properly separately classified from non-priority unsecured claims. Class 5 (Retained Employee Claims) consists of the potential claims of employees who may be retained by the Debtor on the Effective Date, which claims will be Reinstated under the Plan, are not substantially similar to other Claims against the Debtor, and are properly classified.

35. **Classification of Unsecured Claims.** Class 6 (PTO Claims) consists solely of the claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other unsecured claims in Class 7 and Class 8. Class 7 (Convenience Claims) allows holders of eligible and liquidated Claims (below a certain threshold dollar amount) to receive a cash payout of the lesser of 85% of the Allowed amount of the creditor's Claim or such holder's *pro rata* share of the Convenience Claims Cash Pool. Class 7 (Convenience Claims) are provided for administrative convenience purposes in order to allow creditors, most of whom are either trade creditors or holders of professional claims, to receive treatment provided under Class 7 in lieu of the treatment of Class 8 (General Unsecured Claims). The Plan also provides for reciprocal "opt out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8 Claims. Class 8 creditors primarily constitute the litigation claims of the Debtor. Class 8 Creditors

27

will receive Claimant Trust Interests which will be satisfied pursuant to the terms of the Plan. Class 8 also contains an "opt out" mechanism to allow holders of liquidated Class 8 Claims at or below a $1 million threshold to elect to receive the treatment of Class 7 Convenience Claims. The Claims in Class 7 (primarily trade and professional Claims against the Debtor) are not substantially similar to the Claims in Class 8 (primarily the litigation Claims against the Debtor), and are appropriately separately classified. Valid business reasons also exist to classify creditors in Class 7 separately from creditors in Class 8. Class 7 creditors largely consist of liquidated trade or service providers to the Debtor. In addition, the Claims of Class 7 creditors are small relative to the large litigation claims in Class 8. Furthermore, the Class 8 Claims were overwhelmingly unliquidated when the Plan was filed. The nature of the Class 7 Claims as being largely liquidated created an expectation of expedited payment relative to the largely unliquidated Claims in Class 8, which consists in large part of parties who have been engaged in years, and in some cases over a decade of litigation with the Debtor. Separate classification of Class 7 and Class 8 creditors was the subject of substantial arm's-length negotiations between the Debtor and the Committee to appropriately reflect these relative differences.

36.    **Classification of Equity Interests.** The Plan properly separately classifies the Equity Interests in Class 10 (Class B/C Limited Partnership Interests) from the Equity Interests in Class 11 (Class A Limited Partnership Interests) because they represent different types of equity security interests in the Debtor and different payment priorities.

37.    **Elimination of Vacant Classes.** Section III.C of the Plan provides for the elimination of Classes that do not have at least one holder of a Claim or Equity Interest that is

DOCS_SF:104487.21 36027/002

Allowed in an amount greater than zero for purposes of voting to accept or reject the Plan, and are disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class. The purpose of this provision is to provide that a Class that does not have voting members shall not be included in the tabulation of whether that Class has accepted or rejected the Plan. Pursuant to the Voting Certifications, the only voting Class of Claims or Equity Interests that did not have any members is Class 5 (Retained Employees). As noted above, Class 5 does not have any voting members because any potential Claims in Class 5 would not arise, except on account of any current employees of the Debtor who may be employed as of the Effective Date, which is currently unknown. Thus, the elimination of vacant Classes provided in Article III.C of the Plan does not violate section 1122 of the Bankruptcy Code. Class 5 is properly disregarded for purposes of determining whether or not the Plan has been accepted under Bankruptcy Code section 1129(a)(8) because there are no members in that Class. However, the Plan properly provides for the treatment of any Claims that may potentially become members of Class 5 as of the Effective Date in accordance with the terms of the Plan. The Plan therefore satisfies section 1122 of the Bankruptcy Code.

38. **Classification of Claims and Designation of Non-Classified Claims (11 U.S.C. §§ 1122, 1123(a)(1)).** Section 1123(a)(1) of the Bankruptcy Code requires that the Plan specify the classification of claims and equity security interests pursuant to section 1122 of the Bankruptcy Code, other than claims specified in sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code. In addition to Administrative Claims, Professional Fee Claims, and Priority Tax Claims, each of which need not be classified pursuant to section 1123(a)(1) of the Bankruptcy

DOCS_SF:104487.21 36027/002

Code, the Plan designates eleven (11) Classes of Claims and Equity Interests. The Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

39. **Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2)).** Article III of the Plan specifies that each of Class 1 (Jefferies Secured Claim), Class 3 (Other Secured Claims), Class 4 (Priority Non-Tax Claims), Class 5 (Retained Employee Claims), and Class 6 (PTO Claims) are Unimpaired under the Plan. Thus, the requirement of section 1123(a)(2) of the Bankruptcy Code is satisfied.

40. **Specification of Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).** Article III of the Plan designates each of Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), Class 8 (General Unsecured Claims), Class 9 (Subordinated Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) as Impaired and specifies the treatment of Claims and Equity Interests in such Classes. Thus, the requirement of section 1123(a)(3) of the Bankruptcy Code is satisfied.

41. **No Discrimination (11 U.S.C. § 1123(a)(4)).** The Plan provides for the same treatment by the Plan proponent for each Claim or Equity Interest in each respective Class unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest. The Plan satisfies this requirement because Holders of Allowed Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such holder's respective class, subject only to the voluntary "opt out" options afforded to members of Class 7 and Class 8 in accordance with the terms of the Plan. Thus, the requirement of section 1123(a)(4) of the Bankruptcy Code is satisfied.

42.     **Implementation of the Plan (11 U.S.C. § 1123(a)(5)).**  Article IV of the

Plan sets forth the means for implementation of the Plan which includes, but is not limited to, the

establishment of:  (i) the Claimant Trust; (ii) the Litigation Sub-Trust; (iii) the Reorganized Debtor;

and (iv) New GP LLC, in the manner set forth in the Plan Documents, the forms of which are

included in the Plan Supplements.

a.     **The Claimant Trust.**  The Claimant Trust Agreement provides for the management of the Claimant Trust, as well as the Reorganized Debtor with the Claimant Trust serving as the managing member of New GP LLC (a wholly-owned subsidiary of the Claimant Trust that will manage the Reorganized Debtor as its general partner).  The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will all be managed and overseen by the Claimant Trust Oversight Committee.  Additionally, the Plan provides for the transfer to the Claimant Trust of all of the Debtor's rights, title, and interest in and to all of the Claimant Trust Assets in accordance with section 1141 of the Bankruptcy Code and for the Claimant Trust Assets to automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement.  The Claimant Trust will administer the Claimant Trust Assets as provided under the Plan and the Claimant Trust Agreement contained in the Plan Supplements.

b.     **The Litigation Sub-Trust.**  The Plan and the Litigation Sub-Trust Agreement provide for the transfer to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims (as transferred to the Claimant Trust by the Debtor) in accordance with section 1141 of the Bankruptcy Code and for the Estate Claims to automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and the Litigation Sub-Trust Expenses, as provided for in the Litigation Sub-Trust Agreement.   The Litigation Trustee is charged with investigating, pursuing, and otherwise resolving any Estate Claims (including those with respect to which the Committee has standing to pursue prior to the Effective Date pursuant to the January 9 Order) pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, regardless of whether any litigation with respect to any Estate Claim was commenced by the Debtor or the Committee prior to the Effective Date.

  c.  **The Reorganized Debtor**. The Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds.

The precise terms governing the execution of these restructuring transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, and the Schedule of Retained Causes of Action. The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan. The Plan's various mechanisms provide for the Debtor's continued management of its business as it seeks to liquidate the Debtor's assets, wind down its affairs, and pay the Claims of the Debtor's creditors. Upon full payment of Allowed Claims, plus interest as provided in the Plan, any residual value would then flow to the holders of Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests). Finally, Mr. Seery testified that the Debtor engaged in substantial and arm's length negotiations with the Committee regarding the Debtor's post-Effective Date corporate governance, as reflected in the Plan. Mr. Seery testified that he believes the selection of the Claimant Trustee, Litigation Trustee, and members of the Claimant Trust Oversight Board are in the best interests of the Debtor's economic constituents. Thus, the requirements of section 1123(a)(5) of the Bankruptcy Code are satisfied.

  43.  **Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).** The Debtor is not a corporation and the charter documents filed in the Plan Supplements otherwise comply with section 1123(a)(6) of the Bankruptcy Code. Therefore, the requirement of section 1123(a)(6) of the Bankruptcy Code is satisfied.

44.     **Selection of Officers and Directors (11 U.S.C. § 1123(a)(7)).**  Article IV of the Plan provides for the Claimant Trust to be governed and administered by the Claimant Trustee.  The Claimant Trust, the management of the Reorganized Debtor, and the management and monetization of the Claimant Trust Assets and the Litigation Sub-Trust will be managed by the Claimant Trust Oversight Board.  The Claimant Trust Oversight Board will consist of:  (1) Eric Felton, as representative of the Redeemer Committee; (2) Joshua Terry, as representative of Acis; (3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of Meta-E Discovery;  and (5) David Pauker.   Four of the members of the Claimant Trust Oversight Committee are the holders of several of the largest Claims against the Debtor and/or are current members of the Committee.  Each of these creditors has actively participated in the Debtor's case, both through their fiduciary roles as Committee members and in their individual capacities as creditors.  They are therefore intimately familiar with the Debtor, its business, and assets.  The fifth member of the Claimant Trustee Oversight Board, David Pauker, is a disinterested restructuring advisor and turnaround manager with more than 25 years of experience advising public and private companies and their investors, and he has substantial experience overseeing, advising or investigating troubled companies in the financial services industry and has advised or managed such companies on behalf of boards or directors, court-appointed trustees, examiners and special masters, government agencies, and private investor parties.  The members of the Claimant Trust Oversight Board will serve without compensation, except for Mr. Pauker, who will receive payment of $250,000 for his first year of service, and $150,000 for subsequent years.

45.     **Selection of Trustees.**  The Plan Supplements disclose that Mr. Seery will serve as the Claimant Trustee and Marc Kirschner will serve as the Litigation Trustee.  As noted above, Mr. Seery has served as an Independent Board member since January 2020, and as the Chief Executive Officer and Chief Restructuring Officer since July 2020, and he has extensive management and restructuring experience, as evidenced from his curriculum vitae which is part of the record.   The evidence shows that Mr. Seery is intimately familiar with the Debtor's organizational structure, business, and assets, as well as how Claims will be treated under the Plan. Accordingly, it is reasonable and in the Estate's best interests to continue Mr. Seery's employment post-emergence as the Claimant Trustee.  Mr. Seery, upon consultation with the Committee, testified that he intends to employ approximately 10 of the Debtor's employees to enable him to manage the Debtor's business until the Claimant Trust effectively monetizes its remaining assets, instead of hiring a sub-servicer to accomplish those tasks.  Mr. Seery testified that he believes that the Debtor's post-confirmation business can most efficiently and cost-effectively be supported by a sub-set of the Debtor's current employees, who will be managed internally.  Mr. Seery shall initially be paid $150,000 per month for services rendered after the Effective Date as Claimant Trustee; however, Mr. Seery's long-term salary as Claimant Trustee and the terms of any bonuses and severance are subject to further negotiation by Mr. Seery and the Claimant Trust Oversight Board within forty-five (45) days after the Effective Date.  The Bankruptcy Court has also reviewed Mr. Kirschner's curriculum vitae.  Mr. Kirschner has been practicing law since 1967 and has substantial experience in bankruptcy litigation matters, particularly with respect to his prior experience as a litigation trustee for several litigation trusts, as set forth on the record of the

34

Confirmation Hearing and in the Confirmation Brief.  Mr. Kirschner shall be paid $40,000 per month for the first three months and $20,000 per month thereafter, plus a success fee related to litigation recoveries.  The Committee and the Debtor had arm's lengths negotiations regarding the post-Effective Date corporate governance structure of the Reorganized Debtor and believe that the selection of the Claimant Trustee, the Litigation Trustee, and the Claimant Trust Oversight Committee are in the best interests of the Debtor's economic stakeholders.  Section 1123(a)(7) of the Bankruptcy Code is satisfied.

46.     **Debtor's Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).** Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtor has complied with the applicable provisions of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, and 1126 of the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure Statement, the Plan Supplements, and all other matters considered by the Bankruptcy Court in connection with this Chapter 11 Case.

47.     **Debtor's Solicitation Complied with Bankruptcy Code and Disclosure Statement Order.**  Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered the Disclosure Statement Order.  In accordance with the Disclosure Statement Order and evidenced by the Affidavits of Service and Publication, the Debtor appropriately served (i) the Solicitation Packages (as defined in the Disclosure Statement Order) on the Holders of Claims in Classes 2, 7, 8 and 9 and Holders of Equity Interests in Classes 10 and 11 who were entitled to vote on the Plan; and (ii) the Notice of Nonvoting Status (as defined in the Disclosure Statement Order) and the

Confirmation Hearing Notice to the Holders of Claims in Classes 1, 3, 4, 5 and 6, who were not entitled to vote on the Plan pursuant to the Disclosure Statement Order. The Disclosure Statement Order approved the contents of the Solicitation Packages provided to Holders of Claims and Equity Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan, and the deadlines for voting on and objecting to the Plan. The Debtor and KCC each complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code, as evidenced by the Affidavits of Service and Publication. The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class. The Debtor caused the same Disclosure Statement to be transmitted to all holders of Claims and Equity Interests entitled to vote on the Plan. The Debtor has complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order. The Bankruptcy Court rejects the arguments of the Mr. Dondero and certain Dondero Related Entities that the changes made to certain assumptions and projections from the Liquidation Analysis annexed as Exhibit C to the Disclosure Statement (the "Liquidation Analysis") to the Amended Liquidation Analysis/Financial Projections require resolicitation of the Plan. The Bankruptcy Court heard credible testimony from Mr. Seery regarding the changes to the Liquidation Analysis as reflected in the Amended Liquidation Analysis/Financial Projections. Based on the record, including the testimony of Mr. Seery, the Bankruptcy Court finds that the changes between the Liquidation Analysis and the Amended Liquidation Analysis/Financial Projections do not constitute materially adverse change to the treatment of Claims or Equity

Interests.  Instead, the changes served to update the projected distributions based on Claims that were settled after the approval of the Disclosure Statement and to otherwise incorporate more recent financial data.  Such changes were entirely foreseeable given the large amount of unliquidated Claims at the time the Disclosure Statement was approved and the nature of the Debtor's assets.  The Bankruptcy Court therefore finds that holders of Claims and Equity Interests were not misled or prejudiced by the Amended Liquidation Analysis/Financial Projections and the Plan does not need to be resolicited.

48.    **Plan Proposed in Good Faith and Not by Means Forbidden by Law (11 U.S.C. § 1129(a)(3)).**  The Debtor has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of this Chapter 11 Case, the Plan itself, and the extensive, unrebutted testimony of Mr. Seery in which he described the process leading to Plan's formulation.  Based on the totality of the circumstances and Mr. Seery's testimony, the Bankruptcy Court finds that the Plan is the result of extensive arm's-length negotiations among the Debtor, the Committee, and key stakeholders, and promotes the objectives and purposes of the Bankruptcy Code.  Specifically, the Debtor's good faith in proposing the Plan is supported by the following facts adduced by Mr. Seery:

    a.    The Independent Board determined that it should consider all potential restructuring alternatives, including pursuit of a traditional restructuring and the continuation of the Debtor's business, a potential sale of the Debtor's assets in one or more transactions, an asset monetization plan similar to that described in the Plan, and a so-called "grand bargain" plan that would involve Mr. Dondero's sponsorship of a plan with a substantial equity infusion.

b.     The Debtor subsequently engaged in arm's-length, good faith negotiations with the Committee over an asset monetization Plan commencing in June 2020, which negotiations occurred over the next several months.

c.     Negotiations between the Debtor and the Committee were often contentious over disputes, including, but not limited to, the post-confirmation corporate governance structure and the scope of releases contemplated by the Plan.

d.     While negotiations with the Committee progressed, the Independent Board engaged in discussions with Mr. Dondero regarding a potential "grand bargain" plan which contemplated a significant equity infusion by Mr. Dondero, and which Mr. Seery personally spent hundreds of hours pursuing over many months.

e.     On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [Docket No. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation.  As a result of this mediation, the Debtor negotiated the settlement of the claims of Acis and Mr. Terry, which the Bankruptcy Court approved on October 28, 2020 [Docket No. 1302].

f.     On August 12, 2020, the Debtor filed its *Chapter 11 Plan of* Reorganization *of Highland Capital Management, L.P.* [Docket No. 944] (the "Initial Plan") and related disclosure statement (the "Initial Disclosure Statement") which were not supported by either the Committee or Mr. Dondero.  The Independent Board filed the Initial Plan and Initial Disclosure Statement in order to act as a catalyst for continued discussions with the Committee while it simultaneously worked with Mr. Dondero on the "grand bargain" plan.

g.     The Bankruptcy Court conducted a contested hearing on the Initial Disclosure Statement on October 27, 2020.  The Committee and other parties objected to approval of the Disclosure Statement at the Initial Disclosure Statement hearing, which was eventually continued to November 23, 2020.

h.     Following the Initial Disclosure Statement hearing, the Debtor continued to negotiate with the Committee and ultimately resolved the remaining material disputes and led to the Bankruptcy Court's approval of the Disclosure Statement on November 23, 2020.

i.     Even after obtaining the Bankruptcy Court's approval of the Disclosure Statement, the Debtor and the Committee continued to negotiate with Mr. Dondero and the Committee over a potential "pot plan" as an alternative to the Plan on file with the Bankruptcy Court, but such efforts were unsuccessful.  This history conclusively demonstrates that the Plan is being proposed in good faith within the meaning of section 1129(a)(3).

49. **Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**
Article II.B of the Plan provides that Professionals will file all final requests for payment of Professional Fee Claims no later than 60 days after the Effective Date, thereby providing an adequate period of time for interested parties to review such claims. The procedures set forth in the Plan for the Bankruptcy Court's approval of the fees, costs, and expenses to be paid in connection with this chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, satisfy the objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy Code.

50. **Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).** Article IV.B of the Plan provides for the appointment of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee and the members thereto. For the reasons more fully explained in paragraphs 44-45 of this Confirmation Order with respect to the requirement of section 1123(a)(7) of the Bankruptcy Code, the Debtor has disclosed the nature of compensation of any insider to be employed or retained by the Reorganized Debtor, if applicable, and compensation for any such insider. The appointment of such individuals is consistent with the interests of Claims and Equity Interests and with public policy. Thus, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

51. **No Rate Changes (11 U.S.C. § 1129(a)(6)).** The Plan does not provide for any rate change that requires regulatory approval. Section 1129(a)(6) of the Bankruptcy Code is thus not applicable.

DOCS_SF:104487.21 36027/002

52.   **Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).**  The "best interests"

test is satisfied as to all Impaired Classes under the Plan, as each Holder of a Claim or Equity

Interest in such Impaired Classes will receive or retain property of a value, as of the Effective Date

of the Plan, that is not less than the amount that such Holder would so receive or retain if the

Debtor were liquidated under chapter 7 of the Bankruptcy Code.  On October 15, 2020, the Debtor

filed the Liquidation Analysis [Docket 1173], as prepared by the Debtor with the assistance of its

advisors and which was attached as Exhibit C to the Disclosure Statement.  On January 29, 2021,

in advance of Mr. Seery's deposition in connection with confirmation of the Plan, the Debtor

provided an updated version of the Liquidation Analysis to the then-objectors of the Plan,

including Mr. Dondero and the Dondero Related Entities.  On February 1, 2021, the Debtor filed

the Amended Liquidation Analysis/Financial Projections.    The Amended Liquidation

Analysis/Financial Projections included updates to the Debtor's projected asset values, revenues,

and expenses to reflect: (1) the acquisition of an interest in an entity known as "HCLOF" that the

Debtor will acquire as part of its court-approved settlement with HarbourVest and that was valued

at $22.5 million; (2) an increase in the value of certain of the Debtor's assets due to changes in

market conditions and other factors; (3) expected revenues and expenses arising in connection with

the Debtor's continued management of the CLOs pursuant to management agreements that the

Debtor decided to retain; (4) increases in projected expenses for headcount (in addition to adding

two or three employees to assist in the management of the CLOs, the Debtor also increased

modestly the projected headcount as a result of its decision not to engage a Sub-Servicer) and

professional fees; and (5) an increase in projected recoveries on notes resulting from the

acceleration of term notes owed to the Debtor by the following Dondero Related Entities:

NexPoint Advisors, L.P.; Highland Capital Management Services, Inc.; and HCRE Partners, LLC

(n/k/a NexPoint Real Estate Partners, LLC).  Under the Plan, as of the Confirmation Date, (a) Class

7 General Unsecured Creditors are projected to receive 85% on account of their claims; and (b)

Class 8 General Unsecured Creditors are projected to receive at least approximately 71% on

account of their Claims.  Under a hypothetical chapter 7 liquidation, all general unsecured creditors

are projected to receive approximately 55% on account of their Claims.  The Bankruptcy Court

finds that the distributions that Class 7 and 8 General Unsecured Creditors are projected to receive

under the Plan substantially exceeds that which they would receive under a chapter 7 liquidation

based on Mr. Seery's testimony, including the following credible reasons he posited, among

others:

a. The nature of the Debtor's assets is complex.  Certain assets relate to complicated real estate structures and private equity investments in operating businesses.  Mr. Seery's extensive experience with the Debtor during the thirteen months since his appointment as an Independent Director and later Chief Executive Officer and Chief Restructuring Officer, provides him with a substantial learning curve in connection with the disposition of the Debtor's assets and are reasonably expected to result in him being able to realize tens of millions of dollars more value than would a chapter 7 trustee.

b. Assuming that a hypothetical chapter 7 trustee could even operate the Debtor's business under chapter 7 of the Bankruptcy Code and hire the necessary personnel with the relevant knowledge and experience to assist him or her in selling the Debtor's assets, a chapter 7 trustee would likely seek to dispose of the Debtor's assets in a forced sale liquidation which would generate substantially less value for the Debtor's creditors than the asset monetization plan contemplated by the Plan.

c. A chapter 7 trustee would be unlikely to retain the Debtor's existing professionals to assist in its efforts to monetize assets, resulting in delays, increased expenses, and reduced asset yields for the chapter 7 estate.

DOCS_SF:104487.21 36027/002

      d.      The chapter 7 estate would be unlikely to maximize value as compared to the asset monetization process contemplated by the Plan because potential buyers are likely to perceive a chapter 7 trustee as engaging in a quick, forced "fire sale" of assets; and

      e.      The Debtor's employees, who are vital to its efforts to maximum value and recoveries for stakeholders, may be unwilling to provide services to a chapter 7 trustee.

Finally, there is no evidence to support the objectors' argument that the Claimant Trust Agreement's disclaimed liability for ordinary negligence by the Claimant Trustee compared to a chapter 7 trustee's liability has any relevance to creditor recoveries in a hypothetical chapter 7 liquidation. Thus, section 1129(a)(7) of the Bankruptcy Code is satisfied.

      53.    **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).** Classes 1, 3, 4, 5 and 6 are Unimpaired under the Plan. Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 9 (Subordinated Claims) have each voted to accept the Plan in accordance with the Bankruptcy Code, thereby satisfying section 1129(a)(8) as to those Classes. However, Class 8 (General Unsecured Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) have not accepted the Plan. Accordingly, section 1129(a)(8) of the Bankruptcy Code has not been satisfied. The Plan, however, is still confirmable because it satisfies the nonconsensual confirmation provisions of section 1129(b), as set forth below.

      54.    **Treatment of Administrative, Priority, Priority Tax Claims, and Professional Fee Claims (11 U.S.C. § 1129(a)(9)).** The treatment of Administrative Claims, Priority Claims, and Professional Fee Claims pursuant to Article III of the Plan, and as set forth below with respect to the resolution of the objections filed by the Internal Revenue Service and

certain Texas taxing authorities satisfies the requirements of sections 1129(a)(9) of the Bankruptcy Code.

      55.    **Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)).**  Class 2 (Frontier Secured Claims) and Class 7 (Convenience Claims) are each Impaired Classes of Claims that voted to accept the Plan, determined without including any acceptance of the Plan by any insider.  Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code is satisfied.

      56.    **Feasibility (11 U.S.C. § 1129(a)(11)).**  Article IV of the Plan provides for the implementation of the Plan through the Claimant Trust, the Litigation Sub-Trust, and the Reorganized Debtor.  The Plan provides that the Claimant Trust, among other things, will monetize and distribute the Debtor's remaining assets.  The Disclosure Statement, the Amended Liquidation Analysis/Financial Projections, and the other evidence presented at the Confirmation Hearing provide a reasonable probability of success that the Debtor will be able to effectuate the provisions of the Plan.  The Plan contemplates the establishment of the Claimant Trust upon the Effective Date, which will monetize the Estate's assets for the benefit of creditors.  Mr. Seery testified that the Class 2 Frontier Secured Claim will be paid over time pursuant to the terms of the New Frontier Note and the Reorganized Debtor will have sufficient assets to satisfy its obligations under this note.  The Claims of the Holders of Class 7 Claims (as well as those Class 8 creditors who validly opted to receive the treatment of Class 7 Claims) are expected to be satisfied shortly after the Effective Date.  Holders of Class 8 Claims (including any holders of Class 7 Claims who opted to receive the treatment provided to Class 8 Claims) are not guaranteed any recovery and will

periodically receive pro rata distributions as assets are monetized pursuant to the Plan and the Claimant Trust Agreement. Thus, section 1129(a)(11) of the Bankruptcy Code is satisfied.

57.     **Payment of Fees (11 U.S.C. § 1129(a)(12)).**  All fees payable under 28 U.S.C. § 1930 have been paid or will be paid on or before the Effective Date pursuant to Article XII.A of the Plan, thus satisfying the requirement of section 1129(a)(12) of the Bankruptcy Code. The Debtor has agreed that the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.

58.     **Retiree Benefits.**  The Plan provides for the assumption of the Pension Plan (to the extent such Pension Plan provides "retiree benefits" and is governed by section 1114 of the Bankruptcy Code). Thus, the Plan complies with section 1129(a)(13) of the Bankruptcy Code, to the extent applicable.

59.     **Miscellaneous Provisions (11 U.S.C. §§ 1129(a)(14)-(16)).**  Sections 1129(a)(14)-(16) of the Bankruptcy Code are inapplicable as the Debtor (i) has no domestic support obligations (section 1129(a)(14)), (ii) is not an individual (section 1129(a)(15)), and (iii) is not a nonprofit corporation (section 1129(a)(16)).

60.     **No Unfair Discrimination; Fair and Equitable Treatment (11 U.S.C. § 1129(b)).**  The classification and treatment of Claims and Equity Interests in Classes 8, 10 and 11, which have not accepted the Plan, is proper pursuant to section 1122 of the Bankruptcy Code, does

44

not discriminate unfairly, and is fair and equitable pursuant to section 1129(b)(1) of the Bankruptcy

Code.

    a.    <u>Class 8</u>.  The Plan is fair and equitable with respect to Class 8 General Unsecured Claims.  While Equity Interests in Class 10 and Class 11 will receive a contingent interest in the Claimant Trust under the Plan (the "<u>Contingent Interests</u>"), the Contingent Interests will not vest unless and until holders of Class 8 General Unsecured Claims and Class 9 Subordinated Claims receive distributions equal to 100% of the amount of their Allowed Claims plus interest as provided under the Plan and Claimant Trust Agreement.  Accordingly, as the holders of Equity Interests that are junior to the Claims in Class 8 and Class 9 will not receive or retain under the Plan on account of such junior claim interest any property unless and until the Claims in Class 8 and Class 9 are paid in full plus applicable interest, the Plan is fair and equitable with respect to holders of Class 8 General Unsecured Claims pursuant to section 1129(b)(2)(B) of the Bankruptcy Code and the reasoning of *In re Introgen Therapuetics* 429 B.R 570 (Bankr. W.D. Tex. 2010).

    b.    <u>Class 10 and Class 11</u>.  There are no Claims or Equity Interests junior to the Equity Interests in Class 10 and Class 11.  Equity Interests in Class 10 and 11 will neither receive nor retain any property under the Plan unless Allowed Claims in Class 8 and Class 9 are paid in full plus applicable interest pursuant to the terms of the Plan and Claimant Trust Agreement.  Thus, the Plan does not violate the absolute priority rule with respect to Classes 10 and 11 pursuant to Bankruptcy Code section 1129(b)(2)(C).  The Plan does not discriminate unfairly as to Equity Interests.  As noted above, separate classification of the Class B/C Partnership Interests from the Class A Partnerships Interests is appropriate because they constitute different classes of equity security interests in the Debtor, and each are appropriately separately classified and treated.

Accordingly, the Plan does not violate the absolute priority rule, does not discriminate unfairly,

and is fair and equitable with respect to each Class that has rejected the Plan.  Thus, the Plan

satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 8, 10,

and 11.

61.     **Only One Plan (11 U.S.C. § 1129(c)).**  The Plan is the only chapter 11 plan confirmed in this Chapter 11 Case, and the requirements of section 1129(c) of the Bankruptcy Code are therefore satisfied.

62.     **Principal Purpose (11 U.S.C. § 1129(d)).**  Mr. Seery testified that the principal purpose of the Plan is neither the avoidance of taxes nor the avoidance of the application of section 5 of the Securities Act of 1933, and no governmental unit has objected to the confirmation of the Plan on any such grounds.  Accordingly, section 1129(d) of the Bankruptcy Code is inapplicable.

63.     **Satisfaction of Confirmation Requirements.**  Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code and should be confirmed.

64.     **Good Faith Solicitation (11 U.S.C. § 1125(e)).**  The Debtor, the Independent Directors, and the Debtor's employees, advisors, Professionals, and agents have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances of the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and they are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

65.     **Discharge (11 U.S.C. § 1141(d)(3)).**  The Debtor is entitled to a discharge of debts pursuant to section 1141(d)(3)(B) of the Bankruptcy Code.  Under the Plan, the Claimant Trust or Reorganized Debtor, as applicable, will continue to manage funds and conduct business

46

in the same manner as the Debtor did prior to Plan confirmation, which includes the management

of the CLOs, Multi-Strat, Restoration Capital, the Select Fund and the Korea Fund.  Although the

Plan projects that it will take approximately two years to monetize the Debtor's assets for fair

value, Mr. Seery testified that while the Reorganized Debtor and Claimant Trust will be

monetizing their assets, there is no specified time frame by which this process must conclude.  Mr.

Seery's credible testimony demonstrates that the Debtor will continue to engage in business after

consummation of the Plan, within the meaning of Section 1141(d)(3)(b) and that the Debtor is

entitled to a discharge pursuant to section 1141(d)(1) of the Bankruptcy Code.

66.     **Retention of Jurisdiction.**  The Bankruptcy Court may properly retain

jurisdiction over the matters set forth in Article XI of the Plan and/or section 1142 of the

Bankruptcy Code to the maximum extent under applicable law.

67.     **Additional Plan Provisions (11 U.S.C. § 1123(b)).**  The Plan's provisions

are appropriate, in the best interests of the Debtor and its Estate, and consistent with the applicable

provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

68.     **Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).**

The Debtor has exercised reasonable business judgment with respect to the rejection of the

Executory Contracts and Unexpired Leases pursuant the terms of the Plan and this Confirmation

Order, and such rejections are justified and appropriate in this Chapter 11 Case.  The Debtor also

filed the List of Assumed Contracts, which contain notices to the applicable counterparties to the

contracts set forth on Exhibit "FF" to Plan Supplement filed on February 1, 2021 [Docket No.

1875] and which exhibit sets forth the list of executory contracts and unexpired leases to be

assumed by the Debtor pursuant to the Plan (collectively, the "Assumed Contracts"). With respect to the Assumed Contracts, only one party objected to the assumption of any of the Assumed Contracts, but that objection was withdrawn.[8] Any modifications, amendments, supplements, and restatements to the Assumed Contracts that may have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith. Assumption of any Assumed Contract pursuant to the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

69.     **Compromises and Settlements Under and in Connection with the Plan (11 U.S.C. § 1123(b)(3)).** All of the settlements and compromises pursuant to and in connection with the Plan, comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

70.     **Debtor Release, Exculpation and Injunctions (11 U.S.C. § 1123(b)).** The Debtor Release, Exculpation, and Injunction provisions provided in the Plan (i) are within the jurisdiction of the Bankruptcy Court under 28 U.S.C. § 1334; (ii) are integral elements of the transactions incorporated into the Plan, and inextricably bound with the other provisions of the Plan; (iii) confer material benefit on, and are in the best interests of, the Debtor, its Estate, and its

---

[8] *See Notice of Withdrawal of James Dondero's Objection Debtor's Proposed Assumption of Contracts and Cure Amounts Proposed in Connection Therewith* [Docket No. 1876].

creditors; (iv) are fair, equitable, and reasonable; (v) are given and made after due notice and opportunity for hearing; (vi) satisfy the requirements of Bankruptcy Rule 9019; and (vii) are consistent with the Bankruptcy Code and other applicable law, and as set forth below.

71.     **Debtor Release.** Section IX.D of the Plan provides for the Debtor's release of the Debtor's and Estate's claims against the Released Parties.  Releases by a debtor are discretionary and can be provided by a debtor to persons who have provided consideration to the Debtor and its estate pursuant to section 1123(b)(3)(A) of the Bankruptcy Code.  Contrary to the objections raised by Mr. Dondero and certain of the Dondero Related Entities, the Debtor Release is appropriately limited to release claims held by the Debtor and does not purport to release the claims held by the Claimant Trust, Litigation Sub-Trust, or other third parties.  The Plan does not purport to release any claims held by third parties and the Bankruptcy Court finds that the Debtor Release is not a "disguised" release of any third party claims as asserted by certain objecting parties.  The limited scope of the Debtor Release in the Plan was extensively negotiated with the Committee, particularly with the respect to the Debtor's conditional release of claims against employees, as identified in the Plan, and the Plan's conditions and terms of such releases.  The Plan does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction. The Debtor Release also contains

conditions to such releases as set forth in Article X.D of the Plan with respect to employees (the

"Release Conditions"). Until the an employee satisfies the Release Conditions or the Release

Conditions otherwise terminate, any claims against such employee will be tolled so that if the

Release Conditions are not met the Litigation Trustee may pursue claims against an employee at a

later date. The evidence before the Bankruptcy Court, including, but not limited to Mr. Seery's

testimony, demonstrates that the Debtor is not aware of any claims against any of the Released

Parties, that the Released Parties have been instrumental in assisting the Debtor's efforts toward

confirmation of the Plan and that, therefore, the releases are a *quid pro quo* for the Released

Parties' significant contributions to a highly complex and contentious restructuring. The

Committee, whose members hold approximately $200 million in claims against the Estate, is

highly sophisticated and is represented by highly sophisticated professionals, and has actively and

vigorously negotiated the terms of the Debtor Release, which was the subject of significant

controversy at the Initial Disclosure Statement hearing held by the Bankruptcy Court on October

27, 2020.

72. **Exculpation.** Section IX.C of the Plan provides for the exculpation of

certain Exculpated Parties to the extent provided therein (the "Exculpation Provision"). As

explained below, the Exculpation Provision is appropriate under the unique circumstances of this

litigious Chapter 11 Case and consistent with applicable Fifth Circuit precedent. First, with respect

to the Independent Directors, their agents, and their advisors, including any employees acting at

their direction, the Bankruptcy Court finds and concludes that it has already exculpated these parties for acts other than willful misconduct and gross negligence pursuant to the January 9 Order. The January 9 Order was specifically agreed to by Mr. Dondero, who was in control of the Debtor up until entry of the January 9 Order.  The January 9 Order was not appealed.  In addition to the appointment of the Independent Directors in an already contentious and litigious case, the January 9 Order set the standard of care for the Independent Directors and specifically exculpated them for negligence.  Mr. Seery and Mr. Dubel each testified that they had input into the contents of the January 9 Order and would not have agreed to their appointment as Independent Directors if the January 9 Order did not include the protections set forth in paragraph 10 of the January 9 Order. Paragraph 10 of the January 9 Order (1) requires that parties wishing to sue the Independent Directors or their agents and advisors must first seek approval from the Bankruptcy Court before doing so; (2) sets the standard of care for the Independent Directors during the Chapter 11 Case and exculpated the Independent Directors for acts other than willful misconduct or gross negligence; (3) only permits suits against the Independent Directors to proceed for colorable claims of willful misconduct and gross negligence upon order of the Bankruptcy Court; and (4) does not expire by its terms.

73.     **Existing Exculpation of Independent Directors.**  The Bankruptcy Court also finds and concludes that  it has already exculpated Mr. Seery acting in the capacity as Chief Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order.  The Bankruptcy Court concludes its previous approval of the exculpation of the Independent Directors, their agents, advisors and employees working at their direction pursuant to the January 9 Order, and the Chief

Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order constitutes the law of this case and are *res judicata* pursuant to *In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir.1987). The January 9 Order and July 16 Order cannot be collaterally attacked based on the objectors' objection to the exculpation of the Independent Directors, their agents, and advisors, including any employees acting at their direction, as well as the Chief Executive Officer and Chief Restructuring Officer, that the Bankruptcy Court already approved pursuant to the January 9 Order and the July 16 Order.

74. **The Exculpation Provision Complies with Applicable Law.** Separate and apart from the *res judicata* effect of the January 9 Order and the July 16 Order, the Bankruptcy Court also finds and concludes that the Exculpation Provision is consistent with applicable law, including *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009), for several reasons:

a. First, the statutory basis for *Pacific Lumber*'s denial of exculpation for certain parties other than a creditors' committee and its members is that section 524(e) of the Bankruptcy Code "only releases the debtor, not co-liable third parties." *Pacific Lumber*, 253 F.3d. at 253. However, *Pacific Lumber* does not prohibit all exculpations under the Bankruptcy Code and the court in such case specifically approved the exculpations of a creditors' committee and its members on the grounds that "11 U.S.C. § 1103(c), which lists the creditors' committee's powers, implies committee members have qualified immunity for actions within the scope of their duties…. [I]f members of the committee can be sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case, it will be extremely difficult to find members to serve on an official committee." *Pacific Lumber*, 253 F.3d at 253 (quoting Lawrence P. King, et al, Collier on Bankruptcy, ¶ 1103.05[4][b] (15th Ed. 2008]). *Pacific Lumber's* rationale for permitted exculpation of creditors' committees and their members (which was clearly policy-based and based on a creditors' committee qualified immunity flowing from their duties under section 1103(c) of the Bankruptcy Code and their disinterestedness and importance in chapter 11 cases) does not preclude exculpation to other parties in a particular chapter 11 case that perform similar roles to a creditors' committee and its members. The Independent Directors, and by extension the Chief Executive Officer and Chief Restructuring Officer, were not

part of the Debtor's enterprise prior to their appointment by the Bankruptcy Court under the January 9 Order. The Bankruptcy Court appointed the Independent Directors in lieu of a chapter 11 trustee to address what the Bankruptcy Court perceived as serious conflicts of interest and fiduciary duty concerns with the then-existing management prior to January 9, 2020, as identified by the Committee. In addition, the Bankruptcy Court finds that the Independent Directors expected to be exculpated from claims of negligence, and would likely have been unwilling to serve in contentious cases absent exculpation. The uncontroverted testimony of Mr. Seery and Mr. Dubel demonstrates that the Independent Directors would not have agreed to accept their roles without the exculpation and gatekeeper provision in the January 9 Order. Mr. Dubel also testified as to the increasing important role that independent directors are playing in complex chapter 11 restructurings and that unless independent directors could be assured of exculpation for simple negligence in contentious bankruptcy cases they would be reluctant to accept appointment in chapter 11 cases which would adversely affect the chapter 11 restructuring process. The Bankruptcy Court concludes that the Independent Directors were appointed under the January 9 Order in order to avoid the appointment of a chapter 11 trustee and are analogous to a creditors' committee rather than an incumbent board of directors. The Bankruptcy Court also concludes that if independent directors cannot be assured of exculpation for simple negligence in contentious bankruptcy cases, they may not be willing to serve in that capacity. Based upon the foregoing, the Bankruptcy Court concludes that *Pacific Lumber's* policy of exculpating creditors' committees and their members from "being sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case" is applicable to the Independent Directors in this Chapter 11 Case.[9]

b.  Second, the Bankruptcy Court also concludes that *Pacific Lumber* does not preclude the exculpation of parties if there is a showing that "costs [that] the released parties might incur defending against such suits alleging such negligence are likely to swamp either the Exculpated Parties or the reorganization." *Pacific Lumber*, 584 F.3d at 252. If ever there was a risk of that happening in a chapter 11 reorganization, it is this one. Mr. Seery credibly testified that Mr. Dondero stated outside the courtroom that if Mr. Dondero's pot plan does not get approved, that Mr. Dondero will "burn the place down." The Bankruptcy Court can easily expect that the proposed Exculpated Parties might expect to incur costs that could swamp them and the reorganization based on the prior litigious conduct of Mr. Dondero and his controlled entities that justify their inclusion in the Exculpation Provision.

---

[9] The same reasoning applies to the inclusion of Strand in the Exculpation Provision because Strand is the general partner of the Debtor through which each of the Independent Board members act.

DOCS_SF:104487.21 36027/002

75.    **Injunction.** Section IX.D of the Plan provides for a Plan innunction to implement and enforce the Plan's release, discharge and release provisions (the "Injunction Provision").  The Injunction Provision is necessary to implement the provisions in the Plan.  Mr. Seery testified that the Claimant Trustee will monetize the Debtor's assets in order to maximize their value.  In order to accomplish this goal, the Claimant Trustee needs to be able to pursue this objective without the interference and harassment of Mr. Dondero and his related entities, including the Dondero Related Entities.  Mr. Seery also testified that if the Claimant Trust was subject to interference by Mr. Dondero,  it would take additional time to monetize the Debtor's assets and those assets could be monetized for less money to the detriment of the Debtor's creditors.  The Bankruptcy Court finds and concludes that the Injunction Provision is consistent with and permissible under Bankruptcy Code sections 1123(a), 1123(a)(6), 1141(a) and (c), and 1142.  The Bankruptcy Court rejects assertions by certain objecting parties that the Injunction Provision constitutes a "third-party release."  The Injunction Provision is appropriate under the circumstances of this Chapter 11 Case and complies with applicable bankruptcy law.  The Bankruptcy Court also concludes that the terms "implementation" and "consummation" are neither vague nor ambiguous

76.    **Gatekeeper Provision**.  Section IX.F of the Plan contains a provision contained in paragraph AA of this Confirmation Order and which the Debtor has referred to as a gatekeeper provision (the "Gatekeeper Provision").  The Gatekeeper Provision requires that Enjoined Parties first seek approval of the Bankruptcy Court before they may commence an action against Protected Parties.  Thereafter, if the Bankruptcy Court determines that the action is

DOCS_SF:104487.21 36027/002

colorable, the Bankruptcy Court may, if it has jurisdiction, adjudicate the action. The Bankruptcy Court finds that the inclusion of the Gatekeeper Provision is critical to the effective and efficient administration, implementation, and consummation of the Plan. The Bankruptcy Court also concludes that the Bankruptcy Court has the statutory authority as set forth below to approve the Gatekeeper Provision.

77.    **Factual Support for Gatekeeper Provision.** The facts supporting the need for the Gatekeeper Provision are as follows. As discussed earlier in this Confirmation Order, prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Mr. Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in some cases, over a decade. Substantially all of the creditors in this case are either parties who were engaged in litigation with the Debtor, parties who represented the Debtor in connection with such litigation and had not been paid, or trade creditors who provided litigation-related services to the Debtor. During the last several months, Mr. Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor. Such litigation includes: (i) entry of a temporary restraining order and preliminary injunction against Mr. Dondero [Adv. Proc. No. 20-03190 Docket No. 10 and 59] because of, among other things, his harassment of Mr. Seery and employees and interference with the Debtor's business operations; (ii) a contempt motion against Mr. Dondero for violation of the temporary restraining order, which motion is still pending before the Bankruptcy Court [Adv. Proc. No. 20-03190 Docket No. 48]; (iii) a motion by Mr. Dondero's controlled investors in certain CLOs managed by the Debtor that the Bankruptcy Court referred to

as frivolous and a waste of the Bankruptcy Court's time [Docket No. 1528] which was denied by

the Court [Docket No. 1605]; (iv) multiple plan confirmation objections focused on ensuring the

Dondero Related Entities be able to continue their litigation against the Debtor and its successors

post-confirmation [Docket Nos. 1661, 1667, 1670, 1673, 1676, 1677 and 1868]; (v) objections to

the approval of the Debtor's settlements with Acis and HarbourVest and subsequent appeals of the

Bankruptcy Court's order approving each of those settlements [Docket Nos. 1347 and 1870]; and

(vi) a complaint and injunction sought against Mr. Dondero's affiliated entities to prevent them

from violating the January 9 Order and entry of a restraining order against those entities [Adv Proc.

No. 21-03000 Docket No 1] (collectively, the "Dondero Post-Petition Litigation").

78.    **Findings Regarding Dondero Post-Petition Litigation.** The Bankruptcy

Court finds that the Dondero Post-Petition Litigation was a result of Mr. Dondero failing to obtain

creditor support for his plan proposal and consistent with his comments, as set forth in Mr. Seery's

credible testimony, that if Mr. Dondero's plan proposal was not accepted, he would "burn down

the place." The Bankruptcy Court concludes that without appropriate protections in place, in the

form of the Gatekeeper Provision, Mr. Dondero and his related entities will likely commence

litigation against the Protected Parties after the Effective Date and do so in jurisdictions other than

the Bankruptcy Court in an effort to obtain a forum which Mr. Dondero perceives will be more

hospitable to his claims. The Bankruptcy Court also finds, based upon Mr. Seery's testimony, that

the threat of continued litigation by Mr, Dondero and his related entities after the Effective Date

will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result

in lower distributions to creditors because of costs and distraction such litigation or the threats of such litigation would cause.

79.   **Necessity of Gatekeeper Provision.**   The Bankruptcy Court further finds that unless the Bankruptcy Court approves the Gatekeeper Provision, the Claimant Trustee and the Claimant Trust Oversight Board will not be able to obtain D&O insurance, the absence of which will present unacceptable risks to parties currently willing to serve in such roles.   The Bankruptcy Court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("AON"), regarding his efforts to obtain D&O insurance.   Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so without an exclusion for claims asserted by Mr. Dondero and his affiliates otherwise requires that this Order approve the Gatekeeper Provision.   Based on the foregoing, the Bankruptcy Court finds that the Gatekeeper Provision is necessary and appropriate in light of the history of the continued litigiousness of Mr. Dondero and his related entities in this Chapter 11 Case and necessary to the effective and efficient administration, implementation and consummation of the Plan and is appropriate pursuant to *Carroll v. Abide (In re Carroll)* 850 F.3d 811 (5th Cir. 2017).   Approval of the Gatekeeper Provision will prevent baseless litigation designed merely to harass the post-confirmation entities charged with monetizing the Debtor's assets for the benefit of its economic constituents, will avoid abuse of the court system and preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants.   Any suit against a Protected Party would effectively be a suit against the Debtor, and the Debtor may be required to indemnify the Protected

57

Parties under the Limited Partnership Agreement, which will remain in effect through the Effective Date, or those certain *Indemnification and Guaranty Agreements*, dated January 9, 2020, between Strand, the Debtor, and each Independent Director, following the Confirmation Date as each such agreement will be assumed pursuant to 11 U.S.C. § 365 pursuant to the Plan.

80. **Statutory Authority to Approve Gatekeeper Provision.** The Bankruptcy Court finds it has the statutory authority to approve the Gatekeeper Provision under sections 1123(a)(5), 1123(b)(6), 1141, 1142(b), and 105(a). The Gatekeeper Provision is also within the spirit of the Supreme Court's "Barton Doctrine." *Barton v. Barbour,* 104 U.S. 126 (1881). The Gatekeeper Provision is also consistent with the notion of a prefiling injunction to deter vexatious litigants, that has been approved by the Fifth Circuit in such cases as *Baum v. Blue Moon Ventures, LLC,* 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll,* 850 F.3d 811 (5th Cir. 2017).

81. **Jurisdiction to Implement Gatekeeper Provision.** The Bankruptcy Court finds that it will have jurisdiction after the Effective Date to implement the Gatekeeper Provision as post-confirmation bankruptcy court jurisdiction has been interpreted by the Fifth Circuit under *United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296 (5th Cir. 2002) and *EOP-Colonnade of Dallas Ltd. P'Ship v. Faulkner (In re Stonebridge Techs., Inc.)*, 430 F.3d 260 (5th Cir. 2005). Based upon the rationale of the Fifth Circuit in *Villegas v. Schmidt,* 788 F.3d 156, 158-59 (5th Cir. 2015), the Bankruptcy Court's jurisdiction to act as a gatekeeper does not violate *Stern v. Marshall.* The Bankruptcy Court's determination of whether

58

==a claim is colorable, which the Bankruptcy Court has jurisdiction to determine, is distinct from==

==whether the Bankruptcy Court would have jurisdiction to adjudicate any claim it finds colorable.==

82. **Resolution of Objections of Scott Ellington and Isaac Leventon**. Each of Scott Ellington ("Mr. Ellington") and Isaac Leventon ("Mr. Leventon") (each, a "Senior Employee Claimant") has asserted certain claims for liquidated but unpaid bonus amounts for the following periods: 2016, 2017, and 2018, as set forth in Exhibit A to that certain *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1669] (the "Senior Employees' Objection") (for each of Mr. Ellington and Mr. Leventon, the "Liquidated Bonus Claims").

a. Mr. Ellington has asserted Liquidated Bonus Claims in the aggregate amount of $1,367,197.00, and Mr. Leventon has asserted Liquidated Bonus Claims in the aggregate amount of $598,198.00. Mr. Ellington received two Ballots[10] – a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan. Mr. Ellington completed and timely returned both of such Ballots, voted to reject the Plan, and elected to have his Class 8 Liquidated Bonus Claims treated under Class 7 of the Plan, subject to the objections and reservations of rights set forth in the Senior Employees' Objection. If Mr. Ellington is permitted to elect Class 7 treatment for his Liquidated Bonus Claims, then the maximum amount of his Liquidated Bonus Claims will be $1,000,000.

b. Mr. Leventon received two Ballots—a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan. Mr. Leventon completed and timely returned both of such Ballots and voted each such Ballots to rejected the Plan.

c. The Senior Employees' Objection, among other things, objects to the Plan on the grounds that the Debtor improperly disputes the right of Mr. Ellington to elect Class 7 treatment for his Liquidated Bonus Claims and Mr. Leventon's entitlement to receive Class 7 Convenience Class treatment for his Liquidated Bonus Claims. The Debtor contended that neither Mr. Ellington or Mr. Leventon were entitled to elect to receive Class 7 Convenience Class treatment on account of their Liquidated

---

[10] As defined in the Plan, "Ballot" means the forms(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

Bonus Claims under the terms of the Plan, the Disclosure Statement Order or applicable law.

d.    The Debtor and Mr. Ellington and Mr. Leventon negotiated at arms' length in an effort to resolve all issues raised in the Senior Employee's Objection, including whether or not Mr. Ellington and Mr. Leventon were entitled to Class 7 Convenience Class treatment of their Liquidated Bonus Claims. As a result of such negotiation, the Debtor, Mr. Ellington, and Mr. Leventon have agreed to the settlement described in paragraphs 82(e) through 82(k) below and approved and effectuated pursuant to decretal paragraphs RR through SS (the "Senior Employees' Settlement").

e.    Under the terms of the Senior Employees' Settlement, the Debtor has the right to elect one of two treatments of the Liquidated Bonus Claims for a Senior Employee Claimant. Under the first treatment option ("Option A"), the Liquidated Bonus Claims will be entitled to be treated in Class 7 of the Plan, and the Liquidated Bonus Claims will be entitled to receive payment in an amount equal to 70.125% of the Class 7 amount of the Liquidated Bonus Claims, subject to such Liquidated Bonus Claims becoming Allowed Claims under the terms of the Plan. Under this calculation, Mr. Ellington would be entitled to receive $701,250.00 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan, and Mr. Leventon would be entitled to receive $413,175.10 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan. If, however, any party in interest objects to the allowance of the Senior Employee Claimant's Liquidated Bonus Claims and does not prevail in such objection, then such Senior Employee Claimant will be entitled to a payment in an amount equal to 85% of his Allowed Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed on Class 7 Claims). In addition, under Option A, each of Mr. Ellington and Mr. Leventon would retain their respective rights to assert that the Liquidated Bonus Claims are entitled to be treated as Administrative Expense Claims, as defined in Article I.B.2. of the Plan, in which case the holder of such Liquidated Bonus Claims would be entitled to payment in full of the Allowed Liquidated Bonus Claims. Under Option A, parties in interest would retain the right to object to any motion seeking payment of the Liquidated Bonus Amounts as Administrative Expenses.

f.    Under the second treatment option ("Option B"), the Debtor would agree that the Senior Employee Claimant has Allowed Liquidated Bonus Claims, no longer subject to objection by any party in interest, in the amounts of the Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed by Class 7). If the Debtor elects Option B as to a Senior Employee Claimant, then such Senior Employee Claimant would be entitled to a payment on account of his Allowed Liquidated Bonus Claims in an amount equal to 60% of the amount of the

Liquidated Bonus Claims (which, in Mr. Ellington's case, would be $600,000 and in Mr. Leventon's case, would be $358,918.80), and such payment would be the sole recovery on account of such Allowed Liquidated Bonus Claims.

g.    The Debtor may, with the consent of the Committee, elect Option B with respect to a Senior Employee Claimant at any time prior to the occurrence of the Effective Date.  If the Debtor does not make an election, then Option A will apply.

h.    Under either Option A or Option B, Mr. Ellington and Mr. Leventon will retain all their rights with respect to all Claims other than the Liquidated Bonus Amounts, including, but not limited to, their Class 6 PTO Claims, other claims asserted as Class 8 General Unsecured Claims, the Senior Employees' claims for indemnification against the Debtor, and any other claims that they may assert constitute Administrative Expense Claims, and any other such Claims are subject to the rights of any party in interest to object to such Claims, and the Debtor reserves any all of its rights and defenses in connection therewith.

i.    Subject to entry of this Confirmation Order and as set forth and announced on the record at the hearing on confirmation of the Plan and no party objecting thereto, Mr. Ellington and Mr. Leventon agreed to change the votes in their respective Ballots from rejection to acceptance of the Plan and to withdraw the Senior Employees' Objection.

j.    The Senior Employees' Settlement represents a valid exercise of the Debtor's business judgment and satisfies the requirements for a compromise under Bankruptcy Rule 9019(a).

k.    For the avoidance of doubt, neither Mr. Leventon nor Mr. Ellington shall be a Released Party under the Plan regardless of how the Senior Employee Claimants' Claims are to be treated hereunder.

Based upon the foregoing findings, and upon the record made before the Bankruptcy Court at the Confirmation Hearing, and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

A.    **Confirmation of the Plan.**  The Plan is approved in its entirety and **CONFIRMED** under section 1129 of the Bankruptcy Code.  The terms of the Plan, including the

Plan Supplements and Plan Modifications, are incorporated by reference into and are an integral part of this Confirmation Order.[11]

      **B.**      **Findings of Fact and Conclusions of Law**.  The findings of fact and the conclusions of law set forth in this Confirmation Order and on the record of the Confirmation Hearing constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  All findings of fact and conclusion of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to confirmation of the Plan are hereby incorporated into this Confirmation Order.  To the extent that any of the following constitutes findings of fact or conclusions of law, they are adopted as such. To the extent any findings of fact or conclusions of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and incorporated herein) constitutes an order of the Bankruptcy Court, and is adopted as such.

      **C.**      **Objections**.  Any resolution or disposition of objections to confirmation of the Plan or otherwise ruled upon by the Bankruptcy Court on the record of the Confirmation Hearing is hereby incorporated by reference.  All objections and all reservations of rights pertaining to confirmation of the Plan that have not been withdrawn, waived or settled are overruled on the merits, except as otherwise specifically provided in this Confirmation Order.

      **D.**      **Plan Supplements and Plan Modifications.**  The filing with the Bankruptcy Court of the Plan Supplements and the Plan Modifications constitutes due and

---

[11] The Plan is attached hereto as **Exhibit A**.

sufficient notice thereof. Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Modifications and the Plan Supplements do not require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that Holders of Claims or Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. The Plan Modifications and the Plan Supplements constitute the Plan pursuant to section 1127(a) of the Bankruptcy Code. Accordingly, the Plan, as modified, is properly before the Bankruptcy Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

E. **Deemed Acceptance of Plan.** In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Equity Interests who voted to accept the Plan (or whom are conclusively presumed to accept the Plan) are deemed to have accepted the Plan as modified by the Plan Modifications. No holder of a Claim shall be permitted to change its vote as a consequence of the Plan Modifications.

F. **Vesting of Assets in the Reorganized Debtor.** Except as otherwise provided in the Plan or this Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code, except with respect to such Liens, Claims, charges, and other encumbrances that are specifically preserved under the Plan upon the Effective Date. The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the

representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

G. **Effectiveness of All Actions.** All actions contemplated by the Plan, including all actions in connection with the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, are authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to or order of the Bankruptcy Court, or further action by the directors, managers, officers or partners of the Debtor or the Reorganized Debtor and with the effect that such actions had been taken by unanimous action of such parties.

H. **Restructuring Transactions.** The Debtor or Reorganized Debtor, as applicable, are authorized to enter into and effectuate the Restructuring provided under the Plan, including, without limitation, the entry into and consummation of the transactions contemplated by the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, and may take any actions as may be necessary or appropriate to effect a corporate restructuring of its business or a corporate restructuring of the overall corporate structure of the Reorganized Debtor, as and to the extent provided in the Plan. Any transfers of assets or equity interests effected or any obligations incurred through the Restructuring pursuant to the Plan are hereby approved and shall not constitute fraudulent conveyances or fraudulent transfers or otherwise be subject to avoidance.

I. **Preservation of Causes of Action.** Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, this Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor, the Litigation Sub-Trust, or the Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan, or this Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, this Confirmation Order). In addition, the right of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

J. **Independent Board of Directors of Strand.** The terms of the current Independent Directors shall expire on the Effective Date without the need for any further or other action by any of the Independent Directors. For avoidance of doubt, the Assumed Contracts

DOCS_SF:104487.21 36027/002

App. 99

include the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery*; the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel* and *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell Nelms* and shall each remain in full force and effect notwithstanding the expiration of the terms of any Independent Directors.

      **K.**    **Cancellation of Equity Interests and Issuance of New Partnership Interests.**  On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be deemed cancelled, and all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, such Class A Limited Partnership Interests and Class B/C Limited Partnership Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement. As of the Effective Date and pursuant to the Plan, new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited

66

**App. 100**

Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

   **L.**   **Transfer of Assets to Claimant Trust.** On or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax. Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the Plan and the Claimant Trust Agreement.

   **M.**   **Transfer of Estate Claims to Litigation Sub-Trust**. On or prior to the Effective Date, the Claimant Trust shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims as successor in interest to the Debtor, and in accordance with section 1141 of the Bankruptcy Code, the Estate Claims shall automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and Litigation Sub-Trust Expenses. The Litigation Trustee will

67

be authorized to investigate, pursue, and otherwise resolve the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, including as successor in interest to the Debtor or Committee, as applicable, in any litigation commenced prior to the Effective Date in which Estate Claims are asserted.

   **N.**  **Compromise of Controversies.** In consideration for the distributions and other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Equity Interests, and controversies resolved under the Plan and the entry of this Confirmation Order constitutes approval of such compromise and settlement under Bankruptcy Rule 9019.

   **O.**  **Objections to Claims**. The Claims Objection Deadline shall be the date that is 180 days after the Effective Date, *provided, however*, that the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee and as otherwise provided under the Plan.

   **P.**  **Assumption of Contracts and Leases.** Effective as of the date of this Confirmation Order, each of the Assumed Contacts shall be assumed by the Debtor without the need for any further notice to or action, order, or approval of the Bankruptcy Court, under section 365 of the Bankruptcy Code and the payment of Cures, if any, shall be paid in accordance with the Plan. Each Assumed Contract shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to any of the

DOCS_SF:104487.21 36027/002

**App. 102**

Assumed Contracts that have been executed by the Debtor during the Chapter 11 Case shall not

be deemed to alter the prepetition nature of such Assumed Contracts or the validity, priority, or

amount of any Claims that may arise in connection therewith.  Assumption of the Assumed

Contracts pursuant to Article V.A of the Plan and full payment of any applicable Cure pursuant to

the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether

monetary or nonmonetary, including defaults of provisions restricting the change in control or

ownership interest composition, or other bankruptcy-related defaults, arising under any Assumed

Contracts.

> **Q.**     **Rejection of Contracts and Leases.**  Unless previously assumed during the

pendency of the Chapter 11 Case or pursuant to the Plan, all other Executory Contracts and

Unexpired Leases are rejected as of the date of the entry of this Confirmation Order and pursuant

to the terms of the Plan.  To the extent that any party asserts any damages resulting from the

rejection of any Executory Contract or Unexpired Lease, such claim must be filed within **thirty**

**(30) days** following entry of this Confirmation Order, or such claim will be forever barred and

disallowed against the Reorganized Debtor.

> **R.**     **Assumption of Issuer Executory Contracts.**  On the Confirmation Date,

the Debtor will assume the agreements set forth on **Exhibit B** hereto (collectively, the "Issuer

Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan.

In full and complete satisfaction of its obligation to cure outstanding defaults under section

365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the

**App. 103**

Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[12] a cumulative amount of $525,000 (the "Cure Amount") as follows:

a. $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

b. $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and the Bankruptcy Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; *provided, however,* that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

    **S.**    **Release of Issuer Claims.** Effective as of the Confirmation Date, and to the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and

---

[12] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Issuer Released Claims").

      **T.**    **Release of Debtor Claims against Issuer Released Parties.** Upon entry of this Order, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue [(i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe,

(xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton (collectively, the "Issuer Released Parties")],] for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts. Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs S and T hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

U. **Authorization to Consummate.** The Debtor is authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver of the conditions precedent to the Effective Date of the Plan set forth in Article VIII.A of the Plan. The Plan shall not become effective unless and until the conditions set forth in Article VIII.A of the Plan have been satisfied, or otherwise waived pursuant to Article VIII.B of the Plan.

V. **Professional Compensation.** All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date

must be filed no **later than sixty (60) days after the Effective Date**. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and an opportunity for hearing in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Court. The Debtor shall fund the Professional Fee Reserve as provided under the Plan. The Reorganized Debtor shall pay Professional Fee Claims in Cash in the amounts the Bankruptcy Court allows. The Debtor is authorized to pay the pre-Effective Date fees and expenses of all ordinary course professionals in the ordinary course of business without the need for further Bankruptcy Court order or approval. From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 (if applicable) of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor or Claimant Trustee, as applicable, may employ and pay any Professional or Entity employed in the ordinary course of the Debtor's business without any further notice to or action, order, or approval of the Bankruptcy Court.

     **W.**    **Release, Exculpation, Discharge, and Injunction Provisions. The following release, exculpation, discharge, and injunction provisions set forth in the Plan are approved and authorized in their entirety, and such provisions are effective and binding on all parties and Entities to the extent provided therein.**

     **X.**    **Discharge of Claims and Termination of Interests.** To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or this Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement,

discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by the Plan or this Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

Y.      **Exculpation.**  Subject in all respects to Article XII.D of the Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v);

*provided, however*, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  The Plan's exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

**Z.**      **Releases by the Debtor.**  On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under

DOCS_SF:104487.21 36027/002

any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

**AA.** **Injunction.** **Upon entry of this Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.** **Except as expressly provided in the Plan, this Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner,**

76

in any place whatsoever, that does not conform to or comply with the provisions of the Plan. The injunctions set forth in the Plan and this Confirmation Order shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.  Subject in all respects to Article XII.D of the Plan, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however*, the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in

Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

**BB.    Duration of Injunction and Stays.  Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date, shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Bankruptcy Court will enter an equivalent order under Section 105.**

**CC.    Continuance of January 9 Order and July 16 Order.**  Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, each of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, entered by the Bankruptcy Court on January 9, 2020* [Docket No. 339] and *Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020  shall remain in full force and effect from the Confirmation Date and following the Effective Date.

**DD.    No Governmental Releases.**  Nothing in this Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or

any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in this Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit, or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in this Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against any party or person.

      **EE.**    **Exemption from Transfer Taxes.** Pursuant to section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor; (b) the Restructuring transactions pursuant to the Plan; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan,

including any deeds, bills of sale, assignments, or other instrument of transfer executed in

connection with any transaction arising out of, contemplated by, or in any way related to the Plan,

shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or

similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial

Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental

assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon

entry of this Confirmation Order, the appropriate state or local governmental officials or agents

shall forego the collection of any such tax or governmental assessment and accept for filing and

recordation of any of the foregoing instruments or other documents without the payment of any

such tax, recordation fee, or governmental assessment.

> **FF.** **Cancellation of Notes, Certificates and Instruments.** Except for the

purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in

the Plan or as otherwise provided in this Confirmation Order, on the Effective Date, all agreements,

instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest

and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no

force or effect.  The holders of or parties to such cancelled instruments, Securities, and other

documentation will have no rights arising from or related to such instruments, Securities, or other

documentation or the cancellation thereof, except the rights provided for pursuant to the Plan, and

the obligations of the Debtor thereunder or in any way related thereto will be fully released,

terminated, extinguished and discharged, in each case without further notice to or order of the

DOCS_SF:104487.21 36027/002

Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

**GG.   Documents, Mortgages, and Instruments.**    Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring transactions contemplated under the Plan, and this Confirmation Order.

**HH.   Post-Confirmation Modifications.**    Subject section 1127(b) of the Bankruptcy Code and the Plan, the Debtor and the Reorganized Debtor expressly reserve their rights to revoke or withdraw, or to alter, amend, or modify materially the Plan, one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.B of the Plan.

**II.   Applicable Nonbankruptcy Law.**    The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

**JJ.   Governmental Approvals Not Required.**    This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state,

federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

      **KK.**   **Notice of Effective Date.**  As soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall file notice of the Effective Date and shall serve a copy of the same on all Holders of Claims and Equity Interests, and all parties who have filed with the Bankruptcy Court requests to receive notices in accordance with Bankruptcy Rules 2002 and 3020(c).  Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtor mailed notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtor has been informed in writing by such Entity, or is otherwise aware, of that Entity's new address. The above-referenced notices are adequate under the particular circumstances of this Chapter 11 Case and no other or further notice is necessary.

      **LL.**   **Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

      **MM.**   **Waiver of Stay.**  For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Bankruptcy Court.

82

NN.     **References to and Omissions of Plan Provisions.**  References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

OO.     **Headings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

PP.     **Effect of Conflict.**  This Confirmation Order supersedes any Bankruptcy Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control.  If there is any inconsistency between the terms of this Confirmation Order and the terms of a final, executed Plan Supplement Document, the terms of the final, executed Plan Supplement Document will govern and control.

QQ.     **Resolution of Objection of Texas Taxing Authorities.**  Dallas County, Kaufman County, City of Allen, Allen ISD and City of Richardson (collectively, the "Tax Authorities") assert that they are the holders of prepetition and administrative expense claims for 2019, 2020 and 2021 ad valorem real and business personal property taxes.  The ad valorem property taxes for tax year 2020 shall be paid in accordance with and to the extent required under

DOCS_SF:104487.21 36027/002

applicable nonbankruptcy law.  In the event the 2020 taxes are paid after February 1, 2021, the

Tax Authorities may assert any rights and amounts they claim are owed with respect to penalties

and interest that have accrued through the date of payment and the Debtor and Reorganized Debtor

reserve any all rights and defenses in connection therewith.

a.  The Debtor/Reorganized Debtor shall pay all amounts owed to the Tax Authorities for tax year 2021 in accordance with and to the extent required under applicable nonbankruptcy law.  The Tax Authorities shall not be required to file and serve an administrative expense claim and request for payment as a condition of allowance of their administrative expense claims pursuant to 11 U.S.C. Section 503(b)(1)(D).  With regard to year 2019 ad valorem property taxes, the Tax Authorities will receive payment of their prepetition claims within 30 days of the Effective Date of the Plan.  The payment will include interest from the Petition Date through the Effective Date and from the Effective Date through payment in full at the state statutory rate pursuant to 11 U.S.C. Sections 506(b), 511, and 1129, if applicable, subject to all of the Debtor's and Reorganized Debtor's rights and defenses in connection therewith.  Notwithstanding any other provision in the Plan, the Tax Authorities shall (i) retain the liens that secure all prepetition and postpetition amounts ultimately owed to them, if any, as well as (ii) the state law priority of those liens until the claims are paid in full.

b.  The Tax Authorities' prepetition claims and their administrative expense claims shall not be discharged until such time as the amounts owed are paid in full.  In the event of a default asserted by the Taxing Authorities, the Tax Authorities shall provide notice Debtor or Reorganized Debtor, as applicable, and may demand cure of any such asserted default.  Subject to all of its rights and defenses, the Debtor or Reorganized Debtor shall have fifteen (15) days from the date of the notice to cure the default.  If the alleged default is not cured, the Tax Authorities may exercise any of their respective rights under applicable law and pursue collection of all amounts owed pursuant to state law outside of the Bankruptcy Court, subject in all respects to the Debtor's and Reorganized Debtor's applicable rights and defenses. The Debtor/Reorganized Debtor shall be entitled to any notices of default required under applicable nonbankruptcy law and each of the Taxing Authorities, the Debtor and the Reorganized Debtor reserve any and all of their respective rights and defenses in connection therewith.  The Debtor's and Reorganized Debtor's rights and defenses under Texas Law and the Bankruptcy Code with respect to this provision of the Confirmation Order, including their right to dispute or object to the Tax Authorities' Claims and liens, are fully preserved.

RR. **Resolution of Objections of Scott Ellington and Isaac Leventon.**

Pursuant to Bankruptcy Rule 9019(a), the Senior Employees' Settlement is approved in all

respects. The Debtor may, only with the consent of the Committee, elect Option B for a Senior

Employee Claimant by written notice to such Senior Employee Claimant on or before the

occurrence of the Effective Date. If the Debtor does not elect Option B, then Option A will govern

the treatment of the Liquidated Bonus Claims.

    a.    Notwithstanding any language in the Plan, the Disclosure Statement, or this Confirmation Order to the contrary, if Option A applies to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee Claimant will receive the treatment described in paragraph 82(e) hereof, and if the Debtor timely elects Option B with respect to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee will receive the treatment described in paragraph 82(f) hereof.

    b.    The Senior Employees' Settlement is hereby approved, without prejudice to the respective rights of Mr. Ellington and Mr. Leventon to assert all their remaining Claims against the Debtor's estate, including, but not limited to, their Class 6 PTO Claims, their remaining Class 8 General Unsecured Claims, any indemnification claims, and any Administrative Expense Claims that they may assert and is without prejudice to the rights of any party in interest to object to any such Claims.

    c.    Pursuant to Bankruptcy Rule 3018(a), Mr. Ellington and Mr. Leventon were permitted to change their votes on the Plan. Accordingly, Mr. Ellington's votes on his Ballots in Class 7 and Class 8 of the Plan were changed from a rejection of the Plan to acceptance of the Plan, and Mr. Leventon's votes on his Ballots in Class 7 and Class 8 of the Plan were, changed from rejections of the Plan to acceptances of the Plan.

    d.    The Senior Employees' Objection is deemed withdrawn.

    SS.    **No Release of Claims Against Senior Employee Claimants**. For the

avoidance of doubt, the Senior Employees' Settlement, as approved herein, shall not, and shall not

be deemed to, release any Claims or Causes of Action held by the Debtor against either Senior

Employee Claimant nor shall either Senior Employee Claimant be, or be deemed to be, a "Released Party" under the Plan.

**TT.** **Resolution of Objection of Internal Revenue Service.** Notwithstanding any other provision or term of the Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the "IRS Claim"):

(a) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of the date of said notice and demand, then the following shall apply to the IRS:

(1) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code;

(2) The automatic stay of 11 U.S.C. § 362 and any injunction of the Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Bankruptcy Court, and the entire prepetition liability owed to the IRS, together with any unpaid postpetition tax liabilities, may become due and payable immediately; and

(3) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

(b) If the IRS declares the Debtor, the Reorganized Debtor, or any successor-in-interest to be in default of the Debtor's, the Reorganized Debtor's and/ or any successor- in-interest's obligations under the Plan, then entire prepetition liability of an IRS' Allowed Claim, together with any unpaid postpetition tax liabilities shall become due and payable

86

immediately upon written demand to the Debtor, Reorganized Debtor and/or any successor-in-interest. Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(c) The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default, the IRS shall be entitled to proceed as set out in paragraphs (1), (2), and/or (3) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel. The collection statute expiration date for all unpaid federal tax liabilities shall be extended pursuant to non-bankruptcy law.

(d) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(e) Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States and its agency the Internal Revenue Service.

(f) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

UU. **IRS Proof of Claim.** Notwithstanding anything in the Plan or in this Confirmation Order, until all required tax returns are filed with and processed by the IRS, the IRS's proof of claim will not be deemed fixed for purposes of Section 502 of the Bankruptcy Code and may be amended in order to reflect the IRS' assessment of the Debtor's unpaid priority and general unsecured taxes, penalties and interest.

**VV.    CLO Holdco, Ltd. Settlement**    Notwithstanding anything contained herein to the contrary, nothing in this Order is or is intended to supersede the rights and obligations of either the Debtor or CLO Holdco contained in that certain *Settlement Agreement between CLO Holdco, Ltd., and Highland Capital Management, L.P., dated January 25,2021* [Docket No. 1838-1] (the "CLOH Settlement Agreement").  In the event of any conflict between the terms of this Order and the terms of the CLOH Settlement Agreement, the terms of the CLOH Settlement Agreement will govern.

**WW.    Retention of Jurisdiction.**  The Bankruptcy Court may properly, and upon the Effective Date shall, to the maximum extent permitted under applicable law, retain jurisdiction over all matters arising out of, and related to, this Chapter 11 Case, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

**XX.    Payment of Statutory Fees; Filing of Quarterly Reports.**  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date.  The Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.  Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C. § 1930.

**YY.    Dissolution of the Committee**.  On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have

any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). Notwithstanding the foregoing, any Committee member or Professional may serve following the Effective Date with respect to the Claimant Trust Oversight Board or Litigation Sub-Trust. The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan, the Claimant Trust Agreement, and/or Litigation Sub-Trust in connection with such representation.

      **ZZ.** **Miscellaneous.** After the Effective Date, the Debtor or Reorganized Debtor, as applicable, shall have no obligation to file with the Bankruptcy Court or serve on any parties reports that the Debtor or Reorganized Debtor, as applicable, were obligated to file under the Bankruptcy Code or a court order, including monthly operating reports (even for those periods for which a monthly operating report was not filed before the Effective Date), ordinary course professional reports, reports to any parties otherwise required under the "first" and "second" day orders entered in this Chapter 11 Case (including any cash collateral financing orders entered in this Chapter 11 Case) and monthly or quarterly reports for Professionals; *provided*, *however*, that

the Debtor or Reorganized Debtor, as applicable, will comply with the U.S. Trustee's post

confirmation reporting requirements.

### ###END OF ORDER###

**Exhibit A**

**Fifth Amended Plan (as Modified)**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS ............................................1

    A.    Rules of Interpretation, Computation of Time and Governing Law....................1

    B.    Defined Terms ...................................................................................................2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS.................16

    A.    Administrative Expense Claims........................................................................16

    B.    Professional Fee Claims...................................................................................17

    C.    Priority Tax Claims..........................................................................................17

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS ...............................................................18

    A.    Summary.........................................................................................................18

    B.    Summary of Classification and Treatment of Classified Claims and Equity Interests ...............................................................................................18

    C.    Elimination of Vacant Classes .........................................................................19

    D.    Impaired/Voting Classes ..................................................................................19

    E.    Unimpaired/Non-Voting Classes .....................................................................19

    F.    Impaired/Non-Voting Classes ..........................................................................19

    G.    Cramdown........................................................................................................19

    H.    Classification and Treatment of Claims and Equity Interests............................19

    I.    Special Provision Governing Unimpaired Claims.............................................24

    J.    Subordinated Claims........................................................................................24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN .....................................24

    A.    Summary.........................................................................................................24

    B.    The Claimant Trust ..........................................................................................25

        1.    Creation and Governance of the Claimant Trust and Litigation Sub-Trust...............................................................................................25

        2.    Claimant Trust Oversight Committee.....................................................26

App. 127

3.     Purpose of the Claimant Trust. ................................................27

4.     Purpose of the Litigation Sub-Trust. ......................................27

5.     Claimant Trust Agreement and Litigation Sub-Trust Agreement. .........27

6.     Compensation and Duties of Trustees. .....................................29

7.     Cooperation of Debtor and Reorganized Debtor. ..................................29

8.     United States Federal Income Tax Treatment of the Claimant Trust. ......................................................................29

9.     Tax Reporting. ........................................................30

10.    Claimant Trust Assets. ................................................30

11.    Claimant Trust Expenses. ............................................31

12.    Trust Distributions to Claimant Trust Beneficiaries. ............................31

13.    Cash Investments. ....................................................31

14.    Dissolution of the Claimant Trust and Litigation Sub-Trust. .................31

C.    The Reorganized Debtor ..............................................32

1.     Corporate Existence ..................................................32

2.     Cancellation of Equity Interests and Release ...........................32

3.     Issuance of New Partnership Interests ................................32

4.     Management of the Reorganized Debtor ..............................33

5.     Vesting of Assets in the Reorganized Debtor .........................33

6.     Purpose of the Reorganized Debtor ..................................33

7.     Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets ................................33

D.    Company Action ......................................................34

E.    Release of Liens, Claims and Equity Interests ....................................35

F.    Cancellation of Notes, Certificates and Instruments .............................35

**Page**

    G.     Cancellation of Existing Instruments Governing Security Interests ................ 35

    H.     Control Provisions ............................................................................................ 35

    I.      Treatment of Vacant Classes ........................................................................... 36

    J.      Plan Documents ................................................................................................ 36

    K.     Highland Capital Management, L.P. Retirement Plan and Trust ...................... 36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
           LEASES ............................................................................................ 37

    A.     Assumption, Assignment, or Rejection of Executory Contracts and
           Unexpired Leases .......................................................................................... 37

    B.     Claims Based on Rejection of Executory Contracts or Unexpired
           Leases ........................................................................................................... 38

    C.     Cure of Defaults for Assumed or Assigned Executory Contracts and
           Unexpired Leases .......................................................................................... 38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 39

    A.     Dates of Distributions ...................................................................................... 39

    B.     Distribution Agent ........................................................................................... 39

    C.     Cash Distributions ........................................................................................... 40

    D.     Disputed Claims Reserve ................................................................................. 40

    E.     Distributions from the Disputed Claims Reserve ............................................ 40

    F.     Rounding of Payments ..................................................................................... 40

    G.     *De Minimis* Distribution ................................................................................. 41

    H.     Distributions on Account of Allowed Claims .................................................. 41

    I.      General Distribution Procedures ...................................................................... 41

    J.      Address for Delivery of Distributions .............................................................. 41

    K.     Undeliverable Distributions and Unclaimed Property ..................................... 41

    L.     Withholding Taxes ........................................................................................... 42

M.      Setoffs ............................................................................................. 42

N.      Surrender of Cancelled Instruments or Securities .............................. 42

O.      Lost, Stolen, Mutilated or Destroyed Securities ................................ 43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
          UNLIQUIDATED AND DISPUTED CLAIMS ........................................... 43

A.      Filing of Proofs of Claim .................................................................. 43

B.      Disputed Claims ................................................................................ 43

C.      Procedures Regarding Disputed Claims or Disputed Equity Interests .............. 43

D.      Allowance of Claims and Equity Interests ......................................... 44

        1.      Allowance of Claims ............................................................... 44

        2.      Estimation .............................................................................. 44

        3.      Disallowance of Claims ........................................................... 44

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ................................................. 45

A.      Conditions Precedent to the Effective Date ....................................... 45

B.      Waiver of Conditions ........................................................................ 46

C.      Dissolution of the Committee ............................................................ 46

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS ................ 47

A.      General .............................................................................................. 47

B.      Discharge of Claims .......................................................................... 47

C.      Exculpation ....................................................................................... 47

D.      Releases by the Debtor ...................................................................... 48

E.      Preservation of Rights of Action ....................................................... 49

        1.      Maintenance of Causes of Action ........................................... 49

        2.      Preservation of All Causes of Action Not Expressly Settled or
                Released .................................................................................. 49

Page

F.   Injunction ........................................................................................................ 50

G.   Duration of Injunctions and Stays ................................................................... 51

H.   Continuance of January 9 Order ..................................................................... 51

ARTICLE X. BINDING NATURE OF PLAN ................................................................. 51

ARTICLE XI. RETENTION OF JURISDICTION .......................................................... 52

ARTICLE XII. MISCELLANEOUS PROVISIONS ........................................................ 54

A.   Payment of Statutory Fees and Filing of Reports ............................................. 54

B.   Modification of Plan ......................................................................................... 54

C.   Revocation of Plan ........................................................................................... 54

D.   Obligations Not Changed .................................................................................. 55

E.   Entire Agreement .............................................................................................. 55

F.   Closing of Chapter 11 Case .............................................................................. 55

G.   Successors and Assigns ..................................................................................... 55

H.   Reservation of Rights ........................................................................................ 55

I.   Further Assurances ............................................................................................ 56

J.   Severability ....................................................................................................... 56

K.   Service of Documents ....................................................................................... 56

L.   Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of
     the Bankruptcy Code ......................................................................................... 57

M.   Governing Law .................................................................................................. 58

N.   Tax Reporting and Compliance ......................................................................... 58

O.   Exhibits and Schedules ..................................................................................... 58

P.   Controlling Document ....................................................................................... 58

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "<u>Debtor</u>"), proposes the following chapter 11 plan of reorganization (the "<u>Plan</u>") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein. There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents. All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A.  Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set

forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B.    **Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2.    "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3.    "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4.    "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5.    "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6.    "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy

App. 133

Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7.      "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8.      "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9.      "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10.     "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11.     "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

15.     "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16.     "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17.     "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19.     "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims.  The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20.     "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21.     "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22.     "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23.     "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

4

24.     "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25.     "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26.     "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC.  For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27.     "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28.     "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement.  The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29.     "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30.     "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests

unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

42.    "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein.  Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43.    "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44.    "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved.  As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45.    "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46.    "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47.    "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48.    "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49.    "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50.    "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be:  (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized

Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51. "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52. "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53. "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54. "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55. "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56. "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57. "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58. "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59. "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60. "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61. "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

62.     "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63.     "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64.     "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65.     "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66.     "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67.     "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68.     "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

69.     "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70.     "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an:  (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71.     "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72.     "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73.     "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74.     "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75.     "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76.     "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77.     "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78.     "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79.     "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80.     "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

**App. 141**

81.     "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement.  As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82.     "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83.     "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84.     "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85.     "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86.     "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87.     "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88.     "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

89.     "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90.     "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91.     "Petition *Date*" means October 16, 2019.

92.     "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93.     "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94.     "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95.     "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96.     "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97.     "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98.     "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99.     "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100.     "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

101.     "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

102. "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103. "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105. "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106. "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107. "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108. "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder

13

App. 144

of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109.    "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110.    "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111.    "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112.    "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113.    "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114.    "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115.    "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust.  For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116.    "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

117. "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118. "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119. "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121. "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122. "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123. "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124. "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125. "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126. "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127. "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128. "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129. "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

130. "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131. "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132. "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133. "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134. "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135. "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136. "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137. "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

### A.  Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on

or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

## B. Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline. Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement. The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

## C. Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor: (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed

App. 148

Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND EQUITY INTERESTS**

**A.**    **Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

**B.**    **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

## C.   Elimination of Vacant Classes

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

## D.   Impaired/Voting Classes

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

## E.   Unimpaired/Non-Voting Classes

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

## F.   Impaired/Non-Voting Classes

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

## G.   Cramdown

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## H.   Classification and Treatment of Claims and Equity Interests

1.   *Class 1 – Jefferies Secured Claim*

- *Classification*:  Class 1 consists of the Jefferies Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until

full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*: Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2.   *Class 2 – Frontier Secured Claim*

- *Classification*: Class 2 consists of the Frontier Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim: (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note. The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*: Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3.   *Class 3 – Other Secured Claims*

- *Classification*: Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*: Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4.    *Class 4 – Priority Non-Tax Claims*

- *Classification*:  Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.    *Class 5 – Retained Employee Claims*

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.    *Class 6 – PTO Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6

**App. 152**

Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7.    *Class 7 – Convenience Claims*

- *Classification*:  Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8.    *Class 8 – General Unsecured Claims*

- *Classification*:  Class 8 consists of the General Unsecured Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9.  *Class 9 – Subordinated Claims*

- *Classification*:  Class 9 consists of the Subordinated Claims.

  *Treatment*:  On the Effective Date, Holders of Subordinated Claims  shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10.  *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*:  Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11.  *Class 11 – Class A Limited Partnership Interests*

- *Classification*:  Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

## I.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

## J.    Subordinated Claims

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

## A.    Summary

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited

24

partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.** **The Claimant Trust**[2]

1. *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2.    *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

App. 157

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3. *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4. *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5. *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

(i)      the payment of the Claimant Trust Expenses;

(ii)     the payment of other reasonable expenses of the Claimant Trust;

(iii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)     the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)      the orderly monetization of the Claimant Trust Assets;

(vi)     litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)    the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)   the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)     the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court.  Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee.  The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)      the payment of other reasonable expenses of the Litigation Sub-Trust;

(ii)    the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)    the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.    *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.    *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.    *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer

of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9.     *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10.     *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court.  Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

App. 161

11.   _Claimant Trust Expenses._

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.   _Trust Distributions to Claimant Trust Beneficiaries._

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, _provided_ that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.   _Cash Investments._

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; _provided, however,_ that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14.   _Dissolution of the Claimant Trust and Litigation Sub-Trust._

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as:  (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; _provided, however,_ that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and

no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C.     The Reorganized Debtor

### 1.     *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

### 2.     *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

### 3.     *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date. Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order. Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

4.  *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5.  *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.  *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.  *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement,

33

the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D.    Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

App. 165

### E. Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### F. Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### G. Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

### H. Control Provisions

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

## I.    Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

## J.    Plan Documents

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement.  To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

## K.    Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  29 U.S.C. §§ 1301-1461.  The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC.  In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code.  The Debtor reserves the right to contest any such liability or responsibility.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.      Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments.  Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.  To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan.  Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4),

as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Confirmation Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.    Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

**A.**    **Dates of Distributions**

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan.  Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

**B.**    **Distribution Agent**

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

App. 170

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

## C.    Cash Distributions

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

## D.    Disputed Claims Reserve

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

## E.    Distributions from the Disputed Claims Reserve

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount.  To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date.  For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests.  If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

## F.    Rounding of Payments

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.  To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

## G. *De Minimis* Distribution

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

## H. Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

## I. General Distribution Procedures

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

## J. Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

## K. Undeliverable Distributions and Unclaimed Property

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

**L.    Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.    Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.    Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

### O.     Lost, Stolen, Mutilated or Destroyed Securities

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent:  (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

### A.     Filing of Proofs of Claim

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

### B.     Disputed Claims

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

### C.     Procedures Regarding Disputed Claims or Disputed Equity Interests

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

43

## D.   Allowance of Claims and Equity Interests

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

### 1.   *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

### 2.   *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

### 3.   *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE,**

**ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

**ARTICLE VIII.**
**EFFECTIVENESS OF THIS PLAN**

**A.**     **Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtor and the Committee. The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust

App. 176

Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

## B. <u>Waiver of Conditions</u>

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

## C. <u>Dissolution of the Committee</u>

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on

46

the Effective Date or filed and served after the Effective Date pursuant to the Plan.  Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

### A.  General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

### B.  Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

### C.  Exculpation

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided*, *however, the* foregoing

will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

## D.     Releases by the Debtor

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

App. 179

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

### E.    <u>Preservation of Rights of Action</u>

1.    *<u>Maintenance of Causes of Action</u>*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

2.    *<u>Preservation of All Causes of Action Not Expressly Settled or Released</u>*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including,

without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**F.    Injunction**

**Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

**Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court**

**(i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.**

**G.      Duration of Injunctions and Stays**

**ARTICLE II. Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.**

**H.      Continuance of January 9 Order**

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.

**ARTICLE X.
BINDING NATURE OF PLAN**

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan. All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

## ARTICLE XI.
## <u>RETENTION OF JURISDICTION</u>

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

App. 183

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

App. 184

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

## A.    Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date.  All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed.  The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.  The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

## B.    Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

## C.    Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

### D.    Obligations Not Changed

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

### E.    Entire Agreement

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### F.    Closing of Chapter 11 Case

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

### G.    Successors and Assigns

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

### H.    Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the

App. 186

Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

## I.    **Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## J.    **Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## K.    **Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

> **If to the Claimant Trust:**
>
> Highland Claimant Trust
> c/o Highland Capital Management, L.P.
> 300 Crescent Court, Suite 700

App. 187

Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
        Ira D. Kharasch, Esq.
        Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
        Ira D. Kharasch, Esq.
        Gregory V. Demo, Esq.

**L.**    **Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code**

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to

App. 188

evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M.**     **Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N.**     **Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**O.**     **Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P.**     **Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

Dated:  January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

## Exhibit B

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

1. Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

2. Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

3. Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

4. Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

5. Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

6. Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

7. Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

8. Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

9. Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

10. Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

11. Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

12. Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

13. Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

14. Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

15. Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

16. Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

17. Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

18. Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

19. Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

20. Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

21. Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

22. Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

23. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

24. Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

25. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

26. Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

27. Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

28. Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

29. Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

30. Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

31. Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

32. Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

33. Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

34. Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

35. Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

2

36. Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

37. Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

38. Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

39. Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

40. Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

41. Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

42. Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

43. Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

44. Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

45. Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

46. A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

47. A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

48. Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

49. Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

50. Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

3

51.     Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

52.     Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

53.     Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

54.     Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

55.     Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

56.     Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

57.     Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

58.     Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

59.     Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

60.     Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

4

Tab "B"

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

---

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND
## CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

---

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
           ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW AND DEFINED TERMS ............................................ 1

    A.    Rules of Interpretation, Computation of Time and Governing Law .................... 1

    B.    Defined Terms .............................................................................. 2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ................ 16

    A.    Administrative Expense Claims ..................................................... 16

    B.    Professional Fee Claims ................................................................ 17

    C.    Priority Tax Claims ...................................................................... 17

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS
AND EQUITY INTERESTS ................................................... 18

    A.    Summary .................................................................................. 18

    B.    Summary of Classification and Treatment of Classified Claims and
Equity Interests ........................................................................ 18

    C.    Elimination of Vacant Classes ....................................................... 19

    D.    Impaired/Voting Classes .............................................................. 19

    E.    Unimpaired/Non-Voting Classes ................................................... 19

    F.    Impaired/Non-Voting Classes ....................................................... 19

    G.    Cramdown ................................................................................ 19

    H.    Classification and Treatment of Claims and Equity Interests ............. 19

    I.    Special Provision Governing Unimpaired Claims .............................. 24

    J.    Subordinated Claims ................................................................... 24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ..................................... 24

    A.    Summary .................................................................................. 24

    B.    The Claimant Trust ..................................................................... 25

        1.    Creation and Governance of the Claimant Trust and Litigation
Sub-Trust ........................................................................ 25

        2.    Claimant Trust Oversight Committee ..................................... 26

App. 198

**Page**

3. Purpose of the Claimant Trust. .................................................................27

4. Purpose of the Litigation Sub-Trust.........................................................27

5. Claimant Trust Agreement and Litigation Sub-Trust Agreement. .........27

6. Compensation and Duties of Trustees. ....................................................29

7. Cooperation of Debtor and Reorganized Debtor. ....................................29

8. United States Federal Income Tax Treatment of the Claimant Trust. .....................................................................................................29

9. Tax Reporting. ..........................................................................................30

10. Claimant Trust Assets...............................................................................30

11. Claimant Trust Expenses. .........................................................................31

12. Trust Distributions to Claimant Trust Beneficiaries...............................31

13. Cash Investments. .....................................................................................31

14. Dissolution of the Claimant Trust and Litigation Sub-Trust. .................31

C. The Reorganized Debtor ........................................................................................32

1. Corporate Existence ..................................................................................32

2. Cancellation of Equity Interests and Release...........................................32

3. Issuance of New Partnership Interests ......................................................32

4. Management of the Reorganized Debtor ...................................................33

5. Vesting of Assets in the Reorganized Debtor ...........................................33

6. Purpose of the Reorganized Debtor ..........................................................33

7. Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets ....................................................33

D. Company Action ....................................................................................................34

E. Release of Liens, Claims and Equity Interests......................................................35

F. Cancellation of Notes, Certificates and Instruments.............................................35

App. 199

G. Cancellation of Existing Instruments Governing Security Interests ................... 35

H. Control Provisions ............................................................................................. 35

I. Treatment of Vacant Classes ............................................................................. 36

J. Plan Documents ................................................................................................. 36

K. Highland Capital Management, L.P. Retirement Plan and Trust ....................... 36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ................................................................................................ 37

A. Assumption, Assignment, or Rejection of Executory Contracts and
Unexpired Leases .............................................................................................. 37

B. Claims Based on Rejection of Executory Contracts or Unexpired
Leases ................................................................................................................ 38

C. Cure of Defaults for Assumed or Assigned Executory Contracts and
Unexpired Leases .............................................................................................. 38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 39

A. Dates of Distributions ....................................................................................... 39

B. Distribution Agent ............................................................................................. 39

C. Cash Distributions ............................................................................................. 40

D. Disputed Claims Reserve ................................................................................... 40

E. Distributions from the Disputed Claims Reserve ............................................... 40

F. Rounding of Payments ....................................................................................... 40

G. *De Minimis* Distribution ................................................................................... 41

H. Distributions on Account of Allowed Claims ..................................................... 41

I. General Distribution Procedures ........................................................................ 41

J. Address for Delivery of Distributions ................................................................. 41

K. Undeliverable Distributions and Unclaimed Property ....................................... 41

L. Withholding Taxes ............................................................................................. 42

App. 200

M.      Setoffs .............................................................................................42

N.      Surrender of Cancelled Instruments or Securities .............................42

O.      Lost, Stolen, Mutilated or Destroyed Securities ..............................43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS............................................43

A.      Filing of Proofs of Claim ...............................................................43

B.      Disputed Claims.............................................................................43

C.      Procedures Regarding Disputed Claims or Disputed Equity Interests ..............43

D.      Allowance of Claims and Equity Interests.........................................44

        1.      Allowance of Claims...............................................................44

        2.      Estimation ...........................................................................44

        3.      Disallowance of Claims ..........................................................44

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ...................................45

A.      Conditions Precedent to the Effective Date .......................................45

B.      Waiver of Conditions......................................................................46

C.      Dissolution of the Committee ..........................................................46

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS .................47

A.      General..........................................................................................47

B.      Discharge of Claims........................................................................47

C.      Exculpation ...................................................................................47

D.      Releases by the Debtor.....................................................................48

E.      Preservation of Rights of Action.......................................................49

        1.      Maintenance of Causes of Action .............................................49

        2.      Preservation of All Causes of Action Not Expressly Settled or Released ...............49

F.     Injunction ..........................................................................................50

G.    Duration of Injunctions and Stays..................................................51

H.    Continuance of January 9 Order ....................................................51

ARTICLE X. BINDING NATURE OF PLAN ........................................................51

ARTICLE XI. RETENTION OF JURISDICTION...................................................52

ARTICLE XII. MISCELLANEOUS PROVISIONS ...............................................54

A.    Payment of Statutory Fees and Filing of Reports ................................54

B.    Modification of Plan ...........................................................................54

C.    Revocation of Plan .............................................................................54

D.    Obligations Not Changed....................................................................55

E.    Entire Agreement ...............................................................................55

F.    Closing of Chapter 11 Case ...............................................................55

G.    Successors and Assigns.......................................................................55

H.    Reservation of Rights..........................................................................55

I.     Further Assurances..............................................................................56

J.     Severability .........................................................................................56

K.    Service of Documents .........................................................................56

L.    Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code..........................................................................57

M.   Governing Law ...................................................................................58

N.    Tax Reporting and Compliance ..........................................................58

O.    Exhibits and Schedules.......................................................................58

P.    Controlling Document ........................................................................58

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "Debtor"), proposes the following chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor.  Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan.  The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein.  There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents.  All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME,
## GOVERNING LAW AND DEFINED TERMS

### A.    Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set

forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B. Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1. "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2. "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3. "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4. "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5. "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6. "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy

App. 204

Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7.      "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8.      "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9.      "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11.      "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

App. 205

15. "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16. "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19. "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims. The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20. "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21. "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22. "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

4

24.    "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25.    "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26.    "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC.  For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27.    "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28.    "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement.  The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29.    "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30.    "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests

unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31.    "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32.    "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33.    "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34.    "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35.    "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36.    "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37.    "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38.    "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41.    "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election.  For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

App. 208

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized

Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51.     "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52.     "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53.     "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54.     "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55.     "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56.     "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57.     "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58.     "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59.     "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60.     "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61.     "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

62.     "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63.     "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64.     "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65.     "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66.     "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67.     "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68.     "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

69.     "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70.     "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an: (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71.     "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72.     "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73.     "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74.     "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75.     "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76.     "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77.     "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78.     "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79.     "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80.     "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

81. "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement. As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82. "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83. "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84. "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85. "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86. "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87. "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88. "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

89. "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90. "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91. "Petition *Date*" means October 16, 2019.

92. "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93.    "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94.    "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95.    "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96.    "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97.    "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98.    "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99.    "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100.    "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

101.    "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

102.    "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103.    "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105.    "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106.    "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107.    "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108.    "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder

13

of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109.    "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110.    "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111.    "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112.    "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113.    "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114.    "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115.    "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust.  For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116.    "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

117.    "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118.    "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119.    "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120.    "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121.    "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122.    "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123.    "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125.    "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126.    "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127.    "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128.    "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129.    "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

130. "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131. "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132. "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133. "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134. "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135. "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136. "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137. "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

**A.    Administrative Expense Claims**

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on

or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

## B.  Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date.  Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

## C.  Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed

Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND EQUITY INTERESTS**

**A.**     **Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

**B.**     **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

**C.    Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**D.    Impaired/Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

**E.    Unimpaired/Non-Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

**F.    Impaired/Non-Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

**G.    Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**H.    Classification and Treatment of Claims and Equity Interests**

1.    *Class 1 – Jefferies Secured Claim*

- *Classification*:  Class 1 consists of the Jefferies Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until

full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2.    *Class 2 – Frontier Secured Claim*

- *Classification*:  Class 2 consists of the Frontier Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:  (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note.  The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*:  Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3.    *Class 3 – Other Secured Claims*

- *Classification*:  Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4. *Class 4 – Priority Non-Tax Claims*

- *Classification*: Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*: Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5. *Class 5 – Retained Employee Claims*

- *Classification*: Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*: Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6. *Class 6 – PTO Claims*

- *Classification*: Class 6 consists of the PTO Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*: Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 6

21

Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7. *Class 7 – Convenience Claims*

- *Classification*: Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*: Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8. *Class 8 – General Unsecured Claims*

- *Classification*: Class 8 consists of the General Unsecured Claims.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9.       *Class 9 – Subordinated Claims*

-      *Classification*:  Class 9 consists of the Subordinated Claims.

    *Treatment*:  On the Effective Date, Holders of Subordinated Claims  shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

    Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

-      *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10.       *Class 10 – Class B/C Limited Partnership Interests*

-      *Classification*:  Class 10 consists of the Class B/C Limited Partnership Interests.

-      *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

    Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

-      *Impairment and Voting*:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11.       *Class 11 – Class A Limited Partnership Interests*

-      *Classification*:  Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

**I.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**J.    Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THIS PLAN**

**A.    Summary**

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited

App. 226

partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC.  The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan.  The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities.  The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement.  Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.**     **The Claimant Trust**[2]

1.     _Creation and Governance of the Claimant Trust and Litigation Sub-Trust._

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries.  Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2.  *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

App. 228

The Claimant Trust Oversight Committee will initially consist of five members.  Four of the five members will be representatives of the members of the Committee:  (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery.  The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor.  The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement.  The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement.  Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3. *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4. *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims.  Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5. *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

27

(i)       the payment of the Claimant Trust Expenses;

(ii)      the payment of other reasonable expenses of the Claimant Trust;

(iii)      the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)      the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)       the orderly monetization of the Claimant Trust Assets;

(vi)      litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)     the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)    the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)      the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)       the payment of other reasonable expenses of the Litigation Sub-Trust;

(ii)    the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)    the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.    *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.    *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.    *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as:  (a) a transfer

of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9.      *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10.      *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court.  Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

App. 232

11.      *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.      *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.      *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14.      *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as:  (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Claimant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and

31

no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C.     The Reorganized Debtor

### 1.     *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

### 2.     *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

### 3.     *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date. Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order. Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

App. 234

4.      *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5.      *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.      *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.      *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement,

the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

## D. **Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

App. 236

## E.     Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

## F.     Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

## G.     Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

## H.     Control Provisions

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

App. 237

### I. Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

### J. Plan Documents

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

### K. Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.        Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments.  Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.  To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan.  Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4),

as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Confirmation Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.    Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Dates of Distributions

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan.  Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

### B.    Distribution Agent

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

**C.**     **Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

**D.**     **Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

**E.**     **Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount. To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date. For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

**F.**     **Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

## G. *De Minimis* Distribution

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

## H. Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

## I. General Distribution Procedures

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

## J. Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

## K. Undeliverable Distributions and Unclaimed Property

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

**L.      Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.      Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.      Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

### O.     Lost, Stolen, Mutilated or Destroyed Securities

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent: (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

### A.     Filing of Proofs of Claim

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

### B.     Disputed Claims

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

### C.     Procedures Regarding Disputed Claims or Disputed Equity Interests

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

### D. Allowance of Claims and Equity Interests

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

1. *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

2. *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

3. *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE,**

App. 246

**ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

**ARTICLE VIII.**
**EFFECTIVENESS OF THIS PLAN**

**A.**     **Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtor and the Committee. The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust

45

Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

## B.   <u>Waiver of Conditions</u>

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

## C.   <u>Dissolution of the Committee</u>

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on

App. 248

the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

### A.    General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

### B.    Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

### C.    Exculpation

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided*, *however*, the foregoing

App. 249

will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

**D.**     <u>Releases by the Debtor</u>

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "<u>Reduced Employee Claim</u>"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "<u>Independent Members</u>"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

Sub-Trust, or any of their respective employees or agents, or any Released Party on or
in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or
  the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance
  in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the
  monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable,
  or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates
  the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the
Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's
release has not been deemed null and void and of no force and effect on or prior to the date that is
the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior
Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling
agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not
in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the
Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against
the Employee by a third party, or (iii) assisting other persons in defending themselves from any
Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought
by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

## E.   **Preservation of Rights of Action**

### 1.   *Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor
or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate,
any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets,
as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other
tribunal, without limitation, in an adversary proceeding Filed in the Chapter 11 Case
and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive
right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the
foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy
Court.

### 2.   *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity
is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order
(including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved
for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including,

49

without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order). In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**F.    Injunction**

**Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

**Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court**

(i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

G.     **Duration of Injunctions and Stays**

**ARTICLE II. Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.**

H.     **Continuance of January 9 Order**

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.


### ARTICLE X.
### BINDING NATURE OF PLAN

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan.  All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

## ARTICLE XI.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

App. 254

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

App. 255

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.  Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date. All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed. The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee. The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### B.  Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan: (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### C.  Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee. If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then: (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

App. 256

## D.   Obligations Not Changed

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

## E.   Entire Agreement

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

## F.   Closing of Chapter 11 Case

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

## G.   Successors and Assigns

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee.  The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

## H.   Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the

Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

## I. **Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order. On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## J. **Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## K. **Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

> ### If to the Claimant Trust:
>
> Highland Claimant Trust
> c/o Highland Capital Management, L.P.
> 300 Crescent Court, Suite 700

App. 258

Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
            Ira D. Kharasch, Esq.
            Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
            Ira D. Kharasch, Esq.
            Gregory V. Demo, Esq.

## L.    Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to

57

evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M.**     **Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N.**     **Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**O.**     **Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P.**     **Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

Dated:  January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

**Exhibit B**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

1.  Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

2.  Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

3.  Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

4.  Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

5.  Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

6.  Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

7.  Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

8.  Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

9.  Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

10. Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

11. Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

12. Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

13. Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

14. Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

15. Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

16. Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

17. Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

18. Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

19. Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

20. Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

21. Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

22. Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

23. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

24. Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

25. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

26. Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

27. Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

28. Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

29. Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

30. Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

31. Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

32. Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

33. Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

34. Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

35. Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

2

36.     Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

37.     Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

38.     Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

39.     Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

40.     Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

41.     Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

42.     Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

43.     Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

44.     Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

45.     Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

46.     A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

47.     A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

48.     Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

49.     Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

50.     Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

51.  Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

52.  Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

53.  Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

54.  Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

55.  Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

56.  Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

57.  Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

58.  Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

59.  Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

60.  Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

DOCS_NY:42355.1 36027/002

Tab "C"



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed March 16, 2021**

_____
**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

### ORDER CERTIFYING APPEALS OF THE CONFIRMATION ORDER
### FOR DIRECT APPEAL TO THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

CAME ON FOR CONSIDERATION the *Joint Motion for Certification of Appeals of Confirmation Order for Direct Appeal to the Fifth Circuit* (the "Motion"), filed jointly by Highland Capital Management, L.P., Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Global Allocation Fund, Highland Income Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, James Dondero, Get Good Trust, and The Dugaboy Investment Trust (collectively, the "Parties").

---

ORDER CERTIFYING APPEALS OF THE CONFIRMATION ORDER FOR DIRECT APPEAL TO THE
UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT—Page 1

**App. 268**

By the Motion, the Parties jointly request a certification for a direct appeal to the Fifth Circuit of the following appeals (collectively, the "Appeals") of the Court's *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [docket no. 1943] (the "Confirmation Order"):

(i)     the notice of appeal filed by Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. on March 1, 2021 at docket no. 1957;

(ii)    the notice of appeal filed by Highland Global Allocation Fund, Highland Income Fund, NexPoint Capital, Inc., and NexPoint Strategic Opportunities Fund on March 3, 2021 at docket no. 1966;

(iii)   the notice of appeal filed by James Dondero on March 4, 2021 at docket no. 1970; and

(iv)    the notice of appeal filed by Get Good Trust and The Dugaboy Investment Trust on March 4, 2021 at docket no. 1972.

Having considered the Motion, concluding that the Court has core jurisdiction over the Motion, finding that no further notice or hearing on the Motion is required as all parties affected thereby are the Parties to the Motion, and, based on the Parties joint certification and request as provided for in 28 U.S.C. § 158(d)(2)(B), and based also on the Court's agreement with the factual predicates underlying the Parties' certification and request, it is hereby:

ORDERED that the Appeals of the Confirmation Order are certified for direct appeal to the Fifth Circuit because a direct appeal may materially advance the progress of the case or proceeding in which the appeal is taken, within the meaning and operation of 28 U.S.C. § 158(d)(2)(A)(iii).

### ### END OF ORDER ###

ORDER CERTIFYING APPEALS OF THE CONFIRMATION ORDER FOR DIRECT APPEAL TO THE
UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT—Page 2
4828-7733-3728v.1 019717.00001

App. 269

# EXHIBIT 3

CASE NO. _____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

## NEXPOINT ADVISORS, L.P. and HIGHLAND CAPITAL
## MANAGEMENT FUND ADVISORS, L.P.,

### APPELLANTS

### v.

## HIGHLAND CAPITAL MANAGEMENT, L.P.

### APPELLEE

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION
BANKRUPTCY CASE NO. 19-34054 (SGJ11)

APPEAL PENDING AS  CIVIL ACTION NO. 3:21-CV-00538-N IN THE UNITED
STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

## PETITION FOR PERMISSION TO APPEAL
## (DIRECT APPEAL FROM BANKRUPTCY COURT, 28 U.S.C. § 158(d))

MUNSCH HARDT KOPF & HARR, P.C.

Davor Rukavina
Texas Bar No. 24030781
500 North Akard Street
Suite 3800
Dallas, Texas 75201-6659
Telephone:  (214) 855-7500
Facsimile:  (214) 855-7584
Email: drukavina@munsch.com

ATTORNEYS FOR THE APPELLANTS

i

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1. **Appellants:**

   **NexPoint Advisors, L.P.**
   **Highland Capital Management Fund Advisors, L.P.**

   Counsel for the Appellants:
   MUNSCH HARDT KOPF & HARR, P.C.
   Davor Rukavina
   500 North Akard Street, Suite 3800
   Dallas, Texas 75201-6659
   Telephone:  (214) 855-7500
   Facsimile:  (214) 855-7584

2. **Appellee:**

   **Highland Capital Management, L.P.**

   Counsel for Appellee:
   PACHULSKI STANG ZIEHL & JONES LLP
   Jeffrey N. Pomerantz
   John A. Morris
   10100 Santa Monica Blvd., 13th Floor
   Los Angeles, CA 90067
   Telephone: (310) 277-6910
   Facsimile: (310) 201-0760
   -- and --
   HAYWARD PLLC
   Melissa S. Hayward
   Zachery Z. Annable
   10501 N. Central Expy, Ste. 106
   Dallas, Texas 75231
   Tel: (972) 755-7100
   Fax: (972) 755-7110

ii

3.      **Appellants in Separate Appeals (likely to be consolidated)**

**James Dondero**

Counsel:
BONDS ELLIS EPPICH SCHAFER JONES LLP
D. Michael Lynn
John Y. Bonds, III
Clay M. Taylor
Bryan C. Assink
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 – Telephone
(817) 405-6902 – Facsimile

**Highland Income Fund**
**NexPoint Strategic Opportunities Fund**
**Highland Global Allocation Fund**
**NexPoint Capital, Inc.**

Counsel:
K&L GATES LLP
Artoush Varshosaz
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659

A. Lee Hogewood, III
4350 Lassiter at North Hills Ave.
Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306

**Get Good Trust**
**The Dugaboy Investment Trust**

Counsel:
HELLER, DRAPER & HORN, L.L.C.
Douglas S. Draper

Leslie A. Collins
Greta M. Brouphy
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399

 /s/ Davor Rukavina
Davor Rukavina, Esq.
Counsel for the Appellants

iv

## PETITION FOR PERMISSION TO APPEAL
## (DIRECT APPEAL FROM BANKRUPTCY COURT 28 U.S.C. § 158(d))

NexPoint Advisors, L.P. and Highland Capital Management, L.P. (the "Movants" or the "Appellants"), respectfully request that the Court grant them permission to appeal the Confirmation Order (defined below) directly to this Court from the Bankruptcy Court, pursuant to Federal Rule of Appellate Procedure 5 and 28 U.S.C. § 158(d)(2)(A).

## I.     PROCEDURAL BACKGROUND

### A.     THE CONFIRMATION ORDER

This is an appeal of an order of the Bankruptcy Court confirming a Chapter 11 plan on "cramdown" over the objection of the Appellants and various others.

On February 22, 2021, the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") entered that certain *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified); and (ii) Granting Related Relief* (the "Confirmation Order"), by which the Bankruptcy Court confirmed the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [docket no. 1808], as further modified (the "Plan"), filed by Highland Capital Management, L.P. (the "Debtor").

1

A true and correct copy of the Confirmation Order, which includes the Plan as an original part thereof, is attached hereto as Exhibit "A."  Attached hereto as Exhibit "B" is a true and correct copy of the Bankruptcy Court's oral February 8, 2021 ruling by which it confirmed the Plan and gave its oral findings of fact and conclusions of law.

The Debtor filed its voluntary Chapter 11 bankruptcy case (the "<u>Bankruptcy Case</u>") on October 16, 2019 (the "<u>Petition Date</u>"), thereby creating its bankruptcy estate (the "<u>Estate</u>").  The Debtor is a registered investment advisor under the Investment Advisers Act of 1940.  The Debtor is a multi-billion dollar global investment advisor and manager of various funds.  *See* Confirmation Order at p. 6.  Among other assets that the Debtor manages is more than $1 billion invested by third parties in collateral loan obligation investment vehicles (the "<u>CLOs</u>").  *See id*.

The CLOs own the underlying assets, usually securities, and the Debtor manages those assets for the CLOs, including by making decisions as to when to sell CLO assets, pursuant to a series of portfolio management agreements between the Debtor and the CLOs (the "<u>Management Agreements</u>").  *See id*.  Under the Plan, the Debtor assumed the Management Agreements under section 365 of the Bankruptcy Code.  *See id*. at pp. 47-48; 68-69.

The Plan, labeled a "reorganization" plan, is actually a wind down and liquidation plan.  The Plan bifurcates the Estate into two entities: (i) a claimant

2

trust is created for the benefit of creditors (and, as discussed below, potentially for the benefit of equity interest holders), which trust is vested with most assets of the Estate, including causes of action, *see id*. at pp. 5-6; and (ii) the Debtor is reorganized and retains various business assets, including its management rights of the CLOs. *See id*. The claimant trust will own the reorganized Debtor. *See id*. The reorganized Debtor will liquidate and wind-down its assets in approximately two (2) years. *See id*. at p. 47.

The Appellants have several interests directly implicated by the Plan. First, the Appellants themselves are registered advisors, who advise many publicly traded funds and other investment vehicles, some of which funds own interests in the CLOs or otherwise have their assets managed by the Debtor. As discussed below, the Plan enjoins the Appellants from advising or causing their clients to terminate the Debtor's CLO Management Agreements or to otherwise impede or interfere with the Debtor's reorganization. The Plan subjects the Appellants to the "gatekeeper injunction" requiring that they first obtain an order from the Bankruptcy Court before taking various actions against the reorganized Detbor, finding that any claim or cause of action they may wish to pursue is "colorable," including any such claim or cause of action that arises post-confirmation. And, as the holder of various Class 8 unsecured claims by way of transfer from the Debtor's former employees (once the Appellants hired those employees) and large

3

(approximately $14 million) administrative claims, the Plan obviously impacts the Appellants' economic interests.[1]  To protect these legitimate interests and to avoid being bound by permanent injunctions, the Appellants, among others, objected to the Plan, which objections the Bankruptcy Court overruled.

Creditors vote on a Chapter 11 plan by class.  *See* 11 U.S.C. § 1126(c).  To carry a class, a majority of creditors in that class who vote must vote for the plan and they must hold a supermajority of the claims in that class.  *See id*.  Importantly, Class 8, a class of unsecured creditors, rejected the Plan.  *See* Confirmation Order at p. 42.  The Plan does not pay Class 8 in full over time, but instead a projected 71% return.  *See id*. at p. 41.  This triggered the Absolute Priority Rule, codified in 11 U.S.C. § 1129(b)(2)(B).  The Absolute Priority Rule provides that, because Class 8 rejected the Plan and is not paid in full, the holders of interests in junior classes (here, equity interests) cannot "receive or retain under the plan on account of such junior claim or interest any property."  11 U.S.C. § 1129(b)(2)(B)(ii).

The Appellants argued that the Plan violated the Absolute Priority Rule because the Plan gave holders of equity interests contingent interests in the

---

[1]     The Debtor contests both the Class 8 unsecured claims and the administrative claims and maintains that the Appellants have no standing to contest the Plan or Confirmation Order.  The allowance of those claims has not been determined as of this filing and is unlikely to be determined prior to this Court's adjudication of this Petition.  The Bankruptcy Court has confirmed the Appellants' standing to contest the Plan and Confirmation Order.  *See* Exhibit "B" at 20:15-16.

Creditors Trust, to be paid only if unsecured creditors are first paid in full. The Appellants argued that these contingent interests were "property" being "receive[d] or retain[ed]" under the Plan in direct violation of the Absolute Priority Rule. The Bankruptcy Court rejected this argument, relying on a bankruptcy court opinion holding that the Absolute Priority Rule is not violated when the holder of the contingent interest under the Plan does not receive any recovery unless and until higher priority creditors are paid in full first. *See* Confirmation Order at p. 45. This Court has not addressed this issue in any prior opinion.

The other important aspect of the Plan for appellate purposes is its various provisions exculpating various persons and its permanent injunctions. The Plan contains a broad exculpation provision exculpating the Debtor, its professionals, its general partner, and that partner's board members, among others, from any claims for negligence. *See* Exhibit "A" at Plan pp. 47-48. This exculpation extends not only to case administration matters, but also to ordinary business matters and also to post-confirmation matters related to the implementation of the Plan. *See id*. Separately, the Plan contains broad permanent injunctions, prohibiting the Appellants from, among other things, "taking any actions to interfere with the implementation or consummation of the Plan." *See id*. at p. 50. The Plan contains a permanent "gatekeeper injunction" prohibiting the Appellants from commencing or pursuing any claim or cause of action against various protected persons unless

5

the Bankruptcy Court first determines, after notice and a hearing, that such claim or cause of action is "colorable." *See id*. at pp. 50-51.

The Appellants objected to the exculpation provisions of the Plan because those provisions effectuate prohibited third releases (*i.e.* claims by a non-debtor against a non-debtor) in violation of this Court's precedent in *In re Pacific Lumber Co.*, 584 F.3d 229, 253 (5th Cir. 2009). *Pacific Lumber* permitted the exculpation of the members of a creditor's committee for actions taken in the bankruptcy case, but it prohibited the exculpation of other persons or professionals. *See id*. at 253. Here, the Plan exculpates the Debtor and its professionals, as well as the Debtor's general partner and its board members, meaning that, if the Appellants have claims against any of the exculpated parties, those claims are judicially extinguished. The Plan extends exculpation not just to case administration decisions, but also to ordinary business actions and decisions. Most unprecedentedly, the Plan also extends exculpation for post-confirmation matters, when the Debtor is out of bankruptcy and there is no more Estate. The Bankruptcy Court concluded that *Pacific Lumber* did not foreclose these exculpations and that this Court would revisit *Pacific Lumber*. *See* Confirmation Order at pp. 52-53.

With respect to the gatekeeper injunction, the Appellants objected to any such injunction for post-confirmation matters because the Bankruptcy Court will have no post-confirmation jurisdiction to determine whether a claim or cause of

6

action is "colorable" and because the imposition of any gatekeeper injunction for post-confirmation matters is not authorized by the Bankruptcy Code or any other law.  The Estate ceases to exist upon confirmation and the Bankruptcy Court's jurisdiction for post-confirmation matters is strictly limited.  *See In re Craig's Stores of Tex. Inc.*, 266 F.3d 388, 390 (5th Cir. 2001).  Should the Appellants wish to pursue an action arising after confirmation, and the Bankruptcy Court finds that the claim is not "colorable," that means that a court without jurisdiction will have forever decided and prohibited the brining of the claim.  With respect to exercising rights under the Management Agreements after confirmation, the Appellants argued that, once the Debtor assumed those agreements, the Debtor must comply with all terms of the agreements, such as the ability of the contract counterparty to remove the Debtor as manager under those agreements.

The Bankruptcy Court rejected these arguments, finding that the Debtor and others needed special protections from alleged vexatious litigation in the form of the "gatekeeper" injunction and other Plan injunction provisions, without which the Debtor would not be able to obtain post-confirmation D&O insurance.  *See* Confirmation Order at pp. 57-59.

## B.    THE APPEALS

The Advisors timely filed their notice of appeal of the Confirmation Order to the United States District Court for the Northern District of Texas (the "District

Court"), where their appeal is pending as Civil Action No. 3:21-cv-00538-N (the "Appeal"). A true and correct copy of their Notice of Appeal is attached hereto as Exhibit "C," and a true and correct copy of their Statement of Issues on Appeal is attached hereto as Exhibit "D."

The Debtor did not timely file a cross-appeal.

The Appellants requested a discretionary stay pending appeal of the Confirmation Order from the Bankruptcy Court, which motion the Bankruptcy Court denied. The Appellants are in the process of seeking a stay pending appeal of the Confirmation Order from the District Court.

To apprise the Court of very similar, if not identical, issues and proceedings, the following appellants (collectively, the "Other Appellants") filed their separate notices of appeal, thereby initiating the following appeals (collectively, with the Appeal, the "Appeals") before the District Court:

(i)    Highland Global Allocation Fund, Highland Income Fund, NexPoint Capital, Inc., and NexPoint Strategic Opportunities Fund, Civil Action No. 3:21-cv-00539-N;

(ii)   James Dondero, Civil Action No. 3:21-cv-00546-L; and

(iii)  Get Good Trust and The Dugaboy Investment Trust, Civil Action No. 3:21-cv-00550-L.

8

The Appellants and the Other Appellants have considered filing a joint petition for direct review but, because the Appeals have not been consolidated yet and due to the procedural uncertainty of such a course, the Appellants have determined instead to file this separate Petition and apprise the Court of these issues, such that the Court may take whatever action it finds most appropriate and efficient.

## C.    THE ISSUES ON APPEAL

The issues that the Appellants have raised on their Appeal (which may or may not be the same as the issues of the Other Appellants) are generally the following:

1.    Whether the Bankruptcy Court erred as a matter of law in confirming the Plan and entering the Confirmation Order under the Absolute Priority Rule codified by 11 U.S.C. § 1129(b)(2)(B)(ii) because the Plan provides that the holders of equity interests, in the form of limited partnership interests in the Debtor, retain or receive any property under the Plan even though Class 8 under the Plan, a class of unsecured creditors not paid in full under the Plan, rejected the Plan?

2.    Whether the Bankruptcy Court erred as a matter of law in confirming the Plan and entering the Confirmation Order because the exculpation provisions of the Plan, contained in Article IX of the Plan, effectuated

9

third party releases (*i.e.* releasing a claim of a non-debtor against a non-debtor) prohibited by the Bankruptcy Court and over which the Bankruptcy Court had no jurisdiction, in direct violation of this Court's precedent (*see, e.g., In re Pacific Lumber Co.*, 584 F.3d 229, 253 (5th Cir. 2009) and in violation of due process rights.

3.    Whether the Bankruptcy Court erred as a matter of law in confirming the Plan and entering the Confirmation Order because the permanent injunction contained in Article IX of the Plan, which prohibits "taking any actions to interfere with the implementation or consummation of the Plan," is overly broad and impermissibly vague, and because the injunction prohibits the Appellants from advising various funds that they advise and manage, or causing said funds, to remove the Debtor as CLO portfolio manager over various CLOs that the Debtor manages pursuant to executory contracts assumed by the Plan, even though the assumption of an executory contract subjects the Debtor to all provisions of the contract on a go-forward basis as a matter of law.

4.    Whether the Bankruptcy Court erred as a matter of law in confirming the Plan and entering the Confirmation Order because the "gatekeeper" injunction contained in Article IX of the Plan, which requires leave of the Bankruptcy Court upon a showing of a

"colorable" claim or cause of action, is not permitted by the Bankruptcy Code and effectively effectuates prohibited third party releases, is something that the Bankruptcy Court will have no postconfirmation jurisdiction to do, and as something that violates due process. Secondarily, with respect to any justification of the injunction based on an allegation that the Appellants or the Other Appellants are vexatious litigants, whether there was any or sufficient evidence in the record to justify any such extraordinary injunction.

5.     Whether the Bankruptcy Court erred as a matter of law in confirming the Plan and entering the Confirmation Order because the Debtor failed to satisfy the 11 U.S.C. § 1129(a)(2) element for confirmation requiring the Debtor to have complied with all applicable provisions of the Bankruptcy Code, which the Debtor admittedly failed to do because it utterly failed to comply with Bankruptcy Rule 2015.3.

## D.    THE CERTIFICATION ORDER

The Appellants, the Debtor, and the Other Appellants jointly moved the Bankruptcy Court to certify the Appeals for a direct appeal to this Court pursuant to 28 U.S.C. § 158(d)(2)(A). On March 16, 2021, the Bankruptcy Court entered its *Order Certifying Appeals of the Confirmation Order for Direct Appeal to the*

*United States Court of Appeals for the Fifth Circuit* (the "<u>Certification Order</u>"), a true and correct copy of which is attached hereto as Exhibit "E."

By the Certification Order, the Bankruptcy Court certified the Appeals for direct appeal "because a direct appeal may materially advance the progress of the case or proceeding in which the appeal is taken, within the meaning and operation of 28 U.S.C. § 158(d)(2)(A)(iii)."

The Appellants expect the Other Appellants to file similar petitions for direct appeal based on the same Certification Order.  If this Court grants all of the petitions, the Appellants expect that the Appeals will be consolidated before this Court.

## II.    <u>RELIEF REQUESTED</u>

The Appellants respectfully petition this Court to grant permission for the Appeal to be heard directly by this Court, bypassing the District Court, as provided for by 28 U.S.C. § 158(d)(2).  That section:

> was enacted to provide for direct review of bankruptcy court judgments, orders, or decrees by the applicable court of appeals in cases where the bankruptcy court or the district court certify that there is no controlling decision from the Supreme Court or circuit court, the case involves a matter of public importance, there are conflicting precedents, or an immediate appeal may materially advance the progress of the bankruptcy proceeding.

*In re OCA, Inc.*, 552 F.3d 413, 418 (5th Cir. 2008) (citing 28 U.S.C. § 158(d)(2)(A)(i)-(iii)).

"The two primary goals behind this provision are (i) to provide quicker and less costly means of resolving significant issues that are inevitably bound for the court of appeals, and (ii) to facilitate the development of more binding precedents in bankruptcy law." *In re Qimonda AG,* 470 B.R. 374, 382-83 (E.D.Va. 2012) (citing H.R. Rep. No. 109-31(7) at 148 (2005), as *reprinted in* 2005 U.S.L.L.A.N. 88, 206).

In the event that the Bankruptcy Court or the District Court makes the certification under 28 U.S.C. § 158(d)(2), this Court has jurisdiction if it authorizes the direct appeal. *Id.* As set forth in the Certification Order, the Bankruptcy Court determined that the Appeal meets the requirements for direct appeal because an immediate appeal may materially advance the progress of the case or the proceeding in which the Appeal is taken.

## III.   DISCUSSION

The ultimate issue in this Appeal is whether the Bankruptcy Court properly confirmed the Plan under the requirements of the Bankruptcy Code and this Court's precedent, with particular emphasis on whether the Plan violates the Absolute Priority Rule and this Court's *Pacific Lumber* precedent.

The governing statute provides as follows:

The appropriate court of appeals shall have jurisdiction of appeals described in the first sentence of subsection (a) if the bankruptcy court, the district court, or the bankruptcy appellate panel involved,

acting on its own motion or on the request of a party to the judgment, order, or decree described in such first sentence, or all the appellants and appellees (if any) acting jointly, certify that—

> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;

> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or

> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken;

and if the court of appeals authorizes the direct appeal of the judgment, order, or decree.

28 U.S.C. 158(d)(2)(A).

Permission to appeal directly to this Court should be granted for two reasons. First, as agreed to by the Debtor and the Other Appellants, and as certified by the Bankruptcy Court, a direct appeal may materially advance the progress of the case or proceeding in which the Appeal is pending, within the meaning of section 158(d)(2)(A)(iii). Second, the underlying judgment involves a question of law as to which there is no controlling precedent from this Court or from the Supreme Court, and the judgment involves a matter of public importance, within the meaning of section 158(d)(2)(A)(i).

With respect to materially advancing the progress of the case, all parties have stated that they intend to appeal any ruling of the District Court, thus ensuring that this Court will consider this Appeal anyway. The Bankruptcy Court certified the Appeal on this basis. Insofar as this Court will almost certainly be presented with the same Appeal anyway, the Appellants submit that it is in everyone's best interests to proceed with a direct appeal, as the parties will save significant fees and costs, upwards of one year of delay for finality will be avoided,[2] and the District Court will be spared being called upon to adjudicate an appeal that will be further appealed to this Court anyway.

The second ground for a direct appeal—no controlling authority and issues of public importance—is equally as important concerning this Court's discretion in authorizing a direct appeal. This is because there is no controlling authority from this Court or the Supreme Court permitting a "work around" the Absolute Priority Rule by providing contingent trust interests to equity holders and merely providing that those interests cannot recover unless and until unsecured creditors are first paid in full. This is fundamentally a question of law on which neither this Court nor the Supreme Court has issued controlling authority.

---

[2]     Of importance to all creditors and parties-in-interest affected by the Plan, and especially by its payment and injunction provisions.

This question is also one of "public importance."  If the Absolute Priority Rule can be overcome with the Plan's "work around," then it is very likely that many Chapter 11 plans, affecting thousands or tens of thousands of creditors and parties-in-interest, will include a similar "work around."  In the view of the Appellants, this will substantially weaken the Absolute Priority Rule and, therefore, one of the main protections the Bankruptcy Code affords unsecured creditors, while debtors will argue that equitable mootness will prevent subsequent appellate review of confirmed and implemented plans.[3]  A more prompt review by this Court of the issue, and any resulting precedent, will greatly aid those who administer bankruptcy cases and the Bankruptcy Courts asked to decide this issue.

## IV.   PRAYER

WHEREFORE, PREMISES CONSIDERED, the Appellants respectfully request that the Court, pursuant to 28 U.S.C. § 158(d), permit the Appeal to proceed directly in this Court.

---

[3]    The doctrine of equitable mootness may prevent appellate review of a substantially consummated plan in certain situations.  Hence all the more need for a stay pending appeal of the Confirmation Order and for a prompt appellate review of the Confirmation Order.

RESPECTFULLY SUBMITTED this 30th day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By:   /s/ Davor Rukavina
      Davor Rukavina, Esq.
      Texas Bar No. 24030781
      500 North Akard Street, Suite 3800
      Dallas, Texas  75201-6659
      Telephone: (214) 855-7500
      Facsimile: (214) 855-7584
      Email: drukavina@munsch.com

**ATTORNEYS FOR THE APPELLANTS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 30th day of March, 2021, he caused true and correct copies of this document, with all exhibits attached hereto, to be served by e-mail on the following parties through their respective counsel of record:

Appellee:
> Highland Capital Management, L.P.:
>> Jeffrey Pomerantz (jpomerantz@pszjlaw.com)
>> John A. Morris (jmorris@pszjlaw.com)

Other Appellees:
> Jim Dondero:
>> John Bonds (john@bondsellis.com)
>> Clay Taylor (clay.taylor@bondsellis.com)

> Highland Income Fund
> NexPoint Strategic Opportunities Fund
> Highland Global Allocation Fund
> NexPoint Capital, Inc.:
>> A. Lee Hogewood, III (A.Lee.HogewoodIII@klgates.com)

> Get Good Trust
> The Dugaboy Investment Trust:
>> Douglas Draper (ddraper@hellerdraper.com)

/s/ Davor Rukavina
Davor Rukavina, Esq.


## CERTIFICATION OF WORD COUNT

The undersigned hereby certifies that this Petition complies with Rule 5(c) because it contains 4,578 words, excepting those portions that may be excepted.

/s/ Davor Rukavina
Davor Rukavina, Esq.

18

# EXHIBIT A



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 22, 2021**

_____
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |

## ORDER (I) CONFIRMING THE FIFTH AMENDED
## PLAN OF REORGANIZATION OF HIGHLAND CAPITAL
## MANAGEMENT, L.P. (AS MODIFIED) AND (II) GRANTING RELATED RELIEF

The Bankruptcy Court[2] having:

a.      entered, on November 24, 2020, the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Scheduling A Hearing to Confirm the Fifth Amended Plan of Reorganization (C) Establishing Deadline for Filing Objections to Confirmation of Plan, (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures, and (E) Approving Form and Manner of Notice* [Docket No. 1476] (the "Disclosure Statement Order"), pursuant to which the Bankruptcy Court approved the adequacy of the *Disclosure Statement Relating to the Fifth*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as defined below). The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.

EXHIBIT A
**App. 294**

*Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1473] (the "Disclosure Statement") under section 1125 of the Bankruptcy Code and authorized solicitation of the Disclosure Statement;

b.    set January 5, 2021, at 5:00 p.m. prevailing Central Time (the "Objection Deadline"), as the deadline for filing objections to confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (*As Modified*) [Docket No. 1808] (as amended, supplemented or modified, the "Plan");

c.    set January 5, 2021, at 5:00 p.m. prevailing Central Time, as the deadline for voting on the Plan (the "Voting Deadline") in accordance with the Disclosure Statement Order;

d.    initially set January 13, 2021, at 9:30 a.m. prevailing Central Time, as the date and time to commence the hearing to consider confirmation of the Plan pursuant to Bankruptcy Rules 3017 and 3018, sections 1126, 1128, and 1129 of the Bankruptcy Code, and the Disclosure Statement Order, which hearing was continued to January 26, 2021, at 9:30 a.m. prevailing Central Time and further continued to February 2, 2021;

e.    reviewed: (i) the Plan; (ii) the Disclosure Statement; and (iii) *Notice of (I) Entry of Order Approving Disclosure Statement; (II) Hearing to Confirm; and (III) Related Important Dates* (the "Confirmation Hearing Notice"), the form of which is attached as Exhibit 1-B to the Disclosure Statement Order;

f.    reviewed: (i) the *Debtor's Notice of Filing of Plan Supplement for the Third Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1389] filed November 13, 2020; (ii) *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1606] filed on December 18, 2020; (iii) the *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1656] filed on January 4, 2021; (iv) *Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications)t* dated January 22, 2021 [Docket No. 1811]; and (v) *Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified)* on February 1, 2021 [Docket No. 1875]; (collectively, the documents listed in (i) through (v) of this paragraph, the "Plan Supplements");

g.    reviewed: (i) the *Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on December 30, 2020 [Docket No. 1648]; (ii) the *Second Notice of (I) Executory Contracts and*

2

*Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 11, 2021 [Docket No.1719]; (iii) the *Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 15, 2021 [Docket No. 1749]; (iv) the *Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791]; (v) the *Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on January 27, 2021 [Docket No. 1847]; (vi) the *Notice of Hearing on Agreed Motion to (I) Assume Nonresidential Real Property Lease with Crescent TC Investors, L.P. Upon Confirmation of Plan and (II) Extend Assumption Deadline* filed on January 28, 2021 [Docket No. 1857]; and (vii) the *Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on February 1, 2021 [Docket No. 1873] (collectively, the documents referred to in (i) to (vii) are referred to as "List of Assumed Contracts");

h.      reviewed: (i) the *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1814] (the "Confirmation Brief"); (ii) the *Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management*; [Docket No. 1807]; and (iii) the *Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1772] and *Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1887] filed on February 3, 2021 (together, the "Voting Certifications").

i.      reviewed: (i) *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505]; (ii) the *Certificate of Service* dated December 23, 2020 [Docket No. 1630]; (iii) the *Supplemental Certificate of Service* dated December 24, 2020 [Docket No. 1637]; (iv) the *Second Supplemental Certificate of Service* dated December 31, 2020 [Docket No. 1653]; (v) the *Certificate of Service* dated December 23, 2020 [Docket No. 1627]; (vi) the *Certificate of Service* dated January 6, 2021 [Docket No. 1696]; (vii) the *Certificate of Service* dated January 7, 2021 [Docket No. 1699]; (viii) the *Certificate of Service* dated January 7, 2021 [Docket No 1700]; (ix) the *Certificate of Service* dated January 15, 2021 [Docket No. 1761]; (x) the *Certificate of Service* dated January 19, 2021 [Docket No. 1775]; (xi) the

3

*Certificate of Service* dated January 20, 2021 [Docket No. 1787]; (xii) the *Certificate of Service* dated January 26, 2021[Docket No. 1844]; (xiii) the *Certificate of Service* dated January 27, 2021 [Docket No. 1854]; (xiv) the *Certificate of Service* dated February 1, 2021 [Docket No. 1879]; (xv) the *Certificates of Service* dated February 3, 2021 [Docket No. 1891 and 1893]; and (xvi) the *Certificates of Service* dated February 5, 2021 [Docket Nos. 1906, 1907, 1908 and 1909] (collectively, the "Affidavits of Service and Publication");

j.    reviewed all filed[3] pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and confirmation of the Plan, including all objections, statements, and reservations of rights;

k.    conducted a hearing to consider confirmation of the Plan, which commenced on February 2, 2021, at 9:30 a.m. prevailing Central Time and concluded on February 3, 2021, and issued its oral ruling on February 8, 2021 (collectively, the "Confirmation Hearing);

l.    heard the statements and arguments made by counsel in respect of confirmation of the Plan and having considered the record of this Chapter 11 Case and taken judicial notice of all papers and pleadings filed in this Chapter 11 Case; and

m.    considered all oral representations, testimony, documents, filings, and other evidence regarding confirmation of the Plan, including (a) all of the exhibits admitted into evidence;[4] (b) the sworn testimony of (i) James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer and a member of the Board of Directors of Strand Advisors, Inc. ("Strand"), the Debtor's general partner; (ii) John S. Dubel, a member of the Board of Strand; (iii) Marc Tauber, a Vice President at Aon Financial Services; and (iv) Robert Jason Post, the Chief Compliance Officer of NexPoint Advisors, LP (collectively, the "Witnesses"); (c) the credibility of the Witnesses; and (d) the Voting Certifications.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact and conclusions of law:

---

[3] Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in this Chapter 11 Case, as applicable.

[4] The Court admitted the following exhibits into evidence: (a) all of the Debtor's exhibits lodged at Docket No. 1822 (except TTTTT, which was withdrawn by the Debtor); (b) all of the Debtor's exhibits lodged at Docket No. 1866; (c) all of the Debtor's exhibits lodged at Docket No. 1877; (d) all of the Debtor's exhibits lodged at Docket No. 1895; and (e) Exhibits 6-12 and 15-17 offered by Mr. James Dondero and lodged at Docket No. 1874.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      **Findings of Fact and Conclusions of Law.**  The findings and conclusions set forth herein, together with the findings of fact and conclusions of law set forth in the record during the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.      **Introduction and Summary of the Plan.** Prior to addressing the specific requirements under the Bankruptcy Code and Bankruptcy Rules with respect to the confirmation of the Plan, the Bankruptcy Court believes it would be useful to first provide the following background of the Debtor's Chapter 11 Case, the parties involved therewith, and some of the major events that have transpired culminating in the filing and solicitation of the Plan of this very unusual case.  Before the Bankruptcy Court is the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, filed on November 24, 2020, as modified on January 22, 2021 and again on February 1, 2021.  The parties have repeatedly referred to the Plan as an "asset monetization plan" because it involves the orderly wind-down of the Debtor's estate, including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds, subject to the oversight of the Claimant Trust Oversight Board.  The Plan provides for a Claimant Trust to, among other things, manage and monetize the Claimant Trust Assets for the benefit of the Debtor's economic stakeholders.  The Claimant Trustee is responsible

5

for this process, among other duties specified in the Plan's Claimant Trust Agreement.  There is also anticipated to be a Litigation Sub-trust established for the purpose of pursuing certain avoidance or other causes of action for the benefit of the Debtor's economic constituents.

3.      **Confirmation Requirements Satisfied.**  The Plan is supported by the Committee and all claimants with Convenience Claims (*i.e.*, general unsecured claims under $1 million) who voted in Class 7.  Claimants with Class 8 General Unsecured Claims, however, voted to reject the Plan because, although the Plan was accepted by 99.8% of the amount of Claims in that class, only 17 claimants voted to accept the Plan while 27 claimants voted to reject the Plan. As a result of such votes, and because Mr. Dondero and the Dondero Related Entities (as defined below) objected to the Plan on a variety of grounds primarily relating to the Plan's release, exculpation and injunction provisions, the Bankruptcy Court heard two full days of evidence on February 2 and 3, 2021, and considered testimony from five witnesses and thousands of pages of documentary evidence in determining whether the Plan satisfies the confirmation standards required under the Bankruptcy Code.  The Bankruptcy Court finds and concludes that the Plan meets all of the relevant requirements of sections 1123, 1124, and 1129, and other applicable provisions of the Bankruptcy Code, as more fully set forth below with respect to each of the applicable confirmation requirements.

4.      **Not Your Garden Variety Debtor**.  The Debtor's case is not a garden variety chapter 11 case.  The Debtor is a multibillion-dollar global investment adviser registered with the SEC, pursuant to the Investment Advisers Act of 1940.  It was founded in 1993 by James Dondero and Mark Okada.  Mark Okada resigned from his role with Highland prior to the

6

bankruptcy case being filed on October 16, 2019 (the "Petition Date").  Mr. Dondero controlled

the Debtor as of the Petition Date but agreed to relinquish control of it on or about January 9, 2020,

pursuant to an agreement reached with the Committee, as described below.  Although Mr. Dondero

remained with the Debtor as an unpaid employee/portfolio manager after January 9, 2020, his

employment with the Debtor terminated on October 9, 2020.  Mr. Dondero continues to work for

and/or control numerous non-debtor entities in the complex Highland enterprise.

       5.      **The Debtor**.  The Debtor is headquartered in Dallas, Texas.  As of the

Petition Date, the Debtor employed approximately 76 employees.  The Debtor is privately-owned:

(a) 99.5% by the Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment

Trust, a trust created to manage the assets of Mr. Dondero and his family; (c) 0.0627% by Mark

Okada, personally and through family trusts; and (d) 0.25% by Strand, the Debtor's general

partner.

       6.      **The Highland Enterprise.**  Pursuant to various contractual arrangements,

the Debtor provides money management and advisory services for billions of dollars of assets,

including collateralized loan obligation vehicles ("CLOs"), and other investments.  Some of these

assets are managed by the Debtor pursuant to shared services agreements with certain affiliated

entities, including other affiliated registered investment advisors. In fact, there are approximately

2,000 entities in the byzantine complex of entities under the Highland umbrella.  None of these

affiliated entities filed for chapter 11 protection.  Most, but not all, of these entities are not

subsidiaries (direct or indirect) of the Debtor.  Many of the Debtor's affiliated companies are

7

offshore entities, organized in jurisdictions such as the Cayman Islands and Guernsey. *See* Disclosure Statement, at 17-18.

       7.    **Debtor's Operational History.**  The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates.  For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course, primarily through a brokerage account at Jefferies, LLC. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and cause those proceeds to be distributed to the Debtor in the ordinary course of business.  The Debtor's current Chief Executive Officer, James P. Seery, Jr., credibly testified at the Confirmation Hearing that the Debtor was "run at a deficit for a long time and then would sell assets or defer employee compensation to cover its deficits."  The Bankruptcy Court cannot help but wonder if that was necessitated because of enormous litigation fees and expenses incurred by the Debtor due to its culture of litigation—as further addressed below.

       8.    **Not Your Garden Variety Creditor's Committee**.  The Debtor and this chapter 11 case are not garden variety for so many reasons.  One of the most obvious standouts in this case is the creditor constituency.  The Debtor did not file for bankruptcy because of any of the typical reasons that large companies file chapter 11.  For example, the Debtor did not have a large, asset-based secured lender with whom it was in default; it only had relatively insignificant secured indebtedness owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank.  The Debtor also did not have problems with its trade vendors or landlords.

8

The Debtor also did not suffer any type of catastrophic business calamity. In fact, the Debtor filed for Chapter 11 protection six months before the onset of the COVID-19 pandemic. Rather, the Debtor filed for Chapter 11 protection due to a myriad of massive, unrelated, business litigation claims that it faced—many of which had finally become liquidated (or were about to become liquidated) after a decade or more of contentious litigation in multiple forums all over the world. The Committee in this case has referred to the Debtor—under its former chief executive, Mr. Dondero—as a "serial litigator." The Bankruptcy Court agrees with that description. By way of example, the members of the Committee (and their history of litigation with the Debtor and others in the Highland complex) are as follows:

a.  **The Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee")**. This Committee member obtained an arbitration award against the Debtor in the amount of $190,824,557, inclusive of interest, approximately five months before the Petition Date, from a panel of the American Arbitration Association. It was on the verge of having that award confirmed by the Delaware Chancery Court immediately prior to the Petition Date, after years of disputes that started in late 2008 (and included legal proceedings in Bermuda). This creditor's claim was settled during this Chapter 11 Case in the amount of approximately $137,696,610 (subject to other adjustments and details not relevant for this purpose).

b.  **Acis Capital Management, L.P., and Acis Capital Management GP, LLC ("Acis")**. Acis was formerly in the Highland complex of companies, but was not affiliated with Highland as of the Petition Date. This Committee member and its now-owner, Joshua Terry, were involved in litigation with the Debtor dating back to 2016. Acis was forced by Mr. Terry (who was a former Highland portfolio manager) into an involuntary chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of Texas, Dallas Division before the Bankruptcy Court in 2018, after Mr. Terry obtained an approximately $8 million arbitration award and judgment against Acis. Mr. Terry ultimately was awarded the equity ownership of Acis by the Bankruptcy Court in the Acis bankruptcy case. Acis subsequently asserted a multi-million dollar claim against Highland in the Bankruptcy Court for Highland's alleged denuding of Acis to defraud its creditors—primarily Mr. Terry. The litigation involving Acis and Mr. Terry dates back to mid-2016 and has

continued on with numerous appeals of Bankruptcy Court orders, including one appeal still pending at the Fifth Circuit Court of Appeals. There was also litigation involving Mr. Terry and Acis in the Royal Court of the Island of Guernsey and in a state court in New York. The Acis claim was settled during this Chapter 11 Case, in Bankruptcy Court-ordered mediation, for approximately $23 million (subject to other details not relevant for this purpose), and is the subject of an appeal being pursued by Mr. Dondero.

c.   **UBS Securities LLC and UBS AG London Branch ("UBS").**  UBS is a Committee member that filed a proof of claim in the amount of $1,039,957,799.40 in this Chapter 11 Case. The UBS Claim was based on a judgment that UBS received from a New York state court in 2020. The underlying decision was issued in November 2019, after a multi-week bench trial (which had occurred many months earlier) on a breach of contract claim against non-Debtor entities in the Highland complex. The UBS litigation related to activities that occurred in 2008 and 2009. The litigation involving UBS and Highland and affiliates was pending for more than a decade (there having been numerous interlocutory appeals during its history). The Debtor and UBS recently announced an agreement in principle for a settlement of the UBS claim (which came a few months after Bankruptcy Court-ordered mediation) which will be subject to a 9019 motion to be filed with the Bankruptcy Court on a future date.

d.   **Meta-E Discovery ("Meta-E").**  Meta-E is a Committee member that is a vendor who happened to supply litigation and discovery-related services to the Debtor over the years. It had unpaid invoices on the Petition Date of more than $779,000.

It is fair to say that the members of the Committee in this case all have wills of steel. They fought hard before and during this Chapter 11 Case. The members of the Committee, all of whom have volunteered to serve on the Claimant Trust Oversight Board post-confirmation, are highly sophisticated and have had highly sophisticated professionals representing them. They have represented their constituency in this case as fiduciaries extremely well.

9.    **Other Key Creditor Constituents.**  In addition to the Committee members who were all embroiled in years of litigation with Debtor and its affiliates in various ways, the Debtor has been in litigation with Patrick Daugherty, a former limited partner and employee of the Debtor, for many years in both Delaware and Texas state courts. Mr. Daugherty filed an amended

10

proof of claim in this Chapter 11 Case for $40,710,819.42 relating to alleged breaches of employment-related agreements and for defamation arising from a 2017 press release posted by the Debtor. The Debtor and Mr. Daugherty recently announced a settlement of Mr. Daugherty's claim pursuant to which he will receive $750,000 in cash on the Effective Date of the Plan, an $8.25 million general unsecured claim, and a $2.75 million subordinated claim (subject to other details not relevant for this purpose). Additionally, entities collectively known as "HarbourVest" invested more than $70 million with an entity in the Highland complex and asserted a $300 million proof of claim against the Debtor in this case, alleging, among other things, fraud and RICO violations. HarbourVest's claim was settled during the bankruptcy case for a $45 million general unsecured claim and a $35 million subordinated claim, and that settlement is also being appealed by a Dondero Entity.

10. **Other Claims Asserted.** Other than the Claims just described, most of the other Claims in this Chapter 11 Case are Claims asserted against the Debtor by: (a) entities in the Highland complex—most of which entities the Bankruptcy Court finds to be controlled by Mr. Dondero; (b) employees who contend that are entitled to large bonuses or other types of deferred compensation; and (c) numerous law firms that worked for the Debtor prior to the Petition Date and had outstanding amounts due for their prepetition services.

11. **Not Your Garden Variety Post-Petition Corporate Governance Structure**. Yet another reason this is not your garden variety chapter 11 case is its post-petition corporate governance structure. Immediately from its appointment, the Committee's relationship with the Debtor was contentious at best. First, the Committee moved for a change of venue from

Delaware to Dallas.  Second, the Committee (and later, the United States Trustee) expressed its then-desire for the appointment of a chapter 11 trustee due to its concerns over and distrust of Mr. Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and perhaps worse).

        12.      **Post-Petition Corporate Governance Settlement with Committee.**  After spending many weeks under the threat of the potential appointment of a trustee, the Debtor and Committee engaged in substantial and lengthy negotiations resulting in a corporate governance settlement approved by the Bankruptcy Court on January 9, 2020.[5]  As a result of this settlement, among other things, Mr. Dondero relinquished control of the Debtor and resigned his positions as an officer or director of the Debtor and its general partner, Strand.  As noted above, Mr. Dondero agreed to this settlement pursuant a stipulation he executed,[6] and he also agreed not to cause any Related Entity (as defined in the Settlement Motion) to terminate any agreements with the Debtor.  The January 9 Order also (a) required that the Bankruptcy Court serve as "gatekeeper" prior to the commencement of any litigation against the three independent board members appointed to oversee and lead the Debtor's restructuring in lieu of Mr. Dondero and (b) provided for the exculpation of those board members by limiting claims subject to the "gatekeeper" provision to those alleging willful misconduct and gross negligence.

---

[5] This order is hereinafter referred to as the "January 9 Order" and was entered by the Court on January 9, 2020 [Docket No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").

[6] *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Docket No. 338] (the "Stipulation").

DOCS_SF:104487.21 36027/002

**App. 305**

13.     **Appointment of Independent Directors.**   As part of the Bankruptcy Court-approved settlement, three eminently qualified independent directors were chosen to lead Highland through its Chapter 11 Case.  They are:  James P. Seery, Jr., John S. Dubel (each chosen by the Committee), and Retired Bankruptcy Judge Russell Nelms.  These three individuals are each technically independent directors of Strand (Mr. Dondero had previously been the sole director of Strand and, thus, the sole person in ultimate control of the Debtor).   The three independent board members' resumes are in evidence.  The Bankruptcy Court later approved Mr. Seery's appointment as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative.   Suffice it to say that this settlement and the appointment of the independent directors changed the entire trajectory of the case and saved the Debtor from the appointment of a trustee.  The Bankruptcy Court and the Committee each trusted the independent directors.  They were the right solution at the right time.  Because of the unique character of the Debtor's business, the Bankruptcy Court believed the appointment of three qualified independent directors was a far better outcome for creditors than the appointment of a conventional chapter 11 trustee.  Each of the independent directors brought unique qualities to the table.  Mr. Seery, in particular, knew and had vast experience at prominent firms with high-yield and distressed investing similar to the Debtor's business.  Mr. Dubel had 40 years of experience restructuring large complex businesses and serving on boards in this context.  And Retired Judge Nelms had not only vast bankruptcy experience but seemed particularly well-suited to help the Debtor maneuver through conflicts and ethical quandaries.  By way of comparison, in the chapter 11 case of Acis, the former affiliate of Highland that the Bankruptcy Court presided over and which company was

much smaller in size and scope than Highland (managing only 5-6 CLOs), the creditors elected a chapter 11 trustee who was not on the normal trustee rotation panel in this district but, rather, was a nationally known bankruptcy attorney with more than 45 years of large chapter 11 experience. While the Acis chapter 11 trustee performed valiantly, he was sued by entities in the Highland complex shortly after he was appointed (which the Bankruptcy Court had to address). The Acis trustee was also unable to persuade the Debtor and its affiliates to agree to any actions taken in the case, and he finally obtained confirmation of Acis' chapter 11 plan over the objections of the Debtor and its affiliates on his fourth attempt (which confirmation was promptly appealed).

14.     **Conditions Required by Independent Directors.**  Given the experiences in Acis and the Debtor's culture of constant litigation, it was not as easy to get such highly qualified persons to serve as independent board members and, later, as the Debtor's Chief Executive Officer, as it would be in an ordinary chapter 11 case.  The independent board members were stepping into a morass of problems. Naturally, they were worried about getting sued no matter how defensible their efforts—given the litigation culture that enveloped Highland historically.  Based on the record of this Case and the proceedings in the Acis chapter 11 case, it seemed as though everything always ended in litigation at Highland.  The Bankruptcy Court heard credible testimony that none of the independent directors would have taken on the role of independent director without (1) an adequate directors and officers' ("D&O") insurance policy protecting them; (2) indemnification from Strand that would be guaranteed by the Debtor; (3) exculpation for mere negligence claims; and (4) a gatekeeper provision prohibiting the commencement of litigation against the independent directors without the Bankruptcy Court's prior authority.  This gatekeeper provision was also

14

App. 307

included in the Bankruptcy Court's order authorizing the appointment of Mr. Seery as the Debtor's

Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative entered on

July 16, 2020.[7]  The gatekeeper provisions in both the January 9 Order and July 16 Order are

precisely analogous to what bankruptcy trustees have pursuant to the so-called "Barton Doctrine"

(first articulated in an old Supreme Court case captioned *Barton v. Barbour*, 104 U.S. 126 (1881)).

The Bankruptcy Court approved all of these protections in the January 9 Order and the July 16

Order, and no one appealed either of those orders.  As noted above, Mr. Dondero signed the

Stipulation that led to the settlement that was approved by the January 9 Order.  The Bankruptcy

Court finds that, like the Committee, the independent board members have been resilient and

unwavering in their efforts to get the enormous problems in this case solved.  They seem to have

at all times negotiated hard and in good faith, which culminated in the proposal of the Plan

currently before the Bankruptcy Court.  As noted previously, they completely changed the

trajectory of this case.

   15. **Not Your Garden Variety Mediators.**  And still another reason why this

was not your garden variety case was the mediation effort.  In the summer of 2020, roughly nine

months into the chapter 11 case, the Bankruptcy Court ordered mediation among the Debtor, Acis,

UBS, the Redeemer Committee, and Mr. Dondero.  The Bankruptcy Court selected co-mediators

because mediation among these parties seemed like such a Herculean task—especially during

COVID-19 where people could not all be in the same room.  Those co-mediators were:  Retired

---

[7] *See Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020 (the "July 16 Order")

Bankruptcy Judge Alan Gropper from the Southern District of New York, who had a distinguished career presiding over complex chapter 11 cases, and Ms. Sylvia Mayer, who likewise has had a distinguished career, first as a partner at a preeminent law firm working on complex chapter 11 cases, and subsequently as a mediator and arbitrator in Houston, Texas. As noted earlier, the Redeemer Committee and Acis claims were settled during the mediation—which seemed nothing short of a miracle to the Bankruptcy Court—and the UBS claim was settled several months later and the Bankruptcy Court believes the ground work for that ultimate settlement was laid, or at least helped, through the mediation. And, as earlier noted, other significant claims have been settled during this case, including those of HarbourVest (who asserted a $300 million claim) and Patrick Daugherty (who asserted a $40 million claim). The Bankruptcy Court cannot stress strongly enough that the resolution of these enormous claims—and the acceptance by all of these creditors of the Plan that is now before the Bankruptcy Court—seems nothing short of a miracle. It was more than a year in the making.

16.    **Not Your Garden Variety Plan Objectors (That Is, Those That Remain)**. Finally, a word about the current, remaining objectors to the Plan before the Bankruptcy Court. Once again, the Bankruptcy Court will use the phrase "not your garden variety", which phrase applies to this case for many reasons. Originally, there were over a dozen objections filed to the Plan. The Debtor then made certain amendments or modifications to the Plan to address some of these objections, none of which require further solicitation of the Plan for reasons set forth in more detail below. The only objectors to the Plan left at the time of the Confirmation Hearing

DOCS_SF:104487.21 36027/002

were Mr. Dondero [Docket No. 1661] and entities that the Bankruptcy Court finds are owned

and/or controlled by him and that filed the following objections:

a.   *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* (filed by Get Good Trust and The Dugaboy Investment Trust) [Docket No. 1667];

b.   *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670];

c.   A *Joinder to the Objection filed at 1670 by:  NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing* [Docket No. 1677];

d.   *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; and

e.   *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676].  The entities referred to in (i) through (v) of this paragraph are hereinafter referred to as the "Dondero Related Entities").

17.   **Questionability of Good Faith as to Outstanding Confirmation**

**Objections.**  Mr. Dondero and the Dondero Related Entities technically have standing to object to

the Plan, but the remoteness of their economic interests is noteworthy, and the Bankruptcy Court

questions the good faith of Mr. Dondero's and the Dondero Related Entities' objections.  In fact, the Bankruptcy Court has good reason to believe that these parties are not objecting to protect economic interests they have in the Debtor but to be disruptors.  Mr. Dondero wants his company back.  This is understandable, but it is not a good faith basis to lob objections to the Plan.  As detailed below, the Bankruptcy Court has slowed down plan confirmation multiple times and urged the parties to talk to Mr. Dondero in an attempt to arrive at what the parties have repeatedly referred to as a "grand bargain," the ultimate goal to resolve the Debtor's restructuring.  The Debtor and the Committee represent that they have communicated with Mr. Dondero regarding a grand bargain settlement, and the Bankruptcy Court believes that they have.

18.     **Remote Interest of Outstanding Confirmation Objectors.**  To be specific about the remoteness of Mr. Dondero's and the Dondero Related Entities' interests, the Bankruptcy Court will address them each separately.  First, Mr. Dondero has a pending objection to the Plan.  Mr. Dondero's only economic interest with regard to the Debtor is an unliquidated indemnification claim (and, based on everything the Bankruptcy Court has heard, his indemnification claims would be highly questionable at this juncture).  Mr. Dondero owns no equity in the Debtor directly.  Mr. Dondero owns the Debtor's general partner, Strand, which in turn owns a quarter percent of the total equity in the Debtor.  Second, a joint objection has been filed by The Dugaboy Trust ("Dugaboy") and the Get Good Trust ("Get Good").  The Dugaboy Trust was created to manage the assets of Mr. Dondero and his family and owns a 0.1866% limited partnership interest in the Debtor.  *See* Disclosure Statement at 7, n.3.  The Bankruptcy Court is not clear what economic interest the Get Good Trust has, but it likewise seems to be related to Mr. Dondero.  Get Good

DOCS_SF:104487.21 36027/002

filed three proofs of claim relating to a pending federal tax audit of the Debtor's 2008 return, which the Debtor believes arise from Get Good's equity security interests and are subject to subordination as set forth in its Confirmation Brief. Dugaboy filed three claims against the Debtor: (a) an administrative claim relating to the Debtor's alleged postpetition management of Multi-Strat Credit Fund, L.P., (b) a prepetition claim against a subsidiary of the Debtor for which it seeks to pierce the corporate veil, each of which the Debtor maintains are frivolous in the Confirmation Brief, and (c) a claim arising from its equity security interest in the Debtor, which the Debtor asserts should be subordinated. Another group of objectors that has joined together in one objection is what the Bankruptcy Court will refer to as the "Highland Advisors and Funds." *See* Docket No. 1863. The Bankruptcy Court understands they assert disputed administrative expense claims against the estate that were filed shortly before the Confirmation Hearing on January 23, 2021 [Docket No. 1826], and during the Confirmation Hearing on February 3, 2021 [Docket No. 1888]. At the Confirmation Hearing, Mr. Post testified on behalf of the Highland Advisors and Funds that the Funds have independent board members that run the Funds, but the Bankruptcy Court was not convinced of their independence from Mr. Dondero because none of the so-called independent board members have ever testified before the Bankruptcy Court and all have been engaged with the Highland complex for many years. Notably, the Court questions Mr. Post's credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request, and he is currently employed by Mr. Dondero. Moreover, Dustin Norris, a witness in a prior proceeding (whose testimony was made part of the record at the Confirmation Hearing), recently

19

testified on behalf of the Highland Advisors and Funds in another proceeding that Mr. Dondero owned and/or controlled these entities. Finally, various NexBank entities objected to the Plan. The Bankruptcy Court does not believe they have liquidated claims against the Debtor. Mr. Dondero appears to be in control of these entities as well.

19. **Background Regarding Dondero Objecting Parties.** To be clear, the Bankruptcy Court has allowed all these objectors to fully present arguments and evidence in opposition to confirmation, even though their economic interests in the Debtor appear to be extremely remote and the Bankruptcy Court questions their good faith. Specifically, the Bankruptcy Court considers them all to be marching pursuant to the orders of Mr. Dondero. In the recent past, Mr. Dondero has been subject to a temporary restraining order and preliminary injunction by the Bankruptcy Court for interfering with Mr. Seery's management of the Debtor in specific ways that were supported by evidence. Around the time that this all came to light and the Bankruptcy Court began setting hearings on the alleged interference, Mr. Dondero's company phone, which he had been asked to turn in to Highland, mysteriously went missing. The Bankruptcy Court merely mentions this in this context as one of many reasons that the Bankruptcy Court has to question the good faith of Mr. Dondero and his affiliates in raising objections to confirmation of the Plan.

20. **Other Confirmation Objections.** Other than the objections filed by Mr. Dondero and the Dondero Related Entities, the only other pending objection to the Plan is the *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1671], which objected to the Plan's exculpation, injunction, and

Debtor release provisions. In juxtaposition, to these pending objections, the Bankruptcy Court

notes that the Debtor resolved the following objections to the Plan:

    a.    *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph VV of the Confirmation Order;

    b.    *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph QQ of the Confirmation Order;

    c.    *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph 82 and paragraphs RR and SS of the Confirmation Order;

    d.    *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666] and the amended joinder filed by Davis Deadman, Paul Kauffman and Todd Travers [Docket No. 1679]. This Objection and the amended joinder were resolved by agreement of the parties pursuant to modifications to the Plan filed by the Debtor;

    e.    *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraphs TT and UU of the Confirmation Order; and

    f.    *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678]. This objection was resolved by the parties pursuant to the settlement of Mr. Daugherty's claim announced on the record of the Confirmation Hearing.

    21.    **Capitalized Terms.** Capitalized terms used herein, but not defined herein,

shall have the respective meanings attributed to such terms in the Plan and the Disclosure

Statement, as applicable.

22.    **Jurisdiction and Venue.**  The Bankruptcy Court has jurisdiction over the Debtor's Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Chapter 11 Case is proper in this district and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

23.    **Chapter 11 Petition.**  On the Petition Date, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, which case was transferred to the Bankruptcy Court on December 19, 2019.  The Debtor continues to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Chapter 11 Case.  The Office of the United States Trustee appointed the Committee on October 29, 2019.

24.    **Judicial Notice.**  The Bankruptcy Court takes judicial notice of the docket in this Chapter 11 Case maintained by the clerk of the Bankruptcy Court and the court-appointed claims agent, Kurtzman Carson Consultants LLC ("KCC"), including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during this Chapter 11 Case, including, without limitation, the hearing to consider the adequacy of the Disclosure Statement and the Confirmation Hearing, as well as all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings held before the Bankruptcy Court or the District Court for the Northern District of Texas in

22

connection with an adversary proceeding or appellate proceeding, respectively, related to this Chapter 11 Case.

25. **Plan Supplement Documents.** Prior to the Confirmation Hearing, the Debtor filed each of the Plan Supplements. The Plan Supplements contain, among other documents, the Retained Causes of Action, the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Senior Employee Stipulation, the Related Entity List, the Schedule of Employees, the Reorganized Limited Partnership Agreement, supplements to the Liquidation Analysis/Financial Projections, the Schedule of Contracts and Leases to be Assumed, and the other Plan Documents set forth therein (collectively, the "Plan Supplement Documents").

26. **Retained Causes of Action Adequately Preserved.** The Bankruptcy Court finds that the list of Retained Causes of Action included in the Plan Supplements sufficiently describes all potential Retained Causes of Action, provides all persons with adequate notice of any Causes of Action regardless of whether any specific claim to be brought in the future is listed therein or whether any specific potential defendant or other party is listed therein, and satisfies applicable law in all respects to preserve all of the Retained Causes of Action. The definition of the Causes of Action and Schedule of Retained Causes of Action, and their inclusion in the Plan, specifically and unequivocally preserve the Causes of Action for the benefit of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust, as applicable.

27. **Plan Modifications Are Non-Material.** In addition to the Plan Supplements, the Debtor made certain non-material modifications to the Plan, which are reflected in (i) the *Redline of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*

23

*(as Modified)* filed on January 22, 2021 [Docket No. 1809], and (ii) Exhibit B to the *Debtor's Notice of Filing of Plan Supplement to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* filed on February 1, 2021 [Docket No. 1875] (collectively, the "Plan Modifications").  Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation so long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  None of the modifications set forth in the Plan Supplements or the Plan Modifications require any further solicitation pursuant to sections 1125, 1126, or 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, because, among other things, they do not materially adversely change the treatment of the claims of any creditors or interest holders who have not accepted, in writing, such supplements and modifications.  Among other things, there were changes to the projections that the Debtor filed shortly before the Confirmation Hearing (which included projected distributions to creditors and a comparison of projected distributions under the Plan to potential distributions under a hypothetical chapter 7 liquidation).  The Plan Supplements and Plan Modifications did not mislead or prejudice any creditors or interest holders nor do they require that Holders of Claims or Equity Interests be afforded an opportunity to change previously cast votes to accept or reject the Plan.  Specifically, the Amended Liquidation Analysis/Financial Projections filed on February 1, 2021 [Docket No. 1875] do not constitute any material adverse change to the treatment of any creditors or interest holders but, rather, simply update the estimated distributions based on Claims that were settled in the interim and provide updated financial data.  The filing and notice of the Plan Supplements and Plan Modifications were appropriate and complied with the requirements of

DOCS_SF:104487.21 36027/002

section 1127(a) of the Bankruptcy Code and the Bankruptcy Rules, and no other solicitation or disclosure or further notice is or shall be required.  The Plan Supplements and Plan Modifications each became part of the Plan pursuant section 1127(a) of the Bankruptcy Code.  The Debtor or Reorganized Debtor, as applicable, is authorized to modify the Plan or Plan Supplement Documents following entry of this Confirmation Order in a manner consistent with section 1127(b) of the Bankruptcy Code, the Plan, and, if applicable, the terms of the applicable Plan Supplement Document.

28.     **Notice of Transmittal, Mailing and Publication of Materials.**  As is evidenced by the Voting Certifications and the Affidavits of Service and Publication, the transmittal and service of the Plan, the Disclosure Statement, Ballots, and Confirmation Hearing Notice were adequate and sufficient under the circumstances, and all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to the confirmation of the Plan) have been given due, proper, timely, and adequate notice in accordance with the Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and such parties have had an opportunity to appear and be heard with respect thereto.  No other or further notice is required.  The publication of the Confirmation Hearing Notice, as set forth in the *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505], complied with the Disclosure Statement Order.

29.     **Voting.**  The Bankruptcy Court has reviewed and considered the Voting Certifications.  The procedures by which the Ballots for acceptance or rejection of the Plan were

distributed and tabulated, including the tabulation as subsequently amended to reflect the settlement of certain Claims to be Allowed in Class 7, were fairly and properly conducted and complied with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

30. **Bankruptcy Rule 3016(a).** In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtor as the proponent of the Plan.

31. **Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)).** As set forth below, the Plan complies with all of the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

32. **Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).** Section 1122 of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class. The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Equity Interests.

33. **Classification of Secured Claims.** Class 1 (Jefferies Secured Claim) and Class 2 (Frontier Secured Claim) each constitute separate secured claims held by Jefferies LLC and Frontier State Bank, respectively, and it is proper and consistent with section 1122 of the Bankruptcy Code to separately classify the claims of these secured creditors. Class 3 (Other

26

App. 319

Secured Claims) consists of other secured claims (to the extent any exist) against the Debtor, are not substantially similar to the Secured Claims in Class 1 or Class 2, and are also properly separately classified.

34.     **Classification of Priority Claims.**  Class 4 (Priority Non-Tax Claims) consists of Claims entitled to priority under section 507(a), other than Priority Tax Claims, and are properly separately classified from non-priority unsecured claims.  Class 5 (Retained Employee Claims) consists of the potential claims of employees who may be retained by the Debtor on the Effective Date, which claims will be Reinstated under the Plan, are not substantially similar to other Claims against the Debtor, and are properly classified.

35.     **Classification of Unsecured Claims.**  Class 6 (PTO Claims) consists solely of the claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other unsecured claims in Class 7 and Class 8.  Class 7 (Convenience Claims) allows holders of eligible and liquidated Claims (below a certain threshold dollar amount) to receive a cash payout of the lesser of 85% of the Allowed amount of the creditor's Claim or such holder's *pro rata* share of the Convenience Claims Cash Pool. Class 7 (Convenience Claims) are provided for administrative convenience purposes in order to allow creditors, most of whom are either trade creditors or holders of professional claims, to receive treatment provided under Class 7 in lieu of the treatment of Class 8 (General Unsecured Claims).  The Plan also provides for reciprocal "opt out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8 Claims. Class 8 creditors primarily constitute the litigation claims of the Debtor.  Class 8 Creditors

27

will receive Claimant Trust Interests which will be satisfied pursuant to the terms of the Plan. Class 8 also contains an "opt out" mechanism to allow holders of liquidated Class 8 Claims at or below a $1 million threshold to elect to receive the treatment of Class 7 Convenience Claims. The Claims in Class 7 (primarily trade and professional Claims against the Debtor) are not substantially similar to the Claims in Class 8 (primarily the litigation Claims against the Debtor), and are appropriately separately classified. Valid business reasons also exist to classify creditors in Class 7 separately from creditors in Class 8. Class 7 creditors largely consist of liquidated trade or service providers to the Debtor. In addition, the Claims of Class 7 creditors are small relative to the large litigation claims in Class 8. Furthermore, the Class 8 Claims were overwhelmingly unliquidated when the Plan was filed. The nature of the Class 7 Claims as being largely liquidated created an expectation of expedited payment relative to the largely unliquidated Claims in Class 8, which consists in large part of parties who have been engaged in years, and in some cases over a decade of litigation with the Debtor. Separate classification of Class 7 and Class 8 creditors was the subject of substantial arm's-length negotiations between the Debtor and the Committee to appropriately reflect these relative differences.

36. **Classification of Equity Interests.** The Plan properly separately classifies the Equity Interests in Class 10 (Class B/C Limited Partnership Interests) from the Equity Interests in Class 11 (Class A Limited Partnership Interests) because they represent different types of equity security interests in the Debtor and different payment priorities.

37. **Elimination of Vacant Classes.** Section III.C of the Plan provides for the elimination of Classes that do not have at least one holder of a Claim or Equity Interest that is

28

App. 321

Allowed in an amount greater than zero for purposes of voting to accept or reject the Plan, and are disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class. The purpose of this provision is to provide that a Class that does not have voting members shall not be included in the tabulation of whether that Class has accepted or rejected the Plan. Pursuant to the Voting Certifications, the only voting Class of Claims or Equity Interests that did not have any members is Class 5 (Retained Employees). As noted above, Class 5 does not have any voting members because any potential Claims in Class 5 would not arise, except on account of any current employees of the Debtor who may be employed as of the Effective Date, which is currently unknown. Thus, the elimination of vacant Classes provided in Article III.C of the Plan does not violate section 1122 of the Bankruptcy Code. Class 5 is properly disregarded for purposes of determining whether or not the Plan has been accepted under Bankruptcy Code section 1129(a)(8) because there are no members in that Class. However, the Plan properly provides for the treatment of any Claims that may potentially become members of Class 5 as of the Effective Date in accordance with the terms of the Plan. The Plan therefore satisfies section 1122 of the Bankruptcy Code.

38. **Classification of Claims and Designation of Non-Classified Claims (11 U.S.C. §§ 1122, 1123(a)(1)).** Section 1123(a)(1) of the Bankruptcy Code requires that the Plan specify the classification of claims and equity security interests pursuant to section 1122 of the Bankruptcy Code, other than claims specified in sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code. In addition to Administrative Claims, Professional Fee Claims, and Priority Tax Claims, each of which need not be classified pursuant to section 1123(a)(1) of the Bankruptcy

DOCS_SF:104487.21 36027/002

Code, the Plan designates eleven (11) Classes of Claims and Equity Interests. The Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

39. **Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2)).** Article III of the Plan specifies that each of Class 1 (Jefferies Secured Claim), Class 3 (Other Secured Claims), Class 4 (Priority Non-Tax Claims), Class 5 (Retained Employee Claims), and Class 6 (PTO Claims) are Unimpaired under the Plan. Thus, the requirement of section 1123(a)(2) of the Bankruptcy Code is satisfied.

40. **Specification of Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).** Article III of the Plan designates each of Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), Class 8 (General Unsecured Claims), Class 9 (Subordinated Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) as Impaired and specifies the treatment of Claims and Equity Interests in such Classes. Thus, the requirement of section 1123(a)(3) of the Bankruptcy Code is satisfied.

41. **No Discrimination (11 U.S.C. § 1123(a)(4)).** The Plan provides for the same treatment by the Plan proponent for each Claim or Equity Interest in each respective Class unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest. The Plan satisfies this requirement because Holders of Allowed Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such holder's respective class, subject only to the voluntary "opt out" options afforded to members of Class 7 and Class 8 in accordance with the terms of the Plan. Thus, the requirement of section 1123(a)(4) of the Bankruptcy Code is satisfied.

30

42.     **Implementation of the Plan (11 U.S.C. § 1123(a)(5)).**  Article IV of the

Plan sets forth the means for implementation of the Plan which includes, but is not limited to, the

establishment of:  (i) the Claimant Trust; (ii) the Litigation Sub-Trust; (iii) the Reorganized Debtor;

and (iv) New GP LLC, in the manner set forth in the Plan Documents, the forms of which are

included in the Plan Supplements.

a.     **The Claimant Trust.**  The Claimant Trust Agreement provides for the management of the Claimant Trust, as well as the Reorganized Debtor with the Claimant Trust serving as the managing member of New GP LLC (a wholly-owned subsidiary of the Claimant Trust that will manage the Reorganized Debtor as its general partner).  The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will all be managed and overseen by the Claimant Trust Oversight Committee.  Additionally, the Plan provides for the transfer to the Claimant Trust of all of the Debtor's rights, title, and interest in and to all of the Claimant Trust Assets in accordance with section 1141 of the Bankruptcy Code and for the Claimant Trust Assets to automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement.  The Claimant Trust will administer the Claimant Trust Assets as provided under the Plan and the Claimant Trust Agreement contained in the Plan Supplements.

b.     **The Litigation Sub-Trust.**  The Plan and the Litigation Sub-Trust Agreement provide for the transfer to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims (as transferred to the Claimant Trust by the Debtor) in accordance with section 1141 of the Bankruptcy Code and for the Estate Claims to automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and the Litigation Sub-Trust Expenses, as provided for in the Litigation Sub-Trust Agreement.   The Litigation Trustee is charged with investigating, pursuing, and otherwise resolving any Estate Claims (including those with respect to which the Committee has standing to pursue prior to the Effective Date pursuant to the January 9 Order) pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, regardless of whether any litigation with respect to any Estate Claim was commenced by the Debtor or the Committee prior to the Effective Date.

      c.    **The Reorganized Debtor**.  The Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds.

The precise terms governing the execution of these restructuring transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, and the Schedule of Retained Causes of Action. The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan. The Plan's various mechanisms provide for the Debtor's continued management of its business as it seeks to liquidate the Debtor's assets, wind down its affairs, and pay the Claims of the Debtor's creditors. Upon full payment of Allowed Claims, plus interest as provided in the Plan, any residual value would then flow to the holders of Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests). Finally, Mr. Seery testified that the Debtor engaged in substantial and arm's length negotiations with the Committee regarding the Debtor's post-Effective Date corporate governance, as reflected in the Plan. Mr. Seery testified that he believes the selection of the Claimant Trustee, Litigation Trustee, and members of the Claimant Trust Oversight Board are in the best interests of the Debtor's economic constituents. Thus, the requirements of section 1123(a)(5) of the Bankruptcy Code are satisfied.

      43.    **Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).**  The Debtor is not a corporation and the charter documents filed in the Plan Supplements otherwise comply with section 1123(a)(6) of the Bankruptcy Code. Therefore, the requirement of section 1123(a)(6) of the Bankruptcy Code is satisfied.

32

44.     **Selection of Officers and Directors (11 U.S.C. § 1123(a)(7)).**  Article IV of the Plan provides for the Claimant Trust to be governed and administered by the Claimant Trustee.  The Claimant Trust, the management of the Reorganized Debtor, and the management and monetization of the Claimant Trust Assets and the Litigation Sub-Trust will be managed by the Claimant Trust Oversight Board.  The Claimant Trust Oversight Board will consist of:  (1) Eric Felton, as representative of the Redeemer Committee; (2) Joshua Terry, as representative of Acis; (3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of Meta-E Discovery; and (5) David Pauker.   Four of the members of the Claimant Trust Oversight Committee are the holders of several of the largest Claims against the Debtor and/or are current members of the Committee.  Each of these creditors has actively participated in the Debtor's case, both through their fiduciary roles as Committee members and in their individual capacities as creditors.  They are therefore intimately familiar with the Debtor, its business, and assets.  The fifth member of the Claimant Trustee Oversight Board, David Pauker, is a disinterested restructuring advisor and turnaround manager with more than 25 years of experience advising public and private companies and their investors, and he has substantial experience overseeing, advising or investigating troubled companies in the financial services industry and has advised or managed such companies on behalf of boards or directors, court-appointed trustees, examiners and special masters, government agencies, and private investor parties.  The members of the Claimant Trust Oversight Board will serve without compensation, except for Mr. Pauker, who will receive payment of $250,000 for his first year of service, and $150,000 for subsequent years.

DOCS_SF:104487.21 36027/002

45. **Selection of Trustees.** The Plan Supplements disclose that Mr. Seery will serve as the Claimant Trustee and Marc Kirschner will serve as the Litigation Trustee. As noted above, Mr. Seery has served as an Independent Board member since January 2020, and as the Chief Executive Officer and Chief Restructuring Officer since July 2020, and he has extensive management and restructuring experience, as evidenced from his curriculum vitae which is part of the record. The evidence shows that Mr. Seery is intimately familiar with the Debtor's organizational structure, business, and assets, as well as how Claims will be treated under the Plan. Accordingly, it is reasonable and in the Estate's best interests to continue Mr. Seery's employment post-emergence as the Claimant Trustee. Mr. Seery, upon consultation with the Committee, testified that he intends to employ approximately 10 of the Debtor's employees to enable him to manage the Debtor's business until the Claimant Trust effectively monetizes its remaining assets, instead of hiring a sub-servicer to accomplish those tasks. Mr. Seery testified that he believes that the Debtor's post-confirmation business can most efficiently and cost-effectively be supported by a sub-set of the Debtor's current employees, who will be managed internally. Mr. Seery shall initially be paid $150,000 per month for services rendered after the Effective Date as Claimant Trustee; however, Mr. Seery's long-term salary as Claimant Trustee and the terms of any bonuses and severance are subject to further negotiation by Mr. Seery and the Claimant Trust Oversight Board within forty-five (45) days after the Effective Date. The Bankruptcy Court has also reviewed Mr. Kirschner's curriculum vitae. Mr. Kirschner has been practicing law since 1967 and has substantial experience in bankruptcy litigation matters, particularly with respect to his prior experience as a litigation trustee for several litigation trusts, as set forth on the record of the

DOCS_SF:104487.21 36027/002

Confirmation Hearing and in the Confirmation Brief. Mr. Kirschner shall be paid $40,000 per month for the first three months and $20,000 per month thereafter, plus a success fee related to litigation recoveries. The Committee and the Debtor had arm's lengths negotiations regarding the post-Effective Date corporate governance structure of the Reorganized Debtor and believe that the selection of the Claimant Trustee, the Litigation Trustee, and the Claimant Trust Oversight Committee are in the best interests of the Debtor's economic stakeholders. Section 1123(a)(7) of the Bankruptcy Code is satisfied.

46. **Debtor's Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).** Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtor has complied with the applicable provisions of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, and 1126 of the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure Statement, the Plan Supplements, and all other matters considered by the Bankruptcy Court in connection with this Chapter 11 Case.

47. **Debtor's Solicitation Complied with Bankruptcy Code and Disclosure Statement Order.** Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered the Disclosure Statement Order. In accordance with the Disclosure Statement Order and evidenced by the Affidavits of Service and Publication, the Debtor appropriately served (i) the Solicitation Packages (as defined in the Disclosure Statement Order) on the Holders of Claims in Classes 2, 7, 8 and 9 and Holders of Equity Interests in Classes 10 and 11 who were entitled to vote on the Plan; and (ii) the Notice of Nonvoting Status (as defined in the Disclosure Statement Order) and the

35

Confirmation Hearing Notice to the Holders of Claims in Classes 1, 3, 4, 5 and 6, who were not entitled to vote on the Plan pursuant to the Disclosure Statement Order. The Disclosure Statement Order approved the contents of the Solicitation Packages provided to Holders of Claims and Equity Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan, and the deadlines for voting on and objecting to the Plan. The Debtor and KCC each complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code, as evidenced by the Affidavits of Service and Publication. The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class. The Debtor caused the same Disclosure Statement to be transmitted to all holders of Claims and Equity Interests entitled to vote on the Plan. The Debtor has complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order. The Bankruptcy Court rejects the arguments of the Mr. Dondero and certain Dondero Related Entities that the changes made to certain assumptions and projections from the Liquidation Analysis annexed as Exhibit C to the Disclosure Statement (the "Liquidation Analysis") to the Amended Liquidation Analysis/Financial Projections require resolicitation of the Plan. The Bankruptcy Court heard credible testimony from Mr. Seery regarding the changes to the Liquidation Analysis as reflected in the Amended Liquidation Analysis/Financial Projections. Based on the record, including the testimony of Mr. Seery, the Bankruptcy Court finds that the changes between the Liquidation Analysis and the Amended Liquidation Analysis/Financial Projections do not constitute materially adverse change to the treatment of Claims or Equity

Interests. Instead, the changes served to update the projected distributions based on Claims that were settled after the approval of the Disclosure Statement and to otherwise incorporate more recent financial data. Such changes were entirely foreseeable given the large amount of unliquidated Claims at the time the Disclosure Statement was approved and the nature of the Debtor's assets. The Bankruptcy Court therefore finds that holders of Claims and Equity Interests were not misled or prejudiced by the Amended Liquidation Analysis/Financial Projections and the Plan does not need to be resolicited.

48. **Plan Proposed in Good Faith and Not by Means Forbidden by Law (11 U.S.C. § 1129(a)(3)).** The Debtor has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of this Chapter 11 Case, the Plan itself, and the extensive, unrebutted testimony of Mr. Seery in which he described the process leading to Plan's formulation. Based on the totality of the circumstances and Mr. Seery's testimony, the Bankruptcy Court finds that the Plan is the result of extensive arm's-length negotiations among the Debtor, the Committee, and key stakeholders, and promotes the objectives and purposes of the Bankruptcy Code. Specifically, the Debtor's good faith in proposing the Plan is supported by the following facts adduced by Mr. Seery:

    a.    The Independent Board determined that it should consider all potential restructuring alternatives, including pursuit of a traditional restructuring and the continuation of the Debtor's business, a potential sale of the Debtor's assets in one or more transactions, an asset monetization plan similar to that described in the Plan, and a so-called "grand bargain" plan that would involve Mr. Dondero's sponsorship of a plan with a substantial equity infusion.

b.      The Debtor subsequently engaged in arm's-length, good faith negotiations with the Committee over an asset monetization Plan commencing in June 2020, which negotiations occurred over the next several months.

c.      Negotiations between the Debtor and the Committee were often contentious over disputes, including, but not limited to, the post-confirmation corporate governance structure and the scope of releases contemplated by the Plan.

d.      While negotiations with the Committee progressed, the Independent Board engaged in discussions with Mr. Dondero regarding a potential "grand bargain" plan which contemplated a significant equity infusion by Mr. Dondero, and which Mr. Seery personally spent hundreds of hours pursuing over many months.

e.      On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [Docket No. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation. As a result of this mediation, the Debtor negotiated the settlement of the claims of Acis and Mr. Terry, which the Bankruptcy Court approved on October 28, 2020 [Docket No. 1302].

f.      On August 12, 2020, the Debtor filed its *Chapter 11 Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 944] (the "Initial Plan") and related disclosure statement (the "Initial Disclosure Statement") which were not supported by either the Committee or Mr. Dondero. The Independent Board filed the Initial Plan and Initial Disclosure Statement in order to act as a catalyst for continued discussions with the Committee while it simultaneously worked with Mr. Dondero on the "grand bargain" plan.

g.      The Bankruptcy Court conducted a contested hearing on the Initial Disclosure Statement on October 27, 2020. The Committee and other parties objected to approval of the Disclosure Statement at the Initial Disclosure Statement hearing, which was eventually continued to November 23, 2020.

h.      Following the Initial Disclosure Statement hearing, the Debtor continued to negotiate with the Committee and ultimately resolved the remaining material disputes and led to the Bankruptcy Court's approval of the Disclosure Statement on November 23, 2020.

i.      Even after obtaining the Bankruptcy Court's approval of the Disclosure Statement, the Debtor and the Committee continued to negotiate with Mr. Dondero and the Committee over a potential "pot plan" as an alternative to the Plan on file with the Bankruptcy Court, but such efforts were unsuccessful. This history conclusively demonstrates that the Plan is being proposed in good faith within the meaning of section 1129(a)(3).

38

49. **Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**

Article II.B of the Plan provides that Professionals will file all final requests for payment of

Professional Fee Claims no later than 60 days after the Effective Date, thereby providing an

adequate period of time for interested parties to review such claims.  The procedures set forth in

the Plan for the Bankruptcy Court's approval of the fees, costs, and expenses to be paid in

connection with this chapter 11 Case, or in connection with the Plan and incident to this Chapter

11 Case, satisfy the objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy

Code.

50. **Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).**  Article IV.B

of the Plan provides for the appointment of the Claimant Trustee, Litigation Trustee, and the

Claimant Trust Oversight Committee and the members thereto.  For the reasons more fully

explained in paragraphs 44-45 of this Confirmation Order with respect to the requirement of

section 1123(a)(7) of the Bankruptcy Code, the Debtor has disclosed the nature of compensation

of any insider to be employed or retained by the Reorganized Debtor, if applicable, and

compensation for any such insider.  The appointment of such individuals is consistent with the

interests of Claims and Equity Interests and with public policy.  Thus, the Plan satisfies section

1129(a)(5) of the Bankruptcy Code.

51. **No Rate Changes (11 U.S.C. § 1129(a)(6)).**  The Plan does not provide for

any rate change that requires regulatory approval.  Section 1129(a)(6) of the Bankruptcy Code is

thus not applicable.

52.     **Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).**  The "best interests" test is satisfied as to all Impaired Classes under the Plan, as each Holder of a Claim or Equity Interest in such Impaired Classes will receive or retain property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.  On October 15, 2020, the Debtor filed the Liquidation Analysis [Docket 1173], as prepared by the Debtor with the assistance of its advisors and which was attached as Exhibit C to the Disclosure Statement.  On January 29, 2021, in advance of Mr. Seery's deposition in connection with confirmation of the Plan, the Debtor provided an updated version of the Liquidation Analysis to the then-objectors of the Plan, including Mr. Dondero and the Dondero Related Entities.  On February 1, 2021, the Debtor filed the Amended Liquidation Analysis/Financial Projections.    The Amended Liquidation Analysis/Financial Projections included updates to the Debtor's projected asset values, revenues, and expenses to reflect: (1) the acquisition of an interest in an entity known as "HCLOF" that the Debtor will acquire as part of its court-approved settlement with HarbourVest and that was valued at $22.5 million; (2) an increase in the value of certain of the Debtor's assets due to changes in market conditions and other factors; (3) expected revenues and expenses arising in connection with the Debtor's continued management of the CLOs pursuant to management agreements that the Debtor decided to retain; (4) increases in projected expenses for headcount (in addition to adding two or three employees to assist in the management of the CLOs, the Debtor also increased modestly the projected headcount as a result of its decision not to engage a Sub-Servicer) and professional fees; and (5) an increase in projected recoveries on notes resulting from the

App. 333

acceleration of term notes owed to the Debtor by the following Dondero Related Entities: NexPoint Advisors, L.P.; Highland Capital Management Services, Inc.; and HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC). Under the Plan, as of the Confirmation Date, (a) Class 7 General Unsecured Creditors are projected to receive 85% on account of their claims; and (b) Class 8 General Unsecured Creditors are projected to receive at least approximately 71% on account of their Claims. Under a hypothetical chapter 7 liquidation, all general unsecured creditors are projected to receive approximately 55% on account of their Claims. The Bankruptcy Court finds that the distributions that Class 7 and 8 General Unsecured Creditors are projected to receive under the Plan substantially exceeds that which they would receive under a chapter 7 liquidation based on Mr. Seery's testimony, including the following credible reasons he posited, among others:

a.   The nature of the Debtor's assets is complex. Certain assets relate to complicated real estate structures and private equity investments in operating businesses. Mr. Seery's extensive experience with the Debtor during the thirteen months since his appointment as an Independent Director and later Chief Executive Officer and Chief Restructuring Officer, provides him with a substantial learning curve in connection with the disposition of the Debtor's assets and are reasonably expected to result in him being able to realize tens of millions of dollars more value than would a chapter 7 trustee.

b.   Assuming that a hypothetical chapter 7 trustee could even operate the Debtor's business under chapter 7 of the Bankruptcy Code and hire the necessary personnel with the relevant knowledge and experience to assist him or her in selling the Debtor's assets, a chapter 7 trustee would likely seek to dispose of the Debtor's assets in a forced sale liquidation which would generate substantially less value for the Debtor's creditors than the asset monetization plan contemplated by the Plan.

c.   A chapter 7 trustee would be unlikely to retain the Debtor's existing professionals to assist in its efforts to monetize assets, resulting in delays, increased expenses, and reduced asset yields for the chapter 7 estate.

41

d.    The chapter 7 estate would be unlikely to maximize value as compared to the asset monetization process contemplated by the Plan because potential buyers are likely to perceive a chapter 7 trustee as engaging in a quick, forced "fire sale" of assets; and

e.    The Debtor's employees, who are vital to its efforts to maximum value and recoveries for stakeholders, may be unwilling to provide services to a chapter 7 trustee.

Finally, there is no evidence to support the objectors' argument that the Claimant Trust Agreement's disclaimed liability for ordinary negligence by the Claimant Trustee compared to a chapter 7 trustee's liability has any relevance to creditor recoveries in a hypothetical chapter 7 liquidation. Thus, section 1129(a)(7) of the Bankruptcy Code is satisfied.

53.    **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).** Classes 1, 3, 4, 5 and 6 are Unimpaired under the Plan. Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 9 (Subordinated Claims) have each voted to accept the Plan in accordance with the Bankruptcy Code, thereby satisfying section 1129(a)(8) as to those Classes. However, Class 8 (General Unsecured Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) have not accepted the Plan. Accordingly, section 1129(a)(8) of the Bankruptcy Code has not been satisfied. The Plan, however, is still confirmable because it satisfies the nonconsensual confirmation provisions of section 1129(b), as set forth below.

54.    **Treatment of Administrative, Priority, Priority Tax Claims, and Professional Fee Claims (11 U.S.C. § 1129(a)(9)).** The treatment of Administrative Claims, Priority Claims, and Professional Fee Claims pursuant to Article III of the Plan, and as set forth below with respect to the resolution of the objections filed by the Internal Revenue Service and

certain Texas taxing authorities satisfies the requirements of sections 1129(a)(9) of the Bankruptcy Code.

55.     **Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)).**  Class 2 (Frontier Secured Claims) and Class 7 (Convenience Claims) are each Impaired Classes of Claims that voted to accept the Plan, determined without including any acceptance of the Plan by any insider.  Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code is satisfied.

56.     **Feasibility (11 U.S.C. § 1129(a)(11)).**  Article IV of the Plan provides for the implementation of the Plan through the Claimant Trust, the Litigation Sub-Trust, and the Reorganized Debtor.  The Plan provides that the Claimant Trust, among other things, will monetize and distribute the Debtor's remaining assets.  The Disclosure Statement, the Amended Liquidation Analysis/Financial Projections, and the other evidence presented at the Confirmation Hearing provide a reasonable probability of success that the Debtor will be able to effectuate the provisions of the Plan.  The Plan contemplates the establishment of the Claimant Trust upon the Effective Date, which will monetize the Estate's assets for the benefit of creditors.  Mr. Seery testified that the Class 2 Frontier Secured Claim will be paid over time pursuant to the terms of the New Frontier Note and the Reorganized Debtor will have sufficient assets to satisfy its obligations under this note.  The Claims of the Holders of Class 7 Claims (as well as those Class 8 creditors who validly opted to receive the treatment of Class 7 Claims) are expected to be satisfied shortly after the Effective Date.  Holders of Class 8 Claims (including any holders of Class 7 Claims who opted to receive the treatment provided to Class 8 Claims) are not guaranteed any recovery and will

43

periodically receive pro rata distributions as assets are monetized pursuant to the Plan and the

Claimant Trust Agreement. Thus, section 1129(a)(11) of the Bankruptcy Code is satisfied.

57. **Payment of Fees (11 U.S.C. § 1129(a)(12)).** All fees payable under 28

U.S.C. § 1930 have been paid or will be paid on or before the Effective Date pursuant to Article

XII.A of the Plan, thus satisfying the requirement of section 1129(a)(12) of the Bankruptcy Code.

The Debtor has agreed that the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-

Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United

States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor

or the dismissal or conversion of the Chapter 11 Case.

58. **Retiree Benefits.** The Plan provides for the assumption of the Pension Plan

(to the extent such Pension Plan provides "retiree benefits" and is governed by section 1114 of the

Bankruptcy Code). Thus, the Plan complies with section 1129(a)(13) of the Bankruptcy Code, to

the extent applicable.

59. **Miscellaneous Provisions (11 U.S.C. §§ 1129(a)(14)-(16)).** Sections

1129(a)(14)-(16) of the Bankruptcy Code are inapplicable as the Debtor (i) has no domestic

support obligations (section 1129(a)(14)), (ii) is not an individual (section 1129(a)(15)), and (iii)

is not a nonprofit corporation (section 1129(a)(16)).

60. **No Unfair Discrimination; Fair and Equitable Treatment (11 U.S.C. §**

**1129(b)).** The classification and treatment of Claims and Equity Interests in Classes 8, 10 and 11,

which have not accepted the Plan, is proper pursuant to section 1122 of the Bankruptcy Code, does

44

not discriminate unfairly, and is fair and equitable pursuant to section 1129(b)(1) of the Bankruptcy

Code.

> a.   <u>Class 8</u>.  The Plan is fair and equitable with respect to Class 8 General Unsecured
> Claims.  While Equity Interests in Class 10 and Class 11 will receive a contingent
> interest in the Claimant Trust under the Plan (the "<u>Contingent Interests</u>"), the
> Contingent Interests will not vest unless and until holders of Class 8 General
> Unsecured Claims and Class 9 Subordinated Claims receive distributions equal to
> 100% of the amount of their Allowed Claims plus interest as provided under the
> Plan and Claimant Trust Agreement.  Accordingly, as the holders of Equity
> Interests that are junior to the Claims in Class 8 and Class 9 will not receive or
> retain under the Plan on account of such junior claim interest any property unless
> and until the Claims in Class 8 and Class 9 are paid in full plus applicable interest,
> the Plan is fair and equitable with respect to holders of Class 8 General Unsecured
> Claims pursuant to section 1129(b)(2)(B) of the Bankruptcy Code and the reasoning
> of *In re Introgen Therapuetics* 429 B.R 570 (Bankr. W.D. Tex. 2010).

> b.   <u>Class 10 and Class 11</u>.  There are no Claims or Equity Interests junior to the Equity
> Interests in Class 10 and Class 11.  Equity Interests in Class 10 and 11 will neither
> receive nor retain any property under the Plan unless Allowed Claims in Class 8
> and Class 9 are paid in full plus applicable interest pursuant to the terms of the Plan
> and Claimant Trust Agreement.  Thus, the Plan does not violate the absolute priority
> rule with respect to Classes 10 and 11 pursuant to Bankruptcy Code section
> 1129(b)(2)(C).  The Plan does not discriminate unfairly as to Equity Interests.  As
> noted above, separate classification of the Class B/C Partnership Interests from the
> Class A Partnerships Interests is appropriate because they constitute different
> classes of equity security interests in the Debtor, and each are appropriately
> separately classified and treated.

Accordingly, the Plan does not violate the absolute priority rule, does not discriminate unfairly,

and is fair and equitable with respect to each Class that has rejected the Plan.  Thus, the Plan

satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 8, 10,

and 11.

61.     **Only One Plan (11 U.S.C. § 1129(c)).**  The Plan is the only chapter 11 plan confirmed in this Chapter 11 Case, and the requirements of section 1129(c) of the Bankruptcy Code are therefore satisfied.

62.     **Principal Purpose (11 U.S.C. § 1129(d)).**  Mr. Seery testified that the principal purpose of the Plan is neither the avoidance of taxes nor the avoidance of the application of section 5 of the Securities Act of 1933, and no governmental unit has objected to the confirmation of the Plan on any such grounds.  Accordingly, section 1129(d) of the Bankruptcy Code is inapplicable.

63.     **Satisfaction of Confirmation Requirements.**  Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code and should be confirmed.

64.     **Good Faith Solicitation (11 U.S.C. § 1125(e)).**  The Debtor, the Independent Directors, and the Debtor's employees, advisors, Professionals, and agents have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances of the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and they are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

65.     **Discharge (11 U.S.C. § 1141(d)(3)**).  The Debtor is entitled to a discharge of debts pursuant to section 1141(d)(3)(B) of the Bankruptcy Code.  Under the Plan, the Claimant Trust or Reorganized Debtor, as applicable, will continue to manage funds and conduct business

46

in the same manner as the Debtor did prior to Plan confirmation, which includes the management of the CLOs, Multi-Strat, Restoration Capital, the Select Fund and the Korea Fund.  Although the Plan projects that it will take approximately two years to monetize the Debtor's assets for fair value, Mr. Seery testified that while the Reorganized Debtor and Claimant Trust will be monetizing their assets, there is no specified time frame by which this process must conclude.  Mr. Seery's credible testimony demonstrates that the Debtor will continue to engage in business after consummation of the Plan, within the meaning of Section 1141(d)(3)(b) and that the Debtor is entitled to a discharge pursuant to section 1141(d)(1) of the Bankruptcy Code.

66.     **Retention of Jurisdiction.**  The Bankruptcy Court may properly retain jurisdiction over the matters set forth in Article XI of the Plan and/or section 1142 of the Bankruptcy Code to the maximum extent under applicable law.

67.     **Additional Plan Provisions (11 U.S.C. § 1123(b)).**  The Plan's provisions are appropriate, in the best interests of the Debtor and its Estate, and consistent with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

68.     **Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).**  The Debtor has exercised reasonable business judgment with respect to the rejection of the Executory Contracts and Unexpired Leases pursuant the terms of the Plan and this Confirmation Order, and such rejections are justified and appropriate in this Chapter 11 Case.  The Debtor also filed the List of Assumed Contracts, which contain notices to the applicable counterparties to the contracts set forth on Exhibit "FF" to Plan Supplement filed on February 1, 2021 [Docket No. 1875] and which exhibit sets forth the list of executory contracts and unexpired leases to be

DOCS_SF:104487.21 36027/002

assumed by the Debtor pursuant to the Plan (collectively, the "Assumed Contracts"). With respect to the Assumed Contracts, only one party objected to the assumption of any of the Assumed Contracts, but that objection was withdrawn.[8] Any modifications, amendments, supplements, and restatements to the Assumed Contracts that may have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith. Assumption of any Assumed Contract pursuant to the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

69. **Compromises and Settlements Under and in Connection with the Plan (11 U.S.C. § 1123(b)(3)).** All of the settlements and compromises pursuant to and in connection with the Plan, comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

70. **Debtor Release, Exculpation and Injunctions (11 U.S.C. § 1123(b)).** The Debtor Release, Exculpation, and Injunction provisions provided in the Plan (i) are within the jurisdiction of the Bankruptcy Court under 28 U.S.C. § 1334; (ii) are integral elements of the transactions incorporated into the Plan, and inextricably bound with the other provisions of the Plan; (iii) confer material benefit on, and are in the best interests of, the Debtor, its Estate, and its

---

[8] *See Notice of Withdrawal of James Dondero's Objection Debtor's Proposed Assumption of Contracts and Cure Amounts Proposed in Connection Therewith* [Docket No. 1876]

creditors; (iv) are fair, equitable, and reasonable; (v) are given and made after due notice and opportunity for hearing; (vi) satisfy the requirements of Bankruptcy Rule 9019; and (vii) are consistent with the Bankruptcy Code and other applicable law, and as set forth below.

71. **Debtor Release.** Section IX.D of the Plan provides for the Debtor's release of the Debtor's and Estate's claims against the Released Parties. Releases by a debtor are discretionary and can be provided by a debtor to persons who have provided consideration to the Debtor and its estate pursuant to section 1123(b)(3)(A) of the Bankruptcy Code. Contrary to the objections raised by Mr. Dondero and certain of the Dondero Related Entities, the Debtor Release is appropriately limited to release claims held by the Debtor and does not purport to release the claims held by the Claimant Trust, Litigation Sub-Trust, or other third parties. The Plan does not purport to release any claims held by third parties and the Bankruptcy Court finds that the Debtor Release is not a "disguised" release of any third party claims as asserted by certain objecting parties. The limited scope of the Debtor Release in the Plan was extensively negotiated with the Committee, particularly with the respect to the Debtor's conditional release of claims against employees, as identified in the Plan, and the Plan's conditions and terms of such releases. The Plan does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

49

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction.  The Debtor Release also contains

conditions to such releases as set forth in Article X.D of the Plan with respect to employees (the

"Release Conditions").  Until the an employee satisfies the Release Conditions or the Release

Conditions otherwise terminate, any claims against such employee will be tolled so that if the

Release Conditions are not met the Litigation Trustee may pursue claims against an employee at a

later date.  The evidence before the Bankruptcy Court, including, but not limited to Mr. Seery's

testimony, demonstrates that the Debtor is not aware of any claims against any of the Released

Parties, that the Released Parties have been instrumental in assisting the Debtor's efforts toward

confirmation of the Plan and that, therefore, the releases are a *quid pro quo* for the Released

Parties' significant contributions to a highly complex and contentious restructuring.  The

Committee, whose members hold approximately $200 million in claims against the Estate, is

highly sophisticated and is represented by highly sophisticated professionals, and has actively and

vigorously negotiated the terms of the Debtor Release, which was the subject of significant

controversy at the Initial Disclosure Statement hearing held by the Bankruptcy Court on October

27, 2020.

      72.    **Exculpation.**  Section IX.C of the Plan provides for the exculpation of

certain Exculpated Parties to the extent provided therein (the "Exculpation Provision").  As

explained below, the Exculpation Provision is appropriate under the unique circumstances of this

litigious Chapter 11 Case and consistent with applicable Fifth Circuit precedent.  First, with respect

to the Independent Directors, their agents, and their advisors, including any employees acting at

their direction, the Bankruptcy Court finds and concludes that it has already exculpated these parties for acts other than willful misconduct and gross negligence pursuant to the January 9 Order. The January 9 Order was specifically agreed to by Mr. Dondero, who was in control of the Debtor up until entry of the January 9 Order. The January 9 Order was not appealed. In addition to the appointment of the Independent Directors in an already contentious and litigious case, the January 9 Order set the standard of care for the Independent Directors and specifically exculpated them for negligence. Mr. Seery and Mr. Dubel each testified that they had input into the contents of the January 9 Order and would not have agreed to their appointment as Independent Directors if the January 9 Order did not include the protections set forth in paragraph 10 of the January 9 Order. Paragraph 10 of the January 9 Order (1) requires that parties wishing to sue the Independent Directors or their agents and advisors must first seek approval from the Bankruptcy Court before doing so; (2) sets the standard of care for the Independent Directors during the Chapter 11 Case and exculpated the Independent Directors for acts other than willful misconduct or gross negligence; (3) only permits suits against the Independent Directors to proceed for colorable claims of willful misconduct and gross negligence upon order of the Bankruptcy Court; and (4) does not expire by its terms.

73.    **Existing Exculpation of Independent Directors.** The Bankruptcy Court also finds and concludes that  it has already exculpated Mr. Seery acting in the capacity as Chief Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order. The Bankruptcy Court concludes its previous approval of the exculpation of the Independent Directors, their agents, advisors and employees working at their direction pursuant to the January 9 Order, and the Chief

51

Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order constitutes the

law of this case and are *res judicata* pursuant to *In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046

(5th Cir.1987). The January 9 Order and July 16 Order cannot be collaterally attacked based on

the objectors' objection to the exculpation of the Independent Directors, their agents, and advisors,

including any employees acting at their direction, as well as the Chief Executive Officer and Chief

Restructuring Officer, that the Bankruptcy Court already approved pursuant to the January 9 Order

and the July 16 Order.

74.     **The Exculpation Provision Complies with Applicable Law.** Separate

and apart from the *res judicata* effect of the January 9 Order and the July 16 Order, the Bankruptcy

Court also finds and concludes that the Exculpation Provision is consistent with applicable law,

including *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009), for several reasons:

a.      First, the statutory basis for *Pacific Lumber*'s denial of exculpation for certain
parties other than a creditors' committee and its members is that section 524(e) of
the Bankruptcy Code "only releases the debtor, not co-liable third parties." *Pacific
Lumber*, 253 F.3d. at 253. However, *Pacific Lumber* does not prohibit all
exculpations under the Bankruptcy Code and the court in such case specifically
approved the exculpations of a creditors' committee and its members on the
grounds that "11 U.S.C. § 1103(c), which lists the creditors' committee's powers,
implies committee members have qualified immunity for actions within the scope
of their duties…. [I]f members of the committee can be sued by persons unhappy
with the committee's performance during the case or unhappy with the outcome of
the case, it will be extremely difficult to find members to serve on an official
committee." *Pacific Lumber*, 253 F.3d at 253 (quoting Lawrence P. King, et al,
Collier on Bankruptcy, ¶ 1103.05[4][b] (15th Ed. 2008)). *Pacific Lumber's*
rationale for permitted exculpation of creditors' committees and their members
(which was clearly policy-based and based on a creditors' committee qualified
immunity flowing from their duties under section 1103(c) of the Bankruptcy Code
and their disinterestedness and importance in chapter 11 cases) does not preclude
exculpation to other parties in a particular chapter 11 case that perform similar roles
to a creditors' committee and its members. The Independent Directors, and by
extension the Chief Executive Officer and Chief Restructuring Officer, were not

part of the Debtor's enterprise prior to their appointment by the Bankruptcy Court under the January 9 Order. The Bankruptcy Court appointed the Independent Directors in lieu of a chapter 11 trustee to address what the Bankruptcy Court perceived as serious conflicts of interest and fiduciary duty concerns with the then-existing management prior to January 9, 2020, as identified by the Committee. In addition, the Bankruptcy Court finds that the Independent Directors expected to be exculpated from claims of negligence, and would likely have been unwilling to serve in contentious cases absent exculpation. The uncontroverted testimony of Mr. Seery and Mr. Dubel demonstrates that the Independent Directors would not have agreed to accept their roles without the exculpation and gatekeeper provision in the January 9 Order. Mr. Dubel also testified as to the increasing important role that independent directors are playing in complex chapter 11 restructurings and that unless independent directors could be assured of exculpation for simple negligence in contentious bankruptcy cases they would be reluctant to accept appointment in chapter 11 cases which would adversely affect the chapter 11 restructuring process. The Bankruptcy Court concludes that the Independent Directors were appointed under the January 9 Order in order to avoid the appointment of a chapter 11 trustee and are analogous to a creditors' committee rather than an incumbent board of directors. The Bankruptcy Court also concludes that if independent directors cannot be assured of exculpation for simple negligence in contentious bankruptcy cases, they may not be willing to serve in that capacity. Based upon the foregoing, the Bankruptcy Court concludes that *Pacific Lumber's* policy of exculpating creditors' committees and their members from "being sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case" is applicable to the Independent Directors in this Chapter 11 Case.[9]

b.  Second, the Bankruptcy Court also concludes that *Pacific Lumber* does not preclude the exculpation of parties if there is a showing that "costs [that] the released parties might incur defending against such suits alleging such negligence are likely to swamp either the Exculpated Parties or the reorganization." *Pacific Lumber*, 584 F.3d at 252. If ever there was a risk of that happening in a chapter 11 reorganization, it is this one. Mr. Seery credibly testified that Mr. Dondero stated outside the courtroom that if Mr. Dondero's pot plan does not get approved, that Mr. Dondero will "burn the place down." The Bankruptcy Court can easily expect that the proposed Exculpated Parties might expect to incur costs that could swamp them and the reorganization based on the prior litigious conduct of Mr. Dondero and his controlled entities that justify their inclusion in the Exculpation Provision.

---

[9] The same reasoning applies to the inclusion of Strand in the Exculpation Provision because Strand is the general partner of the Debtor through which each of the Independent Board members act.

75. **Injunction.** Section IX.D of the Plan provides for a Plan inunction to implement and enforce the Plan's release, discharge and release provisions (the "Injunction Provision"). The Injunction Provision is necessary to implement the provisions in the Plan. Mr. Seery testified that the Claimant Trustee will monetize the Debtor's assets in order to maximize their value. In order to accomplish this goal, the Claimant Trustee needs to be able to pursue this objective without the interference and harassment of Mr. Dondero and his related entities, including the Dondero Related Entities. Mr. Seery also testified that if the Claimant Trust was subject to interference by Mr. Dondero, it would take additional time to monetize the Debtor's assets and those assets could be monetized for less money to the detriment of the Debtor's creditors. The Bankruptcy Court finds and concludes that the Injunction Provision is consistent with and permissible under Bankruptcy Code sections 1123(a), 1123(a)(6), 1141(a) and (c), and 1142. The Bankruptcy Court rejects assertions by certain objecting parties that the Injunction Provision constitutes a "third-party release." The Injunction Provision is appropriate under the circumstances of this Chapter 11 Case and complies with applicable bankruptcy law. The Bankruptcy Court also concludes that the terms "implementation" and "consummation" are neither vague nor ambiguous

76. **Gatekeeper Provision**. Section IX.F of the Plan contains a provision contained in paragraph AA of this Confirmation Order and which the Debtor has referred to as a gatekeeper provision (the "Gatekeeper Provision"). The Gatekeeper Provision requires that Enjoined Parties first seek approval of the Bankruptcy Court before they may commence an action against Protected Parties. Thereafter, if the Bankruptcy Court determines that the action is

colorable, the Bankruptcy Court may, if it has jurisdiction, adjudicate the action. The Bankruptcy Court finds that the inclusion of the Gatekeeper Provision is critical to the effective and efficient administration, implementation, and consummation of the Plan. The Bankruptcy Court also concludes that the Bankruptcy Court has the statutory authority as set forth below to approve the Gatekeeper Provision.

77. **Factual Support for Gatekeeper Provision.** The facts supporting the need for the Gatekeeper Provision are as follows. As discussed earlier in this Confirmation Order, prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Mr. Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in some cases, over a decade. Substantially all of the creditors in this case are either parties who were engaged in litigation with the Debtor, parties who represented the Debtor in connection with such litigation and had not been paid, or trade creditors who provided litigation-related services to the Debtor. During the last several months, Mr. Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor. Such litigation includes: (i) entry of a temporary restraining order and preliminary injunction against Mr. Dondero [Adv. Proc. No. 20-03190 Docket No. 10 and 59] because of, among other things, his harassment of Mr. Seery and employees and interference with the Debtor's business operations; (ii) a contempt motion against Mr. Dondero for violation of the temporary restraining order, which motion is still pending before the Bankruptcy Court [Adv. Proc. No. 20-03190 Docket No. 48]; (iii) a motion by Mr. Dondero's controlled investors in certain CLOs managed by the Debtor that the Bankruptcy Court referred to

as frivolous and a waste of the Bankruptcy Court's time [Docket No. 1528] which was denied by

the Court [Docket No. 1605]; (iv) multiple plan confirmation objections focused on ensuring the

Dondero Related Entities be able to continue their litigation against the Debtor and its successors

post-confirmation [Docket Nos. 1661, 1667, 1670, 1673, 1676, 1677 and 1868]; (v) objections to

the approval of the Debtor's settlements with Acis and HarbourVest and subsequent appeals of the

Bankruptcy Court's order approving each of those settlements [Docket Nos. 1347 and 1870]; and

(vi) a complaint and injunction sought against Mr. Dondero's affiliated entities to prevent them

from violating the January 9 Order and entry of a restraining order against those entities [Adv Proc.

No. 21-03000 Docket No 1] (collectively, the "Dondero Post-Petition Litigation").

78.     **Findings Regarding Dondero Post-Petition Litigation.**  The Bankruptcy

Court finds that the Dondero Post-Petition Litigation was a result of Mr. Dondero failing to obtain

creditor support for his plan proposal and consistent with his comments, as set forth in Mr. Seery's

credible testimony, that if Mr. Dondero's plan proposal was not accepted, he would "burn down

the place."  The Bankruptcy Court concludes that without appropriate protections in place, in the

form of the Gatekeeper Provision, Mr. Dondero and his related entities will likely commence

litigation against the Protected Parties after the Effective Date and do so in jurisdictions other than

the Bankruptcy Court in an effort to obtain a forum which Mr. Dondero perceives will be more

hospitable to his claims.  The Bankruptcy Court also finds, based upon Mr. Seery's testimony, that

the threat of continued litigation by Mr, Dondero and his related entities after the Effective Date

will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result

56

in lower distributions to creditors because of costs and distraction such litigation or the threats of such litigation would cause.

79.      **Necessity of Gatekeeper Provision.**  The Bankruptcy Court further finds that unless the Bankruptcy Court approves the Gatekeeper Provision, the Claimant Trustee and the Claimant Trust Oversight Board will not be able to obtain D&O insurance, the absence of which will present unacceptable risks to parties currently willing to serve in such roles.  The Bankruptcy Court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("AON"), regarding his efforts to obtain D&O insurance.  Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so without an exclusion for claims asserted by Mr. Dondero and his affiliates otherwise requires that this Order approve the Gatekeeper Provision.  Based on the foregoing, the Bankruptcy Court finds that the Gatekeeper Provision is necessary and appropriate in light of the history of the continued litigiousness of Mr. Dondero and his related entities in this Chapter 11 Case and necessary to the effective and efficient administration, implementation and consummation of the Plan and is appropriate pursuant to *Carroll v. Abide (In re Carroll)* 850 F.3d 811 (5th Cir. 2017).  Approval of the Gatekeeper Provision will prevent baseless litigation designed merely to harass the post-confirmation entities charged with monetizing the Debtor's assets for the benefit of its economic constituents, will avoid abuse of the court system and preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants.  Any suit against a Protected Party would effectively be a suit against the Debtor, and the Debtor may be required to indemnify the Protected

DOCS_SF:104487.21 36027/002

Parties under the Limited Partnership Agreement, which will remain in effect through the Effective

Date, or those certain *Indemnification and Guaranty Agreements*, dated January 9, 2020, between

Strand, the Debtor, and each Independent Director, following the Confirmation Date as each such

agreement will be assumed pursuant to 11 U.S.C. § 365 pursuant to the Plan.

80.     **Statutory Authority to Approve Gatekeeper Provision.**     The

Bankruptcy Court finds it has the statutory authority to approve the Gatekeeper Provision under

sections 1123(a)(5), 1123(b)(6), 1141, 1142(b), and 105(a).  The Gatekeeper Provision is also

within the spirit of the Supreme Court's "Barton Doctrine." *Barton v. Barbour,* 104 U.S. 126

(1881).  The Gatekeeper Provision is also consistent with the notion of a prefiling injunction to

deter vexatious litigants, that has been approved by the Fifth Circuit in such cases as *Baum v. Blue

Moon Ventures, LLC,* 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll,* 850 F.3d 811 (5th Cir.

2017).

81.     **Jurisdiction to Implement Gatekeeper Provision.**  The Bankruptcy Court

finds that it will have jurisdiction after the Effective Date to implement the Gatekeeper Provision

as post-confirmation bankruptcy court jurisdiction has been interpreted by the Fifth Circuit under

*United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d

296 (5th Cir. 2002) and *EOP-Colonnade of Dallas Ltd. P'Ship v. Faulkner (In re Stonebridge

Techs., Inc.)*, 430 F.3d 260 (5th Cir. 2005).  Based upon the rationale of the Fifth Circuit in *Villegas

v. Schmidt,* 788 F.3d 156, 158-59 (5th Cir. 2015), the Bankruptcy Court's jurisdiction to act as a

gatekeeper does not violate *Stern v. Marshall.*  The Bankruptcy Court's determination of whether

a claim is colorable, which the Bankruptcy Court has jurisdiction to determine, is distinct from whether the Bankruptcy Court would have jurisdiction to adjudicate any claim it finds colorable.

82. **Resolution of Objections of Scott Ellington and Isaac Leventon**. Each of Scott Ellington ("Mr. Ellington") and Isaac Leventon ("Mr. Leventon") (each, a "Senior Employee Claimant") has asserted certain claims for liquidated but unpaid bonus amounts for the following periods: 2016, 2017, and 2018, as set forth in Exhibit A to that certain *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1669] (the "Senior Employees' Objection") (for each of Mr. Ellington and Mr. Leventon, the "Liquidated Bonus Claims").

a. Mr. Ellington has asserted Liquidated Bonus Claims in the aggregate amount of $1,367,197.00, and Mr. Leventon has asserted Liquidated Bonus Claims in the aggregate amount of $598,198.00. Mr. Ellington received two Ballots[10] – a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan. Mr. Ellington completed and timely returned both of such Ballots, voted to reject the Plan, and elected to have his Class 8 Liquidated Bonus Claims treated under Class 7 of the Plan, subject to the objections and reservations of rights set forth in the Senior Employees' Objection. If Mr. Ellington is permitted to elect Class 7 treatment for his Liquidated Bonus Claims, then the maximum amount of his Liquidated Bonus Claims will be $1,000,000.

b. Mr. Leventon received two Ballots—a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan. Mr. Leventon completed and timely returned both of such Ballots and voted each such Ballots to rejected the Plan.

c. The Senior Employees' Objection, among other things, objects to the Plan on the grounds that the Debtor improperly disputes the right of Mr. Ellington to elect Class 7 treatment for his Liquidated Bonus Claims and Mr. Leventon's entitlement to receive Class 7 Convenience Class treatment for his Liquidated Bonus Claims. The Debtor contended that neither Mr. Ellington or Mr. Leventon were entitled to elect to receive Class 7 Convenience Class treatment on account of their Liquidated

---

[10] As defined in the Plan, "Ballot" means the forms(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

Bonus Claims under the terms of the Plan, the Disclosure Statement Order or applicable law.

d.      The Debtor and Mr. Ellington and Mr. Leventon negotiated at arms' length in an effort to resolve all issues raised in the Senior Employee's Objection, including whether or not Mr. Ellington and Mr. Leventon were entitled to Class 7 Convenience Class treatment of their Liquidated Bonus Claims.  As a result of such negotiation, the Debtor, Mr. Ellington, and Mr. Leventon have agreed to the settlement described in paragraphs 82(e) through 82(k) below and approved and effectuated pursuant to decretal paragraphs RR through SS (the "Senior Employees' Settlement").

e.      Under the terms of the Senior Employees' Settlement, the Debtor has the right to elect one of two treatments of the Liquidated Bonus Claims for a Senior Employee Claimant.  Under the first treatment option ("Option A"), the Liquidated Bonus Claims will be entitled to be treated in Class 7 of the Plan, and the Liquidated Bonus Claims will be entitled to receive payment in an amount equal to 70.125% of the Class 7 amount of the Liquidated Bonus Claims, subject to the Liquidated Bonus Claims becoming Allowed Claims under the terms of the Plan.  Under this calculation, Mr. Ellington would be entitled to receive $701,250.00 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan, and Mr. Leventon would be entitled to receive $413,175.10 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan.  If, however, any party in interest objects to the allowance of the Senior Employee Claimant's Liquidated Bonus Claims and does not prevail in such objection, then such Senior Employee Claimant will be entitled to a payment in an amount equal to 85% of his Allowed Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed on Class 7 Claims).  In addition, under Option A, each of Mr. Ellington and Mr. Leventon would retain their respective rights to assert that the Liquidated Bonus Claims are entitled to be treated as Administrative Expense Claims, as defined in Article I.B.2. of the Plan, in which case the holder of such Liquidated Bonus Claims would be entitled to payment in full of the Allowed Liquidated Bonus Claims.  Under Option A, parties in interest would retain the right to object to any motion seeking payment of the Liquidated Bonus Amounts as Administrative Expenses.

f.      Under the second treatment option ("Option B"), the Debtor would agree that the Senior Employee Claimant has Allowed Liquidated Bonus Claims, no longer subject to objection by any party in interest, in the amounts of the Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed by Class 7).  If the Debtor elects Option B as to a Senior Employee Claimant, then such Senior Employee Claimant would be entitled to a payment on account of his Allowed Liquidated Bonus Claims in an amount equal to 60% of the amount of the

Liquidated Bonus Claims (which, in Mr. Ellington's case, would be $600,000 and in Mr. Leventon's case, would be $358,918.80), and such payment would be the sole recovery on account of such Allowed Liquidated Bonus Claims.

g.      The Debtor may, with the consent of the Committee, elect Option B with respect to a Senior Employee Claimant at any time prior to the occurrence of the Effective Date. If the Debtor does not make an election, then Option A will apply.

h.      Under either Option A or Option B, Mr. Ellington and Mr. Leventon will retain all their rights with respect to all Claims other than the Liquidated Bonus Amounts, including, but not limited to, their Class 6 PTO Claims, other claims asserted as Class 8 General Unsecured Claims, the Senior Employees' claims for indemnification against the Debtor, and any other claims that they may assert constitute Administrative Expense Claims, and any other such Claims are subject to the rights of any party in interest to object to such Claims, and the Debtor reserves any all of its rights and defenses in connection therewith.

i.      Subject to entry of this Confirmation Order and as set forth and announced on the record at the hearing on confirmation of the Plan and no party objecting thereto, Mr. Ellington and Mr. Leventon agreed to change the votes in their respective Ballots from rejection to acceptance of the Plan and to withdraw the Senior Employees' Objection.

j.      The Senior Employees' Settlement represents a valid exercise of the Debtor's business judgment and satisfies the requirements for a compromise under Bankruptcy Rule 9019(a).

k.      For the avoidance of doubt, neither Mr. Leventon nor Mr. Ellington shall be a Released Party under the Plan regardless of how the Senior Employee Claimants' Claims are to be treated hereunder.

Based upon the foregoing findings, and upon the record made before the Bankruptcy Court at the Confirmation Hearing, and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

A.      **Confirmation of the Plan.** The Plan is approved in its entirety and **CONFIRMED** under section 1129 of the Bankruptcy Code. The terms of the Plan, including the

Plan Supplements and Plan Modifications, are incorporated by reference into and are an integral part of this Confirmation Order.[11]

       **B.**      **Findings of Fact and Conclusions of Law**.  The findings of fact and the conclusions of law set forth in this Confirmation Order and on the record of the Confirmation Hearing constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  All findings of fact and conclusion of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to confirmation of the Plan are hereby incorporated into this Confirmation Order.  To the extent that any of the following constitutes findings of fact or conclusions of law, they are adopted as such. To the extent any findings of fact or conclusions of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and incorporated herein) constitutes an order of the Bankruptcy Court, and is adopted as such.

       **C.**      **Objections**.  Any resolution or disposition of objections to confirmation of the Plan or otherwise ruled upon by the Bankruptcy Court on the record of the Confirmation Hearing is hereby incorporated by reference.  All objections and all reservations of rights pertaining to confirmation of the Plan that have not been withdrawn, waived or settled are overruled on the merits, except as otherwise specifically provided in this Confirmation Order.

       **D.**      **Plan Supplements and Plan Modifications.**  The filing with the Bankruptcy Court of the Plan Supplements and the Plan Modifications constitutes due and

---

[11] The Plan is attached hereto as **Exhibit A**.

sufficient notice thereof.  Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and

Bankruptcy Rule 3019, the Plan Modifications and the Plan Supplements do not require additional

disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126

of the Bankruptcy Code, nor do they require that Holders of Claims or Equity Interests be afforded

an opportunity to change previously cast acceptances or rejections of the Plan.  The Plan

Modifications and the Plan Supplements constitute the Plan pursuant to section 1127(a) of the

Bankruptcy Code.  Accordingly, the Plan, as modified, is properly before the Bankruptcy Court

and all votes cast with respect to the Plan prior to such modification shall be binding and shall

apply with respect to the Plan.

E.      **Deemed Acceptance of Plan.**  In accordance with section 1127 of the

Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Equity Interests who voted

to accept the Plan (or whom are conclusively presumed to accept the Plan) are deemed to have

accepted the Plan as modified by the Plan Modifications.  No holder of a Claim shall be permitted

to change its vote as a consequence of the Plan Modifications.

F.      **Vesting of Assets in the Reorganized Debtor.**  Except as otherwise

provided in the Plan or this Confirmation Order, on or after the Effective Date, all Reorganized

Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or

other encumbrances pursuant to section 1141(c) of the Bankruptcy Code, except with respect to

such Liens, Claims, charges, and other encumbrances that are specifically preserved under the Plan

upon the Effective Date.  The Reorganized Debtor shall be the exclusive trustee of the Reorganized

Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the

representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

G.      **Effectiveness of All Actions.**   All actions contemplated by the Plan, including all actions in connection with the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, are authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to or order of the Bankruptcy Court, or further action by the directors, managers, officers or partners of the Debtor or the Reorganized Debtor and with the effect that such actions had been taken by unanimous action of such parties.

H.      **Restructuring Transactions.**   The Debtor or Reorganized Debtor, as applicable, are authorized to enter into and effectuate the Restructuring provided under the Plan, including, without limitation, the entry into and consummation of the transactions contemplated by the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, and may take any actions as may be necessary or appropriate to effect a corporate restructuring of its business or a corporate restructuring of the overall corporate structure of the Reorganized Debtor, as and to the extent provided in the Plan. Any transfers of assets or equity interests effected or any obligations incurred through the Restructuring pursuant to the Plan are hereby approved and shall not constitute fraudulent conveyances or fraudulent transfers or otherwise be subject to avoidance.

**I.     Preservation of Causes of Action.**  Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, this Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor, the Litigation Sub-Trust, or the Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan, or this Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, this Confirmation Order).  In addition, the right of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**J.     Independent Board of Directors of Strand.**  The terms of the current Independent Directors shall expire on the Effective Date without the need for any further or other action by any of the Independent Directors.  For avoidance of doubt, the Assumed Contracts

include the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery*; the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel* and *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell Nelms* and shall each remain in full force and effect notwithstanding the expiration of the terms of any Independent Directors.

**K.** **Cancellation of Equity Interests and Issuance of New Partnership Interests.** On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be deemed cancelled, and all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, such Class A Limited Partnership Interests and Class B/C Limited Partnership Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement. As of the Effective Date and pursuant to the Plan, new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited

66

Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

L.      **Transfer of Assets to Claimant Trust.**  On or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.  Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the Plan and the Claimant Trust Agreement.

M.      **Transfer of Estate Claims to Litigation Sub-Trust**.  On or prior to the Effective Date, the Claimant Trust shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims as successor in interest to the Debtor, and in accordance with section 1141 of the Bankruptcy Code, the Estate Claims shall automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and Litigation Sub-Trust Expenses.  The Litigation Trustee will

be authorized to investigate, pursue, and otherwise resolve the Estate Claims pursuant to the terms

of the Litigation Sub-Trust Agreement and the Plan, including as successor in interest to the Debtor

or Committee, as applicable, in any litigation commenced prior to the Effective Date in which

Estate Claims are asserted.

   **N.**  **Compromise of Controversies.** In consideration for the distributions and

other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a

good faith compromise and settlement of all Claims, Equity Interests, and controversies resolved

under the Plan and the entry of this Confirmation Order constitutes approval of such compromise

and settlement under Bankruptcy Rule 9019.

   **O.**  **Objections to Claims**. The Claims Objection Deadline shall be the date

that is 180 days after the Effective Date, *provided, however*, that the Claims Objection Deadline

may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee and as otherwise

provided under the Plan.

   **P.**  **Assumption of Contracts and Leases.** Effective as of the date of this

Confirmation Order, each of the Assumed Contacts shall be assumed by the Debtor without the

need for any further notice to or action, order, or approval of the Bankruptcy Court, under section

365 of the Bankruptcy Code and the payment of Cures, if any, shall be paid in accordance with the

Plan. Each Assumed Contract shall include all modifications, amendments, supplements,

restatements, or other agreements related thereto, and all rights related thereto, if any, including

all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and

any other interests. Modifications, amendments, supplements, and restatements to any of the

68

Assumed Contracts that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of such Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith. Assumption of the Assumed Contracts pursuant to Article V.A of the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition, or other bankruptcy-related defaults, arising under any Assumed Contracts.

Q. **Rejection of Contracts and Leases.** Unless previously assumed during the pendency of the Chapter 11 Case or pursuant to the Plan, all other Executory Contracts and Unexpired Leases are rejected as of the date of the entry of this Confirmation Order and pursuant to the terms of the Plan. To the extent that any party asserts any damages resulting from the rejection of any Executory Contract or Unexpired Lease, such claim must be filed within **thirty (30) days** following entry of this Confirmation Order, or such claim will be forever barred and disallowed against the Reorganized Debtor.

R. **Assumption of Issuer Executory Contracts.** On the Confirmation Date, the Debtor will assume the agreements set forth on **Exhibit B** hereto (collectively, the "Issuer Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. In full and complete satisfaction of its obligation to cure outstanding defaults under section 365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the

69

App. 362

Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[12] a

cumulative amount of $525,000 (the "Cure Amount") as follows:

    a.    $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

    b.    $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and the Bankruptcy Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; *provided, however,* that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

    **S.**    **Release of Issuer Claims.** Effective as of the Confirmation Date, and to

the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and

former advisors, trustees, directors, officers, managers, members, partners, employees,

beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and

---

[12] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Issuer Released Claims").

**T.    Release of Debtor Claims against Issuer Released Parties.**  Upon entry of this Order, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue [(i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe,

71

(xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton (collectively, the "Issuer Released Parties"),] for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts. Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs S and T hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

      **U.**    **Authorization to Consummate.** The Debtor is authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver of the conditions precedent to the Effective Date of the Plan set forth in Article VIII.A of the Plan. The Plan shall not become effective unless and until the conditions set forth in Article VIII.A of the Plan have been satisfied, or otherwise waived pursuant to Article VIII.B of the Plan.

      **V.**    **Professional Compensation.** All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date

DOCS_SF:104487.21 36027/002

must be filed no **later than sixty (60) days after the Effective Date**. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and an opportunity for hearing in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Court. The Debtor shall fund the Professional Fee Reserve as provided under the Plan. The Reorganized Debtor shall pay Professional Fee Claims in Cash in the amounts the Bankruptcy Court allows. The Debtor is authorized to pay the pre-Effective Date fees and expenses of all ordinary course professionals in the ordinary course of business without the need for further Bankruptcy Court order or approval. From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 (if applicable) of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor or Claimant Trustee, as applicable, may employ and pay any Professional or Entity employed in the ordinary course of the Debtor's business without any further notice to or action, order, or approval of the Bankruptcy Court.

   **W. Release, Exculpation, Discharge, and Injunction Provisions. The following release, exculpation, discharge, and injunction provisions set forth in the Plan are approved and authorized in their entirety, and such provisions are effective and binding on all parties and Entities to the extent provided therein.**

   **X. Discharge of Claims and Termination of Interests.** To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or this Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement,

DOCS_SF:104487.21 36027/002

discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or this Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

Y.     **Exculpation.**  Subject in all respects to Article XII.D of the Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v);

74

App. 367

*provided, however*, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. The Plan's exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

**Z.** **Releases by the Debtor.** On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person. Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under

DOCS_SF:104487.21 36027/002

any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance

Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction.

      **AA.   Injunction.  Upon entry of this Confirmation Order, all Enjoined**

**Parties are and shall be permanently enjoined, on and after the Effective Date, from taking**

**any actions to interfere with the implementation or consummation of the Plan.  Except as**

**expressly provided in the Plan, this Confirmation Order, or a separate order of the**

**Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after**

**the Effective Date, with respect to any Claims and Equity Interests, from directly or**

**indirectly (i) commencing, conducting, or continuing in any manner, any suit, action, or**

**other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative**

**or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing,**

**levying, attaching (including any prejudgment attachment), collecting, or otherwise**

**recovering, enforcing, or attempting to recover or enforce, by any manner or means, any**

**judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii)**

**creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or**

**encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any**

**right of setoff, directly or indirectly, against any obligation due to the Debtor or against**

**property or interests in property of the Debtor, except to the limited extent permitted under**

**Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner,**

DOCS_SF:104487.21 36027/002

in any place whatsoever, that does not conform to or comply with the provisions of the Plan. The injunctions set forth in the Plan and this Confirmation Order shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property. Subject in all respects to Article XII.D of the Plan, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however*, the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in

Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

BB. **Duration of Injunction and Stays.** Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date, shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Bankruptcy Court will enter an equivalent order under Section 105.

CC. **Continuance of January 9 Order and July 16 Order.** Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, each of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, entered by the Bankruptcy Court on January 9, 2020* [Docket No. 339] and *Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020 shall remain in full force and effect from the Confirmation Date and following the Effective Date.

DD. **No Governmental Releases.** Nothing in this Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or

78

any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in this Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit, or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in this Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against any party or person.

     **EE.**   **Exemption from Transfer Taxes.** Pursuant to section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor; (b) the Restructuring transactions pursuant to the Plan; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan,

including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation of any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

FF.     **Cancellation of Notes, Certificates and Instruments.**  Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan or as otherwise provided in this Confirmation Order, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the

DOCS_SF:104487.21 36027/002

**App. 373**

Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

GG. **Documents, Mortgages, and Instruments.**  Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring transactions contemplated under the Plan, and this Confirmation Order.

HH. **Post-Confirmation Modifications.**  Subject section 1127(b) of the Bankruptcy Code and the Plan, the Debtor and the Reorganized Debtor expressly reserve their rights to revoke or withdraw, or to alter, amend, or modify materially the Plan, one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.B of the Plan.

II. **Applicable Nonbankruptcy Law.**  The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

JJ. **Governmental Approvals Not Required.**  This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state,

federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

      **KK.   Notice of Effective Date.**  As soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall file notice of the Effective Date and shall serve a copy of the same on all Holders of Claims and Equity Interests, and all parties who have filed with the Bankruptcy Court requests to receive notices in accordance with Bankruptcy Rules 2002 and 3020(c).  Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtor mailed notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtor has been informed in writing by such Entity, or is otherwise aware, of that Entity's new address. The above-referenced notices are adequate under the particular circumstances of this Chapter 11 Case and no other or further notice is necessary.

      **LL.   Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

      **MM.   Waiver of Stay.**  For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Bankruptcy Court.

NN.    **References to and Omissions of Plan Provisions.**  References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

OO.    **Headings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

PP.    **Effect of Conflict.**  This Confirmation Order supersedes any Bankruptcy Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control.  If there is any inconsistency between the terms of this Confirmation Order and the terms of a final, executed Plan Supplement Document, the terms of the final, executed Plan Supplement Document will govern and control.

QQ.    **Resolution of Objection of Texas Taxing Authorities.**  Dallas County, Kaufman County, City of Allen, Allen ISD and City of Richardson (collectively, the "Tax Authorities") assert that they are the holders of prepetition and administrative expense claims for 2019, 2020 and 2021 ad valorem real and business personal property taxes.  The ad valorem property taxes for tax year 2020 shall be paid in accordance with and to the extent required under

83

applicable nonbankruptcy law.  In the event the 2020 taxes are paid after February 1, 2021, the

Tax Authorities may assert any rights and amounts they claim are owed with respect to penalties

and interest that have accrued through the date of payment and the Debtor and Reorganized Debtor

reserve any all rights and defenses in connection therewith.

a. The Debtor/Reorganized Debtor shall pay all amounts owed to the Tax Authorities for tax year 2021 in accordance with and to the extent required under applicable nonbankruptcy law.  The Tax Authorities shall not be required to file and serve an administrative expense claim and request for payment as a condition of allowance of their administrative expense claims pursuant to 11 U.S.C. Section 503(b)(1)(D). With regard to year 2019 ad valorem property taxes, the Tax Authorities will receive payment of their prepetition claims within 30 days of the Effective Date of the Plan.  The payment will include interest from the Petition Date through the Effective Date and from the Effective Date through payment in full at the state statutory rate pursuant to 11 U.S.C. Sections 506(b), 511, and 1129, if applicable, subject to all of the Debtor's and Reorganized Debtor's rights and defenses in connection therewith. Notwithstanding any other provision in the Plan, the Tax Authorities shall (i) retain the liens that secure all prepetition and postpetition amounts ultimately owed to them, if any, as well as (ii) the state law priority of those liens until the claims are paid in full.

b. The Tax Authorities' prepetition claims and their administrative expense claims shall not be discharged until such time as the amounts owed are paid in full.  In the event of a default asserted by the Taxing Authorities, the Tax Authorities shall provide notice Debtor or Reorganized Debtor, as applicable, and may demand cure of any such asserted default.  Subject to all of its rights and defenses, the Debtor or Reorganized Debtor shall have fifteen (15) days from the date of the notice to cure the default.  If the alleged default is not cured, the Tax Authorities may exercise any of their respective rights under applicable law and pursue collection of all amounts owed pursuant to state law outside of the Bankruptcy Court, subject in all respects to the Debtor's and Reorganized Debtor's applicable rights and defenses. The Debtor/Reorganized Debtor shall be entitled to any notices of default required under applicable nonbankruptcy law and each of the Taxing Authorities, the Debtor and the Reorganized Debtor reserve any and all of their respective rights and defenses in connection therewith.  The Debtor's and Reorganized Debtor's rights and defenses under Texas Law and the Bankruptcy Code with respect to this provision of the Confirmation Order, including their right to dispute or object to the Tax Authorities' Claims and liens, are fully preserved.

DOCS_SF:104487.21 36027/002

**RR.** **Resolution of Objections of Scott Ellington and Isaac Leventon.**

Pursuant to Bankruptcy Rule 9019(a), the Senior Employees' Settlement is approved in all respects. The Debtor may, only with the consent of the Committee, elect Option B for a Senior Employee Claimant by written notice to such Senior Employee Claimant on or before the occurrence of the Effective Date. If the Debtor does not elect Option B, then Option A will govern the treatment of the Liquidated Bonus Claims.

    a.    Notwithstanding any language in the Plan, the Disclosure Statement, or this Confirmation Order to the contrary, if Option A applies to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee Claimant will receive the treatment described in paragraph 82(e) hereof, and if the Debtor timely elects Option B with respect to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee will receive the treatment described in paragraph 82(f) hereof.

    b.    The Senior Employees' Settlement is hereby approved, without prejudice to the respective rights of Mr. Ellington and Mr. Leventon to assert all their remaining Claims against the Debtor's estate, including, but not limited to, their Class 6 PTO Claims, their remaining Class 8 General Unsecured Claims, any indemnification claims, and any Administrative Expense Claims that they may assert and is without prejudice to the rights of any party in interest to object to any such Claims.

    c.    Pursuant to Bankruptcy Rule 3018(a), Mr. Ellington and Mr. Leventon were permitted to change their votes on the Plan. Accordingly, Mr. Ellington's votes on his Ballots in Class 7 and Class 8 of the Plan were changed from a rejection of the Plan to acceptance of the Plan, and Mr. Leventon's votes on his Ballots in Class 7 and Class 8 of the Plan were, changed from rejections of the Plan to acceptances of the Plan.

    d.    The Senior Employees' Objection is deemed withdrawn.

**SS.** **No Release of Claims Against Senior Employee Claimants**. For the avoidance of doubt, the Senior Employees' Settlement, as approved herein, shall not, and shall not be deemed to, release any Claims or Causes of Action held by the Debtor against either Senior

Employee Claimant nor shall either Senior Employee Claimant be, or be deemed to be, a "Released Party" under the Plan.

**TT. Resolution of Objection of Internal Revenue Service.** Notwithstanding any other provision or term of the Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the "IRS Claim"):

(a) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of the date of said notice and demand, then the following shall apply to the IRS:

(1) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code;

(2) The automatic stay of 11 U.S.C. § 362 and any injunction of the Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Bankruptcy Court, and the entire prepetition liability owed to the IRS, together with any unpaid postpetition tax liabilities, may become due and payable immediately; and

(3) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

(b) If the IRS declares the Debtor, the Reorganized Debtor, or any successor-in-interest to be in default of the Debtor's, the Reorganized Debtor's and/ or any successor- in-interest's obligations under the Plan, then entire prepetition liability of an IRS' Allowed Claim, together with any unpaid postpetition tax liabilities shall become due and payable

immediately upon written demand to the Debtor, Reorganized Debtor and/or any successor-in-interest. Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(c) The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default, the IRS shall be entitled to proceed as set out in paragraphs (1), (2), and/or (3) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel. The collection statute expiration date for all unpaid federal tax liabilities shall be extended pursuant to non-bankruptcy law.

(d) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(e) Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States and its agency the Internal Revenue Service.

(f) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

UU.    **IRS Proof of Claim.**    Notwithstanding anything in the Plan or in this

Confirmation Order, until all required tax returns are filed with and processed by the IRS, the IRS's

proof of claim will not be deemed fixed for purposes of Section 502 of the Bankruptcy Code and

may be amended in order to reflect the IRS' assessment of the Debtor's unpaid priority and general

unsecured taxes, penalties and interest.

**VV.   CLO Holdco, Ltd. Settlement**   Notwithstanding anything contained herein to the contrary, nothing in this Order is or is intended to supersede the rights and obligations of either the Debtor or CLO Holdco contained in that certain *Settlement Agreement between CLO Holdco, Ltd., and Highland Capital Management, L.P., dated January 25,2021* [Docket No. 1838-1] (the "CLOH Settlement Agreement").  In the event of any conflict between the terms of this Order and the terms of the CLOH Settlement Agreement, the terms of the CLOH Settlement Agreement will govern.

**WW.   Retention of Jurisdiction.**  The Bankruptcy Court may properly, and upon the Effective Date shall, to the maximum extent permitted under applicable law, retain jurisdiction over all matters arising out of, and related to, this Chapter 11 Case, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

**XX.   Payment of Statutory Fees; Filing of Quarterly Reports.**  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date.  The Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.  Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C. § 1930.

**YY.   Dissolution of the Committee**.  On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have

any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). Notwithstanding the foregoing, any Committee member or Professional may serve following the Effective Date with respect to the Claimant Trust Oversight Board or Litigation Sub-Trust. The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan, the Claimant Trust Agreement, and/or Litigation Sub-Trust in connection with such representation.

**ZZ.     Miscellaneous.**    After the Effective Date, the Debtor or Reorganized Debtor, as applicable, shall have no obligation to file with the Bankruptcy Court or serve on any parties reports that the Debtor or Reorganized Debtor, as applicable, were obligated to file under the Bankruptcy Code or a court order, including monthly operating reports (even for those periods for which a monthly operating report was not filed before the Effective Date), ordinary course professional reports, reports to any parties otherwise required under the "first" and "second" day orders entered in this Chapter 11 Case (including any cash collateral financing orders entered in this Chapter 11 Case) and monthly or quarterly reports for Professionals; *provided*, *however*, that

the Debtor or Reorganized Debtor, as applicable, will comply with the U.S. Trustee's post confirmation reporting requirements.

### ###END OF ORDER###

**App. 383**

## Exhibit A

**Fifth Amended Plan (as Modified)**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
|  | ) |
| Debtor. | ) |
|  | ) |

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND
## CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW AND DEFINED TERMS ............................................... 1

    A.    Rules of Interpretation, Computation of Time and Governing Law ..................... 1

    B.    Defined Terms ................................................................................ 2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ................ 16

    A.    Administrative Expense Claims ......................................................... 16

    B.    Professional Fee Claims .................................................................. 17

    C.    Priority Tax Claims ....................................................................... 17

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS
AND EQUITY INTERESTS ............................................................. 18

    A.    Summary ................................................................................... 18

    B.    Summary of Classification and Treatment of Classified Claims and
Equity Interests ........................................................................... 18

    C.    Elimination of Vacant Classes .......................................................... 19

    D.    Impaired/Voting Classes ................................................................. 19

    E.    Unimpaired/Non-Voting Classes ....................................................... 19

    F.    Impaired/Non-Voting Classes ........................................................... 19

    G.    Cramdown ................................................................................. 19

    H.    Classification and Treatment of Claims and Equity Interests ...................... 19

    I.    Special Provision Governing Unimpaired Claims .................................... 24

    J.    Subordinated Claims ..................................................................... 24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ...................................... 24

    A.    Summary ................................................................................... 24

    B.    The Claimant Trust ....................................................................... 25

        1.    Creation and Governance of the Claimant Trust and Litigation
Sub-Trust ........................................................................ 25

        2.    Claimant Trust Oversight Committee ....................................... 26

App. 386

3. Purpose of the Claimant Trust. ...................................................27

4. Purpose of the Litigation Sub-Trust. ..........................................27

5. Claimant Trust Agreement and Litigation Sub-Trust Agreement. .........27

6. Compensation and Duties of Trustees. ......................................29

7. Cooperation of Debtor and Reorganized Debtor. ......................29

8. United States Federal Income Tax Treatment of the Claimant Trust. ..................................................................................29

9. Tax Reporting. ...........................................................................30

10. Claimant Trust Assets. ..............................................................30

11. Claimant Trust Expenses. ..........................................................31

12. Trust Distributions to Claimant Trust Beneficiaries. ...............31

13. Cash Investments. .....................................................................31

14. Dissolution of the Claimant Trust and Litigation Sub-Trust. .................31

C. The Reorganized Debtor ........................................................................32

1. Corporate Existence ..................................................................32

2. Cancellation of Equity Interests and Release ............................32

3. Issuance of New Partnership Interests .....................................32

4. Management of the Reorganized Debtor ..................................33

5. Vesting of Assets in the Reorganized Debtor ...........................33

6. Purpose of the Reorganized Debtor .........................................33

7. Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets ....................................33

D. Company Action ......................................................................................34

E. Release of Liens, Claims and Equity Interests ......................................35

F. Cancellation of Notes, Certificates and Instruments ............................35

**Page**

    G.     Cancellation of Existing Instruments Governing Security Interests ..................35

    H.     Control Provisions .....................................................................................35

    I.      Treatment of Vacant Classes .................................................................36

    J.     Plan Documents ......................................................................................36

    K.     Highland Capital Management, L.P. Retirement Plan and Trust ......................36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
               LEASES ....................................................................................37

    A.     Assumption, Assignment, or Rejection of Executory Contracts and
          Unexpired Leases ....................................................................................37

    B.     Claims Based on Rejection of Executory Contracts or Unexpired
          Leases .......................................................................................................38

    C.     Cure of Defaults for Assumed or Assigned Executory Contracts and
          Unexpired Leases ....................................................................................38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...........................................39

    A.     Dates of Distributions .............................................................................39

    B.     Distribution Agent ...................................................................................39

    C.     Cash Distributions ...................................................................................40

    D.     Disputed Claims Reserve ........................................................................40

    E.     Distributions from the Disputed Claims Reserve .............................40

    F.     Rounding of Payments ............................................................................40

    G.     *De Minimis* Distribution .......................................................................41

    H.     Distributions on Account of Allowed Claims .............................................41

    I.      General Distribution Procedures ..............................................................41

    J.     Address for Delivery of Distributions ......................................................41

    K.     Undeliverable Distributions and Unclaimed Property .......................41

    L.     Withholding Taxes ..................................................................................42

App. 388

**Page**

M. Setoffs ...................................................................................................... 42

N. Surrender of Cancelled Instruments or Securities .............................. 42

O. Lost, Stolen, Mutilated or Destroyed Securities ................................ 43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
        UNLIQUIDATED AND DISPUTED CLAIMS ................................ 43

A. Filing of Proofs of Claim ........................................................................ 43

B. Disputed Claims ........................................................................................ 43

C. Procedures Regarding Disputed Claims or Disputed Equity Interests ............... 43

D. Allowance of Claims and Equity Interests ............................................. 44

    1. Allowance of Claims ........................................................................ 44

    2. Estimation ........................................................................................ 44

    3. Disallowance of Claims .................................................................. 44

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ................................................. 45

A. Conditions Precedent to the Effective Date ........................................ 45

B. Waiver of Conditions ................................................................................ 46

C. Dissolution of the Committee ................................................................. 46

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS ................ 47

A. General ........................................................................................................ 47

B. Discharge of Claims .................................................................................. 47

C. Exculpation ................................................................................................ 47

D. Releases by the Debtor ............................................................................ 48

E. Preservation of Rights of Action ........................................................... 49

    1. Maintenance of Causes of Action .............................................. 49

    2. Preservation of All Causes of Action Not Expressly Settled or
       Released ........................................................................................... 49

**Page**

  F.  Injunction ........................................................................................50

  G.  Duration of Injunctions and Stays...........................................................51

  H.  Continuance of January 9 Order ..........................................................51

ARTICLE X. BINDING NATURE OF PLAN ....................................................51

ARTICLE XI. RETENTION OF JURISDICTION.................................................52

ARTICLE XII. MISCELLANEOUS PROVISIONS ...............................................54

  A.  Payment of Statutory Fees and Filing of Reports .............................54

  B.  Modification of Plan .............................................................................54

  C.  Revocation of Plan ..............................................................................54

  D.  Obligations Not Changed......................................................................55

  E.  Entire Agreement .................................................................................55

  F.  Closing of Chapter 11 Case ................................................................55

  G.  Successors and Assigns.........................................................................55

  H.  Reservation of Rights............................................................................55

  I.  Further Assurances ...............................................................................56

  J.  Severability ..........................................................................................56

  K.  Service of Documents ..........................................................................56

  L.  Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code............................................................................57

  M.  Governing Law .....................................................................................58

  N.  Tax Reporting and Compliance ............................................................58

  O.  Exhibits and Schedules ........................................................................58

  P.  Controlling Document ..........................................................................58

---

### DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

---

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "<u>Debtor</u>"), proposes the following chapter 11 plan of reorganization (the "<u>Plan</u>") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor.  Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan.  The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein.  There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents.  All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

### ARTICLE I.
### RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

**A.**  **Rules of Interpretation, Computation of Time and Governing Law**

For purposes hereof:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set

forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B. <u>Defined Terms</u>

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1. "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2. "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3. "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4. "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5. "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6. "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy

App. 392

Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7.      "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8.      "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9.      "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11.      "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

15.    "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16.    "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17.    "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19.    "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims.  The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20.    "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21.    "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22.    "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23.    "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

24.   "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25.   "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26.   "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC.  For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27.   "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28.   "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement.  The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29.   "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30.   "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests

unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31.     "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32.     "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33.     "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34.     "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35.     "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36.     "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37.     "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38.     "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41.     "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election.  For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized

Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51.    "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52.    "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53.    "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54.     "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55.    "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56.    "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57.    "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58.    "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59.    "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60.    "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61.    "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

App. 398

62.     "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63.     "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64.     "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65.     "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66.     "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67.     "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68.     "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

App. 399

69. "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70. "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an:  (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71. "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72. "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73. "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74. "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75. "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76. "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77. "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78. "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79. "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80. "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

81.     "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement.  As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82.     "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83.     "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84.     "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85.     "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86.     "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87.     "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88.     "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

89.      "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90.      "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91.     "Petition *Date*" means October 16, 2019.

92.     "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

11

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93.    "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94.    "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95.    "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96.    "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97.    "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98.    "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99.    "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100.    "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

101.    "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

12

102.    "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103.    "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105.    "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106.    "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107.    "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108.    "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder

App. 403

of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109. "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110. "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111. "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112. "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113. "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114. "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115. "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust. For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116. "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

117.    "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118.    "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119.    "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120.    "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121.    "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122.    "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123.    "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125.    "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126.    "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127.    "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128.    "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129.    "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

130. "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131. "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132. "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133. "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134. "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135. "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136. "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137. "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

**A.**    **Administrative Expense Claims**

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on

App. 406

or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

## B. **Professional Fee Claims**

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline. Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement. The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

## C. **Priority Tax Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor: (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed

Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

<h1 style="text-align:center">ARTICLE III.
CLASSIFICATION AND TREATMENT OF
CLASSIFIED CLAIMS AND EQUITY INTERESTS</h1>

**A.**     **Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

**B.**     **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

App. 408

### C.   Elimination of Vacant Classes

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### D.   Impaired/Voting Classes

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

### E.   Unimpaired/Non-Voting Classes

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

### F.   Impaired/Non-Voting Classes

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

### G.   Cramdown

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### H.   Classification and Treatment of Claims and Equity Interests

1.   *Class 1 – Jefferies Secured Claim*

- *Classification*:  Class 1 consists of the Jefferies Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until

19

full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2.    *Class 2 – Frontier Secured Claim*

- *Classification*:  Class 2 consists of the Frontier Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:  (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note.  The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*:  Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3.    *Class 3 – Other Secured Claims*

- *Classification*:  Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4.     *Class 4 – Priority Non-Tax Claims*

- *Classification*:  Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.     *Class 5 – Retained Employee Claims*

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.     *Class 6 – PTO Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6

Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7.   *Class 7 – Convenience Claims*

- *Classification*: Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*: Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8.   *Class 8 – General Unsecured Claims*

- *Classification*: Class 8 consists of the General Unsecured Claims.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9. *Class 9 – Subordinated Claims*

- *Classification*:  Class 9 consists of the Subordinated Claims.

  *Treatment*:  On the Effective Date, Holders of Subordinated Claims  shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10. *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*:  Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11. *Class 11 – Class A Limited Partnership Interests*

- *Classification*:  Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

**I.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**J.    Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THIS PLAN**

**A.    Summary**

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited

24

partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.**     **The Claimant Trust**[2]

1.     *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets.  The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust.  Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims.  The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee.  The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement.  The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust.  Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement.  After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee.  The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement.  The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution.  Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2. *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

App. 416

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.    *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.    *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5.    *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

(i)     the payment of the Claimant Trust Expenses;

(ii)    the payment of other reasonable expenses of the Claimant Trust;

(iii)   the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)   the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)    the orderly monetization of the Claimant Trust Assets;

(vi)   litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)  the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii) the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)  the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)     the payment of other reasonable expenses of the Litigation Sub-Trust;

(ii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)     the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee.  Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.     *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate.  The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.     *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.     *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as:  (a) a transfer

of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9. *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10. *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

App. 420

11. *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12. *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13. *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14. *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Claimant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and

no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C.     **The Reorganized Debtor**

### 1.     *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

### 2.     *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

### 3.     *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor.  Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date.  Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order.  Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

4. *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5. *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6. *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7. *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement,

the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D.      Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

### E.   Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### F.   Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### G.   Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

### H.   Control Provisions

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

35

## I. Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

## J. Plan Documents

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

## K. Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.     Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4),

as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.** **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Confirmation Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.** **Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Dates of Distributions

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan.  Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

### B.    Distribution Agent

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

## C. **Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

## D. **Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

## E. **Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount. To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date. For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

## F. **Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

### G. *De Minimis* Distribution

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

### H. Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

### I. General Distribution Procedures

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

### J. Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

### K. Undeliverable Distributions and Unclaimed Property

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

**L.      Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.      Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.      Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

## O.     Lost, Stolen, Mutilated or Destroyed Securities

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent: (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED AND DISPUTED CLAIMS

## A.     Filing of Proofs of Claim

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

## B.     Disputed Claims

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

## C.     Procedures Regarding Disputed Claims or Disputed Equity Interests

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

43

#### D. **Allowance of Claims and Equity Interests**

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

1. *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

2. *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

3. *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE,**

ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

**ARTICLE VIII.**
**EFFECTIVENESS OF THIS PLAN**

**A.**     **Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtor and the Committee. The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust

45

Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

## B. <u>Waiver of Conditions</u>

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

## C. <u>Dissolution of the Committee</u>

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on

the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

### A.  General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

### B.  Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

### C.  Exculpation

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided*, *however,* the foregoing

47

will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

**D.**      **Releases by the Debtor**

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

## E.   **Preservation of Rights of Action**

### 1.   *Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

### 2.   *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including,

App. 439

without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

## F.    <u>Injunction</u>

**Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

**Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court**

(i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

**G.**     **Duration of Injunctions and Stays**

**ARTICLE II. Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.**

**H.**     **Continuance of January 9 Order**

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.

**ARTICLE X.
BINDING NATURE OF PLAN**

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan.  All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

App. 441

## ARTICLE XI.
## <u>RETENTION OF JURISDICTION</u>

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

App. 443

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.  Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date.  All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed.  The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.  The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### B.  Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### C.  Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

App. 444

D.     <u>**Obligations Not Changed**</u>

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

E.     <u>**Entire Agreement**</u>

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

F.     <u>**Closing of Chapter 11 Case**</u>

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

G.     <u>**Successors and Assigns**</u>

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

H.     <u>**Reservation of Rights**</u>

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the

Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

## I.  **Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## J.  **Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## K.  **Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

> **If to the Claimant Trust:**
>
> Highland Claimant Trust
> c/o Highland Capital Management, L.P.
> 300 Crescent Court, Suite 700

Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
          Ira D. Kharasch, Esq.
          Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
          Ira D. Kharasch, Esq.
          Gregory V. Demo, Esq.

## L.   **Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code**

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to

**App. 447**

evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M.**     **Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N.**     **Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**O.**     **Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P.**     **Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

App. 448

Dated:  January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

## **Exhibit B**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

## Schedule of CLO Management Agreements and Related Contracts to Be Assumed

1. Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

2. Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

3. Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

4. Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

5. Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

6. Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

7. Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

8. Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

9. Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

10. Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

11. Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

12. Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

13. Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

14. Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

15. Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

16. Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

17. Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

18. Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

19. Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

20. Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

21. Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

22. Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

23. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

24. Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

25. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

26. Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

27. Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

28. Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

29. Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

30. Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

31. Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

32. Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

33. Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

34. Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

35. Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

36.     Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

37.     Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

38.     Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

39.     Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

40.     Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

41.     Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

42.     Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

43.     Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

44.     Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

45.     Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

46.     A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

47.     A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

48.     Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

49.     Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

50.     Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

DOCS_NY:42355.1 36027/002

51.     Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

52.     Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

53.     Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

54.     Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

55.     Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

56.     Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

57.     Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

58.     Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

59.     Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

60.     Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

DOCS_NY:42355.1 36027/002

# EXHIBIT B

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                 FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION
 2
                                )    Case No. 19-34054-sgj-11
 3   In Re:                      )    Chapter 11
                                )
 4   HIGHLAND CAPITAL            )    Dallas, Texas
     MANAGEMENT, L.P.,           )    Monday, February 8, 2021
 5                               )    9:00 a.m. Docket
            Debtor.              )
 6                               )    BENCH RULING ON CONFIRMATION
                                )    HEARING [1808] AND AGREED
 7                               )    MOTION TO ASSUME [1624]
     _____)
 8
                      TRANSCRIPT OF PROCEEDINGS
 9          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.
10
     WEBEX APPEARANCES:
11
12   For the Debtor:            Jeffrey Nathan Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
12                              10100 Santa Monica Blvd.,
                                 13th Floor
13                              Los Angeles, CA  90067-4003
                                (310) 277-6910
14
15   For the Official Committee  Matthew A. Clemente
     of Unsecured Creditors:    SIDLEY AUSTIN, LLP
16                              One South Dearborn Street
                                Chicago, IL  60603
17                              (312) 853-7539
18   For James Dondero:         D. Michael Lynn
                                John Y. Bonds, III
19                              Bryan C. Assink
                                BONDS ELLIS EPPICH SCHAFER
20                               JONES, LLP
                                420 Throckmorton Street,
21                               Suite 1000
                                Fort Worth, TX  76102
22                              (817) 405-6900
23   For Get Good Trust and     Douglas S. Draper
     Dugaboy Investment Trust:  HELLER, DRAPER & HORN, LLC
24                              650 Poydras Street, Suite 2500
                                New Orleans, LA  70130
25                              (504) 299-3300
```

EXHIBIT B

App. 456

Case: 21-90011    Document: 00515803515    Page: 187    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 460 of 521   PageID 6338

2

```
 1   APPEARANCES, cont'd.:

 2   For Certain Funds and          Davor Rukavina
     Advisors:                      MUNSCH, HARDT, KOPF & HARR
 3                                  500 N. Akard Street, Suite 3800
                                    Dallas, TX  75201-6659
 4                                  (214) 855-7587

 5   For Certain Funds and          A. Lee Hogewood, III
     Advisors:                      K&L GATES, LLP
 6                                  4350 Lassiter at North Hills
                                      Avenue, Suite 300
 7                                  Raleigh, NC  27609
                                    (919) 743-7306
 8
     Recorded by:                   Michael F. Edmond, Sr.
 9                                  UNITED STATES BANKRUPTCY COURT
                                    1100 Commerce Street, 12th Floor
10                                  Dallas, TX  75242
                                    (214) 753-2062
11
     Transcribed by:               Kathy Rehling
12                                  311 Paradise Cove
                                    Shady Shores, TX  76208
13                                  (972) 786-3063

14

15

16

17

18

19

20

21

22

23

24
           Proceedings recorded by electronic sound recording;
25             transcript produced by transcription service.
```

Case: 21-90011    Document: 00515803515    Page: 188    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 461 of 521   PageID 6339

3

1          <u>DALLAS, TEXAS - FEBRUARY 8, 2021 - 9:08 A.M.</u>

2          THE COURT:  Please be seated.

3     (Beeping.)

4          THE COURT:  Someone needs to turn off their whatever.

5      All right.  Good morning.  This is Judge Jernigan, and we

6  have scheduled today a bench ruling regarding the Debtor's

7  plan that we had a confirmation trial on last week.  This is

8  Highland Capital Management, LP, Case No. 19-34054.

9      Let me first make sure we've got Debtor's counsel on the

10  line.  Do we have --

11          MR. POMERANTZ:  Yes.

12          THE COURT:  -- Mr. Pomerantz?

13          MR. POMERANTZ:  Yes, Your Honor.  Good morning, Your

14  Honor.  Jeff Pomerantz; Pachulski Stang Ziehl & Jones; on

15  behalf of the Debtor.

16          THE COURT:  Okay.  Good morning.  Do we have the

17  Creditors' Committee on the phone?

18          MR. CLEMENTE:  Good morning, Your Honor.  Matthew

19  Clemente of Sidley Austin on behalf of the Creditors'

20  Committee.

21          THE COURT:  Good morning.  All right.  We had various

22  Objectors.  Do we have Mr. Dondero's counsel on the phone?

23          MR. LYNN:  Yes, Your Honor.  Michael Lynn, together

24  with John Bonds and Bryan Assink, for Jim Dondero.

25          THE COURT:  Good morning.  For the Trusts, the

Case: 21-90011     Document: 00515803515     Page: 189     Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 462 of 521   PageID 6340

4

1    Dugaboy and Get Good Trusts, do we have Mr. Draper?

2              MR. DRAPER:  Yes.  Douglas Draper is on the line,

3    Your Honor.

4              THE COURT:  Good morning.  Now, for what I'll call

5    the Funds and Advisor Objectors, do we have Mr. Rukavina and

6    your crew on the line?

7              MR. RUKAVINA:  Davor Rukavina.  And Lee Hogewood is

8    also on the line.

9              THE COURT:  All right.  Good morning to you.  All

10   right.  And we had objections pending from the U.S. Trustee as

11   well.  Do we have the U.S. Trustee on the line?

12       (No response.)

13             THE COURT:  All right.  If you're appearing, you're

14   on mute.  We're not hearing you.

15       All right.  Well, we have lots of other folks.  I don't

16   mean to be neglectful of them, but we're going to get on with

17   the ruling this morning.  This is going to take a while.  This

18   is a complex matter, so it should take a while.

19       All right.  Before the Court, of course, for consideration

20   is the Debtor's Fifth Amended Plan, first filed on November

21   24, 2020, as later modified on or around January 22, 2021,

22   with more amendments filed on or around February 1, 2021.  The

23   Court will hereinafter refer to this as the "Plan."

24       The parties refer to the Plan as a monetization plan

25   because it involves the gradual wind-down of the Debtor's

Case: 21-90011    Document: 00515803515    Page: 190    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 463 of 521   PageID 6341

5

1  assets and certain of its funds over time, with the

2  Reorganized Debtor continuing to manage certain other funds

3  for a while, under strict governance and monitoring, and a

4  Claimants Trust will receive the proceeds of that process,

5  with the creditors receiving an interest in that trust.  There

6  is also anticipated to be Litigation Sub-Trust established for

7  the purpose of pursuing certain avoidance or other causes of

8  action for the benefit of creditors.

9      The recovery for general unsecured creditors is estimated

10  now at 71 percent.

11      The Plan was accepted by 99.8 percent of the dollar amount

12  of voting creditors in Class 8, the general unsecured class,

13  but as to numerosity, a majority of the class of general

14  unsecured creditors did not vote in favor of the plan.

15  Specifically, 27 claimants voted no and 17 claimants voted

16  yes.  All but one of the rejecting ballots were cast by

17  employees who, according to the Debtor, are unlikely to have

18  allowed claims because they are asserted for bonuses or other

19  compensation that will not become due.

20      Meanwhile, in a convenience class, Class 7, of general

21  unsecured claims under one million dollars, one hundred

22  percent of the 16 claimants who chose to vote in that class

23  chose to accept the Plan.

24      Because of the rejecting votes in Class 8, and because of

25  certain objections to the Plan, the Court heard two full days

Case: 21-90011    Document: 00515803515    Page: 191    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 464 of 521   PageID 6342

6

1  of evidence, considering testimony from five witnesses and

2  thousands of pages of documentary evidence, in considering

3  whether to confirm the Plan pursuant to Sections 1129(a) and

4  (b) of the Bankruptcy Code.

5       The Court finds and concludes that the Plan meets all of

6  the relevant requirements of Sections 1123, 1124, and 1129 of

7  the Code, and other applicable provisions of the Bankruptcy

8  Code, but is issuing this detailed ruling to address certain

9  pending objections to the Plan, including but not limited to

10  objections regarding certain Exculpations, Releases, Plan

11  Injunctions, and Gatekeeping Provisions of the Plan.

12       The Court reserves the right to amend or supplement this

13  oral ruling in more detailed findings of fact, conclusions of

14  law, and an Order.

15       First, by way of introduction, this case is not your

16  garden-variety Chapter 11 case.  Highland Capital Management,

17  LP is a multibillion dollar global investment advisor,

18  registered with the SEC pursuant to the Investment Advisers

19  Act of 1940.  It was founded in 1993 by James Dondero and Mark

20  Okada.  Mr. Okada resigned from his role with Highland prior

21  to the bankruptcy case being filed.  Mr. Dondero was in

22  control of the Debtor as of the day it filed bankruptcy, but

23  agreed to relinquish control of it on or about January 9,

24  2020, pursuant to an agreement reached with the Official

25  Unsecured Creditors' Committee, which will be described later.

Case: 21-90011    Document: 00515803515    Page: 192    Date Filed: 03/31/2021
Case 3:21-cv-01585-S    Document 11    Filed 09/22/21    Page 465 of 521    PageID 6343

7

1        Although Mr. Dondero remained on as an unpaid employee and

2   portfolio manager with the Debtor after January 9, 2020, his

3   employment with the Debtor terminated on October 9, 2020.  Mr.

4   Dondero continues to work for and essentially control numerous

5   nondebtor companies in the Highland complex of companies.

6        The Debtor is headquartered in Dallas, Texas.  As of the

7   October 2019 petition date, the Debtor employed approximately

8   76 employees.

9        Pursuant to various contractual arrangements, the Debtor

10  provides money management and advisory services for billions

11  of dollars of assets, including CLOs and other investments.

12  Some of these assets are managed pursuant to shared services

13  agreements with a variety of affiliated entities, including

14  other affiliated registered investment advisors.  In fact,

15  there are approximately 2,000 entities in the Byzantine

16  complex of companies under the Highland umbrella.

17       None of these affiliates of Highland filed for Chapter 11

18  protection.  Most, but not all, of these entities are not

19  subsidiaries, direct or indirect, of Highland.  And certain

20  parties in the case preferred not to use the term "affiliates"

21  when referring to them.  Thus, the Court will frequently refer

22  loosely to the so-called, in air quotes, "Highland complex of

23  companies" when referring to the Highland enterprise.  That's

24  a term many of the lawyers in the case use.

25       Many of the companies are offshore entities, organized in

Case: 21-90011    Document: 00515803515    Page: 193    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 466 of 521   PageID 6344

8

1    such faraway jurisdictions as the Cayman Islands and Guernsey.

2        The Debtor is privately owned 99.5 percent by an entity

3    called Hunter Mountain Investment Trust; 0.1866 percent by the

4    Dugaboy Investment Trust, a trust created to manage the assets

5    of Mr. Dondero and his family; 0.0627 percent by Mark Okada,

6    personally and through family trusts; and 0.25 percent by

7    Strand Advisors, Inc., the general partner.

8        The Debtor's primary means of generating revenue has

9    historically been from fees collected for the management and

10   advisory services provided to funds that it manages, plus fees

11   generated for services provided to its affiliates.

12       For additional liquidity, the Debtor, prior to the

13   petition date, would sell liquid securities in the ordinary

14   course, primarily through a brokerage account at Jefferies,

15   LLC.  The Debtor would also, from time to time, sell assets at

16   nondebtor subsidiaries and distribute those proceeds to the

17   Debtor in the ordinary course of business.

18       The Debtor's current CEO, James Seery, credibly testified

19   that the Debtor was "run at a deficient for a long time and

20   then would sell assets or defer employee compensation to cover

21   its deficits."  This Court cannot help but wonder if that was

22   necessitated because of enormous litigation fees and expenses

23   that Highland was constantly incurring due to its culture of

24   litigation, as further addressed hereafter.

25       Highland and this case are not garden-variety for so many

Case: 21-90011    Document: 00515803515    Page: 194    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 467 of 521   PageID 6345

9

1   reasons.  One is the creditor constituency.  Highland did not

2   file bankruptcy because of some of the typical reasons a large

3   company files Chapter 11.  For example, it did not have a

4   large asset-based secured lender with whom it was in default.

5   It only had relatively insignificant secured indebtedness

6   owing to Jefferies, with whom it had a brokerage account, and

7   one other entity called Frontier State Bank.

8        Highland did not have problems with trade vendors or

9   landlords.  It did not suffer any type of catastrophic

10  business calamity.  In fact, it filed Chapter 11 six months

11  before the COVID-19 pandemic was declared.  The Debtor filed

12  Chapter 11 due to a myriad of massive unrelated business

13  litigation claims that it was facing, many of which had

14  finally become liquidated or were about to become liquidated

15  after a decade or more of contentious litigation in multiple

16  fora all over the world.

17       The Unsecured Creditors' Committee in this case has

18  referred to the Debtor under its former chief executive, Mr.

19  Dondero, as a serial litigator.  This Court agrees with that

20  description.  By way of example, the members of the Creditors'

21  Committee and their history of litigation with the Debtor and

22  others in the Highland complex are as follows:

23       First, the Redeemer Committee of the Highland Crusader

24  Fund, which I'll call the Redeemer Committee.  This Creditors'

25  Committee member obtained an arbitration award against the

Case: 21-90011    Document: 00515803515    Page: 195    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 468 of 521   PageID 6346

10

1    Debtor of more than $190 million, inclusive of interest,

2    approximately five months before the petition date from a

3    panel of the American Arbitration Association.  It was on the

4    verge of having that award confirmed by the Delaware Chancery

5    Court immediately prior to the petition date, after years of

6    disputes that started in late 2008 and included legal

7    proceedings in Bermuda.  This creditor's claim was settled

8    during the bankruptcy case in the amount of approximately

9    $137.7 million.  The Court is omitting various details and

10   aspects of that settlement.

11        The second Creditors' Committee member, Acis Capital

12   Management, LP, which was formerly in the Highland complex of

13   companies but was not affiliated with Highland as of the

14   petition date.  This UCC member and its now-owner, Josh Terry,

15   were involved in litigation with Highland dating back to 2016.

16   Acis was forced into an involuntary bankruptcy in the

17   Bankruptcy Court for the Northern District of Texas, Dallas

18   Division, by Josh Terry, who was a former Highland portfolio

19   manager, in 2018 after Josh Terry obtained an approximately $8

20   million arbitration award and judgment against Acis that was

21   issued by a state court in Dallas County, Texas.  Josh Terry

22   was ultimately awarded the equity ownership of Acis by the

23   Dallas Bankruptcy Court in the Acis bankruptcy case.

24        Acis subsequently asserted a multimillion dollar claim

25   against Highland in the Dallas Bankruptcy Court for Highland's

Case: 21-90011    Document: 00515803515    Page: 196    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 469 of 521   PageID 6347

11

1  alleged denuding of Acis in fraud of its creditors, primarily

2  Josh Terry.

3      The litigation involving Acis and Mr. Terry dates back to

4  mid-2016, and has continued on, with numerous appeals of

5  bankruptcy court orders, including one appeal still pending at

6  the United States Court of Appeals for the Fifth Circuit.

7      There was also litigation involving Josh Terry and Acis in

8  the Royal Court of the Island of Guernsey and in a court in

9  New York.

10      The Acis claim was settled during this bankruptcy case in

11  court-ordered mediation for approximately $23 million.  Other

12  aspects and details of this settlement are being omitted.

13      Now, the third Creditors' Committee member, UBS

14  Securities.  It's a creditor who filed a proof of claim in the

15  amount of $1,039,000,000 in the Highland case.  Yes, over one

16  billion dollars.  The UBS claim was based on the amount of a

17  judgment that UBS received from a New York state court in 2020

18  after a multi-week bench trial which had occurred many months

19  earlier on a breach of contract claim against other entities

20  in the Highland complex.  UBS alleged that the Debtor should

21  be liable for the judgment.  The UBS litigation related to

22  activities that occurred in 2008.  The litigation involving

23  UBS and Highland and its affiliates was pending for more than

24  a decade, there having been numerous interlocutory appeals

25  during its history.

Case: 21-90011    Document: 00515803515    Page: 197    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 470 of 521   PageID 6348

12

1       The Debtor and UBS recently announced a settlement of the

2   UBS claim, which came a few months after court-ordered

3   mediation.  The settlement is in the amount of $50 million as

4   a general unsecured claim, $25 million as a subordinated

5   claim, and $18 million of cash coming from a nondebtor entity

6   in the Highland complex known as Multistrat.  Other aspects of

7   this settlement are being omitted.

8       The fourth and last Creditors' Committee member is Meta-e

9   Discovery.  It is a vendor who happened to supply litigation

10  and discovery-related services to the Debtor over the years.

11  It had unpaid invoices on the petition date of more than

12  $779,000.

13      It is fair to say that the members of the Creditors'

14  Committee in this case all have wills of steel.  They fought

15  hard before and during the bankruptcy case.  The members of

16  the Creditors' Committee are highly sophisticated and have had

17  highly sophisticated professionals representing them.  They

18  have represented their constituency in this case as

19  fiduciaries extremely well.

20      In addition to these Creditors Committee members, who were

21  all embroiled in years of litigation with Highland and its

22  affiliates in various ways, the Debtor has been in litigation

23  with Patrick Daugherty, a former limited partner and employee

24  of Highland, for many years in both Delaware and Texas state

25  courts.  Patrick Daugherty filed a proof of claim for "at

Case: 21-90011    Document: 00515803515    Page: 198    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 471 of 521   PageID 6349

13

1  least $37.4 million" relating to alleged breached employment-

2  related agreements and for the tort of defamation arising from

3  a 2017 press release posted by the Debtor.

4      The Debtor and Patrick Daugherty recently announced a

5  settlement of the Patrick Daugherty claim in the amount of

6  $750,000 cash on the effective date, an $8.25 million general

7  unsecured claim, and a $2.75 million subordinated claim.

8  Other aspects and details of this settlement are being

9  omitted.

10     Additionally, an entity known as HarbourVest, who invested

11 more than $70 million with an entity in the Highland complex,

12 asserted a $300 million proof of claim against Highland,

13 alleging, among other things, fraud and RICO violations.  The

14 HarbourVest claim was settled during the bankruptcy case for a

15 $45 million general unsecured claim and a $35 million junior

16 claim.

17     Other than these claims just described, most of the other

18 claims in this case are claims asserted against the Debtor by

19 other entities in the Highland complex, most of which entities

20 the Court finds to be controlled by Mr. Dondero; claims of

21 employees who believe that they are entitled to large bonuses

22 or other types of deferred compensation; and claims of

23 numerous law firms that did work for Highland and were unpaid

24 for amounts due to them on the petition date.

25     Yet another reason this is not your garden-variety Chapter

Case: 21-90011    Document: 00515803515    Page: 199    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 472 of 521   PageID 6350

14

11 case is its postpetition corporate governance structure.

Highland filed bankruptcy October 16, 2019.  Contentiousness

with the Creditors' Committee began immediately, with first

the Committee's request for a change of venue from Delaware to

Dallas, and then a desire by the Committee and the U.S.

Trustee for a Chapter 11 or 7 trustee to be appointed due to

concerns over and distrust of Mr. Dondero and his numerous

conflicts of interest and alleged mismanagement or worse.

After many weeks of the threat of a trustee lingering, the

Debtor and the Creditors' Committee negotiated and the Court

approved a corporate governance settlement on January 9, 2020

that resulted in Mr. Dondero no longer being an officer or

director of the Debtor or of its general partner, Strand.

As part of the court-approved settlement, three eminently-

qualified Independent Directors were chosen by the Creditors'

Committee and engaged to lead Highland through its Chapter 11

case.  They were James Seery, John Dubel, and Retired

Bankruptcy Judge Russell Nelms.  They were technically the

Independent Directors of Strand, the general partner of the

Debtor.  Mr. Dondero had previously been the sole director of

Strand, and thus the sole person in ultimate control of the

Debtor.

The three independent board members' resumes are in

evidence.  James Seery eventually was named CEO of the Debtor.

Suffice it to say that this changed the entire trajectory of

Case: 21-90011    Document: 00515803515    Page: 200    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 473 of 521   PageID 6351

15

1    the case.  This saved the Debtor from a trustee.  The Court

2    trusted the new directors.  The Creditors' Committee trusted

3    them.  They were the right solution at the right time.

4         Because of the unique character of the Debtor's business,

5    the Court believed this solution was far better than a

6    conventional Chapter 7 or 11 trustee.  Mr. Seery, in

7    particular, knew and had vast experience at prominent firms

8    with high-yield and distressed investing similar to the

9    Debtor's business.  Mr. Dubel had 40 years of experience

10   restructuring large, complex businesses and serving on their

11   boards of directors in this context.  And Retired Judge Nelms

12   had not only vast bankruptcy experience but seemed

13   particularly well-suited to help the Debtor maneuver through

14   conflicts and ethical quandaries.

15        By way of comparison, in the Chapter 11 case of Acis, the

16   former affiliate of Highland that this Court presided over two

17   or three years ago, which company was much smaller in size and

18   scope than Highland, managing only five or six CLOs, a Chapter

19   11 trustee was elected by the creditors that was not on the

20   normal rotation panel for trustees in this district, but

21   rather was a nationally-known bankruptcy attorney with more

22   than 45 years of large Chapter 11 case experience.  This

23   Chapter 11 trustee performed valiantly, but was sued by

24   entities in the Highland complex shortly after he was

25   appointed, which this Court had to address.  The Acis trustee

Case: 21-90011    Document: 00515803515    Page: 201    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 474 of 521   PageID 6352

16

1  could not get Highland and its affiliates to agree to any

2  actions taken in the case, and he finally obtained

3  confirmation of a plan over Highland and its affiliates'

4  objections in his fourth attempted plan, which confirmation

5  then was promptly appealed by Highland and its affiliates.

6      Suffice it to say it was not easy to get such highly-

7  qualified persons to serve as independent board members and

8  CEO of this Debtor.  They were stepping into a morass of

9  problems.  Naturally, they were worried about getting sued, no

10 matter how defensible their efforts might be, given the

11 litigation culture that enveloped Highland historically.  It

12 seemed as though everything always ended in litigation at

13 Highland.

14     The Court heard credible testimony that none of them would

15 have taken on the role of Independent Director without a good

16 D&O insurance policy protecting them, without indemnification

17 from Strand, guaranteed by the Debtor; without exculpation for

18 mere negligence claims; and without a gatekeeper provision,

19 such that the Independent Directors could not be sued without

20 the bankruptcy court, as a gatekeeper, giving a potential

21 plaintiff permission to sue.

22     With regard to the gatekeeper provision, this was

23 precisely analogous to what bankruptcy trustees have pursuant

24 to the so-called "Barton Doctrine," which was first

25 articulated in an old U.S. Supreme Court case.

Case: 21-90011    Document: 00515803515    Page: 202    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 475 of 521   PageID 6353

17

1      The Bankruptcy Court approved all of these protections in

2    a January 9, 2020 order.  No one appealed that order.  And Mr.

3    Dondero signed the settlement agreement that was approved by

4    that order.

5      An interesting fact about the D&O policy came out in

6    credible testimony at the confirmation hearing.  Mr. Dubel and

7    an insurance broker from Aon, named Marc Tauber, both credibly

8    testified that the gatekeeper provision was needed because of

9    the so-called, and I quote, "Dondero Exclusion" in the

10   insurance marketplace.

11     Specifically, the D&O insurers in the marketplace did not

12   want to cover litigation claims that might be brought against

13   the Independent Directors by Mr. Dondero because the

14   marketplace of D&O insurers are aware of Mr. Dondero's

15   litigiousness.  The insurers would not have issued a D&O

16   policy to the Independent Directors without either the

17   gatekeeping provision or a "Dondero Exclusion" being in the

18   policy.

19     Thus, the gatekeeper provision was part of the January 9,

20   2020 settlement.  There was a sound business justification for

21   it.  It was reasonable and necessary.  It was consistent with

22   the Barton Doctrine in an extremely analogous situation --

23   *i.e.*, the independent board members were analogous to a three-

24   headed trustee in this case, if you will.  Mr. Dondero signed

25   off on it.  And, again, no one ever appealed the order

Case: 21-90011    Document: 00515803515    Page: 203    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 476 of 521   PageID 6354

18

1    approving it.

2        The Court finds that, like the Creditors' Committee, the

3    independent board members here have been resilient and

4    unwavering in their efforts to get the enormous problems in

5    this case solved.  They seem to have at all times negotiated

6    hard and with good faith.  As noted previously, they changed

7    the entire trajectory of this case.

8        Still another reason why this was not your garden-variety

9    case was the mediation effort.  In summer of 2020, roughly

10   nine months into the Chapter 11 case, this Court ordered

11   mediation among the Debtor, Acis, UBS, the Redeemer Committee,

12   and Mr. Dondero.  The Court selected co-mediators, since this

13   seemed like such a Herculean task, especially during COVID-19,

14   where people could not all be in the same room.  Those co-

15   mediators were Retired Bankruptcy Judge Allan Gropper from the

16   Southern District of New York, who had a distinguished career

17   presiding over complex Chapter 11 cases, and Ms. Sylvia Mayer,

18   who likewise has had a distinguished career, first as a

19   partner in a preeminent law firm working on complex Chapter 11

20   cases, and subsequently as a mediator and arbitrator in

21   Houston, Texas.

22       As noted earlier, the Acis claim was settled during the

23   mediation, which seemed nothing short of a miracle to this

24   Court, and the UBS claim was settled many months later, and

25   this Court believes the groundwork for that ultimate

Case: 21-90011    Document: 00515803515    Page: 204    Date Filed: 03/31/2021
Case 3:21-cv-01585-S    Document 11    Filed 09/22/21    Page 477 of 521    PageID 6355

19

1   settlement was laid, or at least helped, through the

2   mediation.  And as earlier noted, other enormous claims have

3   been settled during this case, including that of the Redeemer

4   Committee, who, again, had asserted approximately or close to

5   a $200 million claim; HarbourVest, who asserted a $300 million

6   claim; and Patrick Daugherty, who asserted close to a $40

7   million claim.

8       This Court cannot stress strongly enough that the

9   resolution of these enormous claims and the acceptance of all

10  of these creditors of the Plan that is now before the Court

11  seems nothing short of a miracle.  It was more than a year in

12  the making.

13      Finally, a word about the current remaining Objectors to

14  the Plan before the Court.  Once again, the Court will use the

15  phrase "not garden-variety."  Originally, there were over one

16  dozen objections filed to this Plan.  The Debtor has made

17  various amendments or modifications to the Plan to address

18  some of these objections.  The Court finds that none of these

19  modifications require further solicitation, pursuant to

20  Sections 1125, 1126, 1127 of the Code, or Bankruptcy Rule

21  3019, because, among other things, they do not materially

22  adversely change the treatment of the claims of any creditor

23  or interest holder who has not accepted in writing the

24  modifications.

25      Among other things, there were changes to the projections

Case: 21-90011    Document: 00515803515    Page: 205    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 478 of 521   PageID 6356

20

1    that the Debtor filed shortly before the confirmation hearing

2    that, among other things, show the estimated distribution to

3    creditors and compare plan treatment to a likely disbursement

4    in a Chapter 7.

5        These do not constitute a materially adverse change to the

6    treatment of any creditors or interest holders.  They merely

7    update likely distributions based on claims that have now been

8    settled, and they've otherwise incorporated more recent

9    financial data.  This happens often before confirmation

10   hearings.  The Court finds that it did not mislead or

11   prejudice any creditors or interest holders, and certainly

12   there was no need to resolicit the Plan.

13       The only Objectors to the Plan left at this time were Mr.

14   Dondero and entities that the Court finds are controlled by

15   him.  The standing of these entities to object to the Plan

16   exists, but the remoteness of their economic interest is

17   noteworthy, and the Court questions the good faith of the

18   Objectors.  In fact, the Court has good reason to believe that

19   these parties are not objecting to protect economic interests

20   they have in the Debtor, but to be disruptors.

21       Mr. Dondero wants his company back.  This is

22   understandable.  But it's not a good faith basis to lob

23   objections to the Plan.  The Court has slowed down

24   confirmation multiple times on the current Plan and urged the

25   parties to talk to Mr. Dondero.  The parties represent that

Case: 21-90011    Document: 00515803515    Page: 206    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 479 of 521   PageID 6357

21

1  they have, and the Court believes that they have.

2      Now, to be specific about the remoteness of the objectors'

3  interests, the Court will address them each separately.

4  First, Mr. Dondero has a pending objection.  Mr. Dondero's

5  only economic interest with regard to the Debtor at this point

6  is an unliquidated indemnification claim.  And based on

7  everything this Court has heard, his indemnification claim

8  will be highly questionable at this juncture.

9      Second, a joint objection has been filed by the Dugaboy

10  Trust and the Get Good Trust.  As for the Dugaboy Trust, it

11  was created to manage the assets of Mr. Dondero and his

12  family, and it owns a 0.1866 percent limited partnership

13  interest in the Debtor.  The Court is not clear what economic

14  interest the Get Good Trust has, but it likewise seems to be

15  related to Mr. Dondero, and it has been represented to the

16  Court numerous times that the trustee is Mr. Dondero's college

17  roommate.

18      Another group of Objectors that has joined together in one

19  objection is what the Court will refer to as the Highland and

20  NexPoint Advisors and Funds.  The Court understands they

21  assert disputed administrative expense claims against the

22  estate.  While the evidence presented was that they have

23  independent board members that run these companies, the Court

24  was not convinced of their independence from Mr. Dondero.

25  None of the so-called independent board members of these

Case: 21-90011    Document: 00515803515    Page: 207    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 480 of 521   PageID 6358

22

1  entities have ever testified before the Court.  Moreover, they

2  have all been engaged with the Highland complex for many

3  years.

4      The witness who testified on these Objectors' behalves at

5  confirmation, Mr. Jason Post, their chief compliance officer,

6  resigned from Highland after more than twelve years in October

7  2020, at the same time that Mr. Dondero resigned or was

8  terminated by Highland.  And a prior witness recently for

9  these entities whose testimony was made part of the record at

10  the confirmation hearing essentially testified that Mr.

11  Dondero controlled these entities.

12      Finally, various NexBank entities objected to the Plan.

13  The Court does not believe they have liquidated claims.  Mr.

14  Dondero appears to be in control of these entities as well.

15      To be clear, the Court has allowed all of these objectors

16  to fully present arguments and evidence in opposition to

17  confirmation, even though their economic interests in the

18  Debtor appear to be extremely remote and the Court questions

19  their good faith.  Specifically on that latter point, the

20  Court considers them all to be marching pursuant to the orders

21  of Mr. Dondero.

22      In the recent past, Mr. Dondero has been subject to a TRO

23  and preliminary injunction by the Bankruptcy Court for

24  interfering with the current CEO's management of the Debtor in

25  specific ways that were supported by evidence.  Around the

Case: 21-90011    Document: 00515803515    Page: 208    Date Filed: 03/31/2021
Case 3:21-cv-01585-S    Document 11    Filed 09/22/21    Page 481 of 521    PageID 6359

23

1    time that this all came to light and the Court began setting

2    hearings on the alleged interference, Mr. Dondero's company

3    phone supplied to him by Highland, which he had been asked to

4    turn in, mysteriously went missing.  The Court merely mentions

5    this in this context as one of many reasons that the Court has

6    to question the good faith of Mr. Dondero and his affiliated

7    objectors.

8        The only other pending objection besides these objections

9    of the Dondero and Dondero-controlled entities is an objection

10    of the United States Trustee pertaining to the release,

11    exculpation, and injunction provisions in the Plan.

12        In juxtaposition to these pending objections, the Court

13    notes that the Debtor has resolved earlier-filed objections to

14    the Plan filed by the IRS, Patrick Daugherty, CLO Holdco,

15    Ltd., numerous local taxing authorities, and certain current

16    and former senior-level employees of the Debtor.

17        With that rather detailed factual background addressed,

18    because certainly context matters here, the Court now

19    addresses what it considers the only serious objections raised

20    in connection with confirmation.  Specifically, the Plan

21    contain certain releases, exculpation, plan injunctions, and a

22    gatekeeper provision which are obviously not fully consensual,

23    since there are objections.  Certainly, these provisions are

24    mostly consensual when you consider that parties with hundreds

25    of millions of dollars' worth of legitimate claims have not

Case: 21-90011    Document: 00515803515    Page: 209    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 482 of 521   PageID 6360

24

1    objected to them.

2        First, a word about plan releases generally, since the

3    Objectors at times seem to gloss over, in this Court's view,

4    relevant distinctions, and seem to refer to the plan releases

5    in this Plan and the exculpations and the plan injunctions all

6    as impermissible third-party releases, when, in fact, they are

7    not, *per se*.

8        It has, without a doubt, become quite commonplace in

9    complex Chapter 11 bankruptcy cases to have three categories

10    of releases in plans.  These three types are as follows.

11        First, Debtor Releases.  A debtor release involves a

12    release by the debtor and its bankruptcy estate of claims

13    against nondebtor third-parties.  For example, a release may

14    be granted in favor of creditors, directors, officers,

15    employees, professionals who participated in the bankruptcy

16    process.  This is the least-controversial type of release

17    because the debtor is extinguishing its own claims, which are

18    property of the estate, that a debtor has authority to utilize

19    or not, pursuant to Sections 541 and 363 of the Bankruptcy

20    Code.

21        Authority for a debtor release pursuant to a plan arises

22    out of Section 1123(b)(3)(A), which indicates that a plan may

23    provide for "the settlement or adjustment of any claim or

24    interest belonging to the debtor or to the estate."

25        In this context, it would appear that the only analysis

Case: 21-90011    Document: 00515803515    Page: 210    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 483 of 521   PageID 6361

25

1    required is to determine whether the release or settlement of

2    the claim is an exercise of reasonable business judgment on

3    that part of the debtor, is it fair and equitable, is it in

4    the best interest of the estate, given all the relevant facts

5    and circumstances?  Also relevant is whether there's

6    consideration given of some sort by the releasees.

7        Now, the second type of very commonplace Chapter 11 plan

8    release is an exculpation.  Chapter 11 plans also very often

9    have these exculpation provisions, and they're something much

10   narrower in scope and time than a full-fledged release.  An

11   exculpation provision is more like a shield for a certain

12   subset of key actors in the case for their acts during and in

13   connection with the case, which acts may have been merely

14   negligent.

15       Specifically, a plan may absolve certain actors -- usually

16   estate fiduciaries -- such as an Official Unsecured Creditors'

17   Committee and its members, Committee professionals, sometimes

18   Debtor professionals, senior management, officers and

19   directors of the Debtor, from any liability for postpetition

20   negligent conduct -- *i.e.*, conduct which occurred during the

21   administration of the Chapter 11 case and in the negotiation,

22   drafting, and implementation of a plan.  An exculpation

23   provision typically excludes gross negligence and willful

24   misconduct.  It is usually worded in a passive voice, so it

25   may seem a little unclear as to whether it is actually a

Case: 21-90011    Document: 00515803515    Page: 211    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 484 of 521   PageID 6362

26

1  release and by whom.

2      In any event, the rationale is that parties who actively

3  participate in a court-approved process -- often, court-

4  approved transactions by court order -- should receive

5  protection for their work.  Otherwise, who would want to work

6  in such a messy, contentious situation, only to be sued for

7  alleged negligence for less-than-perfect end results?

8      Chapter 11 end results are not always pretty.  One could

9  argue that these exculpation provisions, though, are much ado

10 about nothing.  Why?  For one thing, again, the shield is only

11 as to negligent conduct.  There is no shield for other

12 problematic conduct, such as gross negligence or willful

13 misconduct.

14     Second, in many situations, any claims or causes of action

15 that might arise will belong to the Debtor or its estate.

16 Thus, they would already be released pursuant to a debtor

17 release.

18     Additionally, there is case law stating that, where a

19 claim is brought against an estate professional whose fees

20 have already been approved in a final fee application, any

21 claims are barred by *res judicata*.  Thus, exculpated

22 professionals would only have potential exposure for a very

23 short window of time, until final fee applications.

24     Additionally, certain case law in Texas makes clear that

25 an attorney generally does not owe any duties to persons other

Case: 21-90011    Document: 00515803515    Page: 212    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 485 of 521   PageID 6363

27

1   than his own client.

2       All of this suggests that the shield of a typical

3   exculpation provision may rarely become useful or needed.

4       Moving now to the third type of release, a true third-

5   party release, Chapter 11 plans also sometimes contain third-

6   party releases.  A true third-party release involves the

7   release of claims held by nondebtor third parties against

8   other nondebtor third parties, and there is often no

9   limitation on the scope and time of the claims released.

10      This is the most heavily scrutinized of the three types of

11   plan releases.  Much of the case authority focuses on whether

12   a third-party release is consensual or not in analyzing their

13   propriety and/or enforceability.

14      In Highland, there are no third-party releases.  Rather,

15   there are debtor releases and exculpations.  There also happen

16   to be plan injunctions and gatekeeper provisions that have

17   been challenged.  The Objectors argue that these provisions

18   violate the Fifth Circuit's opinion in *Pacific Lumber* or are

19   otherwise beyond the jurisdiction or authority of the

20   bankruptcy court.  These arguments are now addressed.

21      First, the debtor release is found at Article IX.D of the

22   Plan.  The language, in pertinent part, reads as follows.  "On

23   and after the effective date, each Released Party is deemed to

24   be hereby conclusively, absolutely, unconditionally,

25   irrevocably, and forever released and discharged by the Debtor

Case: 21-90011    Document: 00515803515    Page: 213    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 486 of 521   PageID 6364

28

1   and the Estate, in each case on behalf of themselves and their

2   respective successors, assigns, and representatives, including

3   but not limited to the Claimant Trust and the Litigation Sub-

4   Trust, from any and all causes of action, including any

5   derivative claims, asserted on behalf of the Debtor, whether

6   known or unknown, foreseen or unforeseen, matured or

7   unmatured, existing or hereafter arising, in law, equity,

8   contract, tort, or otherwise, that the Debtor or the Estate

9   would have been legally entitled to assert in their own right,

10  whether individually or collectively, or on behalf of the

11  holder of any claim against, or interest in, a debtor or other

12  person."

13       There are certain exceptions discussed, and then Released

14  Parties are defined at Definition 113 of the Plan collectively

15  as:  the Independent Directors; Strand, solely from the date

16  of the appointment of the Independent Directors through the

17  effective date; the CEO/CRO; the Committee, the members of the

18  Committee, in their official capacities; the professionals

19  retained by the Debtor and the Committee in the Chapter 11

20  case; and the employees.  This is a defined term in the Plan

21  Supplement and does not include certain employees.

22       To be clear, these are not third-party releases such as

23  addressed in the *Pacific Lumber* case.  These are the Debtor's

24  and/or the bankruptcy estate's causes of action that are

25  proposed to be released.  Releases by a debtor are

Case: 21-90011    Document: 00515803515    Page: 214    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 487 of 521   PageID 6365

29

1  discretionary and can be provided by a debtor to persons who

2  have provided consideration to the debtor and the estate.

3  Section 1123(b)(3)(A) of the Bankruptcy Code permits this.

4        The evidence here supported the notion that these releases

5  are a *quid pro quo* for the Released Parties' significant

6  contributions to a highly complex and contentious

7  restructuring.  The Debtor is releasing its own claims.  Some

8  of the Released Parties would have indemnification rights

9  against the Debtor.  And the Debtor's CEO, James Seery,

10  credibly testified that he does not believe any claims exist

11  as to the Released Parties.  The Court approves the Debtor

12  releases and overrules the objections to them.

13        Next, the exculpations appear at Article IX.C of the Plan

14  and provide as follows:  Subject in all respects to Article

15  XII.D of the Plan, to the maximum extent permitted by

16  applicable law, no Exculpated Party will have or incur, and

17  each Exculpated Party is hereby exculpated from, any claim,

18  obligation, suit, judgment, damage, demand, debt, right, cause

19  of action, remedy, loss, and liability for conduct occurring

20  on or after the petition date in connection with or arising

21  out of the filing and administration of the Chapter 11 case,

22  the negotiation and pursuit of a disclosure statement, the

23  Plan, or the solicitation of votes for or confirmation of the

24  Plan, the funding or consummation of the Plan, or any related

25  agreements, instruments, et cetera, et cetera, whether or not

Case: 21-90011    Document: 00515803515    Page: 215    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 488 of 521   PageID 6366

30

1   such Plan distributions occur following the effective date,

2   the implementation of the Plan, and any negotiation,

3   transactions, and documentation in connection with the

4   foregoing clauses, provided, however, the foregoing will not

5   apply to any acts or omissions of any Exculpated Party arising

6   out of or related to acts or omissions that constitute bad

7   faith, fraud, gross negligence, criminal misconduct, or

8   willful misconduct; or Strand or any employee other than with

9   respect to actions taken by such entities from the date of

10   appointment of the Independent Directors through the effective

11   date.

12       Exculpated Parties are later defined at Section -- or,

13   earlier defined at Section 62 of the Plan, Definition No. 62

14   of the Plan, as later limited by the Debtor, as announced in

15   the confirmation hearing.  And so these are the Exculpated

16   Parties:  the Debtor and its successors and assigns; the

17   employees, certain employees, as defined; Strand; the

18   Independent Directors; the Committee, the members of the

19   Committee, in their official capacities; the professionals

20   retained by the Debtor and the Committee in the Chapter 11

21   case; the CEO and CRO; and the related persons as to each of

22   these parties listed in Part (iv) through (viii) above;

23   provided, for the avoidance of doubt, and it goes on to say

24   Dondero, Mark Okada, and various others aren't Exculpated

25   Parties.

Case: 21-90011    Document: 00515803515    Page: 216    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 489 of 521   PageID 6367

31

1    Now, as earlier mentioned, the Objectors argue that

2    *Pacific Lumber*, 584 F.3d 229, a Fifth Circuit case from 2009,

3    categorically rejects the permissibility of nonconsensual

4    exculpations as well as third-party releases in a Chapter 11

5    plan.  So the Court is going to take a deep dive into that

6    assertion.

7    In *Pacific Lumber*, the Fifth Circuit reviewed on appeal

8    numerous challenges to a confirmed plan of affiliated debtors

9    known as Palco and Scopac and four subsidiaries.  The debtor

10   Palco owned and operated the sawmill, a power plant, and even

11   a town called Scotia, California.  The debtor Scopac owned

12   timberlands.  A creditor, a secured creditor called Marathon

13   had a claim against Palco's assets.  Marathon estimated

14   Palco's assets were worth $110 million.  Its claim was $160

15   million.  Meanwhile, other parties had large secured claims

16   against the other debtor, Scopac.

17   The plan that the bankruptcy court confirmed, which was on

18   appeal to the Fifth Circuit, was filed by both the secured

19   creditor Marathon and a joint plan proponent called MRC.  MRC

20   was a competitor of the debtor Palco.  The Marathon/MRC plan

21   proposed to dissolve all the debtors, cancel intercompany

22   debts, and create two new entities, Townco and Newco.  Almost

23   all of the debtor Palco's assets, including the town of

24   Scotia, California, would be transferred to Townco.  The

25   timberlands and other assets, including the sawmill, would be

Case: 21-90011    Document: 00515803515    Page: 217    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 490 of 521   PageID 6368

32

1    placed in Newco.

2         Marathon and MRC proposed to contribute $580 million to

3    Newco to pay claims against Scopac.  And Marathon would

4    convert its secured claim against Palco's assets into equity,

5    giving it full ownership of Townco, a 15 percent stake in

6    Newco, and a new note for the sawmill's working capital.  MRC

7    would own the other 80 percent of Newco and would manage and

8    run the company.

9         An indenture trustee for the secured indebtedness against

10   Scopac -- which, by the way, had also been a plan proponent of

11   a competing plan -- appealed the confirmation order, raising

12   eight distinct issues on appeal.  One of the eight issues

13   pertained to what the Fifth Circuit referred to as a

14   "nondebtor exculpation and release clause."  This issue is

15   discussed on the last two pages of a very lengthy opinion.

16        While the complained-of provision is not quoted verbatim

17   in the *Pacific Lumber* opinion, it appears to have been a

18   typical exculpation clause.  Not a third-party release; a

19   typical exculpation clause.  The Fifth Circuit stated, "The

20   plan releases MRC, Marathon, Newco, Townco, and the Unsecured

21   Creditors' Committee, and their personnel, from liability,

22   other than for willful and gross negligence related to

23   proposing, implementing, and administering the plan" at Page

24   251.

25        The Fifth Circuit held that "the nondebtor releases must

Case: 21-90011     Document: 00515803515     Page: 218     Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 491 of 521   PageID 6369

33

1    be struck except with respect to the Creditors' Committee and

2    its members."

3         Footnote 26 of the opinion also states that the appellants

4    had "not briefed why Newco and Townco or their officers and

5    directors should not be released," and so "we do not analyze

6    their position."  Rather, the Fifth Circuit merely analyzed

7    why the exculpation provision was not permissible as to the

8    two plan proponents, MRC and Marathon.

9         Thus, the Court views *Pacific Lumber* as being a holding

10   that squarely addressed the propriety of two plan proponents,

11   a secured lender and a third-party competitor purchaser of the

12   Debtors, obtaining nonconsensual exculpation in the plan.

13   However, its reasoning certainly cannot be ignored, strongly

14   suggesting it would not be inclined to approve an exculpation

15   for any party other than a Creditors' Committee or its

16   members.

17        As far as the Fifth Circuit's reasoning, it relied on

18   Bankruptcy Code Section 524(e) for striking down the

19   exculpations, stating, "The law states, however, that

20   discharge of a debt of the debtor does not affect the

21   liability of any other entity on such debt."  Page 251.  The

22   opinion suggests that MRC and Marathon may have tried to argue

23   that 524(e) did not apply to their exculpations because MRC

24   and Marathon were not liable as co-obligors in any way on any

25   of the debtor's debt.

Case: 21-90011    Document: 00515803515    Page: 219    Date Filed: 03/31/2021
Case 3:21-cv-01585-S    Document 11    Filed 09/22/21    Page 492 of 521    PageID 6370

34

1    The Fifth Circuit seemed dismissive of this argument,

2  stating as follows, "MRC/Marathon insist the release clause is

3  part of their bargain because, without the clause, neither

4  company would have been willing to provide the plan's

5  financing.  Nothing in the records suggests that MRC/Marathon,

6  the Committee, or the Debtor's officers and directors were co-

7  liable for the Debtor's prepetition debts.  Instead, the

8  bargain the proponents claim to have purchased is exculpation

9  from any negligence that occurred during the course of the

10  case.  Any costs the released parties might incur defending

11  against suits alleging such negligence are unlikely to swamp

12  either of these parties or the consummated reorganization.  We

13  see little equitable about protecting the released nondebtors

14  from negligence suits arising out of the reorganization."

15    The Court goes on to note that, in a variety of cases,

16  that releases have been approved, but these cases "seem

17  broadly to foreclose nonconsensual nondebtor releases and

18  permanent injunctions."

19    The Court then adds at Footnote 27 that the Fifth Circuit

20  in the past did not set aside challenged plan releases that

21  were in final nonappealable orders and were the subject of

22  collateral attack much later, citing its famous *Republic*

23  *Supply v. Shoaf* case, where the Fifth Circuit ruled that *res*

24  *judicata* barred a debtor from bringing a claim that was

25  specifically and expressly released by a confirmed

Case: 21-90011    Document: 00515803515    Page: 220    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 493 of 521   PageID 6371

35

1    reorganization plan because the debtor -- the objector failed

2    to object to the release at confirmation.

3        The Fifth Circuit in *Pacific Lumber* also noted that the

4    Bankruptcy Code permits bankruptcy courts to enjoin third-

5    party asbestos claims under certain circumstances, 524(g),

6    which the Court said suggests nondebtor releases are most

7    appropriate as a method to channel mass tort claims towards a

8    specific pool of assets, citing numerous cases, including

9    *Johns-Manville*.

10       In reach its holding, the Fifth Circuit saw no reason to

11   uphold exculpation to the plan proponents MRC and Marathon,

12   seeming to find it inconsistent with 524(e) under the facts at

13   bar, but the Court did uphold exculpation for the Creditors'

14   Committee and its members, stating, "We agree, however, with

15   courts that have held that 1103(c) under the Code, which lists

16   the Creditors' Committee's powers, implies Committee members

17   have qualified immunity for actions within the scope of their

18   duties."  Numerous cites.  "The Creditors' Committee and its

19   members are the only disinterested volunteers among the

20   parties sought to be released here.  The scope of protection,

21   which does not insulate them from willful and gross

22   negligence, is adequate."

23       Thus, the Court held that the exculpation provisions in

24   *Pacific Lumber* must be struck except with regard to the

25   Creditors' Committee and its members.

Case: 21-90011    Document: 00515803515    Page: 221    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 494 of 521   PageID 6372

36

1        Now, after all of that, this Court believes the following

2   can be gleaned from *Pacific Lumber*.  First, the Fifth Circuit

3   hinted that consensual exculpations and/or consensual

4   nondebtor third-party releases are permissible.  The Court

5   was, of course, dealing with nonconsensual exculpations in

6   *Pacific Lumber*.  In this regard, I note Page 252, where the

7   Court cited various prior Fifth Circuit authority and then

8   stated, "These cases seem broadly to foreclose nonconsensual

9   nondebtor releases and permanent injunctions."

10       The second thing that can be gleaned from *Pacific Lumber*:

11  The Fifth Circuit hinted that nondebtor releases may be

12  permissible in cases involving global settlements of mass

13  claims against the debtors and co-liable parties.  The Court,

14  of course, referred to 524(g), but various other cases which

15  approved nondebtor releases where mass claims were channeled

16  to a specific pool of assets.

17       Third, the Fifth Circuit outright held that exculpations

18  from negligence for a Creditors' Committee and its members are

19  permissible because the concept is both consistent with

20  1103(c), "which implies Committee members have qualified

21  immunity for actions within the scope of their duties," and a

22  good policy result, since "if members of the Committee can be

23  sued by persons unhappy with the outcome of the case, it will

24  be extremely difficult to find members to serve on an official

25  committee."

Case: 21-90011     Document: 00515803515     Page: 222     Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 495 of 521   PageID 6373

37

1      Fourth, the Fifth Circuit recognized in *Pacific Lumber*

2   that *res judicata* may bar complaints regarding an

3   impermissible plan release, citing to its earlier *Republic*

4   *Supply v. Shoaf* opinion.

5      Now, being ever-mindful of the Fifth Circuit's words in

6   *Pacific Lumber*, this Court cannot help but wonder about at

7   least three things.

8      First, did the Fifth Circuit leave open the door that

9   facts/equities might sometimes justify approval of an

10  exculpation for a person other than a Creditors' Committee and

11  its members?  For example, the Fifth Circuit stated, in

12  referring to the plan proponents Marathon and MRC, that "Any

13  costs the released parties might incur defending against suits

14  alleging such negligence are unlikely to swamp either of these

15  parties or the consummated reorganization."  Here, this Court

16  can easily expect the proposed exculpated parties to incur

17  costs that could swamp them and the reorganization based on

18  the past litigious conduct of Mr. Dondero and his controlled

19  entities.  Do these words of the Fifth Circuit hint that

20  equities/economics might sometimes justify an exculpation?

21     Second, did the Fifth Circuit's rationale for permitted

22  exculpations to Creditors' Committee and their members, which

23  was clearly policy-based, based on their implied qualified

24  immunity flowing from their duties in Section 1103 and their

25  disinterestedness, and the importance of their role in a

Case: 21-90011    Document: 00515803515    Page: 223    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 496 of 521   PageID 6374

38

1   Chapter 11 case, did this rationale leave open the door to

2   sometimes permitting exculpations to other parties in a

3   particular Chapter 11 case besides Creditors' Committees and

4   their members?  For example, in a situation such as the

5   Highland case, in which Independent Directors, brought in to

6   avoid a trustee, are more like a Creditors' Committee than an

7   incumbent board of directors.

8        Third, the Fifth Circuit's sole statutory basis was

9   Section 524(e).  This Court would humbly submit that this is a

10  statute dealing with prepetition liability in which some

11  nondebtor is liable with the Debtor.  Exculpation is a concept

12  dealing with postpetition liability.

13       The Ninth Circuit recently, in a case called *Blixseth v.*

14  *Credit Suisse*, 961 F.3d 1074 (9th Cir. 2020), approved the

15  validity of an exculpation clause incorporated into a

16  confirmed Chapter 11 plan that purported to absolve certain

17  nondebtor parties that were "closely involved" in drafting the

18  plan.  They were the largest secured creditor, a purchaser,

19  and an individual who was an indirect owner of certain of the

20  debtor companies.  The exculpation was from any negligence,

21  liability, for "any act or omission in connection with,

22  related to, or arising out of the Chapter 11 cases."

23       By the time the appeal was before the Ninth Circuit, the

24  only issue was the propriety of the exculpation clause as to

25  the large secured creditor, which was also a plan proponent,

Case: 21-90011    Document: 00515803515    Page: 224    Date Filed: 03/31/2021
Case 3:21-cv-01585-S    Document 11    Filed 09/22/21    Page 497 of 521    PageID 6375

39

1  since all the other exculpated parties had settled with the

2  appellant.

3      The Court, in determining that the exculpation clause was

4  permissible as to the secured lender, concluded that Section

5  524(e) "does not bar a narrow exculpation clause of the kind

6  here at issue -- that is, one focused on actions of various

7  participants in the plan approval process and relating only to

8  that process," Page 1082.  Why?  Because "Section 524(e)

9  establishes that discharge of a debt of the debtor does not

10 affect the liability of any other entity on such debt."  In

11 other words, the discharge in no way affects the liability of

12 any other entity for the discharged debt.  By its terms,

13 524(e) prevents a bankruptcy court from extinguishing claims

14 of creditors against nondebtors over the very discharged debt

15 through the bankruptcy proceedings.

16     The Court went on to explicitly disagree with *Pacific

17 Lumber* in its analysis of 524(e), reiterating that an

18 exculpation clause covers only liabilities arising from the

19 bankruptcy proceedings and not of any of the debtor's

20 discharged debt.  Footnote 7, Page 1085.

21     Ultimately, the Court held that under Section 105(a),

22 which empowers a bankruptcy court to issue any order, process,

23 or judgment that is necessary or appropriate to carry out the

24 provisions of Chapter 11 and Section 1123, which establishes

25 the appropriate content of the bankruptcy plan, under these

Case: 21-90011    Document: 00515803515    Page: 225    Date Filed: 03/31/2021
Case 3:21-cv-01585-S    Document 11    Filed 09/22/21    Page 498 of 521    PageID 6376

40

1  sections, the bankruptcy court had authority to approve an

2  exculpation clause intended to trim subsequent litigation over

3  acts taken during the bankruptcy proceedings and so render the

4  plan viable.

5      This Court concludes that, just as the Fifth Circuit left

6  open the door for consensual exculpations and releases in

7  *Pacific Lumber*, just as it left open the door for consensual

8  exculpations and releases in *Pacific Lumber*, its dicta

9  suggests that an exculpation might be permissible if there is

10  a showing that "costs that the released parties might incur

11  defending against suits alleging such negligence are likely to

12  swamp either the Exculpated Parties or the reorganization."

13  Again, that was a quote from the Fifth Circuit.

14      If ever there were a risk of that happening in a Chapter

15  11 reorganization, it is this one.  The Debtor's current CEO

16  credibly testified that Mr. Dondero has said outside the

17  courtroom that if Mr. Dondero's own pot plan does not get

18  approved, that he will "burn the place down."  Here, this

19  Court can easily expect the proposed exculpated parties might

20  expect to incur costs that could swamp them and the

21  reorganization process based on the past litigious conduct of

22  Mr. Dondero and his controlled entities.

23      Additionally, this Court concludes that the Fifth

24  Circuit's rationale in *Pacific Lumber* for permitted

25  exculpations to Creditors' Committees and their members, which

Case: 21-90011     Document: 00515803515     Page: 226     Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 499 of 521   PageID 6377

41

1  was clearly policy-based based on their implied qualified

2  immunity flowing from Section 1103 and their importance in a

3  Chapter 11 case, leaves the door open to sometimes permitting

4  exculpations to other parties in a particular Chapter 11 case

5  besides a UCC and its members.

6      Again, if there was ever such a case, the Court believes

7  it is this one, in which Independent Directors were brought in

8  to avoid a trustee and are much more like a Creditors'

9  Committee than an incumbent board of directors.  While,

10  admittedly, there are a few exculpated parties here proposed

11  beyond the independent board, such as certain employees, it

12  would appear that no one is invulnerable to a lawsuit here if

13  past is prologue in this Highland saga.

14      The Creditors' Committee was initially not keen on

15  exculpations for certain employees.  However, Mr. Seery

16  credibly testified that there was a contentious arm's-length

17  negotiation over this and that he needs these employees to

18  preserve value implementing the Plan.  Mr. Dondero has shown

19  no hesitancy to litigate with former employees in the past, to

20  the *nth* degree, and there is every reason to believe he would

21  again in the future, if able.

22      Finally, in this situation, in the case at bar, we would

23  appear to have a *Shoaf* reason to approve the exculpations.

24  The January 9, 2020 order of this Court, Docket Entry 339,

25  which approved the independent board and an ongoing corporate

Case: 21-90011    Document: 00515803515    Page: 227    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 500 of 521   PageID 6378

42

1    governance structure for this case, and which is incorporated

2    into the Plan at Article IX.H, provided as follows:  "No

3    entity may commence or pursue a claim or cause of action of

4    any kind against any Independent Director, any Independent

5    Director's agents, or any Independent Director's advisors

6    relating in any way to the Independent Director's role as an

7    Independent Director of Strand without the Court (1) first

8    determining, after notice, that such claim or cause of action

9    represents a colorable claim of willful misconduct or gross

10   negligence against Independent Director, any Independent

11   Director's agents, or any Independent Director's advisors; and

12   (2) specifically authorizing such entity to bring such a

13   claim.  The Court will have sole jurisdiction to adjudicate

14   any claim for which approval of the Court to commence or

15   pursue has been granted."

16        This was both an exculpation from negligence as to the

17   Independent Directors and their agents and advisors, as well

18   as a gatekeeping provision.  This Court believes that this

19   provision basically approved an exculpation for the

20   Independent Directors way back on January 9, 2020 for their

21   postpetition conduct that might be negligent.  And this is the

22   law of the case and has *res judicata* preclusive effect now.

23        Thus, as to the three Independent Directors, as well as

24   the other named parties in the January 9, 2020 order, their

25   agents, their advisors, we have a situation that fits within

Case: 21-90011   Document: 00515803515   Page: 228   Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 501 of 521   PageID 6379

43

1   *Republic Supply v. Shoaf*, and we fit within the exception

2   articulated in *Pacific Lumber*.

3        The Court reserves the right to supplement these findings

4   and conclusions as to the exculpations, but based on the

5   foregoing, they are approved and the objections are overruled.

6        Now, turning to the Plan objection, it appears at Article

7   IX.F of the Plan and provides, in pertinent part, as follows:

8   Upon entry of the confirmation order, all enjoined parties are

9   and shall be permanently enjoined on and after the effective

10  date from taking any action to interfere with the

11  implementation or consummation of the Plan.  Except as

12  expressly provided in the Plan, the confirmation order, or a

13  separate order of the Bankruptcy Court, all Enjoined Parties

14  are and shall be permanently enjoined on and after the

15  effective date, with respect to any claims and interests, from

16  directly or indirectly -- and then commencing, conducting,

17  continuing any suit, action, proceeding of any kind, and

18  numerous other acts of that vein.

19       The injunction set forth herein shall extend to and apply

20  to any act of the type set forth in any of the causes above

21  against any successors to the Debtor, including but not

22  limited to the Reorganized Debtor, the Litigation Sub-Trust,

23  and the Claimant Trust, and their respective property and

24  interests in property.

25       Plan injunctions like this are commonplace and

Case: 21-90011    Document: 00515803515    Page: 229    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 502 of 521   PageID 6380

44

1    appropriate.  They are entirely consistent with and

2    permissible under Bankruptcy Code Sections 1123(a)(5),

3    1123(a)(6), 1141(a) and (c), and 1142, as well as Bankruptcy

4    Rule 3016(c), which articulates the form that a plan

5    injunction must be set forth in a plan.

6         The Court finds the objections to the Plan Injunctions to

7    be unfounded, and they are thus overruled without much

8    discussion here.

9         Now, lastly, the Gatekeeper Provision.  It appears at

10   Paragraph 4 of Article IX.F of the Plan and provides, in

11   pertinent part, "Subject in all respects to Article XII.D, no

12   Enjoined Party may commence or pursue a claim or cause of

13   action of any kind against any Protected Party that arose or

14   arises from or is related to the Chapter 11 case, the

15   negotiation of the Plan, the administration of the Plan, or

16   property to be distributed under the Plan, the wind-down of

17   the business of the Debtor or Reorganized Debtor, the

18   administration of the Claimant Trust or the Litigation Sub-

19   Trust, or the transactions in furtherance of the foregoing,

20   without the Bankruptcy Court (1) first determining, after

21   notice and a hearing, that such claim or cause of action

22   represents a colorable claim of any kind, including but not

23   limited to negligence, bad faith, criminal misconduct and

24   willful misconduct, fraud, or gross negligence against a

25   Protected Party; and (2) specifically authorizing such

Case: 21-90011    Document: 00515803515    Page: 230    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 503 of 521   PageID 6381

45

1    Enjoined Party to bring such claim or cause of action against

2    such Protected Party, provided, however, that the foregoing

3    will not apply to a claim or cause of action against Strand or

4    against any employee other than with respect to actions taken,

5    respectively, by Strand or any such employee from the date of

6    appointment of the Independent Directors through the effective

7    date.  The Bankruptcy Court will have sole and exclusive

8    jurisdiction to determine whether a claim or cause of action

9    is colorable and, only to the extent legally permissible and

10   as provided for in Article XI, shall have jurisdiction to

11   adjudicate the underlying colorable claim or cause of action."

12       This gatekeeper provision appears necessary and reasonable

13   in light of the litigiousness of Mr. Dondero and his

14   controlled entities that has been described at length herein.

15   Provisions similar to this have been approved in this district

16   in the *Pilgrim's Pride* case and the *CHC Helicopter* case.  The

17   provision is within the spirit of the Supreme Court's Barton

18   Doctrine.  And it appears consistent with the notion of a pre-

19   filing injunction to deter vexatious litigants that has been

20   approved by the Fifth Circuit in such cases as *Baum v. Blue*

21   *Moon Ventures*, 513 F.3d 181, and in the *In re Carroll* case,

22   850 F.3d 811, which arose out of a bankruptcy pre-filing

23   injunction.

24       The Fifth Circuit, in fact, noted in the *Carroll* case that

25   federal courts have authority to enjoin vexatious litigants

Case: 21-90011    Document: 00515803515    Page: 231    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 504 of 521   PageID 6382

46

1    under the All Writs Act, 28 U.S.C. § 1651.  And additionally,

2    under the Bankruptcy Code, a bankruptcy court can issue any

3    order, including a civil contempt order, necessary or

4    appropriate to carry out the provisions of the Code, citing,

5    of course, 105 of the Bankruptcy Code.

6        The Fifth Circuit stated that, when considering whether to

7    enjoin future filings against a vexatious litigant, a

8    bankruptcy court must consider the circumstances of the case,

9    including four factors:  (1)  the party's history of

10   litigation; in particular, whether he has filed vexatious,

11   harassing, or duplicative lawsuits; (2) whether the party had

12   a good faith basis for pursuing the litigation, or perhaps

13   intended to harass; (3) the extent of the burden on the courts

14   and other parties resulting from the party's filings; and (4)

15   the adequacy of alternatives.

16       In the *Baum* case, the Fifth Circuit stated that the

17   traditional standards for injunctive relief -- *i.e.*,

18   irreparable harm and inadequate remedy at law -- do not apply

19   to the issuance of an injunction against a vexatious litigant.

20       Here, although I have not been asked to declare Mr.

21   Dondero and his affiliated entities as vexatious litigants *per*

22   *se*, it is certainly not beyond the pale to find that his long

23   history with regard to the major creditors in this case has

24   strayed into that possible realm, and thus this Court is

25   justified in approving this provision.

Case: 21-90011    Document: 00515803515    Page: 232    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 505 of 521   PageID 6383

47

1      One of the Objectors' lawyers stated very eloquently in

2   closing argument, in opposing the plan injunction and

3   gatekeeping provisions, that "Even a serial killer has

4   constitutional rights," suggesting that these provisions would

5   deprive Mr. Dondero and his controlled entities of fundamental

6   rights or due process somehow.  But to paraphrase the district

7   court in the *Carroll* case, no one, rich or poor, is entitled

8   to abuse the judicial process.  There exists no constitutional

9   right of access to the courts to prosecute actions that are

10  frivolous or malicious.  The Plan injunction and gatekeeper

11  provisions in Highland's plan simply set forth a way for this

12  Court to use its tools, its inherent powers, to avoid abuse of

13  the court system, protect the implementation of the Plan, and

14  preempt the use of judicial time that properly could be used

15  to consider the meritorious claims of other litigants.

16      Accordingly, the Objectors' objections to this provision

17  are overruled.

18      As earlier stated, this Court reserves the right to alter

19  or supplement this ruling in a written order.  In this regard,

20  the Court directs Debtor's counsel -- I hope you are still

21  awake; it's been a long time -- the Court directs Debtor's

22  counsel to submit a form of order.  And specifically, I assume

23  that you've already prepared or have been in the process of

24  preparing a set of findings of fact, conclusions of law, and

25  confirmation order that tracks the confirmation evidence and

Case: 21-90011    Document: 00515803515    Page: 233    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 506 of 521   PageID 6384

48

1   recites conclusions of law that the Plan complies with all the

2   various provisions of Section 1123, 1129, and other applicable

3   Code provisions.

4        What I want you to do is take this bench ruling and add it

5   to what you've prepared.  And what I mean is, as you can tell,

6   I've been reading:  I will have my courtroom deputy email to

7   you all a copy of what I just read.  I'll have her obviously

8   copy the Debtor's counsel, Creditors' Committee, Dondero and

9   the other Objectors, copy them on this written document she's

10  going to send out.  And, again, I want you to kind of meld it

11  into what you've already been preparing.

12       Obviously, I did not address in this oral ruling every

13  provision of 1129(a) and (b).  I did not address every 1123

14  objection.  I did not even address every single objection of

15  the Objectors.  But, again, any objection I've not

16  specifically addressed today is overruled.

17       The briefing, I should say, that the Debtor submitted,

18  there was a Memorandum of Law in Support of Confirmation filed

19  on January 22nd.  There was also a reply brief, a hundred

20  pages or so, separately filed, replying to all the objections.

21  I don't disagree with anything that was in that.  So, again,

22  to the extent you want to send me conclusions of law that are

23  along the lines of that briefing, I would consider that.

24       And so what I thought is you'll send me the melded

25  document and I will edit it if I see fit.  I recognize this

Case: 21-90011    Document: 00515803515    Page: 234    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 507 of 521   PageID 6385

49

1  may take a few days, so I don't give you a strict timetable,

2  just hopefully it won't take too many days.

3      All right.  Is there anyone out there -- Mr. Pomerantz,

4  you had to go to jury duty, except I can't believe --

5           MR. POMERANTZ:  No, I --

6           THE COURT:  I can't believe you were called, but are

7  you there?

8           MR. POMERANTZ:  Your Honor, I am here.  I was luckily

9  excused, because I probably wouldn't have made it.

10     Your Honor, one just comment I'd make.  You referred to

11  the January 9th order.  You didn't refer to the CEO order,

12  which is your order July 16th, which had the same gatekeeper

13  provision.  I assume that was the same analysis?

14          THE COURT:  That was an oversight.  Same analysis.

15  And that's exactly why I said I reserve the right to

16  supplement or amend, because I know there had to be places

17  like that where I omitted to mention something important.

18          MR. POMERANTZ:  But thank you, Your Honor, for your

19  thoughtful ruling, and we will certainly incorporate your

20  materials into the order that we're working on and get it to

21  you when we can.  But we appreciate it on behalf of the

22  Debtor.  We know this took a lot of time and a lot of effort.

23  Hopefully, you got a chance to still watch the Super Bowl

24  yesterday.

25          THE COURT:  Well, when I saw that Tom Brady was going

Case: 21-90011    Document: 00515803515    Page: 235    Date Filed: 03/31/2021
Case 3:21-cv-01585-S   Document 11   Filed 09/22/21   Page 508 of 521   PageID 6386

50

1  to win, I turned it off.

2      I'm sorry.  That's terrible.  You know, my law clerk, my

3  law clerk that you can't see, Nate, he is from Ann Arbor,

4  Michigan, University of Michigan, and he almost cried when I

5  said I didn't like Tom Brady the other day.  So, I apologize.

6          MR. POMERANTZ:  Your Honor, one other comment.  We

7  had our motion to assume our nonresidential real property

8  lease that was also on.  It got missed in all the fanfare, but

9  it was -- it has been unopposed and essentially done pursuant

10  to stipulation.  So we'd like to submit an order on that as

11  well.

12          THE COURT:  Okay.  I have seen that, and I approve it

13  under 365.  You may submit the order.  Okay.  Thank you.

14          MR. POMERANTZ:  Thank you, Your Honor.

15          THE CLERK:  All rise.

16      (Proceedings concluded at 10:35 a.m.)

17                          --oOo--

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                          **02/09/2021**

24  _____        _____
   Kathy Rehling, CETD-444                          Date
25  Certified Electronic Court Transcriber

51

INDEX

PROCEEDINGS                                                    3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

Confirmation Hearing [1808]                                   3

Agreed Motion to (1) Assume Non-Residential Real Property    50
Lease with Crescent TC Investors, LP upon Confirmation of
Plan and (II) Extend Assumption Deadline [1624]

END OF PROCEEDINGS                                           50

INDEX                                                        51

# EXHIBIT C

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

### NOTICE OF APPEAL

COME NOW Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors,

L.P. (the "Appellants"), creditors and parties-in-interest in the above styled and numbered

bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"),

and, pursuant to 28 U.S.C. § 158(a), hereby appeal to the United States District Court for the

Northern District of Texas that certain *Order (i) Confirming the Fifth Amended Plan of*

*Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related*

*Relief* (the "Confirmation Order") entered by the Bankruptcy Court on February 22, 2021 at docket

no. 1943 in the Bankruptcy Case.

A copy of the Confirmation is attached hereto as Exhibit "A."

---

NOTICE OF APPEAL—Page 1

EXHIBIT C

The names of the parties to the Confirmation Order, and the contact information for their

attorneys, is as follows:

1.   <u>Appellants:</u>

Highland Capital Management Fund Advisors, L.P.
NexPoint Advisors, L.P.

<u>Attorneys:</u>

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
3800 Ross Tower
500 N. Akard Street
Dallas, Texas  75201-6659
Telephone: (214) 855-7587
Facsimile: (214) 855-7584
Email: drukavina@munsch.com

2.   <u>Appellee:</u>

Highland Capital Management, L.P.

<u>Attorneys:</u>

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

RESPECTFULLY SUBMITTED this 1st day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**


By: /s/ Davor Rukavina
      Davor Rukavina, Esq.
      Texas Bar No. 24030781
      3800 Ross Tower
      500 N. Akard Street
      Dallas, Texas  75201-6659
      Telephone: (214) 855-7500
      Facsimile: (214) 855-7584
      Email:    drukavina@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. AND NEXPOINT ADVISORS, L.P.**


**<u>CERTIFICATE OF SERVICE</u>**

      The undersigned hereby certifies that, on this the 1st day of March, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Appellee.

By: /s/ Davor Rukavina
      Davor Rukavina, Esq.

# EXHIBIT D

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

## STATEMENT BY NEXPOINT ADVISORS, L.P. AND HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. OF ISSUES ON APPEAL

COME NOW Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors,

L.P. (the "Appellants"), creditors and parties-in-interest in the above styled and numbered

bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"),

and, with respect to their *Notice of Appeal* [docket no. 1957], hereby file their *Statement of Issues*

*on Appeal* (the "Statement").

With respect to the Bankruptcy Court's *Order (i) Confirming the Fifth Amended Plan of*

*Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related*

*Relief* [docket no. 1943] (the "Confirmation Order"), by which the Bankruptcy Court confirmed

---

**App. 512**

EXHIBIT D

the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [docket no. 1808], as further modified (the "Plan"):

1.      Whether the Bankruptcy Court erred as a matter of law in confirming the Plan and entering the Confirmation Order under the Absolute Priority Rule codified by 11 U.S.C. § 1129(b)(2)(B)(ii) because the Plan provides that the holders of equity interests, in the form of limited partnership interests in the Debtor, retain or receive any property under the Plan even though Class 8 under the Plan, a class of unsecured creditors not paid in full under the Plan, rejected the Plan?

2.      Whether the Bankruptcy Court erred as a matter of law in confirming the Plan and entering the Confirmation Order because the exculpation provisions of the Plan, contained in Article IX of the Plan, effectuated:

(i)      third party releases (*i.e.* releasing a claim of a non-debtor against a non-debtor) prohibited by the Bankruptcy Court and over which the Bankruptcy Court had no jurisdiction, in direct violation of Fifth Circuit and Northern District of Texas precedent (*see, e.g., In re Pacific Lumber Co.*, 584 F.3d 229, 253 (5th Cir. 2009) and *In re Thru, Inc.*, Civil Action No. 3:17-CV-1958-G, 2018 WL 5113124, at *22-23 (N.D. Tex. Oct. 19, 2018) and in violation of due process rights;

(ii)     releases of business decisions, actions, and potential liabilities, as opposed to case administration matters;

(ii)     releases of non-debtor entities and their managers and professionals, as opposed to estate managers and professionals; and

(iv)     releases of post-confirmation matters.

3.      Whether the Bankruptcy Court erred as a matter of law in confirming the Plan and entering the Confirmation Order because the permanent injunction contained in Article IX of the Plan, which prohibits "taking any actions to interfere with the implementation or consummation of the Plan," is overly broad and impermissibly vague, and because the injunction prohibits the Appellants from advising various funds that they advise and manage, or causing said funds, to

remove the Debtor as CLO portfolio manager over various CLOs that the Debtor manages pursuant to executory contracts assumed by the Plan, even though the assumption of an executory contract subjects, as a matter of law, the Debtor to all provisions of the contract on a go-forward basis?

4.      Whether the Bankruptcy Court erred as a matter of law in confirming the Plan and entering the Confirmation Order because the "gatekeeper" injunction contained in Article IX of the Plan, which requires leave of the Bankruptcy Court upon a showing of a "colorable" claim or cause of action, is:

(i)      not permitted by the Bankruptcy Code and effectively effectuates prohibited third party releases for the same reasons as stated above with respect to exculpation;

(ii)     not permitted with respect to any post-confirmation matter as the Bankruptcy Court will have no jurisdiction over such matters to make any finding or render any order, which would be purely advisory; and

(iii)    not permitted because it violates due process by requiring a party with a claim to seek leave from a court that has no jurisdiction and, if such leave is not granted, such claim will be permanently enjoined without having a court of competent jurisdiction pass on its merits.

5.      Whether the Bankruptcy Court erred as a matter of fact in confirming the Plan and entering the Confirmation Order because the "gatekeeper" injunction contained in Article IX of the Plan, which requires leave of the Bankruptcy Court upon a showing of a "colorable" claim or cause of action, is based on the Bankruptcy Court's finding of vexatious litigation against the Appellants and the need for an ant-filing or pre-filing injunction, when there was no evidence to support such finding?

6.      Whether the Bankruptcy Court erred as a matter of law in confirming the Plan and entering the Confirmation Order because the Debtor failed to satisfy the 11 U.S.C. § 1129(a)(2) element for confirmation requiring the Debtor to have complied with all applicable provisions of the Bankruptcy Code, which the Debtor admittedly failed to do because it utterly failed to comply with Bankruptcy Rule 2015.3?

RESPECTFULLY SUBMITTED this 11th day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
     Davor Rukavina, Esq.
     Texas Bar No. 24030781
     3800 Ross Tower
     500 N. Akard Street
     Dallas, Texas  75201-6659
     Telephone: (214) 855-7500
     Facsimile: (214) 855-7584
     Email:   drukavina@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. AND NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 11th day of March, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Appellee.

By: /s/ Davor Rukavina
     Davor Rukavina, Esq.

STATEMENT BY NEXPOINT ADVISORS, L.P. AND HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. OF ISSUES ON APPEAL—Page 4
4849-6635-7984v.1 019717.00001

App. 515

# EXHIBIT E



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed March 16, 2021**

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

### ORDER CERTIFYING APPEALS OF THE CONFIRMATION ORDER
### FOR DIRECT APPEAL TO THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

CAME ON FOR CONSIDERATION the *Joint Motion for Certification of Appeals of Confirmation Order for Direct Appeal to the Fifth Circuit* (the "Motion"), filed jointly by Highland Capital Management, L.P., Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Global Allocation Fund, Highland Income Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, James Dondero, Get Good Trust, and The Dugaboy Investment Trust (collectively, the "Parties").

EXHIBIT E

_____
ORDER CERTIFYING APPEALS OF THE CONFIRMATION ORDER FOR DIRECT APPEAL TO THE
UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT—Page 1

By the Motion, the Parties jointly request a certification for a direct appeal to the Fifth Circuit of the following appeals (collectively, the "Appeals") of the Court's *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [docket no. 1943] (the "Confirmation Order"):

(i)    the notice of appeal filed by Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. on March 1, 2021 at docket no. 1957;

(ii)   the notice of appeal filed by Highland Global Allocation Fund, Highland Income Fund, NexPoint Capital, Inc., and NexPoint Strategic Opportunities Fund on March 3, 2021 at docket no. 1966;

(iii)  the notice of appeal filed by James Dondero on March 4, 2021 at docket no. 1970; and

(iv)   the notice of appeal filed by Get Good Trust and The Dugaboy Investment Trust on March 4, 2021 at docket no. 1972.

Having considered the Motion, concluding that the Court has core jurisdiction over the Motion, finding that no further notice or hearing on the Motion is required as all parties affected thereby are the Parties to the Motion, and, based on the Parties joint certification and request as provided for in 28 U.S.C. § 158(d)(2)(B), and based also on the Court's agreement with the factual predicates underlying the Parties' certification and request, it is hereby:

ORDERED that the Appeals of the Confirmation Order are certified for direct appeal to the Fifth Circuit because a direct appeal may materially advance the progress of the case or proceeding in which the appeal is taken, within the meaning and operation of 28 U.S.C. § 158(d)(2)(A)(iii).

### # # #  END OF ORDER  # # #

---

ORDER CERTIFYING APPEALS OF THE CONFIRMATION ORDER FOR DIRECT APPEAL TO THE
UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT—Page 2
4828-7733-3728v.1 019717.00001

App. 518