Case No. 3:21-cv-01585-S

## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

In re: HIGHLAND CAPITAL MANAGEMENT, L.P.

Debtor,

THE CHARITABLE DAF FUND, L.P., and
CLO HOLDCO, LTD.,

Appellants,

v.

HIGHLAND CAPITAL MANAGEMENT, L.P.,

Appellee.

On Appeal from the United States Bankruptcy Court
for the Northern District of Texas, Case No. 19-34054-sgj11
Hon. Stacey G. C. Jernigan

## APPENDIX IN SUPPORT OF APPELLEE'S RESPONSE TO
## APPELLANTS' OPPOSED MOTION TO STAY OR ABATE APPEAL

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

| Ex. | Description | Appx. # |
|---|---|---|
| 1. | *Appellants' Opposed Motion to Stay or Abate Appeal*, Case No. 3:21-CV-01585-S, D.I. 10 (N.D. Tex. Sept. 22, 2021) | 1-13 |
| 2. | *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, Case No. 19-34054-sgj, D.I. 339 (Bankr. N.D. Tex. Jan. 9, 2020) | 14-19 |
| 3. | *Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020*, Case No. 19-34054-sgj, D.I. 854 (Bankr. N.D. Tex. July 16, 2020) | 20-32 |
| 4. | *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief*, Case No. 19-34054-sgj, D.I. 1943 (Bankr. N.D. Tex. Feb. 22, 2021) | 33-194 |
| 5. | *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Case No. 19-34054-sgj, D.I. 1808 (Bankr. N.D. Tex. Jan. 22, 2021) | 195-261 |
| 6. | *Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, Case No. 19-34054-sgj, D.I. 2700 (Bankr. N.D. Tex. Aug. 11, 2021) | 262-266 |
| 7. | *Emergency Motion of the Advisors for Stay Pending Appeal of the Confirmation Order, and Brief in Support Thereof*, Case No. 19-34054-sgj, D.I. 1955 (Bankr. N.D. Tex. Feb. 28, 2021) | 267-301 |
| 8. | *Motion for Stay Pending Appeal of the Court's Order Confirming the Debtor's Fifth Amended Plan*, Case No. 19-34054-sgj, D.I. 1967 (Bankr. N.D. Tex. Mar. 4, 2021) | 302-322 |
| 9. | *Joinder to Motions for Stay Pending Appeal of the Court's Order Confirming the Debtor's Fifth Amended Plan*, Case No. 19-34054-sgj, D.I. 1971 (Bankr. N.D. Tex. Mar. 4, 2021) | 323-368 |
| 10. | *Joinder in Motion for Stay Pending Appeal and Additional Grounds for the Issuance of a Stay Pending Appeal*, Case No. 19-34054-sgj, D.I. 1973 (Bankr. N.D. Tex. Mar. 4, 2021) | 369-374 |
| 11. | *Appellants' Motion for Stay Pending Appeal*, Case No. 3:21-cv-00538-N, D.I. 2 (N.D. Tex. Apr. 1, 2021) | 375-408 |

| 12. | *Motion for Stay Pending Appeal*, Case No. 3:21-cv-00550-L, D.I. 5 (N.D. Tex. Apr. 6, 2021) | 409-413 |
|-----|---|---|
| 13. | *Appellants' Motion for Stay Pending Appeal*, Case No. 21-10449 (5th Cir. May 19, 2021) | 414-447 |
| 14. | *Order on Motions for Stay Pending Appeal,* Case No. 19-34054-sgj11, D.I. 2084 (Bankr. N.D. Tex. Mar. 22, 2021) | 448-451 |
| 15. | *Order*, Case No. 3:21-cv-00550-L, D.I. 28 (N.D. Tex. June 23, 2021) | 452-455 |
| 16. | *Order*, Case No. 21-10449 (5th Cir. June 21, 2021) | 456-458 |
| 17. | Summary of Dondero and Related Entity Litigation | 459-473 |
| 18. | *Original Complaint*, Case No. 3:21-cv-00842-B, D.I. 1 (N.D. Tex. Apr. 12, 2021) | 474-500 |
| 19. | *Order of Reference*, Case No. 3:21-cv-00842-B, D.I. 64 (N.D. Tex. Sept. 20, 2021) | 501-502 |
| 20. | *Plaintiffs' Motion for Leave to File First Amended Complaint*, Case No. 3:21-cv-00842-B, D.I. 6 (N.D. Tex. Apr. 19, 2021) | 503-513 |
| 21. | *Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders*, Case No. 19-34054-sgj11, D.I. 2247 (Bankr. N.D. Tex. Apr. 27, 2021) | 514-523 |
| 22. | *Order Certifying Appeals of the Confirmation Order for Direct Appeal to the United States Court of Appeals for the Fifth Circuit*, Case No. 19-34054-sgj11, D.I. 2034 (Bankr. N.D. Tex. Mar. 16, 2021) | 524-526 |
| 23. | *Order*, Case No. 21-10449 (5th Cir. May 4, 2021) | 527-531 |
| 24. | *Order*, Case No. 21-10449 (5th Cir. June 2, 2021) | 532-536 |
| 25. | *Notice of Motion for Modification of Order Authorizing Retention of James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction*, Case No. 19-34054-sgj11, D.I. 2248 (Bankr. N.D. Tex. Apr. 27, 2021) | 537-585 |
| 26. | *Order Denying Motion for Modification of Order Authorizing Retention of James P. Seery, Jr. Filed by Charitable DAF Fund, L.P. and CLO Holdco, Ltd.*, Case No. 19-34054-sgj11, D.I. 2506 (Bankr. N.D. Tex. June 29, 2021) | 586-588 |
| 27. | Hearing Transcript, June 25, 2021 | 589-711 |
| 28. | Summary of Dondero and Related Entities Motions to Continue, Stay, or Abate | 712-715 |

| 29. | *Partially Opposed Motion for Extension of Time to File Appellants' Opening Brief*, Case No. 3:21-CV-01585-S, D.I. 13 (N.D. Tex. Sept. 29, 2021) | 716-722 |
|---|---|---|
| 30. | *Opening Brief of Appellants NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P.*, Case No. 21-10449 (5th Cir. Aug. 2, 2021) | 723-777 |

*[Remainder of Page Intentionally Blank]*

Dated:  October 1, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 1, 2021, a true and correct copy of the foregoing Appendix was served electronically upon all parties registered to receive electronic notice in this case via the Court's CM/ECF system.

*/s/ Zachery Z. Annable*
Zachery Z. Annable

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

_____

No. 3:21-CV-01585-S

_____

**IN RE: HIGHLAND CAPITAL MANAGEMENT, L.P.,**
**Debtors.**

**THE CHARITABLE DAF FUND, L.P. AND CLO HOLDCO, LTD.,**
**Appellants,**

**v.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
**Appellee.**

_____

**APPELLANTS' OPPOSED MOTION TO STAY OR ABATE APPEAL**
_____

APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS, CASE NO. 19-34054-sgj11

Mazin A. Sbaiti
Jonathan Bridges
SBAITI & COMPANY PLLC
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367
MAS@sbaitilaw.com
JEB@sbaitilaw.com

*Counsel for Appellants The Charitable DAF Fund, L.P. and CLO Holdco, Ltd.*

1934054210922000000000000010

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Appellants are The Charitable DAF Fund, L.P., a limited company formed under the laws of the Cayman Islands, and CLO Holdco, Ltd., a limited company formed under the laws of the Cayman Islands. No public corporation directly or indirectly owns 10% or more of the membership interests in The Charitable DAF Fund, L.P. or CLO Holdco, Ltd.

## INTRODUCTION

This case presents both procedural and substantive issues that explore the boundaries of Fifth Circuit precedent on a bankruptcy court's jurisdiction, the finality of certain bankruptcy orders, and whether Debtor-retained professionals should be entitled to the same protections against suit as bankruptcy trustees. Yet, some of these issues are currently being briefed in the Fifth Circuit in a separate appeal from the bankruptcy court's Plan Confirmation Order, entered in the same bankruptcy proceeding. The order appointing a Debtor-retained professional at issue in this appeal and the Plan Confirmation Order contain similar gate-keeping and injunctive language related to suits against Debtor-retained professionals. Given this overlap, judicial economy and conservation of resources favor abating or staying this appeal until the Fifth Circuit gives guidance on the breadth of a bankruptcy court's power to protect, exculpate, and adjudicate claims against Debtor-retained professionals.

## FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises out of a long and complicated Chapter 11 bankruptcy involving Debtor Highland Capital Management, L.P. ("Highland Capital"). Highland Capital was a global investment adviser registered with the SEC pursuant to the Investment Advisers Act of 1940 and managed billions of dollars of third-party assets. *See generally* ROA.672, 831. As such, Highland Capital owed strict

2

fiduciary duties both to the funds it managed and to the investors whose investments its managed. The Charitable DAF Fund, L.P. ("the DAF") and CLO Holdco, Ltd. ("CLO Holdco") are two of those investors. *Id.*

In January 2020, as part of the ongoing Chapter 11 proceedings, the bankruptcy court entered an order that approved the appointment of three new independent directors to govern Highland Capital's general partner, Strand Advisors, Inc. ROA.505-10. One of those new independent board members was Mr. Jim Seery. *Id.* Key to this appeal, in July 2020, the bankruptcy court approved Highland Capital's request to appoint Mr. Seery as its new Chief Executive Officer and Chief Restructuring Officer (the "Appointment Order"). ROA.510-42; ROA.543-54. The Appointment Order, like the January predecessor, contained gate-keeper and injunctive provisions that required parties seeking to sue Mr. Seery to first seek the bankruptcy court's determination that the suing party had a viable claim for willful misconduct or gross negligence only. ROA.544-45. And if such a viable claim were determined to exist, the bankruptcy court would have "sole jurisdiction to adjudicate any such claim[.]" *See id.*

Six months later, Highland Capital filed its proposed plan (as an amendment of prior versions) on January 22, 2021. ROA.601-66. Over objections of numerous creditors and parties, the Bankruptcy Court entered its Plan Confirmation Order on February 22, 2021. ROA.667-865. That order also contains exculpatory and

3

injunctive provisions similar to those in the Appointment Order at issue here. ROA.716-22, 740-44, 810-12. Several parties have challenged the Plan Confirmation Order, resulting in a direct appeal to the Fifth Circuit that is currently being briefed on the merits. *See NexPoint Advisors, L.P. et al. v. Highland Capital Management, L.P.*, No. 21-10449 (5th Cir. 2021) [hereafter "*NexPoint Advisors* appeal"].

Meanwhile, the DAF and CLO Holdco became concerned with Highland Capital's management of their investments and decided to sue for breach of fiduciary duties to the DAF and CLO Holdco mandated under the Investment Advisors Act of 1940, among other claims. Because of the seemingly broad and void nature of the gate-keeping, injunctive, and jurisdictional provisions in the bankruptcy court's Appointment Order, the DAF and CLO Holdco proceeded with caution. They first sued Highland Capital in the Northern District of Texas—the court with supervisory authority over the bankruptcy court and from whom the bankruptcy court's jurisdiction derived. ROA.831. The DAF and CLO Holdco then asked the district court for leave (rather than automatically amend their petition, which they had the right to do) to add Mr. Seery to the lawsuit. *Id.*; ROA.866-75. The motion for leave was denied within twenty-four hours of its filing because not all parties had yet been served. ROA.831. Despite this no-harm situation, Highland immediately initiated sanctions proceedings against The DAF and CLO Holdco,

claiming that the mere act of seeking leave to sue Mr. Seery violated the bankruptcy court's Appointment Order. ROA.319-20. The DAF and CLO Holdco defended, asserting that asking for permission to sue did not violate the order, which was extra-jurisdictional and void in any event. The bankruptcy court nevertheless found the DAF and CLO Holdco in contempt, awarding sanctions of $239,655 against them for a motion that was denied within a day of its filing. *See* ROA.381.

While the contempt proceedings were ongoing, The DAF and CLO Holdco also moved the bankruptcy court to modify its Appointment Order, again arguing that the order improperly extended gate-keeping and exculpation protections to Mr. Seery even though he was not a Chapter 11 trustee and expanded the bankruptcy court's jurisdiction over claims where it otherwise had none. ROA.828-75. The bankruptcy court refused to modify its Appointment Order, deeming the order final and finding the DAF and CLO Holdco had not met Rule 60(b)'s requirements for relief from a final judgment. ROA.04-05. The DAF and CLO Holdco timely filed this appeal from the bankruptcy court's order refusing to modify its Appointment Order. ROA.01-03.

## <u>ARGUMENT TO STAY OR ABATE THIS APPEAL</u>

This Court may abate or stay a case as part of its "power . . . to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *see also*

Appx.000007

*United States v. Hernandez-Saenz*, 733 F. App'x 144, 146 (5th Cir. 2018) (noting the court had stayed the case pending a panel decision and then held the appeal in abeyance to await an en banc decision); *Garza v. Potter*, No. H-04-1844, 2005 WL 6456897, at *1 (S.D. Tex. Oct. 17, 2005) (noting the court granted a motion to abate pending the Fifth Circuit's decision in a separate appeal). Among other things, federal courts have broad discretion to stay proceedings to conserve judicial resources and avoid duplicative litigation. *See Landis*, 299 U.S. at 245-55; *Watts v. Schwartz*, No. 08-5095, 2009 WL 1950586, at *4 (E.D. La. July 1, 2009) ("A district court has the inherent power to stay its proceedings."). This is precisely the type of situation that warrants the exercise of this Court's discretion to stay or abate an appeal.

Here, the DAF and CLO Holdco challenge the validity of a bankruptcy court order appointing a Debtor-retained professional (Mr. Seery) as the Debtor's Chief Executive Officer and Chief Restructuring Officer ("Appointment Order"). Mr. Seery is neither a Trustee nor a professional specifically retained by the Trustee. That Appointment Order does several things: (1) it requires parties to first obtain the bankruptcy court's permission before suing Mr. Seery; (2) it enjoins all claims against Mr. Seery except for those involving gross negligence or willful misconduct (thus implicitly exculpating him from all other tortious acts); and (3) it gives the bankruptcy court sole jurisdiction not only to determine the validity of a party's

6

proposed claims against Mr. Seery, but also to adjudicate those claims even if they would otherwise fall outside of the bankruptcy court's jurisdiction. ROA.531-33. These gate-keeping, injunctive, and jurisdictional provisions in the Appointment Order all served as bases for the DAF's and CLO Holdco's request to modify, which the bankruptcy court refused.

Similar provisions also exist in the Plan Confirmation Order and those provisions have been challenged and accepted for direct appeal by the Fifth Circuit in the *NexPoint Advisors* case. Like the Appointment Order, the Plan Confirmation Order contains broad and sweeping exculpation and injunction provisions that bar and limit claims against several parties, including the Debtor and Mr. Seery, and put the bankruptcy court in a gate-keeping role over any purported claims.[1] ROA.739-44. Appellants in that appeal have already filed their briefs, raising some of the same arguments that the DAF and CLO Holdco would press in this appeal about the propriety of such provisions. And Highland Capital's brief is currently due on October 6, 2021, around the time when the DAF's and CLO Holdco's opening brief would be due in this matter.

---

[1] Notably, the Plan Confirmation Order contains caveated language regarding the bankruptcy court's adjudicatory jurisdiction over claims against Debtor-retained professionals—it has such jurisdiction "only to the extent legally permissible." ROA.743-44. The Appointment Order contains no such caveat—it says the bankruptcy court "shall have *sole jurisdiction to adjudicate any such claim* for which approval of the Court to commence or pursue has been granted." ROA.533.

The Fifth Circuit's resolution of the *NexPoint Advisors* appeal—which challenges very similar gate-keeping and injunctive clauses from the same bankruptcy court in the same bankruptcy proceeding—will shed significant light on the issues that will be raised here. Indeed, the Fifth Circuit's opinion may ultimately narrow or even eliminate issues that would otherwise be raised before this Court.[2] Staying or abating this case until a decision from the Fifth Circuit in the *NexPoint Advisors* appeal will therefore promote judicial economy and conserve resources of both sides. All sides and this Court would benefit from the Fifth Circuit's guidance on the scope of a bankruptcy court's power to gate-keep, enjoin, and determine the propriety of claims against Debtor-retained professionals.

Beyond that, no harm will be done to Highland Capital from an abeyance. Rather, Highland Capital will conserve resources better devoted elsewhere while awaiting guidance from the Fifth Circuit.

## **CONCLUSION**

For the above reasons, the DAF and CLO Holdco request that this Court stay or abate this appeal of the bankruptcy court's Appointment Order until resolution of

---

[2] Aside from the difference in adjudicatory jurisdiction language between the two orders (*see* Footnote 1, *supra*), other issues in this appeal are not presented in the Fifth Circuit matter, including the procedural question of whether the bankruptcy court's Appointment Order was interlocutory. Nevertheless, the Fifth Circuit's guidance on the parameters of a bankruptcy court's power to gate-keep and enjoin claims against bankruptcy professionals will likely shed light on issues raised here.

8

the *NexPoint Advisors* appeal in the Fifth Circuit. The DAF and CLO Holdco request

any and all further relief to which they may be entitled.


Dated: September 22, 2021.

By: */s/ Mazin A. Sbaiti*
 Mazin A. Sbaiti
 Texas Bar No. 24058096
 Jonathan Bridges
 Texas Bar No. 24028835
 SBAITI & COMPANY PLLC
 J.P. Morgan Chase Tower
 2200 Ross Avenue, Suite 4900W
 Dallas, TX  75201
 Telephone: (214) 432-2899
 Facsimile: (214) 853-4367
 MAS@sbaitilaw.com
 JEB@sbaitilaw.com

 *Counsel for Appellants*
 *The Charitable DAF Fund, L.P.*
 *and CLO Holdco, Ltd.*

9

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Bankruptcy Procedure 8015(h), I hereby certify that:

The foregoing motion complies with the word limit of Federal Rules of Bankruptcy Procedure 8013(f)(3)(A), excluding the parts of the motion exempted by the Federal Rule of Bankruptcy Procedure 8015(g) and the accompanying documents exempted by Federal Rule of Bankruptcy Procedure 8013(f)(3), this document contains 1,679 words.

This document complies with the typeface requirements of Federal Rules of Bankruptcy Procedure 8013(f)(2), 8015(a)(5), and 8015(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti

10

## **CERTIFICATE OF CONFERENCE**

I certify that on September 14, 2021, I communicated with counsel for Appellee Highland Capital Management, L.P., and they indicated that Appellee is opposed to the relief requested in this motion.

*/s/ Jonathan Bridges*
Jonathan Bridges

## **CERTIFICATE OF SERVICE**

I certify that on September 22, 2021, I caused a copy of the foregoing document to be served by Electronic Case Filing System for the United States District Court for the Northern District of Texas.

*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti

Appx.000013

# EXHIBIT 2



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 9, 2020**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | Related to Docket Nos. 7 & 259 |

### ORDER APPROVING SETTLEMENT WITH OFFICIAL COMMITTEE OF
### UNSECURED CREDITORS REGARDING GOVERNANCE OF THE DEBTOR
### AND PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE

Upon the *Motion of the Debtor to Approve Settlement with Official Committee of*

*Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the*

*Ordinary Course* (the "Motion"),[2] filed by the above-captioned debtor and debtor in possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1934054202001090000000000008

(the "Debtor"); the Court having reviewed the Motion, and finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), and (c) notice of this Motion having been sufficient under the circumstances and no other or further notice is required; and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and having determined that the relief sought in the Motion is in the best interests of the Debtor and its estate; and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED on the terms and conditions set forth herein, and the United States Trustee's objection to the Motion is OVERRULED.

2.    The Term Sheet is approved and the Debtor is authorized to take such steps as may be necessary to effectuate the settlement contained in the Term Sheet, including, but not limited to: (i) implementing the Document Production Protocol; and (ii) implementing the Protocols.

3.    The Debtor is authorized (A) to compensate the Independent Directors for their services by paying each Independent Director a monthly retainer of (i) $60,000 for each of the first three months, (ii) $50,000 for each of the next three months, and (iii) $30,000 for each of the following six months, provided that the parties will re-visit the director compensation after the sixth month and (B) to reimburse each Independent Director for all reasonable travel or other expenses, including expenses of counsel, incurred by such Independent Director in connection with its service as an Independent Director in accordance with the Debtor's expense reimbursement policy as in effect from time to time.

DOCS_NY:39973.13 36027/002

4.     The Debtor is authorized to guarantee Strand's obligations to indemnify each Independent Director pursuant to the terms of the Indemnification Agreements entered into by Strand with each Independent Director on the date hereof.

5.     The Debtor is authorized to purchase an insurance policy to cover the Independent Directors.

6.     All of the rights and obligations of the Debtor referred to in paragraphs 3 and 4 hereof shall be afforded administrative expense priority under 11 U.S.C. § 503(b).

7.     Subject to the Protocols and the Term Sheet, the Debtor is authorized to continue operations in the ordinary course of its business.

8.     Pursuant to the Term Sheet, Mr. James Dondero will remain as an employee of the Debtor, including maintaining his title as portfolio manager for all funds and investment vehicles for which he currently holds that title; provided, however, that Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors and Mr. Dondero shall receive no compensation for serving in such capacities.  Mr. Dondero's role as an employee of the Debtor will be subject at all times to the supervision, direction and authority of the Independent Directors.  In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero shall resign immediately upon such determination.

9.     Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor.

10.     No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent

Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

11.      Nothing in the Protocols, the Term Sheet or this Order shall affect or impair Jefferies LLC's rights under its Prime Brokerage Customer Agreements with the Debtor and non-debtor Highland Select Equity Master Fund, L.P., or any of their affiliates, including, but not limited to, Jefferies LLC's rights of termination, liquidation and netting in accordance with the terms of the Prime Brokerage Customer Agreements or, to the extent applicable, under the Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code. The Debtor shall not conduct any transactions or cause any transactions to be conducted in or relating to the Jefferies LLC accounts without the express consent and cooperation of Jefferies LLC or, in the event that Jefferies withholds consent, as otherwise ordered by the Court. For the avoidance of doubt, Jefferies LLC shall not be deemed to have waived any rights under the Prime Brokerage Customer Agreements or, to the extent applicable, the Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code, and shall be entitled to take all actions authorized therein without further order of the Court

12.      Notwithstanding any stay under applicable Bankruptcy Rules, this Order shall be effective immediately upon entry.

13.     The Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order, including matters related to the Committee's approval rights over the appointment and removal of the Independent Directors.

**## END OF ORDER ##**

DOCS_NY:39973.13 36027/002

**Appx.000019**

# EXHIBIT 3

Case 19-34054-sgj11 Doc 854 Filed 07/16/20 Entered 07/16/20 14:00:44 Page 1 of 12
Case 3:21-cv-01585-S Document 15 Filed 10/01/21 Page 27 of 783 PageID 6448
Docket #0854 Date Filed: 07/16/2020



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed July 16, 2020**

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: § | |
| § | **Case No. 19-34054** |
| **HIGHLAND CAPITAL MANAGEMENT,** § | **Chapter 11** |
| **L.P.,** § | |
| § | **Re: Docket No. 774** |
| **Debtor.** § | |

---

### ORDER APPROVING DEBTOR'S MOTION UNDER
### BANKRUPTCY CODE SECTIONS 105(a) AND 363(b)
### AUTHORIZING RETENTION OF JAMES P. SEERY, JR., AS
### CHIEF EXECUTIVE OFFICER, CHIEF RESTRUCTURING OFFICER, AND
### FOREIGN REPRESENTATIVE NUNC PRO TUNC TO MARCH 15, 2020

Upon the *Debtor's Motion under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020* (the "Motion"),[1] and the

---

[1] All terms not otherwise defined herein shall be given the meanings ascribed to them in the Motion.



1934054200716000000000007

Court finding that: (i) this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (ii) venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iv) due and sufficient notice of the Motion has been given; (v) entry into the Agreement was an exercise of the Debtor's sound business judgment; and (vi) it appearing that the relief requested in the Motion is necessary and in the best interests of the Debtor's estate and creditors; and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, and DECREED** that:

1.      The Motion is **GRANTED**.

2.      Pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, the Agreement attached hereto as **Exhibit 1** and all terms and conditions thereof are approved, *nunc pro tunc* to March 15, 2020.

3.      The Debtor is hereby authorized to enter into and perform under the Agreement.

4.      The Debtor is authorized to indemnify Mr. Seery pursuant to the terms of the Agreement. Mr. Seery is also entitled to any indemnification or other similar provisions under the Debtor's existing or future insurance policies, including any policy tails obtained (or which may be obtained in the future), by the Debtor. The Debtor and Strand are authorized to enter into any agreements necessary to execute or implement the transactions described in this paragraph. For avoidance of doubt and notwithstanding anything to the contrary in this Order, Mr. Seery shall be entitled to any state law indemnity protections to which he may be entitled under applicable law.

5.      No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

6.      Notwithstanding anything in the Motion, the Agreement or the Order to the contrary, the Agreement shall be deemed terminated upon the effective date of a confirmed plan of reorganization unless such plan provides otherwise.

7.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

8.      This Court shall retain jurisdiction over any and all matters arising from or related to the interpretation and/or implementation of this Order.

9.      The Foreign Representative Order is hereby amended to substitute James P. Seery, Jr., as the chief executive officer, in place of Bradley S. Sharp, as the Debtor's Foreign Representative, Bermuda Foreign Representative and Cayman Foreign Representative.  All other provisions of the Foreign Representative Order shall remain in full force and effect.

### ###END OF ORDER###

DOCS_SF:103156.19 36027/002

## EXHIBIT 1

**Engagement Agreement**

June 23, 2020

CONFIDENTIAL

The Board of Directors of Strand Advisors, Inc.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201


Re:    Highland Capital Management L.P. (the "Company")

Dear Fellow Board Members:

This letter agreement ("Agreement") sets forth the terms and conditions of the engagement of the undersigned James P. Seery, Jr. ("I", "me" or "my"), as Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO"), effective as of March 15, 2020 (the "Commencement Date"), by the Company and its affiliates to perform financial advisory services as detailed below.

I appreciate the trust you have placed in me by asking me to assume these roles and thank you for the opportunity to continue to work with you to restructure the Company.

Roles:

I will serve as the CEO and CRO of the Company during its Chapter 11 bankruptcy case (the "Bankruptcy Case") currently pending in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").

In those roles, I will be responsible for overall management of the business of the Company in Chapter 11 including, directing the reorganization and restructuring of the Company, monetization of assets, resolution of claims, development and negotiation of a plan of reorganization or liquidation, and implementation of such a plan.

My direct reports will include the individuals at the Company that currently report to the Board of Directors of Strand Advisors, Inc. (the "Board") or such other individuals employed by the Company as I determine should report to directly to me.  In the event that the Board determines to restructure the reporting lines or functions of the Company, my direct reports will be amended in accordance with the Board approved restructuring.

At all times, I will remain a full member of the Board entitled to vote on all matters other than those on which I am conflicted.

I will devote as much time to this engagement as I determine is required to execute my responsibilities as CEO and CRO. I will have no specific on-site requirements in Dallas, but will be on site as much as I determine is necessary to execute my responsibilities as CEO and CRO, consistent with Covid-19 orders applicable to Dallas and New York City.

Limitations on Services

My services under this engagement are limited to those specifically noted in this Agreement and do not include legal, accounting, or tax-related assistance or advisory services. For the avoidance of doubt, I am not providing any legal services in connection with this engagement and will have not any duties as a lawyer to the Company, the Board, or any of the Company's employees. The accuracy and completeness of all information submitted to me by the Company are the sole responsibility of the Company, and I will be entitled to rely on such information without independent investigation or verification.

In my role as CEO and CRO, I will act as an independent professional contractor to the Company and will not be an employee of the Company. I will provide and pay for my own benefits, including medical benefits, by J.P Seery & Co. LLC or otherwise.

Fees and Expenses:

In consideration of my acceptance of this engagement and performance of the services pursuant to this Agreement, the Company shall pay the following:

1. Compensation for Services:
   a. Base Compensation: As compensation for my services as CEO and CRO of the Company, the Company shall pay me $150,000.00 per calendar month ("Base Compensation"). Base Compensation shall be due and payable at the start of each calendar month. Consistent with current Board compensation practice, invoices rendered by me to the Company are due and payable by the Company on receipt. Payment of the Base Compensation will be retroactive to March 15, 2020.
   b. Bonus Compensation/Restructuring Fee:
      i. The Company has agreed to pay me a restructuring fee upon confirmation of either a Case Resolution Plan or a Monetization Vehicle Plan in each case as defined below (the "Restructuring Fee").
      ii. Case Resolution Restructuring Plan
         1. On confirmation of any plan or reorganization or liquidation based on resolution of a material amount of the outstanding claims and their respective treatment, even if such plan includes (x) a debtor/creditor trust or similar monetization and claims resolution vehicle, (y) post-confirmation litigation of certain of the claims, and (z) post-confirmation monetization of debtor assets (a "Case Resolution Plan"):
            a. $1,000,000 on confirmation of the Case Resolution Plan;
            b. $500,000 on the effective date of the Case Resolution Plan; and
            c. $750,000 on completion of cash or property distributions to creditors as contemplated by the Case Resolution Plan.

      iii.  Debtor/Creditor Monetization Vehicle Restructuring Fee:

          1.  On confirmation of any plan or reorganization or liquidation based on a debtor/creditor trust or similar asset monetization and claims resolution vehicle that does not include agreement among the debtor and creditors on a material amount of the outstanding claims and their respective treatment at confirmation (a "Monetization Vehicle Plan"):

             a.  $500,000 on confirmation of the Monetization Vehicle Plan;

             b.  $250,000 on the effective date of the Monetization Vehicle Plan; and

             c.  A contingent restructuring fee to be determined by the board or oversight committee installed to oversee the implementation of any Monetization Vehicle Plan based on the CEO/CRO (or acting as trustee) based upon performance under the plan after all material distributions under the Monetization Vehicle Plan are made.

2.  <u>Out-of-Pocket Expenses</u>:  In addition to the Base and Bonus Compensation, I shall be entitled to reimbursement for actual and reasonable out-of-pocket expenses ("Expenses") incurred in connection with the provision of services hereunder.  Expenses will be billed along with Base Compensation and shall be paid by the Company at the same time. Expenses will be generally consistent with expenses incurred to date as a member of the Board.

<u>Bankruptcy Court Approval</u>

Notwithstanding anything herein to the contrary, I understand that this Agreement is contingent, in all respects, on the approval of the Bankruptcy Court.  I also understand that the Company will seek approval of this Agreement in stages and that the Company will first seek approval of my retention as CEO and CRO and the payment of the Base Compensation and will defer seeking Bankruptcy Court approval of the Restructuring Fee until there have been further developments in the Bankruptcy Case.

<u>Conflicts and Other Engagements</u>

I am not aware of any potential conflicts of interest based on my understanding of the various parties involved in this matter to date.

The Company is aware that this engagement is not an exclusive engagement of my time, and that I have and will continue to have other business engagements and investments unrelated to the Company.  Nothing in this Agreement or otherwise precludes me from representing or working with or for any other person or entity in matters not directly related to the services being provided to the Company under this Agreement.  However, I will not take on any engagements directly adverse to the Company during the term of this engagement.

<u>Privilege</u>

I understand that in the course of this engagement, I may become party to or my services may become part of work product of legal counsel to the Company (the Company's in-house and outside counsel are collectively referred to as "Counsel"), and all communications between Counsel and me relating to this engagement shall be protected from disclosure to third parties under the attorney work product doctrine and/or the attorney-client privilege, and, therefore, shall be treated by me as privileged and confidential. I further understand that the Company has the exclusive right to waive the attorney-client privilege, and Counsel has the exclusive right to waive the protections afforded under the attorney work-product doctrine.

Termination of Engagement

This Agreement may be terminated at any time by either the Company or by me upon two weeks advance written notice given to the other party. The termination of this Agreement shall not affect my right to receive, and the Company's obligation to pay, any and all Base Compensation and Expenses incurred (even if not billed) prior to the giving of the termination notice; provided, however, that (i) if this Agreement is terminated by me, the amount of Base Compensation owed shall be calculated based on the actual number of days worked during the applicable month and I will return any Base Compensation received in excess of such amount and (ii) if this Agreement is terminated by the Company, Base Compensation shall be deemed fully earned as of the first day of any month. Bonus Compensation shall be earned by me immediately upon termination of me by the Company; provided, however, I shall not be entitled to Bonus Compensation if (a) the Bankruptcy Case is converted to chapter 7 or dismissed; (b) a chapter 11 trustee is appointed in the Bankruptcy Case; (c) I am terminated by the Company for Cause; or (d) I resign prior to confirmation of a plan or court approval of a sale as described in the Fees and Expense/Compensation for Services section hereof. For purposes of this Agreement, "Cause" means any of the following grounds for termination of my engagement, in each case as reasonably determined by the Board within 60 days of the Board becoming aware of the existence of the event or circumstance: (A) fraud, embezzlement, or any act of moral turpitude or willful misconduct on my part; (B) conviction of or the entry of a plea of nolo contendere by me for any felony; (C) the willful breach by me of any material term of this Agreement; or (D) the willful failure or refusal by me to perform my duties to the Company, which, if capable of being cured, is not cured on or before fifteen (15) days after my receipt of written notice from the Company.

Conditional Requirement to Seek Further Bankruptcy Court Approval of Agreement

The official committee of unsecured creditors in the Bankruptcy Case (the "Committee") may, upon two weeks advance written notice to the Company, require the Company to file a motion with the Bankruptcy Court on normal notice seeking a continuation of this Agreement and if such motion is not filed, this Agreement will terminate at the expiration of such two week period. If the Company files such motion, I will be entitled to my Base Compensation through and including the date on which a final order is entered on such motion by the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Committee may not deliver such notice to the Company until a date which is more than ninety days following the date the Bankruptcy Court enters an order approving this Agreement.

Indemnification

As a material part of the consideration to me under this Agreement, the Company agrees (i) to indemnify and hold harmless me and any of my affiliates (the "Indemnified Party"), to the fullest extent lawful, from and against any and all losses, claims, costs, damages or liabilities (or actions in respect thereof), joint or several, arising out of or related to this Agreement, my engagement under this Agreement, or any actions taken or omitted to be taken by me or the Company in connection with this Agreement and (ii) to reimburse the Indemnified Party for all expenses ( including, without limitation, the reasonable fees and expenses of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending, settling or compromising any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person (including, without limitation, any shareholder or derivative action, or any fee dispute), arising out of or relating to this Agreement, or such engagement, or actions. However, the Company shall not be liable under the foregoing indemnity and reimbursement agreement for any loss, claim, damage or liability which is finally judicially determined by a court of competent jurisdiction to have resulted primarily from the willful misconduct or gross negligence of the Indemnified Party.

The indemnification and insurance currently covering my role as a director shall be extended to me and fully cover me as provided therein in my roles as CEO and CRO.

Miscellaneous

This Agreement (a) constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes any other communications, understandings or agreements among the parties with respect to the subject matter hereof, and (b) may be modified, amended or supplemented only by written agreement among all the parties hereto.

This Agreement is subject to approval by the Bankruptcy Court. As part of such approval the Company shall request that any such order approving this Agreement contain a provision extending the protections afforded to me as a Board Member pursuant to Paragraph 10 of the Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course entered by the Bankruptcy Court on January 9, 2020 [Docket No. 339] to my role as CEO and CRO, which Order prohibits the commencement of any action against me without first obtaining Bankruptcy Court approval to initiate such action.

This Agreement and all controversies arising from or related to performance hereunder shall be governed by and construed in accordance with the laws of the State of New York. The parties hereby submit to the jurisdiction of and venue in the federal and state courts located in New York City and waive any right to trial by jury in connection with any dispute related to this Agreement.

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,

James. P. Seery, Jr.

AGREED AND ACCEPTED

HIGHLAND CAPITAL MANAGEMENT L.P.

By: Strand Advisors, Inc., its general partner

_____     _____
John Dubel                               Russell Nelms
Director                                 Director
Strand Advisors, Inc.                    Strand Advisors, Inc.

Appx.000030

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,


James. P. Seery, Jr.

AGREED AND ACCEPTED

**HIGHLAND CAPITAL MANAGEMENT L.P.**

By: Strand Advisors, Inc., its general partner


_____        _____
John Dubel                                                  Russell Nelms
Director                                                         Director
Strand Advisors, Inc.                                   Strand Advisors, Inc.

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,


James. P. Seery, Jr.

AGREED AND ACCEPTED

**HIGHLAND CAPITAL MANAGEMENT L.P.**

By: Strand Advisors, Inc., its general partner


| _____ | _____ |
|---|---|
| John Dubel | Russell Nelms |
| Director | Director |
| Strand Advisors, Inc. | Strand Advisors, Inc. |

# EXHIBIT 4

Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 1 of 161
Case 3:21-cv-01585-S Document 15 Filed 10/01/21 Page 40 of 783 PageID 6461
Docket #1943 Date Filed: 02/22/2021



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 22, 2021**

_____

**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |

### ORDER (I) CONFIRMING THE FIFTH AMENDED
### PLAN OF REORGANIZATION OF HIGHLAND CAPITAL
### MANAGEMENT, L.P. (AS MODIFIED) AND (II) GRANTING RELATED RELIEF

The Bankruptcy Court[2] having:

a.    entered, on November 24, 2020, the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Scheduling A Hearing to Confirm the Fifth Amended Plan of Reorganization (C) Establishing Deadline for Filing Objections to Confirmation of Plan, (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures, and (E) Approving Form and Manner of Notice* [Docket No. 1476] (the "<u>Disclosure Statement Order</u>"), pursuant to which the Bankruptcy Court approved the adequacy of the *Disclosure Statement Relating to the Fifth*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as defined below). The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.



1934054210222000000000000018

*Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1473] (the "Disclosure Statement") under section 1125 of the Bankruptcy Code and authorized solicitation of the Disclosure Statement;

b. set January 5, 2021, at 5:00 p.m. prevailing Central Time (the "Objection Deadline"), as the deadline for filing objections to confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (*As Modified*) [Docket No. 1808] (as amended, supplemented or modified, the "Plan");

c. set January 5, 2021, at 5:00 p.m. prevailing Central Time, as the deadline for voting on the Plan (the "Voting Deadline") in accordance with the Disclosure Statement Order;

d. initially set January 13, 2021, at 9:30 a.m. prevailing Central Time, as the date and time to commence the hearing to consider confirmation of the Plan pursuant to Bankruptcy Rules 3017 and 3018, sections 1126, 1128, and 1129 of the Bankruptcy Code, and the Disclosure Statement Order, which hearing was continued to January 26, 2021, at 9:30 a.m. prevailing Central Time and further continued to February 2, 2021;

e. reviewed: (i) the Plan; (ii) the Disclosure Statement; and (iii) *Notice of (I) Entry of Order Approving Disclosure Statement; (II) Hearing to Confirm; and (III) Related Important Dates* (the "Confirmation Hearing Notice"), the form of which is attached as Exhibit 1-B to the Disclosure Statement Order;

f. reviewed: (i) the *Debtor's Notice of Filing of Plan Supplement for the Third Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1389] filed November 13, 2020; (ii) *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1606] filed on December 18, 2020; (iii) the *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1656] filed on January 4, 2021; (iv) *Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications)t* dated January 22, 2021 [Docket No. 1811]; and (v) *Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified)* on February 1, 2021 [Docket No. 1875]; (collectively, the documents listed in (i) through (v) of this paragraph, the "Plan Supplements");

g. reviewed: (i) the *Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on December 30, 2020 [Docket No. 1648]; (ii) the *Second Notice of (I) Executory Contracts and*

*Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 11, 2021 [Docket No.1719]; (iii) the *Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 15, 2021 [Docket No. 1749]; (iv) the *Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791]; (v) the *Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on January 27, 2021 [Docket No. 1847]; (vi) the *Notice of Hearing on Agreed Motion to (I) Assume Nonresidential Real Property Lease with Crescent TC Investors, L.P. Upon Confirmation of Plan and (II) Extend Assumption Deadline* filed on January 28, 2021 [Docket No. 1857]; and (vii) the *Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on February 1, 2021 [Docket No. 1873] (collectively, the documents referred to in (i) to (vii) are referred to as "List of Assumed Contracts");

h.   reviewed: (i) the *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1814] (the "Confirmation Brief"); (ii) the *Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management*; [Docket No. 1807]; and (iii) the *Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1772] and *Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1887] filed on February 3, 2021 (together, the "Voting Certifications").

i.   reviewed: (i) *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505]; (ii) the *Certificate of Service* dated December 23, 2020 [Docket No. 1630]; (iii) the *Supplemental Certificate of Service* dated December 24, 2020 [Docket No. 1637]; (iv) the *Second Supplemental Certificate of Service* dated December 31, 2020 [Docket No. 1653]; (v) the *Certificate of Service* dated December 23, 2020 [Docket No. 1627]; (vi) the *Certificate of Service* dated January 6, 2021 [Docket No. 1696]; (vii) the *Certificate of Service* dated January 7, 2021 [Docket No. 1699]; (viii) the *Certificate of Service* dated January 7, 2021 [Docket No 1700]; (ix) the *Certificate of Service* dated January 15, 2021 [Docket No. 1761]; (x) the *Certificate of Service* dated January 19, 2021 [Docket No. 1775]; (xi) the

*Certificate of Service* dated January 20, 2021 [Docket No. 1787]; (xii) the *Certificate of Service* dated January 26, 2021[Docket No. 1844]; (xiii) the *Certificate of Service* dated January 27, 2021 [Docket No. 1854]; (xiv) the *Certificate of Service* dated February 1, 2021 [Docket No. 1879]; (xv) the *Certificates of Service* dated February 3, 2021 [Docket No. 1891 and 1893]; and (xvi) the *Certificates of Service* dated February 5, 2021 [Docket Nos. 1906, 1907, 1908 and 1909] (collectively, the "Affidavits of Service and Publication");

j.     reviewed all filed[3] pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and confirmation of the Plan, including all objections, statements, and reservations of rights;

k.     conducted a hearing to consider confirmation of the Plan, which commenced on February 2, 2021, at 9:30 a.m. prevailing Central Time and concluded on February 3, 2021, and issued its oral ruling on February 8, 2021 (collectively, the "Confirmation Hearing);

l.     heard the statements and arguments made by counsel in respect of confirmation of the Plan and having considered the record of this Chapter 11 Case and taken judicial notice of all papers and pleadings filed in this Chapter 11 Case; and

m.     considered all oral representations, testimony, documents, filings, and other evidence regarding confirmation of the Plan, including (a) all of the exhibits admitted into evidence;[4] (b) the sworn testimony of (i) James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer and a member of the Board of Directors of Strand Advisors, Inc. ("Strand"), the Debtor's general partner; (ii) John S. Dubel, a member of the Board of Strand; (iii) Marc Tauber, a Vice President at Aon Financial Services; and (iv) Robert Jason Post, the Chief Compliance Officer of NexPoint Advisors, LP (collectively, the "Witnesses"); (c) the credibility of the Witnesses; and (d) the Voting Certifications.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact and conclusions of law:

---

[3] Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in this Chapter 11 Case, as applicable.

[4] The Court admitted the following exhibits into evidence: (a) all of the Debtor's exhibits lodged at Docket No. 1822 (except TTTTT, which was withdrawn by the Debtor); (b) all of the Debtor's exhibits lodged at Docket No. 1866; (c) all of the Debtor's exhibits lodged at Docket No. 1877; (d) all of the Debtor's exhibits lodged at Docket No. 1895; and (e) Exhibits 6-12 and 15-17 offered by Mr. James Dondero and lodged at Docket No. 1874.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.     **Findings of Fact and Conclusions of Law.**  The findings and conclusions set forth herein, together with the findings of fact and conclusions of law set forth in the record during the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.     **Introduction and Summary of the Plan.** Prior to addressing the specific requirements under the Bankruptcy Code and Bankruptcy Rules with respect to the confirmation of the Plan, the Bankruptcy Court believes it would be useful to first provide the following background of the Debtor's Chapter 11 Case, the parties involved therewith, and some of the major events that have transpired culminating in the filing and solicitation of the Plan of this very unusual case.  Before the Bankruptcy Court is the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, filed on November 24, 2020, as modified on January 22, 2021 and again on February 1, 2021.  The parties have repeatedly referred to the Plan as an "asset monetization plan" because it involves the orderly wind-down of the Debtor's estate, including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds, subject to the oversight of the Claimant Trust Oversight Board.  The Plan provides for a Claimant Trust to, among other things, manage and monetize the Claimant Trust Assets for the benefit of the Debtor's economic stakeholders.  The Claimant Trustee is responsible

DOCS_SF:104487.21 36027/002

for this process, among other duties specified in the Plan's Claimant Trust Agreement. There is also anticipated to be a Litigation Sub-trust established for the purpose of pursuing certain avoidance or other causes of action for the benefit of the Debtor's economic constituents.

3. **Confirmation Requirements Satisfied.** The Plan is supported by the Committee and all claimants with Convenience Claims (*i.e.*, general unsecured claims under $1 million) who voted in Class 7. Claimants with Class 8 General Unsecured Claims, however, voted to reject the Plan because, although the Plan was accepted by 99.8% of the amount of Claims in that class, only 17 claimants voted to accept the Plan while 27 claimants voted to reject the Plan. As a result of such votes, and because Mr. Dondero and the Dondero Related Entities (as defined below) objected to the Plan on a variety of grounds primarily relating to the Plan's release, exculpation and injunction provisions, the Bankruptcy Court heard two full days of evidence on February 2 and 3, 2021, and considered testimony from five witnesses and thousands of pages of documentary evidence in determining whether the Plan satisfies the confirmation standards required under the Bankruptcy Code. The Bankruptcy Court finds and concludes that the Plan meets all of the relevant requirements of sections 1123, 1124, and 1129, and other applicable provisions of the Bankruptcy Code, as more fully set forth below with respect to each of the applicable confirmation requirements.

4. **Not Your Garden Variety Debtor**. The Debtor's case is not a garden variety chapter 11 case. The Debtor is a multibillion-dollar global investment adviser registered with the SEC, pursuant to the Investment Advisers Act of 1940. It was founded in 1993 by James Dondero and Mark Okada. Mark Okada resigned from his role with Highland prior to the

6

bankruptcy case being filed on October 16, 2019 (the "Petition Date"). Mr. Dondero controlled

the Debtor as of the Petition Date but agreed to relinquish control of it on or about January 9, 2020,

pursuant to an agreement reached with the Committee, as described below. Although Mr. Dondero

remained with the Debtor as an unpaid employee/portfolio manager after January 9, 2020, his

employment with the Debtor terminated on October 9, 2020. Mr. Dondero continues to work for

and/or control numerous non-debtor entities in the complex Highland enterprise.

5. **The Debtor**. The Debtor is headquartered in Dallas, Texas. As of the

Petition Date, the Debtor employed approximately 76 employees. The Debtor is privately-owned:

(a) 99.5% by the Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment

Trust, a trust created to manage the assets of Mr. Dondero and his family; (c) 0.0627% by Mark

Okada, personally and through family trusts; and (d) 0.25% by Strand, the Debtor's general

partner.

6. **The Highland Enterprise.** Pursuant to various contractual arrangements,

the Debtor provides money management and advisory services for billions of dollars of assets,

including collateralized loan obligation vehicles ("CLOs"), and other investments. Some of these

assets are managed by the Debtor pursuant to shared services agreements with certain affiliated

entities, including other affiliated registered investment advisors. In fact, there are approximately

2,000 entities in the byzantine complex of entities under the Highland umbrella. None of these

affiliated entities filed for chapter 11 protection. Most, but not all, of these entities are not

subsidiaries (direct or indirect) of the Debtor. Many of the Debtor's affiliated companies are

offshore entities, organized in jurisdictions such as the Cayman Islands and Guernsey. *See* Disclosure Statement, at 17-18.

7. **Debtor's Operational History.** The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates. For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course, primarily through a brokerage account at Jefferies, LLC. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and cause those proceeds to be distributed to the Debtor in the ordinary course of business. The Debtor's current Chief Executive Officer, James P. Seery, Jr., credibly testified at the Confirmation Hearing that the Debtor was "run at a deficit for a long time and then would sell assets or defer employee compensation to cover its deficits." The Bankruptcy Court cannot help but wonder if that was necessitated because of enormous litigation fees and expenses incurred by the Debtor due to its culture of litigation—as further addressed below.

8. **Not Your Garden Variety Creditor's Committee**. The Debtor and this chapter 11 case are not garden variety for so many reasons. One of the most obvious standouts in this case is the creditor constituency. The Debtor did not file for bankruptcy because of any of the typical reasons that large companies file chapter 11. For example, the Debtor did not have a large, asset-based secured lender with whom it was in default; it only had relatively insignificant secured indebtedness owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank. The Debtor also did not have problems with its trade vendors or landlords.

The Debtor also did not suffer any type of catastrophic business calamity.  In fact, the Debtor filed for Chapter 11 protection six months before the onset of the COVID-19 pandemic.  Rather, the Debtor filed for Chapter 11 protection due to a myriad of massive, unrelated, business litigation claims that it faced—many of which had finally become liquidated (or were about to become liquidated) after a decade or more of contentious litigation in multiple forums all over the world. The Committee in this case has referred to the Debtor—under its former chief executive, Mr. Dondero—as a "serial litigator."  The Bankruptcy Court agrees with that description. By way of example, the members of the Committee (and their history of litigation with the Debtor and others in the Highland complex) are as follows:

a.   **The Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee")**.  This Committee member obtained an arbitration award against the Debtor in the amount of $190,824,557, inclusive of interest, approximately five months before the Petition Date, from a panel of the American Arbitration Association. It was on the verge of having that award confirmed by the Delaware Chancery Court immediately prior to the Petition Date, after years of disputes that started in late 2008 (and included legal proceedings in Bermuda).  This creditor's claim was settled during this Chapter 11 Case in the amount of approximately $137,696,610 (subject to other adjustments and details not relevant for this purpose).

b.   **Acis Capital Management, L.P., and Acis Capital Management GP, LLC ("Acis")**.  Acis was formerly in the Highland complex of companies, but was not affiliated with Highland as of the Petition Date.  This Committee member and its now-owner, Joshua Terry, were involved in litigation with the Debtor dating back to 2016.  Acis was forced by Mr. Terry (who was a former Highland portfolio manager) into an involuntary chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of Texas, Dallas Division before the Bankruptcy Court in 2018, after Mr. Terry obtained an approximately $8 million arbitration award and judgment against Acis.  Mr. Terry ultimately was awarded the equity ownership of Acis by the Bankruptcy Court in the Acis bankruptcy case.  Acis subsequently asserted a multi-million dollar claim against Highland in the Bankruptcy Court for Highland's alleged denuding of Acis to defraud its creditors—primarily Mr. Terry. The litigation involving Acis and Mr. Terry dates back to mid-2016 and has

continued on with numerous appeals of Bankruptcy Court orders, including one appeal still pending at the Fifth Circuit Court of Appeals. There was also litigation involving Mr. Terry and Acis in the Royal Court of the Island of Guernsey and in a state court in New York. The Acis claim was settled during this Chapter 11 Case, in Bankruptcy Court-ordered mediation, for approximately $23 million (subject to other details not relevant for this purpose), and is the subject of an appeal being pursued by Mr. Dondero.

c.   **UBS Securities LLC and UBS AG London Branch ("UBS").** UBS is a Committee member that filed a proof of claim in the amount of $1,039,957,799.40 in this Chapter 11 Case. The UBS Claim was based on a judgment that UBS received from a New York state court in 2020. The underlying decision was issued in November 2019, after a multi-week bench trial (which had occurred many months earlier) on a breach of contract claim against non-Debtor entities in the Highland complex. The UBS litigation related to activities that occurred in 2008 and 2009. The litigation involving UBS and Highland and affiliates was pending for more than a decade (there having been numerous interlocutory appeals during its history). The Debtor and UBS recently announced an agreement in principle for a settlement of the UBS claim (which came a few months after Bankruptcy Court-ordered mediation) which will be subject to a 9019 motion to be filed with the Bankruptcy Court on a future date.

d.   **Meta-E Discovery ("Meta-E").** Meta-E is a Committee member that is a vendor who happened to supply litigation and discovery-related services to the Debtor over the years. It had unpaid invoices on the Petition Date of more than $779,000.

It is fair to say that the members of the Committee in this case all have wills of steel. They fought hard before and during this Chapter 11 Case. The members of the Committee, all of whom have volunteered to serve on the Claimant Trust Oversight Board post-confirmation, are highly sophisticated and have had highly sophisticated professionals representing them. They have represented their constituency in this case as fiduciaries extremely well.

9.   **Other Key Creditor Constituents.** In addition to the Committee members who were all embroiled in years of litigation with Debtor and its affiliates in various ways, the Debtor has been in litigation with Patrick Daugherty, a former limited partner and employee of the Debtor, for many years in both Delaware and Texas state courts. Mr. Daugherty filed an amended

proof of claim in this Chapter 11 Case for $40,710,819.42 relating to alleged breaches of employment-related agreements and for defamation arising from a 2017 press release posted by the Debtor. The Debtor and Mr. Daugherty recently announced a settlement of Mr. Daugherty's claim pursuant to which he will receive $750,000 in cash on the Effective Date of the Plan, an $8.25 million general unsecured claim, and a $2.75 million subordinated claim (subject to other details not relevant for this purpose). Additionally, entities collectively known as "HarbourVest" invested more than $70 million with an entity in the Highland complex and asserted a $300 million proof of claim against the Debtor in this case, alleging, among other things, fraud and RICO violations. HarbourVest's claim was settled during the bankruptcy case for a $45 million general unsecured claim and a $35 million subordinated claim, and that settlement is also being appealed by a Dondero Entity.

10. **Other Claims Asserted.** Other than the Claims just described, most of the other Claims in this Chapter 11 Case are Claims asserted against the Debtor by: (a) entities in the Highland complex—most of which entities the Bankruptcy Court finds to be controlled by Mr. Dondero; (b) employees who contend that are entitled to large bonuses or other types of deferred compensation; and (c) numerous law firms that worked for the Debtor prior to the Petition Date and had outstanding amounts due for their prepetition services.

11. **Not Your Garden Variety Post-Petition Corporate Governance Structure.** Yet another reason this is not your garden variety chapter 11 case is its post-petition corporate governance structure. Immediately from its appointment, the Committee's relationship with the Debtor was contentious at best. First, the Committee moved for a change of venue from

Delaware to Dallas. Second, the Committee (and later, the United States Trustee) expressed its then-desire for the appointment of a chapter 11 trustee due to its concerns over and distrust of Mr. Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and perhaps worse).

        12.    **Post-Petition Corporate Governance Settlement with Committee.** After spending many weeks under the threat of the potential appointment of a trustee, the Debtor and Committee engaged in substantial and lengthy negotiations resulting in a corporate governance settlement approved by the Bankruptcy Court on January 9, 2020.[5] As a result of this settlement, among other things, Mr. Dondero relinquished control of the Debtor and resigned his positions as an officer or director of the Debtor and its general partner, Strand. As noted above, Mr. Dondero agreed to this settlement pursuant a stipulation he executed,[6] and he also agreed not to cause any Related Entity (as defined in the Settlement Motion) to terminate any agreements with the Debtor. The January 9 Order also (a) required that the Bankruptcy Court serve as "gatekeeper" prior to the commencement of any litigation against the three independent board members appointed to oversee and lead the Debtor's restructuring in lieu of Mr. Dondero and (b) provided for the exculpation of those board members by limiting claims subject to the "gatekeeper" provision to those alleging willful misconduct and gross negligence.

---

[5] This order is hereinafter referred to as the "January 9 Order" and was entered by the Court on January 9, 2020 [Docket No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").

[6] *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Docket No. 338] (the "Stipulation").

13. **Appointment of Independent Directors.** As part of the Bankruptcy Court-approved settlement, three eminently qualified independent directors were chosen to lead Highland through its Chapter 11 Case. They are: James P. Seery, Jr., John S. Dubel (each chosen by the Committee), and Retired Bankruptcy Judge Russell Nelms. These three individuals are each technically independent directors of Strand (Mr. Dondero had previously been the sole director of Strand and, thus, the sole person in ultimate control of the Debtor). The three independent board members' resumes are in evidence. The Bankruptcy Court later approved Mr. Seery's appointment as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative. Suffice it to say that this settlement and the appointment of the independent directors changed the entire trajectory of the case and saved the Debtor from the appointment of a trustee. The Bankruptcy Court and the Committee each trusted the independent directors. They were the right solution at the right time. Because of the unique character of the Debtor's business, the Bankruptcy Court believed the appointment of three qualified independent directors was a far better outcome for creditors than the appointment of a conventional chapter 11 trustee. Each of the independent directors brought unique qualities to the table. Mr. Seery, in particular, knew and had vast experience at prominent firms with high-yield and distressed investing similar to the Debtor's business. Mr. Dubel had 40 years of experience restructuring large complex businesses and serving on boards in this context. And Retired Judge Nelms had not only vast bankruptcy experience but seemed particularly well-suited to help the Debtor maneuver through conflicts and ethical quandaries. By way of comparison, in the chapter 11 case of Acis, the former affiliate of Highland that the Bankruptcy Court presided over and which company was

13

much smaller in size and scope than Highland (managing only 5-6 CLOs), the creditors elected a

chapter 11 trustee who was not on the normal trustee rotation panel in this district but, rather, was

a nationally known bankruptcy attorney with more than 45 years of large chapter 11 experience.

While the Acis chapter 11 trustee performed valiantly, he was sued by entities in the Highland

complex shortly after he was appointed (which the Bankruptcy Court had to address).  The Acis

trustee was also unable to persuade the Debtor and its affiliates to agree to any actions taken in the

case, and he finally obtained confirmation of Acis' chapter 11 plan over the objections of the

Debtor and its affiliates on his fourth attempt (which confirmation was promptly appealed).

14.    **Conditions Required by Independent Directors.**  Given the experiences

in Acis and the Debtor's culture of constant litigation, it was not as easy to get such highly qualified

persons to serve as independent board members and, later, as the Debtor's Chief Executive Officer,

as it would be in an ordinary chapter 11 case.  The independent board members were stepping into

a morass of problems. Naturally, they were worried about getting sued no matter how defensible

their efforts—given the litigation culture that enveloped Highland historically.  Based on the

record of this Case and the proceedings in the Acis chapter 11 case, it seemed as though everything

always ended in litigation at Highland.  The Bankruptcy Court heard credible testimony that none

of the independent directors would have taken on the role of independent director without (1) an

adequate directors and officers' ("D&O") insurance policy protecting them; (2) indemnification

from Strand that would be guaranteed by the Debtor; (3) exculpation for mere negligence claims;

and (4) a gatekeeper provision prohibiting the commencement of litigation against the independent

directors without the Bankruptcy Court's prior authority.  This gatekeeper provision was also

included in the Bankruptcy Court's order authorizing the appointment of Mr. Seery as the Debtor's

Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative entered on

July 16, 2020.[7]   The gatekeeper provisions in both the January 9 Order and July 16 Order are

precisely analogous to what bankruptcy trustees have pursuant to the so-called "Barton Doctrine"

(first articulated in an old Supreme Court case captioned *Barton v. Barbour,* 104 U.S. 126 (1881)).

The Bankruptcy Court approved all of these protections in the January 9 Order and the July 16

Order, and no one appealed either of those orders.   As noted above, Mr. Dondero signed the

Stipulation that led to the settlement that was approved by the January 9 Order.   The Bankruptcy

Court finds that, like the Committee, the independent board members have been resilient and

unwavering in their efforts to get the enormous problems in this case solved.   They seem to have

at all times negotiated hard and in good faith, which culminated in the proposal of the Plan

currently before the Bankruptcy Court.   As noted previously, they completely changed the

trajectory of this case.

       15.     **Not Your Garden Variety Mediators.**   And still another reason why this

was not your garden variety case was the mediation effort.   In the summer of 2020, roughly nine

months into the chapter 11 case, the Bankruptcy Court ordered mediation among the Debtor, Acis,

UBS, the Redeemer Committee, and Mr. Dondero.   The Bankruptcy Court selected co-mediators

because mediation among these parties seemed like such a Herculean task—especially during

COVID-19 where people could not all be in the same room.   Those co-mediators were:  Retired

---

[7] *See Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020 (the "July 16 Order")

Bankruptcy Judge Alan Gropper from the Southern District of New York, who had a distinguished career presiding over complex chapter 11 cases, and Ms. Sylvia Mayer, who likewise has had a distinguished career, first as a partner at a preeminent law firm working on complex chapter 11 cases, and subsequently as a mediator and arbitrator in Houston, Texas. As noted earlier, the Redeemer Committee and Acis claims were settled during the mediation—which seemed nothing short of a miracle to the Bankruptcy Court—and the UBS claim was settled several months later and the Bankruptcy Court believes the ground work for that ultimate settlement was laid, or at least helped, through the mediation. And, as earlier noted, other significant claims have been settled during this case, including those of HarbourVest (who asserted a $300 million claim) and Patrick Daugherty (who asserted a $40 million claim). The Bankruptcy Court cannot stress strongly enough that the resolution of these enormous claims—and the acceptance by all of these creditors of the Plan that is now before the Bankruptcy Court—seems nothing short of a miracle. It was more than a year in the making.

16. **Not Your Garden Variety Plan Objectors (That Is, Those That Remain)**. Finally, a word about the current, remaining objectors to the Plan before the Bankruptcy Court. Once again, the Bankruptcy Court will use the phrase "not your garden variety", which phrase applies to this case for many reasons. Originally, there were over a dozen objections filed to the Plan. The Debtor then made certain amendments or modifications to the Plan to address some of these objections, none of which require further solicitation of the Plan for reasons set forth in more detail below. The only objectors to the Plan left at the time of the Confirmation Hearing

were Mr. Dondero [Docket No. 1661] and entities that the Bankruptcy Court finds are owned

and/or controlled by him and that filed the following objections:

a. *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* (filed by Get Good Trust and The Dugaboy Investment Trust) [Docket No. 1667];

b. *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670];

c. A *Joinder to the Objection filed at 1670 by: NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing* [Docket No. 1677];

d. *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; and

e. *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676]. The entities referred to in (i) through (v) of this paragraph are hereinafter referred to as the "Dondero Related Entities").

17. **Questionability of Good Faith as to Outstanding Confirmation Objections.** Mr. Dondero and the Dondero Related Entities technically have standing to object to

the Plan, but the remoteness of their economic interests is noteworthy, and the Bankruptcy Court

questions the good faith of Mr. Dondero's and the Dondero Related Entities' objections.  In fact, the Bankruptcy Court has good reason to believe that these parties are not objecting to protect economic interests they have in the Debtor but to be disruptors.  Mr. Dondero wants his company back.  This is understandable, but it is not a good faith basis to lob objections to the Plan.  As detailed below, the Bankruptcy Court has slowed down plan confirmation multiple times and urged the parties to talk to Mr. Dondero in an attempt to arrive at what the parties have repeatedly referred to as a "grand bargain," the ultimate goal to resolve the Debtor's restructuring.  The Debtor and the Committee represent that they have communicated with Mr. Dondero regarding a grand bargain settlement, and the Bankruptcy Court believes that they have.

18.    **Remote Interest of Outstanding Confirmation Objectors.**  To be specific about the remoteness of Mr. Dondero's and the Dondero Related Entities' interests, the Bankruptcy Court will address them each separately.  First, Mr. Dondero has a pending objection to the Plan. Mr. Dondero's only economic interest with regard to the Debtor is an unliquidated indemnification claim (and, based on everything the Bankruptcy Court has heard, his indemnification claims would be highly questionable at this juncture).  Mr. Dondero owns no equity in the Debtor directly.  Mr. Dondero owns the Debtor's general partner, Strand, which in turn owns a quarter percent of the total equity in the Debtor.  Second, a joint objection has been filed by The Dugaboy Trust ("Dugaboy") and the Get Good Trust ("Get Good").  The Dugaboy Trust was created to manage the assets of Mr. Dondero and his family and owns a 0.1866% limited partnership interest in the Debtor.  *See* Disclosure Statement at 7, n.3.  The Bankruptcy Court is not clear what economic interest the Get Good Trust has, but it likewise seems to be related to Mr. Dondero.  Get Good

filed three proofs of claim relating to a pending federal tax audit of the Debtor's 2008 return, which the Debtor believes arise from Get Good's equity security interests and are subject to subordination as set forth in its Confirmation Brief. Dugaboy filed three claims against the Debtor: (a) an administrative claim relating to the Debtor's alleged postpetition management of Multi-Strat Credit Fund, L.P., (b) a prepetition claim against a subsidiary of the Debtor for which it seeks to pierce the corporate veil, each of which the Debtor maintains are frivolous in the Confirmation Brief, and (c) a claim arising from its equity security interest in the Debtor, which the Debtor asserts should be subordinated. Another group of objectors that has joined together in one objection is what the Bankruptcy Court will refer to as the "Highland Advisors and Funds." *See* Docket No. 1863. The Bankruptcy Court understands they assert disputed administrative expense claims against the estate that were filed shortly before the Confirmation Hearing on January 23, 2021 [Docket No. 1826], and during the Confirmation Hearing on February 3, 2021 [Docket No. 1888]. At the Confirmation Hearing, Mr. Post testified on behalf of the Highland Advisors and Funds that the Funds have independent board members that run the Funds, but the Bankruptcy Court was not convinced of their independence from Mr. Dondero because none of the so-called independent board members have ever testified before the Bankruptcy Court and all have been engaged with the Highland complex for many years. Notably, the Court questions Mr. Post's credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request, and he is currently employed by Mr. Dondero. Moreover, Dustin Norris, a witness in a prior proceeding (whose testimony was made part of the record at the Confirmation Hearing), recently

DOCS_SF:104487.21 36027/002

testified on behalf of the Highland Advisors and Funds in another proceeding that Mr. Dondero owned and/or controlled these entities.  Finally, various NexBank entities objected to the Plan.  The Bankruptcy Court does not believe they have liquidated claims against the Debtor.  Mr. Dondero appears to be in control of these entities as well.

19.     **Background Regarding Dondero Objecting Parties.**  To be clear, the Bankruptcy Court has allowed all these objectors to fully present arguments and evidence in opposition to confirmation, even though their economic interests in the Debtor appear to be extremely remote and the Bankruptcy Court questions their good faith.  Specifically, the Bankruptcy Court considers them all to be marching pursuant to the orders of Mr. Dondero.  In the recent past, Mr. Dondero has been subject to a temporary restraining order and preliminary injunction by the Bankruptcy Court for interfering with Mr. Seery's management of the Debtor in specific ways that were supported by evidence.  Around the time that this all came to light and the Bankruptcy Court began setting hearings on the alleged interference, Mr. Dondero's company phone, which he had been asked to turn in to Highland, mysteriously went missing.  The Bankruptcy Court merely mentions this in this context as one of many reasons that the Bankruptcy Court has to question the good faith of Mr. Dondero and his affiliates in raising objections to confirmation of the Plan.

20.     **Other Confirmation Objections.**  Other than the objections filed by Mr. Dondero and the Dondero Related Entities, the only other pending objection to the Plan is the *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1671], which objected to the Plan's exculpation, injunction, and

Debtor release provisions. In juxtaposition, to these pending objections, the Bankruptcy Court notes that the Debtor resolved the following objections to the Plan:

    a. *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph VV of the Confirmation Order;

    b. *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph QQ of the Confirmation Order;

    c. *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph 82 and paragraphs RR and SS of the Confirmation Order;

    d. *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666] and the amended joinder filed by Davis Deadman, Paul Kauffman and Todd Travers [Docket No. 1679]. This Objection and the amended joinder were resolved by agreement of the parties pursuant to modifications to the Plan filed by the Debtor;

    e. *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraphs TT and UU of the Confirmation Order; and

    f. *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678]. This objection was resolved by the parties pursuant to the settlement of Mr. Daugherty's claim announced on the record of the Confirmation Hearing.

    21. **Capitalized Terms.** Capitalized terms used herein, but not defined herein, shall have the respective meanings attributed to such terms in the Plan and the Disclosure Statement, as applicable.

22.     **Jurisdiction and Venue.**  The Bankruptcy Court has jurisdiction over the Debtor's Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Chapter 11 Case is proper in this district and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

23.     **Chapter 11 Petition.**  On the Petition Date, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, which case was transferred to the Bankruptcy Court on December 19, 2019.  The Debtor continues to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Chapter 11 Case.  The Office of the United States Trustee appointed the Committee on October 29, 2019.

24.     **Judicial Notice.**  The Bankruptcy Court takes judicial notice of the docket in this Chapter 11 Case maintained by the clerk of the Bankruptcy Court and the court-appointed claims agent, Kurtzman Carson Consultants LLC ("KCC"), including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during this Chapter 11 Case, including, without limitation, the hearing to consider the adequacy of the Disclosure Statement and the Confirmation Hearing, as well as all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings held before the Bankruptcy Court or the District Court for the Northern District of Texas in

connection with an adversary proceeding or appellate proceeding, respectively, related to this Chapter 11 Case.

25. **Plan Supplement Documents.** Prior to the Confirmation Hearing, the Debtor filed each of the Plan Supplements. The Plan Supplements contain, among other documents, the Retained Causes of Action, the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Senior Employee Stipulation, the Related Entity List, the Schedule of Employees, the Reorganized Limited Partnership Agreement, supplements to the Liquidation Analysis/Financial Projections, the Schedule of Contracts and Leases to be Assumed, and the other Plan Documents set forth therein (collectively, the "Plan Supplement Documents").

26. **Retained Causes of Action Adequately Preserved.** The Bankruptcy Court finds that the list of Retained Causes of Action included in the Plan Supplements sufficiently describes all potential Retained Causes of Action, provides all persons with adequate notice of any Causes of Action regardless of whether any specific claim to be brought in the future is listed therein or whether any specific potential defendant or other party is listed therein, and satisfies applicable law in all respects to preserve all of the Retained Causes of Action. The definition of the Causes of Action and Schedule of Retained Causes of Action, and their inclusion in the Plan, specifically and unequivocally preserve the Causes of Action for the benefit of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust, as applicable.

27. **Plan Modifications Are Non-Material.** In addition to the Plan Supplements, the Debtor made certain non-material modifications to the Plan, which are reflected in (i) the *Redline of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*

*(as Modified)* filed on January 22, 2021 [Docket No. 1809], and (ii) Exhibit B to the *Debtor's*

*Notice of Filing of Plan Supplement to Fifth Amended Plan of Reorganization of Highland Capital*

*Management, L.P. (as Modified)* filed on February 1, 2021 [Docket No. 1875] (collectively, the

"Plan Modifications"). Section 1127(a) of the Bankruptcy Code provides that a plan proponent

may modify its plan at any time before confirmation so long as such modified plan meets the

requirements of sections 1122 and 1123 of the Bankruptcy Code. None of the modifications set

forth in the Plan Supplements or the Plan Modifications require any further solicitation pursuant

to sections 1125, 1126, or 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, because,

among other things, they do not materially adversely change the treatment of the claims of any

creditors or interest holders who have not accepted, in writing, such supplements and

modifications. Among other things, there were changes to the projections that the Debtor filed

shortly before the Confirmation Hearing (which included projected distributions to creditors and

a comparison of projected distributions under the Plan to potential distributions under a

hypothetical chapter 7 liquidation). The Plan Supplements and Plan Modifications did not mislead

or prejudice any creditors or interest holders nor do they require that Holders of Claims or Equity

Interests be afforded an opportunity to change previously cast votes to accept or reject the Plan.

Specifically, the Amended Liquidation Analysis/Financial Projections filed on February 1, 2021

[Docket No. 1875] do not constitute any material adverse change to the treatment of any creditors

or interest holders but, rather, simply update the estimated distributions based on Claims that were

settled in the interim and provide updated financial data. The filing and notice of the Plan

Supplements and Plan Modifications were appropriate and complied with the requirements of

section 1127(a) of the Bankruptcy Code and the Bankruptcy Rules, and no other solicitation or disclosure or further notice is or shall be required.  The Plan Supplements and Plan Modifications each became part of the Plan pursuant section 1127(a) of the Bankruptcy Code.  The Debtor or Reorganized Debtor, as applicable, is authorized to modify the Plan or Plan Supplement Documents following entry of this Confirmation Order in a manner consistent with section 1127(b) of the Bankruptcy Code, the Plan, and, if applicable, the terms of the applicable Plan Supplement Document.

28.     **Notice of Transmittal, Mailing and Publication of Materials.**  As is evidenced by the Voting Certifications and the Affidavits of Service and Publication, the transmittal and service of the Plan, the Disclosure Statement, Ballots, and Confirmation Hearing Notice were adequate and sufficient under the circumstances, and all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to the confirmation of the Plan) have been given due, proper, timely, and adequate notice in accordance with the Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and such parties have had an opportunity to appear and be heard with respect thereto.  No other or further notice is required.  The publication of the Confirmation Hearing Notice, as set forth in the *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505], complied with the Disclosure Statement Order.

29.     **Voting.**  The Bankruptcy Court has reviewed and considered the Voting Certifications.  The procedures by which the Ballots for acceptance or rejection of the Plan were

distributed and tabulated, including the tabulation as subsequently amended to reflect the settlement of certain Claims to be Allowed in Class 7, were fairly and properly conducted and complied with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

30. **Bankruptcy Rule 3016(a).** In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtor as the proponent of the Plan.

31. **Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)).** As set forth below, the Plan complies with all of the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

32. **Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).** Section 1122 of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class. The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Equity Interests.

33. **Classification of Secured Claims.** Class 1 (Jefferies Secured Claim) and Class 2 (Frontier Secured Claim) each constitute separate secured claims held by Jefferies LLC and Frontier State Bank, respectively, and it is proper and consistent with section 1122 of the Bankruptcy Code to separately classify the claims of these secured creditors. Class 3 (Other

Secured Claims) consists of other secured claims (to the extent any exist) against the Debtor, are not substantially similar to the Secured Claims in Class 1 or Class 2, and are also properly separately classified.

34. **Classification of Priority Claims.** Class 4 (Priority Non-Tax Claims) consists of Claims entitled to priority under section 507(a), other than Priority Tax Claims, and are properly separately classified from non-priority unsecured claims. Class 5 (Retained Employee Claims) consists of the potential claims of employees who may be retained by the Debtor on the Effective Date, which claims will be Reinstated under the Plan, are not substantially similar to other Claims against the Debtor, and are properly classified.

35. **Classification of Unsecured Claims.** Class 6 (PTO Claims) consists solely of the claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other unsecured claims in Class 7 and Class 8. Class 7 (Convenience Claims) allows holders of eligible and liquidated Claims (below a certain threshold dollar amount) to receive a cash payout of the lesser of 85% of the Allowed amount of the creditor's Claim or such holder's *pro rata* share of the Convenience Claims Cash Pool. Class 7 (Convenience Claims) are provided for administrative convenience purposes in order to allow creditors, most of whom are either trade creditors or holders of professional claims, to receive treatment provided under Class 7 in lieu of the treatment of Class 8 (General Unsecured Claims). The Plan also provides for reciprocal "opt out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8 Claims. Class 8 creditors primarily constitute the litigation claims of the Debtor. Class 8 Creditors

will receive Claimant Trust Interests which will be satisfied pursuant to the terms of the Plan. Class 8 also contains an "opt out" mechanism to allow holders of liquidated Class 8 Claims at or below a $1 million threshold to elect to receive the treatment of Class 7 Convenience Claims. The Claims in Class 7 (primarily trade and professional Claims against the Debtor) are not substantially similar to the Claims in Class 8 (primarily the litigation Claims against the Debtor), and are appropriately separately classified. Valid business reasons also exist to classify creditors in Class 7 separately from creditors in Class 8. Class 7 creditors largely consist of liquidated trade or service providers to the Debtor. In addition, the Claims of Class 7 creditors are small relative to the large litigation claims in Class 8. Furthermore, the Class 8 Claims were overwhelmingly unliquidated when the Plan was filed. The nature of the Class 7 Claims as being largely liquidated created an expectation of expedited payment relative to the largely unliquidated Claims in Class 8, which consists in large part of parties who have been engaged in years, and in some cases over a decade of litigation with the Debtor. Separate classification of Class 7 and Class 8 creditors was the subject of substantial arm's-length negotiations between the Debtor and the Committee to appropriately reflect these relative differences.

36. **Classification of Equity Interests.** The Plan properly separately classifies the Equity Interests in Class 10 (Class B/C Limited Partnership Interests) from the Equity Interests in Class 11 (Class A Limited Partnership Interests) because they represent different types of equity security interests in the Debtor and different payment priorities.

37. **Elimination of Vacant Classes.** Section III.C of the Plan provides for the elimination of Classes that do not have at least one holder of a Claim or Equity Interest that is

Allowed in an amount greater than zero for purposes of voting to accept or reject the Plan, and are disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class. The purpose of this provision is to provide that a Class that does not have voting members shall not be included in the tabulation of whether that Class has accepted or rejected the Plan. Pursuant to the Voting Certifications, the only voting Class of Claims or Equity Interests that did not have any members is Class 5 (Retained Employees). As noted above, Class 5 does not have any voting members because any potential Claims in Class 5 would not arise, except on account of any current employees of the Debtor who may be employed as of the Effective Date, which is currently unknown. Thus, the elimination of vacant Classes provided in Article III.C of the Plan does not violate section 1122 of the Bankruptcy Code. Class 5 is properly disregarded for purposes of determining whether or not the Plan has been accepted under Bankruptcy Code section 1129(a)(8) because there are no members in that Class. However, the Plan properly provides for the treatment of any Claims that may potentially become members of Class 5 as of the Effective Date in accordance with the terms of the Plan. The Plan therefore satisfies section 1122 of the Bankruptcy Code.

38. **Classification of Claims and Designation of Non-Classified Claims (11 U.S.C. §§ 1122, 1123(a)(1)).** Section 1123(a)(1) of the Bankruptcy Code requires that the Plan specify the classification of claims and equity security interests pursuant to section 1122 of the Bankruptcy Code, other than claims specified in sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code. In addition to Administrative Claims, Professional Fee Claims, and Priority Tax Claims, each of which need not be classified pursuant to section 1123(a)(1) of the Bankruptcy

Code, the Plan designates eleven (11) Classes of Claims and Equity Interests. The Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

39. **Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2)).** Article III of the Plan specifies that each of Class 1 (Jefferies Secured Claim), Class 3 (Other Secured Claims), Class 4 (Priority Non-Tax Claims), Class 5 (Retained Employee Claims), and Class 6 (PTO Claims) are Unimpaired under the Plan. Thus, the requirement of section 1123(a)(2) of the Bankruptcy Code is satisfied.

40. **Specification of Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).** Article III of the Plan designates each of Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), Class 8 (General Unsecured Claims), Class 9 (Subordinated Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) as Impaired and specifies the treatment of Claims and Equity Interests in such Classes. Thus, the requirement of section 1123(a)(3) of the Bankruptcy Code is satisfied.

41. **No Discrimination (11 U.S.C. § 1123(a)(4)).** The Plan provides for the same treatment by the Plan proponent for each Claim or Equity Interest in each respective Class unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest. The Plan satisfies this requirement because Holders of Allowed Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such holder's respective class, subject only to the voluntary "opt out" options afforded to members of Class 7 and Class 8 in accordance with the terms of the Plan. Thus, the requirement of section 1123(a)(4) of the Bankruptcy Code is satisfied.

42. **Implementation of the Plan (11 U.S.C. § 1123(a)(5)).** Article IV of the Plan sets forth the means for implementation of the Plan which includes, but is not limited to, the establishment of: (i) the Claimant Trust; (ii) the Litigation Sub-Trust; (iii) the Reorganized Debtor; and (iv) New GP LLC, in the manner set forth in the Plan Documents, the forms of which are included in the Plan Supplements.

a. **The Claimant Trust.** The Claimant Trust Agreement provides for the management of the Claimant Trust, as well as the Reorganized Debtor with the Claimant Trust serving as the managing member of New GP LLC (a wholly-owned subsidiary of the Claimant Trust that will manage the Reorganized Debtor as its general partner). The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will all be managed and overseen by the Claimant Trust Oversight Committee. Additionally, the Plan provides for the transfer to the Claimant Trust of all of the Debtor's rights, title, and interest in and to all of the Claimant Trust Assets in accordance with section 1141 of the Bankruptcy Code and for the Claimant Trust Assets to automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement. The Claimant Trust will administer the Claimant Trust Assets as provided under the Plan and the Claimant Trust Agreement contained in the Plan Supplements.

b. **The Litigation Sub-Trust.** The Plan and the Litigation Sub-Trust Agreement provide for the transfer to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims (as transferred to the Claimant Trust by the Debtor) in accordance with section 1141 of the Bankruptcy Code and for the Estate Claims to automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and the Litigation Sub-Trust Expenses, as provided for in the Litigation Sub-Trust Agreement. The Litigation Trustee is charged with investigating, pursuing, and otherwise resolving any Estate Claims (including those with respect to which the Committee has standing to pursue prior to the Effective Date pursuant to the January 9 Order) pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, regardless of whether any litigation with respect to any Estate Claim was commenced by the Debtor or the Committee prior to the Effective Date.

      c.    **The Reorganized Debtor**. The Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds.

The precise terms governing the execution of these restructuring transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, and the Schedule of Retained Causes of Action. The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan. The Plan's various mechanisms provide for the Debtor's continued management of its business as it seeks to liquidate the Debtor's assets, wind down its affairs, and pay the Claims of the Debtor's creditors. Upon full payment of Allowed Claims, plus interest as provided in the Plan, any residual value would then flow to the holders of Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests). Finally, Mr. Seery testified that the Debtor engaged in substantial and arm's length negotiations with the Committee regarding the Debtor's post-Effective Date corporate governance, as reflected in the Plan. Mr. Seery testified that he believes the selection of the Claimant Trustee, Litigation Trustee, and members of the Claimant Trust Oversight Board are in the best interests of the Debtor's economic constituents. Thus, the requirements of section 1123(a)(5) of the Bankruptcy Code are satisfied.

      43.    **Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).** The Debtor is not a corporation and the charter documents filed in the Plan Supplements otherwise comply with section 1123(a)(6) of the Bankruptcy Code. Therefore, the requirement of section 1123(a)(6) of the Bankruptcy Code is satisfied.

44. **Selection of Officers and Directors (11 U.S.C. § 1123(a)(7)).** Article IV of the Plan provides for the Claimant Trust to be governed and administered by the Claimant Trustee. The Claimant Trust, the management of the Reorganized Debtor, and the management and monetization of the Claimant Trust Assets and the Litigation Sub-Trust will be managed by the Claimant Trust Oversight Board. The Claimant Trust Oversight Board will consist of: (1) Eric Felton, as representative of the Redeemer Committee; (2) Joshua Terry, as representative of Acis; (3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of Meta-E Discovery; and (5) David Pauker. Four of the members of the Claimant Trust Oversight Committee are the holders of several of the largest Claims against the Debtor and/or are current members of the Committee. Each of these creditors has actively participated in the Debtor's case, both through their fiduciary roles as Committee members and in their individual capacities as creditors. They are therefore intimately familiar with the Debtor, its business, and assets. The fifth member of the Claimant Trustee Oversight Board, David Pauker, is a disinterested restructuring advisor and turnaround manager with more than 25 years of experience advising public and private companies and their investors, and he has substantial experience overseeing, advising or investigating troubled companies in the financial services industry and has advised or managed such companies on behalf of boards or directors, court-appointed trustees, examiners and special masters, government agencies, and private investor parties. The members of the Claimant Trust Oversight Board will serve without compensation, except for Mr. Pauker, who will receive payment of $250,000 for his first year of service, and $150,000 for subsequent years.

45.    **Selection of Trustees.**  The Plan Supplements disclose that Mr. Seery will serve as the Claimant Trustee and Marc Kirschner will serve as the Litigation Trustee.  As noted above, Mr. Seery has served as an Independent Board member since January 2020, and as the Chief Executive Officer and Chief Restructuring Officer since July 2020, and he has extensive management and restructuring experience, as evidenced from his curriculum vitae which is part of the record.   The evidence shows that Mr. Seery is intimately familiar with the Debtor's organizational structure, business, and assets, as well as how Claims will be treated under the Plan. Accordingly, it is reasonable and in the Estate's best interests to continue Mr. Seery's employment post-emergence as the Claimant Trustee.   Mr. Seery, upon consultation with the Committee, testified that he intends to employ approximately 10 of the Debtor's employees to enable him to manage the Debtor's business until the Claimant Trust effectively monetizes its remaining assets, instead of hiring a sub-servicer to accomplish those tasks.  Mr. Seery testified that he believes that the Debtor's post-confirmation business can most efficiently and cost-effectively be supported by a sub-set of the Debtor's current employees, who will be managed internally.  Mr. Seery shall initially be paid $150,000 per month for services rendered after the Effective Date as Claimant Trustee; however, Mr. Seery's long-term salary as Claimant Trustee and the terms of any bonuses and severance are subject to further negotiation by Mr. Seery and the Claimant Trust Oversight Board within forty-five (45) days after the Effective Date.  The Bankruptcy Court has also reviewed Mr. Kirschner's curriculum vitae.  Mr. Kirschner has been practicing law since 1967 and has substantial experience in bankruptcy litigation matters, particularly with respect to his prior experience as a litigation trustee for several litigation trusts, as set forth on the record of the

34

Confirmation Hearing and in the Confirmation Brief.  Mr. Kirschner shall be paid $40,000 per month for the first three months and $20,000 per month thereafter, plus a success fee related to litigation recoveries.  The Committee and the Debtor had arm's lengths negotiations regarding the post-Effective Date corporate governance structure of the Reorganized Debtor and believe that the selection of the Claimant Trustee, the Litigation Trustee, and the Claimant Trust Oversight Committee are in the best interests of the Debtor's economic stakeholders.  Section 1123(a)(7) of the Bankruptcy Code is satisfied.

46.     **Debtor's Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).**
Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtor has complied with the applicable provisions of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, and 1126 of the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure Statement, the Plan Supplements, and all other matters considered by the Bankruptcy Court in connection with this Chapter 11 Case.

47.     **Debtor's Solicitation Complied with Bankruptcy Code and Disclosure Statement Order.**  Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered the Disclosure Statement Order.  In accordance with the Disclosure Statement Order and evidenced by the Affidavits of Service and Publication, the Debtor appropriately served (i) the Solicitation Packages (as defined in the Disclosure Statement Order) on the Holders of Claims in Classes 2, 7, 8 and 9 and Holders of Equity Interests in Classes 10 and 11 who were entitled to vote on the Plan; and (ii) the Notice of Nonvoting Status (as defined in the Disclosure Statement Order) and the

Confirmation Hearing Notice to the Holders of Claims in Classes 1, 3, 4, 5 and 6, who were not entitled to vote on the Plan pursuant to the Disclosure Statement Order. The Disclosure Statement Order approved the contents of the Solicitation Packages provided to Holders of Claims and Equity Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan, and the deadlines for voting on and objecting to the Plan. The Debtor and KCC each complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code, as evidenced by the Affidavits of Service and Publication. The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class. The Debtor caused the same Disclosure Statement to be transmitted to all holders of Claims and Equity Interests entitled to vote on the Plan. The Debtor has complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order. The Bankruptcy Court rejects the arguments of the Mr. Dondero and certain Dondero Related Entities that the changes made to certain assumptions and projections from the Liquidation Analysis annexed as Exhibit C to the Disclosure Statement (the "Liquidation Analysis") to the Amended Liquidation Analysis/Financial Projections require resolicitation of the Plan. The Bankruptcy Court heard credible testimony from Mr. Seery regarding the changes to the Liquidation Analysis as reflected in the Amended Liquidation Analysis/Financial Projections. Based on the record, including the testimony of Mr. Seery, the Bankruptcy Court finds that the changes between the Liquidation Analysis and the Amended Liquidation Analysis/Financial Projections do not constitute materially adverse change to the treatment of Claims or Equity

Interests. Instead, the changes served to update the projected distributions based on Claims that were settled after the approval of the Disclosure Statement and to otherwise incorporate more recent financial data. Such changes were entirely foreseeable given the large amount of unliquidated Claims at the time the Disclosure Statement was approved and the nature of the Debtor's assets. The Bankruptcy Court therefore finds that holders of Claims and Equity Interests were not misled or prejudiced by the Amended Liquidation Analysis/Financial Projections and the Plan does not need to be resolicited.

48.    **Plan Proposed in Good Faith and Not by Means Forbidden by Law (11 U.S.C. § 1129(a)(3)).** The Debtor has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of this Chapter 11 Case, the Plan itself, and the extensive, unrebutted testimony of Mr. Seery in which he described the process leading to Plan's formulation. Based on the totality of the circumstances and Mr. Seery's testimony, the Bankruptcy Court finds that the Plan is the result of extensive arm's-length negotiations among the Debtor, the Committee, and key stakeholders, and promotes the objectives and purposes of the Bankruptcy Code. Specifically, the Debtor's good faith in proposing the Plan is supported by the following facts adduced by Mr. Seery:

    a.    The Independent Board determined that it should consider all potential restructuring alternatives, including pursuit of a traditional restructuring and the continuation of the Debtor's business, a potential sale of the Debtor's assets in one or more transactions, an asset monetization plan similar to that described in the Plan, and a so-called "grand bargain" plan that would involve Mr. Dondero's sponsorship of a plan with a substantial equity infusion.

b.    The Debtor subsequently engaged in arm's-length, good faith negotiations with the Committee over an asset monetization Plan commencing in June 2020, which negotiations occurred over the next several months.

c.    Negotiations between the Debtor and the Committee were often contentious over disputes, including, but not limited to, the post-confirmation corporate governance structure and the scope of releases contemplated by the Plan.

d.    While negotiations with the Committee progressed, the Independent Board engaged in discussions with Mr. Dondero regarding a potential "grand bargain" plan which contemplated a significant equity infusion by Mr. Dondero, and which Mr. Seery personally spent hundreds of hours pursuing over many months.

e.    On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [Docket No. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation. As a result of this mediation, the Debtor negotiated the settlement of the claims of Acis and Mr. Terry, which the Bankruptcy Court approved on October 28, 2020 [Docket No. 1302].

f.    On August 12, 2020, the Debtor filed its *Chapter 11 Plan of* Reorganization *of Highland Capital Management, L.P.* [Docket No. 944] (the "Initial Plan") and related disclosure statement (the "Initial Disclosure Statement") which were not supported by either the Committee or Mr. Dondero. The Independent Board filed the Initial Plan and Initial Disclosure Statement in order to act as a catalyst for continued discussions with the Committee while it simultaneously worked with Mr. Dondero on the "grand bargain" plan.

g.    The Bankruptcy Court conducted a contested hearing on the Initial Disclosure Statement on October 27, 2020. The Committee and other parties objected to approval of the Disclosure Statement at the Initial Disclosure Statement hearing, which was eventually continued to November 23, 2020.

h.    Following the Initial Disclosure Statement hearing, the Debtor continued to negotiate with the Committee and ultimately resolved the remaining material disputes and led to the Bankruptcy Court's approval of the Disclosure Statement on November 23, 2020.

i.    Even after obtaining the Bankruptcy Court's approval of the Disclosure Statement, the Debtor and the Committee continued to negotiate with Mr. Dondero and the Committee over a potential "pot plan" as an alternative to the Plan on file with the Bankruptcy Court, but such efforts were unsuccessful. This history conclusively demonstrates that the Plan is being proposed in good faith within the meaning of section 1129(a)(3).

38

49. **Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**
Article II.B of the Plan provides that Professionals will file all final requests for payment of
Professional Fee Claims no later than 60 days after the Effective Date, thereby providing an
adequate period of time for interested parties to review such claims. The procedures set forth in
the Plan for the Bankruptcy Court's approval of the fees, costs, and expenses to be paid in
connection with this chapter 11 Case, or in connection with the Plan and incident to this Chapter
11 Case, satisfy the objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy
Code.

50. **Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).** Article IV.B
of the Plan provides for the appointment of the Claimant Trustee, Litigation Trustee, and the
Claimant Trust Oversight Committee and the members thereto. For the reasons more fully
explained in paragraphs 44-45 of this Confirmation Order with respect to the requirement of
section 1123(a)(7) of the Bankruptcy Code, the Debtor has disclosed the nature of compensation
of any insider to be employed or retained by the Reorganized Debtor, if applicable, and
compensation for any such insider. The appointment of such individuals is consistent with the
interests of Claims and Equity Interests and with public policy. Thus, the Plan satisfies section
1129(a)(5) of the Bankruptcy Code.

51. **No Rate Changes (11 U.S.C. § 1129(a)(6)).** The Plan does not provide for
any rate change that requires regulatory approval. Section 1129(a)(6) of the Bankruptcy Code is
thus not applicable.

DOCS_SF:104487.21 36027/002

Appx.000072

52. **Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).** The "best interests" test is satisfied as to all Impaired Classes under the Plan, as each Holder of a Claim or Equity Interest in such Impaired Classes will receive or retain property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. On October 15, 2020, the Debtor filed the Liquidation Analysis [Docket 1173], as prepared by the Debtor with the assistance of its advisors and which was attached as Exhibit C to the Disclosure Statement. On January 29, 2021, in advance of Mr. Seery's deposition in connection with confirmation of the Plan, the Debtor provided an updated version of the Liquidation Analysis to the then-objectors of the Plan, including Mr. Dondero and the Dondero Related Entities. On February 1, 2021, the Debtor filed the Amended Liquidation Analysis/Financial Projections. The Amended Liquidation Analysis/Financial Projections included updates to the Debtor's projected asset values, revenues, and expenses to reflect: (1) the acquisition of an interest in an entity known as "HCLOF" that the Debtor will acquire as part of its court-approved settlement with HarbourVest and that was valued at $22.5 million; (2) an increase in the value of certain of the Debtor's assets due to changes in market conditions and other factors; (3) expected revenues and expenses arising in connection with the Debtor's continued management of the CLOs pursuant to management agreements that the Debtor decided to retain; (4) increases in projected expenses for headcount (in addition to adding two or three employees to assist in the management of the CLOs, the Debtor also increased modestly the projected headcount as a result of its decision not to engage a Sub-Servicer) and professional fees; and (5) an increase in projected recoveries on notes resulting from the

acceleration of term notes owed to the Debtor by the following Dondero Related Entities: NexPoint Advisors, L.P.; Highland Capital Management Services, Inc.; and HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC). Under the Plan, as of the Confirmation Date, (a) Class 7 General Unsecured Creditors are projected to receive 85% on account of their claims; and (b) Class 8 General Unsecured Creditors are projected to receive at least approximately 71% on account of their Claims. Under a hypothetical chapter 7 liquidation, all general unsecured creditors are projected to receive approximately 55% on account of their Claims. The Bankruptcy Court finds that the distributions that Class 7 and 8 General Unsecured Creditors are projected to receive under the Plan substantially exceeds that which they would receive under a chapter 7 liquidation based on Mr. Seery's testimony, including the following credible reasons he posited, among others:

    a.    The nature of the Debtor's assets is complex. Certain assets relate to complicated real estate structures and private equity investments in operating businesses. Mr. Seery's extensive experience with the Debtor during the thirteen months since his appointment as an Independent Director and later Chief Executive Officer and Chief Restructuring Officer, provides him with a substantial learning curve in connection with the disposition of the Debtor's assets and are reasonably expected to result in him being able to realize tens of millions of dollars more value than would a chapter 7 trustee.

    b.    Assuming that a hypothetical chapter 7 trustee could even operate the Debtor's business under chapter 7 of the Bankruptcy Code and hire the necessary personnel with the relevant knowledge and experience to assist him or her in selling the Debtor's assets, a chapter 7 trustee would likely seek to dispose of the Debtor's assets in a forced sale liquidation which would generate substantially less value for the Debtor's creditors than the asset monetization plan contemplated by the Plan.

    c.    A chapter 7 trustee would be unlikely to retain the Debtor's existing professionals to assist in its efforts to monetize assets, resulting in delays, increased expenses, and reduced asset yields for the chapter 7 estate.

DOCS_SF:104487.21 36027/002

    d.    The chapter 7 estate would be unlikely to maximize value as compared to the asset monetization process contemplated by the Plan because potential buyers are likely to perceive a chapter 7 trustee as engaging in a quick, forced "fire sale" of assets; and

    e.    The Debtor's employees, who are vital to its efforts to maximum value and recoveries for stakeholders, may be unwilling to provide services to a chapter 7 trustee.

Finally, there is no evidence to support the objectors' argument that the Claimant Trust Agreement's disclaimed liability for ordinary negligence by the Claimant Trustee compared to a chapter 7 trustee's liability has any relevance to creditor recoveries in a hypothetical chapter 7 liquidation. Thus, section 1129(a)(7) of the Bankruptcy Code is satisfied.

53.    **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).** Classes 1, 3, 4, 5 and 6 are Unimpaired under the Plan. Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 9 (Subordinated Claims) have each voted to accept the Plan in accordance with the Bankruptcy Code, thereby satisfying section 1129(a)(8) as to those Classes. However, Class 8 (General Unsecured Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) have not accepted the Plan. Accordingly, section 1129(a)(8) of the Bankruptcy Code has not been satisfied. The Plan, however, is still confirmable because it satisfies the nonconsensual confirmation provisions of section 1129(b), as set forth below.

54.    **Treatment of Administrative, Priority, Priority Tax Claims, and Professional Fee Claims (11 U.S.C. § 1129(a)(9)).** The treatment of Administrative Claims, Priority Claims, and Professional Fee Claims pursuant to Article III of the Plan, and as set forth below with respect to the resolution of the objections filed by the Internal Revenue Service and

certain Texas taxing authorities satisfies the requirements of sections 1129(a)(9) of the Bankruptcy Code.

55.    **Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)).**    Class 2 (Frontier Secured Claims) and Class 7 (Convenience Claims) are each Impaired Classes of Claims that voted to accept the Plan, determined without including any acceptance of the Plan by any insider.  Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code is satisfied.

56.    **Feasibility (11 U.S.C. § 1129(a)(11)).**    Article IV of the Plan provides for the implementation of the Plan through the Claimant Trust, the Litigation Sub-Trust, and the Reorganized Debtor.  The Plan provides that the Claimant Trust, among other things, will monetize and distribute the Debtor's remaining assets.  The Disclosure Statement, the Amended Liquidation Analysis/Financial Projections, and the other evidence presented at the Confirmation Hearing provide a reasonable probability of success that the Debtor will be able to effectuate the provisions of the Plan.  The Plan contemplates the establishment of the Claimant Trust upon the Effective Date, which will monetize the Estate's assets for the benefit of creditors.  Mr. Seery testified that the Class 2 Frontier Secured Claim will be paid over time pursuant to the terms of the New Frontier Note and the Reorganized Debtor will have sufficient assets to satisfy its obligations under this note.  The Claims of the Holders of Class 7 Claims (as well as those Class 8 creditors who validly opted to receive the treatment of Class 7 Claims) are expected to be satisfied shortly after the Effective Date.  Holders of Class 8 Claims (including any holders of Class 7 Claims who opted to receive the treatment provided to Class 8 Claims) are not guaranteed any recovery and will

43

periodically receive pro rata distributions as assets are monetized pursuant to the Plan and the

Claimant Trust Agreement. Thus, section 1129(a)(11) of the Bankruptcy Code is satisfied.

57. **Payment of Fees (11 U.S.C. § 1129(a)(12)).** All fees payable under 28

U.S.C. § 1930 have been paid or will be paid on or before the Effective Date pursuant to Article

XII.A of the Plan, thus satisfying the requirement of section 1129(a)(12) of the Bankruptcy Code.

The Debtor has agreed that the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-

Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United

States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor

or the dismissal or conversion of the Chapter 11 Case.

58. **Retiree Benefits.** The Plan provides for the assumption of the Pension Plan

(to the extent such Pension Plan provides "retiree benefits" and is governed by section 1114 of the

Bankruptcy Code). Thus, the Plan complies with section 1129(a)(13) of the Bankruptcy Code, to

the extent applicable.

59. **Miscellaneous Provisions (11 U.S.C. §§ 1129(a)(14)-(16)).** Sections

1129(a)(14)-(16) of the Bankruptcy Code are inapplicable as the Debtor (i) has no domestic

support obligations (section 1129(a)(14)), (ii) is not an individual (section 1129(a)(15)), and (iii)

is not a nonprofit corporation (section 1129(a)(16)).

60. **No Unfair Discrimination; Fair and Equitable Treatment (11 U.S.C. §**

**1129(b)).** The classification and treatment of Claims and Equity Interests in Classes 8, 10 and 11,

which have not accepted the Plan, is proper pursuant to section 1122 of the Bankruptcy Code, does

not discriminate unfairly, and is fair and equitable pursuant to section 1129(b)(1) of the Bankruptcy

Code.

a.   <u>Class 8</u>.  The Plan is fair and equitable with respect to Class 8 General Unsecured Claims.  While Equity Interests in Class 10 and Class 11 will receive a contingent interest in the Claimant Trust under the Plan (the "<u>Contingent Interests</u>"), the Contingent Interests will not vest unless and until holders of Class 8 General Unsecured Claims and Class 9 Subordinated Claims receive distributions equal to 100% of the amount of their Allowed Claims plus interest as provided under the Plan and Claimant Trust Agreement.  Accordingly, as the holders of Equity Interests that are junior to the Claims in Class 8 and Class 9 will not receive or retain under the Plan on account of such junior claim interest any property unless and until the Claims in Class 8 and Class 9 are paid in full plus applicable interest, the Plan is fair and equitable with respect to holders of Class 8 General Unsecured Claims pursuant to section 1129(b)(2)(B) of the Bankruptcy Code and the reasoning of *In re Introgen Therapuetics* 429 B.R 570 (Bankr. W.D. Tex. 2010).

b.   <u>Class 10 and Class 11</u>.  There are no Claims or Equity Interests junior to the Equity Interests in Class 10 and Class 11.  Equity Interests in Class 10 and 11 will neither receive nor retain any property under the Plan unless Allowed Claims in Class 8 and Class 9 are paid in full plus applicable interest pursuant to the terms of the Plan and Claimant Trust Agreement.  Thus, the Plan does not violate the absolute priority rule with respect to Classes 10 and 11 pursuant to Bankruptcy Code section 1129(b)(2)(C).  The Plan does not discriminate unfairly as to Equity Interests.  As noted above, separate classification of the Class B/C Partnership Interests from the Class A Partnerships Interests is appropriate because they constitute different classes of equity security interests in the Debtor, and each are appropriately separately classified and treated.

Accordingly, the Plan does not violate the absolute priority rule, does not discriminate unfairly,

and is fair and equitable with respect to each Class that has rejected the Plan.  Thus, the Plan

satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 8, 10,

and 11.

61. **Only One Plan (11 U.S.C. § 1129(c)).** The Plan is the only chapter 11 plan confirmed in this Chapter 11 Case, and the requirements of section 1129(c) of the Bankruptcy Code are therefore satisfied.

62. **Principal Purpose (11 U.S.C. § 1129(d)).** Mr. Seery testified that the principal purpose of the Plan is neither the avoidance of taxes nor the avoidance of the application of section 5 of the Securities Act of 1933, and no governmental unit has objected to the confirmation of the Plan on any such grounds. Accordingly, section 1129(d) of the Bankruptcy Code is inapplicable.

63. **Satisfaction of Confirmation Requirements.** Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code and should be confirmed.

64. **Good Faith Solicitation (11 U.S.C. § 1125(e)).** The Debtor, the Independent Directors, and the Debtor's employees, advisors, Professionals, and agents have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances of the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and they are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

65. **Discharge (11 U.S.C. § 1141(d)(3)**). The Debtor is entitled to a discharge of debts pursuant to section 1141(d)(3)(B) of the Bankruptcy Code. Under the Plan, the Claimant Trust or Reorganized Debtor, as applicable, will continue to manage funds and conduct business

in the same manner as the Debtor did prior to Plan confirmation, which includes the management

of the CLOs, Multi-Strat, Restoration Capital, the Select Fund and the Korea Fund. Although the

Plan projects that it will take approximately two years to monetize the Debtor's assets for fair

value, Mr. Seery testified that while the Reorganized Debtor and Claimant Trust will be

monetizing their assets, there is no specified time frame by which this process must conclude. Mr.

Seery's credible testimony demonstrates that the Debtor will continue to engage in business after

consummation of the Plan, within the meaning of Section 1141(d)(3)(b) and that the Debtor is

entitled to a discharge pursuant to section 1141(d)(1) of the Bankruptcy Code.

66.     **Retention of Jurisdiction.**  The Bankruptcy Court may properly retain

jurisdiction over the matters set forth in Article XI of the Plan and/or section 1142 of the

Bankruptcy Code to the maximum extent under applicable law.

67.     **Additional Plan Provisions (11 U.S.C. § 1123(b)).**  The Plan's provisions

are appropriate, in the best interests of the Debtor and its Estate, and consistent with the applicable

provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

68.     **Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).**

The Debtor has exercised reasonable business judgment with respect to the rejection of the

Executory Contracts and Unexpired Leases pursuant the terms of the Plan and this Confirmation

Order, and such rejections are justified and appropriate in this Chapter 11 Case. The Debtor also

filed the List of Assumed Contracts, which contain notices to the applicable counterparties to the

contracts set forth on Exhibit "FF" to Plan Supplement filed on February 1, 2021 [Docket No.

1875] and which exhibit sets forth the list of executory contracts and unexpired leases to be

assumed by the Debtor pursuant to the Plan (collectively, the "<u>Assumed Contracts</u>"). With respect to the Assumed Contracts, only one party objected to the assumption of any of the Assumed Contracts, but that objection was withdrawn.[8] Any modifications, amendments, supplements, and restatements to the Assumed Contracts that may have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith. Assumption of any Assumed Contract pursuant to the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

69. **Compromises and Settlements Under and in Connection with the Plan (11 U.S.C. § 1123(b)(3)).** All of the settlements and compromises pursuant to and in connection with the Plan, comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

70. **Debtor Release, Exculpation and Injunctions (11 U.S.C. § 1123(b)).** The Debtor Release, Exculpation, and Injunction provisions provided in the Plan (i) are within the jurisdiction of the Bankruptcy Court under 28 U.S.C. § 1334; (ii) are integral elements of the transactions incorporated into the Plan, and inextricably bound with the other provisions of the Plan; (iii) confer material benefit on, and are in the best interests of, the Debtor, its Estate, and its

---

[8] *See Notice of Withdrawal of James Dondero's Objection Debtor's Proposed Assumption of Contracts and Cure Amounts Proposed in Connection Therewith* [Docket No. 1876]

creditors; (iv) are fair, equitable, and reasonable; (v) are given and made after due notice and opportunity for hearing; (vi) satisfy the requirements of Bankruptcy Rule 9019; and (vii) are consistent with the Bankruptcy Code and other applicable law, and as set forth below.

71. **Debtor Release.** Section IX.D of the Plan provides for the Debtor's release of the Debtor's and Estate's claims against the Released Parties. Releases by a debtor are discretionary and can be provided by a debtor to persons who have provided consideration to the Debtor and its estate pursuant to section 1123(b)(3)(A) of the Bankruptcy Code. Contrary to the objections raised by Mr. Dondero and certain of the Dondero Related Entities, the Debtor Release is appropriately limited to release claims held by the Debtor and does not purport to release the claims held by the Claimant Trust, Litigation Sub-Trust, or other third parties. The Plan does not purport to release any claims held by third parties and the Bankruptcy Court finds that the Debtor Release is not a "disguised" release of any third party claims as asserted by certain objecting parties. The limited scope of the Debtor Release in the Plan was extensively negotiated with the Committee, particularly with the respect to the Debtor's conditional release of claims against employees, as identified in the Plan, and the Plan's conditions and terms of such releases. The Plan does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction. The Debtor Release also contains

conditions to such releases as set forth in Article X.D of the Plan with respect to employees (the

"Release Conditions"). Until the an employee satisfies the Release Conditions or the Release

Conditions otherwise terminate, any claims against such employee will be tolled so that if the

Release Conditions are not met the Litigation Trustee may pursue claims against an employee at a

later date. The evidence before the Bankruptcy Court, including, but not limited to Mr. Seery's

testimony, demonstrates that the Debtor is not aware of any claims against any of the Released

Parties, that the Released Parties have been instrumental in assisting the Debtor's efforts toward

confirmation of the Plan and that, therefore, the releases are a *quid pro quo* for the Released

Parties' significant contributions to a highly complex and contentious restructuring. The

Committee, whose members hold approximately $200 million in claims against the Estate, is

highly sophisticated and is represented by highly sophisticated professionals, and has actively and

vigorously negotiated the terms of the Debtor Release, which was the subject of significant

controversy at the Initial Disclosure Statement hearing held by the Bankruptcy Court on October

27, 2020.

72.    **Exculpation.** Section IX.C of the Plan provides for the exculpation of

certain Exculpated Parties to the extent provided therein (the "Exculpation Provision"). As

explained below, the Exculpation Provision is appropriate under the unique circumstances of this

litigious Chapter 11 Case and consistent with applicable Fifth Circuit precedent. First, with respect

to the Independent Directors, their agents, and their advisors, including any employees acting at

their direction, the Bankruptcy Court finds and concludes that it has already exculpated these parties for acts other than willful misconduct and gross negligence pursuant to the January 9 Order. The January 9 Order was specifically agreed to by Mr. Dondero, who was in control of the Debtor up until entry of the January 9 Order. The January 9 Order was not appealed. In addition to the appointment of the Independent Directors in an already contentious and litigious case, the January 9 Order set the standard of care for the Independent Directors and specifically exculpated them for negligence. Mr. Seery and Mr. Dubel each testified that they had input into the contents of the January 9 Order and would not have agreed to their appointment as Independent Directors if the January 9 Order did not include the protections set forth in paragraph 10 of the January 9 Order. Paragraph 10 of the January 9 Order (1) requires that parties wishing to sue the Independent Directors or their agents and advisors must first seek approval from the Bankruptcy Court before doing so; (2) sets the standard of care for the Independent Directors during the Chapter 11 Case and exculpated the Independent Directors for acts other than willful misconduct or gross negligence; (3) only permits suits against the Independent Directors to proceed for colorable claims of willful misconduct and gross negligence upon order of the Bankruptcy Court; and (4) does not expire by its terms.

73. **Existing Exculpation of Independent Directors.** The Bankruptcy Court also finds and concludes that it has already exculpated Mr. Seery acting in the capacity as Chief Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order. The Bankruptcy Court concludes its previous approval of the exculpation of the Independent Directors, their agents, advisors and employees working at their direction pursuant to the January 9 Order, and the Chief

Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order constitutes the

law of this case and are *res judicata* pursuant to *In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046

(5th Cir.1987).  The January 9 Order and July 16 Order cannot be collaterally attacked based on

the objectors' objection to the exculpation of the Independent Directors, their agents, and advisors,

including any employees acting at their direction, as well as the Chief Executive Officer and Chief

Restructuring Officer, that the Bankruptcy Court already approved pursuant to the January 9 Order

and the July 16 Order.

74.    **The Exculpation Provision Complies with Applicable Law.**  Separate

and apart from the *res judicata* effect of the January 9 Order and the July 16 Order, the Bankruptcy

Court also finds and concludes that the Exculpation Provision is consistent with applicable law,

including *In re Pacific Lumber Co*., 584 F.3d 229 (5th Cir. 2009), for several reasons:

a.    First, the statutory basis for *Pacific Lumber's* denial of exculpation for certain
parties other than a creditors' committee and its members is that section 524(e) of
the Bankruptcy Code "only releases the debtor, not co-liable third parties." *Pacific
Lumber*, 253 F.3d. at 253.  However, *Pacific Lumber* does not prohibit all
exculpations under the Bankruptcy Code and the court in such case specifically
approved the exculpations of a creditors' committee and its members on the
grounds that "11 U.S.C. § 1103(c), which lists the creditors' committee's powers,
implies committee members have qualified immunity for actions within the scope
of their duties…. [I]f members of the committee can be sued by persons unhappy
with the committee's performance during the case or unhappy with the outcome of
the case, it will be extremely difficult to find members to serve on an official
committee." *Pacific Lumber*, 253 F.3d at 253 (quoting Lawrence P. King, et al,
Collier on Bankruptcy, ¶ 1103.05[4][b] (15th Ed. 2008)).  *Pacific Lumber's*
rationale for permitted exculpation of creditors' committees and their members
(which was clearly policy-based and based on a creditors' committee qualified
immunity flowing from their duties under section 1103(c) of the Bankruptcy Code
and their disinterestedness and importance in chapter 11 cases) does not preclude
exculpation to other parties in a particular chapter 11 case that perform similar roles
to a creditors' committee and its members.  The Independent Directors, and by
extension the Chief Executive Officer and Chief Restructuring Officer, were not

part of the Debtor's enterprise prior to their appointment by the Bankruptcy Court under the January 9 Order. The Bankruptcy Court appointed the Independent Directors in lieu of a chapter 11 trustee to address what the Bankruptcy Court perceived as serious conflicts of interest and fiduciary duty concerns with the then-existing management prior to January 9, 2020, as identified by the Committee. In addition, the Bankruptcy Court finds that the Independent Directors expected to be exculpated from claims of negligence, and would likely have been unwilling to serve in contentious cases absent exculpation. The uncontroverted testimony of Mr. Seery and Mr. Dubel demonstrates that the Independent Directors would not have agreed to accept their roles without the exculpation and gatekeeper provision in the January 9 Order. Mr. Dubel also testified as to the increasing important role that independent directors are playing in complex chapter 11 restructurings and that unless independent directors could be assured of exculpation for simple negligence in contentious bankruptcy cases they would be reluctant to accept appointment in chapter 11 cases which would adversely affect the chapter 11 restructuring process. The Bankruptcy Court concludes that the Independent Directors were appointed under the January 9 Order in order to avoid the appointment of a chapter 11 trustee and are analogous to a creditors' committee rather than an incumbent board of directors. The Bankruptcy Court also concludes that if independent directors cannot be assured of exculpation for simple negligence in contentious bankruptcy cases, they may not be willing to serve in that capacity. Based upon the foregoing, the Bankruptcy Court concludes that *Pacific Lumber's* policy of exculpating creditors' committees and their members from "being sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case" is applicable to the Independent Directors in this Chapter 11 Case.[9]

b.  Second, the Bankruptcy Court also concludes that *Pacific Lumber* does not preclude the exculpation of parties if there is a showing that "costs [that] the released parties might incur defending against such suits alleging such negligence are likely to swamp either the Exculpated Parties or the reorganization." *Pacific Lumbe*r, 584 F.3d at 252. If ever there was a risk of that happening in a chapter 11 reorganization, it is this one. Mr. Seery credibly testified that Mr. Dondero stated outside the courtroom that if Mr. Dondero's pot plan does not get approved, that Mr. Dondero will "burn the place down." The Bankruptcy Court can easily expect that the proposed Exculpated Parties might expect to incur costs that could swamp them and the reorganization based on the prior litigious conduct of Mr. Dondero and his controlled entities that justify their inclusion in the Exculpation Provision.

---

[9] The same reasoning applies to the inclusion of Strand in the Exculpation Provision because Strand is the general partner of the Debtor through which each of the Independent Board members act.

75.    **Injunction.**  Section IX.D of the Plan provides for a Plan inunction to implement and enforce the Plan's release, discharge and release provisions (the "Injunction Provision").  The Injunction Provision is necessary to implement the provisions in the Plan.  Mr. Seery testified that the Claimant Trustee will monetize the Debtor's assets in order to maximize their value.  In order to accomplish this goal, the Claimant Trustee needs to be able to pursue this objective without the interference and harassment of Mr. Dondero and his related entities, including the Dondero Related Entities.  Mr. Seery also testified that if the Claimant Trust was subject to interference by Mr. Dondero,  it would take additional time to monetize the Debtor's assets and those assets could be monetized for less money to the detriment of the Debtor's creditors.  The Bankruptcy Court finds and concludes that the Injunction Provision is consistent with and permissible under Bankruptcy Code sections 1123(a), 1123(a)(6), 1141(a) and (c), and 1142.  The Bankruptcy Court rejects assertions by certain objecting parties that the Injunction Provision constitutes a "third-party release."  The Injunction Provision is appropriate under the circumstances of this Chapter 11 Case and complies with applicable bankruptcy law.  The Bankruptcy Court also concludes that the terms "implementation" and "consummation" are neither vague nor ambiguous

76.    **Gatekeeper Provision**.  Section IX.F of the Plan contains a provision contained in paragraph AA of this Confirmation Order and which the Debtor has referred to as a gatekeeper provision (the "Gatekeeper Provision").  The Gatekeeper Provision requires that Enjoined Parties first seek approval of the Bankruptcy Court before they may commence an action against Protected Parties.  Thereafter, if the Bankruptcy Court determines that the action is

Appx.000087

colorable, the Bankruptcy Court may, if it has jurisdiction, adjudicate the action. The Bankruptcy Court finds that the inclusion of the Gatekeeper Provision is critical to the effective and efficient administration, implementation, and consummation of the Plan. The Bankruptcy Court also concludes that the Bankruptcy Court has the statutory authority as set forth below to approve the Gatekeeper Provision.

77. **Factual Support for Gatekeeper Provision.** The facts supporting the need for the Gatekeeper Provision are as follows. As discussed earlier in this Confirmation Order, prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Mr. Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in some cases, over a decade. Substantially all of the creditors in this case are either parties who were engaged in litigation with the Debtor, parties who represented the Debtor in connection with such litigation and had not been paid, or trade creditors who provided litigation-related services to the Debtor. During the last several months, Mr. Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor. Such litigation includes: (i) entry of a temporary restraining order and preliminary injunction against Mr. Dondero [Adv. Proc. No. 20-03190 Docket No. 10 and 59] because of, among other things, his harassment of Mr. Seery and employees and interference with the Debtor's business operations; (ii) a contempt motion against Mr. Dondero for violation of the temporary restraining order, which motion is still pending before the Bankruptcy Court [Adv. Proc. No. 20-03190 Docket No. 48]; (iii) a motion by Mr. Dondero's controlled investors in certain CLOs managed by the Debtor that the Bankruptcy Court referred to

as frivolous and a waste of the Bankruptcy Court's time [Docket No. 1528] which was denied by

the Court [Docket No. 1605]; (iv) multiple plan confirmation objections focused on ensuring the

Dondero Related Entities be able to continue their litigation against the Debtor and its successors

post-confirmation [Docket Nos. 1661, 1667, 1670, 1673, 1676, 1677 and 1868]; (v) objections to

the approval of the Debtor's settlements with Acis and HarbourVest and subsequent appeals of the

Bankruptcy Court's order approving each of those settlements [Docket Nos. 1347 and 1870]; and

(vi) a complaint and injunction sought against Mr. Dondero's affiliated entities to prevent them

from violating the January 9 Order and entry of a restraining order against those entities [Adv Proc.

No. 21-03000 Docket No 1] (collectively, the "Dondero Post-Petition Litigation").

78.    **Findings Regarding Dondero Post-Petition Litigation.** The Bankruptcy

Court finds that the Dondero Post-Petition Litigation was a result of Mr. Dondero failing to obtain

creditor support for his plan proposal and consistent with his comments, as set forth in Mr. Seery's

credible testimony, that if Mr. Dondero's plan proposal was not accepted, he would "burn down

the place." The Bankruptcy Court concludes that without appropriate protections in place, in the

form of the Gatekeeper Provision, Mr. Dondero and his related entities will likely commence

litigation against the Protected Parties after the Effective Date and do so in jurisdictions other than

the Bankruptcy Court in an effort to obtain a forum which Mr. Dondero perceives will be more

hospitable to his claims. The Bankruptcy Court also finds, based upon Mr. Seery's testimony, that

the threat of continued litigation by Mr, Dondero and his related entities after the Effective Date

will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result

in lower distributions to creditors because of costs and distraction such litigation or the threats of such litigation would cause.

79. **Necessity of Gatekeeper Provision.** The Bankruptcy Court further finds that unless the Bankruptcy Court approves the Gatekeeper Provision, the Claimant Trustee and the Claimant Trust Oversight Board will not be able to obtain D&O insurance, the absence of which will present unacceptable risks to parties currently willing to serve in such roles. The Bankruptcy Court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("AON"), regarding his efforts to obtain D&O insurance. Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so without an exclusion for claims asserted by Mr. Dondero and his affiliates otherwise requires that this Order approve the Gatekeeper Provision. Based on the foregoing, the Bankruptcy Court finds that the Gatekeeper Provision is necessary and appropriate in light of the history of the continued litigiousness of Mr. Dondero and his related entities in this Chapter 11 Case and necessary to the effective and efficient administration, implementation and consummation of the Plan and is appropriate pursuant to *Carroll v. Abide (In re Carroll)* 850 F.3d 811 (5th Cir. 2017). Approval of the Gatekeeper Provision will prevent baseless litigation designed merely to harass the post-confirmation entities charged with monetizing the Debtor's assets for the benefit of its economic constituents, will avoid abuse of the court system and preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants. Any suit against a Protected Party would effectively be a suit against the Debtor, and the Debtor may be required to indemnify the Protected

Parties under the Limited Partnership Agreement, which will remain in effect through the Effective

Date, or those certain *Indemnification and Guaranty Agreements*, dated January 9, 2020, between

Strand, the Debtor, and each Independent Director, following the Confirmation Date as each such

agreement will be assumed pursuant to 11 U.S.C. § 365 pursuant to the Plan.

80. **Statutory Authority to Approve Gatekeeper Provision.** The

Bankruptcy Court finds it has the statutory authority to approve the Gatekeeper Provision under

sections 1123(a)(5), 1123(b)(6), 1141, 1142(b), and 105(a). The Gatekeeper Provision is also

within the spirit of the Supreme Court's "Barton Doctrine." *Barton v. Barbour,* 104 U.S. 126

(1881). The Gatekeeper Provision is also consistent with the notion of a prefiling injunction to

deter vexatious litigants, that has been approved by the Fifth Circuit in such cases as *Baum v. Blue*

*Moon Ventures, LLC,* 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll,* 850 F.3d 811 (5th Cir.

2017).

81. **Jurisdiction to Implement Gatekeeper Provision.** The Bankruptcy Court

finds that it will have jurisdiction after the Effective Date to implement the Gatekeeper Provision

as post-confirmation bankruptcy court jurisdiction has been interpreted by the Fifth Circuit under

*United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.),* 301 F.3d

296 (5th Cir. 2002) and *EOP-Colonnade of Dallas Ltd. P'Ship v. Faulkner (In re Stonebridge*

*Techs., Inc.),* 430 F.3d 260 (5th Cir. 2005). Based upon the rationale of the Fifth Circuit in *Villegas*

*v. Schmidt,* 788 F.3d 156, 158-59 (5th Cir. 2015), the Bankruptcy Court's jurisdiction to act as a

gatekeeper does not violate *Stern v. Marshall.* The Bankruptcy Court's determination of whether

a claim is colorable, which the Bankruptcy Court has jurisdiction to determine, is distinct from whether the Bankruptcy Court would have jurisdiction to adjudicate any claim it finds colorable.

82. **Resolution of Objections of Scott Ellington and Isaac Leventon**. Each of Scott Ellington ("Mr. Ellington") and Isaac Leventon ("Mr. Leventon") (each, a "Senior Employee Claimant") has asserted certain claims for liquidated but unpaid bonus amounts for the following periods: 2016, 2017, and 2018, as set forth in Exhibit A to that certain *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1669] (the "Senior Employees' Objection") (for each of Mr. Ellington and Mr. Leventon, the "Liquidated Bonus Claims").

a. Mr. Ellington has asserted Liquidated Bonus Claims in the aggregate amount of $1,367,197.00, and Mr. Leventon has asserted Liquidated Bonus Claims in the aggregate amount of $598,198.00. Mr. Ellington received two Ballots[10] – a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan. Mr. Ellington completed and timely returned both of such Ballots, voted to reject the Plan, and elected to have his Class 8 Liquidated Bonus Claims treated under Class 7 of the Plan, subject to the objections and reservations of rights set forth in the Senior Employees' Objection. If Mr. Ellington is permitted to elect Class 7 treatment for his Liquidated Bonus Claims, then the maximum amount of his Liquidated Bonus Claims will be $1,000,000.

b. Mr. Leventon received two Ballots—a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan. Mr. Leventon completed and timely returned both of such Ballots and voted each such Ballots to rejected the Plan.

c. The Senior Employees' Objection, among other things, objects to the Plan on the grounds that the Debtor improperly disputes the right of Mr. Ellington to elect Class 7 treatment for his Liquidated Bonus Claims and Mr. Leventon's entitlement to receive Class 7 Convenience Class treatment for his Liquidated Bonus Claims. The Debtor contended that neither Mr. Ellington or Mr. Leventon were entitled to elect to receive Class 7 Convenience Class treatment on account of their Liquidated

---

[10] As defined in the Plan, "Ballot" means the forms(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

Bonus Claims under the terms of the Plan, the Disclosure Statement Order or applicable law.

d.　　The Debtor and Mr. Ellington and Mr. Leventon negotiated at arms' length in an effort to resolve all issues raised in the Senior Employee's Objection, including whether or not Mr. Ellington and Mr. Leventon were entitled to Class 7 Convenience Class treatment of their Liquidated Bonus Claims. As a result of such negotiation, the Debtor, Mr. Ellington, and Mr. Leventon have agreed to the settlement described in paragraphs 82(e) through 82(k) below and approved and effectuated pursuant to decretal paragraphs RR through SS (the "Senior Employees' Settlement").

e.　　Under the terms of the Senior Employees' Settlement, the Debtor has the right to elect one of two treatments of the Liquidated Bonus Claims for a Senior Employee Claimant. Under the first treatment option ("Option A"), the Liquidated Bonus Claims will be entitled to be treated in Class 7 of the Plan, and the Liquidated Bonus Claims will be entitled to receive payment in an amount equal to 70.125% of the Class 7 amount of the Liquidated Bonus Claims, subject to the Liquidated Bonus Claims becoming Allowed Claims under the terms of the Plan. Under this calculation, Mr. Ellington would be entitled to receive $701,250.00 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan, and Mr. Leventon would be entitled to receive $413,175.10 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan. If, however, any party in interest objects to the allowance of the Senior Employee Claimant's Liquidated Bonus Claims and does not prevail in such objection, then such Senior Employee Claimant will be entitled to a payment in an amount equal to 85% of his Allowed Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed on Class 7 Claims). In addition, under Option A, each of Mr. Ellington and Mr. Leventon would retain their respective rights to assert that the Liquidated Bonus Claims are entitled to be treated as Administrative Expense Claims, as defined in Article I.B.2. of the Plan, in which case the holder of such Liquidated Bonus Claims would be entitled to payment in full of the Allowed Liquidated Bonus Claims. Under Option A, parties in interest would retain the right to object to any motion seeking payment of the Liquidated Bonus Amounts as Administrative Expenses.

f.　　Under the second treatment option ("Option B"), the Debtor would agree that the Senior Employee Claimant has Allowed Liquidated Bonus Claims, no longer subject to objection by any party in interest, in the amounts of the Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed by Class 7). If the Debtor elects Option B as to a Senior Employee Claimant, then such Senior Employee Claimant would be entitled to a payment on account of his Allowed Liquidated Bonus Claims in an amount equal to 60% of the amount of the

Liquidated Bonus Claims (which, in Mr. Ellington's case, would be $600,000 and in Mr. Leventon's case, would be $358,918.80), and such payment would be the sole recovery on account of such Allowed Liquidated Bonus Claims.

g.      The Debtor may, with the consent of the Committee, elect Option B with respect to a Senior Employee Claimant at any time prior to the occurrence of the Effective Date.  If the Debtor does not make an election, then Option A will apply.

h.      Under either Option A or Option B, Mr. Ellington and Mr. Leventon will retain all their rights with respect to all Claims other than the Liquidated Bonus Amounts, including, but not limited to, their Class 6 PTO Claims, other claims asserted as Class 8 General Unsecured Claims, the Senior Employees' claims for indemnification against the Debtor, and any other claims that they may assert constitute Administrative Expense Claims, and any other such Claims are subject to the rights of any party in interest to object to such Claims, and the Debtor reserves any all of its rights and defenses in connection therewith.

i.      Subject to entry of this Confirmation Order and as set forth and announced on the record at the hearing on confirmation of the Plan and no party objecting thereto, Mr. Ellington and Mr. Leventon agreed to change the votes in their respective Ballots from rejection to acceptance of the Plan and to withdraw the Senior Employees' Objection.

j.      The Senior Employees' Settlement represents a valid exercise of the Debtor's business judgment and satisfies the requirements for a compromise under Bankruptcy Rule 9019(a).

k.      For the avoidance of doubt, neither Mr. Leventon nor Mr. Ellington shall be a Released Party under the Plan regardless of how the Senior Employee Claimants' Claims are to be treated hereunder.

Based upon the foregoing findings, and upon the record made before the Bankruptcy Court

at the Confirmation Hearing, and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

A.      **Confirmation of the Plan.**  The Plan is approved in its entirety and

**CONFIRMED** under section 1129 of the Bankruptcy Code.  The terms of the Plan, including the

Plan Supplements and Plan Modifications, are incorporated by reference into and are an integral part of this Confirmation Order.[11]

       **B.**    **Findings of Fact and Conclusions of Law**.  The findings of fact and the conclusions of law set forth in this Confirmation Order and on the record of the Confirmation Hearing constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  All findings of fact and conclusion of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to confirmation of the Plan are hereby incorporated into this Confirmation Order.  To the extent that any of the following constitutes findings of fact or conclusions of law, they are adopted as such. To the extent any findings of fact or conclusions of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and incorporated herein) constitutes an order of the Bankruptcy Court, and is adopted as such.

       **C.**    **Objections**.  Any resolution or disposition of objections to confirmation of the Plan or otherwise ruled upon by the Bankruptcy Court on the record of the Confirmation Hearing is hereby incorporated by reference.  All objections and all reservations of rights pertaining to confirmation of the Plan that have not been withdrawn, waived or settled are overruled on the merits, except as otherwise specifically provided in this Confirmation Order.

       **D.**    **Plan Supplements and Plan Modifications.**  The filing with the Bankruptcy Court of the Plan Supplements and the Plan Modifications constitutes due and

---

[11] The Plan is attached hereto as **Exhibit A**.

sufficient notice thereof.  Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and

Bankruptcy Rule 3019, the Plan Modifications and the Plan Supplements do not require additional

disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126

of the Bankruptcy Code, nor do they require that Holders of Claims or Equity Interests be afforded

an opportunity to change previously cast acceptances or rejections of the Plan.  The Plan

Modifications and the Plan Supplements constitute the Plan pursuant to section 1127(a) of the

Bankruptcy Code.  Accordingly, the Plan, as modified, is properly before the Bankruptcy Court

and all votes cast with respect to the Plan prior to such modification shall be binding and shall

apply with respect to the Plan.

   **E.**  **Deemed Acceptance of Plan.**  In accordance with section 1127 of the

Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Equity Interests who voted

to accept the Plan (or whom are conclusively presumed to accept the Plan) are deemed to have

accepted the Plan as modified by the Plan Modifications.  No holder of a Claim shall be permitted

to change its vote as a consequence of the Plan Modifications.

   **F.**  **Vesting of Assets in the Reorganized Debtor.**  Except as otherwise

provided in the Plan or this Confirmation Order, on or after the Effective Date, all Reorganized

Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or

other encumbrances pursuant to section 1141(c) of the Bankruptcy Code, except with respect to

such Liens, Claims, charges, and other encumbrances that are specifically preserved under the Plan

upon the Effective Date.  The Reorganized Debtor shall be the exclusive trustee of the Reorganized

Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the

representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

      **G.**     **Effectiveness of All Actions.**   All actions contemplated by the Plan, including all actions in connection with the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, are authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to or order of the Bankruptcy Court, or further action by the directors, managers, officers or partners of the Debtor or the Reorganized Debtor and with the effect that such actions had been taken by unanimous action of such parties.

      **H.**     **Restructuring Transactions.**   The Debtor or Reorganized Debtor, as applicable, are authorized to enter into and effectuate the Restructuring provided under the Plan, including, without limitation, the entry into and consummation of the transactions contemplated by the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, and may take any actions as may be necessary or appropriate to effect a corporate restructuring of its business or a corporate restructuring of the overall corporate structure of the Reorganized Debtor, as and to the extent provided in the Plan. Any transfers of assets or equity interests effected or any obligations incurred through the Restructuring pursuant to the Plan are hereby approved and shall not constitute fraudulent conveyances or fraudulent transfers or otherwise be subject to avoidance.

**I. Preservation of Causes of Action.** Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, this Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor, the Litigation Sub-Trust, or the Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan, or this Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, this Confirmation Order). In addition, the right of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**J. Independent Board of Directors of Strand.** The terms of the current Independent Directors shall expire on the Effective Date without the need for any further or other action by any of the Independent Directors. For avoidance of doubt, the Assumed Contracts

DOCS_SF:104487.21 36027/002

Appx.000098

include the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery*; the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel* and *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell Nelms* and shall each remain in full force and effect notwithstanding the expiration of the terms of any Independent Directors.

> **K.    Cancellation of Equity Interests and Issuance of New Partnership Interests.**  On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be deemed cancelled, and all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, such Class A Limited Partnership Interests and Class B/C Limited Partnership Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.  As of the Effective Date and pursuant to the Plan, new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited

Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

      **L.**      **Transfer of Assets to Claimant Trust.**  On or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.  Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the Plan and the Claimant Trust Agreement.

      **M.**      **Transfer of Estate Claims to Litigation Sub-Trust**.  On or prior to the Effective Date, the Claimant Trust shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims as successor in interest to the Debtor, and in accordance with section 1141 of the Bankruptcy Code, the Estate Claims shall automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and Litigation Sub-Trust Expenses.  The Litigation Trustee will

be authorized to investigate, pursue, and otherwise resolve the Estate Claims pursuant to the terms

of the Litigation Sub-Trust Agreement and the Plan, including as successor in interest to the Debtor

or Committee, as applicable, in any litigation commenced prior to the Effective Date in which

Estate Claims are asserted.

        **N.**    **Compromise of Controversies.**  In consideration for the distributions and

other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a

good faith compromise and settlement of all Claims, Equity Interests, and controversies resolved

under the Plan and the entry of this Confirmation Order constitutes approval of such compromise

and settlement under Bankruptcy Rule 9019.

        **O.**    **Objections to Claims**.  The Claims Objection Deadline shall be the date

that is 180 days after the Effective Date, *provided, however*, that the Claims Objection Deadline

may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee and as otherwise

provided under the Plan.

        **P.**    **Assumption of Contracts and Leases.**  Effective as of the date of this

Confirmation Order, each of the Assumed Contacts shall be assumed by the Debtor without the

need for any further notice to or action, order, or approval of the Bankruptcy Court, under section

365 of the Bankruptcy Code and the payment of Cures, if any, shall be paid in accordance with the

Plan.   Each Assumed Contract shall include all modifications, amendments, supplements,

restatements, or other agreements related thereto, and all rights related thereto, if any, including

all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and

any other interests.  Modifications, amendments, supplements, and restatements to any of the

Assumed Contracts that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of such Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith. Assumption of the Assumed Contracts pursuant to Article V.A of the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition, or other bankruptcy-related defaults, arising under any Assumed Contracts.

Q.    **Rejection of Contracts and Leases.** Unless previously assumed during the pendency of the Chapter 11 Case or pursuant to the Plan, all other Executory Contracts and Unexpired Leases are rejected as of the date of the entry of this Confirmation Order and pursuant to the terms of the Plan. To the extent that any party asserts any damages resulting from the rejection of any Executory Contract or Unexpired Lease, such claim must be filed within **thirty (30) days** following entry of this Confirmation Order, or such claim will be forever barred and disallowed against the Reorganized Debtor.

R.    **Assumption of Issuer Executory Contracts.** On the Confirmation Date, the Debtor will assume the agreements set forth on **Exhibit B** hereto (collectively, the "Issuer Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. In full and complete satisfaction of its obligation to cure outstanding defaults under section 365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the

Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[12] a cumulative amount of $525,000 (the "Cure Amount") as follows:

a. $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

b. $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and the Bankruptcy Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; *provided, however,* that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

   **S.** **Release of Issuer Claims.** Effective as of the Confirmation Date, and to the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and

---

[12] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Issuer Released Claims").

       **T.**    **Release of Debtor Claims against Issuer Released Parties.**  Upon entry of this Order, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue [(i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe,

(xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton  (collectively, the "Issuer Released Parties"),] for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts.  Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs S and T hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

U.     **Authorization to Consummate.**  The Debtor is authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver of the conditions precedent to the Effective Date of the Plan set forth in Article VIII.A of the Plan.  The Plan shall not become effective unless and until the conditions set forth in Article VIII.A of the Plan have been satisfied, or otherwise waived pursuant to Article VIII.B of the Plan.

V.     **Professional Compensation.**  All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date

must be filed no **later than sixty (60) days after the Effective Date**.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and an opportunity for hearing in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Court.  The Debtor shall fund the Professional Fee Reserve as provided under the Plan. The Reorganized Debtor shall pay Professional Fee Claims in Cash in the amounts the Bankruptcy Court allows.  The Debtor is authorized to pay the pre-Effective Date fees and expenses of all ordinary course professionals in the ordinary course of business without the need for further Bankruptcy Court order or approval.  From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 (if applicable) of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor or Claimant Trustee, as applicable, may employ and pay any Professional or Entity employed in the ordinary course of the Debtor's business without any further notice to or action, order, or approval of the Bankruptcy Court.

> **W.     Release, Exculpation, Discharge, and Injunction Provisions.   The following release, exculpation, discharge, and injunction provisions set forth in the Plan are approved and authorized in their entirety, and such provisions are effective and binding on all parties and Entities to the extent provided therein.**

> **X.     Discharge of Claims and Termination of Interests.**  To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or this Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement,

discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by the Plan or this Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

Y.    **Exculpation.**  Subject in all respects to Article XII.D of the Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v);

*provided, however*, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  The Plan's exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

Z.     **Releases by the Debtor.**  On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under

DOCS_SF:104487.21 36027/002

any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance

Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction.

**AA.    Injunction.  Upon entry of this Confirmation Order, all Enjoined**

**Parties are and shall be permanently enjoined, on and after the Effective Date, from taking**

**any actions to interfere with the implementation or consummation of the Plan.  Except as**

**expressly provided in the Plan, this Confirmation Order, or a separate order of the**

**Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after**

**the Effective Date, with respect to any Claims and Equity Interests, from directly or**

**indirectly (i) commencing, conducting, or continuing in any manner, any suit, action, or**

**other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative**

**or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing,**

**levying, attaching (including any prejudgment attachment), collecting, or otherwise**

**recovering, enforcing, or attempting to recover or enforce, by any manner or means, any**

**judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii)**

**creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or**

**encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any**

**right of setoff, directly or indirectly, against any obligation due to the Debtor or against**

**property or interests in property of the Debtor, except to the limited extent permitted under**

**Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner,**

in any place whatsoever, that does not conform to or comply with the provisions of the Plan. The injunctions set forth in the Plan and this Confirmation Order shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property. Subject in all respects to Article XII.D of the Plan, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however*, the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in

**Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.**

**BB.    Duration of Injunction and Stays.  Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date, shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Bankruptcy Court will enter an equivalent order under Section 105.**

**CC.    Continuance of January 9 Order and July 16 Order.**  Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, each of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, entered by the Bankruptcy Court on January 9, 2020* [Docket No. 339] and *Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020  shall remain in full force and effect from the Confirmation Date and following the Effective Date.

**DD.    No Governmental Releases.**  Nothing in this Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or

DOCS_SF:104487.21 36027/002

any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in this Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit, or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in this Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against any party or person.

   **EE.** **Exemption from Transfer Taxes.** Pursuant to section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor; (b) the Restructuring transactions pursuant to the Plan; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan,

DOCS_SF:104487.21 36027/002

including any deeds, bills of sale, assignments, or other instrument of transfer executed in

connection with any transaction arising out of, contemplated by, or in any way related to the Plan,

shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or

similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial

Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental

assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon

entry of this Confirmation Order, the appropriate state or local governmental officials or agents

shall forego the collection of any such tax or governmental assessment and accept for filing and

recordation of any of the foregoing instruments or other documents without the payment of any

such tax, recordation fee, or governmental assessment.

       **FF.**    **Cancellation of Notes, Certificates and Instruments.**  Except for the

purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in

the Plan or as otherwise provided in this Confirmation Order, on the Effective Date, all agreements,

instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest

and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no

force or effect.  The holders of or parties to such cancelled instruments, Securities, and other

documentation will have no rights arising from or related to such instruments, Securities, or other

documentation or the cancellation thereof, except the rights provided for pursuant to the Plan, and

the obligations of the Debtor thereunder or in any way related thereto will be fully released,

terminated, extinguished and discharged, in each case without further notice to or order of the

Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

**GG. Documents, Mortgages, and Instruments.** Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring transactions contemplated under the Plan, and this Confirmation Order.

**HH. Post-Confirmation Modifications.** Subject section 1127(b) of the Bankruptcy Code and the Plan, the Debtor and the Reorganized Debtor expressly reserve their rights to revoke or withdraw, or to alter, amend, or modify materially the Plan, one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.B of the Plan.

**II. Applicable Nonbankruptcy Law.** The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

**JJ. Governmental Approvals Not Required.** This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state,

federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

   **KK.** **Notice of Effective Date.** As soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall file notice of the Effective Date and shall serve a copy of the same on all Holders of Claims and Equity Interests, and all parties who have filed with the Bankruptcy Court requests to receive notices in accordance with Bankruptcy Rules 2002 and 3020(c).  Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtor mailed notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtor has been informed in writing by such Entity, or is otherwise aware, of that Entity's new address. The above-referenced notices are adequate under the particular circumstances of this Chapter 11 Case and no other or further notice is necessary.

   **LL.** **Substantial Consummation.** On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

   **MM.** **Waiver of Stay.** For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Bankruptcy Court.

DOCS_SF:104487.21 36027/002

Appx.000115

NN.   **References to and Omissions of Plan Provisions.**  References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

OO.   **Headings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

PP.   **Effect of Conflict.**  This Confirmation Order supersedes any Bankruptcy Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control.  If there is any inconsistency between the terms of this Confirmation Order and the terms of a final, executed Plan Supplement Document, the terms of the final, executed Plan Supplement Document will govern and control.

QQ.   **Resolution of Objection of Texas Taxing Authorities.**  Dallas County, Kaufman County, City of Allen, Allen ISD and City of Richardson (collectively, the "Tax Authorities") assert that they are the holders of prepetition and administrative expense claims for 2019, 2020 and 2021 ad valorem real and business personal property taxes.  The ad valorem property taxes for tax year 2020 shall be paid in accordance with and to the extent required under

applicable nonbankruptcy law.  In the event the 2020 taxes are paid after February 1, 2021, the

Tax Authorities may assert any rights and amounts they claim are owed with respect to penalties

and interest that have accrued through the date of payment and the Debtor and Reorganized Debtor

reserve any all rights and defenses in connection therewith.

a.  The Debtor/Reorganized Debtor shall pay all amounts owed to the Tax Authorities for tax year 2021 in accordance with and to the extent required under applicable nonbankruptcy law.  The Tax Authorities shall not be required to file and serve an administrative expense claim and request for payment as a condition of allowance of their administrative expense claims pursuant to 11 U.S.C. Section 503(b)(1)(D). With regard to year 2019 ad valorem property taxes, the Tax Authorities will receive payment of their prepetition claims within 30 days of the Effective Date of the Plan.  The payment will include interest from the Petition Date through the Effective Date and from the Effective Date through payment in full at the state statutory rate pursuant to 11 U.S.C. Sections 506(b), 511, and 1129, if applicable, subject to all of the Debtor's and Reorganized Debtor's rights and defenses in connection therewith. Notwithstanding any other provision in the Plan, the Tax Authorities shall (i) retain the liens that secure all prepetition and postpetition amounts ultimately owed to them, if any, as well as (ii) the state law priority of those liens until the claims are paid in full.

b.  The Tax Authorities' prepetition claims and their administrative expense claims shall not be discharged until such time as the amounts owed are paid in full.  In the event of a default asserted by the Taxing Authorities, the Tax Authorities shall provide notice Debtor or Reorganized Debtor, as applicable, and may demand cure of any such asserted default.  Subject to all of its rights and defenses, the Debtor or Reorganized Debtor shall have fifteen (15) days from the date of the notice to cure the default.  If the alleged default is not cured, the Tax Authorities may exercise any of their respective rights under applicable law and pursue collection of all amounts owed pursuant to state law outside of the Bankruptcy Court, subject in all respects to the Debtor's and Reorganized Debtor's applicable rights and defenses. The Debtor/Reorganized Debtor shall be entitled to any notices of default required under applicable nonbankruptcy law and each of the Taxing Authorities, the Debtor and the Reorganized Debtor reserve any and all of their respective rights and defenses in connection therewith.  The Debtor's and Reorganized Debtor's rights and defenses under Texas Law and the Bankruptcy Code with respect to this provision of the Confirmation Order, including their right to dispute or object to the Tax Authorities' Claims and liens, are fully preserved.

RR. **Resolution of Objections of Scott Ellington and Isaac Leventon.**

Pursuant to Bankruptcy Rule 9019(a), the Senior Employees' Settlement is approved in all

respects. The Debtor may, only with the consent of the Committee, elect Option B for a Senior

Employee Claimant by written notice to such Senior Employee Claimant on or before the

occurrence of the Effective Date. If the Debtor does not elect Option B, then Option A will govern

the treatment of the Liquidated Bonus Claims.

a.   Notwithstanding any language in the Plan, the Disclosure Statement, or this Confirmation Order to the contrary, if Option A applies to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee Claimant will receive the treatment described in paragraph 82(e) hereof, and if the Debtor timely elects Option B with respect to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee will receive the treatment described in paragraph 82(f) hereof.

b.   The Senior Employees' Settlement is hereby approved, without prejudice to the respective rights of Mr. Ellington and Mr. Leventon to assert all their remaining Claims against the Debtor's estate, including, but not limited to, their Class 6 PTO Claims, their remaining Class 8 General Unsecured Claims, any indemnification claims, and any Administrative Expense Claims that they may assert and is without prejudice to the rights of any party in interest to object to any such Claims.

c.   Pursuant to Bankruptcy Rule 3018(a), Mr. Ellington and Mr. Leventon were permitted to change their votes on the Plan. Accordingly, Mr. Ellington's votes on his Ballots in Class 7 and Class 8 of the Plan were changed from a rejection of the Plan to acceptance of the Plan, and Mr. Leventon's votes on his Ballots in Class 7 and Class 8 of the Plan were, changed from rejections of the Plan to acceptances of the Plan.

d.   The Senior Employees' Objection is deemed withdrawn.

SS. **No Release of Claims Against Senior Employee Claimants**. For the

avoidance of doubt, the Senior Employees' Settlement, as approved herein, shall not, and shall not

be deemed to, release any Claims or Causes of Action held by the Debtor against either Senior

DOCS_SF:104487.21 36027/002

Employee Claimant nor shall either Senior Employee Claimant be, or be deemed to be, a "Released

Party" under the Plan.

> **TT. Resolution of Objection of Internal Revenue Service.** Notwithstanding

any other provision or term of the Plan or Confirmation Order, the following Default Provision

shall control as to the United States of America, Internal Revenue Service ("<u>IRS</u>") and all of its

claims, including any administrative claim (the "<u>IRS Claim</u>"):

> (a) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of the date of said notice and demand, then the following shall apply to the IRS:

>> (1) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code;

>> (2) The automatic stay of 11 U.S.C. § 362 and any injunction of the Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Bankruptcy Court, and the entire prepetition liability owed to the IRS, together with any unpaid postpetition tax liabilities, may become due and payable immediately; and

>> (3) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

> (b) If the IRS declares the Debtor, the Reorganized Debtor, or any successor-in-interest to be in default of the Debtor's, the Reorganized Debtor's and/ or any successor- in-interest's obligations under the Plan, then entire prepetition liability of an IRS' Allowed Claim, together with any unpaid postpetition tax liabilities shall become due and payable

immediately upon written demand to the Debtor, Reorganized Debtor and/or any successor-in-interest. Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(c) The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default, the IRS shall be entitled to proceed as set out in paragraphs (1), (2), and/or (3) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel. The collection statute expiration date for all unpaid federal tax liabilities shall be extended pursuant to non-bankruptcy law.

(d) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(e) Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States and its agency the Internal Revenue Service.

(f) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

  **UU. IRS Proof of Claim.** Notwithstanding anything in the Plan or in this Confirmation Order, until all required tax returns are filed with and processed by the IRS, the IRS's proof of claim will not be deemed fixed for purposes of Section 502 of the Bankruptcy Code and may be amended in order to reflect the IRS' assessment of the Debtor's unpaid priority and general unsecured taxes, penalties and interest.

**VV.    CLO Holdco, Ltd. Settlement**    Notwithstanding anything contained herein to the contrary, nothing in this Order is or is intended to supersede the rights and obligations of either the Debtor or CLO Holdco contained in that certain *Settlement Agreement between CLO Holdco, Ltd., and Highland Capital Management, L.P., dated January 25,2021* [Docket No. 1838-1] (the "CLOH Settlement Agreement").  In the event of any conflict between the terms of this Order and the terms of the CLOH Settlement Agreement, the terms of the CLOH Settlement Agreement will govern.

**WW.    Retention of Jurisdiction.**  The Bankruptcy Court may properly, and upon the Effective Date shall, to the maximum extent permitted under applicable law, retain jurisdiction over all matters arising out of, and related to, this Chapter 11 Case, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

**XX.    Payment of Statutory Fees; Filing of Quarterly Reports.**  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date.   The Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.  Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C. § 1930.

**YY.    Dissolution of the Committee**.  On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have

any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). Notwithstanding the foregoing, any Committee member or Professional may serve following the Effective Date with respect to the Claimant Trust Oversight Board or Litigation Sub-Trust.  The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan.  Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan, the Claimant Trust Agreement, and/or Litigation Sub-Trust in connection with such representation.

ZZ.    **Miscellaneous.**    After the Effective Date, the Debtor or Reorganized Debtor, as applicable, shall have no obligation to file with the Bankruptcy Court or serve on any parties reports that the Debtor or Reorganized Debtor, as applicable, were obligated to file under the Bankruptcy Code or a court order, including monthly operating reports (even for those periods for which a monthly operating report was not filed before the Effective Date), ordinary course professional reports, reports to any parties otherwise required under the "first" and "second" day orders entered in this Chapter 11 Case (including any cash collateral financing orders entered in this Chapter 11 Case) and monthly or quarterly reports for Professionals; *provided*, *however*, that

the Debtor or Reorganized Debtor, as applicable, will comply with the U.S. Trustee's post confirmation reporting requirements.

### ###END OF ORDER###

**Exhibit A**

**Fifth Amended Plan (as Modified)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND
CAPITAL MANAGEMENT, L.P. (AS MODIFIED)**

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
            ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS ............................................1

    A.    Rules of Interpretation, Computation of Time and Governing Law....................1

    B.    Defined Terms ...........................................................................................2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS................16

    A.    Administrative Expense Claims.......................................................................16

    B.    Professional Fee Claims...................................................................................17

    C.    Priority Tax Claims..........................................................................................17

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS ........................................................................18

    A.    Summary..........................................................................................................18

    B.    Summary of Classification and Treatment of Classified Claims and Equity Interests ..............................................................................................18

    C.    Elimination of Vacant Classes .......................................................................19

    D.    Impaired/Voting Classes .................................................................................19

    E.    Unimpaired/Non-Voting Classes ....................................................................19

    F.    Impaired/Non-Voting Classes.........................................................................19

    G.    Cramdown.......................................................................................................19

    H.    Classification and Treatment of Claims and Equity Interests...........................19

    I.    Special Provision Governing Unimpaired Claims.............................................24

    J.    Subordinated Claims .......................................................................................24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ....................................24

    A.    Summary..........................................................................................................24

    B.    The Claimant Trust .........................................................................................25

        1.    Creation and Governance of the Claimant Trust and Litigation Sub-Trust..............................................................................................25

        2.    Claimant Trust Oversight Committee....................................................26

Appx.000126

**Page**

3.    Purpose of the Claimant Trust. ................................................................27

4.    Purpose of the Litigation Sub-Trust........................................................27

5.    Claimant Trust Agreement and Litigation Sub-Trust Agreement. .........27

6.    Compensation and Duties of Trustees. ...................................................29

7.    Cooperation of Debtor and Reorganized Debtor. ..................................29

8.    United States Federal Income Tax Treatment of the Claimant
Trust. .......................................................................................................29

9.    Tax Reporting. .........................................................................................30

10.   Claimant Trust Assets. ............................................................................30

11.   Claimant Trust Expenses. ........................................................................31

12.   Trust Distributions to Claimant Trust Beneficiaries.............................31

13.   Cash Investments. ....................................................................................31

14.   Dissolution of the Claimant Trust and Litigation Sub-Trust. ................31

C.    The Reorganized Debtor .....................................................................................32

1.    Corporate Existence .................................................................................32

2.    Cancellation of Equity Interests and Release..........................................32

3.    Issuance of New Partnership Interests .....................................................32

4.    Management of the Reorganized Debtor ..................................................33

5.    Vesting of Assets in the Reorganized Debtor ..........................................33

6.    Purpose of the Reorganized Debtor .........................................................33

7.    Distribution of Proceeds from the Reorganized Debtor Assets;
Transfer of Reorganized Debtor Assets ...................................................33

D.    Company Action ..................................................................................................34

E.    Release of Liens, Claims and Equity Interests....................................................35

F.    Cancellation of Notes, Certificates and Instruments...........................................35

Appx.000127

**Page**

G.    Cancellation of Existing Instruments Governing Security Interests .................. 35

H.    Control Provisions ............................................................................. 35

I.     Treatment of Vacant Classes .............................................................. 36

J.     Plan Documents ............................................................................... 36

K.    Highland Capital Management, L.P. Retirement Plan and Trust ...................... 36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
          LEASES ........................................................................................ 37

A.    Assumption, Assignment, or Rejection of Executory Contracts and
       Unexpired Leases ............................................................................. 37

B.    Claims Based on Rejection of Executory Contracts or Unexpired
       Leases ........................................................................................... 38

C.    Cure of Defaults for Assumed or Assigned Executory Contracts and
       Unexpired Leases ............................................................................. 38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ........................................... 39

A.    Dates of Distributions ....................................................................... 39

B.    Distribution Agent ........................................................................... 39

C.    Cash Distributions ........................................................................... 40

D.    Disputed Claims Reserve ................................................................... 40

E.    Distributions from the Disputed Claims Reserve ...................................... 40

F.    Rounding of Payments ...................................................................... 40

G.    *De Minimis* Distribution ................................................................... 41

H.    Distributions on Account of Allowed Claims ........................................... 41

I.     General Distribution Procedures .......................................................... 41

J.     Address for Delivery of Distributions .................................................... 41

K.    Undeliverable Distributions and Unclaimed Property ................................. 41

L.    Withholding Taxes ........................................................................... 42

Appx.000128

**Page**

M.    Setoffs ................................................................................................42

N.    Surrender of Cancelled Instruments or Securities ..............................42

O.    Lost, Stolen, Mutilated or Destroyed Securities ................................43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED AND DISPUTED CLAIMS............................43

A.    Filing of Proofs of Claim ....................................................................43

B.    Disputed Claims..................................................................................43

C.    Procedures Regarding Disputed Claims or Disputed Equity Interests ..............43

D.    Allowance of Claims and Equity Interests..........................................44

    1.    Allowance of Claims..................................................................44

    2.    Estimation ..................................................................................44

    3.    Disallowance of Claims ............................................................44

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ....................................45

A.    Conditions Precedent to the Effective Date ........................................45

B.    Waiver of Conditions..........................................................................46

C.    Dissolution of the Committee ..............................................................46

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS ................47

A.    General................................................................................................47

B.    Discharge of Claims............................................................................47

C.    Exculpation .........................................................................................47

D.    Releases by the Debtor........................................................................48

E.    Preservation of Rights of Action.........................................................49

    1.    Maintenance of Causes of Action ............................................49

    2.    Preservation of All Causes of Action Not Expressly Settled or
Released ....................................................................................49

Appx.000129

**Page**

F.     Injunction ...................................................................................................50

G.     Duration of Injunctions and Stays...........................................................51

H.     Continuance of January 9 Order ..............................................................51

ARTICLE X. BINDING NATURE OF PLAN .................................................................51

ARTICLE XI. RETENTION OF JURISDICTION.............................................................52

ARTICLE XII. MISCELLANEOUS PROVISIONS ..........................................................54

A.     Payment of Statutory Fees and Filing of Reports ...................................54

B.     Modification of Plan ................................................................................54

C.     Revocation of Plan...................................................................................54

D.     Obligations Not Changed.........................................................................55

E.     Entire Agreement .....................................................................................55

F.     Closing of Chapter 11 Case .....................................................................55

G.     Successors and Assigns............................................................................55

H.     Reservation of Rights...............................................................................55

I.     Further Assurances...................................................................................56

J.     Severability ..............................................................................................56

K.     Service of Documents..............................................................................56

L.     Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of
       the Bankruptcy Code................................................................................57

M.     Governing Law ........................................................................................58

N.     Tax Reporting and Compliance ...............................................................58

O.     Exhibits and Schedules ............................................................................58

P.     Controlling Document ..............................................................................58

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "<u>Debtor</u>"), proposes the following chapter 11 plan of reorganization (the "<u>Plan</u>") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor.  Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan.  The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein.  There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents.  All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A.    Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set

forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B.    **Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2.    "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3.    "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4.    "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5.    "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6.    "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy

Appx.000132

Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7.      "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8.      "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9.      "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11.      "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

Appx.000133

15. "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16. "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19. "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims. The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20. "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21. "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22. "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

Appx.000134

24.    "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25.    "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26.    "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC.  For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27.    "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28.    "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement.  The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29.    "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30.    "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests

unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized

Appx.000137

Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51. "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52. "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53. "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54. "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55. "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56. "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57. "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58. "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59. "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60. "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61. "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

62. "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries, the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63. "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64. "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65. "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66. "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67. "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68. "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

69.     "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70.     "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an: (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71.     "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72.     "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73.     "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74.     "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75.     "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76.     "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77.     "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78.     "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79.     "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80.     "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

81.     "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement.  As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82.     "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83.     "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84.     "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85.     "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86.     "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87.     "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88.     "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

89.     "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90.     "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91.     "Petition *Date*" means October 16, 2019.

92.     "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93. "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94. "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95. "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96. "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97. "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98. "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99. "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100. "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

101. "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

102. "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103. "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105. "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106. "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107. "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108. "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder

of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109. "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110. "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111. "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112. "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113. "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114. "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115. "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust. For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116. "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

117.    "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118.    "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119.    "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120.    "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121.    "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122.    "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123.    "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125.    "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126.    "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127.    "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128.    "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129.    "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

Appx.000145

130. "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131. "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132. "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133. "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134. "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135. "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136. "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137. "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

### A.     Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on

or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

## B.    Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date.  Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

## C.    Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed

Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND EQUITY INTERESTS**

**A.    Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

**B.    Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

**C.**     **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**D.**     **Impaired/Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

**E.**     **Unimpaired/Non-Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

**F.**     **Impaired/Non-Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

**G.**     **Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**H.**     **Classification and Treatment of Claims and Equity Interests**

    1.     *Class 1 – Jefferies Secured Claim*

-     *Classification*:  Class 1 consists of the Jefferies Secured Claim.

-     *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until

full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*: Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2.    <u>*Class 2 – Frontier Secured Claim*</u>

- *Classification*: Class 2 consists of the Frontier Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim: (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note. The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*: Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3.    <u>*Class 3 – Other Secured Claims*</u>

- *Classification*: Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*: Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4.    *Class 4 – Priority Non-Tax Claims*

- *Classification*: Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*: Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.    *Class 5 – Retained Employee Claims*

- *Classification*: Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*: Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.    *Class 6 – PTO Claims*

- *Classification*: Class 6 consists of the PTO Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*: Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 6

Appx.000151

Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7.    *Class 7 – Convenience Claims*

- *Classification*:  Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8.    *Class 8 – General Unsecured Claims*

- *Classification*:  Class 8 consists of the General Unsecured Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

Appx.000152

9.    *Class 9 – Subordinated Claims*

- *Classification*:  Class 9 consists of the Subordinated Claims.

  *Treatment*:  On the Effective Date, Holders of Subordinated Claims  shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10.    *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*:  Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11.    *Class 11 – Class A Limited Partnership Interests*

- *Classification*:  Class 11 consists of the Class A Limited Partnership Interests.

Appx.000153

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

## I.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

## J.    Subordinated Claims

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

## A.    Summary

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust.  The Claimant Trust, as limited

Appx.000154

partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC.  The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan.  The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities.  The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement.  Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.**     **The Claimant Trust**[2]

1.     _Creation and Governance of the Claimant Trust and Litigation Sub-Trust._

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries.  Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

Appx.000155

such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2. *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

Appx.000156

The Claimant Trust Oversight Committee will initially consist of five members.  Four of the five members will be representatives of the members of the Committee:  (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery.  The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor.  The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement.  The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement.  Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.    *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.    *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims.  Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5.    *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

Appx.000157

      (i)     the payment of the Claimant Trust Expenses;

      (ii)     the payment of other reasonable expenses of the Claimant Trust;

      (iii)    the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

      (iv)    the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

      (v)     the orderly monetization of the Claimant Trust Assets;

      (vi)    litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

      (vii)    the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

      (viii)   the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

      (ix)    the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. The Litigation Sub-Trust Agreement generally will provide for, among other things:

      (i)     the payment of other reasonable expenses of the Litigation Sub-Trust;

Appx.000158

(ii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)     the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.     _Compensation and Duties of Trustees._

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.     _Cooperation of Debtor and Reorganized Debtor._

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.     _United States Federal Income Tax Treatment of the Claimant Trust._

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer

Appx.000159

of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trust makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9. *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10. *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

Appx.000160

11. _Claimant Trust Expenses._

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12. _Trust Distributions to Claimant Trust Beneficiaries._

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, _provided_ that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13. _Cash Investments._

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; _provided, however,_ that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14. _Dissolution of the Claimant Trust and Litigation Sub-Trust._

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; _provided, however,_ that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and

no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C. **The Reorganized Debtor**

### 1. *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

### 2. *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

### 3. *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date. Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order. Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

Appx.000162

4.    *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC.  The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee.  The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor.  Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes.  Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5.    *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.    *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.    *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement.  As set forth in the Reorganized Limited Partnership Agreement,

the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

## D. **Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

Appx.000164

E. **Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

F. **Cancellation of Notes, Certificates and Instruments**

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

G. **Cancellation of Existing Instruments Governing Security Interests**

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

H. **Control Provisions**

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

Appx.000165

## I.    Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

## J.    Plan Documents

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

## K.    Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**     **Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4),

as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.**    **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Confirmation Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.**    **Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

Appx.000168

## ARTICLE VI.
## <u>PROVISIONS GOVERNING DISTRIBUTIONS</u>

### A.    <u>Dates of Distributions</u>

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan.  Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

### B.    <u>Distribution Agent</u>

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

Appx.000169

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

### C. __Cash Distributions__

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

### D. __Disputed Claims Reserve__

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

### E. __Distributions from the Disputed Claims Reserve__

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount. To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date. For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

### F. __Rounding of Payments__

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

### G. *De Minimis* Distribution

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

### H. Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

### I. General Distribution Procedures

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

### J. Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

### K. Undeliverable Distributions and Unclaimed Property

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Appx.000171

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

## L. **Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

## M. **Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

## N. **Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

**O.**     **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent: (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

**A.**     **Filing of Proofs of Claim**

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

**B.**     **Disputed Claims**

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

**C.**     **Procedures Regarding Disputed Claims or Disputed Equity Interests**

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

### D.     <u>Allowance of Claims and Equity Interests</u>

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

    1.     *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

    2.     *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

    3.     *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE,**

**ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

**ARTICLE VIII.**
**EFFECTIVENESS OF THIS PLAN**

**A.    Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtor and the Committee.  The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust

45

Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

## B.    <u>Waiver of Conditions</u>

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

## C.    <u>Dissolution of the Committee</u>

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on

the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

### A. General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

### B. Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

### C. Exculpation

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided*, *however,* the foregoing

Appx.000177

will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

**D.**     **Releases by the Debtor**

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

**E.**    **Preservation of Rights of Action**

1.    *Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

2.    *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including,

without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order). In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**F.   Injunction**

   **Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

   **Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

   **The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

   **Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court**

**(i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.**

**G.    Duration of Injunctions and Stays**

**ARTICLE II. Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.**

**H.    Continuance of January 9 Order**

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.

**ARTICLE X.
BINDING NATURE OF PLAN**

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan. All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

## ARTICLE XI.
## <u>RETENTION OF JURISDICTION</u>

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

Appx.000182

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

Appx.000183

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.  Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date.  All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed.  The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.   The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### B.  Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### C.  Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

Appx.000184

### D.    Obligations Not Changed

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

### E.    Entire Agreement

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### F.    Closing of Chapter 11 Case

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

### G.    Successors and Assigns

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

### H.    Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the

Appx.000185

Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

## I.   **Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order. On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## J.   **Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## K.   **Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

### **If to the Claimant Trust:**

Highland Claimant Trust
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700

Appx.000186

Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
          Ira D. Kharasch, Esq.
          Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
          Ira D. Kharasch, Esq.
          Gregory V. Demo, Esq.

**L.**      **Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code**

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to

Appx.000187

evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

## M.   Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

## N.   Tax Reporting and Compliance

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

## O.   Exhibits and Schedules

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

## P.   Controlling Document

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.  The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

Appx.000188

Dated: January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

## Exhibit B

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

1. Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

2. Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

3. Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

4. Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

5. Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

6. Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

7. Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

8. Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

9. Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

10. Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

11. Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

12. Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

13. Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

14. Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

15. Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

16. Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

17. Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

18. Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

19. Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

20. Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

21. Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

22. Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

23. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

24. Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

25. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

26. Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

27. Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

28. Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

29. Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

30. Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

31. Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

32. Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

33. Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

34. Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

35. Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

36. Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

37. Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

38. Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

39. Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

40. Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

41. Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

42. Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

43. Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

44. Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

45. Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

46. A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

47. A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

48. Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

49. Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

50. Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

51. Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

52. Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

53. Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

54. Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

55. Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

56. Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

57. Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

58. Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

59. Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

60. Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

DOCS_NY:42355.1 36027/002

Appx.000194

# EXHIBIT 5

Appx.000195

Docket #1808  Date Filed: 01/22/2021

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054210122000000000013

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS ............................................. 1

    A.    Rules of Interpretation, Computation of Time and Governing Law .................... 1

    B.    Defined Terms ............................................................................. 2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ................ 16

    A.    Administrative Expense Claims ..................................................... 16

    B.    Professional Fee Claims ............................................................. 17

    C.    Priority Tax Claims ................................................................... 18

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS ........................................................ 18

    A.    Summary ................................................................................. 18

    B.    Summary of Classification and Treatment of Classified Claims and Equity Interests ...................................................................... 19

    C.    Elimination of Vacant Classes ...................................................... 19

    D.    Impaired/Voting Classes .............................................................. 19

    E.    Unimpaired/Non-Voting Classes ................................................... 19

    F.    Impaired/Non-Voting Classes ...................................................... 19

    G.    Cramdown ............................................................................... 19

    H.    Classification and Treatment of Claims and Equity Interests ............................. 20

    I.    Special Provision Governing Unimpaired Claims ............................................. 24

    J.    Subordinated Claims ................................................................... 25

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN .................................... 25

    A.    Summary ................................................................................. 25

    B.    The Claimant Trust ................................................................... 26

    *1.*    *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.* ........................................................................... 26

    *2.*    *Claimant Trust Oversight Committee* ............................................. 27

Appx.000197

**Page**

3. *Purpose of the Claimant Trust.* .................................................................27

4. *Purpose of the Litigation Sub-Trust.* ...........................................................28

5. *Claimant Trust Agreement and Litigation Sub-Trust Agreement.* .....................28

6. *Compensation and Duties of Trustees.* .........................................................29

7. *Cooperation of Debtor and Reorganized Debtor.* ...........................................30

8. *United States Federal Income Tax Treatment of the Claimant Trust.* ................30

9. *Tax Reporting.* ........................................................................................30

10. *Claimant Trust Assets.* ............................................................................31

11. *Claimant Trust Expenses.* ........................................................................31

12. *Trust Distributions to Claimant Trust Beneficiaries.* ....................................31

13. *Cash Investments.* ..................................................................................31

14. *Dissolution of the Claimant Trust and Litigation Sub-Trust.* ............................32

C. The Reorganized Debtor ...........................................................................32

1. *Corporate Existence* ...............................................................................32

2. *Cancellation of Equity Interests and Release* .............................................33

3. *Issuance of New Partnership Interests* ......................................................33

4. *Management of the Reorganized Debtor* ....................................................33

5. *Vesting of Assets in the Reorganized Debtor* ..............................................34

6. *Purpose of the Reorganized Debtor* ..........................................................34

7. *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets* ..........................................................................34

D. Company Action .......................................................................................34

E. Release of Liens, Claims and Equity Interests ...............................................35

F. Cancellation of Notes, Certificates and Instruments ........................................36

G. Cancellation of Existing Instruments Governing Security Interests ....................36

- iii -

**Page**

H. Control Provisions ............................................................................... 36

I. Treatment of Vacant Classes ............................................................... 36

J. Plan Documents ................................................................................... 36

K. Highland Capital Management, L.P. Retirement Plan and Trust ........ 37

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ..................................................................................... 37

A. Assumption, Assignment, or Rejection of Executory Contracts and
Unexpired Leases .......................................................................... 37

B. Claims Based on Rejection of Executory Contracts or Unexpired
Leases ............................................................................................ 38

C. Cure of Defaults for Assumed or Assigned Executory Contracts and
Unexpired Leases .......................................................................... 39

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................ 39

A. Dates of Distributions ......................................................................... 39

B. Distribution Agent ............................................................................... 40

C. Cash Distributions ............................................................................... 41

D. Disputed Claims Reserve ..................................................................... 41

E. Distributions from the Disputed Claims Reserve ............................... 41

F. Rounding of Payments ......................................................................... 41

G. *De Minimis* Distribution ...................................................................... 41

H. Distributions on Account of Allowed Claims ..................................... 42

I. General Distribution Procedures ......................................................... 42

J. Address for Delivery of Distributions .................................................. 42

K. Undeliverable Distributions and Unclaimed Property ........................ 42

L. Withholding Taxes ............................................................................... 43

M. Setoffs ................................................................................................. 43

Appx.000199

**Page**

N.      Surrender of Cancelled Instruments or Securities .............................................43

O.      Lost, Stolen, Mutilated or Destroyed Securities ...............................................43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
          UNLIQUIDATED AND DISPUTED CLAIMS............................................44

A.      Filing of Proofs of Claim .................................................................................44

B.      Disputed Claims...............................................................................................44

C.      Procedures Regarding Disputed Claims or Disputed Equity Interests ..............44

D.      Allowance of Claims and Equity Interests........................................................44

1.      *Allowance of Claims* .......................................................................................45

2.      *Estimation* .....................................................................................................45

3.      *Disallowance of Claims* ..................................................................................45

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ...................................................46

A.      Conditions Precedent to the Effective Date ......................................................46

B.      Waiver of Conditions .......................................................................................47

C.      Effect of Non-Occurrence of Conditions to Effectiveness**Error! Bookmark not defined.**

D.      Dissolution of the Committee ...........................................................................47

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS .................48

A.      General.............................................................................................................48

B.      Discharge of Claims.........................................................................................48

C.      Exculpation .....................................................................................................48

D.      Releases by the Debtor.....................................................................................49

E.      Preservation of Rights of Action......................................................................50

1.      *Maintenance of Causes of Action* ....................................................................50

2.      *Preservation of All Causes of Action Not Expressly Settled or Released*...........50

F.      Injunction ........................................................................................................51

**Page**

G.    Term of Injunctions or Stays ................................................................ 52

H.    Continuance of January 9 Order ........................................................ 52

ARTICLE X. BINDING NATURE OF PLAN ............................................................ 52

ARTICLE XI. RETENTION OF JURISDICTION ...................................................... 53

ARTICLE XII. MISCELLANEOUS PROVISIONS .................................................... 55

A.    Payment of Statutory Fees and Filing of Reports ............................... 55

B.    Modification of Plan ........................................................................... 55

C.    Revocation of Plan .............................................................................. 55

D.    Obligations Not Changed ..................................................................... 56

E.    Entire Agreement ................................................................................. 56

F.    Closing of Chapter 11 Case ................................................................. 56

G.    Successors and Assigns ........................................................................ 56

H.    Reservation of Rights ........................................................................... 56

I.    Further Assurances ............................................................................... 57

J.    Severability .......................................................................................... 57

K.    Service of Documents .......................................................................... 57

L.    Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code ........................................................................ 58

M.    Governing Law .................................................................................... 59

N.    Tax Reporting and Compliance ........................................................... 59

O.    Exhibits and Schedules ........................................................................ 59

P.    Controlling Document .......................................................................... 59

---

### DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

---

      HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "Debtor"), proposes the following chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

      Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein. There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents. All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

      If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

### ARTICLE I.
### RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

#### A.    Rules of Interpretation, Computation of Time and Governing Law

      For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns;

(h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B.   **Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.  "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2.  "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3.  "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4.  "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5.  "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6.  "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the

Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7. "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8. "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9. "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10. "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11. "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

Appx.000204

15. "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16. "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19. "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims. The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20. "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21. "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22. "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

24. "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25. "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26. "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC. For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27. "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28. "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement. The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29. "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30. "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold

Claimant Trust Interests unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election.  For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

Appx.000207

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or

Reorganized Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51. "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52. "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53. "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54. "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55. "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56. "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57. "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58. "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59. "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60. "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61. "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

8

62. "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63. "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64. "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65. "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66. "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67. "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68. "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

Appx.000210

69. "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70. "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an: (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71. "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72. "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73. "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74. "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75. "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76. "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77. "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78. "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79. "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80. "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

10

81. "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement. As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82. "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83. "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84. "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85. "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86. "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87. "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88. "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

89. "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90. "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91. "*Petition Date*" means October 16, 2019.

92. "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93. "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94. "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95. "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96. "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97. "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98. "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99. "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100. "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

101. "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

102. "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103. "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105. "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106. "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107. "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108. "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any

13

damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109. "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110. "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111. "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112. "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113. "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114. "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115. "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust. For the avoidance of doubt, "Reorganized

Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116. "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

117. "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118. "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119. "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121. "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122. "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123. "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124. "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125. "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126. "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127. "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128. "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129. "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or order entered by the Bankruptcy Court.

130. "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131. "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132. "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133. "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134. "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135. "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136. "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137. "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

A. **Administrative Expense Claims**

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized

Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

## B.    Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline. Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement. The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee

Appx.000218

Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

**C.     Priority Tax Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND EQUITY INTERESTS**

**A.     Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

**B.**     **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

**C.**     **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**D.**     **Impaired/Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

**E.**     **Unimpaired/Non-Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

**F.**     **Impaired/Non-Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

**G.**     **Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the

Appx.000220

Bankruptcy Code. If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### H. **Classification and Treatment of Claims and Equity Interests**

 *1.*   *Class 1 – Jefferies Secured Claim*

- *Classification*: Class 1 consists of the Jefferies Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired. Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*: Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

 *2.*   *Class 2 – Frontier Secured Claim*

- *Classification*: Class 2 consists of the Frontier Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim: (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note. The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*: Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

Appx.000221

3. _Class 3 – Other Secured Claims_

- _Classification_:  Class 3 consists of the Other Secured Claims.

- _Allowance and Treatment_:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- _Impairment and Voting_:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4. _Class 4 – Priority Non-Tax Claims_

- _Classification_:  Class 4 consists of the Priority Non-Tax Claims.

- _Allowance and Treatment_:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- _Impairment and Voting_:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5. _Class 5 – Retained Employee Claims_

- _Classification_:  Class 5 consists of the Retained Employee Claims.

- _Allowance and Treatment_:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.    *Class 6 – PTO Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7.    *Class 7 – Convenience Claims*

- *Classification*:  Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8.    *Class 8 – General Unsecured Claims*

- *Classification*:  Class 8 consists of the General Unsecured Claims.

Appx.000223

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

   Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9.   *Class 9 – Subordinated Claims*

- *Classification*:  Class 9 consists of the Subordinated Claims.

   *Treatment*:  On the Effective Date, Holders of Subordinated Claims  shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

   Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10.   *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*:  Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11.  <u>*Class 11 – Class A Limited Partnership Interests*</u>

- *Classification*:  Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

I.  **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

24

**J.**     **Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Under section 510 of the Bankruptcy Code, upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

**A.**     **Summary**

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be

Appx.000226

cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

## B.   The Claimant Trust[2]

### 1.       _Creation and Governance of the Claimant Trust and Litigation Sub-Trust._

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; _provided_ that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2.        *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.        *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and

27

monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.        *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5.        *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

(i)        the payment of the Claimant Trust Expenses;

(ii)        the payment of other reasonable expenses of the Claimant Trust;

(iii)        the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)        the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)        the orderly monetization of the Claimant Trust Assets;

(vi)        litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)        the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)        the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)        the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

28

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)     the payment of other reasonable expenses of the Litigation Sub-Trust;

(ii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)     the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.          *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust

Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

### 7. *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

### 8. *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

### 9. *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10. *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

11. *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12. *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13. *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are

31

investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14. *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C. **The Reorganized Debtor**

1. *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

2.        *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

3.        *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date. Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order. Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

4.        *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5. *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6. *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7. *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement, the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D. Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in

Appx.000235

the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

## E.   <u>Release of Liens, Claims and Equity Interests</u>

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of

doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

**F.** **Cancellation of Notes, Certificates and Instruments**

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

**G.** **Cancellation of Existing Instruments Governing Security Interests**

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

**H.** **Control Provisions**

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

**I.** **Treatment of Vacant Classes**

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

**J.** **Plan Documents**

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

Appx.000237

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

**K.** **Highland Capital Management, L.P. Retirement Plan and Trust**

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.** **Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a

contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

## B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Effective Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed

Appx.000239

and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

## C. Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A. Dates of Distributions

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity

Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein. If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan. Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order. All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests. The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

## B.    Distribution Agent

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter. The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the

40

Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

## C.     Cash Distributions

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

## D.     Disputed Claims Reserve

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

## E.     Distributions from the Disputed Claims Reserve

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount. To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date. For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

## F.     Rounding of Payments

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

## G.     *De Minimis* Distribution

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall

revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

## H. Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

## I. General Distribution Procedures

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

## J. Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

## K. Undeliverable Distributions and Unclaimed Property

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

42

### L.     Withholding Taxes

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

### M.     Setoffs

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

### N.     Surrender of Cancelled Instruments or Securities

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

### O.     Lost, Stolen, Mutilated or Destroyed Securities

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent: (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any

43

damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest.  Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

**A.      Filing of Proofs of Claim**

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

**B.      Disputed Claims**

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

**C.      Procedures Regarding Disputed Claims or Disputed Equity Interests**

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

**D.      Allowance of Claims and Equity Interests**

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

Appx.000245

    *1.    <u>Allowance of Claims</u>*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

    *2.    <u>Estimation</u>*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

    *3.    <u>Disallowance of Claims</u>*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH**

LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

## ARTICLE VIII.
## EFFECTIVENESS OF THIS PLAN

### A.    Conditions Precedent to the Effective Date

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtor and the Committee. The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding

Appx.000247

upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

## B.   **Waiver of Conditions**

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee) and any applicable parties in Section VII.A of this Plan, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

## C.   **Dissolution of the Committee**

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's

Appx.000248

Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

### A. General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

### B. Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

### C. Exculpation

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided*, *however,* the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross

Appx.000249

negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

## D.    **Releases by the Debtor**

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

## E.    **Preservation of Rights of Action**

### *1.    Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

### *2.    Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final

50

Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

## F.    <u>Injunction</u>

**Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

**Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or**

Appx.000252

arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

**G.**     **Duration of Injunctions and Stays**

**ARTICLE II.** Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.

**H.**     **Continuance of January 9 Order**

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.

## ARTICLE X.
## BINDING NATURE OF PLAN

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan. All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state,

Appx.000253

Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

**ARTICLE XI.**
**<u>RETENTION OF JURISDICTION</u>**

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or

53

expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such

54

orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.  Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date.  All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed.  The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.  The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### B.  Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### C.  Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement

executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

### D. Obligations Not Changed

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

### E. Entire Agreement

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### F. Closing of Chapter 11 Case

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

### G. Successors and Assigns

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

### H. Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this

Appx.000257

Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

## I.    **Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## J.    **Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## K.    **Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

**If to the Claimant Trust:**

Highland Claimant Trust
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Attn: Jeffrey N. Pomerantz, Esq.
       Ira D. Kharasch, Esq.
       Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn: Jeffrey N. Pomerantz, Esq.
       Ira D. Kharasch, Esq.
       Gregory V. Demo, Esq.

**L.**     **Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code**

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego

Appx.000259

the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

## M. <u>Governing Law</u>

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

## N. <u>Tax Reporting and Compliance</u>

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

## O. <u>Exhibits and Schedules</u>

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

## P. <u>Controlling Document</u>

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

Dated:  January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
           ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

# EXHIBIT 6

Appx.000262

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (admitted *pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (admitted *pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
|  | ) |
| Debtor. | ) |
|  | ) |

**NOTICE OF OCCURRENCE OF EFFECTIVE DATE OF**
**CONFIRMED FIFTH AMENDED PLAN OF REORGANIZATION**
**OF HIGHLAND CAPITAL MANAGEMENT, L.P.**

        **PLEASE TAKE NOTICE** that on February 22, 2021, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1943] (the "Confirmation Order") confirming the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (as

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.


1934054210811000000000001

amended, supplemented, or modified, the "Plan"). Unless otherwise defined in this notice, capitalized terms used in this notice shall have the meanings ascribed to them in the Plan and the Confirmation Order, as applicable.

PLEASE TAKE FURTHER NOTICE that the Effective Date of the Plan occurred on August 11, 2021.

PLEASE TAKE FURTHER NOTICE that, except with respect to Administrative Expense Claims that are Professional Fee Claims or as otherwise set forth in the Plan, requests for payment of an Administrative Expense Claim must be Filed with the Bankruptcy Court **no later than forty-five (45) days after the Effective Date** (the "Administrative Expense Claims Bar Date"). **HOLDERS OF ADMINISTRATIVE EXPENSE CLAIMS THAT ARE REQUIRED TO FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE EXPENSE CLAIMS BY THE ADMINISTRATIVE EXPENSE CLAIMS BAR DATE THAT DO NOT FILE AND SERVE SUCH A REQUEST BY THE ADMINISTRATIVE EXPENSE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE EXPENSE CLAIMS AGAINST THE DEBTOR OR THE REORGANIZED DEBTOR.**

PLEASE TAKE FURTHER NOTICE that, unless otherwise ordered by the Bankruptcy Court, all final requests for payment of Professional Fee Claims must be Filed **no later than sixty (60) days after the Effective Date**.

PLEASE TAKE FURTHER NOTICE that the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtor or the Reorganized Debtor, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan and Confirmation Order, including, without limitation: the injunction with respect to the commencement of claims and causes of action against Protected Parties set forth in Section IX.F of the Plan and Sections AA and BB of the Confirmation Order, the duration of injunction and stays set forth in Section IX.G of the Plan and Section AA of the Confirmation Order, and the continuance of the January 9 Order and July 16 Order set forth in Section IX.H of the Plan and Section CC of the Confirmation Order.

PLEASE TAKE FURTHER NOTICE that on the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be deemed cancelled, and all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, such Class A Limited Partnership Interests and Class B/C Limited Partnership Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

PLEASE TAKE FURTHER NOTICE that the Confirmation Order and the Plan

are available for inspection.  If you would like to obtain copies you may: (a) access the Debtor's restructuring website at http://www.kccllc.net/hcmlp; (b) call toll free: (877) 573-3984 or international: (310) 751-1829; or (c) email HighlandInfo@kccllc.com and reference "Highland" in the subject line.  You may also obtain copies of any pleadings filed in this case for a fee via PACER at: pacer.uscourts.gov.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

**Appx.000265**

Dated: August 11, 2021.                    **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor*

# EXHIBIT 7

Appx.000267

Case 19-34054-sgj11 Doc 1955 Filed 02/28/21    Entered 02/28/21 09:49:28    Page 1 of 34
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 274 of 783   PageID 6695
Docket #1955  Date Filed 02/28/2021

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

Counsel for Highland Capital Management Fund
Advisors, L.P. and NexPoint Advisors, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

## EMERGENCY MOTION OF THE ADVISORS FOR STAY PENDING APPEAL OF THE CONFIRMATION ORDER, AND BRIEF IN SUPPORT THEREOF

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COME NOW Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. (the "Movants"), creditors and parties-in-interest in the above styled and numbered bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"), and file this their *Emergency Motion for Stay Pending Appeal of the Confirmatio Order, and Brief In Support Thereof* (the "Motion"), respectfully stating as follows:

### I.    SUMMARY

1.    The Movants respectfully request a stay of the Confirmation Order pending appeal in order to protect their appellate rights and ensure that, if they are successful on their

1934054210228000000000001

appeal of the Confirmation Order, their rights will not be mooted by that time. Not only is there the threat of equitable mootness, but there is also a more immediate threat that, if the Movants cannot exercise their legitimate rights and fulfil their fiduciary obligations to the funds due to the Plan's gatekeeper injunction, those rights will effectively be vitiated by the time of any final resolution of the appeal. A stay pending appeal would not harm the Debtor or the creditors because the Plan does not give the Debtor any tools or ability to manage its assets any more or better than it has at present; the Debtor will continue doing what it is doing today, albeit through a different corporate form, but will not receive any new money, exit financing, or other assets under the Plan. Thus, while the absence of a stay pending appeal may well irreparably harm the legitimate interests of the Movants, no legitimate interest of the Debtor will be implicated or harmed.

2.    The Movants submit that they have a likelihood of success on the merits of their appeal. The issues being appealed with respect to: (i) the Absolute Priority Rule; (ii) satisfaction of section 1129(a)(2) of the Bankruptcy Code; and (iii) the confirmed plan's exculpation and injunction provisions are all legal issues reviewed *de novo*. While the Court has overruled the Movants' objections to the Plan on these bases, an objective analysis of these issues demonstrates that they are subject to material dispute and that the Movants have a reasonable likelihood of success on the merits. The public interest supports a stay because the Advisors, those whose money the Debtor manages, and the public at large all have a strong interest in ensuring that the Debtor complies with its contractual, fiduciary, and statutory obligations to its investors. And, because the Plan does not afford the Debtor any tools to manage its business and monetize its assets, any bond for the stay pending appeal should not be punitive but should instead compensate for the time value of money at the federal postjudgment interest rate.

## II.    <u>BACKGROUND</u>

3.    On February 22, 2021, the Court entered its *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [docket no. 1943] (the "<u>Confirmation Order</u>").

4.    By the Confirmation Order, and over the Movants' objections, the Court confirmed the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [docket no. 1808], as further modified (the "<u>Plan</u>").

5.    The Movants, although controlled by James Dondero, advise and manage various funds and investment vehicles including, of relevance to this Bankruptcy Case, various publicly traded retail funds.  The Movants are registered as investment advisors under the Investment Advisors Act of 1940.  The Movants have fiduciary duties to the funds and other investment vehicles they advise and manage.

6.    Three of these retail funds managed by the Advisors are Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc.  In turn, these funds have invested approximately $140 million in various collateralized loan obligations ("<u>CLOs</u>") managed by the Debtor pursuant to portfolio management agreements (the "<u>Portfolio Management Agreements</u>").  Under most of the Portfolio Management Agreements, defined "cause" is required to remove the Debtor as manager of the CLOs, but in a handful such removal is possible without cause.

7.    Under at least three of the Portfolio Management Agreements, these funds have the right to remove the Debtor as the manager of the CLOs, because these funds hold the requisite percentage of shares under the agreements to remove the CLO manager.  There are various other CLOs where the funds do not hold the requisite percentage of shares to remove the Debtor as manager unilaterally, but are able to vote their shares to remove the Debtor as

manager if other preference shareholders join in such removal and, collectively, the contractual threshold of voting preference shares for removal is met.

8.      As the Advisors have informed the Court (and as the funds have also informed the Court), they do not believe that the Debtor is properly managing more than $1 billion invested in the CLOs because the Debtor, in contravention of the Advisors' and funds' stated objectives otherwise, has been liquidating the CLOs even though they do not need liquidity, and will liquidate the CLOs in approximately 18 to 24 months. The Advisors recognize that the Court did not agree with these concerns. Nevertheless, the Advisors submit that these are legitimate concerns motivated by business interests and not by any desire to harm the Debtor.

9.      The Plan contains various exculpation, release, and injunction provisions that are of particular concern to the Advisors. Article IX of the Plan contains the following exculpation provision (the "Exculpation Provision"):

## C.      **Exculpation**

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); provided, however, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other

releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

Plan at 54-55.  "Exculpated Parties," in turn, means, collectively:

> (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

Plan at 15.

10.    Article IX of the Plan also contains an injunction provision (the "Injunction"),

which provides, in pertinent part, as follows:

**F.    Injunction**

> Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.
>
> . . . .
>
> Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct,

fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; provided, however, the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

Plan at 57-58. "Enjoined Parties," in turn, is defined to mean:

(i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

Plan at 14. "Protected Parties" means, collectively:

(i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

Plan at 19.

11.     The Advisors are subject to the Injunction.   The Injunction prohibits the Advisors from taking any action to "interfere with the implementation or consummation of the Plan."   As the evidence at the confirmation hearing made clear, the Debtor considers this injunction to prohibit the Advisors from advising the funds or others to cause the removal of the Debtor as the manager of the CLOs.  As also made clear at the confirmation hearing, the Injunction applies to the Debtor's postconfirmation operations, including its management of the CLOs.  Thus, the Plan prohibits the Advisors from fully exercising their fiduciary duties to the funds.

## III.     ARGUMENTS AND AUTHORITIES

### A.    STANDARD FOR A STAY PENDING APPEAL

12.     Bankruptcy Rule 8007 allows a bankruptcy court, in the first instance, to stay a judgment in order to maintain the status quo pending appeal.    FED. R. BANKR. P. 8007(a)(1)(A).  In determining whether to grant a discretionary stay pending appeal under Bankruptcy Rule 8007, courts consider the following criteria:

(1) the likelihood that the movant will prevail on the merits of the appeal;

(2) whether the movant will suffer irreparable injury if the stay is denied;

(3) whether other parties would suffer substantial harmed if the stay is granted; and

(4) whether the public interest will be served by granting the stay.

*In re First S. Sav. Ass'n*, 820 F.2d 700, 709 (5th Cir. 1987); *In re Texas Equip. Co.*, 283 B.R. 222, 226-27 (Bankr. N.D. Tex. 2002).  The first two elements are the most critical.  *Saldana v. Saldana*, 2015 WL 502145, at *2 (N.D. Tex. Aug. 25, 2015).

13.     The fundamental purpose of a stay pending appeal, especially with respect to an order of an Article I court, is aptly summarized as follows:

> The application for a stay of an order confirming a chapter 11 reorganization plan in a highly litigated and complex bankruptcy proceeding presents a classic clash of competing interests, all of which have merit. Without a stay, it is extremely unlikely that Appellants will ever be able to have meaningful appellate review of the rulings of the Bankruptcy Court, a non-Article III court, and in any event, a lower court. The ability to review decisions of the lower courts is the guarantee of accountability in our judicial system. In other words, no single judge or court can violate the Constitution and laws of the United States, or the rules that govern court proceedings, with impunity, because nearly all decisions are subject to appellate review. At the end of the appellate process, all parties and the public accept the decision of the courts because we, as a nation, are governed by the rule of law. Thus, the ability to appeal a lower court ruling is a substantial and important right.

*In re Adelphia Commc'ns. Corp.*, 361 B.R. 337, 342 (S.D.N.Y. 2007).

## B.   THERE IS A LIKELIHOOD OF SUCCESS ON THE MERITS

### i.   Legal Standard.

14.   With respect to the first factor, the likelihood of success on the merits of the appeal, this Court has summarized as follows:

> With respect to the first element, the Fifth Circuit has explained that the movant need not always show a 'probability' of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay. When the issue appealed is mostly a factual question over which the bankruptcy court has broad discretion, such discretion is unlikely to be overturned on appeal. Thus, with respect to questions of fact, the movant usually fails to satisfy the first element. With respect to questions of law, however, especially questions involving the application of law, or when the law has not been definitively addressed by a higher court, the movant more easily satisfies the first element.

*In re Tex. Equip. Co.*, 283 B.R. at 227 (internal citations and quotations omitted); *accord In re First S. Sav. Assoc.*, 820 F.2d at 704 ("the movant need only present a substantial case on the merits when a serious legal question is involved").

15.   When considering the confirmation of a chapter 11 plan on appeal, the Court's findings of fact are reviewed for clear error, while its conclusions of law are reviewed *de novo.  See In re Tex. Grand Prairie Hotel Realty LLC*, 710 F.3d 324, 326 n. 1 (5th Cir. 2013).

Here, the Movants challenge the Court's ruling on issues of law: the Absolute Priority Rule, section 1129(a)(2) of the Bankruptcy Code, and the Plan's exculpation and injunction provisions. As these are issues of law, the standard of review will be *de novo*, and as such, "the movant more easily satisfies the first element." *In re Tex. Equip. Co.*, 283 B.R. at 227.

**ii.    Absolute Priority Rule.**

16.    Class 8, a class of unsecured creditors, rejected the plan.[1] That means that the Plan could have only been confirmed under the cramdown provisions of section 1129(b) of the Bankruptcy Code. *See* 11 U.S.C. §§ 1129(b)(1); 1129(a)(8). This means that, in order to be confirmed, the Plan must "not discriminate unfairly" and that it must be "fair and equitable" with respect to Class 8. Because Class 8 consists of unsecured creditors, in order to be "fair and equitable":

> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B).

17.    The Plan estimates a recovery to Class 8 creditors of 71% over time. *See* Confirmation Order at p. 41. While the Debtor testified that there may be a higher return based on causes of action, the Debtor did not value those causes of action or offer any evidence that Class 8 would be paid in full. As such, subsection (i) above does not apply because Class 8 will not be paid in full. That means that the only way the Plan could be confirmed is under subsection (ii), also known as the Absolutely Priority Rule. This Rule is

---

[1]    The Movants do not hold Class 8 claims. Nevertheless, as the Plan alters their legal rights, they have standing to object to any portion of the Plan that may prevent the Plan from being confirmed.

simple: if the Class rejects the Plan and is not paid in full under the Plan, then the holder of any junior interest; *i.e.* equity interest, cannot "receive or retain . . . any property" on account of its junior interest.

18.     Here, the Plan violates the Absolute Priority Rule as a matter of law, and the Movants respectfully submit that Court erred as a matter of law in concluding otherwise. This is because the Plan gives the holders of limited partnership interests in the Debtor contingent interests in the Claimant Trust. *See* Plan at p. 45. There can be no question that the contingent trust interests the Plan gives to holders of equity interests is "property" within the meaning of the Absolute Priority Rule. The Debtor admitted this during closing arguments: "These are contingent interests. They are property. No doubt they are property." Confirmation Hearing Transcript at 242:19-20. The Debtor's Chief Executive Officer and Chief Restructuring Officer, who prepared and authorized the Plan for the Debtor, testified that the contingent interests are, in his belief, inchoate property interests. *See id*. at 177:10-178:21. Moreover, that witness confirmed that these contingent interests may have some value in the future. *See id*. at 178:22-25. As a matter of law, an interest in a trust, even if a contingent one subject to a contingency that may never happen, is "property." *See In re Edmonds*, 273 B.R. 527, 529 (Bankr. E.D. Mich. 2000) ("[t]he question should not be whether a future interest is vested or contingent. Clearly a contingent future interest is a legally cognizable interest, and thus property of the estate").

19.     That is the beginning and end of the inquiry: the Absolute Priority Rule prohibits equity from receiving or retaining any "property" under the Plan, and that is precisely what they are receiving under the Plan. It does not matter that that property is subject to a contingency that is only triggered if and when unsecured creditors are paid in full,

EMERGENCY MOTION OF THE ADVISORS FOR STAY PENDING APPEAL OF THE CONFIRMATION ORDER, AND BRIEF IN SUPPORT THEREOF—Page 10

Appx.000277

or that the property has little to no value, or that the contingency may never occur: "property" is being received under the Plan.

20.     The Debtor argued, and the Court agreed, that these contingent interests may have no value and would only vest and be paid if unsecured creditors are paid in full, thus preserving the priority scheme of the Bankruptcy Code.  As for the argument regarding value, the United States Supreme Court has squarely rejected any such argument:

> Respondents further argue that the absolute priority rule has no application in this case, where the property which the junior interest holders wish to retain has no value to the senior unsecured creditors.  In such a case, respondents argue, the creditors are deprived of nothing if such a so-called interest continues in the possession of the reorganized debtor.  Here, respondents contend, because the farm has no 'going concern' value (apart from their own labor on it), any equity interest they retain in a reorganization of the farm is worthless and therefore is not 'property' under 11 U. S. C. § 1129(b)(2)(B)(ii).

> We join with the overwhelming consensus of authority which has rejected this 'no value' theory. . .  Whether the value is present or prospective, for dividends or only for purposes of control a retained equity interest is a property interest. . . .  And while the Code itself does not define what 'property' means as the term is used in § 1129(b), the relevant legislative history suggests that Congress' meaning was quite broad.  Property includes both tangible and intangible property.

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207-08 (1988) (internal quotations and citations omitted).  Thus, it does not matter that the "property" may be prospective, or that it may be intangible, or that it may have no value.  All that matters is that "property," which is intended to be read broadly, is retained or received under the Plan.  There can be no question that it is.

21.     The Debtor and the Court also relied on *In re Introgen Therapeutics*, 429 B.R. 570 (Bankr. W.D. Tex. 2010) for the proposition that, so long as the contingent interests are not paid unless and until all unsecured claims are paid in full, the Absolute Priority Rule is not violated and is, in fact, preserved.  As is the case here, the plan in *Introgen* provided that

EMERGENCY MOTION OF THE ADVISORS FOR STAY PENDING APPEAL OF THE CONFIRMATION ORDER, AND BRIEF IN SUPPORT THEREOF—Page 11

Appx.000278

equity interests, which were retained, would only be paid if and when unsecured creditors were paid in full:

> The right to receive something imaginary is not property. The only way Class 4 will receive anything is if Class 3 in fact gets paid in full, in satisfaction of § 1129(b)(2)(B)(i), meaning the absolute priority rule would not be an issue. If Class 3 is not paid in full, Class 4's 'property interest' is not just valueless, as Creditors argue, it simply does not exist.

*Id.*

22.    This opinion is wrongly decided. First, it directly contradicts the language of the Bankruptcy Code, which implicates the Absolute Priority if *any* "property" is being retained or received. Second, this opinion looked to the present value of what was being retained, something directly foreclosed by the Supreme Court's opinion in *Norwest Bank Worthington v. Ahlers* quoted above. It cannot be doubted that a contingent, non-vested interest in a trust is "property." It may have no present value or other benefits, and it may never have a value or any other benefits, but there is a condition precedent which, if triggered, converts it to something of value, benefit, and present interest. Whatever it is that is converted into the "property" is itself "property."

23.    Third, this opinion fails to take into account the Supreme Court's opinion in *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle P'ship*, 526 U.S. 434 (1999). That well know opinion considered whether the Absolute Priority Rule was triggered under a plan where equity was retained. While it may be obvious that equity is "property" and that the retention of equity therefore violated the Rule, the Supreme Court's reasoning was different. Rather, the Supreme Court equated the exclusive opportunity to bid on new equity under a plan as itself "property" that was being granted or retained in violation of the Rule: "[t]his opportunity should, first of all, be treated as an item of property in its own right." Id. at 455. The Supreme Court reasoned as follows:

EMERGENCY MOTION OF THE ADVISORS FOR STAY PENDING APPEAL OF THE CONFIRMATION ORDER, AND BRIEF IN SUPPORT THEREOF—Page 12

Appx.000279

> While it may be argued that the opportunity has no market value, being significant only to old equity holders owing to their potential tax liability, such an argument avails the Debtor nothing, for several reasons. It is to avoid just such arguments that the law is settled that any otherwise cognizable property interest must be treated as sufficiently valuable to be recognized under the Bankruptcy Code. Even aside from that rule, the assumption that no one but the Debtor's partners might pay for such an opportunity would obviously support no inference that it is valueless, let alone that it should not be treated as property. And, finally, the source in the tax law of the opportunity's value to the partners implies in no way that it lacks value to others.

*Id*. at 455. If an exclusive "opportunity" is "property" for purposes of the Absolute Priority Rule, then the "opportunity" to perhaps share in a future recovery, however remote, is also "property." Even a contingent, non-vested interest is "otherwise cognizable property," since the law recognizes such interests and even brings them into an estate as property of the estate.

24.     For similar reasons, the Plan also violates the Absolute Priority Rule because the Debtor retains control of its property and its business after confirmation. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207-08 (holding that retention of control is "property" under the Absolute Priority Rule). In this respect, it must be understood that the Plan, while creating a trust for creditors and funding that trust with certain assets, also reorganizes the Debtor and vests the Debtor's business assets in the reorganized Debtor, while the creditor trust will own the reorganized debtor. Before the Plan, the Debtor controlled its property and its business. Under the Plan, the Debtor will continue to do so, through the same CEO/CRO, even though the Debtor will be indirectly owned by its creditors. But it is the retention of control that matters, not the ownership of the new equity.

25.     As summarized by one court in denying confirmation, "the power to control a corporation, through its board of directors, that a majority shareholder has, *is a separate property interest*, distinct from the value of the shares themselves." *In re 4 C Solutions Inc.*, 302 B.R. 592, 597 (Bankr. C.D. Ill. 2003) (emphasis added). Likewise, the U.S. Court of

EMERGENCY MOTION OF THE ADVISORS FOR STAY PENDING APPEAL OF THE CONFIRMATION ORDER, AND BRIEF IN SUPPORT THEREOF—Page 13

Appx.000280

Appeals for the Tenth Circuit has concluded that the retention of control is "property" within the meaning of the Absolute Priority Rule. *See Unruh v. Rushville State Bank*, 987 F.2d 1506, 1509 (10th Cir. 1993). Stated differently, "[i]t is the control of the reorganized entity which is a valuable asset, and that asset should not be passed on to the junior class." *In re Pecht*, 53 B.R. 768, 772 (Bankr. E.D. Va. 1985). This conclusion also applies where there is a change in ownership but control is retained. In *In re Perdido Motel Group Inc.*, 101 B.R. 289, 291-92 (Bankr. N.D. Ala. 1989), the debtor principals proposed to transfer ownership of the debtor to someone else (their parents) but with them retaining control after confirmation. Setting aside the potential of a sham transaction, the court denied confirmation because, while current equity would lose its equity, it would retain control: "by indirection, a retention of control of the debtor's property." *Id.* at 292. Indeed, the Absolute Priority Rule would lose all meaning if a debtor could create a trust, have that trust own the reorganized debtor, yet retain control of the reorganized debtor.

26. Therefore, under the Plan, current holders of equity interests retain "property" in the form of contingent trust interests, and the Debtor retains controls on account of its current equity interests, both in violation of the Absolute Priority Rule because Class 8 has rejected the Plan and Class 8 is not paid in full under the Plan. The Movants therefore submit that they have presented "a substantial case on the merits when a serious legal question is involved." *In re Tex. Equip. Co.*, 283 B.R. at 227. Moreover, with respect to the conclusion that the Absolute Priority Rule is not violated because equity would not be paid anything unless and until all unsecured creditors are paid in full, and the holding of *In re Introgen Therapeutics* supporting that conclusion, neither the Supreme Court nor the Fifth Circuit has addressed this argument. Thus, because this issue has not been "definitively addressed by a higher court," the Movants have "more easily" satisfied this element. *See id.*

EMERGENCY MOTION OF THE ADVISORS FOR STAY PENDING APPEAL OF THE CONFIRMATION ORDER, AND BRIEF IN SUPPORT THEREOF—Page 14

Appx.000281

### iii.      Exculpation and Injunction Provisions.

27.      The Movants recognize that the Court, through its oral and written findings and conclusions, carefully considered the Plan's exculpation and injunction provisions and carefully considered all objections to the same in detail, prior to approving these provisions. Respectfully, the Movants believe that the Court's findings and conclusions on these points do not comport with established Fifth Circuit precedent because, among other things: (i) these provisions apply to *business* decisions as well as to case administration, and exculpating and providing injunctions for business decisions appears unprecedented; (ii) these provisions apply to non-debtor entities, *i.e.* the Debtor's general partner and its management; and (iii) these provisions apply to *postconfirmation* matters.

28.      The Fifth Circuit has held that exculpation provisions designed to absolve parties other than the debtor and the creditors' committee of any negligent conduct that occurred during the course of the bankruptcy are unenforceable. *In re Pacific Lumber Co.*, 584 F.3d 229, 253 (5th Cir. 2009). To the contrary, Fifth Circuit authorities broadly "foreclose non-consensual non-debtor releases and permanent injunctions." *Id.* at 252 (citing authorities); *see also In re Thru, Inc.*, Civil Action No. 3:17-CV-1958-G, 2018 WL 5113124, at *22-23 (N.D. Tex. Oct. 19, 2018). Whereas exculpation of the debtor is justified by section 524 of the Bankruptcy Code, and exculpation of creditors' committees has been deemed justified by section 1103 of the Bankruptcy Code, there is no authority justifying an extension of exculpation protections to other parties, even if the parties sought to be exculpated participated significantly in formulating the confirmed plan. *In re Pacific Lumber*, 584 F.3d at 253 (noting that the creditors' committee and its members were "the only disinterested volunteers among the parties sought to be released").

29.      However, the Plan extends the Exculpation Provision to not only the Debtor,

EMERGENCY MOTION OF THE ADVISORS FOR STAY PENDING APPEAL OF THE CONFIRMATION ORDER, AND BRIEF IN SUPPORT THEREOF—Page 15

Appx.000282

the creditors' committee, and their professionals, but also impermissibly to the Debtor's majority-owned subsidiaries, Strand, the Independent Directors, the CEO/CRO, and other Related Persons, in contravention of established precedent. Such parties are not "disinterested volunteers" akin to the creditors' committee, and even if they were, Fifth Circuit precedent does not support their exculpation from liability. Furthermore, there is no clear end date with respect to the Exculpation Provision. The Exculpation Provision has the practical effect of allowing the Exculpated Parties to escape liability for post-confirmation conduct that goes beyond activity relating to the bankruptcy case or the administration of the estate, and allows the Exculpated Parties to escape liability that may arise in ordinary course, post-petition relationships of the parties, such as liability for an ordinary breach of contract.

30.     Indeed, the District Court, in *In re Thru, Inc.*, struck down a virtually identical exculpation clause as the one in the Plan. 2018 WL 5113124, at \*22-23. The exculpation clause in that case provided as follows:

> Neither the Debtor nor any of its present officers, directors, employees, agents, advisors, or affiliates, nor any of its Professionals (collectively, the "Exculpated Persons"), shall have or incur any liability to any Entity for any act taken or omission made in good faith in connection with or related to formulating, negotiating, implementing, confirming or consummating the Plan, the Disclosure Statement or any Plan Document. The Exculpated Persons shall have no liability to the Debtor, any Creditor, Interest holder, any other party in interest in the Chapter 11 Case or any other Entity for actions taken or not taken under the Plan, in connection herewith or with respect thereto, or arising out of their administration of the Plan or the property to be distributed under the Plan, in good faith, including failure to obtain Confirmation or to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the occurrence of the Effective Date, and in all respects such Exculpated Persons shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

*Id.* at \*22.

31.     Because the District Court has already concluded that confirmation of a plan containing a virtually identical exculpation provision constituted an error as a matter of law,

the Movants have demonstrated a likelihood of success on the merits of their appeal. Here, however, the exculpation provision is even broader, protecting non-debtor entities and their directors, not being limited to bankruptcy administration matters but also affecting business decisions, and not being limited in time to the pre-confirmation period.

32. Furthermore, the sweeping Injunction preventing parties from pursuing causes of action against the non-debtor Protected Parties effectively discharges non-debtors and contravenes established Fifth Circuit precedent. The Injunction is significantly broader than injunctions that have been struck down by courts in the Fifth Circuit. In the recent case of *In re Thru, Inc.*, the District Court struck down an injunction that purported to enjoin causes of action held against the debtor or the estate and that arose prior to the effective date of the plan from being brought against certain non-debtor protected parties. 2018 WL 5113124, at *21-22. The District Court found that it was clearly erroneous for the bankruptcy court to approve the injunction under section 105 of the Bankruptcy Code. *Id.* The injunction at issue in *In re Thru* was narrower than the Injunction in the Plan in several important respects, as the Plan Injunction is not limited to claims that arose prior to the Effective Date, and is not limited to claims that the Enjoined Parties hold against the Debtor. Rather, the Injunction appears to have no end date, so long as a claim or cause of action arises out of some future administration or implementation of the Plan. Moreover, and significantly, the Injunction precludes Enjoined Parties from bringing claims held *against the Protected Parties* -- not just claims held against the Debtor or the estate.

33. The propriety of the Injunction is not saved by the ability of an Enjoined Party to bring such claim if the Court so allows. In fact, the channeling nature of the Injunction is impermissible as well. As drafted, the Injunction is broad enough to cover claims and causes of action that arise out of postconfirmation, ordinary course transactions between the

EMERGENCY MOTION OF THE ADVISORS FOR STAY PENDING APPEAL OF THE CONFIRMATION ORDER, AND BRIEF IN SUPPORT THEREOF—Page 17

Appx.000284

reorganized debtor and parties in interest and which do not have any actual relationship to the Plan or its implementation.  With result to any such disputes that arise, the Court lacks subject matter jurisdiction.  *See In re CJ Holding Co.*, 597 B.R. 597, 604 (S.D. Tex. 2019) ("After confirmation, 'the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan.'") (quoting *In re Galaz*, 841 F.3d 316, 322 (5th Cir. 2016)).  Therefore, the channeling Injunction is impermissible because the Court appears to lack jurisdiction to even consider whether an enjoined action is colorable.  Parties cannot create indefinite subject matter jurisdiction where none otherwise exists.

34.     The Injunction of particular concern to the Movants.  Under the Injunction, the Movants are prohibited from advising or causing their clients to exercising their contractual rights against the postconfirmation Debtor pursuant to contracts that the Debtor has assumed under the Plan.  The law is clear that, upon assumption, the Debtor must comply with and be subject to all provisions of the assumed contracts.  *See In re Nat'l Gypsum Co.*, 208 F.3d 498, 505-06 (5th Cir. 2000); *In re Texas Baseball Partners*, 521 B.R. 134, 179-80 (Bankr. N.D. Tex. 2014).  Here, the Plan's exculpation and injunction provisions alter this clear law by imposing a new requirement that permission from the Court must first be obtained before proceeding against the Debtor, and that, as part of that permission, any party seeking to enforce rights must demonstrate a "colorable claim."  This means that this Court will of necessity be determining some aspect of the underlying dispute, even if the dispute relates solely to postconfirmation mattes over which the Court will have no jurisdiction.  Moreover, if the Court finds that the action is not colorable, then an Article I court with no post-confirmation jurisdiction will have effectively decided the matter on the merits.  In addition to the Court lacking jurisdiction, the Injunction also violates 28 U.S.C. § 959, the first portion of

which expressly provides that no leave from court is required in order to sue a debtor-in-possession based on its management of property—which would be the direct issue involved in any post-confirmation action.

35. The Confirmation Order, by approving the Exculpation Provision and the Injunction, therefore presents a serious legal question. At a minimum, the Movants have shown a substantial case on the merits and the balance of equities weigh heavily in favor of a stay. *See In re First S. Savings*, 820 F.2d at 704; *In re Dernick*, 2019 WL 236999, at \*3; *In re Texas Equipment Co.*, 283 B.R. at 227. "A serious legal question exists when legal issues have far-reaching effects, involve significant public concerns, or have a broad impact on federal/state relations." *In re Dernick*, 2019 WL 236999, at \*3; *see In re Westwood Plaza Apartments, Ltd.*, 150 B.R. 163, 168 (Bankr. E.D. Tex. 1993). Here, the Exculpation Provision and the Injunction violate established Fifth Circuit precedent and the Confirmation Order's approval of such provisions is erroneous as a matter of law. Precedent involves significant public concerns, and the allowance of the provisions will cause lasting effects on parties in interest. Indeed, the Injunction is so broad that it will prevent parties from enforcing their rights with respect to postconfirmation transactions unrelated to the bankruptcy case unless they first seek authority to do so from the Court. Not only does this prevent a serious hurdle to the enforcement of rights, but it presents a serious due process concern.

**iv. Section 1129(a)(2) of the Bankruptcy Code.**

36. In order to confirm the Plan, the Bankruptcy Code requires that the "proponent of the plan complies with the applicable provisions of this title [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(2). The proponent of the Plan was the Debtor. The Debtor failed to satisfy section 1129(a)(2) of the Bankruptcy Code, and the Court erred as a matter of law in

concluding that it had, because the Debtor completely failed to comply with Bankruptcy Rule 2015.3—on at least three occasions.

37. Section 1129(a)(2) is a mandatory provision and if it is not satisfied, a plan cannot be confirmed as a matter of law. 11 U.S.C. § 1129(a) ("[t]he court shall confirm a plan only if all of the following requirements are met"). Section 1129(a)(2) is not limited to whether a debtor complies with section 1129 itself; that is the point of the opening clause of section 1129(a). Rather, as the House Judiciary Report confirms, this section "requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure." H. Rept. No. 95-595 to accompany H.R. 8200, 95th Cong., 1st Sess. (1977) pp. 412–418.

38. The Debtor, as a debtor-in-possession, has the duties and obligations of a trustee under section 1106(a) of the Bankruptcy Code (except with respect to certain such duties not relevant here). 11 U.S.C. § 1107(a). One of those duties is to comply with subsection 8 of section 704(a) of the Bankruptcy Code." 11 U.S.C. § 1106(a)(1). That subsection provides that that trustee (here, the debtor-in-possession) shall:

> if the business of the debtor is authorized to be operated, file with the court, with the United States trustee, and with any governmental unit charged with responsibility for collection or determination of any tax arising out of such operation, periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires.

11 U.S.C. § 704(a)(8).

39. As there is no question that the business of the Debtor was authorized to be operated, this section requires the Debtor to file periodic reports of business operations and such other information as the "United States trustee or the court requires." *Id*. Bankruptcy Rule 2015.3 provides that:

EMERGENCY MOTION OF THE ADVISORS FOR STAY PENDING APPEAL OF THE CONFIRMATION
ORDER, AND BRIEF IN SUPPORT THEREOF—Page 20

Appx.000287

> In a chapter 11 case, the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest. The reports shall be prepared as prescribed by the appropriate Official Form, and shall be based upon the most recent information reasonably available to the trustee or debtor in possession.

Bankruptcy Rule 2015.3(a).

40.     There is a presumption of "substantial or controlling interest" where the debtor owns or controls at least 20 percent of such entity."  Bankruptcy Rule 2015.3(c).  The first Rule 2015.3 report is due seven days before the meeting of creditors, and a subsequent report is due every six months thereafter.  Bankruptcy Rule 2015.3(b).

41.     The Debtor violated this Rule several times.  The Debtor admitted that it held interests in at least eight other companies, with respect to which the Debtor admitted that it held at least 20% of such interests in three of such companies (and did not remember the percentage of interest in the other companies.  Confirmation Hearing Transcript (February 3, 2021) at 46:15-48:8.  The Debtor admitted that these were not publicly traded entities and were not themselves debtors in bankruptcy.  *See id*. at 46:2-14.  The reason given for the Debtor for its failure to file its initial Rule 2015.3 report and each subsequent one was that, with all that was going on early in the case, "it fell through the cracks."  *See id*. at 49:17-21.  Yet, the Debtor never sought nor received any leave from the Bankruptcy Court to file its Rule 2015.3 reports late.  *See id*. at 50:1-8.

42.     There is no question, therefore, that the Debtor failed to comply with Bankruptcy Rule 2015.3—indeed the Debtor admitted that fact.  The Debtor therefore failed to comply with its duties to file such reports as required by the United States Trustee and Bankruptcy Court under section 704(a)(8) of the Bankruptcy Code, as made applicable to a debtor-in-possession under sections 1106 and 1107 of the Bankruptcy Code.  The Debtor

therefore failed to comply with all applicable provisions of the Bankruptcy Code; *i.e.* Chapter 11.

43.    That section is broad, requiring the Debtor to "compl[y] with the applicable provisions of this title." There is no exception for minor things, reports that need to be filed, or anything else. Indeed, courts have correctly construed this section broadly, as it is an important safety mechanism to ensure that a plan proponent cannot simply ignore its obligations under the Bankruptcy Code yet confirm a plan just because its plan otherwise satisfies confirmation requirements, thereby sweeping all prior failures and defaults under the rug. The District Court held that this section prohibited confirmation where the debtor had retained and paid professionals without proper bankruptcy court authority, even though the bankruptcy court later granted this relief *nunc pro tunc*. *See In re Briscoe Enters. Ltd.*, 138 B.R. 795, 808-09 (N.D. Tex. 1992) ("[i]f that were all that was required, there would be no need for § 1129(a)(2)"), *rev'd* 994 F.2d 1160, 1170 (5th Cir.). While this conclusion was reversed on appeal, because the bankruptcy court subsequently permitted the retention and payment *nunc pro tunc*, the Debtor here never made a request for leave to file its Bankruptcy Rule 2015.3 reports late, and it has never sought any *nunc pro tunc* relief regarding the same. And, as the Supreme Court has made clear, a court cannot use its *nunc pro tunc* authority to "make the record what it is not." *Roman Catholic Archdiocese of San Juan v. Feliciano*, 140 S. Ct. 696, 701 (2020) (internal quotation omitted).

44.    A different district court affirmed a denial of a plan based on section 1129(a)(2) because the plan proponent had spent proceeds from a sale in violation of section 363(c) of the Bankruptcy Code. *See Cothran v. United States*, 45 B.R. 836, 838 (S.D. Ga. 1984) ("[t]o the extent that the administrative provisions of Chapter 3 apply to cases under Chapter 11, a debtor must also abide by Chapter 3 or risk non-confirmation"). One

bankruptcy court denied confirmation under section 1129(a)(2) because the debtor refused to pay court-ordered administrative expense claims. *See In re Midwestern Cos.*, 55 B.R. 856, 863-64 (Bankr. D. Mont. 1985). A different bankruptcy court denied confirmation on the basis of section 1129(a)(2) because the debtor had failed to comply with the deadline to propose a small business plan. *See In re Win Trucking Inc.*, 236 B.R. 774, 778-79 (Bankr. D. Utah 1999).

45.     What these opinions demonstrate is that section 1129(a)(2) means what it says, and what it says is broad: if the plan proponent has not complied with chapter 11 (the "applicable provisions") then its plan cannot be confirmed. Period. And, as these opinions further confirm, the provisions of chapter 11 that must be complied with are all of them, as opposed to merely those governing the plan itself. Indeed, that is the point of section 1129(a)(1) of the Bankruptcy Code and there would be no need for a separate provision if all that was applicable was the statute governing confirmation itself. *See* 11 U.S.C. § 1129(a)(1).

46.     Notwithstanding the broad language of section 1129(a)(2) of the Bankruptcy Code, one bankruptcy court has concluded that section 1129(a)(2) "does not provide creditors with a 'silver bullet' to defeat confirmation based on each and every minor infraction of Title 11 that a debtor may commit." *In re Cypresswood Land Partners I*, 409 B.R. 396, 423-24 (Bankr. S.D. Tex. 2009). This opinion is wrong, however, and it should not be followed, for the simple reason that it reads into the statute an exception that is simply not there. *Connecticut Nat'l Bank v Germain*, 503 U.S. 249, 254 (1992) (Congress "says in a statute what it means and means in a statute what it says there"). Nor is a violation of the Bankruptcy Code a "silver bullet" that creditors have. A debtor obtains immense relief and benefits from Chapter 11 and requiring it to comply with its own obligations, and imposing upon it consequences if it fails to do so, should not be a controversial proposition. It is not the

creditor's "silver bullet"; it is the consequence, perhaps even penalty, for failure to comply with the law.

47.     But even if this opinion has some persuasiveness, compliance with Bankruptcy Rule 2015.3 is not a "minor infraction."  This is an important rule that provides all participants with transparency and some level of control over a debtor's ownership interest in other entities—here, interests worth hundreds of millions of dollars.  *See, e.g., In re Sillerman*, 605 B.R. 631, 644 (Bankr. S.D.N.Y. 2019) (discussing importance of Rule 2015.3 reports: "[t]hese reports would supply the Court and creditors with relevant and material information regarding the Debtor's interest in his dozens of entities, thereby enhancing transparency and potentially laying bare any improper transfers or self-dealing").  What if a debtor is selling its interests and not accounting for the proceeds?  What if a debtor is using its control of those entities to cause them to dispose of their assets improperly, so as to remove them from creditor reach?  What if a debtor is channeling business or other estate resources into or through those entities?  As those entities are not debtors themselves, the bankruptcy court and creditors would have no other way of knowing what is going on with those assets except through compliance with Bankruptcy Rule 2015.3.  *See, e.g., In re Hoyle*, 2013 Bankr. LEXIS 420 at *12-*14 (Bankr. D. Idaho 2013) (detailing improper use and accounting of non-debtor entities owned by debtor).

48.     Bankruptcy Rule 2015.3 is not trivial or minor; it is very important.  Failure to comply with the Rule has led to conversion of the bankruptcy case:

> Winterhalter's failure deprived creditors of critical information regarding the Debtor's partnership interests, and Debtor's receipt and use of the partnership distributions created suspicion among the creditors, contributed to the multiple litigation between the Debtor and his creditors at almost every juncture of his Chapter 11 case, and ultimately contributed to the conversion of the Debtor's case from Chapter 11 to Chapter 7.

*In re Grasso*, 586 B.R. 110, 150 (Bankr. E.D. Pa. 2018). Likewise, a failure to file the reports is cause to appoint a chapter 11 trustee or to dismiss the bankruptcy case. *See, e.g., In re Sillerman*, 605 B.R. 631, 644 (Bankr. S.D.N.Y. 2019). Thus, if the failure to timely file these reports is sufficient cause to convert or dismiss the case, or to appoint a chapter 11 trustee, then such failure cannot be described as trivial or a "minor infraction" even if there were a "minor infraction" exception to section 1129(a)(1).

C.   <u>MOVANTS WILL SUFFER IRREPARABLE INJURY WITHOUT A STAY</u>

49.   The focus of the second element is whether, absent a stay pending appeal, the Movants may suffer irreparable injury in the form of effectively being denied appellate review due to mootness or similar considerations. *See In re Tex. Equip. Co.*, 283 B.R. 222, 228 (Bankr. N.D. Tex. 2002). This element puts the Movants in an awkward situation. On the one hand, they are not admitting that their appeal will be moot. On the other hand, they have to address the reality that mootness is a significant concern any time that a chapter 11 plan is on appeal.

50.   This is because consummation of a plan may render any challenges to confirmation thereof moot. *In re Westwood Plaza Apartments*, 150 B.R. at 169 (factor tilted in favor of granting stay); *Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, Case No. 3:17-CV-1958-G, 2018 WL 5113124, at *12 (N.D. Tex. Oct. 19, 2018) (equitable mootness more likely if no stay has been obtained and plan has been substantially consummated); *see also In re Best Products Co.*, 177 B.R. 791 (S.D.N.Y. 1995) (dismissing appeal of confirmation order as moot where appellant failed to seek stay of confirmation order and plan had been consummated). Indeed, the Fifth Circuit in *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009), recognized the potential issues with denying a stay of a confirmation order pending appeal:

Although the exigencies of the case appeared to demand prompt action, simply denying a stay seems to have been, and often will be, too simplistic a response. A plan may be designed to take effect, as it was here, after a lapse of sufficient time to initiate appellate review. A supersedeas bond may be tailored to the scope of the appeal. An appeal may be expedited. As with all facets of bankruptcy practice, myriad possibilities exist. Thus, substantial legal issues can and ought to be preserved for review.

584 F.3d at 243.

51.     The unprecedented breadth of the Exculpation Provision and the Injunction has the potential to cause immediate and irreparable harm to the Movants and other parties in interest. These provisions have the cumulative effect of preventing the Movants, among other parties, from exercising their legal rights to pursue any claims or causes of action against non-debtor parties.[2] Indeed, the provisions are so broad that they essentially prevent the Movants from exercising their rights and remedies that arise post-confirmation in the ordinary course of business, despite the same being completely distinct from the bankruptcy case, and notwithstanding the basis or nature of the claim. In practical effect, the Movants will, at the very least, have to seek leave of the Court in order to seek any relief for any present or future actionable wrongs, whether contractual or under applicable non-bankruptcy law. Furthermore, if the stay is denied, the Movants could suffer harm for which they have no legal redress and which becomes moot - equitably or otherwise - before the District Court has an opportunity to rule.

52.     The impermissibility of the Exculpation Provision and Injunction is apparent, and absent a stay, will immediately deprive Movants of their due process rights and ability to seek legal redress for wrongs that may be suffered. The possibility of irreparable injury can

---

[2]     As the Court is aware, in light of the Debtor's termination of its shared services agreements with the Advisors, the Advisors and the Debtor are in the process of transferring to the Advisors their data held by the Debtor. It is too soon to determine whether this process will be satisfactorily concluded but, if it is not, the Movants may have additional claims and causes of action against the Debtor which would be subject to the Plan's exculpation and injunction provisions.

only be remedied by a stay of the Confirmation Order.

53.     Additionally, the Plan has the practical effect of enjoining the Movants from advising or causing the funds to remove the Debtor as manager of the CLOs or to join with other, non-enjoined funds, from removing the Debtor as manager. Should the Debtor engage in conduct after confirmation that justifies the removal of the Debtor as manager, the Movants will be prevented from being able to advise their clients accordingly or to take action on their behalf. This would cause Movants irreparable injury.

54.     The Debtor will argue that there is no irreparable harm because the gatekeeper Injunction will permit the Movants to seek relief from the Court in order to exercise their rights. But, as argued above, this Court will not have post-confirmation jurisdiction over post-confirmation and post-assumption transactions and disputes. This is especially the case if the Bankruptcy Case is closed soon after confirmation, as may be likely given that most sizable claims have been adjudicated or compromised. Simply put, the Court, without jurisdiction, may nevertheless decide that a proposed action is not "colorable" as is required by the gatekeeper Injunction, meaning that the Movants will be prevented from acting without a court of proper jurisdiction reviewing the matter. At a minimum, the time it would take Movants to comply with the gatekeeping Injunction, during which time the Movants would be prevented from exercising their legitimate, contractual and statutory rights, imposes a substantial burden.

55.     As a subset of the above, mootness will also arise because the Debtor has stated that it intends to liquidate and wind down the CLOs in approximately two years. Thus, by the time that the appeal of the Plan is ultimately concluded, the liquidation of the CLOs will have occurred in full or in large part, and even if the Movants prevail on appeal the damage will already have been done.

D.    NO SUBSTANTIAL HARM TO DEBTOR OR OTHER PARTIES

56.    A stay pending appeal is also justified under the third prong because neither the

Debtor, nor any of the Debtor's creditors, will be substantially harmed by a stay of the

Confirmation Order pending appeal.  Moreover, the Court can fashion the stay to prevent

harm to the Debtor and other parties.  *See In re Westwood Plaza Apartments*, 150 B.R. at 169

(conditioning stay of plan on, among other things, debtor's ability to pay administrative, tax

and secured claims as provided for under the plan); *In re Thru*, 2018 WL 5113124, at *20

(recognizing availability of partial relief on appeal of plan with respect to exculpation

provisions).

57.    Courts have found substantial harm to other parties if the stay would cause a

significant delay in the administration of the estate or a delay in the distribution to creditors

under the plan.  *In re Dernick*, 2019 WL 236999, at *4.  Here, a stay will not lead to any

harm, much less substantial harm, to the Debtor or other creditors.  This is because the Debtor

can continue doing exactly what it would do under the Plan: (i) the CEO/CRO is still in

charge and the members of the creditors committee will be on the trust oversight board, with

the addition of one additional member; (ii) the CEO/CRO can continue administering the

estate the same as he is doing now; (iii) the CEO/CRO can continue managing affirmative

litigation the same as he is doing now; (iv) the CEO/CRO can continue managing the CLOs

and funds that the Debtor manages the same as he is doing now; (v) there is no exit financing

under the Plan; (vi) there are no asset sales or compromises under the Plan that cannot be

effectuated without the Plan; and (vii) there is no new money or new value being contributed

under the Plan.  185:3-188:5.

58.    As the Debtor's CEO/CRO confirmed, "post-confirmation, you are basically

going to continue managing the CLOs and funds and trying to monetize assets for creditors

EMERGENCY MOTION OF THE ADVISORS FOR STAY PENDING APPEAL OF THE CONFIRMATION
ORDER, AND BRIEF IN SUPPORT THEREOF—Page 28

Appx.000295

the same as you are today." Confirmation Hearing Transcript (February 2, 2021) at 188:2-5. And, as the CEO/CRO confirmed, he does not "need anything in the plan that [he] does [not] have today to keep managing" the "Funds and the CLOs." *Id.* 188:23-189:2. Instead, as the CEO/CRO confirmed, the only difference is that he would not be willing to serve as the post-confirmation trustee without the Plan's channeling Injunction, and that the reorganized debtor would be unable to obtain directors and officers insurance. *Id.* 168:6-18. But that is precisely the point: a Plan should not have as its principal purpose the entry of an injunction limiting the ability of parties to exercise their rights for matters arising *after* confirmation and assumption.

59. The Court should also take into account that 27 Class 8 creditors rejected the Plan, while only 17 accepted the Plan. It is the unsecured creditors who would be the only ones potentially prejudiced if the Plan is stayed, as that may delay their recoveries. But Class 8 overwhelmingly rejected the Plan. While 16 Class 7 convenience class creditors accepted the Plan, the total cost to pay those creditors is approximately $10 million. The Debtor has more than sufficient cash on hand to pay these creditors with an interim distribution if it so wished. The five subordinated creditors accepting the Plan do not matter, since they are not projected to receive anything under the Plan, and if they do receive anything, it will be years into the future after extensive litigation. As for the Class 2 Frontier Secured Claim, the Debtor has many options to treat this secured claim with adequate protection and other payments that it can do without need for the Plan.

60. Finally, a stay pending appeal will actually protect the Debtor and its professionals. As demonstrated above, the District Court has already rejected an exculpation clause that is similar to the one in the Plan as a matter of law. Yet, as the Court heard at the confirmation hearing, the CEO/CRO would not be willing to serve as the post-confirmation trustee or manager of the Debtor without the Plan's Exculpation Provision and Injunction, and

EMERGENCY MOTION OF THE ADVISORS FOR STAY PENDING APPEAL OF THE CONFIRMATION ORDER, AND BRIEF IN SUPPORT THEREOF—Page 29

Appx.000296

the reorganized debtor would not be able to obtain directors and officers insurance. Should something arise after confirmation, with these provisions of the Plan reversed by an appellate court, the CEO/CRO, the reorganized debtor, and potentially others may face potential liability without coverage. All parties, and especially the CEO/CRO and the Debtor, should have a strong interest in ensuring that nothing of that sort happens—something best done by a stay pending appeal.

E.   **THE PUBLIC INTEREST IS SERVED BY A STAY PENDING APPEAL**

61.   Because the Exculpation Provision and the Injunction impermissibly infringe upon the contractual, legal and due process rights of parties in interest in the bankruptcy case, a stay pending appeal of such provisions will serve the public interest. A stay will ensure that non-debtor parties are held accountable for their post-petition and post-confirmation conduct, while preserving the rights and remedies of parties in interest under applicable non-bankruptcy law. Likewise, a stay will serve the public interest of respecting and upholding judicial precedent. The interests of many innocent, third party investors must also be taken into account, and their interests are not served by the Exculpation Provision and Injunction that may effectively and permanently prevent them from exercising legitimate contract and statutory rights. Finally, the public has a strong interest in ensuring that securities laws are complied with, including the Investment Advisers Act of 1940. The Plan's Exculpation Provision and Injunction threaten to substantially vitiate these laws and effectively relieve the Debtor from its obligations and duties (and potential liabilities) thereunder.

F.   **SECURITY FOR STAY PENDING APPEAL**

62.   The Court may, but need not, condition a stay pending appeal on a bond or other security being posted. As this Court has summarized:

> The purpose of a supersedeas bond is to preserve the status quo while protecting the non-appealing party's rights pending appeal. The bond secures the prevailing party against any loss sustained as a result of being forced to forgo execution on a judgment during the course of an ineffectual appeal. In deciding how best to secure the non-appealing party from loss, the court applies general equitable principles.

*In re Tex. Equip. Co.*, 283 B.R. at 229.

63.     Normally, the amount of any bond should be the amount of the judgment being stayed. The Movants are aware of one bankruptcy court concluding that, when the order being stayed is a confirmation order, the amount of the bond should be the entire amount of debt subject to the plan. *See In re Scotia Dev. LLC*, 2008 Bankr. LEXIS 5127 *32-*33 (Bankr. S.D. Tex. 2008). Here, however, the Plan does not propose to pay any claims any time soon, except for administrative claims and Class 7 convenience claims, both of which can be satisfied by the amount of cash the Debtor is presently holding. Thus, an analogy to *Scotia Dev. LLC* is not warranted, and applying its reasoning here would lead to a punitive result that would actually better the returns to creditors, meaning that it would do far more than preserve the status quo and protect against harm resulting from the stay pending appeal itself. Moreover, the risk in *Scotia Dev. LLC* was that the debtor's business would collapse from a lack of funding that the confirmed plan provided for. *See id*. at *25 ("the continued viability and operation of the debtors must be protected. All parties agree that some extraordinary program is required to allow these debtors to survive more than even ten days. Without additional cash, both Scopac and Palco would have to shut down immediately"). No such considerations are present here.

64.     Instead, the Movants respectfully submit that any such conclusion would be punitive and would not be warranted by the facts. *See, e.g., In re Gleasman*, 111 B.R. 595, 604 (Bankr. W.D. Tex. 1990) ("The purpose of a bond, after all, is to protect Franklin against

EMERGENCY MOTION OF THE ADVISORS FOR STAY PENDING APPEAL OF THE CONFIRMATION ORDER, AND BRIEF IN SUPPORT THEREOF—Page 31

Appx.000298

any loss, not to confer a windfall.  The property itself is not going anywhere").  As discussed above, the Plan does not give the Debtor anything it does not have now.  No new funds are coming in, no exit financing is involved, and no asset sale is provided for in the Plan.  Rather, the Debtor will simply continue doing under the Plan what it is doing now: it will manage its assets, funds, and the CLOs, and will continue monetizing its assets and managing litigation the same as now.  Whatever the value of the assets being administered is today will be the same under the Plan and without the Plan.  No new funds and no exit financing is involved. Nothing in the Plan gives the Debtor tools to administer its estate that it lacks at present, and nothing in the Plan will increase the value of assets available for creditors.  Thus, there will be no harm to the Debtor or to the estate.

65.    The only conceivable harm is from a delay in certain payments to certain creditors.  If the Plan is affirmed, then those creditors would not have the use of those funds for a period of time.  Here, the Debtor believes that it will distribute approximately $60 million to Class 7 and Class 8 creditors within one year of the Plan being confirmed.  As unsecured creditors, these creditors would be entitled to interest at the federal rate of post-judgment interest.  *See In re Thru Inc.*, 2017 Bankr. LEXIS 1902 at *28-29.  That rate is at present less than 1% and is unlikely to rise past that amount during the period of any stay. Thus, the interest that any creditor may be able to claim for any delay in payment is less than 1%, or less than $600,000.00.

66.    The Movants therefore submit that a bond or security of $1 million is sufficient to protect the Debtor and its estate from any harm resulting from the delay in the effectiveness of the Plan.

## IV.    <u>CONCLUSION</u>

67.    Based on the foregoing, a stay of the Confirmation Order is justified under

each of the applicable factors for a stay pending appeal.  Accordingly, the Court should grant

a stay of the Confirmation Order.

WHEREFORE, the Movants request that the Court enter an Order:

1.       Staying the effectiveness of the Confirmation Order pending appeal; and

2.       Granting such other relief as is just and proper.

Dated:  February 28, 2021                    **MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
E-mail: drukavina@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.,
AND NEXPOINT ADVISORS, L.P.**

EMERGENCY MOTION OF THE ADVISORS FOR STAY PENDING APPEAL OF THE CONFIRMATION
ORDER, AND BRIEF IN SUPPORT THEREOF—Page 33

Appx.000300

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this the 28th day of February, 2021, true and correct copies of this document were electronically served on parties entitled to notice thereof, including on counsel for the Debtor.

Dated:  February 28, 2021

*/s/ Davor Rukavina*

Davor Rukavina

# EXHIBIT 8

Case 19-34054-sgj11 Doc 1967 Filed 03/03/21 Entered 03/03/21 14:43:05 Page 1 of 20
Case 3:21-cv-01585-S Document 15 Filed 10/01/21 Page 309 of 783 PageID 6730
Docket #1967 Date Filed 03/03/2021

K&L GATES LLP
Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Telephone: (214) 939-5659
E-mail: artoush.varshosaz@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Telephone: (919) 743-7306
E-mail: lee.hogewood@klgates.com

*Counsel for Highland Income Fund, NexPoint
Strategic Opportunities Fund, Highland Global
Allocation Fund, and NexPoint Capital, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) Case No. 19-34054 (SGJ11) |
| | ) |
| Debtor. | ) |
| | ) |
| | ) |

## MOTION FOR STAY PENDING APPEAL OF THE COURT'S ORDER
## CONFIRMING THE DEBTOR'S FIFTH AMENDED PLAN

Highland Income Fund, NexPoint Strategic Opportunities Fund, Highland Global

Allocation Fund, and NexPoint Capital, Inc. (each, a "**Fund**," and collectively, the "**Funds**" or

"**Movants**"), by and through their undersigned counsel, and pursuant to Rule 8007 of the Federal

Rules of Bankruptcy Procedure, respectfully move (the "**Motion**") this Court to stay its *Order (I)*

*Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as*

*Modified) and (II) Granting Related Relief* [Dkt. No. 1943] (the "**Confirmation Order**") pending

appeal. In support of the Motion, the Movants respectfully show the Court as follows:

## I.    PRELIMINARY STATEMENT

1

1934054210303000000000000006

1.      On February 22, 2021, this Court entered its Confirmation Order in the above-captioned chapter 11 case of Highland Capital Management, L.P. (the "**Debtor**").  On March 3, 2021, Movants timely filed a notice of appeal pursuant to Bankruptcy Rule 8002.  Movants maintain that the Confirmation Order contravenes established law in the Fifth Circuit by confirming a plan that contains non-consensual non-debtor exculpation and injunction provisions that are overly broad.  Further, the Confirmation Order approves a channeling injunction that impermissibly attempts to confer jurisdiction in the Court over post-confirmation matters with respect to which it would otherwise lack subject matter jurisdiction.  The aforementioned provisions, which are now part of a confirmed plan, are sweeping and unprecedented.

2.      Accordingly, Movants respectfully request a stay pending appeal of the Confirmation Order.  If a stay is not granted, Movants' rights would be severely prejudiced pending the ruling on appeal, even if the ruling on appeal ultimately results in Movants' favor. There is a present threat that the exculpation and injunction provisions preclude Movants from being able to exercise their contractual rights under certain management contracts with collateralized loan obligations (the "**CLOs**") that are assumed under the confirmed plan. Moreover, Movants' rights could be mooted by the time of any final resolution on appeal because by that time, the Debtor may have already completed its liquidation and wind down of the CLOs' assets.  A stay pending appeal does not present any serious risk of harm to the Debtor or its creditors.  Furthermore, the public interest supports a stay pending appeal by ensuring that the Debtor and non-debtor parties are held responsible for their performance and compliance under contracts the Debtor has assumed, including the CLO management contracts.  Accordingly, and as required by Bankruptcy Rule 8007, Movants, with all due respect, move this Court for a stay of its own Confirmation Order.

Appx.000304

## II. BACKGROUND

### A. General Background on the Funds

3.      Each of the Funds is a publicly registered investment company or business development company under the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a-1, *et. seq.* (the "**1940 Act**"). Each of the Funds is regulated by the U.S. Securities and Exchange Commission (the "**SEC**") and by a comprehensive set of securities laws, including the Securities Act of 1933, the Securities Exchange Act of 1934, and the 1940 Act, in addition to various state law provisions (collectively, the "**Securities Laws**"). Collectively, the Funds have thousands of shareholders, ranging from large institutional investors to small individual shareholders, and have more than $1 billion in assets under management.

4.      Each Fund is advised by either Highland Capital Management Fund Advisors, L.P., or NexPoint Advisors, L.P. (each, an "**Advisor**," and collectively, the "**Advisors**"). The Advisors are investment advisers registered with the SEC as investment advisers under the Investment Advisers Act of 1940, as amended, 15 U.S.C. § 80b-1, *et seq.* (the "**Advisers Act**").

5.      As public registered investment companies and a business development company, each Fund is regulated under the 1940 Act and is governed by a Board of Trustees (a "**Board**"). Each Board owes fiduciary duties to its Funds and to the Funds' shareholders. The Boards also have obligations under the Securities Laws to exercise independent business judgment and act in the best interests of the Funds and their shareholders.

6.      The Boards have regular quarterly meetings, and frequently meet in between the quarterly meetings regarding a variety of Fund operational issues. The SEC routinely describes and emphasizes the oversight duties of investment company boards in its rulemaking efforts. The Boards' members include a number of sophisticated investment professionals, all but one of whom

3

is independent from the Advisors and who are advised by their own legal counsel.

7.     Additionally, the Funds do not have employees.  Rather, the Boards retain the Advisors to advise the Funds, subject to the Boards' oversight.

8.     The Funds also own the preference shares in certain CLOs for which the Debtor serves as portfolio manager, and own the majority of preference shares in at least three of such CLOs.  The CLOs are securitization vehicles that were formed to acquire and hold pools of debt obligations.  They also issued various tranches of notes and preference shares, which are intended to be repaid from proceeds of the subject CLO's pool of debt obligations.  The notes issued by the CLOs are paid according to a contractual priority of payments, with the value remaining in the CLOs after the notes are fully paid flowing to the holders of the preference shares.

9.     The CLO management agreements generally allow the holders of preference shares, i.e., the Funds, to remove the portfolio manager for cause, and some allow removal without cause.

**B.     The Confirmation Order**

10.     On October 16, 2019 (the "**Petition Date**"), the Debtor filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), commencing the above-captioned bankruptcy case.

11.     On November 24, 2020, the Debtor filed its *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Dkt. No. 1472] (the "**Fifth Amended Plan**").

12.     Movants, among other parties in interest, filed an objection to the Fifth Amended Plan.  *See, e.g.,* Dkt. No. 1670.

13.     On January 22, 2021, the Debtor filed its *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Dkt. No. 1808] (the "**Plan**").

14.     Article IX of the Plan contains the following exculpation provision (the

"**Exculpation Provision**"):[1]

## C.    <u>Exculpation</u>

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); provided, however, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

Dkt. No. 1808 at 54-55. "Exculpated Parties," in turn, means, collectively:

(i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds,[2] (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of

---

[1] Capitalized terms used, but not otherwise defined, shall have the meanings ascribed to such terms in the Plan.
[2] To avoid any confusion, Movants note that the Plan defines the Managed Funds as "Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan." Dkt. No. 1808 at 17.

Appx.000307

its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

Dkt. No. 1808 at 15.

15.     Article IX of the Plan also contains an injunction provision (the "**Injunction**"), which provides, in pertinent part, as follows:

### F.     <u>**Injunction**</u>

Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.

. . . .

Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; provided, however, the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

Dkt. No. 1808 at 57-58.  "Enjoined Parties," in turn, is defined to mean:

(i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the

6

capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

Dkt. No. 1808 at 14.  "Protected Parties" means, collectively:

(i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

Dkt. No. 1808 at 19.

16.     On February 2 and 3, 2021, the Court conducted a hearing on confirmation of the Plan, and on February 22, 2021, entered the Confirmation Order.

17.     Movants timely appealed the Confirmation Order by filing a Notice of Appeal on March 3, 2021 [Dkt. No. 1966].

### III.     <u>ARGUMENTS AND AUTHORITIES</u>

### A.     **Standard for a Stay Pending Appeal**

18.     By the Motion, Movants request a stay of the Confirmation Order pending appeal pursuant to Bankruptcy Rule 8007.

19.     Bankruptcy Rule 8007 allows a bankruptcy court to stay a judgment in order to maintain the status quo pending appeal.  Fed. R. Bankr. P. 8007(a)(1)(A).

Appx.000309

20.     The decision of whether to grant a stay pending appeal under Bankruptcy Rule 8007 is a matter within the court's discretion. *In re Dye*, Case No. 06-71024, 2007 Bankr. LEXIS 2972, at *3 (Bankr. N.D. Ga. July 24, 2007) (discussing former Bankruptcy Rule 8005). "That discretion is by design a flexible tool which permits the bankruptcy court to tailor relief to the circumstances of the particular case." *Id.* (citing *Gleasman v. Jones, Day, Reavis & Pogue*, 111 B.R. 595 (Bankr. W.D. Tex. 1990)).

21.     In determining whether to grant a discretionary stay pending appeal under Bankruptcy Rule 8007, courts consider the following criteria:

(1) the likelihood that the movant will prevail on the merits of the appeal;

(2) whether the movant will suffer irreparable injury if the stay is denied;

(3) whether other parties would suffer substantial harmed if the stay is granted; and

(4) whether the public interest will be served by granting the stay.

*In re First S. Sav. Ass'n*, 820 F.2d 700, 709 (5th Cir. 1987); *In re Tex. Equip. Co.*, 283 B.R. 222, 226-27 (Bankr. N.D. Tex. 2002).   In the Fifth Circuit, each of the foregoing criteria must be satisfied by the party requesting the stay.  *In re Tex. Equip. Co.*, 283 B.R. at 227; *see also In re Dernick*, Case No. 18-32417, 2019 WL 236999, at *2 (Bankr. S.D. Tex. Jan. 16, 2019) (movants must prove entitlement to relief by a preponderance of the evidence).   However, the first two elements are the most critical.  *Saldana v. Saldana*, 2015 WL 502145, at *2 (N.D. Tex. Aug. 25, 2015).

22.     The nature of an order confirming a plan of reorganization makes a stay pending appeal uniquely important.   Without a stay of such an order, "it is extremely unlikely that Appellants will ever be able to have meaningful appellate review of the rulings of the Bankruptcy Court, a non-Article III court, and in any event, a lower court.   The ability to review decisions of

8

the lower courts is the guarantee of accountability in our judicial system. . . . Thus, the ability to appeal a lower court ruling is a substantial and important right." *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 342 (S.D.N.Y. 2007).

23.    As discussed herein, a stay of the Confirmation Order is justified.

**B.    There is a Likelihood of Success on the Merits**

24.    With respect to the first factor, the U.S. Court of Appeals for the Fifth Circuit has recognized that a movant must either present a prima facie case, but need not show that it is certain to win, or, if a serious legal question is involved, must present a substantial case on the merits and show that the balance of equities weighs heavily in favor of granting the stay. *In re First S. Sav.*, 820 F.2d at 704; *In re Dernick*, 2019 WL 236999, at *2; *In re Tex. Equip. Co.*, 283 B.R. at 227. The standards provided by substantive law guide the court in determining whether a movant has shown a likelihood of success on the merits. *In re Dernick*, 2019 WL 236999, at *2.

25.    Where an appeal involves questions of law, "the movant more easily satisfies the first element." *In re Tex. Equip. Co.*, 283 B.R. at 227. With respect to confirmation of a chapter 11 plan, the bankruptcy court's conclusions of law are reviewed *de novo*. *See In re Tex. Grand Prairie Hotel Realty LLC*, 710 F.3d 324, 326 n.1 (5th Cir. 2013). The Movants' appeal relates to the Exculpation Provision and the Injunction, which are legal issues that will be subject to *de novo* review.

26.    The Movants have shown a likelihood of success on the merits. The Exculpation Provision and Injunction provided for in the Plan contravene established law. The Fifth Circuit has held that exculpation provisions designed to absolve parties other than the debtor and the creditors' committee of any negligent conduct that occurred during the course of the bankruptcy are unenforceable. *In re Pac. Lumber Co.*, 584 F.3d 229, 253 (5th Cir. 2009). To the contrary,

Fifth Circuit authorities broadly "foreclose non-consensual non-debtor releases and permanent injunctions." *Id.* at 252 (citing authorities); *see also Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, Civil Action No. 3:17-CV-1958-G, 2018 WL 5113124, at *22-23 (N.D. Tex. Oct. 19, 2018). Whereas exculpation of the debtor is justified by section 524 of the Bankruptcy Code, and exculpation of creditors' committees has been deemed justified by section 1103 of the Bankruptcy Code, there is no authority justifying an extension of exculpation protections to other parties, even if the parties sought to be exculpated participated significantly in formulating the confirmed plan. *In re Pac. Lumber*, 584 F.3d at 253 (noting that the creditors' committee and its members were "the only disinterested volunteers among the parties sought to be released"); *see also In re Pilgrim's Pride Corp.*, Case No. 08-45664, 2010 WL 200000, at *5 (Bankr. N.D. Tex. Jan. 14, 2010) ("Because *Pacific Lumber* is binding precedent, the court may not, over objection, approve through confirmation of the Plan third-party protections, other than those provided to the Committees, members of the Committees, and the Committees' Professionals.").

27. However, the Plan extends the Exculpation Provision to not only the Debtor, the creditors' committee, and their professionals, but also, impermissibly, to the Debtor's majority-owned subsidiaries, the Managed Funds, Employees, Strand, the Independent Directors, the CEO/CRO, and other Related Persons, in contravention of established precedent. Such parties are not "disinterested volunteers" akin to the creditors' committee, and even if they were, Fifth Circuit precedent does not support their exculpation from liability.

28. Furthermore, there is no clear end date with respect to the Exculpation Provision. The Exculpation Provision has the practical effect of allowing the Exculpated Parties to escape liability for post-confirmation conduct that goes beyond activity relating to the bankruptcy case, formulation of the Plan, or the administration of the estate, and allows the Exculpated Parties to

escape liability that may arise in ordinary course, post-petition relationships of the parties, such as liability for an ordinary breach of contract.

29.     Indeed, the district court, in *In re Thru, Inc.*, struck down a virtually identical exculpation clause as the one in the Plan.  2018 WL 5113124, at *22-23.  The exculpation clause in that case provided as follows:

> Neither the Debtor nor any of its present officers, directors, employees, agents, advisors, or affiliates, nor any of its Professionals (collectively, the "Exculpated Persons"), shall have or incur any liability to any Entity for any act taken or omission made in good faith in connection with or related to formulating, negotiating, implementing, confirming or consummating the Plan, the Disclosure Statement or any Plan Document.  The Exculpated Persons shall have no liability to the Debtor, any Creditor, Interest holder, any other party in interest in the Chapter 11 Case or any other Entity for actions taken or not taken under the Plan, in connection herewith or with respect thereto, or arising out of their administration of the Plan or the property to be distributed under the Plan, in good faith, including failure to obtain Confirmation or to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the occurrence of the Effective Date, and in all respects such Exculpated Persons shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

*Id.* at *22.

30.     Because the district court has already concluded that confirmation of a plan containing a virtually identical exculpation provision constituted clear error, the Movants have demonstrated a likelihood of success on the merits of their appeal.  Here, the Exculpation Provision is even broader than the one at issue in *In re Thru*, as it protects non-debtor entities and their directors, is not limited to bankruptcy administration matters, and is not limited in time to the pre-Effective Date period.

31.     Moreover, the Court's stated reasons for allowing the Exculpation Provision, as expressed in the Confirmation Order, on their face do not apply to many of the Exculpated Parties. The Court found that dicta in *Pacific Lumber* that "costs the released parties might incur defending against suits alleging such negligence are unlikely to swamp either these parties or the

11

consummated reorganization" hinted that the equities and/or economics of a case might justify a non-debtor exculpation provision. While Movants concede it is possible that litigation against some of the Exculpated Parties, such as the Debtor, the Independent Directors, the CEO/CRO, and even the Employees, could hamper reorganization efforts, there is no foreseeable or expressed concern that litigation against other Exculpated Parties, such as the Debtor's owned subsidiaries and Managed Funds, or the Related Persons, would have any impact on reorganization efforts. The Court also found that the Independent Directors, and by extension the CEO/CRO, fell within a policy-based exclusion as being akin to a creditors' committee or its members, but the Independent Directors and the CEO/CRO are only one subset of the Exculpated Parties. The Court made no finding that exculpation of any of the other Exculpated Parties could be justified under this rationale. Finally, again only with respect to the Independent Directors, the Court found that they were already exculpated by virtue of its January 9, 2020 order at Docket No. 339. Accordingly, even if there is a basis in law for extending exculpation protections to certain of the Exculpated Parties, namely the Independent Directors and the CEO/CRO, there is no stated or implied basis for allowing the Exculpation Provision with respect to any of the other Exculpated Parties.[3]

32. Furthermore, the sweeping Injunction preventing parties from pursuing causes of action against the non-debtor Protected Parties effectively discharges non-debtors and contravenes

---

[3] It is also worth noting that the breadth of the Exculpation Provision *does* serve to discharge non-debtors in contravention of section 524 of the Bankruptcy Code. Under section 1141(d) of the Bankruptcy Code, confirmation of a plan discharges the debtor from any debt "that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1). Section 524 simply provides the effect of a discharge granted under another chapter of the Bankruptcy Code. Thus, to the extent that the Exculpation Provision exculpates non-debtor parties from claims arising prior to the date of confirmation, it has the effect of granting a discharge to such parties. With this understanding in mind, the Fifth Circuit's bar on exculpation provisions with respect to non-debtor third parties that are not co-liable with the debtor avoids conflict between sections 524(e) and 1141(d)(1) of the Bankruptcy Code. Movants submit that the decision of the U.S. Court of Appeals for the Ninth Circuit, cited favorably by the Court in its oral ruling, misses this point.

established Fifth Circuit precedent. The Injunction is significantly broader than injunctions that have been struck down by courts in the Fifth Circuit. In the recent case of *In re Thru, Inc.*, the district court struck down an injunction that purported to enjoin causes of action held against the debtor or the estate and that arose prior to the effective date of the plan from being brought against certain non-debtor protected parties. 2018 WL 5113124, at *21-22. The district court found that it was clearly erroneous for the bankruptcy court to approve the injunction, which the bankruptcy court approved under section 105 of the Bankruptcy Code, because it effectively discharged non-debtors. *Id.* The Injunction in the Plan is broader than the injunction at issue in *In re Thru* in several important respects, as the Plan Injunction is not limited to claims that arose prior to the Effective Date, and is not limited to claims that the Enjoined Parties hold against the Debtor. Rather, the Injunction appears to have no end date, so long as a claim or cause of action arises out of some future administration or implementation of the Plan. Moreover, and significantly, the Injunction precludes Enjoined Parties from bringing claims held *against the Protected Parties* -- not just claims held against the Debtor or the estate. *See also In re Pilgrim's Pride*, 2010 WL 200000, at *5 n.14 (*Pacific Lumber* prohibits exculpatory language that would bar outright actions against the debtor's management and professionals for their actions taken during a chapter 11 case).

33. The propriety of the Injunction is not saved by the ability of an Enjoined Party to bring such claim if the Court so allows. In fact, the channeling nature of the Injunction is impermissible as well. As drafted, the Injunction is broad enough to cover claims and causes of action that arise out of post-confirmation, ordinary course transactions between the Reorganized Debtor and/or non-debtor parties and other parties in interest and which do not have any actual relationship to the Plan or its implementation. The Court lacks subject matter jurisdiction over the

breadth of actions covered by the Injunction. *See In re CJ Holding Co.*, 597 B.R. 597, 604 (S.D. Tex. 2019) ("After confirmation, 'the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan.'") (quoting *In re Galaz*, 841 F.3d 316, 322 (5th Cir. 2016)); *see also In re Pilgrim's Pride*, 2010 WL 200000, at *5, n.14 (bankruptcy court could retain *limited* jurisdiction to channel claims against the debtors' management and professionals stemming from their conduct during the chapter 11 cases, but *Pacific Lumber* prohibits exculpatory language that would bar such claims outright). Therefore, the channeling Injunction is impermissible because the Court appears to lack jurisdiction to even consider whether an enjoined action is colorable. The channeling Injunction goes far beyond what the Court has jurisdiction to channel to itself. Parties cannot create indefinite subject matter jurisdiction where none otherwise exists.

34.     Furthermore, the Court's justification of the gatekeeping Injunction is based primarily on the litigiousness of Dondero and his controlled entities. However, this justification does not extend to the Funds, which are controlled by independent boards, as discussed above, and are wholly independent of Dondero. This reality reflects why the gatekeeping Injunction is overly broad, as it serves to prevent innocent third parties from exercising their legal rights.

35.     Accordingly, to the extent that the Confirmation Order authorizes the Exculpation Provision and the Injunction, it does so based upon an erroneous interpretation of the law and is an abuse of discretion. *In re Tex. Equip. Co.*, 283 B.R. at 227.

36.     Second, this element is also satisfied because the Confirmation Order, to the extent it approves the Exculpation Provision and the Injunction, presents a serious legal question. At a minimum, Movants have shown a substantial case on the merits and the balance of equities weigh heavily in favor of a stay. *See In re First S. Sav.*, 820 F.2d at 704; *In re Dernick*, 2019 WL 236999,

Appx.000316

at *3; *In re Tex. Equip. Co.*, 283 B.R. at 227. "A serious legal question exists when legal issues have far-reaching effects, involve significant public concerns, or have a broad impact on federal/state relations." *In re Dernick*, 2019 WL 236999, at *3; *see In re Westwood Plaza Apartments, Ltd.*, 150 B.R. 163, 168 (Bankr. E.D. Tex. 1993) (serious legal question existed with respect to the appropriate standard for determining the market rate of interest in a cramdown plan, even though no likelihood of success on the merits). Here, the Exculpation Provision and the Injunction violate established Fifth Circuit precedent, and the Confirmation Order's approval of such provisions is clearly erroneous. Upholding judicial precedent is a significant public interest, and the allowance of these provisions will cause lasting effects on parties in interest. Indeed, the Injunction is so broad that it will prevent parties, such as the Movants, from enforcing their rights with respect to post-confirmation transactions unrelated to the bankruptcy case unless they first seek authority to do so from the Court. Not only does this prevent a significant hurdle to the enforcement of rights, but it presents a serious due process concern.

37.     Accordingly, it is likely that the Confirmation Order will be reversed to the extent it allows the Exculpation Provision and the Injunction. At the very least, the validity of the Exculpation Provision and the Injunction presents serious legal issues, Movants have presented a substantial case on the merits, and as discussed herein, the balance of equities weigh in favor of issuing a stay.

### C.     Movants will Suffer Irreparable Injury without a Stay

38.     The second factor concerns whether the moving party will suffer irreparable injury if the stay is denied because it will effectively be denied appellate review due to mootness or similar considerations. *In re Tex. Equip. Co.*, 283 B.R. at 228. This factor also warrants a stay of the Confirmation Order.

Appx.000317

39.     Consummation of a plan may render any challenges to confirmation thereof moot.

*In re Westwood Plaza Apartments*, 150 B.R. at 169 (factor tilted in favor of granting stay); *In re*

*Thru, Inc.*, 2018 WL 5113124, at *12 (equitable mootness more likely if no stay has been obtained

and plan has been substantially consummated); *see also In re Best Products Co.*, 177 B.R. 791

(S.D.N.Y. 1995) (dismissing appeal of confirmation order as moot where appellant failed to seek

stay of confirmation order and plan had been consummated).  Indeed, the Fifth Circuit in *In re*

*Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009), recognized the potential issues with denying a

stay of a confirmation order pending appeal:

> Although the exigencies of the case appeared to demand prompt action, simply
> denying a stay seems to have been, and often will be, too simplistic a response. A
> plan may be designed to take effect, as it was here, after a lapse of sufficient time
> to initiate appellate review. A supersedeas bond may be tailored to the scope of the
> appeal. An appeal may be expedited. As with all facets of bankruptcy practice,
> myriad possibilities exist. Thus, substantial legal issues can and ought to be
> preserved for review.

584 F.3d at 243.

40.     The unprecedented breadth of the Exculpation Provision and the Injunction has the

potential to cause immediate and irreparable harm to the Movants and other parties in interest.

These provisions have the cumulative effect of preventing Movants, among other parties, from

exercising their legal rights to pursue any claims or causes of action, however distantly related to

the bankruptcy case.  Indeed, the provisions are so broad that they would prevent Movants from

exercising their contractual rights and remedies that arise post-confirmation in the ordinary course

of business under the CLO management agreements, and insulate the Debtor as well as non-debtor

parties from any corresponding liability, despite the same being completely distinct from the

bankruptcy case, and notwithstanding the basis or nature of the claim.  In effect, even if the Debtor

were to engage in conduct post-confirmation that presented a basis for the Movants to remove the

Debtor as manager under the CLO management agreements, they would be prevented from doing so. The Exculpation Provision and the Injunction impermissibly shields the Debtor and non-debtor parties from liability for post-petition and post-confirmation breaches of contract.

41. In practical effect, Movants will, at the very least, have to seek leave of the Court in order to seek any relief for any present or future actionable wrongs, whether contractual or under applicable non-bankruptcy law. However, the Court will not have jurisdiction with respect to disputes that arise post-confirmation. It is thus foreseeable that the Court, without jurisdiction, could decide that a proposed claim is not colorable, preventing Movants from pursuing their contractual rights and remedies without review by a court of proper jurisdiction. At a minimum, the time it would take Movants to comply with the gatekeeping Injunction, during which time the Movants would be prevented from exercising their legitimate contractual rights, imposes a substantial burden.

42. Clearly, if the stay is denied, Movants could suffer harm for which they have no legal redress and which becomes moot - equitably or otherwise - before a decision is rendered on appeal.

43. The impermissibility of the Exculpation Provision and Injunction is apparent, and absent a stay, will immediately deprive Movants of their rights and ability to seek legal redress for wrongs that may be suffered. The possibility of irreparable injury can only be remedied by a stay of the Confirmation Order.

**D.    No Substantial Harm to the Debtor or Other Parties**

44. A stay pending appeal is also justified under the third prong because neither the Debtor, nor any of the Debtor's creditors, will be substantially harmed by a stay of the Confirmation Order pending appeal. Moreover, the Court can fashion the stay to prevent harm to

17

the Debtor and other parties. *See In re Westwood Plaza Apartments*, 150 B.R. at 169 (conditioning

stay of plan on, among other things, debtor's ability to pay administrative, tax and secured claims

as provided for under the plan); *In re Thru*, 2018 WL 5113124, at *20 (recognizing availability of

partial relief on appeal of plan with respect to exculpation provisions).

45. Courts have found substantial harm to other parties if the stay would cause a

significant delay in the administration of the estate or a delay in the distribution to creditors under

the plan. *In re Dernick*, 2019 WL 236999, at *4. However, a stay of the Confirmation Order does

not prevent the Debtor from continuing to operate as it has been doing during the bankruptcy case.

Indeed, the Plan largely contemplates a continuation of the pre-confirmation business. The Debtor

can thus continue administering the estate, as well as the CLOs and other managed funds. There

are no asset sales or compromises under the Plan that depend upon it becoming effective, nor is

there any contingent exit financing. Accordingly, staying the Confirmation Order will not hamper

the reorganization.

46. To the contrary, if the Confirmation Order is not stayed, parties in interest in the

case would be significantly injured by the serious deprivation of their rights.

47. A stay pending appeal is critical to preserve the status quo, which, in this instance

involves preservation of the Movants' legal rights and remedies, while important legal issues are

determined by the appellate court. *In re Tolco Props., Inc.*, 6 B.R. 490, 491 (Bankr. E.D. Va.

1980) ("The Court is of the opinion that the purpose of a stay pending appeal is to maintain the

status quo and to prevent harm to the moving party between the time the original order was entered

and the decision to appeal.").

**E.     The Public Interest is Served by a Stay**

48. Because the Exculpation Provision and the Injunction impermissibly infringe upon

the contractual, legal and due process rights of parties in interest in the bankruptcy case, a stay pending appeal of the Confirmation Order will serve the public interest. A stay will ensure that the Debtor as well as non-debtor parties are held accountable for their post-petition and post-confirmation conduct, while preserving the rights and remedies of parties in interest under applicable non-bankruptcy law. Likewise, a stay will serve the public interest of respecting and upholding judicial precedent.

49. Moreover, a stay will protect the interests of the Movants and other innocent third party investors that have collectively invested more than $1 billion in the CLOs that the Debtor manages. The Exculpation Provision and Injunction, if not stayed, may effectively and permanently prevent these parties from exercising legitimate contractual rights.

50. The public interest will further be served by preserving the status quo among the parties while the propriety of the Exculpation and Injunction provisions is resolved by the appellate court. "The case law signals a preference in favor of maintaining the status quo." *Skinner v. SBA (In re Skinner)*, 202 B.R. 867, 869 (W.D. Va. 1996) (*citing Feller v. Brock,* 802 F.2d 722, 727 (4th Cir. 1986)).

### IV.  CONCLUSION

51. Based on the foregoing, a stay of the Confirmation Order is justified under each of the applicable factors for a stay pending appeal. Accordingly, the Court should grant a stay of the Confirmation Order with respect to such provisions pending appeal.

WHEREFORE, Movants request that the Court enter an Order:

1. Staying the Confirmation Order pending appeal; and

2. Granting such other relief as is just and proper.

Dated:  March 3, 2021

**K&L Gates LLP**

*/s/ A. Lee Hogewood, III*
A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Telephone: (919) 743-7306
E-mail: lee.hogewood@klgates.com

Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Telephone: (214) 939-5659
E-mail: artoush.varshosaz@klgates.com

*Counsel for Highland Income Fund,*
*NexPoint Strategic Opportunities Fund,*
*Highland Global Allocation Fund, and*
*NexPoint Capital, Inc.*


## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2021, I caused the foregoing document to be served via first class United States mail, postage prepaid and/or electronic email through the Court's CM/ECF system to the parties that consented to such service.

Dated:  March 3, 2021

*/s/ A. Lee Hogewood, III*
A. Lee Hogewood, III

Appx.000322

# EXHIBIT 9

Case 19-34054-sgj11 Doc 1971 Filed 03/04/21    Entered 03/04/21 17:04:18    Page 1 of 14
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 330 of 783   PageID 6751
Docket #1971  Date Filed: 03/04/2021

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

**JOINDER TO MOTIONS FOR STAY PENDING APPEAL
OF THE COURT'S ORDER CONFIRMING THE
DEBTOR'S FIFTH AMENDED PLAN**

Now into Court, through undersigned counsel, come The Dugaboy Investment Trust and

Get Good Trust ("Movers") who hereby submit this *Joinder to Motions for Stay Pending Appeal of*

*the Court's Order Confirming the Debtor's Fifth Amended Plan* ("Joinder"), and respectfully represent as

follows:

**Notice of Joinder**

1.      The Dugaboy Investment Trust and Get Good Trust hereby join and adopt all

assertions as stated in the following:

a.      *Emergency Motion of the Advisors for Stay Pending Appeal of the*

*Confirmation Order, and Brief in Support thereof* filed on February 28, 2021 (Dkt.



#1955) filed by Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.; and

b.      *Motion for Stay Pending Appeal of the Court's Order Confirming the Debtor's Fifth Amended Plan* filed on March 3, 2021 (Dkt. #1967) filed by Highland Income Fund, NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and NexPoint Capital, Inc.

(collectively, "Motions for Stay").

2.      Further, to the extent any other parties seek the relief requested in the Motions for Stay subsequent to filing this Joinder, The Dugaboy Investment Trust and Get Good Trust shall support the relief requested in the subsequent filing.

3.      In addition to the reasons set forth in the Motions for Stay, Movers believe that a stay is warranted based upon the following:

a.   Success on the Merits -

i.  The Court, in confirming the Debtor's Plan, distinguished 5th Circuit case law (*In Re Pacific Lumber,* 584 F.3d 229 (5th Cir 2009) regarding the release and exculpation provisions set forth in the Plan.  Movers believe the 5th Circuit's decision in *Securities and Exchange Commission v. Stanford International Bank, Ltd.,* No. 17-10663 (5th Cir. 2019) (copy attached) is the latest expression by the 5th Circuit that such release and exculpation provisions are not permissible as a matter of law.  Judge Jones in *Stanford* stated:

"The prohibition on enjoining unrelated, third party claims without the third parties' consent does not depend on the Bankruptcy Code, but it is a maxim of law not abrogated by the district court's equitable power to fashion ancillary relief measures."

The *Stanford* decision rendered some ten (10) years after *In re Pacific Lumber* reaffirms the 5th Circuit's bright line prohibition concerning release and exculpation provisions and that, notwithstanding the equitable powers of District and Bankruptcy Courts, such provisions are not permissible as a matter of law.

    b. Public Policy -

The other issue raised by Movers is the issue relative to the unfair discrimination contained in the Plan. As a policy matter, absent a clear directive by the 5th Circuit that the language in 11 U.S.C. § 1129(b) means something other than prohibiting unfair discrimination, this Court should suspend the effect of the Plan that discriminates against the Class 8 creditors.

**WHEREFORE**, based upon the foregoing Joinder to Motions for Stay Pending Appeal of the Court's Order Confirming the Debtor's Fifth Amended Plan, The Dugaboy Investment Trust and Get Good Trust assert a stay of the Confirmation Order is justified under each of the applicable factors for a stay pending appeal. Therefore, The Dugaboy Investment Trust and Get Good Trust pray that this Court grant a stay of the Confirmation Order with respect to such provisions pending appeal and for all other relief that is just and equitable.

March 4, 2021

*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300

{00375210-8}

Appx.000326

Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*
*and Get Good Trust*

## CERTIFICATE OF SERVICE

I, Douglas S. Draper, certify that on March 4, 2021, a copy of the above and foregoing *Joinder to Motions for Stay Pending Appeal of the Court's Order Confirming the Debtor's Fifth Amended Plan* has been served electronically to all parties entitled to receive electronic notice in this matter through the Court's ECF system as follows:

- David G. Adams    david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Amy K. Anderson    aanderson@joneswalker.com, lfields@joneswalker.com;amy-anderson-9331@ecf.pacerpro.com
- Zachery Z. Annable    zannable@haywardfirm.com
- Bryan C. Assink    bryan.assink@bondsellis.com
- Asif Attarwala    asif.attarwala@lw.com
- Joseph E. Bain    JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird    baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach    bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette    pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com;rmatsumura@kslaw.com
- John Y. Bonds    john@bondsellis.com
- Larry R. Boyd    lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner    jbrookner@grayreed.com, lwebb@grayreed.com;acarson@grayreed.com;cpatterson@grayreed.com
- Greta M. Brouphy    gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com
- M. David Bryant    dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson    Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello    achiarello@winstead.com
- Shawn M. Christianson    schristianson@buchalter.com, cmcintire@buchalter.com
- James Robertson Clarke    robbie.clarke@bondsellis.com
- Matthew A. Clemente    mclemente@sidley.com, matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwomey@sidley.com
- Megan F. Clontz    mclontz@spencerfane.com, lvargas@spencerfane.com
- Andrew Clubok    andrew.clubok@lw.com
- Leslie A. Collins    lcollins@hellerdraper.com
- David Grant Crooks    dcrooks@foxrothschild.com, etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com

{00375210-8}

- Gregory V. Demo    gdemo@pszjlaw.com,
  jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com
  ;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjla
  w.com;lsc@pszjlaw.com
- Casey William Doherty    casey.doherty@paulhastings.com
- Douglas S. Draper    ddraper@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com
- Lauren Kessler Drawhorn    lauren.drawhorn@wickphillips.com,
  samantha.tandy@wickphillips.com
- Vickie L. Driver    Vickie.Driver@crowedunlevy.com,
  crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@cr
  owedunlevy.com;ecf@crowedunlevy.com
- Jonathan T. Edwards    jonathan.edwards@alston.com
- Jason Alexander Enright    jenright@winstead.com
- Robert Joel Feinstein    rfeinstein@pszjlaw.com
- Matthew Gold    courts@argopartners.net
- Bojan Guzina    bguzina@sidley.com
- Thomas G. Haskins    thaskins@btlaw.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse    ghesse@HuntonAK.com,
  amckenzie@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman    jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-
  hoffman-8287@ecf.pacerpro.com
- A. Lee Hogewood    lee.hogewood@klgates.com,
  haley.fields@klgates.com;matthew.houston@klgates.com;mary-
  beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.co
  m;Artoush.varshosaz@klgates.com
- Warren Horn    whorn@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com
- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com,
  gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-
  7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com,
  txefilingnotice@sidley.com;paige-montgomery-
  7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sid
  ley.com

{00375210-8}

Appx.000328

- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- Holland N. O'Neil    honeil@foley.com,
  jcharrison@foley.com;acordero@foley.com;holly-holland-oneil-3540@ecf.pacerpro.com
- Rakhee V. Patel    rpatel@winstead.com,
  dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz    jpomerantz@pszjlaw.com
- Kimberly A. Posin    kim.posin@lw.com, colleen.rico@lw.com
- Jeff P. Prostok    jprostok@forsheyprostok.com,
  lbreedlove@forsheyprostok.com;calendar@forsheyprostok.com;calendar_0573@ecf.cour
  tdrive.com;jprostok@ecf.courtdrive.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txefilingnotice@sidley.com;penny-reid-
  4098@ecf.pacerpro.com;ncade@sidley.com
- Suzanne K. Rosen    srosen@forsheyprostok.com,
  lbreedlove@forsheyprostok.com;calendar@forsheyprostok.com;srosen@ecf.courtdrive.c
  om;calendar_0573@ecf.courtdrive.com
- Davor Rukavina    drukavina@munsch.com
- Amanda Melanie Rush    asrush@jonesday.com
- Alyssa Russell    alyssa.russell@sidley.com
- Douglas J. Schneller    douglas.schneller@rimonlaw.com
- Brian Patrick Shaw    shaw@roggedunngroup.com,
  cashion@roggedunngroup.com;jones@roggedunngroup.com
- Michelle E. Shriro    mshriro@singerlevick.com,
  scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich    nskolnekovich@hunton.com,
  plozano@huntonak.com;astowe@huntonak.com;creeves@huntonak.com
- Jared M. Slade    jared.slade@alston.com
- Frances Anne Smith    frances.smith@judithwross.com,
  michael.coulombe@judithwross.com
- Eric A. Soderlund    eric.soderlund@judithwross.com
- Martin A. Sosland    martin.sosland@butlersnow.com,
  ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com
- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-
  Perez@lgbs.com;dallas.bankruptcy@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com
- Kesha Tanabe    kesha@tanabelaw.com
- Chad D. Timmons    bankruptcy@abernathy-law.com
- Dennis M. Twomey    dtwomey@sidley.com
- Basil A. Umari    BUmari@dykema.com, pelliott@dykema.com
- United States Trustee    ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz    artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Julian Preston Vasek    jvasek@munsch.com

- Donna K. Webb     donna.webb@usdoj.gov,
  brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber     bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller     dallas.bankruptcy@publicans.com, dora.casiano-
  perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka     danw@lfdslaw.com,
  craigs@lfdslaw.com,dawnw@lfdslaw.com,ivys@lfdslaw.com
- Hayley R. Winograd     hwinograd@pszjlaw.com
- Megan Young-John     myoung-john@porterhedges.com

I also caused same to be served on March 5, 2021, by Docusource via U.S. First Class Mail, postage prepaid upon the following parties:

Paul N. Adkins
11 Mount Emily Road #07-27
Singapore, 228493

American Express National Bank
c/o Becket and Lee LLP
PO Box 3001
Malvern, PA 19355-0701

James T. Bentley
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

Jeffrey E. Bjork
LATHAM & WATKINS LLP
355 South Grand Avenue, Ste. 100
Los Angeles, CA 90071

Jessica Boelter
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019

Matthew G. Bouslog
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612

William P. Bowden
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150

{00375210-8}

Appx.000330

Wilmington, DE 19899

Candace C. Carlyon
CARLYON CICA CHTD.
265 e. Warm Springs Road., Ste 107
Las Vegas, NV 89119

Joseph L. Christensen
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

Louis J. Cisz
Nixon Peabody LLP
One Embarcadero Center, 32nd Fl
San Francisco, CA 94111

Kevin M. Coen
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, Suite 1600
1000 North King Street
Wilmington, DE 19801

Debra A. Dandeneau
Baker & McKenzie LLP
425 5th Ave.
New York, NY 10018

Deloitte Tax LLP
1111 Bagby Street, Ste. 4500
Houston, TX 77002

Mark. L. Desgrosseilliers
Chipman, Brown, Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801

Development Specialists, Inc.
333 South Grand Ave., Ste. 4070
Los Angeles, CA 90071

Fair Harbor Capital, LLC
Ansonia Finance Station
PO Box 237037
New York, NY 10023

{00375210-8}

Appx.000331

Bojan Guzina
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

Emily M. Hahn
Abernathy, Roeder, Boyd & Hullett, P.C.
1700 Redbud Blvd. Ste. 300
McKinney, TX 75069

Hain Capital Group, LLC
301 Route 17, 6th Floor
Rutherford, NJ 07070

Marc B. Hankin
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3098

Michelle Hartman
Baker & McKenzie LLP
1900 N. Pearl, Ste. 1500
Dallas, TX 75201

Hayward & Associates PLLC
10501 N. Central Expwy., Ste 106
Dallas, TX 75231

William A. Hazeltine
Sullivan Hazeltine Allinson LLC
901 North Market Street
Suite 1300
Wilmington, DE 19801

Kuan Huang
Latham & Watkins LLP
855 Third Avenue
New York, NY 10022

Ira D Kharasch
10100 Santa Monica Boulevard
13th Floor
Los Angeles, CA 90067

Marshall R. King
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
Suite 1400
New York, NY 10066

Alan J. Kornfeld
Pachulski Stang Ziehl & Jones LLPL
10100 Santa Monica Blvd., 13 Fl
Los Angeles, CA 90067

Kurtzman Carson Consultants LLC
Attn: Drake Foster
222 N. Pacific Coast Highway, 3rd Floor
El Segundo, CA 90245

 Kurtzman Carson Consultants, LLC
222 N. Pacific Coast Highway, Ste. 300
El Segundo, CA 90245

M. Natasha Labovitz
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Richard B. Levin
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3098

Maxim B Litvak
Pachulski Stang Ziehl & Jones LLP
150 California Street
15th Floor
San Francisco, CA 94111

John E. Lucian
Blank Rome LLP
1201 N. Market Street, Sutie 800
1000 North King Street
Wilmington, DE 19801

Lauren Macksoud
1221 Avenue of the Americas
New York, NY 10020-1089

{00375210-8}

Appx.000333

Mark M. Maloney
King & Spalding LLP
191 Peachtree St.
Suite 4900
Atlanta, GA 30303-1763

Mark M. Maloney
King & Spalding LLP
1180 Peachtree Steet, NE
Atlanta, GA 30309

Terri L. Mascherin
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456

Patrick C. Maxcy
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361

R. Stephen McNeill
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

Mercer (US) Inc.
155 N. Wacker Drive, Ste. 1500
Chicago, IL 60606

Michael J. Merchant
RICHARDS, LAYTON & FINGER, P.A.
one Rodney Square
920 North King Street
Wilmington, DE 19801

Curtis S. Miller
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, Suite 1600
1000 North King Street
Wilmington, DE 19801

Josef W. Mintz
Blank Rome LLP
1201 Market Street, Suite 800
1000 North King Street
Wilmington, DE 19801

Joseph T. Moldovan
MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022

Alan A. Moskowitz
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10066

Michael R. Nestor
YOUNG CONAWAY STARGATT & TAYLOR, LL
Rodney Square
1000 North King Street
Wilmington, DE 19801

James E. O'Neill
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Fl.
Wilmington, DE 19801

Tracy M. O'Steen
CARLYON CICA CHTD.
265 E. Warm Springs Road., Ste 107
Las Vegas, NV 89119

Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Kathleen Preston
Winston & Strawn LLP
800 Capitol Street, Ste. 2400
Houston, TX 77002

Michael A. Rosenthal - DO NOT USE
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10066

{00375210-8}

Appx.000335

Jeremy W. Ryan
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

James P. Seery
795 Columbus Ave., 12A
New York, NY 10025

Sally T. Siconolfi
MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022

Sarah E. Silveira
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

D. Ryan Slaugh
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

Tracy K. Stratford
Jones Day
North Point
901 Lakeside Ave.
Cleveland, OH 44114

Daniel E. Stroik
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Sarah A. Tomkowiak
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304

Stephen G. Topetzes
K&L Gates LLP
1601 King St., N.W.
Washington, DC 20006

Thomas A. Uebler
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

Michael L. Vild
CROSS & SIMON, LLC
1105 N. Market Street, Suite 901
1000 North King Street
Wilmington, DE 19801

Elissa A. Wagner
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003

Erica S. Weisgerber
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

James A. Wright
K&L Gates LLP
State Street Financial Center
One Lincoln St.
Boston, MA 02111

Sean M. Young Conway Stargatt & Taylor, LLP
Young Conway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801

_/s/Douglas S. Draper._
Douglas S. Draper, La. Bar No. 5073

{00375210-8}

14

Case: 17-10663     Document: 00514998485     Page: 1     Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21   Entered 03/04/21 17:04:18   Page 1 of 31
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 344 of 783   PageID 6765

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-10663

United States Court of Appeals
Fifth Circuit

**FILED**

June 17, 2019

Lyle W. Cayce
Clerk

SECURITIES AND EXCHANGE COMMISSION

Plaintiff

v.

STANFORD INTERNATIONAL BANK, LIMITED

Defendant

v.

JOSEPH BECKER; TERENCE BEVEN; WANDA BEVIS;
THOMAS EDDIE BOWDEN; TROY L. LILLIE, JR., et al

Movants - Appellants

DOUG MCDANIEL; SCOTT NOTOWICH;
EDDIE ROLLINS; CORDELL HAYMON; et al,

Objecting Parties - Appellants

v.

CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON;
ARCH SPECIALTY INSURANCE COMPANY;
LEXINGTON INSURANCE COMPANY,

Interested Parties - Appellees

RALPH S. JANVEY,

Appellee
***********************
CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON;

Appx.000338

Case: 17-10663     Document: 00514998485     Page: 2     Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21   Entered 03/04/21 17:04:18   Page 2 of 31
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 345 of 783   PageID 6766

No. 17-10663

ARCH SPECIALTY INSURANCE COMPANY,

       Plaintiffs - Appellees

v.

RALPH S. JANVEY, In his Capacity as Court Appointed Receiver for
Stanford International Bank Limited, Stanford Group Company, Stanford
Capital Managment L.L.C., Stanford Financial Group, and Stanford
Financial Group Bldg,

       Defendant - Appellee

v.

CORDELL HAYMON,

       Intervenor - Appellant

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON;
ARCH SPECIALTY INSURANCE COMPANY;
LEXINGTON INSURANCE COMPANY,

       Plaintiffs - Appellees

v.

CORDELL HAYMON,

       Objecting Party - Appellant

v.

RALPH S. JANVEY,

       Intervenor - Appellee

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON;
ARCH SPECIALTY INSURANCE COMPANY;
LEXINGTON INSURANCE COMPANY,

       Plaintiffs - Appellees

v.

2

Case: 17-10663    Document: 00514998485    Page: 3    Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21   Entered 03/04/21 17:04:18   Page 3 of 31
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 346 of 783   PageID 6767

No. 17-10663

RALPH S. JANVEY,

>Intervenor Defendant - Appellee

v.

CORDELL HAYMON,

>Objecting Party - Appellant

**********************************************

CORDELL HAYMON,

>Third Party Plaintiff - Appellant

v.

CERTAIN UNDERWRITERS OF LLOYD'S OF LONDON, Claims asserted
by Claude F. Reynaud, Jr.

>Third Party Defendant - Appellee

v.

RALPH S. JANVEY,

>Appellee

————————————

Appeals from the United States District Court
for the Northern District of Texas

————————————

Before JONES, CLEMENT, and SOUTHWICK, Circuit Judges.

EDITH H. JONES, Circuit Judge:

These appeals challenge the district court's approval of a global
settlement between Ralph Janvey, the Receiver for Stanford International
Bank and related entities, and various insurance company Underwriters, who
issued policies providing coverage for fidelity breaches, professional indemnity,
directors and officers protection, and excess losses.  The settlement yielded $65

3

Case: 17-10663    Document: 00514998485    Page: 4    Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21    Entered 03/04/21 17:04:18    Page 4 of 31
Case 3:21-cv-01585-S    Document 15    Filed 10/01/21    Page 347 of 783    PageID 6768

No. 17-10663

million for the Receiver's claims against the insurance policy proceeds, but it wipes out, through "bar orders," claims by coinsureds to the policy proceeds and their extracontractual claims against the Underwriters even if such claims would not reduce or affect the policies' coverage limits. Among the parties whose claims were barred are Appellants comprising (a) two groups of former Stanford managers and employees; (b) Cordell Haymon, a Stanford entity director who settled with the Receiver for $2 million; and (c) a group of Louisiana retiree-investors.

A constellation of issues surrounding the global settlement is encapsulated in the question whether the district court abused its discretion in approving the settlement and bar orders. Based on the nature of *in rem* jurisdiction and the limitations on the court's and Receiver's equitable power, we conclude the district court lacked authority to approve the Receiver's settlement to the extent it (a) nullified the coinsureds' claims to the policy proceeds without an alternative compensation scheme; (b) released claims the Estate did not possess; and (c) barred suits that could not result in judgments against proceeds of the Underwriters' policies or other receivership assets. Accordingly, we VACATE the district court's order approving the settlement and bar orders and REMAND for further proceedings consistent with this opinion.

## BACKGROUND

The massive Stanford Financial Ponzi scheme defrauded more than 18,000 investors who collectively lost over $5 billion. As part of a securities fraud lawsuit brought by the SEC, the district court appointed the Receiver "to immediately take and have complete and exclusive control" of the receivership estate and "any assets traceable" to it. The court granted the Receiver "the full power of an equity receiver under common law," including the right to assert claims against third parties and "persons or entities who received assets or

4

Case: 17-10663     Document: 00514998485     Page: 5     Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21   Entered 03/04/21 17:04:18   Page 5 of 31
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 348 of 783   PageID 6769

No. 17-10663

records traceable to the Receivership Estate." *SEC v. Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d 323, 326 (N.D. Tex. 2011). The district court also held that the court possessed exclusive jurisdiction over a group of insurance policies and their proceeds, at issue in this case, and ruled that, other than a lawsuit involving the Stanford criminal defendants, "[n]o persons or entities may bring further claims related to the [Proceeds] in any forum other than" the district court. Neither of these latter two orders was timely appealed.

The policies issued to the Stanford entities covered, in different arrangements, losses and defense costs for the entities and their officers, directors and certain employees. At issue are the following policies: a Directors' and Officers' Liability and Company Indemnity Policy ("D&O"); a Financial Institutions Crime and Professional Indemnity Policy, including (a) first-party fidelity coverage for employee theft ("Fidelity Bond") and "[l]oss resulting directly from dishonest, malicious or fraudulent acts committed by an Employee," and (b) third-party coverage for professional indemnity ("PI Policy"); and an Excess Blended "Wrap" Policy ("Excess Policy"). The policy limits are as follows:

|  | **Stanford Bank Entities** | **Stanford Brokerage Entities** |
|---|---|---|
| **D&O Policy** | $5 million | $5 million |
| **PI Policy** | $5 million per Claim $10 million aggregate | $5 million per Claim $10 million aggregate |
| **Fidelity Bond** | $5 million per Loss $10 million aggregate | $5 million per Loss $10 million aggregate |
| **Excess Policy** | $45 million each Claim or Loss/$90 million aggregate | |

Case: 17-10663     Document: 00514998485     Page: 6     Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21   Entered 03/04/21 17:04:18   Page 6 of 31
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 349 of 783   PageID 6770

No. 17-10663

The maximum amount of remaining coverage is disputed.  According to the district court, the Underwriters have paid some $30 million in claims under the policies for insureds' defense costs.  Underwriters contend that only $46 million remains available because the losses resulted from a single event – the Ponzi scheme.  The Receiver argues that the conduct implicates the aggregate loss limits up to $101 million of remaining coverage.  The questions of coverage ultimately depend on the identity of the insureds under each policy and the nature of the claims, and these issues are hotly contested.  The Stanford corporate entities are insured under all of the policies, but Stanford directors, officers, and employees are coinsureds only under the D&O, PI, and Excess policies.[1]  Each policy is subject to multiple definitions and exclusions.  After the Receiver made numerous claims for coverage under the policies (the "Direct Claims") that were met with Underwriters' denial based on policy exclusions, several lawsuits ensued.

The Receiver also pursued the policy proceeds indirectly by filing lawsuits (the "Indirect Claims") against hundreds of former Stanford directors, officers, and employees, alleging fraudulent transfers and unjust enrichment and/or breach of fiduciary duty.  The Receiver obtained a $2 billion judgment against one former Stanford International Bank director and a $57 million judgment against a former Bank treasurer, both of whom were potentially covered under the policies.  The Receiver continues to litigate similar claims against the coinsured Appellants who were Stanford managers and employees. *See, e.g.*, *Stanford International Bank, Ltd., et al., v. James R. Alguire, et al.*, No. 3:09-CV-0724-N (N.D. Tex., filed Dec. 18, 2019).

---

[1] There is no dispute that the Appellants here are coinsured under the noted policies, but *not* coinsured under the Fidelity bond.  The chief dispute is about the effect of certain limitations and exclusions within the policies.

Appx.000343

Case: 17-10663    Document: 00514998485    Page: 7    Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21    Entered 03/04/21 17:04:18    Page 7 of 31
Case 3:21-cv-01585-S    Document 15    Filed 10/01/21    Page 350 of 783    PageID 6771

No. 17-10663

After eight years of sparring, the Receiver and Underwriters, together with the court-appointed Examiner on behalf of Stanford investors, mediated their disputes for several months in 2015. Mediation initially resulted in a Settlement Proposal under which the Underwriters agreed to pay the Receiver $65 million, and in return the Receiver would "fully release any and all insureds under the relevant policies." The purpose of the complete release was to shield the Underwriters from any policy obligations to defend or indemnify former Stanford personnel, including the employee Appellants, in the Receiver's Indirect Claim lawsuits. The parties almost immediately disagreed about the content of the settlement, however, and the Underwriters filed an Expedited Motion to Enforce the Settlement Agreement. The district court denied the motion and instructed the parties to continue negotiating. On June 27, 2016, the Receiver and Underwriters notified the court that they had entered into a new settlement agreement, which the Examiner supported.

Under this new settlement, the Underwriters again agreed to pay $65 million into the receivership estate, but the settlement required orders barring all actions against Underwriters relating to the policies or the Stanford Entities. Paragraph 35 of the settlement provides Underwriters the unqualified right to withdraw from the settlement if the court refuses to issue the bar orders. The bar orders were necessary because, unlike the terms of the first proposed settlement, the Receiver is required to release only the Estate's claims against 16 directors and officers (rather than all insureds), as well as the judgments already obtained against certain directors and officers.[2] All other former Stanford employees, officers and directors, including Appellants,

---

[2] Oddly, the settlement releases claims only against those directors and officers who were among the most culpable for the Ponzi scheme. And it releases Underwriters from any obligation in connection with the aforementioned judgments for $2 billion and $57 million. This oddity should have been considered when assessing the fairness of the settlement.

Case: 17-10663    Document: 00514998485    Page: 8    Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21    Entered 03/04/21 17:04:18    Page 8 of 31
Case 3:21-cv-01585-S    Document 15    Filed 10/01/21    Page 351 of 783    PageID 6772

No. 17-10663

remain subject to ongoing or potential litigation by the Receiver once the litigation stay against them is lifted. Some Appellants assert that their individual costs of defending the Receiver's ongoing actions already exceed $10,000. But the bar orders prevent them from suing the Underwriters for their costs of defense and indemnity under the insurance policies, even though they are coinsured, or for extra-contractual or statutory claims.

The Receiver moved for approval of the settlement and entry of the bar orders. The district court directed notice to all interested parties, and received objections from several third parties, including Appellants. The court heard arguments of counsel regarding the settlement, but it refused to allow parties to offer evidence or live testimony or engage in cross-examination. After the hearing, parties were permitted to file additional declarations or affidavits.

The district court approved the settlement and bar orders, denied all objections, and approved the payment of $14 million of attorney fees to Receiver's counsel. Separate Final Judgments and Bar Orders were entered in each action pending before it relating to the Stanford Entities and in Appellant Haymon's and Appellant Alvarado's separate lawsuits against the Underwriters. The district court rejected all post-trial motions.

A more complete discussion of the court's findings will follow, but in general, the court found that the settlement resulted from "vigorous, good faith, arm's-length, mediated negotiations" and concluded that the settlement was "in all respects, fair, reasonable, and adequate, and in the best interests of all Persons claiming an interest in, having authority over, or asserting a claim against Underwriters, Underwriters' Insureds, the Stanford Entities, the Receiver, or the Receivership Estate." The court further found that the settlement and bar orders were "fair, just, and equitable," and it rejected the Appellants' due process claims based on their exclusion from settlement talks and the lack of an evidentiary hearing. While the court recognized that the

8

Case: 17-10663    Document: 00514998485    Page: 9    Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21   Entered 03/04/21 17:04:18   Page 9 of 31
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 352 of 783   PageID 6773

No. 17-10663

bar orders discriminate between a few Stanford officers and the Appellants, it reasoned that "on balance the unfairness alleged by the Objectors is either mitigated by other circumstances or simply outweighed by the benefit of the settlement in terms of fairness, equity, reasonableness, and the best interests of the receivership."

The Appellants fall into three categories. The McDaniel Appellants and "Alvarado"[3] Appellants are former Stanford managers or employees from offices around the country ("Employees") who seek contractual coverage under the insurance policies and press extra-contractual claims against the Underwriters, including for bad faith and statutory violations of the Texas Insurance Code. Appellant Cordell Haymon ("Haymon") was a member of Stanford Trust Company's Board of Directors who settled the Receiver's claims against him for $2 million before the instant global settlement was reached, and in return received the express right to pursue Underwriters for policy coverage and extra-contractual claims. Finally, the Louisiana Retirees/Becker Appellants ("Retirees") are former Stanford investors who sued Stanford brokers covered by the insurance policies and seek to recover from the Underwriters directly pursuant to the Louisiana Direct Action Statute, La. Rev. Stat. 22:1269.

Each group of Appellants raises different challenges to the court's approval of the settlement and bar orders. They appeal from the district court's order denying their objections to the proposed settlement, the Final Bar Order,

---

[3] While Alvarado was originally a party to this appeal, he withdrew his individual appeal on April 19, 2018. The other employees to that action remain as appellants and will be denominated, for the sake of convenience, Alvarado Appellants.

Case: 17-10663     Document: 00514998485     Page: 10     Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21     Entered 03/04/21 17:04:18     Page 10 of
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 353 of 783   PageID 6774

No. 17-10663

and the Order Approving Attorneys' Fees[4] for the Receiver's counsel.  The Stanford Employees additionally appeal the Order denying their new trial motion, and Haymon appeals from the Order denying his motion for reconsideration.  After explaining the principles that govern the court's management of the Receivership, we will analyze each set of Appellants' objections.

## STANDARD OF REVIEW

A district court's entry of a bar order, like other actions in supervising an equity receivership, is reviewed for abuse of discretion.  *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 373 (5th Cir. 1982); *Newby v. Enron Corp.*, 542 F.3d 463, 468 (5th Cir. 2008).  A district court's determination of the fairness of a settlement in an equity receivership proceeding is reviewed for an abuse of discretion.  *Sterling v. Stewart*, 158 F.3d 1199, 1202 (11th Cir. 1998) ("Determining the fairness of the settlement [in an equity receivership] is left to the sound discretion of the trial court and we will not overturn the court's decision absent a clear showing of abuse of that discretion.").  There is no abuse of discretion where factual findings are not clearly erroneous and rulings are without legal error.  *Marlin v. Moody Nat. Bank, N.A.*, 533 F.3d 374, 377 (5th Cir. 2008).  A district court's denial of a Rule 59 motion for a new trial or to alter or amend a judgment also is reviewed for an abuse of discretion.  *St. Paul Mercury Ins. Co. v. Fair Grounds Corp.*, 123 F.3d 336, 339 (5th Cir. 1997).  This Court reviews *de novo* a district court's application of exceptions to the Anti–Injunction Act as a question of law.  *Moore v. State Farm Fire & Cas. Co.*, 556 F.3d 264, 269 (5th Cir. 2009).

---

[4] The amount and propriety of the Receiver's very high fee request is not substantively briefed by any party and is therefore waived, except to the extent that on remand the fee ought to be reconsidered in light of this opinion.

Case: 17-10663     Document: 00514998485     Page: 11     Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21     Entered 03/04/21 17:04:18     Page 11 of
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 354 of 783   PageID 6775

No. 17-10663

## DISCUSSION

### I.  General Receivership Principles

A district court has broad authority to place assets into receivership "to preserve and protect the property pending its final disposition." *Gordon v. Washington*, 295 U.S. 30, 37, 55 S. Ct. 584 (1935); *see also Gilchrist v. Gen. Elec. Capital Corp.*, 262 F.3d 295, 302 (4th Cir. 2001) ("the district court has within its equity power the authority to appoint receivers and to administer receiverships") (citing Fed. R. Civ. P. 66).  The primary purpose of the equitable receivership is the marshaling of the estate's assets for the benefit of aggrieved investors and other creditors of the receivership entities.  *See SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986).  Receivers appointed by a federal court are directed to "manage and operate" the receivership estate "according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."  28 U.S.C. § 959(b).

In general, the Receiver has wide powers to acquire, organize and distribute the property of the receivership.  A properly appointed receiver is "vested with complete jurisdiction and control of all [receivership] property with the right to take possession thereof."  28 U.S.C. § 754.  The Receiver is obliged to allocate receivership assets among the competing claimants according to their respective rights and, in this case, under the laws of Texas, where the Stanford Financial Group was headquartered.  The district court ruled, in a 2009 order that was not appealed, that the insurance policies and proceeds are property of the estate subject to the court's exclusive *in rem* jurisdiction.

Once assets have been placed in receivership, "[i]t is a recognized principle of law that the district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership."  *Safety Fin.*,

Appx.000348

Case: 17-10663      Document: 00514998485      Page: 12      Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21    Entered 03/04/21 17:04:18    Page 12 of
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21    Page 355 of 783   PageID 6776

No. 17-10663

674 F.2d at 372–73 (citing *SEC v. Lincoln Thrift Assoc.*, 577 F.2d 600, 606 (9th Cir. 1978)).  This discretion derives not only from the statutory grant of power, but also the court's equitable power to fashion appropriate remedies as "ancillary relief" measures.  *See SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980).  Courts have accordingly exercised their discretion to issue bar orders to prevent parties from initiating or continuing lawsuits that would dissipate receivership assets or otherwise interfere with the collection and distribution of the assets.  *See SEC v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 340 (5th Cir. 2011) ("It is axiomatic that a district court has broad authority to issue blanket stays of litigation to preserve the property placed in receivership pursuant to SEC actions.").  Receivership courts, like bankruptcy courts, may also exercise discretion to approve settlements of disputed claims to receivership assets, provided that the settlements are "fair and equitable and in the best interests of the estate."  *Ritchie Capital Mgmt., L.L.C. v. Kelley*, 785 F.3d 273, 278 (8th Cir. 2015) (citing *Tri–State Fin., LLC v. Lovald*, 525 F.3d 649, 654 (8th Cir. 2008)).

Neither a receiver's nor a receivership court's power is unlimited, however.  *See Whitcomb v. Chavis,* 403 U.S. 124, 161, 91 S. Ct. 1858, 1878 (1971) ("The remedial powers of an equity court must be adequate to the task, but they are not unlimited.").  Courts often look to the related context of bankruptcy when deciding cases involving receivership estates.  The district court here acknowledged that the purpose of bankruptcy receiverships and equity receiverships is "essentially the same—to marshal assets, preserve value, equally distribute to creditors, and, either reorganize, if possible, or orderly liquidate."  *Janvey v. Alquire*, No. 3:09-cv-0724, 2014 WL 12654910, at *17 (N.D. Tex. July 30, 2014); *see also SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 334 (7th Cir. 2010) ("The goal in both securities-fraud receiverships and liquidation bankruptcy is identical—the fair distribution of the liquidated

Appx.000349

Case: 17-10663     Document: 00514998485     Page: 13     Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21     Entered 03/04/21 17:04:18     Page 13 of
Case 3:21-cv-01585-S  Document 15  Filed 10/01/21   Page 356 of 783  PageID 6777

No. 17-10663

assets"). That their purpose is the same "makes sense" and reflects their shared legal heritage, since "federal equity receiverships were the predecessor to Chapter 7 liquidations and Chapter 11 reorganizations." *Alquire*, 2014 WL 12654910, at \*17 (citing *Duparquet Huot & Moneuse Co. v. Evans*, 297 U.S. 216, 221, 56 S. Ct. 412, 414 (1936)). The district court also recognized that "[i]n this particular case, the purpose and objectives of the receivership, as delineated in the Receivership Order, closely reflect the general purpose shared by the Bankruptcy Code and federal equity receiverships," and it concluded that "[u]ltimately, this particular receivership is the essential equivalent of a Chapter 7 bankruptcy." *Id.* at \*18.

Unfortunately, two interrelated limitations on the Stanford receivership were downplayed by the district court in its approval of the settlement and bar orders. Both derive from the broader principle that the receiver collects and distributes only assets of the entity in receivership. The first applies to the Receiver's standing: "[l]ike a trustee in bankruptcy or for that matter the plaintiff in a derivative suit, an equity receiver may sue *only to redress injuries to the entity in receivership*, corresponding to the debtor in bankruptcy and the corporation of which the plaintiffs are shareholders in the derivative suit." *Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995) (emphasis added) (citing, *inter alia*, *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S. Ct. 1678 (1972)). The *Scholes* case involved an SEC receivership, but *Caplin*, on which it relied, was a Supreme Court decision in a Chapter X reorganization case. This court endorsed the *Scholes* limitation as applied to this receivership in *Janvey v. Democratic Senatorial Campaign Comm., Inc.* ("*DSCC*"), 712 F.3d 185, 190–93 (5th Cir. 2013). And following *Caplin,* a sister circuit held, "a trustee, who lacks standing to assert the claims of creditors, equally lacks standing to settle them." *DSQ Prop. Co., Ltd. v. DeLorean,* 891 F.2d 128, 131 (6th Cir. 1989); s*ee also Wuliger v. Mfr's. Life Ins. Co.,* 567 F.3d 787, 794 (6th

13

Case: 17-10663      Document: 00514998485      Page: 14      Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21   Entered 03/04/21 17:04:18   Page 14 of
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 357 of 783   PageID 6778

No. 17-10663

Cir. 2009) ("Because the receivership entities all would have lacked standing, and because of the rule that receivers' rights are limited to those of the receivership entities, the Receiver also lacked standing [to sue for misrepresentations by brokers to defrauded investors].").

The second limitation, arising from the district court's *in rem* jurisdiction, is that the court may not exercise unbridled authority over assets belonging to third parties to which the receivership estate has no claim. Put another way, in the course of administering this receivership, this district court previously rejected a broad reading of 28 U.S.C. § 754 that suggested the court's *in rem* jurisdiction over the property would necessarily reach every *claim* relating to that property. *See Rishmague v. Winter*, No. 3:11-cv-2024-N, 2014 WL 11633690, at *2 (N.D. Tex. Sept. 9, 2014).

Thus, this court and others have held that a bankruptcy court may not authorize a debtor to enter into a settlement with liability insurers that enjoins independent third-party claims against the insurers. *See*, *e.g.*, *Matter of Zale Corp.*, 62 F.3d 746 (5th Cir. 1995) (refusing to countenance a bankruptcy court's authority to enforce a settlement prohibiting third-party bad faith insurance claims because the claims were not property of the bankruptcy estate). Similarly, "if [the coinsureds'] portion of the [insurance] Proceeds is truly *not* property of the Estate, then the bankruptcy court has no authority to enjoin suits against the [coinsureds]." *In re Vitek*, 51 F.3d 530, 536 (5th Cir. 1995); s*ee also In re SportStuff, Inc.,* 430 B.R. 170, 175 (B.A.P. 8th Cir. 2010) (bankruptcy court lacked jurisdiction or authority to impair or extinguish independent contractual rights of vendors that were additional insureds under the debtor's policies). As these cases illustrate, bankruptcy courts lack "jurisdiction" to enjoin such claims.

The prohibition on enjoining unrelated, third-party claims without the third parties' consent does not depend on the Bankruptcy Code, but is a maxim

Appx.000351

Case: 17-10663     Document: 00514998485     Page: 15     Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21     Entered 03/04/21 17:04:18     Page 15 of
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 358 of 783   PageID 6779

No. 17-10663

of law not abrogated by the district court's equitable power to fashion ancillary relief measures.   Contrary to the Receiver's assertion, the fact that the bankruptcy statute, 28 U.S.C. § 1334(b), limits jurisdiction to proceedings "arising in or related to" bankruptcy cases does not diminish the application of *Zale* or *Vitek* to equity receiverships.   As noted, bankruptcy and equity receiverships share common legal roots.[5]  *See In re Davis,* 730 F.2d 176, 183– 84 (5th Cir. 1984) (the Bankruptcy Code arms bankruptcy courts with broad powers analogous to a court in equity).   Moreover, to justify its decision denying bankruptcy court jurisdiction over third-party claims, the court in *Zale* quoted the Supreme Court in a civil rights class action case: "[o]f course, parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement.   A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors . . . ." *Zale*, 62 F.3d at 757 n.26 (citing *Local No. 93 v. City of Cleveland*, 478 U.S. 501, 529, 106 S. Ct. 3063, 3079, (1986)).[6]  All of

---

[5] Modern bankruptcy reorganization law originated with Section 77B of the Bankruptcy Act of 1934, the purpose of which was to codify best practices in what had formerly been known as equity receiverships.  *See Duparquet Huot & Moneuse Co. v. Evans,* 297 U.S. 216, 222–24, 56 S. Ct. 412, 415–17 (1936).  Section 77B(a), in turn, stated that the bankruptcy court's powers are those "which a Federal court would have had it appointed a receiver in equity of the property of the debtor . . . ." *Id.* at 221, 56 S. Ct. at 415.

[6] *Local No. 93* is merely one example of the Supreme Court's rejection of the use of consent decrees to extinguish the claims of non-consenting third-parties, for "[a] voluntary settlement in the form of a consent decree between one [party] and [another party] cannot possibly 'settle,' voluntarily or otherwise, the conflicting claims of another group of [parties] who do not join in the agreement.  This is true even if the second group of [parties] is a party to the litigation." *Martin v. Wilks*, 490 U.S. 755, 755–68, 109 S. Ct. 2180, 2181–88 (1989).  Indeed, "[a]ll agree" that "[i]t is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Id.* (citing *Hansberry v. Lee*, 311 U.S. 32, 40, 61 S. Ct. 115, 117 (1940)).

Case: 17-10663    Document: 00514998485    Page: 16    Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21    Entered 03/04/21 17:04:18    Page 16 of
Case 3:21-cv-01585-S    Document 15    Filed 10/01/21    Page 359 of 783    PageID 6780

No. 17-10663

this makes clear that it is not the subject matter or statutory limitations driving this limitation, and federal district courts have no greater authority in equity receiverships to ignore these bedrock propositions, because a "court in equity may not do that which the law forbids." *United States v. Coastal Ref. & Mktg., Inc.,* 911 F.2d 1036, 1043 (5th Cir. 1990).

Rather than reckon with the limits on the Receiver's standing and the court's equitable power, the district court here cited an unpublished Fifth Circuit case, *SEC v. Kaleta*, No. 4:09-cv-3674, 2012 WL 401069, at *4 (S.D. Tex. Feb. 7, 2012), aff'd., 530 F. App'x. 360 (5th Cir. 2013), to support both the settlement and bar orders. Importantly, *Kaleta* is an unpublished, non-precedential decision of this court. Not only that, but reading it as the district court and Appellees here advocate would mean investing the Receiver with unbridled discretion to terminate the third-party claims against a settling party that are unconnected to the *res* establishing jurisdiction. That is unprecedented. But *Kaleta* is in any event distinguishable and not inconsistent with the above-stated principles. In *Kaleta*, the bar order prevented defrauded investors from suing parties closely affiliated with the entity in receivership after the parties had agreed to make good on their guarantees to the receiver. Moreover, the settling parties would have been codefendants with receivership entities, leading to the possibility of their asserting indemnity or contribution from the estate. The court was forestalling a race to judgment that would have diminished the recovery of all creditors against receivership assets. That bar order protected the assets of the receivership estate, whereas the bar orders before us extend beyond receivership assets.

The Receiver also contends that the district court may permanently enjoin the claims of non-consenting third parties based on general statements about ancillary powers found in SEC cases such as *Wencke* and *Safety*

16

Case: 17-10663     Document: 00514998485     Page: 17     Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21     Entered 03/04/21 17:04:18     Page 17 of
Case 3:21-cv-01585-S     Document 15     Filed 10/01/21     Page 360 of 783     PageID 6781

No. 17-10663

*Financial Services*.  We disagree.  These cases stand only for the proposition that, in some circumstances, federal courts may use injunctive measures, such as stays, "where necessary to protect the federal receivership."  *See Wencke*, 622 F.2d at 1370; *Safety Fin. Serv.*, 674 F.2d at 372 n.5 (distinguishing *Wencke*, which "involved the much broader question of a federal court's power to enjoin nonparty state actions *against receivership assets*.") (emphasis added).  In fact, the court in *Wencke* recognized that its holding was limited to the propriety of staying third-party "proceedings *against a court-imposed receivership*." *Wencke*, 622 F.2d at 1371 (emphasis added).  Correctly read, these cases explain that *in rem* jurisdiction over the receivership estate imbues the district court with broad discretion to shape equitable remedies necessary to protect the *estate*.[7]  They do not support that a district court's *in rem* jurisdiction over the estate may serve as a basis to permanently bar and extinguish independent, non-derivative third-party claims that do not affect the *res* of the receivership estate.

The Appellees emphasize the recent decision *SEC v. DeYoung,* 850 F.3d 1172 (10th Cir. 2017), as supporting their argument that an equity court's permanent bar order against third parties is appropriate when tied to a settlement that secures receivership assets.  Like many of their arguments, however, this assertion proves too much.  *DeYoung* is a narrow and deliberately fact-specific opinion.  *See DeYoung*, 850 F.3d at 1182–83.  The court approved a bar order preventing three defrauded IRA Account holders (out of over 5,500 victims) from pursuing claims against the depository bank in which the accounts had been illegally commingled.  Notably, however, the court demonstrated that (1) the claims of the barred investors precisely mirrored

---

[7] *See also SEC v. Stanford Int'l Bank, Ltd.,* 424 F. App'x. 338, 340 (5th Cir. 2011) ("It is axiomatic that a district court has broad authority to issue blanket stays of litigation *to preserve the property placed in receivership* pursuant to SEC actions.") (emphasis added).

17

Case: 17-10663          Document: 00514998485          Page: 18          Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21   Entered 03/04/21 17:04:18   Page 18 of
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 361 of 783   PageID 6782

No. 17-10663

claims that had been asserted and settled by the receiver; (2) averted a duplicative lawsuit whereby the bank could have asserted its contract right to indemnity from the receivership assets; and (3) provided the account holders with a claim against the receivership estate. The court simply channeled redundant claims into the receivership while preventing diminution of receivership assets.

Returning to the broad issue in this case, whether the district court abused its discretion in approving the settlement and bar orders, there are two subparts to the question. The first is whether the district court's equitable power to fashion ancillary relief could be used to bar claims by insureds to proceeds of the Underwriters' policies, which are property within the receivership estate. The second is whether the court's equitable power may be used to bar third-party claims, like tort or statutory claims, against the Underwriters but unconnected to the property of the Receivership. The answers to these questions vary according to the Appellants' claims. Texas law, unless otherwise noted, applies by virtue of 28 U.S.C. § 959(b).

## II. Party Contentions

### a. Appellants Alvarado and McDaniel

The McDaniel and Alvarado Appellants are all former Stanford managers or employees who are being sued by the Receiver for clawbacks of their compensation via the Receiver's Indirect Claims on the Underwriters' policies. Appellants seek coverage under the insurance policies, which Underwriters have denied, to defend against these lawsuits and indemnify their losses. Appellants object to the settlement and bar orders on numerous grounds. From a practical standpoint, the settlement will exhaust the Underwriters' policy proceeds, leaving these Appellants wholly uninsured against the Receiver's lawsuits. The bar orders, moreover, prevent them from pursuing against the Underwriters not only breach of contract claims for

Appx.000355

Case: 17-10663    Document: 00514998485    Page: 19    Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21    Entered 03/04/21 17:04:18    Page 19 of
Case 3:21-cv-01585-S    Document 15    Filed 10/01/21    Page 362 of 783    PageID 6783

No. 17-10663

violating the duties to defend and indemnify, but also statutory and tort claims that, if successful, would not be paid from policy proceeds and would not reduce Receivership assets.

The district court's rejection of Appellants' objections rested generally on its conclusion that the settlement and bar orders are fair, equitable, reasonable and in the best interests of the receivership estate. As has been noted, the court cited only the *Kaleta* case, affirmed by a non-precedential decision of this court, in support of its conclusions. The court's reasoning invoked the perceived necessity of a settlement, together with the bar orders, to resolve fairly and efficiently the competing claims of the Receiver and Underwriters about policy coverage and assure the maximum recovery for Stanford's defrauded investors. Without the bar orders, the court stated, Underwriters would not settle. The court pointedly refused to decide whether policy exclusions apply to the Appellants' coverage claims. Even if such exclusions barred coverage, the court added, then the Receiver might also be barred by the same exclusions and all potential benefit of the settlement would be lost. In sum, the Appellants would lose out no matter what: their claims could be barred by exclusions, held uninsurable, or the Receiver, having the right to settle, would exhaust the proceeds first.[8] The balance of benefits to the receivership estate against Appellants' admitted losses weighed in favor of the court's approving the settlement and bar orders.

---

[8] Implicit in the district court's reference to the Receiver's right to settle and exhaust all the policy proceeds is apparently its reliance on Texas law, which allows an insurer to settle with fewer than all of its co-insureds when the policy proceeds are insufficient to satisfy all of the claims. *See G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex. 1929); *Pride Transp. v. Cont'l Cas. Co.*, 511 F. App'x 347, 351 (5th Cir. 2013); *Travelers Indem. Co. v. Citgo Petroleum Corp.*, 166 F.3d 761, 765–68 (5th Cir. 1999); *see also Tex. Farmers Ins. Co. v. Soriano*, 881 S.W.2d 312, 315 (Tex. 1994). The court, however, never referenced these cases.

Case: 17-10663     Document: 00514998485     Page: 20     Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21   Entered 03/04/21 17:04:18   Page 20 of
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21     Page 363 of 783   PageID 6784

No. 17-10663

In the course of explaining its decision, however, the court made some errors. First, its broad statement that the settlement would fail without the bar orders did not account for the fact that the parties had mediated a prior settlement that required no bar orders against these Appellants because the Receiver had agreed to release all of its claims against them. "Global peace" there was achieved not by bar orders, but by the Receiver's agreeing to drop the Indirect Claim suits. The final settlement required the broad bar orders only because the Receiver, for whatever reason, insisted that it must continue to pursue hundreds of clawback actions.[9] The court's broad statement also neglected to note that, despite the Receiver's overall insistence to the contrary, the Receiver nonetheless released its claims against sixteen former Stanford officers and employees in the final settlement.

Second, the court, perhaps inadvertently, did not address the fact that Appellants were foreclosed from sharing in the assets recovered by the Receiver by filing claims against the estate.

Third, the court failed to distinguish between the Appellants' two separate types of claims – contractual claims for defense and indemnity payable (if successful) from policy proceeds in competition with investors' claims to the Receivership assets; and independent, non-derivative, third-party claims for tort and statutory violations, which would be satisfied (if successful) out of Underwriters' assets. In this connection, the court also undervalued the Appellants' claims for indemnity by disregarding *Pendergest-Holt*. In that case, this court held that the D&O policies should provide up-front reimbursement of defense costs in Stanford insureds' criminal cases

---

[9] Indeed, when the Underwriters moved the district court to enforce the terms of the mediated settlement, their motion queried the benefits to be reaped, other than in the Receiver's legal fees, from these time-consuming suits against relatively poor former employees targeted by the Receiver.

Case: 17-10663    Document: 00514998485    Page: 21    Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21    Entered 03/04/21 17:04:18    Page 21 of
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21    Page 364 of 783   PageID 6785

No. 17-10663

pending a separate judicial proceeding to resolve the coverage question. *Pendergest-Holt v. Certain Und. at Lloyd's of London,* 600 F.3d 562, 572–74 (5th Cir. 2010). Although carefully hedged, this decision offered Appellants the prospect of possible, temporary relief for their mounting defense costs and was not "wholly inapplicable" to the decision concerning the settlement and bar orders. But in any event, the court did not analyze the ramifications of Appellants' distinct claims against Receivership assets and claims wholly independent of receivership assets.

### i. Contractual Claims for Defense and Indemnity

Reviewing first the settlement and bar of Appellants' contractual claims against the policy proceeds that are property of the receivership estate, we find that the court abused its discretion by extinguishing Appellants' claims to the policy proceeds, while making no provision for them to access the proceeds through the Receiver's claims process. This undermines the fairness of the settlement.

As the district court observed, some settlement with the Underwriters was prudent because of the sheer magnitude of claims far beyond the policies' coverage, and because the scope of coverage, dependent on multiple, insured-specific factual and legal questions, is unclear. What is clear in Texas law, as conceded by Appellants, is that an insurer may settle with fewer than all of its co-insureds when the policy proceeds are insufficient to satisfy all of the claims. *See G.A. Stowers Furniture Co. v. American Indem. Co.,* 15 S.W.2d 544 (Tex. 1929); *Pride Transp. v. Continental Cas. Co.,* 511 F. App'x 347, 351 (5th Circuit 2013); *Travelers Indem. Co. v. Citgo Petroleum Corp.,* 166 F.3d 761, 765–68 (5th Cir. 1999); *see also Farmers Insurance Co. v. Soriano,* 881 S.W.2d 312, 315

Case: 17-10663     Document: 00514998485     Page: 22     Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21   Entered 03/04/21 17:04:18   Page 22 of
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 365 of 783   PageID 6786
31

No. 17-10663

(Tex. 1994).[10]  Although the district court did not cite these cases, its ruling squares with them and supports its cost/benefit calculation for the Receiver/Underwriters' settlement to the detriment of Appellants' contractual claims.

But not only did  the settlement expressly foreclose the Appellants from sharing in the insurance policy proceeds of which they are coinsureds, the Appellants are not even allowed to file claims against the Receivership estate. Unlike the Stanford investors and the Receiver's attorneys, who can pursue restitution through the Receiver's claims process, Appellants have no access to the claims process.  The Settlement Agreement specifically restricts payment of the Proceeds to the Receivers' attorneys and the Stanford investors and specifically excludes Stanford employees and management, including Appellants.  For these Appellants, should the Receiver continue to pursue them, their claims against the Underwriters offer the only avenue of recovery. This alone serves to distinguish this case from *Kaleta*, which approved the settlement because, inter alia, the settlement agreement "expressly permits" those affected by the bar order "to pursue their claims by 'participat[ing] in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate.'"  *See Kaleta*, 530 F. App'x at 362–63 (alteration in original).  Barring Appellants' claims to coverage under their insurance policies by claiming the proceeds of these policies as property of the Receivership, *and then* barring Appellants' from accessing even a portion of these proceeds through the Receivership claim process, undermines the fairness of the settlement.

---

[10] *Soriano* may not squarely apply to the extent that the settlement does not, on its face, exhaust the policy limits.  But this uncertainty in the law meant that settlement between the Receiver and the Underwriters was fair game.

Case: 17-10663    Document: 00514998485    Page: 23    Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21    Entered 03/04/21 17:04:18    Page 23 of
Case 3:21-cv-01585-S    Document 15    Filed 10/01/21    Page 366 of 783    PageID 6787

No. 17-10663

The district court and Receiver lacked authority to dispossess claimants of their legal rights to share in receivership assets "for the sake of the greater good." The court's duty, as previously described, is to assure that all claimants against the Receivership have a reasonable opportunity to share in the estate's assets. Given the numerous exclusions to policy coverage,[11] the Appellants' entitlement to proceeds may appear weak, but the court disclaimed deciding coverage issues, and the Appellants have identified several reasons, in addition to *Pendergest-Holt,* why their contractual claims might prevail on final adjudication.[12]

Rather than extinguish the Appellants' contractual claims, the court could have authorized them to be filed against the Receivership in tandem with the Stanford investors' claims. Such "channeling orders" are often employed to afford alternative satisfaction to competing claimants to receivership assets while limiting their rights of legal recourse against the assets. *See, e.g., DeYoung,* 850 F.3d at 1182; *see also Kaleta,* 530 F. App'x at 360 (approving claims filing in receivership for barred litigants). In any event, the court may have intended to channel the Appellants' claims here but simply overlooked their omission from the extant procedures.[13]

---

[11] The myriad of contested policy exclusions include the insured versus insured, money laundering, fraud, intentional corporate or business policy, and prior knowledge exclusions.

[12] Appellants explain that a significant number of their group have no personal liability, and, inferentially, should not be subject to policy exclusions, because they did not sell Stanford CDs to investors. Further, because the Receiver's claims against the Appellants are not derivative, any recovery from the proceeds would not at all reduce or offset the Appellants' liability for fraudulent transfers. Finally, Appellants assert viable defenses to the clawback actions based, in part, on Texas law in this Receivership. *See Janvey v. Golf Channel, Inc.,* 487 S.W.3d 581, 582 (Tex. 2016) (recognizing defense to fraudulent transfer of reasonably equivalent value received).

[13] The Receiver and Underwriters contend that in lieu of other modes of compensation through the receivership, these Appellants have received "benefits," however small, from the settlement because the insurance proceeds that have gone into the receivership estate offset

Appx.000360

Case: 17-10663     Document: 00514998485     Page: 24     Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21   Entered 03/04/21 17:04:18   Page 24 of
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21     Page 367 of 783   PageID 6788

No. 17-10663

## ii. *Extracontractual Claims for Tort and Statutory Violations*

By ignoring the distinction between Appellants' contractual and extracontractual claims against Underwriters, the district court erred legally and abused its discretion in approving the bar orders.[14]   These claims, including common law bad faith breach of duty and claims under the Texas Insurance Code, lie directly against the Underwriters and do not involve proceeds from the insurance policies or other receivership assets.[15]   These damage claims against the Underwriters exist independently; they do not arise from derivative liability nor do they seek contribution or indemnity from the estate.[16]   As the preceding discussion explains in detail, receivership courts have no authority to dismiss claims that are unrelated to the receivership estate.   That the district court was "looking only to the fairness of the settlement as between the debtor and the settling claimant [and ignoring third-party rights] contravenes a basic notion of fairness."   *Zale*, 62 F.3d at 754

---

their potential liability in the Receiver's and other suits.  The district court made no such finding, and we see no basis in the record for it.

[14] The Receiver and Underwriters would pretermit any such distinction by contending that unless the Appellants had valid contractual claims for insurance from the Underwriters' policies, they could not bring extracontractual claims.  This may well be accurate.  The district court, however, refused to rule on the viability of Appellants' contractual claims, and we need not undertake that task here.  The basis of settlement for all concerned is to avoid tedious litigation of insurance coverage claims.

[15] This principle has been described above in the related context of bankruptcy.  *See Matter of Zale Corp.*, 62 F.3d 746, 756–57 (5th Cir. 1995); *Matter of Vitek, Inc.*, 51 F.3d 530, 538 (5th Cir. 1995); *In re Sportstuff, Inc.*, 430 B.R. 170, 178–79 (B.A.P. 8th Cir. 2010); *see also Matter of Buccaneer Res., LLC*, 912 F.3d 291, 293–97 (5th Cir. 2019) (explicating the difference between derivative and non-derivative injuries and holding that a tortious interference claim by a former company president against the outside lenders is non-derivative and separate from the bankruptcy estate).

[16] *See SEC v. DeYoung,* 850 F.3d 1172; *In re Heritage Bond Litig.,* 546 F.3d 667, 680 (9th Cir. 2008) (discussing settlement of a securities class action and distinguishing between claims for codefendant contribution and independent claims against settling defendants; former could be dismissed by bar order, but latter claims could not be).

24

Case: 17-10663    Document: 00514998485    Page: 25    Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21    Entered 03/04/21 17:04:18    Page 25 of
Case 3:21-cv-01585-S    Document 15    Filed 10/01/21    Page 368 of 783    PageID 6789

No. 17-10663

(alteration in original) (citing *United States v. AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir.)).

As discussed above, the Receiver lacked standing to settle independent, non-derivative, non-contractual claims of these Appellants against the Underwriters. *See DSCC,* 712 F.3d at 190, 193 (receiver "has standing to assert only the claims of the entities in receivership, not the claims of the entities' investor-creditors [coinsureds] . . ."). Of course, the Receiver and Underwriters were, as Appellants' counsel colorfully described, all too happy to compromise at the expense of Appellants' rights. The court purported to justify this result by claiming that "the bar orders are not settling claims, they are enjoining them." No matter the euphemism, a permanent bar order is a death knell intended to extinguish the claims, which are a property interest, however valued, of the Appellants.

Moreover, in approving the settlement and bar orders against these Appellants, the district court overlooked problems inherent in the settling parties' positions. The Underwriters' position was in conflict with the Appellants: by means of the bar orders, the Underwriters limited their exposure to further costly and time-consuming litigation over Appellants' non-derivative extracontractual claims against them. The Receiver was enabled by the settlement and bar orders to place Appellants in a vise: preserving his ability to sue Appellants for clawbacks even as the agreement stripped Appellants' access to any recompense from the Underwriters.[17]    These

---

[17] The mediated settlement, in contrast, averted these conflicts of interest with the Receiver's release of claims against Appellants offsetting the Underwriters' potential extracontractual liability.

Case: 17-10663     Document: 00514998485     Page: 26     Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21     Entered 03/04/21 17:04:18     Page 26 of
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 369 of 783   PageID 6790

No. 17-10663

problems cast grave doubt on the fairness and equity of the settlement and bar orders reached without Appellants' participation.[18]

In sum, although we sympathize with the impetus to settle difficult and atomized issues of insurance coverage rather than dissipate receivership assets in litigation, the settlement and bar orders violated fundamental limits on the authority of the court and Receiver. The court and Receiver could not abrogate contractual claims of these Appellants to proceeds of Underwriters' policies without affording them an alternative compensation scheme similar, if not identical, to the claims process for Stanford investors. The court could not authorize the Receiver and Underwriters to compromise their differences while extinguishing the Appellants' extracontractual claims against Underwriters. Equity must follow the law, which here constrains the court's and Receiver's authority to protecting the assets of the receivership and claims directly affecting those assets.[19]

### b.     Appellant Cordell Haymon

Like the Alvarado and McDaniel Appellants, Appellant Cordell Haymon, a member of Stanford Trust Company's board of Directors, was targeted by the

---

[18] When compared with *DeYoung,* 850 F.3d at 1182–83, the unsustainability of the settlement and bar orders here is manifest. Unlike that case, the extracontractual claims of these Appellants do not parallel those of the Receiver, Underwriters possess no contribution/indemnity claim against the receivership estate, and Appellants have been provided no channel to assert claims in the receivership.

[19] We reject Appellants' due process claims against the settlement and bar orders. They contend that because they "had an interest in" the outcome of the settlement, and the Bar Order "fully and finally adjudicates Appellants' independent state law contract and tort claims," due process required at least the ability to introduce evidence at the hearing. McDaniel presses other constitutional claims. But Appellants were provided notice of the settlement hearing, were able to fully brief their position and provide affidavits, and they have offered nothing more on appeal. Although excluded from the settlement negotiations, they have shown no legal requirement that they be allowed to participate in a settlement resolving claims for reimbursement against the limited policy proceeds. The applicable Texas law allows insurers to settle with fewer than all of the insureds in such circumstances. Appellants' due process arguments fail, and McDaniel's other claims are meritless.

Appx.000363

Case: 17-10663     Document: 00514998485     Page: 27     Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21   Entered 03/04/21 17:04:18   Page 27 of
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 370 of 783   PageID 6791

No. 17-10663

Receiver and sought coverage of his defense costs under the insurance policies. After the Underwriters denied his claim for coverage, he settled the Receiver's fiduciary duty breach suit for $2 million. Haymon asserts that he relied on the language of his settlement agreement, which specifically authorized the continuation of his suit against the Underwriters. Only a few months later, however, the final proposed settlement undid his expectations of recovery from the Underwriters. Haymon requested to intervene in the initial coverage dispute between Underwriters and the Receiver, and he filed objections to the proposed settlement. He argues now that the district court erred in barring all of his contractual and extracontractual tort and statutory claims against the Underwriters.

To the extent that Haymon's claims mirror those of Alvarado and McDaniel, the same results follow. The district court acted within its authority to bar Haymon's claim for contractual defense and indemnity under the insurance policies, but some alternate compensation mode from the receivership estate is required, and the court could not bar his extracontractual claims against the Underwriters. However, the ultimate evaluation of Haymon's claims may differ from that of the other Appellants for two reasons, which the district court should assess on remand. First, because his insurance coverage claim was liquidated before the final settlement ($2 million potential indemnity and $1.5 million defense costs) it was ripe for judicial determination under *Pendergest-Holt*.[20] Second, Haymon received a bar order, perhaps valuable to him, against any further litigation concerning his involvement with Stanford entities.

_____

[20] Finally, as noted in regard to the other Appellants, Haymon was afforded the opportunity, and availed himself of the ability to press his constitutional objections to the settlement and bar orders. There was no failure of due process and his other vaguely identified constitutional objections are meritless.

Case: 17-10663     Document: 00514998485     Page: 28     Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21   Entered 03/04/21 17:04:18   Page 28 of
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 371 of 783   PageID 6792

No. 17-10663

### c.     Appellant Louisiana Retirees

Unlike the foregoing Appellants, the Louisiana Retirees are not coinsureds under the insurance policies, and they are not being pursued in Indirect Claim actions by the Receiver.  Retirees have assiduously pursued securities law claims against certain Stanford brokers and the Underwriters, as insurers for those brokers, under the Louisiana Direct Action Statute, La. R.S. 22:1269.

First, the parties dispute the meaning of the bar order and the extent to which it bars the Retirees' claims.  The Receiver argues that the bar order applies only to claims against the Underwriters and the Underwriters' *Released Parties*, defined as the officers, agents, etc. of Underwriters, and expressly excluding the officers, directors, or employees of Stanford Entities. Retirees argue that it enjoins them from pursuing the Stanford Claims, defined as "any action, lawsuit or claims brought by any Stanford Investor against Underwriters [or] . . . *Underwriter's Insureds*."   In turn, Underwriters' Insureds are defined as "any person that shall be an officer and director of any Stanford Entities . . . [or] any employee of any Stanford Entities."  On remand, it would be appropriate for the district court to determine and clarify the meaning of the bar order as to the Retirees, keeping in mind that the district court may not enjoin any claims by Retirees against the brokers that do not implicate the policy proceeds.

Second, the Retirees' claims under the Louisiana direct action statute unequivocally implicate the policy proceeds and therefore assets of the receivership.  The statute specifies that an action can be brought "within the terms and limits of the policy by the injured person." La. Rev. Stat. 22:1269(A), (C), (D).  It "does not create an independent cause of action against the insurer[;] it merely grants a procedural right of action against an insurer where the plaintiff has a substantive cause of action against the insured." *Soileau v.*

28

Case: 17-10663     Document: 00514998485     Page: 29     Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21     Entered 03/04/21 17:04:18     Page 29 of
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21     Page 372 of 783   PageID 6793

No. 17-10663

*Smith True Value & Rental*, 144 So. 3d 771, 780 (La. 2013). As such, the Receiver could settle with the Underwriters notwithstanding the direct action claim just as he could settle regardless of the Employee Appellants' contractual claims to policy proceeds. Further, as former investors in the Stanford entities, the Retirees were afforded a means of filing claims apart from the direct action suit, and many have availed themselves of that opportunity. Consequently, the Retirees' direct action suit against the Underwriters amounts to a redundant claim on receivership assets.

Nevertheless, the Retirees assert several arguments that have no bearing on the permissibility of the settlement and bar order as to them. They contend first that the settlement and bar order conflict with the Supreme Court's decision in *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058 (2014), which they characterize as "acknowledg[ing] the Louisiana Retirees' rights to bring their state law securities claims in Louisiana state court." But *Troice* held only that the Securities Litigation Uniform Standards Act did not preempt the Louisiana Appellants' state court claims. The Court's ruling did not bear on the merits of or procedure for the Retirees' state law case.

Second, they contend that *DSCC*, 712 F.3d at 185, forbids giving the receiver the right to "control the settlement of a claim it does not own." That is certainly correct according to our previous discussion, but here, the Receiver had standing to pursue *its own* claims as coinsured under the Underwriters' policies, such claims perfected the Receiver's interest in a valuable asset, and Texas law provided the right to settle them even at the expense of the Retirees' direct action claims.

The Retirees argue that the district court should have first determined the disputed legal questions about the magnitude of, and legal rights to, the policy proceeds before approving the settlement and bar orders under *In re Louisiana World Exposition, Inc.*, 832 F.2d 1391 (5th Cir. 1987). This

29

Case: 17-10663    Document: 00514998485    Page: 30    Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21    Entered 03/04/21 17:04:18    Page 30 of
Case 3:21-cv-01585-S    Document 15    Filed 10/01/21    Page 373 of 783    PageID 6794
81

No. 17-10663

argument simply misreads that case. The court in *Louisiana World* explicitly distinguished the facts before it from cases involving coinsureds with equal claims to the policy proceeds. Moreover, at least one disputed policy – the Fidelity Bond – covers only the Receivership entities.[21] It was not an abuse of discretion for the district court to hold that equity favored avoiding costly litigation and dissipation of receivership assets by allowing the Receiver, a coinsured with equal claim to the policy proceeds, to settle with the Underwriters. Avoiding protracted legal examination of the policy exclusions, which could just as easily bar Retirees and others from the policy proceeds, was precisely the point of the settlement.

Fourth, Retirees assert that the Anti-Injunction Act, 28 U.S.C. § 2283 ("AIA"), prevented the court from issuing its bar orders. This argument has no merit. Under the AIA, "any injunction against state court proceedings otherwise proper under general equitable principles must be based on one of the specific statutory exceptions to [the Anti-Injunction Act] if it is to be upheld." *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 287, 90 S. Ct. 1739, 1743 (1970). The specific exceptions are express authorization by an Act of Congress, where necessary in aid of the court's jurisdiction, or to protect or effectuate the court's judgments. *Id.* at 288, 90 S. Ct. at 1743–44. The AIA does not prohibit the settlement and bar order because, pertinent to the Retirees, they cover only those claims implicating the insurance policy proceeds and so were necessary in aid of the district court's jurisdiction over those proceeds. The district court has exclusive *in rem* jurisdiction over the policy proceeds and permanent bar orders have been approved as parts of settlements to secure receivership assets. *See*, *e.g.*, S*EC*

---

[21] As with the other policies, the Underwriters and Receiver dispute the scope of coverage and exclusions of the Fidelity Bond, and whether the Receiver may access the proceeds, but there is no argument that the Retirees may access these proceeds.

Case: 17-10663    Document: 00514998485    Page: 31    Date Filed: 06/17/2019
Case 19-34054-sgj11 Doc 1971-1 Filed 03/04/21    Entered 03/04/21 17:04:18    Page 31 of
Case 3:21-cv-01585-S    Document 15    Filed 10/01/21    Page 374 of 783    PageID 6795

No. 17-10663

*v. Parish*, No. 2:07-CV-00919-DCN, 2010 WL 8347143 (D.S.C. Feb. 10, 2010)

("[T]he bar order is necessary to preserve and aid this court's jurisdiction over

the receivership estate, such that the Anti-Injunction Act would not prohibit

the bar order even if there were pending state court actions, which there are

not.").

For these reasons, the settlement and bar orders did not interfere with

or improperly extinguish the Retirees' rights.

## CONCLUSION

For the foregoing reasons, we **VACATE** the district court's orders

approving the settlement and bar orders and **REMAND** for further

proceedings consistent with this opinion.[22]

---

[22] Vacatur and remand will probably necessitate the court's reconsideration of the
attorneys' fee award to the Receiver's counsel.

Appx.000368

# EXHIBIT 10

Case 19-34054-sgj11 Doc 1973 Filed 03/04/21    Entered 03/04/21 17:34:17    Page 1 of 5
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 376 of 783   PageID 6797

Docket #1973  Date Filed 03/04/2021

D. Michael Lynn – State Bar ID 12736500
John Y. Bonds, III – State Bar ID 02589100
Clay M. Taylor – State Bar ID 24033261
Bryan C. Assink – State Bar ID 24089009
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 – Telephone
(817) 405-6902 – Facsimile
Michael.lynn@bondsellis.com
john@bondsellis.com
clay.taylor@bondsellis.com
bryan.assink@bondsellis.com

**COUNSEL FOR JAMES DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Chapter 11 |
| | § | |
| Debtor. | § | |

### JOINDER IN MOTION FOR STAY PENDING APPEAL AND ADDITIONAL
### GROUNDS FOR THE ISSUANCE OF A STAY PENDING APPEAL

James Dondero ("Dondero") herby files his Joinder to Highland Capital Management Fund

Advisors, L.P. and NexPoint Advisors, L.P.'s Motion for Stay Pending Appeal of the Confirmation

Order, and Brief In Support Thereof (the "Advisor Motion"), and also submits his Additional

Grounds for the Issuance of a Stay Pending Appeal.[1]

### Joinder

1.      First, Dondero joins and incorporates by reference each of the points, facts, legal

analysis and standards made by the Movants in the Advisor Motion.

---

[1] Defined terms not defined herein have the same terms ascribed to them in the Advisor Motion.



1934054210304000000000007

**Additional Facts Relevant to this Joinder**

2.      During the course of this bankruptcy case, and after Dondero was removed from his role at the Debtor, the Debtor or its subsidiaries, under the direction of the Debtor's CEO James Seery, sold three substantial assets. Those three assets sales were generically referred to as the Life Settlements sale, the Omnimax sale and the Trussway or SSP sale (collectively the "Sales").

3.      In each of the Sales, the sale of the assets that occurred was not actually carried on the balance sheet of the Debtor itself, but instead on the balance sheet of a subsidiary or a subsidiary of a subsidiary. Each Sale was significant and in excess of $2,000,000.

4.      The Debtor did not provide notice of the Sales to creditors or parties-in-interest.

5.      The Debtor further maintains that notice of the Sales was not required. For the reasons stated below, the Debtor is mistaken.

**Additional Support for Issuance of a Stay Pending Appeal**

6.      As additional grounds and argument as why a stay should issue, as stated in Dondero's Objection to the Plan and as argued at the confirmation hearing on the same, the Debtor failed to meet its burden proving that the best interests of the creditors test had been met by showing that creditors and other parties in the waterfall (such as equity) would receive as much as they would have in a hypothetical chapter 7 case. This objection was, in part, based on the Debtor's repeated refusal, even while in bankruptcy, to afford creditors and parties-in-interest, such as Dondero, notice and opportunity to participate in sales of the Debtor's assets. One of the numerous reasons for the requirements under the Bankruptcy Code and Rules that notice of such sales be provided is so that any creditor, or any other interested party, could participate in the sales process and thereby ensure that the estate (and other stakeholders) can reasonably anticipate that

the highest and best sales price(s) for any asset(s) being sold was indeed reached for the sale of that asset.  Absent a stay pending appeal, Dondero and other parties-in-interest would lose the protections offered by the notice procedures for the sale of assets provided for under 11 U.S.C. Section 363 and Federal Rule of Bankruptcy Procedure 2002.

7.     The Debtor maintains that while it did not give notice to Dondero of prior sales in bankruptcy, that it did not have to.  Dondero reasonably assumes that the Debtor may continue such practice even if a stay was granted.  As a result, the imposition of the stay is not material to the Debtor and does no harm to it.

8.     Alternatively, if the Debtor now acknowledges that under the Bankruptcy Code and Rules notice should have been provided and that any subsequent similar sale would need to be noticed out in accordance with Section 363 and Rule 2002, then the additional burden to do so is not material to the Debtor, better insures that creditors and parties-in-interest are both informed and their interests are protected, and informs both this Court and the court hearing the appeal of this matter additional evidence of why this underlying appeal should be granted.

9.     First, the argument used to justify the prior lack of compliance with the Code and the Rules of "the assets that were being sold were assets of a subsidiary entity and therefore not assets of the estate," and therefore not implicating the notice provisions of Section 363 and Rule 2002, is specious and self-serving.  At times in this case, the Debtor has maintained that the subsidiaries are subject to ultimate control of and by this Court and proceeding, but at other times it chooses to assert their independence from the obligations that come commensurate with that assertion.

10.    All the Sales done in this bankruptcy were significant sales, not conducted within the ordinary course of business of the Debtor, and necessarily positively or negatively impacted

the recoveries that creditors and parties-in-interest will ultimately realize in this case.  In short, the Debtor knew exactly what it was doing, violated the Code and the Rules, but proceeded with the Sales despite these infirmities.

11.     Moreover, the argument misses the point.  If a stay were granted, and if the Debtor continued to operate in such a manner avoiding what Dondero maintains are fundamental and applicable protections of both bankruptcy statute and rule, and the appeal was subsequently granted in whole or in part on such grounds, and also on the third-party releases and exculpation grounds, then the parties responsible for such violations of the Bankruptcy Code and Rules could be held responsible for such acts and the creditors and parties-in-interest could seek recompense. Absent a stay pending appeal, the public interests are harmed by allowing the Debtor to continue to skirt its duties about providing due notice of sales of the Debtor's assets under a plan that may be subsequently overturned if the appeal is granted.  The imposition of a stay would not alter the Debtor's ability to actually sell assets, but would at least make it either provide notice of such sales, or, if it chooses not to, make the Debtor responsible for the consequences of its actions if that decision is an erroneous one.  This is precisely why a stay should be grated to keep irreparable harm from being done to creditors and parties-in-interest such as Dondero.

12.     Therefore, the issuance of stay pending appeal affords: (i) at least some marginal protections to the creditors and parties-in-interest that the Bankruptcy Code provisions should be adhered to regarding sales of assets; and (ii) if it is ultimately found that such lack of notice is and was indeed proper, then the issuance of a stay does no practical harm to the Debtor who can continue its practices of not providing such notice.

**Request for Relief**

Dondero requests that the Court enter an Order:

(i)     Staying the effectiveness of the Confirmation Order pending appeal; and

(ii)     granting such other relief as is just and proper.

Signed: March 4, 2021.

BONDS ELLIS EPPICH SCHAFER JONES LLP

By:     */s/ Clay M. Taylor*
        D. Michael Lynn – State Bar ID 12736500
        John Y. Bonds, III – State Bar ID 02589100
        Clay M. Taylor – State Bar ID 24033261
        Bryan C. Assink – State Bar ID 24089009
        Telephone: (817) 405-6900
        Facsimile: (817) 405-6902
        Email: clay.taylor@bondsellis.com

ATTORNEYS FOR JAMES DONDERO

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this on March 4, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Appellee.

By:     */s/ Clay M. Taylor*
        Clay M. Taylor

Appx.000374

# EXHIBIT 11

**Case No. 21-10449**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

In re:  Highland Capital Management, L.P.

     Debtor.

-------------------------------------------------

NexPoint Advisors, L.P., and Highland Capital Management Fund Advisors, L.P.,

     Appellants,

v.

Highland Capital Management, L.P.,

     Appellee.

---

## APPELLANTS' MOTION FOR STAY PENDING APPEAL

---

Direct Appeal from the United States Bankruptcy Court
for the Northern District of Texas, Honorable Stacey G.C. Jernigan

Davor Rukavina, Esq.
Julian P. Vasek, Esq.
MUNSCH HARDT KOPF & HARR, P.C.
500 North Akard Street, Ste. 3800
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

ATTORNEYS FOR APPELLANTS/MOVANTS

1934054210520000000000000009

**Case No. 21-10449**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

In re:  Highland Capital Management, L.P.

     Debtor.

-----------------------------------------------

NexPoint Advisors, L.P., and Highland Capital Management Fund Advisors, L.P.,

     Appellants,

v.

Highland Capital Management, L.P.,

     Appellee.

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

    1.   <u>**APPELLANTS/MOVANT**</u>:

       **NexPoint Advisors, L.P.**
          Owned by:
              The Dugaboy Investment Trust
              NexPoint Advisors GP, LLC
                 Owned by:
                    James Dondero

i

**Highland Capital Management Fund Advisors, L.P.**
Owned by:
Highland Capital Management Services, Inc.
Strand Advisors XVI, Inc.
Okada Family Revocable Trust

**Represented by**:
Davor Rukavina, Esq.
Julian P. Vasek, Esq.
MUNSCH HARDT KOPF & HARR, P.C.

2.    **RETAIL FUNDS MANAGED BY APPELLANTS:**

**NexPoint Capital, Inc.**

**Highland Income Fund**

**NexPoint Global Strategic Opportunities, Fund**

3.    **APPELLEE/RESPONDENT:**

**Highland Capital Management, L.P.**
Owned by:
Hunter Mountain Investment Trust
The Dugaboy Investment Trust
Mark and Pamela Okada Family Trust – Exempt Trust 2
Mark and Pamela Okada – Exempt Descendants' Trust
Mark Kiyoshi Okada
Strand Advisors, Inc.

**Represented by:**
PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz, Esq.
John Morris, Esq.
HAYWARD PLLC
Melissa S. Hayward, Esq.
Zachery Annable, Esq.

Appx.000378

4. **OTHER PARTIES INDIRECTLY AFFECTED BY APPEAL:**

**Official Committee of Unsecured Creditors**
  Members:
    Redeemer Committee of Highland Crusader Fund
    Meta-e Discovery
    UBS Securities LLC
    UBS AG London Branch
    Acis Capital Management, L.P.
    Acis Capital Management GP, LLC
    Josh Terry

**All creditors in Highland Capital Management, L.P. bankruptcy**

       /s/ Davor Rukavina
       Davor Rukavina, Esq.
       Counsel for the Appellants

Appx.000379

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. v

I.    SUMMARY ........................................................................... 1

II.   BACKGROUND ...................................................................... 3

      A.    THE DEBTOR AND THE CLOS ............................................ 3

      B.    THE CONFIRMATION ORDER AND PLAN ................................ 4

      C.    MOTION FOR STAY PENDING APPEAL PROCEEDINGS BELOW ......... 6

III.  ARGUMENTS AND AUTHORITIES ............................................... 7

      A.    STANDARD FOR A STAY PENDING APPEAL ............................. 7

      B.    THERE IS A LIKELIHOOD OF SUCCESS ON THE MERITS ............. 8

            i.     Legal Standard ................................................. 8

            ii.    The Plan Violates *Pacific Lumber* ........................ 8

            iii.   The Plan Violates the Absolute Priority Rule .......... 16

            iv.    Conclusion .................................................... 18

      C.    MOVANTS WILL SUFFER IRREPARABLE INJURY WITHOUT
            A STAY ............................................................ 19

      D.    DEBTOR AND CREDITORS WILL NOT BE UNDULY
            PREJUDICED BY A STAY ......................................... 21

      E.    THE PUBLIC INTEREST IS SERVED BY A STAY PENDING APPEAL ...... 22

      F.    SECURITY FOR STAY PENDING APPEAL ............................. 23

IV.   CONCLUSION ..................................................................... 24

Appx.000380

# TABLE OF AUTHORITIES

## Cases

*Arnold v. Garlock*, 278 F.3d 426 (5th Cir. 2001) ......................................8

*Associated Press v. Otter*, 682 F.3d 821 (9th Cir. 2012)........................20

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle P'ship*,
    526 U.S. 434 (1999)...........................................................................18

*Bank of. La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores*
    *of Tex., Inc.)*, 266 F.3d 388 (5th Cir. 2001)....................................11, 14

*Bank of New York Trust Co., N.A. v. Official Unsecured*
    *Creditors' Comm. (In re Pacific Lumber Co.)*,
    584 F.3d 229 (5th Cir. 2009) ........................................................*passim*

*Cooper v. U.S. Postal. Serv.*, 246 F.R.D. 415 (D. Conn. 2007) ..............20

*Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, 782 Fed. Appx. 339
    (5th Cir. 2019).....................................................................................23

*In re Blast Energy Services, Inc.*, 593 F.3d 418 (5th Cir. 2010) .............19

*Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746 (5th Cir. 1995) .........9

*In re Edmonds*, 273 B.R. 527 (Bankr. E.D. Mich. 2000) ........................17

*In re First S. Sav. Ass'n*, 820 F.2d 700 (5th Cir. 1987) .............................8

*In re Introgen Therapeutics*, 429 B.R. 570 (Bankr. W.D. Tex. 2010) ....17

*In re Nat'l Gypsum Co.*, 208 F.3d 498 (5th Cir. 2000).........................5, 12

*In re W. Real Fund*, 922 F.2d 592 (10th Cir. 1990) ..................................9

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988)....................17

*Scott v. Schedler*, 826 F.3d 207 (5th Cir. 2016)......................................13

*Tex. Democratic Party v. Abbott*, 961 F.2d 389 (5th Cir. 2020) .........8, 18

*Weingarten Realty Investors v. Miller*, 661 F.3d 904 (5th Cir. 2011)...8, 19

Appx.000381

## Statutes and Rules

11 U.S.C. § 1126 ...................................................................................16

11 U.S.C. § 1129 ...................................................................................16

FED. R. BANKR. P. 8007 ......................................................................7, 22

Appx.000382

Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. (the "Movants"), the appellants in this direct bankruptcy appeal, file this their *Motion for Stay Pending Appeal* (the "Motion"), respectfully stating as follows:

## I.   SUMMARY[1]

The Movants respectfully request a stay of the Bankruptcy Court's Confirmation Order, by which it confirmed the Chapter 11 Plan of Highland Capital Management, L.P. (the "Debtor").

A stay is necessary to prevent irreparable harm by ensuring that this Appeal does not become equitably moot through the implementation of the Plan. A stay is also necessary because the Plan's injunctions prevent the Movants from exercising their contractual and statutory rights, post-confirmation, and from potentially asserting claims against various non-debtor parties, which claims the Plan releases, exculpates, and enjoins. If a stay is not entered, then the Debtor is likely to liquidate all of its holdings with judicial immunity by the time that the merits of this appeal are heard.

A stay is appropriate because the Plan violates this Court's precedent and the Bankruptcy Code. First, the Plan contains sweeping injunction, release, and exculpation provisions expressly forbidden by this Court in *Pacific Lumber*, which provisions permanently enjoin the Movants from exercising their lawful rights and

---

[1]   Capitalized terms used in this Summary are defined below.

which impermissibly release claims that the Movants have against various non-debtors. The Bankruptcy Court recognized as much, predicting that this Court would "extend the holding" of *Pacific Lumber*—something that this Court has yet to do, however. Second, the Plan could not have been confirmed at all under the "cramdown" provisions of the Bankruptcy Code because equity interest holders retain certain interests even though unsecured creditors rejected the Plan and are not paid in full under the Plan.

A stay will not prejudice the Debtor or other creditors. The Plan does not provide for a sale, nor for exit financing, nor for the issuance or new securities or investments in the Debtor. Rather, the Plan simply provides for the Debtor to liquidate its assets over time, something that the Debtor is presently doing and can continue doing without a need for the Plan.

A stay will serve the public interests. Thousands of innocent investors, whose investments (more than $1 billion) the Debtor manages, are enjoined from exercising their solemn rights for post-bankruptcy claims. Potential claims they hold against the Debtor's management and non-debtors are simultaneously extinguished through the Plan's exculpation provisions. The public interest cannot be served by permitting a Plan that clearly violates this Court's precedent to become effective, and the public interest cannot be served when these innocent investors are enjoined from exercising their contractual and statutory rights.

# I.     BACKGROUND[2]

## A.     THE DEBTOR AND THE CLOs

The Debtor is a multibillion-dollar global investment adviser registered with the SEC, pursuant to the Investment Advisers Act of 1940.[3]  Under that Act, the Debtor owes strict fiduciary duties to the funds that it manages and to the investors whose investments it manages.[4]  Among other things, the Debtor manages more than $1 billion in investments in various collateralized loan obligations ("CLOs") pursuant to portfolio management agreements (the "PMAs") in exchange for various fees paid by the CLOs.[5]

The Movants are also registered investment advisors who manage and advise various publicly traded funds, including three such funds (the "Funds")[6] which collectively have invested approximately $140 million in the CLOs the Debtor manages.[7]  The Movants are also unsecured and administrative creditors

---

[2]     Contemporaneously with the filing of this Motion, the Movants are filing their *Appendix of Appellants*.  Citations to the appendix shall be notated as follows: Appx. #.

[3]     Appx. 6.

[4]     Appx. 340 (Tr. 179:8-15).

[5]     Appx. 350-51 (Tr. 189:3-190:12).

[6]     NexPoint Capital Inc., Highland Income Fund, and NexPoint Strategic Opportunities, Fund.  Appx. 508 (Tr. 52:20-25).

[7]     Appx. 509-11 (Tr. 53:1-55:5).

against the Debtor.[8]  The Movants have standing to appeal the Confirmation Order and to seek a stay pending appeal, as confirmed by the Bankruptcy Court.[9]

Under at least three PMAs, the Funds may remove the Debtor as CLO manager because the Funds hold the requisite percentage of shares.  There are various other CLOs where the Funds do not hold enough shares but are still able to vote their shares along with other shareholders.  Thus, should the Debtor, as manager, act inappropriately, the Funds, and the Movants acting on their behalf, have the ability to protect themselves and their investors, absent the Plan.

**B.    THE CONFIRMATION ORDER AND PLAN**

The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 16, 2019.[10]  On February 22, 2021, the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") entered an order (the "Confirmation Order")[11] confirming the Debtor's Chapter 11 plan (the "Plan") over the objections of the Movants and various others.[12]

---

[8]    Appx. 777-95.

[9]    Appx. 733 (Tr. 20:15-18); Appx. 863 (Tr. 68:13-15).

[10]    Appx. 7.

[11]    Appx. 1.

[12]    Appx. 92.

Because Class 8, the class of unsecured creditors, rejected the Plan and is not paid in full under the Plan,[13] the Bankruptcy Court confirmed the Plan under the cramdown provisions of the Bankruptcy Code, *see* 11 U.S.C. § 1129(b)(2)(B), including the critical "Absolute Priority Rule." This Rule is discussed in detail in section III.B.iii below.

The Plan contains various other provisions directly applicable to this appeal. First, the Plan assumes the PSAs.[14]  The effect of assumption is that "the debtor must continue to perform . . . the debtor accepts both the obligations and the benefits of the executory contract." *In re Nat'l Gypsum Co.*, 208 F.3d 498, 505-06 (5th Cir. 2000).  Second, the Plan releases and exculpates claims that the Movants and others have against numerous non-debtors, as discussed in detail in section III.B.ii below.  Third, the Plan enjoins the Movants and others from exercising their rights and claims against the Debtor and numerous non-debtors, some of which claims are subject to a "gatekeeper" injunction where the Bankruptcy Court must first determine that a claim against a non-debtor is "colorable," as discussed in detail in section III.B.ii below.

The Movants timely filed their notice of appeal of the Confirmation Order.[15] On March 31, 2021, and after certification by the Bankruptcy Court,[16] the Movants

---

[13]     Appx. 6, ¶ 3 (Class 8 rejected Plan); Appx. 41 (Class 8 projected to receive 71%).

[14]     Appx. 69, 157-61.

[15]     Appx. 772.

filed their petition for leave to file a direct appeal of the Confirmation Order, asserting five (5) issues on appeal (only the first four (4) of which are relevant to this Motion).[17]   On May 4, 2021, this Court granted the Movants' petition for a direct appeal of the Confirmation Order.[18]

## C.   MOTION FOR STAY PENDING APPEAL PROCEEDINGS BELOW

While the Confirmation Order has been entered, that does not mean that the Plan is effective or operative.   Rather, as is common, the Plan contains various conditions precedent that must be met before the Plan can be declared "effective."[19]

On February 28, 2021, the Movants sought a stay of the Confirmation Order before the Bankruptcy Court.[20]   On March 19, 2021, the Bankruptcy Court orally denied said motion.[21]   The Bankruptcy Court followed its oral denial with two written orders.[22]

On April 1, 2021, the Movants sought a stay of the Confirmation Order before the United States District Court for the Northern District of Texas, Dallas

---

[16]   Appx. 775.

[17]   Appx. 885, 897-99.

[18]   Appx. 945.

[19]   Appx. 142.

[20]   Appx. 947-80.

[21]   Appx. 861-76 (Tr. 66:13 – 81:13).

[22]   Appx. 878-84.

Appx.000388

Division (the "<u>District Court</u>"), as that is where the appeal was then pending.[23]  On April 12, 2021, the District Court entered an order granting expedited consideration of said motion and ordering expedited briefing.[24]  As of the filing of this Motion, the District Court has yet to adjudicate the motion for stay pending appeal.

Because this Court now has jurisdiction over this appeal, the Movants now file this Motion and seek a stay of the Confirmation Order from this Court.

The Debtor has agreed to stay the effectiveness of the Plan through June 25, 2021.  Thus, the Plan has yet to become effective or be implemented.

## II.    ARGUMENTS AND AUTHORITIES

### A.    STANDARD FOR A STAY PENDING APPEAL

Because this Court has granted a direct appeal of the Confirmation Order, this Court is the appropriate court to consider a stay of the Confirmation Order pending appeal.  *See* FED. R. BANKR. P. 8007(b)(1).  The Movants have satisfied the requirement of first seeking a stay from the Bankruptcy Court, which denied said relief.  *See id*. at 8007(b)(2)(B).

In determining whether to grant a discretionary stay pending appeal, the Court considers the following criteria: (1) the likelihood that the movant will

---

[23]    Appx. 912-44.

[24]    Appx. 907-11.

7

prevail on the merits of the appeal; (2) whether the movant will suffer irreparable injury if the stay is denied; (3) whether other parties would suffer substantial harm if the stay is granted; and (4) whether the public interest will be served by granting the stay.  *See In re First S. Sav. Ass'n*, 820 F.2d 700, 709 (5th Cir. 1987).  "The first two factors are the most critical."  *Tex. Democratic Party v. Abbott*, 961 F.2d 389, 397 (5th Cir. 2020).  However, the four-element test does not apply "where there is a serious legal question involved and the balance of equities heavily favors a stay; in those situations, the movant only needs to present a substantial case on the merits."  *Weingarten Realty Investors v. Miller*, 661 F.3d 904, 910 (5th Cir. 2011).

## B.   THERE IS A LIKELIHOOD OF SUCCESS ON THE MERITS

### i.   Legal Standard.

"[T]he appellant need not always show a 'probability' of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay."  *Arnold v. Garlock*, 278 F.3d 426, 439 (5th Cir. 2001) (quotations omitted).

### ii.   The Plan Violates *Pacific Lumber*

In *Bank of New York Trust Co., N.A. v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 253 (5th Cir. 2009), this Court

Appx.000390

broadly foreclosed nonconsensual releases or exculpations of third party claims; *i.e.* a claim held by a non-debtor against a non-debtor. The *Pacific Lumber* plan proposed to exculpate the debtor's management and professionals for actions (or omissions) they may have taken during the Chapter 11 case. *See id.* at 251. The Court found this impermissible:

> this court has held Section 524(e) only releases the debtor, not co-liable third parties. These cases seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions. . . the essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose.

*Id.* at 252 (internal citations omitted).

Nor can a release of third party claims be effectuated through an injunction: "[s]ection 524 prohibits the discharge of debts of nondebtors. Accordingly, we must overturn a § 105 injunction if it effectively discharges a nondebtor." *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760 (5th Cir. 1995). The Court concluded that no such injunction could be imposed under a plan on a permanent basis:

> the stay may not be extended post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to the creditor. Not only does such a permanent injunction improperly insulate nondebtors in violation of section 524(e), it does so without any countervailing justification of debtor protection.

*Id.* at 760 (*quoting In re W. Real Fund*, 922 F.2d 592, 601-02 (10th Cir. 1990)).

Here, the Plan violates these dictates in three substantial ways: (i) it exculpates claims for negligence that may be held by the Movants and others against numerous non-debtor parties;[25] (ii) it enjoins the Movants and others from exercising their contractual rights after confirmation under contracts that are assumed;[26] and (iii) it subjects any claim that the Movants and others may have against the foregoing for anything other than negligence to a "gatekeeper injunction" where the Bankruptcy Court, reserving "exclusive jurisdiction," must first determine that a "colorable claim" exists.[27]

With respect to the Plan's exculpation provisions, "Exculpated Parties" non-debtor managed funds, employees, the Debtor's general partner, the Debtor's management and professionals, and the affiliates of the foregoing.[28]  Subject to various limitations, the Plan provides that:

> no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of . . .[29]

On its face, these provisions directly and clearly violate *Pacific Lumber*. But these provisions are even more serious because they also apply to, and

---

[25]    Appx. 144 (C. Exculpation).

[26]    Appx. 147 (F. Injunction)

[27]    *Id.*

[28]    Appx. 106.

[29]    Appx. 144 (C. Exculpation).

exculpate, potential *prospective* liability incurred after the confirmation of the Plan, because these provisions also apply to "the implementation of the Plan."[30] The "implementation of the Plan" will take between two to three years and involves the Debtor's management of more than $1 billion of other peoples' investments.[31]   This is unprecedented, that a federal court would immunize fiduciaries against future claims.   This also violates the fundamental premise of what it means to *exit* bankruptcy:

> Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval.   The firm also is without the protection of the bankruptcy court.   It may not come running to the bankruptcy judge every time something unpleasant happens.

*Bank of. La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001).

It is the equivalent of General Motors releasing the post-confirmation entity from liability for manufacturing defects for cars it sells after bankruptcy.   Nor is this concern an academic one.   As the Debtor's CEO testified at the confirmation hearing, the Debtor lost approximately $200 million in value during its bankruptcy case, at least $100 million of which the CEO blamed on the Debtor's prior (yet post-bankruptcy) manager.[32]

---

[30]   *Id.* (sub. iv).

[31]   Appx. 350 (Tr. 189:3-9).

[32]   Appx. 256-59 (Tr. 95:17-98:6); Appx. 361 (Tr. 200:16-19).

11

Next, the Plan contains a sweeping, permanent injunction: "all Enjoined Parties[33] are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan."[34]  Of immediate relevance and effect on the Movants, this means that the Movants are enjoined from advising or causing their clients, including the Funds, to remove the Debtor as the manager of the CLOs, even though the Debtor assumed the PMAs and even if the Debtor mismanages the CLOs.[35]

As with exculpations, *Pacific Lumber* broadly foreclosed non-consensual "permanent injunctions."  *In re Pacific Lumber Co.*, 584 F.3d at 252-53.  More technically, the assumption of the PMAs means that the Debtor is obligated to perform under them and all rights of the counterparty are preserved and may be enforced: "[w]here the debtor assumes an executory contract, it must assume the entire contract, cum onere – the debtor accepts both the obligations and the benefits of the executory contract."  *In re Nat'l Gypsum Co.*, 208 F.3d at 505-06. The Debtor here found a clever way around this fundamental rule by simply obtaining an injunction that permanently enjoins and alters contract rights and obligations, in direct violation of the Bankruptcy Code.

---

[33]    The Movants are "Enjoined Parties."  Appx. 105.

[34]    Appx. 147.

[35]    Appx. 359 (Tr. 198:12-25).

This injunction, prohibiting "any actions to interfere with the implementation or consummation of the Plan," is also both overbroad and vague. *See Scott v. Schedler*, 826 F.3d 207, 211-12 (5th Cir. 2016) ("an injunction is overly vague if it fails to satisfy the specificity requirements . . . and it is overbroad if it is not narrowly tailored to remedy the specific action"). The Movants should not be subjected to potential contempt actions when the Plan fails to define with any reasonable specificity what it means to "interfere" with the "implementation or consummation" of the Plan.

With respect to the "gatekeeper injunction," the Movants are included within the "Enjoined Parties" subject to that injunction, which injunction prohibits the Movants from taking various actions, including to sue any of the "Protected Parties."[36] The "Protected Parties" include the same entities that are exculpated as discussed above.[37] Like the exculpation provision, this injunction effectuates a non-consensual, non-debtor release prohibited by *Pacific Lumber* because the Movants are enjoined from suing the Protected Parties *even for* claims based on "bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence."[38] *See In re Pacific Lumber Co.*, 584 F.3d at 252-53.

---

[36]    Appx. 105 ("Enjoined Parties"); Appx. 110 ("Protected Parties"); Appx. 147 (F. Injunction).

[37]    Appx. 110.

[38]    Appx. 147-48.

13

This injunction is not saved by the fact that the Bankruptcy Court may grant relief from the injunction if it first determines that an Enjoined Party has a "colorable claim" against a "Protected Party."  Nothing in the Bankruptcy Code possibly permits the Bankruptcy Court to require a non-debtor to come to it and prove that it has a viable claim against another non-debtor before it can assert that claim, or else be in contempt of court.  And this, too, applies *prospectively* to actions the Debtor will take in the next two to three years during the "wind down of the business of the Debtor or Reorganized Debtor" and the "the administration of the Claimant Trust."[39]  This is unprecedented, it violates due process, it is a taking, and it is prohibited by *Pacific Lumber*.

The Bankruptcy Court also impermissibly reserved to itself the "sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable."[40]  It is black-letter law that the Bankruptcy Court has no such jurisdiction between non-debtors today, and will certainly have no such jurisdiction in the future as the Plan is implemented.  *See In re Craig's Stores of Tex. Inc.*, 266 F.3d at 390 ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan.").  And it is certainly

---

[39]    *Id.*

[40]    *Id.*

Appx.000396

black-letter law that the Bankruptcy Court cannot confer onto itself jurisdiction that it does not have.

The end result is that the Movants, and many others, are enjoined *permanently* from exercising their legal and contractual rights; that potential present and *prospective* claims they have against non-debtors are released and exculpated; and that they are required to prove a "colorable" claim for any present or *prospective* claim they may have against non-debtors before they may assert that claim, while the Debtor and its management, officers, and others are free to manage billions of dollars of innocent investors' funds, taking very large fees for themselves, effectively free from the fiduciary duties imposed on them by the federal securities laws.  This is precisely what *Pacific Lumber* prohibits, and the wisdom of *Pacific Lumber's* prohibition is aptly proven by this case.

The Bankruptcy Court attempted to distinguish *Pacific Lumber*.[41]  In fact, the Bankruptcy Court stated its belief that this Court would "extend the holding of *Pacific Lumber*" with respect to the proper scope of an exculpation provision.[42] But if the holdings and limitations of *Pacific Lumber* must be extended in order for the Plan's exculpation provision to be permissible, then the Movants have demonstrated a likelihood of success on the merits of this issue *per se*.

---

[41]     Appx. 744-56.

[42]     Appx. 865 (Tr. 70:10-24).

Appx.000397

### iii.     The Plan Violates the Absolute Priority Rule.

Creditors vote by class under a Chapter 11 plan.  *See* 11 U.S.C. § 1126(c).

Class 8—unsecured creditors—rejected the plan.[43]  As the Plan does not pay Class

8 in full[44] and Class 8 rejected the Plan, the Plan could only be confirmed if the

Debtor satisfied the "Absolute Priority Rule."  Under the Absolute Priority Rule,

the holder of any junior interest—*e.g.*, an equity interest—cannot "receive or retain

… any property" on account of its junior interest.  11 U.S.C. § 1129(b)(2)(B)(ii).

Here, the Plan violates the Absolute Priority Rule as a matter of law because

the Plan gives the Debtor's limited partners—*i.e.*, junior interest holders—

contingent interests in the "Claimant Trust" created under the Plan to pay creditors

and, after they are paid in full, to pay equity holders.[45]  There is no question that

those contingent trust interests are "property" as admitted by the Debtor at trial:

"These are contingent interests.  They are property.  No doubt they are property."[46]

The Debtor's CEO also testified that the contingent interests are, in his belief,

inchoate property interests which may have some value in the future.[47]  As a matter

of law, an interest in a trust, even one subject to a contingency that may never

---

[43]     Appx. 6.  One of the Movants, NexPoint Advisors, L.P., is a partial assignee of four Class 8 Claims.  Appx. 777-87.

[44]     Appx. 41.

[45]     Appx. 120.

[46]     Appx. 698 (242:19-20).

[47]     Appx. 339 (178:22-25).

16

happen, is "property." *See In re Edmonds*, 273 B.R. 527, 529 (Bankr. E.D. Mich.
2000). The Plan therefore violates the Absolute Priority Rule because equity
holders retain or receive "property" under the Plan.

The Debtor argued that these contingent interests may have no value and
would only vest and be paid if unsecured creditors are paid in full, thus satisfying
the Absolute Priority Rule.[48] But the United States Supreme Court has squarely
rejected this argument:

> Respondents further argue that the absolute priority rule has no
> application in this case, where the property which the junior interest
> holders wish to retain has no value to the senior unsecured creditors. .
> . We join with the overwhelming consensus of authority which has
> rejected this 'no value' theory. . . Whether the value is present or
> prospective, for dividends or only for purposes of control a retained
> equity interest is a property interest. . . And while the Code itself does
> not define what 'property' means as the term is used in § 1129(b), the
> relevant legislative history suggests that Congress' meaning was quite
> broad. Property includes both tangible and intangible property.

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207-08 (1988) (internal
quotations and citations omitted). Thus, it does not matter that the property may be
prospective, intangible, or valueless.

The Bankruptcy Court relied on *In re Introgen Therapeutics*, 429 B.R. 570
(Bankr. W.D. Tex. 2010), for the proposition that, so long as the contingent
interests are not paid unless and until all unsecured claims are paid in full, the

---

[48]    Appx. 45.

Appx.000399

Absolute Priority Rule is satisfied.  This opinion was wrongly decided and has never been adopted by this Court or any appellate court.

First, it directly contradicts the language of the Bankruptcy Code, which implicates the Absolute Priority Rule if *any* "property" is being retained or received.  Second, the opinion looked to the present value of what was being retained, something directly foreclosed by the Supreme Court's opinion in *Norwest Bank Worthington* quoted above.  Third, the opinion fails to take into account the Supreme Court's opinion in *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle P'ship*, 526 U.S. 434 (1999).  There the Supreme Court equated the exclusive opportunity to bid on new equity under a plan as itself "property" that was being granted or retained in violation of the Rule: "[t]his opportunity should, first of all, be treated as an item of property in its own right."  *Id.* at 455.  If an exclusive opportunity is "property" for purposes of the Absolute Priority Rule, then so is an "opportunity" to share in a future recovery, however remote.

**(iv)  Conclusion.**

At a minimum, the Movants have shown that a "serious legal question is involved and [that] the balance of the equities weighs heavily in favor of granting the stay." *Tex. Democratic Party v. Abbott*, 961 F.3d at 397.  Permanent federal injunctions; a court exculpating someone of potential liability; a court requiring someone to come before it and prove that a claim is "colorable" before he may

Appx.000400

have access to the courts; violating the Absolute Priority Rule—all of these are "serious legal questions." And, given that the Bankruptcy Court ignored the dictates of *Pacific Lumber*, and that billions of dollars of investments from thousands of innocent investors are at stake, whose claims are released and who are enjoined from exercising their legal rights and remedies *after* bankruptcy, "the equities weighs heavily in favor of granting the stay."

Simply put, debtors and bankruptcy courts must not be permitted to use expediency to trample on legal rights, in the belief that appeals will become moot rendering appellate review unlikely. The Confirmation Order represents such clear errors of law and such a "substantial case on the merits" that the Court need not even consider the remaining factors governing a discretionary stay pending appeal under the authority of *Weingarten Realty Investors*, 661 F.3d at 910. Nevertheless, the Movants address such other factors below.

## C.    MOVANTS WILL SUFFER IRREPARABLE INJURY WITHOUT A STAY

First, there is the threat of equitable mootness, which this Court applies to Chapter 11 confirmation orders to dismiss appeals because it may be effectively too late to "unscramble the eggs." *See, e.g., In re Blast Energy Services, Inc.*, 593 F.3d 418, 424 (5th Cir. 2010). Indeed, this Court has recognized potential issues with denying a stay pending appeal:

> Although the exigencies of the case appeared to demand prompt action, simply denying a stay seems to have been, and often will be,

too simplistic a response. A plan may be designed to take effect, as it was here, after a lapse of sufficient time to initiate appellate review. A supersedeas bond may be tailored to the scope of the appeal. An appeal may be expedited. As with all facets of bankruptcy practice, myriad possibilities exist. Thus, substantial legal issues can and ought to be preserved for review.

*Bank of New York Trust Co., N.A. v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 243 (5th Cir. 2009).   This is all the more important here where the order of the Article I bankruptcy court should be reviewed on its merits by an Article III court.

Second, the various release, exculpation, and injunction provisions of the Plan detailed above will lead to irreparable injury if the Movants are unable to exercise their contractual rights or take other action to protect their interests and those of the investments they manage.   Being enjoined from doing what one otherwise has the lawful right to do is irreparable injury as a matter of law.   *C.f. Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012); *Cooper v. U.S. Postal. Serv.*, 246 F.R.D. 415, 418 (D. Conn. 2007).

The Debtor has testified that it intends to liquidate and wind down the CLOs in approximately two years.[49]   During that time, if the Movants dispute how the Debtor is doing so, or believe they have claims against the Debtor for its conduct, or wish to advise or cause their clients to take action against the Debtor on account of the same, the Plan will prohibit them from doing so, and the Debtor and its

---

[49]   Appx. 273 (line 5); Appx. 343 (line 5).

Appx.000402

management will be exculpated.  Absent a stay pending appeal, by the time that the Movants may ultimately prevail on their appeal, various rights will effectively have been lost for good.

### D.   DEBTOR AND CREDITORS WILL NOT BE UNDULY PREJUDICED BY A STAY

The Plan does not involve exit financing, a sale of the business, new investments, new money coming in, nor anything else that the Debtor does not already have to monetize its assets for the benefit of its creditors.[50]   As the Debtor's CEO confirmed at trial, "post-confirmation, you are basically going to continue managing the CLOs and funds and trying to monetize assets for creditors the same as you are today."[51]  He does not "need anything in the plan that [he] does [not] have today to keep managing" the "Funds and the CLOs."[52]

Thus, because the Plan does not give the Debtor anything that it lacks at present to continue monetizing its assets, managing the CLOs, and doing everything else it would under the Plan, the Debtor and its other creditors will not suffer any prejudice if a stay pending appeal is granted.  In this respect, the Court should take into account that 27 Class 8 creditors rejected the Plan, while only 17 accepted the Plan.[53]   It is the unsecured creditors who would be the only ones

---

[50]      Appx. 346 (185:3-188:5).

[51]      Appx. 349 (188:2-5).

[52]      *Id.* (188:23-189:2).

[53]      Appx. 6.

potentially prejudiced if the Plan is stayed, as that may delay their recoveries, but Class 8 overwhelmingly rejected the Plan.

### E.     THE PUBLIC INTEREST IS SERVED BY A STAY PENDING APPEAL

Because the Plan's exculpation and injunction provisions impermissibly infringe upon the contractual, legal, and due-process rights of parties in interest in the bankruptcy case, a stay pending appeal will serve the public interest. Thousands of innocent investors have invested in the CLOs or funds that the Debtor manages, totaling well over $1 billion, including $140 million for just the Funds that the Movants manage.  A stay will ensure that non-debtor parties can be held accountable for their post-petition and post-confirmation conduct.  The public has a strong interest, for example, in ensuring that the Debtor complies with federal securities laws.  But the Plan's exculpation provision and injunction threaten to substantially vitiate these laws and effectively relieve the Debtor from its obligations and duties (and potential liabilities) thereunder.

The public interest is also best served by requiring respect for judicial precedent, here *Pacific Lumber*.  While the Bankruptcy Court believed that this Court will revisit its *Pacific Lumber* holdings and will expand *Pacific Lumber*, at present *Pacific Lumber* is the law, and the Bankruptcy Court was bound by it.  This Court should not permit a Plan that clearly and directly violates *Pacific Lumber* to become effective before addressing the merits of this appeal.

Appx.000404

## F.    SECURITY FOR STAY PENDING APPEAL

The Court may, but need not, condition a stay pending appeal on a bond or other security being posted.  *See* FED. R. BANKR. P. 8007(c).  Because: (i) the Plan so clearly violates *Pacific Lumber;* (ii) the Plan so clearly violates the Absolute Priority Rule; (iii) there is the threat of equitable mootness; and (iv) the Debtor and creditors would not be harmed by a stay pending appeal, the Movants should not be required to post a bond as a condition to obtaining a stay.  Indeed, the Debtor argued below for a multi-hundred-million dollar bond, clearly designed *not* to protect other parties but to effectively *prevent* a stay pending appeal as no legitimate appellant should be required to post the entire amount of debt in a bankruptcy case as a condition of obtaining meaningful appellate relief.

The only conceivable harm pending appeal is from a delay in payments to certain creditors and minor added administrative expenses for having to file reports and pleadings with the Bankruptcy Court.  If the Plan is affirmed, then those creditors would not have use of those funds for a period of time.  Here, the Debtor believes that it will distribute approximately $60 million to Class 7 and Class 8 creditors within one year of the Plan going effective, which so far it has not.[54]  As unsecured creditors, these creditors would be entitled to interest at the federal rate of post-judgment interest.  *See Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, 782

---

[54]    Appx. 766.

Appx.000405

Fed. Appx. 339, 341 (5th Cir. 2019).  That rate is presently less than 1% and is unlikely to rise past that amount during the period of any stay.  Thus, the interest that any creditor may be able to claim for any delay in payment is less than 1%, or less than $600,000.00.  With respect to increased administrative costs for having to file reports and pleadings with the Bankruptcy Court, the Movants estimate that it cannot reasonably cost the Debtor more than $150,000.00 per month to have to continue filing reports and pleadings with the Bankruptcy Court that it would no longer have to do under its Plan.

Assuming this Court resolves this appeal within twelve months, the Movants therefore submit that a bond or security of no more than $2.4 million is sufficient to protect the Debtor and its estate from any harm resulting from the delay in the effectiveness of the Plan.

## IV.   <u>CONCLUSION</u>

WHEREFORE, premises considered, the Movants request that the Court enter an Order: (i) staying the effectiveness of the Confirmation Order pending appeal; and (ii) granting such other relief as is just and proper.

Appx.000406

RESPECTFULLY SUBMITTED this the 19th day of May, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By:  /s/ Davor Rukavina
     Davor Rukavina, Esq.
     Julian P. Vasek, Esq.
     500 N. Akard St., Ste. 3800
     Dallas, Texas  75201-6659
     Telephone: (214) 855-7500
     Facsimile: (214) 855-7584
     drukavina@munsch.com
     jvasek@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS,
L.P., AND NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that he discussed the relief requested herein with Jeff Pomerantz, Esq., counsel of record for the Debtor, who informed the undersigned that the Debtor opposes said relief.

/s/ Davor Rukavina
Davor Rukavina

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this Petition complies with Rule 27(d)(2) because it contains 5,176 words, excepting those portions that may be excepted under Rule 32(f).

/s/ Davor Rukavina
Davor Rukavina

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 19th day of May, 2021, true and correct copies of this document, with any exhibits attached thereto, were served on the recipients listed below via email.

Jeffrey N Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067
Email: jpomerantz@pszjlaw.com

John A Morris
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY 10017-2024
Email: jmorris@pszjlaw.com

/s/ Davor Rukavina
Davor Rukavina

Appx.000408

# EXHIBIT 12

Docket #0005 Date Filed: 4/6/2021

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | Bankruptcy Case No. 19-34054 |
| | § | |
| Debtor. | § § | |
| | § | |
| THE DUGABOY INVESTMENT TRUST AND GET GOOD TRUST | § § § | |
| Appellants, | § | |
| | § | |
| v. | § | Civ. Act. No. 3:21-cv-00550-L |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| | § | |
| Appellee. | § § | |
| | § | |

## <u>MOTION FOR STAY PENDING APPEAL</u>

TO THE HONORABLE JUDGE SAM A. LINDSAY, U.S. DISTRICT JUDGE:

**NOW COMES** the Appellants, The Dugaboy Investment Trust and Get Good Trust (the "<u>Movants</u>"), in the above styled and numbered appeal from the bankruptcy case (the "<u>Bankruptcy Case</u>") captioned, *In re: Highland Capital Management, L.P.*, case number 19-34054, as filed by Highland Capital Management, L.P. (the "<u>Debtor</u>"), and hereby file this *Motion for Stay Pending Appeal* (the "<u>Motion</u>"). In support of the Motion, the Movants, respectfully aver as follows:

Pursuant to this Motion and Fed. R. Bankr. P. 8007, the Movants request that the Court issue a stay of that certain *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Bankr. Dkt.

1934054210406000000000000008

No. 1943] (the "<u>Confirmation Order</u>"[1]), pending the outcome of this appeal through the Fifth Circuit.  Contemporaneously herewith, the Movants are filing their *Brief in Support of Motion for Stay Pending Appeal* (the "<u>Brief</u>").   Such a stay is justified for the reasons set forth in the Brief, all of which is incorporated herein by reference.

Notices of Appeal from the Confirmation Order have been filed by the Movants (DKT 1972 and 2014), Highland Capital Management Fund Advisors L.P. and NexPoint Advisors L.P ("<u>Advisors</u>") (DKT 1957), Highland Income Fund, NexPoint Strategic Opportunities Fund Highland Global Fund and NexPoint Capital, Inc ("<u>Funds</u>") (DKT 1966) and James Dondero (DKT 1970).  The appeal of the Confirmation Order filed by Funds and Advisors has been allotted to Judge David C. Godbey[2].  The appeal of the Confirmation Order filed by Movants and Dondero have been allotted to this Court[3].

Motions for Stay of the Confirmation Order have been filed by Funds and Advisors (DKTS 1967 and 1955) Movants and Dondero filed joinders to the Motions to Stay the Confirmation Order (DKTS 1971 and 1973).

The Bankruptcy Court conducted a hearing on March 19, 2021; and the Bankruptcy Court denied the Motions for Stay Pending Appeal by order entered on March 23, 2021 (DKT 2084 and 2095).

A Motion for Stay Pending Appeal has been filed by Advisors in this Court.  (See USDC-NDTX Case No. 3:21-cv-00538-N).

---

[1] Appx. 1.
[2] Highland Capital Management Fund Advisors L.P. and NexPoint Advisors L.P ("<u>Advisors</u>") – USDC NDTX Case No. 3:21-cv-00538-N

Highland Income Fund, NexPoint Strategic Opportunities Fund Highland Global Fund and NexPoint Capital, Inc ("<u>Funds</u>") – USDC NDTX Case No. 3:21-cv-00539-N.

[3] James Dondero USDC NDTX Case No. 3:21-cv-00546-L.

The Debtor, Funds Advisors, Movants and Dondero request for a direct appeal to the 5th Circuit of the Confirmation Order was granted by *Order Certifying Appeals of the Confirmation Order for Direct Appeal to the United States Court of Appeals for the Fifth Circuit* (DKT 2034). For the reasons set forth in the Brief filed by the Movant in Support of this Motion, Movant requests that this Court issue a Stay Pending Appeal of the Confirmation Order.

WHEREFORE, PREMISES CONSIDERED, the Movants request that the Court enter an Order:

1. Staying the effectiveness of the Confirmation Order pending the conclusion of the appeal thereof through the Fifth Circuit; and

2. Granting such other relief as is just and proper.

RESPECTFULLY SUBMITTED this the 6th day of April 2021.

*/s/ Douglas S. Draper*
Douglas S. Draper, (*pro hac vice admittance requested*)
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Phone: 504-299-3300/Fax: 504-299-3399
e-mail: ddraper@hellerdraper.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this the 6th day of April, 2021, true and correct copies of this document, with any exhibits attached thereto, were served on the recipients listed below via email, and correct copies of this document, with any exhibits attached thereto, were served on the recipients listed below via first class U.S. mail, postage prepaid:

Jeffrey N Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd
13th Floor
Los Angeles, CA 90067
Email: jpomerantz@pszjlaw.com

John A Morris
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY 10017-2024
Email: jmorris@pszjlaw.com

Zachery Z. Annable
Hayward PLLC
10501 N. Central Expressway
Suite 106
Dallas, TX 75231
Email: zannable@haywardfirm.com

/s/ Douglas S. Draper
Douglas S. Draper

# EXHIBIT 13

**Case No. 21-10449**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

In re:  Highland Capital Management, L.P.

     Debtor.

-----------------------------------------------

NexPoint Advisors, L.P., and Highland Capital Management Fund Advisors, L.P.,

     Appellants,

v.

Highland Capital Management, L.P.,

     Appellee.

---

### APPELLANTS' MOTION FOR STAY PENDING APPEAL

---

Direct Appeal from the United States Bankruptcy Court
for the Northern District of Texas, Honorable Stacey G.C. Jernigan

Davor Rukavina, Esq.
Julian P. Vasek, Esq.
MUNSCH HARDT KOPF & HARR, P.C.
500 North Akard Street, Ste. 3800
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

ATTORNEYS FOR APPELLANTS/MOVANTS

1934054210520000000000000009

**Case No. 21-10449**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

In re:  Highland Capital Management, L.P.

     Debtor.

-----------------------------------------------

NexPoint Advisors, L.P., and Highland Capital Management Fund Advisors, L.P.,

     Appellants,

v.

Highland Capital Management, L.P.,

     Appellee.

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

     The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

     1.    <u>**APPELLANTS/MOVANT**</u>**:**

          **NexPoint Advisors, L.P.**
               Owned by:
                    The Dugaboy Investment Trust
                    NexPoint Advisors GP, LLC
                       Owned by:
                           James Dondero

i

**Highland Capital Management Fund Advisors, L.P.**
        Owned by:
                Highland Capital Management Services, Inc.
                Strand Advisors XVI, Inc.
                Okada Family Revocable Trust

**Represented by**:
        Davor Rukavina, Esq.
        Julian P. Vasek, Esq.
        MUNSCH HARDT KOPF & HARR, P.C.

**2.**     **RETAIL FUNDS MANAGED BY APPELLANTS:**

**NexPoint Capital, Inc.**

**Highland Income Fund**

**NexPoint Global Strategic Opportunities, Fund**

**3.**     **APPELLEE/RESPONDENT:**

**Highland Capital Management, L.P.**
        Owned by:
                Hunter Mountain Investment Trust
                The Dugaboy Investment Trust
                Mark and Pamela Okada Family Trust – Exempt Trust 2
                Mark and Pamela Okada – Exempt Descendants' Trust
                Mark Kiyoshi Okada
                Strand Advisors, Inc.

**Represented by:**
        PACHULSKI STANG ZIEHL & JONES LLP
        Jeffrey N. Pomerantz, Esq.
        John Morris, Esq.
        HAYWARD PLLC
        Melissa S. Hayward, Esq.
        Zachery Annable, Esq.

Appx.000417

4.      **OTHER PARTIES INDIRECTLY AFFECTED BY APPEAL:**

**Official Committee of Unsecured Creditors**
   Members:
          Redeemer Committee of Highland Crusader Fund
          Meta-e Discovery
          UBS Securities LLC
          UBS AG London Branch
          Acis Capital Management, L.P.
          Acis Capital Management GP, LLC
          Josh Terry

**All creditors in Highland Capital Management, L.P. bankruptcy**


                                    /s/ Davor Rukavina
                                    Davor Rukavina, Esq.
                                    Counsel for the Appellants

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................v

I.      SUMMARY ......................................................................1

II.     BACKGROUND ................................................................3

        A.      THE DEBTOR AND THE CLOs ..............................3

        B.      THE CONFIRMATION ORDER AND PLAN.................4

        C.      MOTION FOR STAY PENDING APPEAL PROCEEDINGS BELOW ................6

III.    ARGUMENTS AND AUTHORITIES............................................7

        A.      STANDARD FOR A STAY PENDING APPEAL .............7

        B.      THERE IS A LIKELIHOOD OF SUCCESS ON THE MERITS ...........................8

                i.      Legal Standard ..............................................8

                ii.     The Plan Violates *Pacific Lumber* .............8

                iii.    The Plan Violates the Absolute Priority Rule...........................16

                iv.     Conclusion ..................................................18

        C.      MOVANTS WILL SUFFER IRREPARABLE INJURY WITHOUT
                A STAY .................................................................19

        D.      DEBTOR AND CREDITORS WILL NOT BE UNDULY
                PREJUDICED BY A STAY ......................................21

        E.      THE PUBLIC INTEREST IS SERVED BY A STAY PENDING APPEAL...........22

        F.      SECURITY FOR STAY PENDING APPEAL .................23

IV.     CONCLUSION..................................................................24

Appx.000419

# TABLE OF AUTHORITIES

## Cases

*Arnold v. Garlock*, 278 F.3d 426 (5th Cir. 2001) ....................................................8

*Associated Press v. Otter*, 682 F.3d 821 (9th Cir. 2012)........................................20

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle P'ship*,
    526 U.S. 434 (1999)...........................................................................................18

*Bank of. La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores
    of Tex., Inc.)*, 266 F.3d 388 (5th Cir. 2001)..................................................11, 14

*Bank of New York Trust Co., N.A. v. Official Unsecured
    Creditors' Comm. (In re Pacific Lumber Co.)*,
    584 F.3d 229 (5th Cir. 2009) ......................................................................*passim*

*Cooper v. U.S. Postal. Serv.*, 246 F.R.D. 415 (D. Conn. 2007) .............................20

*Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, 782 Fed. Appx. 339
    (5th Cir. 2019)....................................................................................................23

*In re Blast Energy Services, Inc.*, 593 F.3d 418 (5th Cir. 2010) ............................19

*Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746 (5th Cir. 1995) .........................9

*In re Edmonds*, 273 B.R. 527 (Bankr. E.D. Mich. 2000) .......................................17

*In re First S. Sav. Ass'n*, 820 F.2d 700 (5th Cir. 1987) ...........................................8

*In re Introgen Therapeutics*, 429 B.R. 570 (Bankr. W.D. Tex. 2010) ...................17

*In re Nat'l Gypsum Co.*, 208 F.3d 498 (5th Cir. 2000)......................................5, 12

*In re W. Real Fund*, 922 F.2d 592 (10th Cir. 1990) ..................................................9

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988)...................................17

*Scott v. Schedler*, 826 F.3d 207 (5th Cir. 2016)......................................................13

*Tex. Democratic Party v. Abbott*, 961 F.2d 389 (5th Cir. 2020) ........................8, 18

*Weingarten Realty Investors v. Miller*, 661 F.3d 904 (5th Cir. 2011)................8, 19

Appx.000420

## Statutes and Rules

11 U.S.C. § 1126 ................................................................................................. 16

11 U.S.C. § 1129 ................................................................................................. 16

Fed. R. Bankr. P. 8007 ................................................................................... 7, 22

Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. (the "Movants"), the appellants in this direct bankruptcy appeal, file this their *Motion for Stay Pending Appeal* (the "Motion"), respectfully stating as follows:

## I.   SUMMARY[1]

The Movants respectfully request a stay of the Bankruptcy Court's Confirmation Order, by which it confirmed the Chapter 11 Plan of Highland Capital Management, L.P. (the "Debtor").

A stay is necessary to prevent irreparable harm by ensuring that this Appeal does not become equitably moot through the implementation of the Plan. A stay is also necessary because the Plan's injunctions prevent the Movants from exercising their contractual and statutory rights, post-confirmation, and from potentially asserting claims against various non-debtor parties, which claims the Plan releases, exculpates, and enjoins. If a stay is not entered, then the Debtor is likely to liquidate all of its holdings with judicial immunity by the time that the merits of this appeal are heard.

A stay is appropriate because the Plan violates this Court's precedent and the Bankruptcy Code. First, the Plan contains sweeping injunction, release, and exculpation provisions expressly forbidden by this Court in *Pacific Lumber*, which provisions permanently enjoin the Movants from exercising their lawful rights and

---

[1]   Capitalized terms used in this Summary are defined below.

which impermissibly release claims that the Movants have against various non-debtors.  The Bankruptcy Court recognized as much, predicting that this Court would "extend the holding" of *Pacific Lumber*—something that this Court has yet to do, however.  Second, the Plan could not have been confirmed at all under the "cramdown" provisions of the Bankruptcy Code because equity interest holders retain certain interests even though unsecured creditors rejected the Plan and are not paid in full under the Plan.

A stay will not prejudice the Debtor or other creditors.  The Plan does not provide for a sale, nor for exit financing, nor for the issuance or new securities or investments in the Debtor.  Rather, the Plan simply provides for the Debtor to liquidate its assets over time, something that the Debtor is presently doing and can continue doing without a need for the Plan.

A stay will serve the public interests.  Thousands of innocent investors, whose investments (more than $1 billion) the Debtor manages, are enjoined from exercising their solemn rights for post-bankruptcy claims.  Potential claims they hold against the Debtor's management and non-debtors are simultaneously extinguished through the Plan's exculpation provisions.  The public interest cannot be served by permitting a Plan that clearly violates this Court's precedent to become effective, and the public interest cannot be served when these innocent investors are enjoined from exercising their contractual and statutory rights.

2

# I.     BACKGROUND[2]

## A.     THE DEBTOR AND THE CLOS

The Debtor is a multibillion-dollar global investment adviser registered with the SEC, pursuant to the Investment Advisers Act of 1940.[3]   Under that Act, the Debtor owes strict fiduciary duties to the funds that it manages and to the investors whose investments it manages.[4]   Among other things, the Debtor manages more than $1 billion in investments in various collateralized loan obligations ("CLOs") pursuant to portfolio management agreements (the "PMAs") in exchange for various fees paid by the CLOs.[5]

The Movants are also registered investment advisors who manage and advise various publicly traded funds, including three such funds (the "Funds")[6] which collectively have invested approximately $140 million in the CLOs the Debtor manages.[7]   The Movants are also unsecured and administrative creditors

---

[2]     Contemporaneously with the filing of this Motion, the Movants are filing their *Appendix of Appellants*.  Citations to the appendix shall be notated as follows: Appx. #.

[3]     Appx. 6.

[4]     Appx. 340 (Tr. 179:8-15).

[5]     Appx. 350-51 (Tr. 189:3-190:12).

[6]     NexPoint Capital Inc., Highland Income Fund, and NexPoint Strategic Opportunities, Fund.  Appx. 508 (Tr. 52:20-25).

[7]     Appx. 509-11 (Tr. 53:1-55:5).

Appx.000424

against the Debtor.[8]  The Movants have standing to appeal the Confirmation Order and to seek a stay pending appeal, as confirmed by the Bankruptcy Court.[9]

Under at least three PMAs, the Funds may remove the Debtor as CLO manager because the Funds hold the requisite percentage of shares.  There are various other CLOs where the Funds do not hold enough shares but are still able to vote their shares along with other shareholders.  Thus, should the Debtor, as manager, act inappropriately, the Funds, and the Movants acting on their behalf, have the ability to protect themselves and their investors, absent the Plan.

### B.    THE CONFIRMATION ORDER AND PLAN

The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 16, 2019.[10]  On February 22, 2021, the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") entered an order (the "Confirmation Order")[11] confirming the Debtor's Chapter 11 plan (the "Plan") over the objections of the Movants and various others.[12]

---

[8]    Appx. 777-95.

[9]    Appx. 733 (Tr. 20:15-18); Appx. 863 (Tr. 68:13-15).

[10]   Appx. 7.

[11]   Appx. 1.

[12]   Appx. 92.

4

Because Class 8, the class of unsecured creditors, rejected the Plan and is not paid in full under the Plan,[13] the Bankruptcy Court confirmed the Plan under the cramdown provisions of the Bankruptcy Code, *see* 11 U.S.C. § 1129(b)(2)(B), including the critical "Absolute Priority Rule." This Rule is discussed in detail in section III.B.iii below.

The Plan contains various other provisions directly applicable to this appeal. First, the Plan assumes the PSAs.[14]  The effect of assumption is that "the debtor must continue to perform . . . the debtor accepts both the obligations and the benefits of the executory contract." *In re Nat'l Gypsum Co.*, 208 F.3d 498, 505-06 (5th Cir. 2000).  Second, the Plan releases and exculpates claims that the Movants and others have against numerous non-debtors, as discussed in detail in section III.B.ii below.  Third, the Plan enjoins the Movants and others from exercising their rights and claims against the Debtor and numerous non-debtors, some of which claims are subject to a "gatekeeper" injunction where the Bankruptcy Court must first determine that a claim against a non-debtor is "colorable," as discussed in detail in section III.B.ii below.

The Movants timely filed their notice of appeal of the Confirmation Order.[15] On March 31, 2021, and after certification by the Bankruptcy Court,[16] the Movants

---

[13]     Appx. 6, ¶ 3 (Class 8 rejected Plan); Appx. 41 (Class 8 projected to receive 71%).

[14]     Appx. 69, 157-61.

[15]     Appx. 772.

Appx.000426

filed their petition for leave to file a direct appeal of the Confirmation Order, asserting five (5) issues on appeal (only the first four (4) of which are relevant to this Motion).[17]  On May 4, 2021, this Court granted the Movants' petition for a direct appeal of the Confirmation Order.[18]

## C.    MOTION FOR STAY PENDING APPEAL PROCEEDINGS BELOW

While the Confirmation Order has been entered, that does not mean that the Plan is effective or operative.  Rather, as is common, the Plan contains various conditions precedent that must be met before the Plan can be declared "effective."[19]

On February 28, 2021, the Movants sought a stay of the Confirmation Order before the Bankruptcy Court.[20]  On March 19, 2021, the Bankruptcy Court orally denied said motion.[21]  The Bankruptcy Court followed its oral denial with two written orders.[22]

On April 1, 2021, the Movants sought a stay of the Confirmation Order before the United States District Court for the Northern District of Texas, Dallas

---

[16]     Appx. 775.

[17]     Appx. 885, 897-99.

[18]     Appx. 945.

[19]     Appx. 142.

[20]     Appx. 947-80.

[21]     Appx. 861-76 (Tr. 66:13 – 81:13).

[22]     Appx. 878-84.

Division (the "<u>District Court</u>"), as that is where the appeal was then pending.[23]  On April 12, 2021, the District Court entered an order granting expedited consideration of said motion and ordering expedited briefing.[24]  As of the filing of this Motion, the District Court has yet to adjudicate the motion for stay pending appeal.

Because this Court now has jurisdiction over this appeal, the Movants now file this Motion and seek a stay of the Confirmation Order from this Court.

The Debtor has agreed to stay the effectiveness of the Plan through June 25, 2021.  Thus, the Plan has yet to become effective or be implemented.

## II.    ARGUMENTS AND AUTHORITIES

### A.    STANDARD FOR A STAY PENDING APPEAL

Because this Court has granted a direct appeal of the Confirmation Order, this Court is the appropriate court to consider a stay of the Confirmation Order pending appeal.  *See* FED. R. BANKR. P. 8007(b)(1).  The Movants have satisfied the requirement of first seeking a stay from the Bankruptcy Court, which denied said relief.  *See id*. at 8007(b)(2)(B).

In determining whether to grant a discretionary stay pending appeal, the Court considers the following criteria: (1) the likelihood that the movant will

---

[23]    Appx. 912-44.

[24]    Appx. 907-11.

prevail on the merits of the appeal; (2) whether the movant will suffer irreparable injury if the stay is denied; (3) whether other parties would suffer substantial harm if the stay is granted; and (4) whether the public interest will be served by granting the stay. *See In re First S. Sav. Ass'n*, 820 F.2d 700, 709 (5th Cir. 1987). "The first two factors are the most critical." *Tex. Democratic Party v. Abbott*, 961 F.2d 389, 397 (5th Cir. 2020). However, the four-element test does not apply "where there is a serious legal question involved and the balance of equities heavily favors a stay; in those situations, the movant only needs to present a substantial case on the merits." *Weingarten Realty Investors v. Miller*, 661 F.3d 904, 910 (5th Cir. 2011).

## B. THERE IS A LIKELIHOOD OF SUCCESS ON THE MERITS

### i. Legal Standard.

"[T]he appellant need not always show a 'probability' of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay." *Arnold v. Garlock*, 278 F.3d 426, 439 (5th Cir. 2001) (quotations omitted).

### ii. The Plan Violates *Pacific Lumber*

In *Bank of New York Trust Co., N.A. v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 253 (5th Cir. 2009), this Court

Appx.000429

broadly foreclosed nonconsensual releases or exculpations of third party claims; *i.e.* a claim held by a non-debtor against a non-debtor. The *Pacific Lumber* plan proposed to exculpate the debtor's management and professionals for actions (or omissions) they may have taken during the Chapter 11 case. *See id.* at 251. The Court found this impermissible:

> this court has held Section 524(e) only releases the debtor, not co-liable third parties. These cases seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions. . . the essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose.

*Id.* at 252 (internal citations omitted).

Nor can a release of third party claims be effectuated through an injunction: "[s]ection 524 prohibits the discharge of debts of nondebtors. Accordingly, we must overturn a § 105 injunction if it effectively discharges a nondebtor." *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760 (5th Cir. 1995). The Court concluded that no such injunction could be imposed under a plan on a permanent basis:

> the stay may not be extended post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to the creditor. Not only does such a permanent injunction improperly insulate nondebtors in violation of section 524(e), it does so without any countervailing justification of debtor protection.

*Id.* at 760 (*quoting In re W. Real Fund*, 922 F.2d 592, 601-02 (10th Cir. 1990)).

Appx.000430

Here, the Plan violates these dictates in three substantial ways: (i) it exculpates claims for negligence that may be held by the Movants and others against numerous non-debtor parties;[25] (ii) it enjoins the Movants and others from exercising their contractual rights after confirmation under contracts that are assumed;[26] and (iii) it subjects any claim that the Movants and others may have against the foregoing for anything other than negligence to a "gatekeeper injunction" where the Bankruptcy Court, reserving "exclusive jurisdiction," must first determine that a "colorable claim" exists.[27]

With respect to the Plan's exculpation provisions, "Exculpated Parties" non-debtor managed funds, employees, the Debtor's general partner, the Debtor's management and professionals, and the affiliates of the foregoing.[28]  Subject to various limitations, the Plan provides that:

> no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of . . .[29]

On its face, these provisions directly and clearly violate *Pacific Lumber*. But these provisions are even more serious because they also apply to, and

---

[25]     Appx. 144 (C. Exculpation).

[26]     Appx. 147 (F. Injunction)

[27]     *Id.*

[28]     Appx. 106.

[29]     Appx. 144 (C. Exculpation).

10

exculpate, potential *prospective* liability incurred after the confirmation of the Plan, because these provisions also apply to "the implementation of the Plan."[30] The "implementation of the Plan" will take between two to three years and involves the Debtor's management of more than $1 billion of other peoples' investments.[31]   This is unprecedented, that a federal court would immunize fiduciaries against future claims.   This also violates the fundamental premise of what it means to *exit* bankruptcy:

> Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval.   The firm also is without the protection of the bankruptcy court.   It may not come running to the bankruptcy judge every time something unpleasant happens.

*Bank of. La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001).

It is the equivalent of General Motors releasing the post-confirmation entity from liability for manufacturing defects for cars it sells after bankruptcy.   Nor is this concern an academic one.   As the Debtor's CEO testified at the confirmation hearing, the Debtor lost approximately $200 million in value during its bankruptcy case, at least $100 million of which the CEO blamed on the Debtor's prior (yet post-bankruptcy) manager.[32]

---

[30]   *Id.* (sub. iv).

[31]   Appx. 350 (Tr. 189:3-9).

[32]   Appx. 256-59 (Tr. 95:17-98:6); Appx. 361 (Tr. 200:16-19).

11

Next, the Plan contains a sweeping, permanent injunction: "all Enjoined Parties[33] are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan."[34]  Of immediate relevance and effect on the Movants, this means that the Movants are enjoined from advising or causing their clients, including the Funds, to remove the Debtor as the manager of the CLOs, even though the Debtor assumed the PMAs and even if the Debtor mismanages the CLOs.[35]

As with exculpations, *Pacific Lumber* broadly foreclosed non-consensual "permanent injunctions."  *In re Pacific Lumber Co.*, 584 F.3d at 252-53.  More technically, the assumption of the PMAs means that the Debtor is obligated to perform under them and all rights of the counterparty are preserved and may be enforced: "[w]here the debtor assumes an executory contract, it must assume the entire contract, cum onere – the debtor accepts both the obligations and the benefits of the executory contract."  *In re Nat'l Gypsum Co.*, 208 F.3d at 505-06.  The Debtor here found a clever way around this fundamental rule by simply obtaining an injunction that permanently enjoins and alters contract rights and obligations, in direct violation of the Bankruptcy Code.

---

[33]     The Movants are "Enjoined Parties."  Appx. 105.

[34]     Appx. 147.

[35]     Appx. 359 (Tr. 198:12-25).

This injunction, prohibiting "any actions to interfere with the implementation or consummation of the Plan," is also both overbroad and vague. *See Scott v. Schedler*, 826 F.3d 207, 211-12 (5th Cir. 2016) ("an injunction is overly vague if it fails to satisfy the specificity requirements . . . and it is overbroad if it is not narrowly tailored to remedy the specific action"). The Movants should not be subjected to potential contempt actions when the Plan fails to define with any reasonable specificity what it means to "interfere" with the "implementation or consummation" of the Plan.

With respect to the "gatekeeper injunction," the Movants are included within the "Enjoined Parties" subject to that injunction, which injunction prohibits the Movants from taking various actions, including to sue any of the "Protected Parties."[36] The "Protected Parties" include the same entities that are exculpated as discussed above.[37] Like the exculpation provision, this injunction effectuates a non-consensual, non-debtor release prohibited by *Pacific Lumber* because the Movants are enjoined from suing the Protected Parties *even for* claims based on "bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence."[38] *See In re Pacific Lumber Co.*, 584 F.3d at 252-53.

---

[36]   Appx. 105 ("Enjoined Parties"); Appx. 110 ("Protected Parties"); Appx. 147 (F. Injunction).

[37]   Appx. 110.

[38]   Appx. 147-48.

Appx.000434

This injunction is not saved by the fact that the Bankruptcy Court may grant relief from the injunction if it first determines that an Enjoined Party has a "colorable claim" against a "Protected Party."  Nothing in the Bankruptcy Code possibly permits the Bankruptcy Court to require a non-debtor to come to it and prove that it has a viable claim against another non-debtor before it can assert that claim, or else be in contempt of court.  And this, too, applies *prospectively* to actions the Debtor will take in the next two to three years during the "wind down of the business of the Debtor or Reorganized Debtor" and the "the administration of the Claimant Trust."[39]  This is unprecedented, it violates due process, it is a taking, and it is prohibited by *Pacific Lumber*.

The Bankruptcy Court also impermissibly reserved to itself the "sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable."[40]  It is black-letter law that the Bankruptcy Court has no such jurisdiction between non-debtors today, and will certainly have no such jurisdiction in the future as the Plan is implemented.  *See In re Craig's Stores of Tex. Inc.*, 266 F.3d at 390 ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan.").  And it is certainly

---

[39]     *Id.*

[40]     *Id.*

black-letter law that the Bankruptcy Court cannot confer onto itself jurisdiction that it does not have.

The end result is that the Movants, and many others, are enjoined *permanently* from exercising their legal and contractual rights; that potential present and *prospective* claims they have against non-debtors are released and exculpated; and that they are required to prove a "colorable" claim for any present or *prospective* claim they may have against non-debtors before they may assert that claim, while the Debtor and its management, officers, and others are free to manage billions of dollars of innocent investors' funds, taking very large fees for themselves, effectively free from the fiduciary duties imposed on them by the federal securities laws. This is precisely what *Pacific Lumber* prohibits, and the wisdom of *Pacific Lumber's* prohibition is aptly proven by this case.

The Bankruptcy Court attempted to distinguish *Pacific Lumber*.[41]  In fact, the Bankruptcy Court stated its belief that this Court would "extend the holding of *Pacific Lumber*" with respect to the proper scope of an exculpation provision.[42] But if the holdings and limitations of *Pacific Lumber* must be extended in order for the Plan's exculpation provision to be permissible, then the Movants have demonstrated a likelihood of success on the merits of this issue *per se*.

---

[41]     Appx. 744-56.

[42]     Appx. 865 (Tr. 70:10-24).

### iii.    The Plan Violates the Absolute Priority Rule.

Creditors vote by class under a Chapter 11 plan.  *See* 11 U.S.C. § 1126(c).

Class 8—unsecured creditors—rejected the plan.[43]  As the Plan does not pay Class

8 in full[44] and Class 8 rejected the Plan, the Plan could only be confirmed if the

Debtor satisfied the "Absolute Priority Rule."  Under the Absolute Priority Rule,

the holder of any junior interest—*e.g.*, an equity interest—cannot "receive or retain

… any property" on account of its junior interest.  11 U.S.C. § 1129(b)(2)(B)(ii).

Here, the Plan violates the Absolute Priority Rule as a matter of law because

the Plan gives the Debtor's limited partners—*i.e.*, junior interest holders—

contingent interests in the "Claimant Trust" created under the Plan to pay creditors

and, after they are paid in full, to pay equity holders.[45]  There is no question that

those contingent trust interests are "property" as admitted by the Debtor at trial:

"These are contingent interests.  They are property.  No doubt they are property."[46]

The Debtor's CEO also testified that the contingent interests are, in his belief,

inchoate property interests which may have some value in the future.[47]  As a matter

of law, an interest in a trust, even one subject to a contingency that may never

---

[43]    Appx. 6.  One of the Movants, NexPoint Advisors, L.P., is a partial assignee of four Class 8 Claims.  Appx. 777-87.

[44]    Appx. 41.

[45]    Appx. 120.

[46]    Appx. 698 (242:19-20).

[47]    Appx. 339 (178:22-25).

happen, is "property." *See In re Edmonds*, 273 B.R. 527, 529 (Bankr. E.D. Mich. 2000). The Plan therefore violates the Absolute Priority Rule because equity holders retain or receive "property" under the Plan.

The Debtor argued that these contingent interests may have no value and would only vest and be paid if unsecured creditors are paid in full, thus satisfying the Absolute Priority Rule.[48] But the United States Supreme Court has squarely rejected this argument:

> Respondents further argue that the absolute priority rule has no application in this case, where the property which the junior interest holders wish to retain has no value to the senior unsecured creditors. . . We join with the overwhelming consensus of authority which has rejected this 'no value' theory. . . Whether the value is present or prospective, for dividends or only for purposes of control a retained equity interest is a property interest. . . And while the Code itself does not define what 'property' means as the term is used in § 1129(b), the relevant legislative history suggests that Congress' meaning was quite broad. Property includes both tangible and intangible property.

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207-08 (1988) (internal quotations and citations omitted). Thus, it does not matter that the property may be prospective, intangible, or valueless.

The Bankruptcy Court relied on *In re Introgen Therapeutics*, 429 B.R. 570 (Bankr. W.D. Tex. 2010), for the proposition that, so long as the contingent interests are not paid unless and until all unsecured claims are paid in full, the

---

[48] Appx. 45.

Absolute Priority Rule is satisfied.  This opinion was wrongly decided and has never been adopted by this Court or any appellate court.

First, it directly contradicts the language of the Bankruptcy Code, which implicates the Absolute Priority Rule if *any* "property" is being retained or received.  Second, the opinion looked to the present value of what was being retained, something directly foreclosed by the Supreme Court's opinion in *Norwest Bank Worthington* quoted above.  Third, the opinion fails to take into account the Supreme Court's opinion in *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle P'ship*, 526 U.S. 434 (1999).  There the Supreme Court equated the exclusive opportunity to bid on new equity under a plan as itself "property" that was being granted or retained in violation of the Rule: "[t]his opportunity should, first of all, be treated as an item of property in its own right."  *Id.* at 455.  If an exclusive opportunity is "property" for purposes of the Absolute Priority Rule, then so is an "opportunity" to share in a future recovery, however remote.

**(iv)    Conclusion.**

At a minimum, the Movants have shown that a "serious legal question is involved and [that] the balance of the equities weighs heavily in favor of granting the stay."  *Tex. Democratic Party v. Abbott*, 961 F.3d at 397.  Permanent federal injunctions; a court exculpating someone of potential liability; a court requiring someone to come before it and prove that a claim is "colorable" before he may

have access to the courts; violating the Absolute Priority Rule—all of these are "serious legal questions." And, given that the Bankruptcy Court ignored the dictates of *Pacific Lumber*, and that billions of dollars of investments from thousands of innocent investors are at stake, whose claims are released and who are enjoined from exercising their legal rights and remedies *after* bankruptcy, "the equities weighs heavily in favor of granting the stay."

Simply put, debtors and bankruptcy courts must not be permitted to use expediency to trample on legal rights, in the belief that appeals will become moot rendering appellate review unlikely. The Confirmation Order represents such clear errors of law and such a "substantial case on the merits" that the Court need not even consider the remaining factors governing a discretionary stay pending appeal under the authority of *Weingarten Realty Investors*, 661 F.3d at 910. Nevertheless, the Movants address such other factors below.

## C.    MOVANTS WILL SUFFER IRREPARABLE INJURY WITHOUT A STAY

First, there is the threat of equitable mootness, which this Court applies to Chapter 11 confirmation orders to dismiss appeals because it may be effectively too late to "unscramble the eggs." *See, e.g., In re Blast Energy Services, Inc.*, 593 F.3d 418, 424 (5th Cir. 2010). Indeed, this Court has recognized potential issues with denying a stay pending appeal:

> Although the exigencies of the case appeared to demand prompt action, simply denying a stay seems to have been, and often will be,

Appx.000440

too simplistic a response. A plan may be designed to take effect, as it was here, after a lapse of sufficient time to initiate appellate review. A supersedeas bond may be tailored to the scope of the appeal. An appeal may be expedited. As with all facets of bankruptcy practice, myriad possibilities exist. Thus, substantial legal issues can and ought to be preserved for review.

*Bank of New York Trust Co., N.A. v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 243 (5th Cir. 2009). This is all the more important here where the order of the Article I bankruptcy court should be reviewed on its merits by an Article III court.

Second, the various release, exculpation, and injunction provisions of the Plan detailed above will lead to irreparable injury if the Movants are unable to exercise their contractual rights or take other action to protect their interests and those of the investments they manage. Being enjoined from doing what one otherwise has the lawful right to do is irreparable injury as a matter of law. *C.f. Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012); *Cooper v. U.S. Postal. Serv.*, 246 F.R.D. 415, 418 (D. Conn. 2007).

The Debtor has testified that it intends to liquidate and wind down the CLOs in approximately two years.[49] During that time, if the Movants dispute how the Debtor is doing so, or believe they have claims against the Debtor for its conduct, or wish to advise or cause their clients to take action against the Debtor on account of the same, the Plan will prohibit them from doing so, and the Debtor and its

---

[49] Appx. 273 (line 5); Appx. 343 (line 5).

management will be exculpated.  Absent a stay pending appeal, by the time that the Movants may ultimately prevail on their appeal, various rights will effectively have been lost for good.

### D.    DEBTOR AND CREDITORS WILL NOT BE UNDULY PREJUDICED BY A STAY

The Plan does not involve exit financing, a sale of the business, new investments, new money coming in, nor anything else that the Debtor does not already have to monetize its assets for the benefit of its creditors.[50]  As the Debtor's CEO confirmed at trial, "post-confirmation, you are basically going to continue managing the CLOs and funds and trying to monetize assets for creditors the same as you are today."[51]  He does not "need anything in the plan that [he] does [not] have today to keep managing" the "Funds and the CLOs."[52]

Thus, because the Plan does not give the Debtor anything that it lacks at present to continue monetizing its assets, managing the CLOs, and doing everything else it would under the Plan, the Debtor and its other creditors will not suffer any prejudice if a stay pending appeal is granted.  In this respect, the Court should take into account that 27 Class 8 creditors rejected the Plan, while only 17 accepted the Plan.[53]  It is the unsecured creditors who would be the only ones

---

[50]    Appx. 346 (185:3-188:5).

[51]    Appx. 349 (188:2-5).

[52]    *Id.* (188:23-189:2).

[53]    Appx. 6.

potentially prejudiced if the Plan is stayed, as that may delay their recoveries, but Class 8 overwhelmingly rejected the Plan.

### E.    THE PUBLIC INTEREST IS SERVED BY A STAY PENDING APPEAL

Because the Plan's exculpation and injunction provisions impermissibly infringe upon the contractual, legal, and due-process rights of parties in interest in the bankruptcy case, a stay pending appeal will serve the public interest. Thousands of innocent investors have invested in the CLOs or funds that the Debtor manages, totaling well over $1 billion, including $140 million for just the Funds that the Movants manage. A stay will ensure that non-debtor parties can be held accountable for their post-petition and post-confirmation conduct. The public has a strong interest, for example, in ensuring that the Debtor complies with federal securities laws. But the Plan's exculpation provision and injunction threaten to substantially vitiate these laws and effectively relieve the Debtor from its obligations and duties (and potential liabilities) thereunder.

The public interest is also best served by requiring respect for judicial precedent, here *Pacific Lumber*. While the Bankruptcy Court believed that this Court will revisit its *Pacific Lumber* holdings and will expand *Pacific Lumber*, at present *Pacific Lumber* is the law, and the Bankruptcy Court was bound by it. This Court should not permit a Plan that clearly and directly violates *Pacific Lumber* to become effective before addressing the merits of this appeal.

Appx.000443

## F.     SECURITY FOR STAY PENDING APPEAL

The Court may, but need not, condition a stay pending appeal on a bond or other security being posted.  *See* FED. R. BANKR. P. 8007(c).  Because: (i) the Plan so clearly violates *Pacific Lumber;* (ii) the Plan so clearly violates the Absolute Priority Rule; (iii) there is the threat of equitable mootness; and (iv) the Debtor and creditors would not be harmed by a stay pending appeal, the Movants should not be required to post a bond as a condition to obtaining a stay.  Indeed, the Debtor argued below for a multi-hundred-million dollar bond, clearly designed *not* to protect other parties but to effectively *prevent* a stay pending appeal as no legitimate appellant should be required to post the entire amount of debt in a bankruptcy case as a condition of obtaining meaningful appellate relief.

The only conceivable harm pending appeal is from a delay in payments to certain creditors and minor added administrative expenses for having to file reports and pleadings with the Bankruptcy Court.  If the Plan is affirmed, then those creditors would not have use of those funds for a period of time.  Here, the Debtor believes that it will distribute approximately $60 million to Class 7 and Class 8 creditors within one year of the Plan going effective, which so far it has not.[54]  As unsecured creditors, these creditors would be entitled to interest at the federal rate of post-judgment interest.  *See Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, 782

---

[54]     Appx. 766.

Fed. Appx. 339, 341 (5th Cir. 2019).  That rate is presently less than 1% and is unlikely to rise past that amount during the period of any stay.  Thus, the interest that any creditor may be able to claim for any delay in payment is less than 1%, or less than $600,000.00.  With respect to increased administrative costs for having to file reports and pleadings with the Bankruptcy Court, the Movants estimate that it cannot reasonably cost the Debtor more than $150,000.00 per month to have to continue filing reports and pleadings with the Bankruptcy Court that it would no longer have to do under its Plan.

Assuming this Court resolves this appeal within twelve months, the Movants therefore submit that a bond or security of no more than $2.4 million is sufficient to protect the Debtor and its estate from any harm resulting from the delay in the effectiveness of the Plan.

## IV.   <u>CONCLUSION</u>

WHEREFORE, premises considered, the Movants request that the Court enter an Order: (i) staying the effectiveness of the Confirmation Order pending appeal; and (ii) granting such other relief as is just and proper.

RESPECTFULLY SUBMITTED this the 19th day of May, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By:  /s/ Davor Rukavina
      Davor Rukavina, Esq.
      Julian P. Vasek, Esq.
      500 N. Akard St., Ste. 3800
      Dallas, Texas  75201-6659
      Telephone: (214) 855-7500
      Facsimile: (214) 855-7584
      drukavina@munsch.com
      jvasek@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS,
L.P., AND NEXPOINT ADVISORS, L.P.**

Appx.000446

## <u>CERTIFICATE OF CONFERENCE</u>

The undersigned hereby certifies that he discussed the relief requested herein with Jeff Pomerantz, Esq., counsel of record for the Debtor, who informed the undersigned that the Debtor opposes said relief.

/s/ Davor Rukavina
Davor Rukavina

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that this Petition complies with Rule 27(d)(2) because it contains 5,176 words, excepting those portions that may be excepted under Rule 32(f).

/s/ Davor Rukavina
Davor Rukavina

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this the 19th day of May, 2021, true and correct copies of this document, with any exhibits attached thereto, were served on the recipients listed below via email.

Jeffrey N Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067
Email: jpomerantz@pszjlaw.com

John A Morris
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY 10017-2024
Email: jmorris@pszjlaw.com

/s/ Davor Rukavina
Davor Rukavina

Appx.000447

# EXHIBIT 14



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 22, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-SGJ-11 |
| | § | |
| Debtor. | § | |
| | § | |

## ORDER ON MOTIONS FOR STAY PENDING APPEAL

This matter having come before the Court on the *Emergency Motion of the Advisors for Stay Pending Appeal of the Confirmation Order, and Brief in Support Thereof* [Docket No. 1955] (the "Advisors Motion"); *Motion for Stay Pending Appeal of the Court's Order Confirming the Debtor's Fifth Amended Plan* [Docket No. 1967] (the "Funds Motion"); *Joinder to Motions for Stay Pending Appeal of the Court's Order Confirming the Debtor's Fifth Amended Plan* [Docket No. 1971] (the "Trusts Motion"); and *Joinder in Motion for Stay Pending Appeal and Additional Grounds for the*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054210323000000000004

*Issuance of a Stay Pending Appeal* [Docket No. 1973] (the "<u>Dondero Motion</u>," and together with the Advisors Motion, the Funds Motion, and the Trusts Motion, the ("<u>Motions</u>"), and this Court having considered (i) the Motions; (ii) *Debtor's Omnibus Response to Motions for Stay Pending Appeal of the Confirmation Order* [Docket No. 2022] (the "<u>Debtor's Response</u>");[2] (iii) *Omnibus Objection of the Official Committee of Unsecured Creditors' Objection to Motions for Stay Pending Appeal of the Confirmation Order and Joinder in Debtor's Omnibus Objection to Motions for Stay* [Docket No. 2023] (the "<u>UCC Response</u>," and together with the Motions and the Debtor's Response, the "<u>Briefs</u>"); (iv) the evidence admitted into evidence during the hearing held on March 19, 2021 (the "<u>Hearing</u>"); and (v) the arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the notice of the Motions and opportunity for a hearing on the Motions were appropriate and that no other notice need be provided; and upon all of the proceedings had before this Court, the legal and factual bases set forth in the Briefs, and the evidence submitted at the Hearing; and after due deliberation and sufficient cause appearing therefor, and for the reasons set forth in the record on the Motions, it is hereby **ORDERED** that:

1. The Motions are **DENIED**.

2. The Court will hold a hearing on March 24, 2021, at 9:30 a.m. Central Time (the "<u>Bond Hearing</u>") on whether the Appellants are entitled to a stay pending appeal of the Confirmation Order, as a matter of right, under applicable law upon the posting of an adequate monetary bond. If the Court determines that applicable law provides Appellants with a stay

---

[2] Capitalized terms used but not herein defined shall have the meanings ascribed to such terms in the Debtor's Response.

2

pending appeal of the Confirmation Order as a matter of right upon the posting of an adequate monetary bond, then this Court will hear evidence at the Bond Hearing regarding the appropriate amount of such bond.

3.     Parties may submit briefs on the question of whether Appellants are entitled to a stay pending appeal of the Confirmation Order as a matter of right upon the posting of an adequate monetary bond, and if so, the appropriate amount of such bond, by no later than 3:00 p.m. Central Time on March 23, 2021.

4.     The Effective Date of the Plan will not occur prior to March 31, 2021.

5.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###

# EXHIBIT 15

Appx.000452

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Bankruptcy Case No. 19-34054 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. and NEXPOINT | § | |
| ADVISORS, L.P., | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-cv-538-N |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Appellee. | § | |
| | § | |
| HIGHLAND GLOBAL ALLOCATION | § | |
| FUND, HIGHLAND INCOME FUND, | § | |
| NEXPOINT CAPITAL, INC., and | § | |
| NEXPOINT STRATEGY | § | |
| OPPORTUNITIES FUND | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-cv-539-N |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Appellee. | § | |
| | § | |
| JAMES DONDERO, | § | |
| | § | |
| Appellant, | § | |
| | § | |

ORDER – PAGE 1



v.                                    §        Civil Action No. 3:21-cv-546-N
                                      §
HIGHLAND CAPITAL MANAGEMENT, §
L.P.,                                 §
                                      §
        Appellee.                     §

§
THE DUGABOY INVESTMENT TRUST §
AND GET GOOD TRUST                    §
                                      §
        Appellants,                   §
                                      §
v.                                    §        Civil Action No. 3:21-cv-550-N
                                      §
HIGHLAND CAPITAL MANAGEMENT, §
L.P.,                                 §
                                      §
        Appellee.                     §

### ORDER

This Order addresses Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. (collectively, the "Advisors"), The Dugaboy Investment Trust, and Get Good Trust's motion for stay pending appeal. The Court denies the motion.

This is a bankruptcy case concerning Highland Capital Management, L.P. On February 22, 2021, the Bankruptcy Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* (the "Confirmation Order"). Appellants filed motions for stay in the Bankruptcy Court and initiated four separate appeals of the Confirmation Order to this Court. The Bankruptcy Court denied the motions for stay and certified a direct appeal to the Fifth Circuit. The Advisors then filed this motion for stay pending the outcome of their

ORDER – PAGE 2

appeal to the Fifth Circuit.  The Dugaboy Investment Trust and the Get Good Trust then filed a motion adopting the Advisors' motion.

Shortly after this motion became ripe, the Advisors filed a similar motion to the Fifth Circuit.  The Fifth Circuit ultimately denied that motion.  *See* Order, NexPoint v. Highland Capital Mgmt., No. 21-10449 (5th Cir. June 21, 2021).  Because the Fifth Circuit has already reviewed and denied a motion with identical arguments, the Court denies this motion for stay pending appeal.


Signed June 23, 2021.

David C. Godbey
United States District Judge

ORDER – PAGE 3

# EXHIBIT 16

Appx.000456

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

June 21, 2021

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

    No. 21-10449   NexPoint v. Highland Capital Mgmt
                    USDC No. 19-34054
                    USDC No. 3:21-CV-538

Enclosed is an order entered in this case.

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Lisa E. Ferrara, Deputy Clerk
504-310-7675

Mr. Zachery Z. Annable
Mr. Robert P. Colwell
Mr. Douglas Scott Draper
Mr. David R. Fine
Ms. Melissa Sue Hayward
Mr. Jeffrey N. Pomerantz
Mr. Davor Rukavina
Mr. Clay Marshall Taylor
Mr. Julian Preston Vasek

Appx.000457

# United States Court of Appeals
# for the Fifth Circuit

--------------

No. 21-10449

--------------

NexPoint Advisors, L.P.; Highland Capital Management
Fund Advisors, L.P.,

*Appellants*,

*versus*

Highland Capital Management, L.P.,

*Appellee.*

--------------

Appeal from the United States Bankruptcy Court
for the Northern District of Texas
USDC No. 19-34054

--------------

Before Dennis, Southwick, and Engelhardt, *Circuit Judges*.

Per Curiam:

IT IS ORDERED that appellants Highland Capital Management
Fund Advisors, L.P. and Nexpoint Advisors, L.P.'s motion for stay pending
appeal is DENIED.

# EXHIBIT 17

# SUMMARY OF DONDERO AND RELATED ENTITY LITIGATION*

*In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (Bankr. N.D. Tex.)

| 9/23/20 | *Debtor's Motion for Entry of an Order Approving Settlement with (a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P. (Claim No. 159) and Authorizing Actions Consistent Therewith* **[D.I. 1087]** | | | |
|---|---|---|---|---|
| | **Objectors**: | Dondero [D.I. 1121] | Acis filed a claim for at least $75 million. Acis claim was the result of an involuntary bankruptcy initiated when the Debtor refused to pay an arbitration award and instead transferred assets to become judgment proof. Debtor settled claim for an allowed Class 8 claim of $23 million and approximately $1 million in cash payments. Dondero objected to the settlement alleging that it was unreasonable and constituted vote buying. | The Acis Settlement Motion was approved and Dondero's objection was overruled [D.I. 1302]. | Dondero appealed [D.I. 1347]. The appeal has been briefed and the decision is pending. |
| 11/18/20 | *Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreements* **[D.I. 1424]** | | | |
| | **Objectors**: | Dondero [D.I. 1447] | The Debtor filed a motion seeking to retain a sub-servicer to assist in its reorganization consistent with the proposed plan. Dondero alleged that the sub-servicer was not needed; was too expensive; and would not be subject to Bankruptcy Court jurisdiction [D.I. 1447]. | Dondero withdrew his objection [D.I. 1460] after forcing the Debtor to incur costs responding [D.I. 1459] | N/A |
| 11/19/20 | *James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside of the Ordinary Course* **[D.I. 1439]** | | | |
| | **Movant**: | Dondero | Dondero alleged the Debtor sold significant assets in violation of 11 U.S.C. § 363 and without providing Dondero a chance to bid. Dondero requested an emergency hearing on this motion [D.I. 1443]. Dondero filed this motion despite having agreed to the Protocols governing such sales. | Dondero withdrew this motion [D.I. 1622] after the Debtor and the Committee were forced to incur costs responding and preparing for trial [D.I. 1546, 1551]. | N/A |
| 12/8/20 | *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* **[D.I. 1522]** | | | |
| | **Movants**: | Advisors Funds | Movants argued that the Debtor should be precluded from causing the CLOs to sell assets without Movants' consent. Movants provided no support for this position which directly contradicted the terms of the CLO Agreements; and was filed notwithstanding the Protocols which governed such sales. Movants requested an emergency hearing on this motion [D.I. 1523]. | The motion was denied [D.I. 1605] and was characterized as "frivolous." | N/A |

**\* The following is by way of summary only and does not include discovery disputes or similar matters.  Nothing herein shall be deemed or considered a waiver of any rights or an admission of fact.  The Debtor reserves all rights that it may have whether in law or in equity.**

| 12/23/20 | **_Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 150, 153, 154) and Authorizing Actions Consistent Therewith_ [D.I. 1625]** | | | |
|---|---|---|---|---|
| | **Objectors**: | Dondero [D.I. 1697] Trusts [D.I. 1706] CLOH [D.I. 1707] | The HarbourVest Entities asserted claims in excess of $300 million in connection with an investment in a fund indirectly managed by the Debtor for, among other things, fraud and fraudulent inducement, concealment, and misrepresentation. Debtor settled for an allowed Class 8 claim of $45 million and an allowed Class 9 claim of $35 million. Dondero and the Trusts alleged that the settlement was unreasonable; was a windfall to the HarbourVest Entities; and constituted vote buying. CLOH argued that the settlement could not be effectuated under the operative documents. | CLOH withdrew its objection at the hearing. The settlement was approved and the remaining objections were overruled [D.I. 1788]. | The Trusts appealed [D.I. 1870], and the appeal has been briefed. CLOH recently filed a complaint alleging, among other things, that the settlement was a breach of fiduciary duty and a RICO violation. |
| 1/14/21 | **_Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)_ [D.I. 1752]** | | | |
| | **Movants**: | Trusts Dondero [D.I. 1756] | Movants sought the appointment of an examiner 14 months after the Petition Date and commencement of Plan solicitation to assess the legitimacy of the claims against the various Dondero Entities and to avoid litigation. Movants requested an emergency hearing on this motion [D.I. 1748]. | The motion was denied [D.I. 1960]. | N/A |
| 1/20/21 | **_James Dondero's Objection to Debtor's Proposed Assumption of Executory Contracts and Cure Amounts Proposed in Connection Therewith_ [D.I. 1784]** | | | |
| | **Objector**: | Dondero | Dondero objected to the Debtor's proposed assumption of the limited partnership agreement governing the Debtor and MSCF [D.I. 1719]. | Dondero withdrew his objection [D.I. 1876] after forcing the Debtor to incur the expense of responding (which included a statement that the Debtor limited partnership agreement was not being assumed). | N/A |

Appx.000461

| 1/22/20 | **_Objections to Fifth Amended Plan of Reorganization_ [D.I. 1472]** | | | | |
|---|---|---|---|---|---|
| | **Objectors**:[1] | | All objections to the Plan were consensually resolved prior to the confirmation hearing except for the objections of the Dondero Entities and the U.S. Trustee. The U.S. Trustee did not press its objection at confirmation. | All objections were overruled and the Confirmation Order was entered. The Confirmation Order specifically found that Mr. Dondero would "burn the place down" if his case resolution plan was not accepted. | Dondero, the Trusts, the Advisors, and the Funds appealed [D.I. 1957, 1966, 1970, 1972]. The appeal is being briefed. |
| | Dondero [D.I. 1661] | Trusts [D.I. 1667] | | | |
| | Advisors & Funds[2] [D.I. 1670] | Senior Employees [D.I. 1669] | | | |
| | HCRE [D.I. 1673] | CLOH [D.I. 1675] | | | |
| | NexBank Entities [D.I. 1676] | | | | |
| 1/24/21 | **_Application for Allowance of Administrative Expense Claim_ [D.I. 1826]** | | | | |
| | **Movants**: | Advisors | The Advisors seek an administrative expense claim for approximately $14 million they allege they overpaid to the Debtor during the bankruptcy case under the Shared Services Agreement.  Notably, the Advisors have not paid $14 million to the Debtor during the bankruptcy. | This matter is currently being litigated. | N/A |
| 2/3/21 | **_NexBank's Application for Allowance of Administrative Expense Claim_ [D.I. 1888]** | | | | |
| | **Movant**: | NexBank | NexBank seeks an administrative expense claim for reimbursement of $2.5 million paid to the Debtor under its Shared Services Agreement and investment advisory agreement. NexBank alleges that it did not receive the services. | This matter is currently being litigated. | N/A |

---

[1] In addition to the Dondero Entities' objections, the following objections were filed: State Taxing Authorities [D.I. 1662]; Former Employees [D.I. 1666]; IRS [D.I. 1668]; US Trustee [D.I. 1671]; Daugherty [D.I. 1678].  These objections were either resolved prior to confirmation or not pressed at confirmation.

[2] In addition to the Funds, this objection was joined by: Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Healthcare Opportunities Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Real Estate Strategies Fund, NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., and NexPoint Real Estate Advisors VIII, L.P. [D.I. 1677].

| 2/8/21 | *James Dondero Motion for Status Conference* **[D.I. 1914]** | | | | |
|---|---|---|---|---|---|
| | **Movant**: | Dondero | Dondero requested a chambers conference to convince the Court to delay confirmation of the Plan to allow for continued negotiation of the "pot plan." | The request was denied [D.I. 1929] after the Debtor and Committee informally objected. | N/A. |
| 2/28/21 | *Motions for Stay Pending Appeal* | | | | |
| | **Movants**: | | The only parties requesting a stay pending appeal were the Dondero Entities.  They alleged a number of potential harms to the Dondero Entities if a stay was not granted and offered to post a $1 million bond. | Relief was denied [D.I. 2084, 2095] and a number of the Movants' arguments were found to be frivolous. | Movants sought a stay pending appeal from this Court. |
| | Dondero [D.I. 1973] | Advisors [D.I. 1955] | | | |
| | Funds [D.I. 1967] | Trusts [D.I. 1971] | | | |

| 3/18/21 | *James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Motion to Recuse Pursuant to 28 U.S.C. § 455* **[D.I. 2060]** | | | | |
|---|---|---|---|---|---|
| | **Movants**: | Dondero | Dondero argued that Judge Jernigan should recuse herself as her rulings against him and his related entities were evidence of her bias. | Judge Jernigan denied the motion without briefing from any other party on March 23, 2021 [D.I. 2083]. | The Movants appealed [D.I. 2149]. The opening brief and the Debtor's response have been filed. |
| | | Advisors | | | |
| | | Trusts | | | |
| | | HCRE | | | |

| 4/15/21 | *Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* **[D.I. 2199]** | | | | |
|---|---|---|---|---|---|
| | **Movants**: | Debtor | UBS Securities LLC and UBS AG London Branch (collectively, "UBS") asserted claims against the Debtor in excess of $1 billion arising from two Debtor-managed funds' breach of contract in 2008.  The settlement resolved ten plus years of litigation but had to be renegotiated when the Debtor discovered that the Dondero-controlled Debtor had caused the funds to transfer cash and securities with a face amount of over $300 million to a Cayman-based Dondero controlled entity in 2017, presumably to thwart UBS's ability to collect on its judgment. | The only parties to object were Dondero [D.I. 2295] and Dugaboy [D.I. 2268, 2293]. The Debtor filed an omnibus reply on May 14, 2021 [D.I. 2308]. UBS also filed a reply [D.I. 2310].  The UBS settlement was approved on May 24, 2021 [D.I. 2389]. | The objectors appealed the settlement. |

4

**4/23/21** *Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* **[D.I. 2247]**

| **Movants**: | Debtor | Debtor filed a motion seeking an order to show cause as to why Dondero, CLOH, DAF, and their counsel should not be held in contempt of court for willingly violating two final Bankruptcy Court orders. The Bankruptcy Court entered an order to show cause on April 29, 2021 [D.I. 2255] and set an in-person hearing for June 8, 2021. | Dondero, CLOH, the DAF, Mark Patrick (allegedly the person in control of the DAF), and their counsel filed responses to the order to show cause on May 14, 2021 [D.I. 2309, 2312, 2313]. The Debtor filed its reply on May 21, 2021 [D.I. 2350]. On August 4, 2021, the Court found each of Dondero, CLOH, the DAF, Patrick, and Sbaiti & Co. in contempt of court [D.I. 2660] | Dondero has appealed [D.I. 2712] |
|---|---|---|---|---|

**4/23/21** *Motion for Modification of Order Authorizing Appointment of James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction* **[D.I. 2242]**

| **Movants**: | Debtor | DAF and CLOH filed a motion asking the Bankruptcy Court to modify the July 16, 2020, order appointing Seery as the Debtor's CEO/CRO alleging the Bankruptcy Court lacked subject matter jurisdiction. | On May 14, 2021, the Debtor filed a response [D.I. 2311] stating that DAF and CLOH's motion was a collateral attack and barred by res judicata, among other things. The Committee joined in the Debtor's response [D.I. 2315]. DAF and CLOH filed their reply on May 21, 2021 [D.I. 2347]. The Motion was denied on June 25, 2021 [D.I. 2506] | DAF and CLOH have appealed. [D.I. 2513] but are seeking to stay the appeal and the filing of their opening brief. |
|---|---|---|---|---|

**4/20/21** *Debtor's Motion for Entry of an Order (i) Authorizing the Debtor to (a) Enter into Exit Financing Agreement in Aid of Confirmed Chapter 11 Plan and (b) Incur and Pay Related Fees and Expenses and (ii) Granting Related Relief* **[D.I. 2229]**

| **Movants**: | Debtor | The Debtor filed a motion seeking authority to enter into an exit financing facility. The facility was required, in part, to fund the increased costs to the estate from Dondero's litigiousness. Dugaboy filed two objections to the motion alleging, among other things, that there was no basis for the financing [D.I. 2403; 2467] | The motion was granted on June 30 [D.I. 2503] | N/A |
|---|---|---|---|---|

5

| | | | | |
|---|---|---|---|---|
| 4/29/21 | *Motion to Compel Compliance with Bankruptcy Rule 2015.3* **[D.I. 2256]** | | | |
| | **Movants:** | Trusts | The Trusts filed a motion on negative notice seeking to compel the Debtor to file certain reports under Rule 2015.3 [D.I. 2256]. The Debtor opposed that motion on May 20, 2021 [D.I. 2341], which was joined by the Committee [D.I. 2343]. The Trusts filed their reply on June 8, 2021 [D.I. 2424] | A hearing was held on June 10, 2021 [D.I. 2442] and the motion was adjourned. The motion was denied as moot on September 7, 2021 [D.I. 2812] | The Trusts appealed [D.I. 2840] |
| 6/25/21 | *Debtor's Motion for Entry of an Order (i) Authorizing the (a) Creation of an Indemnity Subtrust and (b) entry into an Indemnity Trust Agreement and (ii) Granting Related Relief* **[D.I. 2491]** | | | |
| | **Movants:** | Debtor | The Debtor filed a motion seeking authority to create an indemnity trust to secure the Reorganized Debtor, Claimant Trust, and Litigation Trust's indemnification obligations [D.I. 2491]. Dondero, HCMFA, NPA, and Dugaboy objected [D.I. 2563] arguing that it constituted an improper plan modification. The Debtor and the Committee filed replies in support [D.I. 2576, 2577] | A hearing was held and the Debtor's motion was granted [D.I. 2599]. | Dondero, HCMFA, NPA, and Dugaboy appealed [D.I. 2673] |
| 8/3/21 | *James Dondero's First Amended Motion for Entry of an Order (i) Compelling Mediation and (ii) Granting Related Relief* **[D.I. 2657]** | | | |
| | **Movants:** | Dondero | Dondero filed a motion to compel mediation nearly six months after confirmation of the Debtor's plan [D.I. 2657]. The Debtor filed a response setting forth certain conditions for the appointment of a mediator [D.I. 2756]. | Dondero withdrew his motion to compel mediation after reviewing the Debtor's conditions [D.I. 2763] | N/A |

## *Highland Capital Management, L.P. v. James D. Dondero*, Adv. Proc. No. 20-03190-sgj (Bankr. N.D. Tex.)

| | | | | |
|---|---|---|---|---|
| 12/7/20 | *Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* **[D.I. 2]** | | | |
| | **Movant:** | Debtor | The Debtor commenced an adversary proceeding seeking an injunction against Dondero. Dondero actively interfered with the management of the estate. Seery had instructed Debtor employees to sell certain securities on behalf of the CLOs. Dondero disagreed with Seery's direction and intervened to prevent these sales from being executed. Dondero also threatened Seery via text message and sent threatening emails to other Debtor employees. | A TRO was entered on December 10 [D.I. 10], which prohibited Dondero from, among other things, interfering with the Debtor's estate and communicating with Debtor employees unless it related to the Shared Services Agreements. A preliminary injunction was entered on January 12 after an exhaustive evidentiary hearing [D.I. 59]. This matter was resolved consensually by order entered | Dondero appealed to the District Court, which declined to hear the interlocutory appeal. Dondero is seeking a writ of mandamus from the Fifth Circuit. The writ of mandamus was withdrawn as part of the settlement. |

6

| | | | May 18, 2021 [D.I. 182], which enjoined Dondero from certain conduct until the close of the Bankruptcy Case. | |

**1/7/21** *Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* **[D.I. 48]**

| **Movant**: | Debtor | In late December, the Debtor discovered that Dondero had violated the TRO in multiple ways, including by destroying his cell phone, his text messages, and conspiring with the Debtor's then general counsel and assistant general counsel[3] to coordinate offensive litigation against the Debtor. The hearing on this matter was delayed and there was litigation on evidentiary issues, among other things. An extensive evidentiary hearing was held on March 22. | The Court entered an order finding Mr. Dondero in contempt of court on June 7, 2021 [D.I. 190] | Mr. Dondero has appealed [D.I. 212] |

---

[3] As a result of this conduct, among other things, the Debtor terminated its general counsel and assistant general counsel for cause on January 5, 2021.

*Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc., and CLO Holdco, Ltd.*, **Adv. Proc. No. 21-03000-sgj (Bankr. N.D. Tex.)**

| 1/6/21 | *Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero* [D.I. 2] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | In late December, the Debtor received a number of threatening letters from the Funds, the Advisors, and CLOH regarding the Debtor's management of the CLOs. These letters reiterated the arguments made by these parties in their motion filed on December 8, which the Court concluded were "frivolous." The relief requested by the Debtor was necessary to prevent the Funds, Advisors, and CLOH's improper interference in the Debtor's management of its estate. | The parties agreed to the entry of a temporary restraining order on January 13 [D.I. 20]. A hearing on a preliminary injunction began on January 26 and was continued to May 7. The TRO was further extended with the parties' consent [D.I. 64]. The Debtor reached an agreement with CLOH and dismissed CLOH from the adversary proceeding. The Debtor has reached an agreement in principle with the Funds and Advisors that settled this matter, and filed its 9019 motion. | N/A |

*Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.*, **Adv. Proc. No. 21-03010-sgj (Bankr. N.D. Tex.)**

| 2/17/21 | *Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021* [D.I. 2] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | The Debtor's Plan called for a substantial reduction in its work force. As part of this process, the Debtor terminated the Shared Services Agreements and began negotiating a transition plan with the Advisors that would enable them to continue providing services to the retail funds they managed without interruption. The Debtor was led to believe that without the Debtor's assistance the Advisors would not be able to provide services to their retail funds, and, although the Debtor had proceed appropriately, the Debtor was concerned it would be brought into any action brought by the SEC against the Advisors if they could not service the funds. | At a daylong hearing, the Advisors testified that they had a transition plan in place. An order was entered on February 24 [D.I. 25] making factual findings and ruling that the injunction was moot. The parties recently entered into a stipulation regarding discovery for the remaining breach of contract claim. This action was consolidated with the Advisors' | N/A |

The Debtor brought this action to force the Advisors to formulate a transition plan and to avoid exposure to the SEC, among others.

admin claim since both matters arise from Shared Services Agreements.

### *Highland Capital Management, L.P. v. James Dondero*, **Adv. Proc. No. 21-03003-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* **[D.I. 1]** | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | Dondero borrowed $8.825 million from Debtor pursuant to a demand note. Dondero did not pay when the note was called and the Debtor was forced to file an adversary. Dondero subsequently amended his answer to add a series of affirmative defenses, including that the notes had been forgiven because of an undocumented oral agreement with Dondero's sister. | The parties are currently conducting discovery and engaging in motion practice. The parties entered into a global revised scheduling agreement for all five notes litigations. | N/A |

| 4/15/21 | *James Dondero's Motion and Memorandum of Law in Support to Withdraw the Reference* **[D.I. 21]** | | | |
|---|---|---|---|---|
| | **Movant**: | Dondero | Three months after the complaint was filed Dondero filed a motion to withdraw the bankruptcy reference and a motion to stay the adversary pending resolution of his motion [D.I. 22]. | A hearing was held on May 25, 2021, and a stay was granted until mid-July 2021. The Court transmitted a report and recommendation on July 7 [D.I. 69]. Dondero filed a limited objection to the R&R. | N/A |

### *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P.*, **Adv. Proc. No. 21-03004-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* **[D.I. 1]** | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | HCMFA borrowed $7.4 million from Debtor pursuant to a demand note. Dondero did not pay when the note was called and the Debtor was forced to file an adversary. HCMFA subsequently amended its answer to add a series of affirmative defenses, including that the notes had been forgiven because of an undocumented oral agreement between Dondero and his sister. | The parties are currently conducting discovery and engaging in motion practice. The parties entered into a global revised scheduling agreement for all five notes litigations. | N/A |

9

| | | | | |
|---|---|---|---|---|
| 4/13/21 | *Defendants Motion to Withdraw the Reference* **[D.I. 20]** | | | |
| **Movant**: | HCMFA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021. The Court transmitted a R&R on July 9 [D.I. 52]. HCMFA filed a limited objection to the R&R. | N/A |

### *Highland Capital Management, L.P. v. NexPoint Advisors, L.P.*, Adv. Proc. No. 21-03005-sgj (Bankr. N.D. Tex.)

| | | | | |
|---|---|---|---|---|
| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* **[D.I. 1]** | | | |
| **Movant**: | Debtor | NPA borrowed approximately $30.75 million under an installment note.  NPA did not pay the note when and the Debtor was forced to file an adversary. NPA subsequently amended its answer to add a series of affirmative defenses, including that the notes had been forgiven because of an undocumented oral agreement between Dondero and his sister. | The parties are currently conducting discovery and engaging in motion practice. The parties entered into a global revised scheduling agreement for all five notes litigations. | N/A |
| 4/13/21 | *Defendants Motion to Withdraw the Reference* **[D.I. 19]** | | | |
| **Movant**: | NPA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021. The Court transmitted a R&R on July 9 [D.I. 42]. NPA filed a limited objection to the R&R.  The District Court adopted the R&R. [D. Ct. D.I. 10]. | N/A |

*Highland Capital Management, L.P. v. Highland Capital Management Services, Inc.*, Adv. Proc. No. 21-03006-sgj (Bankr. N.D. Tex.)

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | | |
|---|---|---|---|---|---|
| **Movant**: | Debtor | Highland Capital Management Services, Inc. ("<u>HCMS</u>"), borrowed $900,000 in demand notes and approximately $20.5 million in installment notes. HCMS did not pay the notes when due and the Debtor was forced to file an adversary. HCMS subsequently amended its answer to add a series of affirmative defenses, including that the notes had been forgiven because of an undocumented oral agreement between Dondero and his sister. | The parties are currently conducting discovery and engaging in motion practice. The parties entered into a global revised scheduling agreement for all five notes litigations. | N/A |
| 6/3/21 | *Defendants Motion to Withdraw the Reference* [D.I. 19] | | | | |
| **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021. The Court issued its R&R on July 15, 2021 [D. I. 52]. HCMS filed a limited objection to the R&R. the District Court adopted the R&R. [D. Ct. Docket No. 5]. HCMS filed a Motion for Reconsideration of the District Court's Order adopting R&R [D. Ct. Docket No. 8]. | |

*Highland Capital Management, L.P. v. HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)*, Adv. Proc. No. 21-03007-sgj (Bankr. N.D. Tex.)

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | | |
|---|---|---|---|---|---|
| **Movant**: | Debtor | HCRE borrowed $4.25 million in demand notes and approximately $6.05 million in installment notes. HCRE did not pay the notes when due and the Debtor was forced to file an adversary. HCRE subsequently amended its answer to add a series of affirmative defenses, including that the notes had been forgiven because of an undocumented oral agreement between Dondero and his sister. | The parties are currently conducting discovery and engaging in motion practice. The parties entered into a global revised scheduling agreement for all five notes litigations. | N/A |
| 6/3/21 | *Defendants Motion to Withdraw the Reference* [D.I. 20] | | | | |

11

| | | | | |
|---|---|---|---|---|
| **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021. The Court issued its R&R on July 15, 2021 [D.I. 47]. HCRE filed a limited objection to the R&R [D. Ct. Docket No. 5]. | |

*Charitable DAF Fund, L.P., and CLO Holdco, Ltd., v. Highland Capital Management, L.P., Highland HCF Advisor, Ltd., and Highland CLO Funding, Ltd.*, Case No. 21-cv-00842-B (N.D. Tex. April 12, 2021)

| 4/12/21 | *Original Complaint* | | | |
|---|---|---|---|---|
| **Movants**: | DAF CLOH | Movants allege that the Debtor and Seery violated SEC rules, breached fiduciary duties, engaged in self-dealing, and violated RICO in connection with its settlement with the HarbourVest Entities. The Movants brought this complaint despite CLOH having objected to the HarbourVest settlement; never raised this issue; and withdrawn its objection. The Debtor believes the complaint is frivolous and represents a collateral attack on the order approving the HarbourVest settlement. The Debtor will take all appropriate actions. | On May 19, the Debtor filed a motion to enforce the order of reference seeking to have the case referred to the Bankruptcy Court [D.I. 22]. On May 27, 2019, the Debtor filed a motion to dismiss the complaint [D.I. 26]. Briefing was completed for both motions. After briefing was completed, CLOH and the DAF filed a motion seeking to stay the proceeding pending resolution of the appeal of the confirmation order [D.I. 55] and the Debtor filed a responsive brief. | the Court entered an order enforcing the reference on September 20, 2021 [D.I. 64],a and this matter is proceeding in the Bankruptcy Court. |

| 4/19/21 | ***Plaintiff's Motion for Leave to File First Amended Complaint in the District Court*** | | | |
|---|---|---|---|---|
| **Movants:** | DAF CLOH | Movants filed a motion seeking leave from this Court to add Seery as a defendant and to seek, in this Court, a reconsideration of two final Bankruptcy Court orders. | This Court denied the motion but with leave to refile. | N/A |

***PCMG Trading Partners XXIII, L.P. v. Highland Capital Management, L.P.*, Case No. 21-cv-01169-N (N.D. Tex. May 21, 2021)**

4/12/21     <u>*Original Complaint*</u>

| **Movants**: | PCMG Trading Partners XXIII, L.P. | Movants allege that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. The Movant is an entity owned and controlled by Dondero, which had less than a 0.05% interest in the investment vehicle at issue and is no longer an investor. The Debtor believes the complaint is frivolous.  The Debtor will take all appropriate actions. | The Complaint was recently filed and the Debtor has not yet been served.  Although the Complaint was not served, the movant filed a motion to stay on August 26, 2021 pending the appeal of the confirmation order [D.I. 6]. | N/A |

***The Dugaboy Investment Trust v. Highland Capital Management, L.P.*, Case No. 21-cv-01479-S (N.D. Tex. June 23, 2021)**

6/23/21     <u>*Original Complaint*</u>

| **Movants**: | Dugaboy | Dugaboy alleges that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. Dugaboy is Dondero's family trust with less than a 2% interest in the vehicle. Dugaboy's allegations in the complaint are duplicative of allegations it made in proofs of claim filed in the Bankruptcy Court. | The Complaint was withdrawn after the Debtor informed the Bankruptcy Court of the filing. | N/A |

***The Charitable DAF Fund, LP v. Highland Capital Management, L.P.*, Case No. 21-cv-01710-N (N.D. Tex. July 22, 2021)**

7/22/21     <u>*Original Complaint*</u>

| **Movants**: | Dugaboy | DAF alleges that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. DAF's allegations in the complaint are duplicative of allegations Dugaboy made in proofs of claim filed in the Bankruptcy Court and in its complaint filed in the Northern District of Texas. | The Complaint was recently filed and the Debtor has not yet been served.  Although the Complaint was not served, the movant filed a motion to stay on August 26, 2021 pending the appeal of the confirmation order [D.I. 6]. | N/A |

13

*In re James Dondero, Petitioner,* **Cause No. DC-21-09534 (Tex. July 22, 2021)**

**7/22/21**     *Original Complaint*

| | | | | |
|---|---|---|---|---|
| **Movants**: | Dondero | Dondero seeks pre-suit discovery from Farallon Capital, a purchaser of certain claims in this case, and the Crusader Fund.  Dondero alleges that Farallon breached certain U.S. Trustee requirements when it purchased those claims.   Dondero also alleges that Farallon purchased those claims because of its relationship to Mr. Seery and that Mr. Seery was leveraging his relationship with Farallon to ensure that he remains in control of the Debtor. | Farallon and the Crusader Fund removed this action to the Bankruptcy Court [D.I. 1]. Dondero moved to remand [D.I. 4], which is being opposed. | This matter is currently being litigated. |

14

# EXHIBIT 18

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **Cause No. _____** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P. , HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

---

## ORIGINAL COMPLAINT

---

## I.

## INTRODUCTION

This action arises out of the acts and omissions of Defendant Highland Capital Management, L.P. ("HCM"), which is the general manager of Highland HCF Advisor, Ltd. ("HCFA"), both of which are registered investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("HCLOF") (HCM and HCFA each a "Defendant," or together, "Defendants"). The acts and omissions which have recently come to light reveal breaches of fiduciary duty,  a pattern of violations of the Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement, among others, which have caused and/or likely will cause Plaintiffs damages.

---

[1] https://adviserinfo.sec.gov/firm/summary/110126

At all relevant times, HCM was headed by CEO and potential party James P. Seery ("Seery"). Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information and belief, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## PARTIES

1.     Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

2.     Plaintiff Charitable DAF Fund, L.P., ("DAF") is a limited partnership formed under the laws of the Cayman Islands.

3.     Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

4.     Defendant Highland HCF Advisor, Ltd.  is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("RIA") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "Adviser's Act"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

5.     Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

6.     Potential party James P. Seery, Jr. ("Seery") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

# III.

## JURISDICTION AND VENUE

**7.** This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

**8.** Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

**9.** Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

# IV.

## RELEVANT BACKGROUND

### *HCLOF IS FORMED*

**10.** Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.** Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

---

Original Complaint

12.     At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13.     On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14.     Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15.     On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

**The Harbourvest Settlement with**
**Highland Capital Management in Bankruptcy**

16.     On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

Appx.000479

17.     The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

18.     Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

19.     Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

20.     Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

21.     In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054,  Doc. 1057.

22.     The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

23.     Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

24.     HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

25.    Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

26.    While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million).  Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

27.    In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values  were starting to recover.

28.    HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

29.    On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

30.    HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

31.    On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

**32.** An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

**33.** As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

**34.** HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

**35.** Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

**36.** At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

**37.** It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

**38.** On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

**39.** The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

Appx.000482

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

40.    Typically, the value of the securities reflected by a market price quote.

41.    However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

42.    There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

43.    Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off the mark by a mile.

44.    Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

45.    It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; *or* (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

46.    For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

47.     Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

48.     Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth—Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

49.     Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

50.     Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

51.     That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

52.     The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of  hanging on to the HCLOF assets.

---

Original Complaint

53.     Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

54.     HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### *Breaches of Fiduciary Duty*

55.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

56.     HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

57.     The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

58.     HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

59.     In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

60.     The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

61.     While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

62.     HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

63.     As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

64.     The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

65.     This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

66.     The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. § 275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

67.     The simple thesis of this claim is that Defendants HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

68.     HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

69.     This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

70.     It also violated HCM's own internal policies and procedures.

71.     Also, the regulations impose obligations on Defendants to calculate a *current* valuation when communicating with an investor, such as what may or may not be taken into account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

72.     HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

73.     HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

74.     In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[6]

75.     At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

---

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest confirmation, implicitly suggested that a proper current valuation had been performed.

76.     Defendant's principal, Seery, testified in January 2021 that the then-current fair market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But by then, it was worth almost double that amount and has continued to appreciate. Seery knew or should have known that fact because the value of some of the HCLOF assets had increased, and he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper diligence and information that was plainly available.

77.     Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors meeting in December 2020 that Highland would have to restrict its trading in MGM because of its insider status due to activities that were likely to apply upward pressure on MGM's share price.

78.     Furthermore, Seery controlled the Board of CCS Medical. And in or around October 2020, Seery was advocating an equatization that would have increased the value of the CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's holdings.

79.     Seery's knowledge is imputed to HCM.

80.     Moreover, it is a breach of fiduciary duty to commit corporate waste, which is effectively what disposing of the HCLOF assets would constitute in a rising market, where there

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

81.     As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

82.     Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

83.     Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

84.     Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

85.     In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

86.     Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

87.     What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

88.     Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

89.     For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

90.     HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

91.     Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

Appx.000491

## SECOND CAUSE OF ACTION
### *Breach of HCLOF Company Agreement*
### (By Holdco against HCLOF, HCM and HCFA)

92.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

93.     On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

94.     The Company Agreement governs the rights and duties of the members of HCLOF.

95.     Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

96.     Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

97.     The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

98.     Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

99.     Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

---

Appx.000492

**100.** Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

**101.** No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

**102.** Plaintiff is entitled to specific performance or, alternatively, disgorgement, constructive trust, damages, attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
*Negligence*
**(By the DAF and CLO Holdco against HCM and HCFA)**

**103.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**104.** Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

**105.** Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

**106.** Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

**107.** It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

Appx.000493

**108.** It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

**109.** It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

**110.** Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

**111.** Defendants' negligence foreseeably and directly caused Plaintiff harm.

**112.** Plaintiff is thus entitled to damages.

**FOURTH CAUSE OF ACTION**
***Racketeering Influenced Corrupt Organizations Act***
**(CLO Holdco and DAF against HCM)**

**113.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**114.** Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

**115.** HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

116.    The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

117.    Defendants injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

118.    HCM operated in such a way as to violate insider trading rules and regulations when it traded with Harbourvest while it had material, non-public information that it had not supplied to Harbourvest or to Plaintiffs.

119.    In or about November 2020, HCM and Harbourvest entered into discussions about settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests in HCLOF.

120.    On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

Appx.000495

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

121.    On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

122.    Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

123.    However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

124.    The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

125.    On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

**126.** In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the Adviser's Act.

**127.** Seery was informed in late December 2020 at an in-person meeting in Dallas to which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the Board of MGM, of a potential purchase of the company. The news of the MGM purchase should have caused Seery to revalue the HCLOF investment in MGM.

**128.** In or around October 2020, Seery (who controls the Board of CSS Medical) was pursuing "equatization" of CSS Medical's debt, which would have increased the value of certain securities by 25%. In several communications through the U.S. interstate wires and/or mails, and with Plaintiffs, and the several communications with Harbourvest during the negotiations of the settlement, Seery failed to disclose these changes which were responsible in part for the ever-growing value of the HCLOF CLO portfolio.

**129.** Seery was at all relevant times operating as an agent of HCM.

**130.** This series of related violations of the wire fraud, mail fraud, and securities fraud laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000 payday under the confirmation agreement.

**131.** The federal RICO statute makes it actionable for one's conduct of an enterprise to include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

132. Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

133. Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

**FIFTH CAUSE OF ACTION**
***Tortious Interference***
**(CLO Holdco against HCM)**

134. Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

135. At all relevant times, HCM owned a 0.6% interest in HCLOF.

136. At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

137. Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

138. HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

139.    HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

140.    But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

141.    Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

## VI.

## JURY DEMAND

142.    Plaintiff demands trial by jury on all claims so triable.

## VII.

## PRAYER FOR RELIEF

143.    Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

    a.  Actual damages;

    b.  Disgorgement;

    c.  Treble damages;

    d.  Exemplary and punitive damages;

    e.  Attorneys' fees and costs as allowed by common law, statute or contract;

    f.  A constructive trust to avoid dissipation of assets;

    g.  All such other relief to which Plaintiff is justly entitled.

Appx.000499

Dated:  April 12, 2021                          Respectfully submitted,

                                                **SBAITI & COMPANY PLLC**

                                                */s/  Mazin A. Sbaiti*
                                                **Mazin A. Sbaiti**
                                                Texas Bar No. 24058096
                                                **Jonathan Bridges**
                                                Texas Bar No. 24028835
                                                JPMorgan Chase Tower
                                                2200 Ross Avenue – Suite 4900W
                                                Dallas, TX  75201
                                                T:  (214) 432-2899
                                                F:  (214) 853-4367
                                                E:  mas@sbaitilaw.com
                                                    jeb@sbaitilaw.com

                                                **Counsel for Plaintiffs**

# EXHIBIT 19

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., and | § | |
| CLO HOLDCO, LTD., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-CV-0842-B |
| | § | |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., HIGHLAND | § | |
| HCF ADVISOR, LTD., and | § | |
| HIGHLAND CLO FUNDING, LTD., | § | |
| | § | |
| Defendants. | § | |

## ORDER OF REFERENCE

Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby **REFERRED** to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No. 19-34054. The Clerk of this Court and the Clerk of the Bankruptcy Court to which this case is hereby referred are directed to take such actions as are necessary and appropriate to cause this matter to be docketed as an Adversary Proceeding associated with the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Case No. 19-34054.

SO ORDERED.

SIGNED: September 20, 2021.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

- 1 -

# EXHIBIT 20

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CAUSE NO. 3:21-cv-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P., HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFFS' MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

### I.

### NECESSITY OF MOTION

Plaintiffs submit this Motion under Rule 15 of the Federal Rules of Civil Procedure for one purpose: to name as defendant one James P. Seery, Jr., the CEO of Defendant Highland Capital Management, L.P. ("HCM"), and the chief perpetrator of the wrongdoing that forms the basis of Plaintiffs' causes of action.

Seery is not named in the Original Complaint. But this is only out of an abundance of caution due to the bankruptcy court, in HCM's pending Chapter 11 proceeding, having issued an order prohibiting the filing of any causes of action against Seery in any way related to his role at HCM, subject to certain prerequisites. In that order, the bankruptcy court also asserts "sole jurisdiction" over all such causes of action.

Plaintiffs respectfully submit that, to the extent the bankruptcy court order prohibits the filing of an action in ***this Court***, whose jurisdiction the bankruptcy court's jurisdiction is wholly

---

Appx.000504

derivative of, that order exceeds the bankruptcy court's powers and is unenforceable. Alternatively, Plaintiffs submit that filing *this Motion* satisfies the prerequisites provided in the bankruptcy court's order. Either of these reasons provides sufficient grounds to grant this Motion.

The proposed First Amended Complaint is attached as Exhibit 1.

## II.

## BACKGROUND

On June 23, 2020, counsel for HCM filed a motion in HC's bankruptcy proceedings asking the bankruptcy court to defer to the "business judgment" of the board's compensation committee and approve the terms of its appointment of Seery as chief executive officer and chief restructuring officer at HCM, retroactive to March.[1] Counsel also asked the bankruptcy court to declare that it had exclusive jurisdiction over any claims asserted against Seery in this role.

On July 16, 2020, the bankruptcy court granted that motion and stated as follows:

> No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. *The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted*.[2]

---

[1] Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative *Nunc Pro Tunc* to March 15, 2020 [Doc. 774]. This motion is attached as Exhibit 2.

[2] Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020 [Doc 854]. A related order dated January 9, 2020, contains a similar provision with regard to Seery's role as an "Independent Director." Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Doc 339]. These orders are attached, respectively, as Exhibits 3 and 4.

---

On March 22, 2021, the bankruptcy court entered an order confirming HCM's reorganization plan.[3] That order purports to extend the prohibitions on suits against Seery, and it also prohibits certain actions against HCM and its affiliates. By its own terms, however, that order is not effective due to a pending appeal.

On April 12, 2021, Plaintiffs filed their Original Complaint in this action, alleging that HCM and related entities are liable as a result of insider trading and other violations of the antifraud provisions of the Investment Company Act of 1940, among other causes of action. The Original Complaint does not name Seery as a defendant. But the action is based on Seery's misrepresentations, omissions, and other breaches of duty committed in his role as HCM's CEO, which are sufficient to demonstrate his willful misconduct or gross negligence, though Plaintiffs submit that mere negligence and breach of fiduciary duty also form sufficient bases for his personal liability.

### III.

### ARGUMENT

This Court should grant leave to amend because the liberal policies behind Rule 15 require it and because leave is not prohibited by the bankruptcy court's order.

### A. Rule 15(a) Allows Plaintiffs' Amendment As a Matter of Course

Rule 15(a) instructs the Court to "freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a). The Fifth Circuit, in *Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States Co.,* 195 F.3d 765 (5th Cir. 1999), interpreted the rule as "evinc[ing] a bias in favor of granting leave to amend." *Id.* at 770. Thus the Court must possess a "substantial reason"

---

[3] Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) And (II) Granting Related Relief [Doc. 1943].

to deny a request for leave to amend. *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002); *Jamieson v. Shaw*, 772 F.2d 1205, 1208 (5th Cir. 1985); *cf. Foman v. Davis*, 371 U.S. 178, 182 (1962) (explaining that leave should be granted "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.").

Moreover, one amendment, filed within 21 days of service of the pleading it seeks to amend or before a responsive pleading is filed, is allowed "as a matter of course." Fed. R. Civ. P. 15(a)(1); *Zaidi v. Ehrlich*, 732 F.2d 1218, 1220 (5th Cir. 1984) ("When, as in this case, a plaintiff who has a right to amend nevertheless petitions the court for leave to amend, the court should grant the petition."); *Galustian v. Peter*, 591 F.3d 724, 729-30 (4th Cir. 2010) (holding that district court abused its discretion in denying timely motion to amend adding defendant because "[t]he plaintiff's right to amend once is absolute"); *Rogers v. Girard Tr. Co.*, 159 F.2d 239, 241 (6th Cir. 1947) (holding that complaint may be amended as matter of course where defendant has filed no responsive pleading, and leave of district court is not necessary, but it is error to deny leave when asked); *Bancoult v. McNamara*, 214 F.R.D. 5, 7-8 (D.D.C. 2003) (holding that plaintiff's filing of a motion for leave to amend does not nullify plaintiff's absolute right to amend once before responsive pleadings, even if the amendment would be futile).

Here, Plaintiffs did not name Seery as a defendant in the Original Complaint out of an abundance of caution in light of the bankruptcy court's order of July 16, 2020 [Doc. 854]. Instead, Plaintiffs are seeking leave in this Motion to do so. Because the proposed amendment is their first, and because it comes within 21 days of service of the Original Complaint, as well as before any

responsive pleadings, Plaintiffs respectfully submit that they are entitled to leave and their proposed First Amended Complaint should be allowed.

## B. The Bankruptcy Court's Order Should Not Prohibit Plaintiffs' Amendment

Plaintiffs submit that the bankruptcy court order of July 16, 2020, does not prohibit the proposed amendment for two independent reasons.

### 1. The Bankruptcy Court's Order Exceeds Its Jurisdiction

#### a. The Bankruptcy Court Cannot Strip This Court of Jurisdiction

Because the bankruptcy court's jurisdiction derives from and is dependent upon the jurisdiction of this Court, its order declaring that it has "sole jurisdiction" is overreaching.

Congress provided for and limited the jurisdiction of bankruptcy courts in 28 U.S.C. § 1334 and 28 U.S.C. § 157. As a result, bankruptcy court jurisdiction derives from and is limited by statute. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995) ("The jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute."); *Williams v. SeaBreeze Fin., LLC (In re 7303 Holdings, Inc.)*, Nos. 08-36698, 10-03079, 2010 Bankr. LEXIS 2938 at *7 (Bankr. S.D. Tex. Aug. 26, 2010) ("A bankruptcy court's jurisdiction is derivative of the district court's jurisdiction. The bankruptcy court does not have jurisdiction unless the district court could exercise authority over the matter . . . ."). The plain provisions of § 1334 grant **to the district courts** "original jurisdiction" over all bankruptcy cases and related civil proceedings. 28 U.S.C. § 1334(a)-(b). What Congress giveth, the bankruptcy courts cannot taketh away.

#### b. The *Barton* Doctrine Does Not Apply

The bankruptcy court's overreach seems to stem from a misapplication of the *Barton* doctrine. That doctrine protects receivers and trustees who are appointed by the bankruptcy court. *Randazzo v. Babin*, No. 15-4943, 2016 U.S. Dist. LEXIS 110465, at *3 (E.D. La. Aug. 18, 2016)

---

Appx.000508

("While the *Barton* case involved a receiver in state court, the United States Court of Appeals for the Fifth Circuit has extended this principle, now known as the *Barton* doctrine, to lawsuits against bankruptcy trustees for acts committed in their official capacities."). The doctrine does not apply to executives of a debtor, like Seery, who are not receivers or trustees, and who are stretching the truth to claim that they were "appointed" by the bankruptcy court after asking it merely to approve their appointment in deference to their discretion under the business judgment rule.[4]

### c. The Order Exceeds the Constitutional Limits of the Bankruptcy Court's Jurisdiction

Plainly the bankruptcy court does not have "***sole jurisdiction***" over all causes of action that might be brought against Seery related to his role as HCM's CEO. But more to the point, the bankruptcy court does not even have ***concurrent jurisdiction*** over *all* such claims. The separation of powers doctrine does not allow that. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011) (holding that Congress cannot bypass Article III and create jurisdiction in bankruptcy courts "simply because a proceeding may have some bearing on a bankruptcy case"); *id.* at 488 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856), for the proposition that "Congress cannot 'withdraw from judicial [read Article III] cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty'" with the limited exception of matters involving certain public rights); *id.* at 494 (quoting the dissent's quote of *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 584 (1985), for the proposition that "Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law," and

---

[4] Exhibit 2 at 14-15 (arguing that the bankruptcy court should not "interfere" with their "corporate decisions . . . as long as they are attributable to any rational business purpose") (internal quotes omitted); *id.* at 5-7 (detailing the compensation committee's "appointment" of Seery as CEO as well as chief restructuring officer).

Appx.000509

then adding "tort" to the rule for purposes of the matter before it); *cf. In re Prescription Home Health Care,* 316 F.3d 542, 548 (5th Cir. 2002) (holding that trustee's tax liability was not within the bankruptcy court's related-to jurisdiction and rejecting "the theory that a bankruptcy court has jurisdiction to enjoin any activity that threatens the debtor's reorganization prospects [because that] would permit the bankruptcy court to intervene in a wide variety of third-party disputes [such as] any action (however personal) against key corporate employees, if they were willing to state that their morale, concentration, or personal credit would be adversely affected by that action"). The bankruptcy court's order asserting "sole jurisdiction" here is hardly even relevant since that court lacks the power to expand its jurisdiction or manufacture jurisdiction where none exists.

The proposed First Amended Complaint asserts common law and equitable contract and tort claims. For the reasons explained by the Supreme Court in *Stern*, such claims should not be deemed within the bankruptcy court's jurisdiction.

### d.  The Order Exceeds the Bankruptcy Court's Statutory Authorization

Not only are there constitutional issues with the scope of the bankruptcy court's order, there is also the limitation of 28 U.S.C. § 157(d). *See TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 523 & n.40 (5th Cir. 2014) (noting bankruptcy court's "more limited jurisdiction" as a result of its "limited power" under 28 U.S.C. § 157). In § 157(d), Congress prohibited the bankruptcy court, absent the parties' consent, from presiding over cases or proceedings that require consideration of both Title 11 and other federal law regulating organizations or activities affecting interstate commerce.

The First Amended Complaint's allegations against Seery—accusing him of insider trading, violations of the RICO statute (18 U.S.C. § 1961 et seq.), and violations of the antifraud provisions of the Investment Advisers Act of 1940—require precisely that. Even determining the

---

Plaintiffs' Motion for Leave to File First Amended Complaint                                                  Page 7

"colorability" of such claims will require a close examination of both the proceedings that took place in the bankruptcy court under Title 11 and the Investment Advisers Act as well as the RICO statute. The bankruptcy court lacks the authority to make such determinations. This Court has that power.

Thus, at least as it applies to the proposed First Amended Complaint, the bankruptcy court's order exceeds its authority under 28 U.S.C. § 157(d), and any determination of "colorability" should take place in this Court, which Rule 12(b)(6) of the Federal Rules of Civil Procedure already provides for. To hold otherwise would create unnecessary tension with the congressional aims of 28 U.S.C. § 959 ("Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property.").

### 2. The Prerequisites in the Bankruptcy Court's Order Are Satisfied by This Motion and the Detailed Allegations in the Proposed First Amended Complaint

Alternatively, or in addition, should this Court read the bankruptcy court's order as prohibiting the filing of actions against Seery even in *this* Court, Plaintiffs submit that this Motion seeking leave provides the mechanisms required by that order and therefore satisfies it.

The bankruptcy court's order requires only that any contemplated action must first be submitted to that court for a preliminary determination of colorability. Because that court only has derivative jurisdiction as a result of this Court's jurisdiction—and only over matters referred to it by this Court—Plaintiffs submit that filing a motion for leave here is the correct procedure for complying with that order. This Court may refer this Motion to the bankruptcy court under Miscellaneous Order No. 33, as authorized by § 104 of the Bankruptcy Amendments and Federal Judgeship Act of 1984, codified at 28 U.S.C. § 157(a). Or it may instead decline to refer the Motion or withdraw the reference under 28 U.S.C. § 157(d), as Plaintiffs submit is appropriate for the

---

reasons addressed above. Regardless, this Motion presents the issue in a manner that allows the bankruptcy court to address it, should this Court decide that the bankruptcy court is authorized to do so. *Cf.* Confirmation Order [Doc. 1943] at 77, ¶ AA ("The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, ***only to the extent legally permissible*** and as provided for in Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.") (emphasis added).

Plaintiffs therefore submit that, by filing this Motion in this Court, they have complied with the bankruptcy court's order.

## IV.

## CONCLUSION

Plaintiffs are entitled to amend as a matter of course. The bankruptcy court lacks jurisdiction to prohibit the proposed amendment. In these circumstances, Plaintiffs respectfully submit that the interests of justice support the granting of leave to amend, and Rule 15(a) requires that this Motion be granted.

Dated:  April 19, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Jonathan Bridges*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
       jeb@sbaitilaw.com

**Counsel for Plaintiffs**

---

Appx.000512

## <u>CERTIFICATE OF CONFERENCE</u>

I hereby certify that, on April 19, 2021, I conferred with Defendant HCM's counsel in the HCM bankruptcy proceedings regarding this Motion. I have not conferred with counsel for the other Defendants because they have not been served and I do not know who will represent them. HCM's counsel indicated that they are opposed to the relief sought in this Motion.


*/s/ Jonathan Bridges*
Jonathan Bridges

# EXHIBIT 21

Case 19-34054-sgj11 Doc 2247 Filed 04/27/21 Entered 04/27/21 10:41:21 Page 1 of 9
Case 3:21-cv-01585-S Document 15 Filed 10/01/21 Page 521 of 783 PageID 6942
Docket #2247 Date Filed: 04/27/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] § | Case No. 19-34054-sgj11 |
| Debtor. § | |

**DEBTOR'S MOTION FOR AN ORDER REQUIRING THE VIOLATORS TO SHOW**
**CAUSE WHY THEY SHOULD NOT BE HELD IN CIVIL CONTEMPT FOR**
**VIOLATING TWO COURT ORDERS**

Highland Capital Management, L.P., the debtor and debtor-in-possession (the "<u>Debtor</u>" or

"<u>Highland</u>") in the above-captioned chapter 11 case ("<u>Bankruptcy Case</u>"), by and through its

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



undersigned counsel, files this motion (the "Motion") seeking entry of an order requiring The Charitable DAF Fund, L.P. ("The DAF"), CLO Holdco, Ltd. ("CLO Holdco"), the persons who authorized The DAF and CLO Holdco, respectively (together, the "Authorizing Persons") to file the Seery Motion (as defined below) in the DAF Action (as defined below), and Sbaiti & Company PLLC ("Sbaiti & Co." and together with The DAF, CLO Holdco, and the Authorizing Persons, the "Violators"), counsel to The DAF and CLO Holdco in the DAF Action, to show cause why each of them should not be held in civil contempt for violating the Court's: (a) *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339], and (b) *Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] (together, the "Orders").  In support of its Motion, the Debtor states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b).  The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

3.      The predicates for the relief requested in the Motion are sections 105(a) and 362(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 7065 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## RELIEF REQUESTED

DOCS_NY:42974.2 36027/002

**Appx.000516**

4.      The Debtor requests that this Court issue the proposed form of order attached as **Exhibit A** (the "Proposed Order"), pursuant to sections 105(a) and 362(a) of the Bankruptcy Code and Rules 7001 and 7065 of the Bankruptcy Rules.

5.      For the reasons set forth more fully in the *Debtor's Memorandum of Law in Support of Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* (the "Memorandum of Law"), filed contemporaneously with this Motion, the Debtor requests that the Court: (a) find and hold each of the Violators in contempt of court; (b) direct the Violators, jointly and severally, to pay the Debtor's estate an amount of money equal to two (2) times the Debtor's actual expenses incurred in bringing this Motion, payable within three (3) calendar days of presentment of an itemized list of expenses; (c) impose a penalty of three (3) times the Debtor's actual expenses incurred in connection with any future violation of any order of this Court (including filing any motion in the District Court to name Mr. Seery as a defendant without seeking and obtaining this Court's prior approval, as required under the Orders), and (d) grant the Debtor such other and further relief as the Court deems just and proper under the circumstances.

6.      In accordance with Rule 7007-1 of the *Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas* (the "Local Rules"), contemporaneously herewith and in support of this Motion, the Debtor is filing: (a) its Memorandum of Law, and (b) the *Declaration of John A. Morris  in Support of the Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* (the "Morris Declaration") together with the exhibits annexed thereto.

7. Based on the exhibits annexed to the Morris Declaration, and the arguments contained in the Memorandum of Law, the Debtor is entitled to the relief requested herein as set forth in the Proposed Order.

8. Notice of this Motion has been provided to all parties. The Debtor submits that no other or further notice need be provided.

WHEREFORE, the Debtor respectfully requests that the Court (i) enter the Proposed Order substantially in the formed annexed hereto as **Exhibit A** granting the relief requested herein, and (ii) grant the Debtor such other and further relief as the Court may deem proper.

Dated: April 23, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
    ikharasch@pszjlaw.com
    jmorris@pszjlaw.com
    gdemo@pszjlaw.com
    hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Appx.000519

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**



| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[2] | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |

**ORDER GRANTING DEBTOR'S MOTION FOR AN ORDER REQUIRING THE**
**VIOLATORS TO SHOW CAUSE WHY THEY SHOULD NOT BE HELD IN CIVIL**
**CONTEMPT FOR VIOLATING TWO COURT ORDERS**

      Having considered (a) the *Debtor's Motion for an Order Requiring the Violators to Show*

*Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [Docket

No. __] (the "Motion"),[3] (b) the *Debtor's Memorandum of Law in Support of Motion for an Order*

*Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for*

---

[2] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[3] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Memorandum of Law.

*Violating Two Court* [Docket No. __] (the "Memorandum of Law"), (c) the exhibits annexed to

the *Declaration of John A. Morris in Support of the Debtor's Motion for an Order Requiring the*

*Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court*

*Orders* [Docket No. __] (the "Morris Declaration"), and (d) all prior proceedings relating to this

matter, including the proceedings that led to the entry of each of the Orders and the Approval

Order; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334;

and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and

this Court having found that venue of this proceeding and the Motion in this District is proper

pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that sanctions is warranted

under sections 105(a) and 362(a) of the Bankruptcy Code and that the relief requested in the

Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and

this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on

the Motion were appropriate under the circumstances and that no other notice need be provided;

and this Court having determined that the legal and factual bases set forth in the Motion establish

good cause for the relief granted herein; and upon all of the proceedings had before this Court; and

after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the

record on this Motion, it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      The DAF, CLO Holdco, and Sbaiti & Co. shall show cause before this Court on **[**

**], May [ ], 2021 at 9:30 a.m. (Central Time)** why an order should not be granted: (a) finding and

holding each of the Violators in contempt of court; (b) directing the Violators, jointly and severally,

to pay the Debtor's estate an amount of money equal to two (2) times the Debtor's actual expenses

incurred in bringing this Motion, payable within three (3) calendar days of presentment of an

itemized list of expenses; (c) imposing a penalty of three (3) times the Debtor's actual expenses incurred in connection with any future violation of any order of this Court (including filing any motion in the District Court to name Mr. Seery as a defendant without seeking and obtaining this Court's prior approval, as required under the Orders), and (d) granting the Debtor such other and further relief as the Court deems just and proper under the circumstances.

3. The Court shall retain exclusive jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###

Appx.000523

# EXHIBIT 22

Case 19-34054-sgj11 Doc 2034 Filed 03/16/21 Entered 03/16/21 11:44:38 Page 1 of 2
Case 3:21-cv-01585-S Document 15 Filed 10/01/21 Page 531 of 783 PageID 6952
Docket #2034 Date Filed: 03/16/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 16, 2021**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## ORDER CERTIFYING APPEALS OF THE CONFIRMATION ORDER
## FOR DIRECT APPEAL TO THE UNITED STATES COURT OF APPEALS
## <u>FOR THE FIFTH CIRCUIT</u>

CAME ON FOR CONSIDERATION the *Joint Motion for Certification of Appeals of Confirmation Order for Direct Appeal to the Fifth Circuit* (the "<u>Motion</u>"), filed jointly by Highland Capital Management, L.P., Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Global Allocation Fund, Highland Income Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, James Dondero, Get Good Trust, and The Dugaboy Investment Trust (collectively, the "<u>Parties</u>").

By the Motion, the Parties jointly request a certification for a direct appeal to the Fifth Circuit of the following appeals (collectively, the "Appeals") of the Court's *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [docket no. 1943] (the "Confirmation Order"):

(i)     the notice of appeal filed by Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. on March 1, 2021 at docket no. 1957;

(ii)    the notice of appeal filed by Highland Global Allocation Fund, Highland Income Fund, NexPoint Capital, Inc., and NexPoint Strategic Opportunities Fund on March 3, 2021 at docket no. 1966;

(iii)   the notice of appeal filed by James Dondero on March 4, 2021 at docket no. 1970; and

(iv)    the notice of appeal filed by Get Good Trust and The Dugaboy Investment Trust on March 4, 2021 at docket no. 1972.

Having considered the Motion, concluding that the Court has core jurisdiction over the Motion, finding that no further notice or hearing on the Motion is required as all parties affected thereby are the Parties to the Motion, and, based on the Parties joint certification and request as provided for in 28 U.S.C. § 158(d)(2)(B), and based also on the Court's agreement with the factual predicates underlying the Parties' certification and request, it is hereby:

ORDERED that the Appeals of the Confirmation Order are certified for direct appeal to the Fifth Circuit because a direct appeal may materially advance the progress of the case or proceeding in which the appeal is taken, within the meaning and operation of 28 U.S.C. § 158(d)(2)(A)(iii).

### # # #  END OF ORDER  # # #

ORDER CERTIFYING APPEALS OF THE CONFIRMATION ORDER FOR DIRECT APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT—Page 2
4828-7733-3728v.1 019717.00001

Appx.000526

# EXHIBIT 23

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 4, 2021

Lyle W. Cayce
Clerk

_____

No. 21-90011

_____

In re: Highland Capital Management, L.P.,

*Debtor,*

NexPoint Advisors, L.P.; Highland Capital Management
Fund Advisors, L.P.; Highland Income Fund; NexPoint
Strategic Opportunities Fund; Highland Global
Allocation Fund; NexPoint Capital, Incorporated;
James Dondero; The Dugaboy Investment Trust; Get
Good Trust,

*Petitioners,*

*versus*

Highland Capital Management, L.P.,

*Respondent.*

_____

Motion for Leave to Appeal
Pursuant to 28 U.S.C. § 158(d)

_____

Before Dennis, Southwick, and Engelhardt, *Circuit Judges.*

Per Curiam:

No. 21-90011

IT IS ORDERED that the motion of NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P. for leave to appeal under 28 U.S.C. § 158(d) is GRANTED.

Appx.000529

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

May 04, 2021

Mr. Jed Weintraub
U.S. Bankruptcy Court, Northern District of Texas
1100 Commerce Street
Earle Cabell Federal Building
Room 1254
Dallas, TX 75242-1496

        Misc No. 21-90011    NexPoint v. Highland Capital Mgmt
                            USDC No. 19-34054

Enclosed is a copy of the court's order granting the motion(s) for leave to appeal.  The case is transferred to the court's general docket.  All future inquiries should refer to docket No. 21-10449.

If there is a concurrent appeal at the district court, it is the appellant's responsibility to advise this court of any developments which may affect this appeal.

The appellant(s) should immediately pay the appropriate fees to the **bankruptcy court clerk** ($207.00) and notify us of the payment within 14 days from the date of this letter.  If you do not, we will dismiss the appeal, see 5TH CIR. R.  42.3.

By copy of this letter, I am requesting the **bankruptcy court** to send the certified record immediately.

Counsel desiring to appear in this case must electronically file a "Form for Appearance of Counsel", naming each party you represent, within 14 days from the date of this letter.  The form is available from the Fifth Circuit's website, www.ca5.uscourts.gov. If you fail to electronically file the form, we will remove your name from the docket.  Pro se parties do not need to file an appearance form.  **Please note that appearance forms filed in 21-90011 will be entered in the instant case. It is not necessary to file another appearance form.**

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Charles B. Whitney, Deputy Clerk
504-310-7679

Enclosure(s)

cc:
        Mr. Jeffrey N. Pomerantz
        Mr. Davor Rukavina

# EXHIBIT 24

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 2, 2021

Lyle W. Cayce
Clerk

———————

No. 21-90011

———————

IN RE: HIGHLAND CAPITAL MANAGEMENT, L.P.,

*Debtor*,

NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT
FUND ADVISORS, L.P.; HIGHLAND INCOME FUND; NEXPOINT
STRATEGIC OPPORTUNITIES FUND; HIGHLAND GLOBAL
ALLOCATION FUND; NEXPOINT CAPITAL, INCORPORATED;
JAMES DONDERO; THE DUGABOY INVESTMENT TRUST; GET
GOOD TRUST,

*Petitioners*,

*versus*

HIGHLAND CAPITAL MANAGEMENT, L.P.,

*Respondent.*

———————————————————————

Motion for Leave to Appeal
Pursuant to 28 U.S.C. § 158(D)

———————————————————————

Before DENNIS, SOUTHWICK, and ENGELHARDT, *Circuit Judges*.

PER CURIAM:

IT IS ORDERED that the motion of Highland Global Allocation
Fund, Highland Income Fund, NexPoint Capital, Incorporated, and

No. 21-90011

NexPoint Strategic Opportunities Fund for leave to appeal under 28 U.S.C. § 158(d) is GRANTED.

IT IS FURTHER ORDERED that the motion of James Dondero for leave to appeal under 28 U.S.C. § 158(d) is GRANTED.

IT IS FURTHER ORDERED that the motion of Get Good Trust and The Dugaboy Investment Trust for leave to appeal under 28 U.S.C. § 158(d) is GRANTED.

Appx.000534

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

June 02, 2021

Mr. Robert P. Colwell
U.S. Bankruptcy Court, Northern District of Texas
1100 Commerce Street
Earle Cabell Federal Building
Room 1254
Dallas, TX 75242-1496

    Misc No. 21-90011   NexPoint v. Highland Capital Mgmt
                USDC No. 19-34054

Enclosed is a copy of the court's order granting the motion(s) for
leave to appeal.  The case is transferred to the court's general
docket.  All future inquiries should refer to docket No. 21-10449.

If there is a concurrent appeal at the district court, it is the
appellant's responsibility to advise this court of any
developments which may affect this appeal.

The appellant(s) should immediately pay the appropriate fees
($207.00 for each notice of appeal filed) to the **bankruptcy court
clerk** and notify us of the payment within 14 days from the date of
this letter.  If you do not, we will dismiss the appeal, see 5TH
CIR. R. 42.3.

By copy of this letter, I am requesting the **bankruptcy court** to
send the certified record immediately.

Counsel desiring to appear in this case must electronically file
a "Form for Appearance of Counsel", naming each party you
represent, within 14 days from the date of this letter.  The form
is available from the Fifth Circuit's website,
www.ca5.uscourts.gov.  If you fail to electronically file the form,
we will remove your name from the docket.  Pro se parties do not
need to file an appearance form.

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Charles B. Whitney, Deputy Clerk
504-310-7679

Enclosure(s)

cc:
    Mr. Zachery Z. Annable
    Mr. Douglas Scott Draper
    Mr. David R. Fine
    Ms. Melissa Sue Hayward
    Mr. Jeffrey N. Pomerantz
    Mr. Davor Rukavina
    Mr. Clay Marshall Taylor
    Mr. Julian Preston Vasek

# EXHIBIT 25

Case 19-34054-sgj11 Doc 2248 Filed 04/27/21    Entered 04/27/21 11:13:29    Page 1 of 48
Case 3:21-cv-01585-S   Document 15   Filed 10/01/21   Page 544 of 783   PageID 6965
Docket #2248  Date Filed: 04/27/2021

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.
and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

## NOTICE OF MOTION FOR MODIFICATION OF ORDER
## AUTHORIZING RETENTION OF JAMES P. SEERY, JR. DUE TO
## LACK OF SUBJECT MATTER JURISDICTION

The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. respectfully bring this contested

motion seeking modification of a prior order of this Court and respectfully submit that the order,

as applied to them in current circumstances, exceeds this Court's subject matter jurisdiction for

the reasons that follow.

Notice of Motion for Modification of Order Authorizing Retention
James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction

1934054210427000000000002

## I.

## NECESSITY OF MOTION[1]

As applied to their action currently before the Northern District of Texas, Movants would show that this Court's Order of July 16, 2020 ("Order")[2] appears to overstate this Court's jurisdiction. Despite the request from the Debtor, this Court should not attempt to assert *exclusive* jurisdiction over any and all claims that might be asserted against James P. Seery, Jr. ("Seery"), relating in any way to his role as an officer of the Debtor, as the Order asserts that it can.

In 28 U.S.C. § 1334, Congress has vested the federal district courts with original jurisdiction over claims arising under, arising in, or related to title 11. Article III of the Constitution also grants such "judicial power" to the district courts. This Court's subject matter jurisdiction is derivative of the district courts' jurisdiction, and it lacks the power to strip that jurisdiction from the district courts. To the extent that the Debtor's counsel asserts that this Court does have that power, they should identify the specific source of that authority. But Movants respectfully submit that there appears to be no authority providing that this Court can undo what Article III and § 1334 have done.

This Court should modify the Order to clarify or correct the apparent jurisdictional overreach. Plainly, Movants' claims against Seery are within the jurisdiction of the district court—jurisdiction which cannot be divested.

---

[1] Notably, as undersigned counsel was finalizing this Motion, Highland Capital and James P. Seery, Jr.'s counsel filed a Motion to Show Cause, arguing that the act of merely *asking* the District Court to entertain the addition of James Seery somehow amounts to a Rule 11 violation or contempt of this Court's orders. The Movants intend to respond to that motion in a robust and timely fashion. Movants respectfully suggest that that Motion and this one be considered at the same time.

[2] Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020 [Doc 854].

Notice of Motion for Modification of Order Authorizing Retention of
James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction                    Page 2

Appx.000539

## II.

## BACKGROUND

On June 23, 2020, counsel for the Debtor filed a motion asking this Court to defer to the "business judgment" of the Strand board's compensation committee and approve the terms of its appointment of Seery as chief executive officer and chief restructuring officer at the Debtor, retroactive to March.[3] Counsel also asked the Bankruptcy Court to declare that it had exclusive jurisdiction over any claims asserted against Seery in this role.

On July 16, 2020, this Court granted that motion and entered the Order, stating as follows:

> *No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery* relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. *The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.*[4]

On March 22, 2021, this Court entered an order confirming the Debtor's reorganization plan.[5] The confirmation order purports to extend the prohibitions on suits against Seery, and it also prohibits certain actions against the Debtor and its affiliates. By its own terms, however, the confirmation order is not yet effective due to a pending appeal. And this Court explicitly limited the scope of

---

[3] Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative *Nunc Pro Tunc* to March 15, 2020 [Doc. 774] ("Debtors Motion").

[4] A related order dated January 9, 2020, contains a similar provision with regard to Seery's role as an "Independent Director." Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, ¶ 5 [Doc. 339].

[5] Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) And (II) Granting Related Relief [Doc. 1943].

Notice of Motion for Modification of Order Authorizing Retention of
James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction                                    Page 3
Appx.000540

the "sole and exclusive jurisdiction" it asserted therein, noting that such jurisdiction would extend "only to the extent legally permissible."[6]

On April 12, 2021, Movants here filed their Original Complaint in federal district court in the Northern District of Texas, alleging that the Debtor and related entities are liable as a result of insider trading and other violations of the antifraud provisions of the Investment Company Act of 1940, among other causes of action.[7]

The Original Complaint does not name Seery as a defendant. But the action is based on Seery's misrepresentations, omissions, and other breaches of duty committed in his role as the Debtor's CEO, acts which are sufficient to demonstrate his willful misconduct or gross negligence, though Movants would submit that mere negligence and breach of fiduciary duty also form sufficient bases for his personal liability.

Although Seery is not named as a defendant in that action, this is only out of an abundance of caution due to the prohibitions in the Order. Movants filed a motion for leave to amend in the district court, citing to and briefing the Order as well as this Court's jurisdictional limitations.[8] Movants expected that motion would likely be referred to this Court. But that motion was promptly denied without prejudice due to the foreign defendants not yet having been served.[9]

In the meantime, and in the interests of a speedier resolution, Movants here ask this Court to modify the Order to the extent it states that amending to add Seery to Movants' action in district

---

[6] *Id.* at 77, ¶ AA ("The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, ***only to the extent legally permissible*** and as provided for in Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.") (emphasis added).

[7] *See* generally, Original Complaint, Cause No. 3:21-cv-00842-B, Docket No. 1 (attached hereto as Exhibit 1).

[8] *See* Cause No. 3:21-cv-00842-B, Doc. 6 (attached hereto as Exhibit 2).

[9] *See* Cause No. 3:21-cv-00842-B, Doc. 8.

Notice of Motion for Modification of Order Authorizing Retention of
James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction
Page 4
Appx.000541

court is prohibited. Prohibiting that amendment in current circumstances, Movants submit, would be beyond this Court's jurisdiction.

## III.

## ARGUMENT

Movants submit that the Order should not prohibit amending their action in the district court to assert claims against Seery. To the extent the Order does so, Movants respectfully submit that the prohibition should be modified to avoid exceeding this Court's powers.

### A. THIS COURT LACKS THE AUTHORITY TO STRIP THE DISTRICT COURT OF JURISDICTION

Movants respectfully submit that, because this Court's jurisdiction derives from and is dependent upon the jurisdiction of the district court, the Order's declaration that this Court has "sole jurisdiction" to the *exclusion* of the district court is an overreach.

Congress provided for and limited the jurisdiction of bankruptcy courts in 28 U.S.C. § 1334 and 28 U.S.C. § 157. As a result, bankruptcy court jurisdiction derives from and is limited by statute. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995) ("The jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute."); *Williams v. SeaBreeze Fin., LLC (In re 7303 Holdings, Inc.)*, Nos. 08-36698, 10-03079, 2010 Bankr. LEXIS 2938 at *7 (Bankr. S.D. Tex. Aug. 26, 2010) ("A bankruptcy court's jurisdiction is derivative of the district court's jurisdiction. The bankruptcy court does not have jurisdiction unless the district court could exercise authority over the matter . . . ."). The plain provisions of § 1334 grant to the district courts "original jurisdiction" over all bankruptcy cases and related civil proceedings. 28 U.S.C. § 1334(a)-(b). Thus, when it comes to subject matter jurisdiction, what Congress giveth, this Court cannot take away and reserve for itself.

Notice of Motion for Modification of Order Authorizing Retention of
James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction                    Page 5
Appx.000542

### a. The *Barton* Doctrine Does Not Apply

Movants suspect this Court's jurisdictional overreach is the result Debtor's counsel's overly aggressive interpretation of the *Barton* doctrine. That doctrine protects receivers and trustees who are appointed by the bankruptcy court. *Randazzo v. Babin*, No. 15-4943, 2016 U.S. Dist. LEXIS 110465, at *3 (E.D. La. Aug. 18, 2016) ("While the *Barton* case involved a receiver in state court, the United States Court of Appeals for the Fifth Circuit has extended this principle, now known as the *Barton* doctrine, to lawsuits against bankruptcy trustees for acts committed in their official capacities."). The doctrine does not apply to executives of a debtor, like Seery, who are not receivers or trustees, and who must stretch the truth to claim that they were "appointed" by this Court, having asked it merely to approve their appointment in deference to their discretion under the business judgment rule.[10]

### B. THE ORDER EXCEEDS THE CONSTITUTIONAL LIMITS OF THE BANKRUPTCY COURT'S JURISDICTION

Not only does this Court lack "***sole jurisdiction***" over all causes of action that might be brought against Seery related to his role as HCM's CEO, according to the plain language of 28 U.S.C. § 1334, this Court does not even have ***concurrent jurisdiction*** over ***all*** such claims.

The separation of powers doctrine simply does not allow that. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011) (holding that Congress cannot bypass Article III and create jurisdiction in bankruptcy courts "simply because a proceeding may have *some* bearing on a bankruptcy case");

---

[10] *See* Debtors Motion at 14-15 (arguing that the bankruptcy court should not "interfere" with their "corporate decisions . . . as long as they are attributable to any rational business purpose") (internal quotes omitted); *id.* at 5-7 (detailing the compensation committee's "appointment" of Seery as CEO as well as chief restructuring officer). Moreover, Fifth Circuit law prohibits non-debtor exculpation with regard to third-party claims, with exceptions that are inapplicable here. *See, e.g., Bank of N.Y. Tr. Co., NA v. Official Unsecured Creditor' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 251-52 (5th Cir. 2009) (prohibiting "non-consensual non-debtor releases and permanent injunctions")

Notice of Motion for Modification of Order Authorizing Retention of
James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction                    Page 6
                                                                        Appx.000543

*id.* at 499 (emphasis in original) (quoting at *488 *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856), for the proposition that "Congress cannot 'withdraw from judicial [read Article III] cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty'" with the limited exception of matters involving certain public rights); *id.* at 494 (quoting the dissent's quote of *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 584 (1985), for the proposition that "Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law," and then adding "tort" to the rule for purposes of the matter before it); *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (1982) (plurality opinion) (holding that bankruptcy court could not hear debtor's suit against third party for breach of contract, misrepresentation, coercion, and duress because "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case."); *cf. In re Prescription Home Health Care,* 316 F.3d 542, 548 (5th Cir. 2002) (holding that trustee's tax liability was not within the bankruptcy court's related-to jurisdiction and rejecting "the theory that a bankruptcy court has jurisdiction to enjoin any activity that threatens the debtor's reorganization prospects [because that] would permit the bankruptcy court to intervene in a wide variety of third-party disputes [such as] any action (however personal) against key corporate employees, if they were willing to state that their morale, concentration, or personal credit would be adversely affected by that action").

Simply put, this Court lacks the power to expand its jurisdiction or manufacture it where none exists. And doing so here, when Movants seek to bring in the district court "a suit at common law," *Stern*, 564 U.S. at 488, "a traditional contract action [and tort action] arising under state law,"

Notice of Motion for Modification of Order Authorizing Retention of
James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction                                          Page 7
                                                                                                Appx.000544

*id.* at 494, and an "action . . . against key corporate employees," *Prescription Home Health Care*, 316 F.3d at 548, exceeds even Congress's power. The causes of action in Movants' district court case are beyond this Court's constitutional reach.

## C. THE ORDER EXCEEDS THE BANKRUPTCY COURT'S STATUTORY AUTHORIZATION

Not only are there constitutional issues with the scope of the Order, there is also the plainly worded "full stop" of 28 U.S.C. § 157(d). *See TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 523 & n.40 (5th Cir. 2014) (noting bankruptcy court's "more limited" jurisdiction as a result of its "limited power" under 28 U.S.C. § 157). In Section 157(d), Congress prohibited the bankruptcy court, absent the parties' consent, from presiding over cases or proceedings that require consideration of both Title 11 and other federal law regulating organizations or activities affecting interstate commerce.

The allegations concerning Seery in Movants' district court case—accusing him of insider trading, violations of the RICO statute (18 U.S.C. § 1961 et seq.), and violations of the antifraud provisions of the Investment Advisers Act of 1940—require precisely that. Even determining the "colorability" of those claims will require a close examination of both the proceedings that took place in this Court under Title 11 *and* the Investment Advisers Act, as well as the RICO statute. Under § 157(d), this Court lacks the authority to make such determinations. Only the district court has that power.

Thus, at least as it applies to Movants' district court action, the Order (at least as far as Debtor and Seery seem to interpret it), exceeds this Court's power under 28 U.S.C. § 157(d). Any determination of "colorability" regarding Movants' causes of action should take place in the district court, not here.

Notice of Motion for Modification of Order Authorizing Retention of
James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction Page 8
Appx.000545

Furthermore, a contrary conclusion would create unnecessary tension with the congressional aims of 28 U.S.C. § 959 ("Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property.").

The district court, of course, may refer Movants' action to this Court under Miscellaneous Order No. 33, as authorized by § 104 of the Bankruptcy Amendments and Federal Judgeship Act of 1984, codified at 28 U.S.C. § 157(a). But withdrawal of that reference would still be mandatory for any determination of "colorability" as previously noted or for any other matter likewise within the scope of § 157(d).

To the extent the Order requires otherwise[11]—and on its face it would seem to—Movants respectfully submit that it is in error.

## IV.

## <u>CONCLUSION</u>

Movants ask this Court to modify the provisions of the Order that assert exclusive jurisdiction over any and all causes of action against Seery related to his role as an officer of the Debtor. This Court's jurisdiction does not reach all such cases. More specifically, it does not reach Movants' district court action or cancel out that court's jurisdiction under 28 U.S.C. § 1334.

As a result, the Order is overreaching and should be modified. And Movants respectfully submit that this Motion should be granted.

---

[11] To the extent that Seery would seek to assert some kind of immunity, that is an affirmative defense that he may assert in the district court as well.

Notice of Motion for Modification of Order Authorizing Retention of
James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction
Page 9
Appx.000546

Dated:  April 23, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
     jeb@sbaitilaw.com

**Counsel for Plaintiffs**

Notice of Motion for Modification of Order Authorizing Retention of
James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction

Page 10
**Appx.000547**

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **Cause No. _____** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P. , HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

---

## ORIGINAL COMPLAINT

---

## I.

## INTRODUCTION

This action arises out of the acts and omissions of Defendant Highland Capital Management, L.P. ("HCM"), which is the general manager of Highland HCF Advisor, Ltd. ("HCFA"), both of which are registered investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("HCLOF") (HCM and HCFA each a "Defendant," or together, "Defendants"). The acts and omissions which have recently come to light reveal breaches of fiduciary duty, a pattern of violations of the Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement, among others, which have caused and/or likely will cause Plaintiffs damages.

---

[1] https://adviserinfo.sec.gov/firm/summary/110126

At all relevant times, HCM was headed by CEO and potential party James P. Seery ("Seery"). Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information and belief, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## PARTIES

1.      Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

2.      Plaintiff Charitable DAF Fund, L.P., ("DAF") is a limited partnership formed under the laws of the Cayman Islands.

3.      Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

4.      Defendant Highland HCF Advisor, Ltd.  is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("RIA") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "Adviser's Act"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

5.      Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

6.      Potential party James P. Seery, Jr. ("Seery") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

## III.

## <u>JURISDICTION AND VENUE</u>

**7.** This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

**8.** Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

**9.** Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

## IV.

## <u>RELEVANT BACKGROUND</u>

### *HCLOF IS FORMED*

**10.** Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.** Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

12.     At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13.     On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14.     Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15.     On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

### The Harbourvest Settlement with
### Highland Capital Management in Bankruptcy

16.     On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

17. The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

18. Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

19. Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

20. Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

21. In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054, Doc. 1057.

22. The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

23. Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

24. HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

25.     Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

26.     While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million).  Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

27.     In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values  were starting to recover.

28.     HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

29.     On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

30.     HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

31.     On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

32.    An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

33.    As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

34.    HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

35.    Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

36.    At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

37.    It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

38.    On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

39.    The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

40.     Typically, the value of the securities reflected by a market price quote.

41.     However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

42.     There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

43.     Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off the mark by a mile.

44.     Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

45.     It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; or (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

46.     For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

47.     Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

48.     Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth— Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

49.     Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

50.     Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

51.     That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

52.     The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

53. Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

54. HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### Breaches of Fiduciary Duty

55. Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

56. HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

57. The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

58.     HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

59.     In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

60.     The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

61.     While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

62.     HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

63.     As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

64.     The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

65.     This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

66.     The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. § 275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

67.     The simple thesis of this claim is that Defendants HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

68.     HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

69.     This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

70.     It also violated HCM's own internal policies and procedures.

---

71.     Also, the regulations impose obligations on Defendants to calculate a *current* valuation when communicating with an investor, such as what may or may not be taken into account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

72.     HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

73.     HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

74.     In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[6]

75.     At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

---

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest confirmation, implicitly suggested that a proper current valuation had been performed.

76.     Defendant's principal, Seery, testified in January 2021 that the then-current fair market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But by then, it was worth almost double that amount and has continued to appreciate. Seery knew or should have known that fact because the value of some of the HCLOF assets had increased, and he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper diligence and information that was plainly available.

77.     Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors meeting in December 2020 that Highland would have to restrict its trading in MGM because of its insider status due to activities that were likely to apply upward pressure on MGM's share price.

78.     Furthermore, Seery controlled the Board of CCS Medical. And in or around October 2020, Seery was advocating an equatization that would have increased the value of the CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's holdings.

79.     Seery's knowledge is imputed to HCM.

80.     Moreover, it is a breach of fiduciary duty to commit corporate waste, which is effectively what disposing of the HCLOF assets would constitute in a rising market, where there

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

81.     As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

82.     Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

83.     Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

84.     Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

85.     In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

Appx.000564

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

86.     Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

87.     What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

88.     Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

89.     For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

90.     HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

91.     Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

**SECOND CAUSE OF ACTION**
*Breach of HCLOF Company Agreement*
**(By Holdco against HCLOF, HCM and HCFA)**

92.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

93.     On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

94.     The Company Agreement governs the rights and duties of the members of HCLOF.

95.     Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

96.     Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

97.     The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

98.     Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

99.     Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

---

Original Complaint

**100.**    Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

**101.**    No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

**102.**    Plaintiff is entitled to specific performance or, alternatively, disgorgement, constructive trust, damages, attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
*Negligence*
**(By the DAF and CLO Holdco against HCM and HCFA)**

**103.**    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**104.**    Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

**105.**    Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

**106.**    Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

**107.**    It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

---

Original Complaint

**108.** It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

**109.** It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

**110.** Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

**111.** Defendants' negligence foreseeably and directly caused Plaintiff harm.

**112.** Plaintiff is thus entitled to damages.

### FOURTH CAUSE OF ACTION
### *Racketeering Influenced Corrupt Organizations Act*
### (CLO Holdco and DAF against HCM)

**113.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**114.** Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

**115.** HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

116.     The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

117.     Defendants injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

118.     HCM operated in such a way as to violate insider trading rules and regulations when it traded with Harbourvest while it had material, non-public information that it had not supplied to Harbourvest or to Plaintiffs.

119.     In or about November 2020, HCM and Harbourvest entered into discussions about settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests in HCLOF.

120.     On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

121.     On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

122.     Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

123.     However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

124.     The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

125.     On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

126.     In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the Adviser's Act.

127.     Seery was informed in late December 2020 at an in-person meeting in Dallas to which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the Board of MGM, of a potential purchase of the company. The news of the MGM purchase should have caused Seery to revalue the HCLOF investment in MGM.

128.     In or around October 2020, Seery (who controls the Board of CSS Medical) was pursuing "equalization" of CSS Medical's debt, which would have increased the value of certain securities by 25%. In several communications through the U.S. interstate wires and/or mails, and with Plaintiffs, and the several communications with Harbourvest during the negotiations of the settlement, Seery failed to disclose these changes which were responsible in part for the ever-growing value of the HCLOF CLO portfolio.

129.     Seery was at all relevant times operating as an agent of HCM.

130.     This series of related violations of the wire fraud, mail fraud, and securities fraud laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000 payday under the confirmation agreement.

131.     The federal RICO statute makes it actionable for one's conduct of an enterprise to include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

132.    Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

133.    Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

### FIFTH CAUSE OF ACTION
### *Tortious Interference*
### (CLO Holdco against HCM)

134.    Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

135.    At all relevant times, HCM owned a 0.6% interest in HCLOF.

136.    At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

137.    Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

138.    HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

---

139.    HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

140.    But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

141.    Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

## VI.

## JURY DEMAND

142.    Plaintiff demands trial by jury on all claims so triable.

## VII.

## PRAYER FOR RELIEF

143.    Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

    a.  Actual damages;

    b.  Disgorgement;

    c.  Treble damages;

    d.  Exemplary and punitive damages;

    e.  Attorneys' fees and costs as allowed by common law, statute or contract;

    f.  A constructive trust to avoid dissipation of assets;

    g.  All such other relief to which Plaintiff is justly entitled.

Dated:  April 12, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*

**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
    jeb@sbaitilaw.com

**Counsel for Plaintiffs**

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CAUSE NO. 3:21-cv-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P., HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFFS' MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT**

**I.**

**NECESSITY OF MOTION**

Plaintiffs submit this Motion under Rule 15 of the Federal Rules of Civil Procedure for one purpose: to name as defendant one James P. Seery, Jr., the CEO of Defendant Highland Capital Management, L.P. ("HCM"), and the chief perpetrator of the wrongdoing that forms the basis of Plaintiffs' causes of action.

Seery is not named in the Original Complaint. But this is only out of an abundance of caution due to the bankruptcy court, in HCM's pending Chapter 11 proceeding, having issued an order prohibiting the filing of any causes of action against Seery in any way related to his role at HCM, subject to certain prerequisites. In that order, the bankruptcy court also asserts "sole jurisdiction" over all such causes of action.

Plaintiffs respectfully submit that, to the extent the bankruptcy court order prohibits the filing of an action in ***this Court***, whose jurisdiction the bankruptcy court's jurisdiction is wholly

---

derivative of, that order exceeds the bankruptcy court's powers and is unenforceable. Alternatively, Plaintiffs submit that filing *this Motion* satisfies the prerequisites provided in the bankruptcy court's order. Either of these reasons provides sufficient grounds to grant this Motion.

The proposed First Amended Complaint is attached as Exhibit 1.

## II.

## <u>BACKGROUND</u>

On June 23, 2020, counsel for HCM filed a motion in HC's bankruptcy proceedings asking the bankruptcy court to defer to the "business judgment" of the board's compensation committee and approve the terms of its appointment of Seery as chief executive officer and chief restructuring officer at HCM, retroactive to March.[1] Counsel also asked the bankruptcy court to declare that it had exclusive jurisdiction over any claims asserted against Seery in this role.

On July 16, 2020, the bankruptcy court granted that motion and stated as follows:

> No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. *The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted*.[2]

---

[1] Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative *Nunc Pro Tunc* to March 15, 2020 [Doc. 774]. This motion is attached as Exhibit 2.

[2] Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020 [Doc 854]. A related order dated January 9, 2020, contains a similar provision with regard to Seery's role as an "Independent Director." Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Doc 339]. These orders are attached, respectively, as Exhibits 3 and 4.

---

On March 22, 2021, the bankruptcy court entered an order confirming HCM's reorganization plan.[3] That order purports to extend the prohibitions on suits against Seery, and it also prohibits certain actions against HCM and its affiliates. By its own terms, however, that order is not effective due to a pending appeal.

On April 12, 2021, Plaintiffs filed their Original Complaint in this action, alleging that HCM and related entities are liable as a result of insider trading and other violations of the antifraud provisions of the Investment Company Act of 1940, among other causes of action. The Original Complaint does not name Seery as a defendant. But the action is based on Seery's misrepresentations, omissions, and other breaches of duty committed in his role as HCM's CEO, which are sufficient to demonstrate his willful misconduct or gross negligence, though Plaintiffs submit that mere negligence and breach of fiduciary duty also form sufficient bases for his personal liability.

### III.

### ARGUMENT

This Court should grant leave to amend because the liberal policies behind Rule 15 require it and because leave is not prohibited by the bankruptcy court's order.

**A. Rule 15(a) Allows Plaintiffs' Amendment As a Matter of Course**

Rule 15(a) instructs the Court to "freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a). The Fifth Circuit, in *Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States Co.,* 195 F.3d 765 (5th Cir. 1999), interpreted the rule as "evinc[ing] a bias in favor of granting leave to amend." *Id.* at 770. Thus the Court must possess a "substantial reason"

---

[3] Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) And (II) Granting Related Relief [Doc. 1943].

to deny a request for leave to amend. *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002); *Jamieson v. Shaw*, 772 F.2d 1205, 1208 (5th Cir. 1985); *cf. Foman v. Davis*, 371 U.S. 178, 182 (1962) (explaining that leave should be granted "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.").

Moreover, one amendment, filed within 21 days of service of the pleading it seeks to amend or before a responsive pleading is filed, is allowed "as a matter of course." Fed. R. Civ. P. 15(a)(1); *Zaidi v. Ehrlich*, 732 F.2d 1218, 1220 (5th Cir. 1984) ("When, as in this case, a plaintiff who has a right to amend nevertheless petitions the court for leave to amend, the court should grant the petition."); *Galustian v. Peter*, 591 F.3d 724, 729-30 (4th Cir. 2010) (holding that district court abused its discretion in denying timely motion to amend adding defendant because "[t]he plaintiff's right to amend once is absolute"); *Rogers v. Girard Tr. Co.*, 159 F.2d 239, 241 (6th Cir. 1947) (holding that complaint may be amended as matter of course where defendant has filed no responsive pleading, and leave of district court is not necessary, but it is error to deny leave when asked); *Bancoult v. McNamara*, 214 F.R.D. 5, 7-8 (D.D.C. 2003) (holding that plaintiff's filing of a motion for leave to amend does not nullify plaintiff's absolute right to amend once before responsive pleadings, even if the amendment would be futile).

Here, Plaintiffs did not name Seery as a defendant in the Original Complaint out of an abundance of caution in light of the bankruptcy court's order of July 16, 2020 [Doc. 854]. Instead, Plaintiffs are seeking leave in this Motion to do so. Because the proposed amendment is their first, and because it comes within 21 days of service of the Original Complaint, as well as before any

responsive pleadings, Plaintiffs respectfully submit that they are entitled to leave and their proposed First Amended Complaint should be allowed.

## B.  The Bankruptcy Court's Order Should Not Prohibit Plaintiffs' Amendment

Plaintiffs submit that the bankruptcy court order of July 16, 2020, does not prohibit the proposed amendment for two independent reasons.

### 1.  The Bankruptcy Court's Order Exceeds Its Jurisdiction

#### a.  The Bankruptcy Court Cannot Strip This Court of Jurisdiction

Because the bankruptcy court's jurisdiction derives from and is dependent upon the jurisdiction of this Court, its order declaring that it has "sole jurisdiction" is overreaching.

Congress provided for and limited the jurisdiction of bankruptcy courts in 28 U.S.C. § 1334 and 28 U.S.C. § 157. As a result, bankruptcy court jurisdiction derives from and is limited by statute. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995) ("The jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute."); *Williams v. SeaBreeze Fin., LLC (In re 7303 Holdings, Inc.)*, Nos. 08-36698, 10-03079, 2010 Bankr. LEXIS 2938 at *7 (Bankr. S.D. Tex. Aug. 26, 2010) ("A bankruptcy court's jurisdiction is derivative of the district court's jurisdiction. The bankruptcy court does not have jurisdiction unless the district court could exercise authority over the matter . . . ."). The plain provisions of § 1334 grant **to the district courts** "original jurisdiction" over all bankruptcy cases and related civil proceedings. 28 U.S.C. § 1334(a)-(b). What Congress giveth, the bankruptcy courts cannot taketh away.

#### b.  The *Barton* Doctrine Does Not Apply

The bankruptcy court's overreach seems to stem from a misapplication of the *Barton* doctrine. That doctrine protects receivers and trustees who are appointed by the bankruptcy court. *Randazzo v. Babin*, No. 15-4943, 2016 U.S. Dist. LEXIS 110465, at *3 (E.D. La. Aug. 18, 2016)

---

Appx.000580

("While the *Barton* case involved a receiver in state court, the United States Court of Appeals for the Fifth Circuit has extended this principle, now known as the *Barton* doctrine, to lawsuits against bankruptcy trustees for acts committed in their official capacities."). The doctrine does not apply to executives of a debtor, like Seery, who are not receivers or trustees, and who are stretching the truth to claim that they were "appointed" by the bankruptcy court after asking it merely to approve their appointment in deference to their discretion under the business judgment rule.[4]

### c. The Order Exceeds the Constitutional Limits of the Bankruptcy Court's Jurisdiction

Plainly the bankruptcy court does not have "***sole jurisdiction***" over all causes of action that might be brought against Seery related to his role as HCM's CEO. But more to the point, the bankruptcy court does not even have ***concurrent jurisdiction*** over *all* such claims. The separation of powers doctrine does not allow that. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011) (holding that Congress cannot bypass Article III and create jurisdiction in bankruptcy courts "simply because a proceeding may have some bearing on a bankruptcy case"); *id.* at 488 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856), for the proposition that "Congress cannot 'withdraw from judicial [read Article III] cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty'" with the limited exception of matters involving certain public rights); *id.* at 494 (quoting the dissent's quote of *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 584 (1985), for the proposition that "Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law," and

---

[4] Exhibit 2 at 14-15 (arguing that the bankruptcy court should not "interfere" with their "corporate decisions . . . as long as they are attributable to any rational business purpose") (internal quotes omitted); *id.* at 5-7 (detailing the compensation committee's "appointment" of Seery as CEO as well as chief restructuring officer).

---

Appx.000581

then adding "tort" to the rule for purposes of the matter before it); *cf. In re Prescription Home Health Care,* 316 F.3d 542, 548 (5th Cir. 2002) (holding that trustee's tax liability was not within the bankruptcy court's related-to jurisdiction and rejecting "the theory that a bankruptcy court has jurisdiction to enjoin any activity that threatens the debtor's reorganization prospects [because that] would permit the bankruptcy court to intervene in a wide variety of third-party disputes [such as] any action (however personal) against key corporate employees, if they were willing to state that their morale, concentration, or personal credit would be adversely affected by that action"). The bankruptcy court's order asserting "sole jurisdiction" here is hardly even relevant since that court lacks the power to expand its jurisdiction or manufacture jurisdiction where none exists.

The proposed First Amended Complaint asserts common law and equitable contract and tort claims. For the reasons explained by the Supreme Court in *Stern,* such claims should not be deemed within the bankruptcy court's jurisdiction.

### d.  The Order Exceeds the Bankruptcy Court's Statutory Authorization

Not only are there constitutional issues with the scope of the bankruptcy court's order, there is also the limitation of 28 U.S.C. § 157(d). *See TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 523 & n.40 (5th Cir. 2014) (noting bankruptcy court's "more limited jurisdiction" as a result of its "limited power" under 28 U.S.C. § 157). In § 157(d), Congress prohibited the bankruptcy court, absent the parties' consent, from presiding over cases or proceedings that require consideration of both Title 11 and other federal law regulating organizations or activities affecting interstate commerce.

The First Amended Complaint's allegations against Seery—accusing him of insider trading, violations of the RICO statute (18 U.S.C. § 1961 et seq.), and violations of the antifraud provisions of the Investment Advisers Act of 1940—require precisely that. Even determining the

---

"colorability" of such claims will require a close examination of both the proceedings that took place in the bankruptcy court under Title 11 and the Investment Advisers Act as well as the RICO statute. The bankruptcy court lacks the authority to make such determinations. This Court has that power.

Thus, at least as it applies to the proposed First Amended Complaint, the bankruptcy court's order exceeds its authority under 28 U.S.C. § 157(d), and any determination of "colorability" should take place in this Court, which Rule 12(b)(6) of the Federal Rules of Civil Procedure already provides for. To hold otherwise would create unnecessary tension with the congressional aims of 28 U.S.C. § 959 ("Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property.").

### 2. The Prerequisites in the Bankruptcy Court's Order Are Satisfied by This Motion and the Detailed Allegations in the Proposed First Amended Complaint

Alternatively, or in addition, should this Court read the bankruptcy court's order as prohibiting the filing of actions against Seery even in *this* Court, Plaintiffs submit that this Motion seeking leave provides the mechanisms required by that order and therefore satisfies it.

The bankruptcy court's order requires only that any contemplated action must first be submitted to that court for a preliminary determination of colorability. Because that court only has derivative jurisdiction as a result of this Court's jurisdiction—and only over matters referred to it by this Court—Plaintiffs submit that filing a motion for leave here is the correct procedure for complying with that order. This Court may refer this Motion to the bankruptcy court under Miscellaneous Order No. 33, as authorized by § 104 of the Bankruptcy Amendments and Federal Judgeship Act of 1984, codified at 28 U.S.C. § 157(a). Or it may instead decline to refer the Motion or withdraw the reference under 28 U.S.C. § 157(d), as Plaintiffs submit is appropriate for the

---

reasons addressed above. Regardless, this Motion presents the issue in a manner that allows the bankruptcy court to address it, should this Court decide that the bankruptcy court is authorized to do so. *Cf.* Confirmation Order [Doc. 1943] at 77, ¶ AA ("The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, ***only to the extent legally permissible*** and as provided for in Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.") (emphasis added).

 Plaintiffs therefore submit that, by filing this Motion in this Court, they have complied with the bankruptcy court's order.

## IV.

## CONCLUSION

 Plaintiffs are entitled to amend as a matter of course. The bankruptcy court lacks jurisdiction to prohibit the proposed amendment. In these circumstances, Plaintiffs respectfully submit that the interests of justice support the granting of leave to amend, and Rule 15(a) requires that this Motion be granted.

Dated:  April 19, 2021     Respectfully submitted,

             **SBAITI & COMPANY PLLC**

             */s/  Jonathan Bridges*
             **Mazin A. Sbaiti**
             Texas Bar No. 24058096
             **Jonathan Bridges**
             Texas Bar No. 24028835
             JPMorgan Chase Tower
             2200 Ross Avenue – Suite 4900W
             Dallas, TX  75201
             T:  (214) 432-2899
             F:  (214) 853-4367
             E:  mas@sbaitilaw.com
              jeb@sbaitilaw.com

             **Counsel for Plaintiffs**

Appx.000584

## <u>CERTIFICATE OF CONFERENCE</u>

      I hereby certify that, on April 19, 2021, I conferred with Defendant HCM's counsel in the HCM bankruptcy proceedings regarding this Motion. I have not conferred with counsel for the other Defendants because they have not been served and I do not know who will represent them. HCM's counsel indicated that they are opposed to the relief sought in this Motion.


                      */s/ Jonathan Bridges*
                      Jonathan Bridges

Appx.000585

# EXHIBIT 26

Appx.000586

Case 19-34054-sgj11 Doc 2506 Filed 06/30/21 Entered 06/30/21 13:58:26 Page 1 of 2
Case 3:21-cv-01585-S Document 15 Filed 10/01/21 Page 593 of 783 PageID 7014

Docket #2506 Date Filed: 06/30/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 29, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

### ORDER DENYING MOTION FOR MODIFICATION OF ORDER AUTHORIZING RETENTION OF JAMES P. SEERY, JR. FILED BY CHARITABLE DAF FUND L.P. AND CLO HOLDCO, LTD.

This matter having come before the Court on the _Motion for Modification of Order Authorizing Retention of James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction_ [Docket No. 2248] (the "Motion")[2] filed by Charitable DAF Fund, L.P. and CLO Holdco, Ltd. in the above-captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered (a) the Motion; (b) the _Debtor's Objection to Motion for Modification of Order Authorizing Retention of_

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.



1934054210630000000000008

*James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction* [Docket No. 2311] (the "Objection") filed by Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor"); (c) the documents admitted into evidence during the hearing held on June 25, 2021 with respect to the Motion (the "Hearing"); and (d) the arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1.      The Motion is **DENIED** for the reasons stated on the record during the Hearing.

2.      The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

###End of Order###

DOCS_NY:43541.3 36027/002

Appx.000588

# EXHIBIT 27

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION

                                  )    Case No. 19-34054-sgj-11
In Re:                            )    Chapter 11
                                  )
HIGHLAND CAPITAL                  )    Dallas, Texas
MANAGEMENT, L.P.,                 )    Friday, June 25, 2021
                                  )    9:30 a.m. Docket
        Debtor.                   )
                                  )    EXCERPT:  MOTION FOR
                                  )    MODIFICATION OF ORDER
                                  )    AUTHORIZING RETENTION OF JAMES
                                  )    P. SEERY, JR. DUE TO LACK OF
                                  )    SUBJECT MATTER JURISDICTION
                                  )    (2248)
_____   )


                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                 UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:              Jeffrey Nathan Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd.,
                              13th Floor
                             Los Angeles, CA  90067-4003
                             (310) 277-6910

For the Debtor:              John A. Morris
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700

For CLO Holdco, Ltd. and     Jonathan E. Bridges
The Charitable DAF Fund,      Mazin Ahmad Sbaiti
LP:                          SBAITI & COMPANY, PLLC
                             JP Morgan Chase Tower
                             2200 Ross Avenue, Suite 4900 W
                             Dallas, TX  75201
                             (214) 432-2899

For Get Good Trust and       Douglas S. Draper
Dugaboy Investment Trust:    HELLER, DRAPER & HORN, LLC
                             650 Poydras Street, Suite 2500
                             New Orleans, LA  70130
                             (504) 299-3300
```

2

1   APPEARANCES, cont'd.:

2   For the Official Committee   Matthew A. Clemente
    of Unsecured Creditors:      SIDLEY AUSTIN, LLP
3                                One South Dearborn Street
                                 Chicago, IL  60603
4                                (312) 853-7539

5   Recorded by:                 Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
6                                1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
7                                (214) 753-2062

8   Transcribed by:              Kathy Rehling
                                 311 Paradise Cove
9                                Shady Shores, TX  76208
                                 (972) 786-3063

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25        Proceedings recorded by electronic sound recording;
             transcript produced by transcription service.

1           DALLAS, TEXAS - JUNE 25, 2021 - 9:36 A.M.

2        (Transcript excerpt begins at 11:33 a.m.)

3            THE CLERK:  All rise.

4            THE COURT:  All right.  Please be seated.  We are

5    back on the record, and our last motion this morning is the

6    Motion to Reconsider filed by CLO Holdco and the DAF.  Do we

7    have Mr. Bridges and Mr. Sbaiti back with us now?

8            MR. BRIDGES:  Yes, Your Honor.  I have changed seats

9    because of audio problems we're having here, but we're both

10   here.

11           THE COURT:  Okay.  Well, I think we heard an

12   agreement that you all have agreed that you're going to have

13   an hour and a half each, and I presume that means everything:

14   opening statements, arguments, evidence.  So, we'll start the

15   clock.  Nate, it's 11:35.  So, Mr. Bridges, your opening

16   statement?

17    OPENING STATEMENT ON BEHALF OF CLO HOLDCO AND THE CHARITABLE

18                            DAF, LP

19           MR. BRIDGES:  Thank you, Your Honor.  We're here on a

20   motion to modify an order that we'd submit has already been

21   modified by the plan confirmation order, although that order

22   has not yet become effective.

23      The modification there was to add the phrase "to the

24   extent legally permissible" to the Court's assertion of

25   jurisdiction in what is essentially the same gatekeeper

1    provision that's at issue here.  We submit that change is an

2    admission or at least a strong indication that the unmodified

3    order, at least as applied in some instances, contains

4    legally-impermissible provisions.  The entire argument today

5    from our side is about what's not legally permissible in that

6    order.

7         And that starts with our concerns regarding the

8    application of 28 U.S.C. § 959(a).  As Your Honor knows well,

9    959(a) is a provision of law that the Fifth Circuit and

10   *Collier on Bankruptcy* call an exception to the *Barton*

11   doctrine.  I know from the last time we were here that the

12   Court is already aware of what 959(a) says.  It's the second

13   sentence, I understand, which the Court pointed to in our

14   previous hearing that creates general equity powers or

15   authorizes the Court to use its general equity powers to

16   exercise some jurisdiction, some control over actions that

17   fall within the first sentence of 959(a).  But that second

18   sentence also prohibits explicitly the Court's using general

19   equity powers to deprive a litigant of his right to trial by

20   jury.

21        Here, we're not under *Barton*, the statutory exception to

22   *Barton* applies, because Mr. Seery is a manager of hundreds of

23   millions of third-party investor property.  Instead, we're

24   here under the Court's general equity powers, as authorized by

25   959(a).  And those equity powers cannot deprive the right to

1  trial by jury.

2      But the order does deprive trials by jury, first by

3  asserting sole jurisdiction here, where jury trials are

4  unavailable, and secondly, by abolishing any trial rights for

5  claims that do not involve gross negligence or intentional

6  misconduct.

7      Movants' third cause of action in the District Court case

8  is for ordinary negligence.  It comes with a Seventh Amendment

9  jury right.  But it's barred by the order because the order

10  only allows colorable claims involving gross negligence or

11  intentional conduct, not ordinary negligence.

12      Movants' second cause of action in the District Court case

13  is for breach of contract.  That comes with a Seventh

14  Amendment jury right, but it's barred by the order because the

15  order only allows colorable claims of gross negligence or

16  intentional misconduct, not negligent or faultless breaches of

17  contractual obligations.

18      Movants' first cause of action in the District Court case,

19  breach of Advisers Act fiduciary duties, comes with a jury

20  right.  It's also barred by the order because the order only

21  allows colorable claims involving gross negligence or

22  intentional misconduct.

23      You see there what I mean.  Congress couldn't have been

24  clearer.  Courts cannot deprive litigants of their day in

25  court before a jury of their peers by invoking general equity

1    powers.  Those powers don't trump the constitutional right to

2    a jury trial.

3        Yet this Court's order purports to do precisely that, not

4    only for the Movants, but also for future potential litigants

5    who may have claims that have not even accrued yet.  If those

6    claims are for ordinary negligence or breach of contract or

7    breach of fiduciary duties and don't rise to the level of

8    gross negligence or intentional misconduct, this order says

9    that those claims are barred, and it would deprive them of

10   their day in court.

11       The Court's general equity powers are simply not broad

12   enough to uphold such an order.

13       This issue is even more problematic when the causes of

14   action at issue fall within the mandatory withdrawal of the

15   reference provisions of 28 U.S.C. § 157(d).  As this Court

16   knows, it lacks jurisdiction over proceedings that require

17   consideration of non-bankruptcy federal law regulating

18   interstate commerce.  Some such claims -- Movants' Advisers

19   Act claim, for instance -- do not involve culpability rising

20   to the level of gross negligence or intentional misconduct,

21   but the order purports to bar them nonetheless, despite this

22   Court's lacking jurisdiction over the subject matter of those

23   claims.

24       Even if there is gross negligence or intentional

25   misconduct, the order states that this Court will have sole

1    jurisdiction over such claims.  And that can't be right if

2    withdrawal of the reference is mandatory.

3        Opposing counsel will tell you that 157(d) is inapplicable

4    here because they think our claims in the District Court won't

5    require substantial consideration of the Advisers Act or any

6    other federal laws regulating interstate commerce.  But their

7    cases don't come anywhere close to making that showing, as the

8    briefing demonstrates.

9        And in any case, that argument is beside the point.  This

10   order is contrary to 157(d) because it asserts jurisdiction

11   over claims that 157(d) does not apply -- I'm sorry, does

12   apply to.  And that's true regardless of whether Movants'

13   claims are among those.

14       The idea that there's no substantial consideration of

15   federal law, however, in the District Court case is undermined

16   by Mr. Seery's testimony in support of his appointment in

17   which he confirmed that the Advisers Act applies to him and

18   that he has fiduciary duties under that Act to the investors

19   of the funds he manages.

20       Your Honor, importantly, the Advisers Act isn't the

21   typical federal statute with loads of case law under it.  It's

22   actually an underdeveloped, less-relied-upon statute, and most

23   -- most of the law under that Act is promulgated by regulation

24   and supervised by the SEC.  As a registered investment

25   advisor, Mr. Seery is bound by that Act, which he admits, he

1    agrees to.  But to flesh out what his duties are requires a

2    close exam of more than three dozen regulations under 17

3    C.F.R. Part 275.

4         The obligations include robust duties of transparency and

5    disclosure, as well as duties against self-dealing and the

6    necessity of obtaining informed consent, none of which are

7    waivable, these duties.

8         The proceedings here in this Court reflect an effort to

9    have those unwaivable duties waived.  The allegations in the

10   District Court are essentially insider trading allegations

11   that the Debtor and Mr. Seery knew or should have known

12   information that they had a duty under the Advisers Act to

13   disclose to their advisees.  Both under the Act and

14   contractually, they had those duties.  And, instead, they did

15   not disclose and consummated a transaction that benefited

16   themselves nonetheless.

17        In considering those claims, the presiding court will have

18   to consider and apply the Advisers Act and the many

19   regulations promulgated under it, in addition to other federal

20   laws regulating interstate commerce.  For that reason,

21   withdrawal of the reference on the District Court action is

22   mandatory.  That's the two major -- that's two major problems

23   out of four with the order that we're here on today.

24        First, it deprives litigants of their right to trial, to a

25   jury trial, when Section 959(a) says that can't be done.  And,

two, the order asserts jurisdiction -- sole jurisdiction, even

-- over proceedings in which withdrawal of the reference is

mandatory under 157(d).

The fourth major problem is what the Court called

specificity at the previous hearing.  The Fifth Circuit's

*Applewood Chair* case holds that the rule from *Shoaf* does not

apply without a "specific discharge or release," and that that

release has to be enumerated and approved by the Bankruptcy

Court.  Thus, the order here can't exculpate Mr. Seery of

liability for ordinary negligence and the like in a blanket

fashion.  The claims being released must be identified.

That's what happened in *Shoaf*.  Shoaf's guaranty

obligation was explicitly released.  That's also what happened

in *Espinosa*.  Espinosa's plan listed his student loan as his

only specific indebtedness.  But it's not what happened here.

And it couldn't happen here, because the ordinary negligence

and similar claims being discharged by the order had not yet

accrued and thus were not even in existence at the time the

order issued.

Instead, what we have here is a nonconsensual, nondebtor

injunction or release that's precisely what the Fifth Circuit

refused to enforce in the *Pacific Lumber* case.

So, lack of specificity is the third major problem with

the order.  And that brings us to the fourth problem, which is

the *Barton* doctrine.  *Barton* is the only possible basis for

1   this Court to assert exclusive or sole jurisdiction over

2   anything.  Outside of *Barton*, it's plain black letter law that

3   the District Court's jurisdiction is equal to and includes

4   anything that this Court's derivative jurisdiction would also

5   reach.

6       But the exception to the *Barton* doctrine in 959(a) plainly

7   applies here, leaving no basis for exclusivity with regards to

8   jurisdiction and the District Court.  That's because Mr. Seery

9   is carrying on the business of a debtor and managing the

10  property of others, rather than merely administering the

11  bankruptcy estate.  The exclusive jurisdiction function of the

12  *Barton* doctrine has no applicability because 959(a) creates

13  that exception here.

14      Under its general equity powers, yes, 959(a) still

15  authorizes this Court to exercise some control over actions

16  against Mr. Seery, but short of depriving litigants of their

17  day in court.  And nothing in 959(a), that exception to

18  *Barton*, says that the Court can nonetheless exercise

19  exclusivity in that jurisdiction.  Those general equity powers

20  do not create exclusive or sole jurisdiction.  They do not

21  deprive the District Court of its Congressionally-granted

22  original jurisdiction.

23      Moreover, Mr. Seery is not an appointed trustee entitled

24  to the protections of the *Barton* doctrine in any case.  His

25  appointment was a corporate decision that the Court was asked

1    not to interfere with.  The Court was asked to defer under the

2    business judgment rule to the Debtor's appointment of Mr.

3    Seery.  And the Court did so.

4         As we asserted last time, no authority that we can find

5    combines these two unrelated doctrines, the *Barton* doctrine

6    and the business judgment rule.  And they don't go together.

7    None of the testimony or the briefing or argument, in the July

8    order, in the January order that preceded it, none of that

9    indicated that Mr. Seery would be a trustee or the functional

10   equivalent of a trustee.  The word "trustee" does not appear

11   in any of those briefs or transcripts.

12        Opposing -- and because of that, the District Court suit

13   is not about -- well, not because of that.  The District Court

14   suit simply is not about any trustee-like role that Mr. Seery

15   may have played anyway.  Opposing counsel will try to convince

16   you otherwise, will tell you that the District Court case is a

17   collateral attack on the settlement, but it's not.  Wearing

18   his estate administrator hat, Mr. Seery can settle claims in

19   this court.  Wearing his advisor hat, he has to fulfill his

20   Advisers Act duties and properly advise his clients.

21        He doesn't have to wear both hats, and it seems highly

22   unusual that he would choose to fill both of those roles

23   simultaneously.  But he has chosen both roles.  And the

24   District Court case is a hundred percent about his role as an

25   advisor.  Did he comply with the Act?  Did he do the things

1   that his advisor role obligated him to do as a manager of that

2   property?

3       The District Court suit really is only being used to

4   illustrate the issues that we're raising here.  It's

5   important, it's timely to address those issues now because of

6   the District Court action, but that's an illustration of the

7   problems with the order.  It is not exclusively that that

8   action is what we're attempting to address.  Rather, the order

9   exculpating Mr. Seery from ordinary negligence liability and

10  similar liability is problematic, is contrary to the law.  On

11  top of that, the Court is asserting jurisdiction over gross

12  negligence and intentional misconduct claims.  To the extent

13  that 157(d) applies, it is problematic and contrary to law as

14  well.

15          THE COURT:  Okay.  We're occasionally getting some

16  breakup of your sound.  So please -- I don't know what you can

17  do to adjust, but it was just now, and intermittently we get a

18  little bit of garbly.  So if you could just say your last

19  sentence one more time, and we'll see if it improves.

20          MR. BRIDGES:  Your Honor, I'm not sure I can say this

21  last sentence again.

22          THE COURT:  Okay.

23          MR. BRIDGES:  I was -- I was mentioning that the

24  District Court case is an illustration of our argument.  Our

25  argument is not merely that the District Court case should be

1   exempted or excepted from the order.  Our argument is that the

2   order is legally infirm and that the District Court case and

3   the claims there illustrate some of those infirmities, but

4   that the infirmities go beyond just what's at issue in the

5   District Court case.

6       In sum, there are four problems with the order that render

7   parts of it legally infirm.  It deprives the right of a jury

8   trial -- in fact, of any trial -- in contravention of 959(a)

9   for some causes of action.

10      It asserts jurisdiction -- two, it asserts jurisdiction

11  over claims that are subject to the mandatory withdrawal of

12  the reference provision (garbled) 157(d).

13      And three, it lacks the specificity required to discharge

14  future claims under *Applewood*.

15      Finally, Your Honor, number four, the order relies on the

16  *Barton* doctrine, which doesn't apply and which 959(a) creates

17  an exception to.

18      Movants respectfully submit the order should be modified

19  for those reasons.

20          MR. SBAITI:  Tell him Mark Patrick is here, for the

21  record.

22          THE COURT:  All right.  I have a couple of follow-up

23  questions for you.  I want to drill down on the issue of your

24  client not having appealed the July 2020 order.  Or the

25  HarbourVest settlement order, for that matter.  Tell me as

 1  directly as possible why you don't view that as a big problem.

 2  Because it's high on my list of possible problems here.

 3        MR. BRIDGES:  I understand, Your Honor.  The

 4  *Applewood Chair* case is our -- our defense to that argument,

 5  that without providing specifics as to the claims being

 6  discharged in the July order, that *Shoaf* cannot apply to

 7  create a res judicata effect from the failure to appeal that

 8  order.

 9        THE COURT:  But is that really what we're talking

10  about, a discharge of certain claims?  We're talking about a

11  protocol that the Court established which wasn't appealed.

12        MR. BRIDGES:  Your Honor, your order does many

13  things.  We're talking about a few of them in one paragraph of

14  the order.  And in that order -- in that paragraph, yes, it

15  creates a protocol for determining the colorability of some

16  claims, claims that rise to the level of gross negligence or

17  intentional misconduct.  It does not create a protocol for

18  claims that fall below that threshold, claims for ordinary

19  negligence, as an example.

20        THE COURT:  Okay.

21        MR. BRIDGES:  For breach of contract that's not

22  intentional, is not grossly negligent, it's just a breach of

23  contract.  It can even be faultless.  There's still liability.

24  There's still a jury right under the Seventh Amendment for

25  faultless breach of contract.

1    The protocols in the order do not address such claims

2  other than to bar them.  To discharge them.  And thus, yes,

3  it's a release, it's a discharge of those claims.  It can be

4  viewed as a permanent injunction against bringing such claims.

5  It's what's -- it's what's not allowed by the *Applewood Chair*

6  case and by *Pacific Lumber*.

7         THE COURT:  All right.  So you're arguing that was --

8  the wording of the order was not specific enough to apprise

9  affected parties of what they were releasing, they're

10  releasing claims based on ordinary negligence against Mr.

11  Seery?  That's not specific enough?

12         MR. BRIDGES:  Correct.  Future unproved claims, the

13  factual basis for which has not happened yet.  Those cannot be

14  and were not disclosed with any specificity in this order.

15    If we compare it to *Shoaf* and to *Espinosa*, in *Shoaf* what

16  we had was a guaranty, Shoaf's guaranty on a transaction that

17  was listed in the actual release, describing what the

18  transaction was that was being -- that the guaranty was being

19  released for.

20    In *Espinosa*, what we had was a student loan --

21         THE COURT:  Right.

22         MR. BRIDGES:  -- that was listed in the plan

23  specifically, as the only specific indebtedness.

24    Here, we don't have any of that specificity.  What we have

25  is a notice to the entire world, Your Honor, that for an

1    unlimited period of time any claim for ordinary negligence,

2    for ordinary breach of contract or fiduciary duty against Mr.

3    Seery is barred if it relates to his CEO role.  And his CEO

4    role means as a manager of property, exactly precisely what

5    959(a) is talking about.

6        Those jury rights (garbled) claims cannot be released,

7    discharged, expunged, done away with, in an order that isn't

8    explicit.

9        On top of that, even in an explicit order, 959(a) tells

10   the Court it cannot deprive a litigant of its jury trial

11   right.

12            THE COURT:  Well, as anyone knows who's been around a

13   while in this case, my brain sometimes goes down an unexpected

14   trail, and maybe this one is one of those situations.  Are

15   there contracts that your clients would rely on in potential

16   litigation?

17            MR. BRIDGES:  Yes, Your Honor.

18            THE COURT:  What are those contracts?

19            MR. BRIDGES:  It is a management contract.  I don't

20   think I can give you the specifics at this moment, but I

21   probably can before we're done here today.  A management

22   contract in which the Debtor provides advisory and management

23   services to the DAF --

24            THE COURT:  Well, you know, the shared services

25   agreements that we heard so much about in this case?  A shared

1   service agreement?  I can't remember, you know, which entities

2   have them and which do not at times.  So, --

3          MR. BRIDGES:  The shared services agreement is one of

4   those contracts, Your Honor.

5          THE COURT:  Okay.

6          MR. BRIDGES:  It's not the only one.

7          THE COURT:  And what are the others?

8          MR. BRIDGES:  There's -- the other is the investment

9   advisory agreement.

10          THE COURT:  Those two?

11          MR. BRIDGES:  (no response)

12          THE COURT:  Those are the only two?

13          MR. BRIDGES:  There may be one other, Your Honor.

14   I'm not sure.

15          THE COURT:  Are they in evidence?

16          MR. BRIDGES:  I can find out shortly.

17          THE COURT:  Are they in evidence?  We haven't talked

18   about evidence yet, but are they going to be in evidence,

19   potentially?

20          MR. BRIDGES:  They are referenced in the District

21   Court case, the complaint, which is in evidence.

22          THE COURT:  I'm asking, are --

23          MR. BRIDGES:  But those contracts I don't believe are

24   listed as exhibits here in this motion, no.

25          THE COURT:  They are not?  Okay.

 1          Well, what my brain is thinking about here is, of the

 2     umpteen agreements I've seen -- more than umpteen -- of the

 3     many, many agreements I've seen over time in this case, so

 4     often there's a waiver of jury trial rights, as I recall, as

 5     well as an arbitration clause.  I just was curious, hmm, you

 6     know, you talked a lot about your clients' jury trial rights:

 7     do we know that these agreements have not waived those?

 8          MR. BRIDGES:  Your Honor, I think I can answer that

 9     by the end of our hearing.  I don't have an answer off the top

10     of my head.  What I can tell you is a jury right has been

11     demanded in the federal court complaint, which is in evidence,

12     and that opposing counsel has brought no evidence indicating

13     that they have the defense of our having waived the right to a

14     jury trial here.

15          THE COURT:  Okay.  Well, I just --

16          MR. BRIDGES:  Or arbitra...

17          THE COURT:  -- would think that you would know that.

18     Does anyone know that on the Debtor's side off the top of your

19     head?

20          MR. POMERANTZ:  I do not, Your Honor.

21          THE COURT:  Uh-huh.

22          MR. POMERANTZ:  And to Mr. Bridges' last point, we

23     have filed a motion to dismiss.  We have not answered the

24     complaint.  So any time to object to their jury trial right

25     would be in the context of the answer.  So the implication

1  that we have not raised the issue and therefore it doesn't

2  exist is just not a correct implication and connection he's

3  trying to draw.

4          THE COURT:  Okay.  All right.

5      Well, let me also ask you about this.  I'm obsessing a

6  little over the *Barton* doctrine and your insistence that it

7  does not provide authority or an analogy here.

8      Well, for one thing, is there anything in the Fifth

9  Circuit case *Sherman v. Ondova* that you think either helps you

10  or hurts you on that point?  I'm intimately familiar with it,

11  although I haven't read it in a while, because it was my

12  opinion that the Fifth Circuit affirmed.  And I spent a lot of

13  time thinking about that.  It was a trustee, a traditional --

14  well, no, a Chapter 11 trustee and his counsel.  But anything

15  from that case that you think is worthy of pointing out here?

16          MR. BRIDGES:  No, Your Honor.  I'm not -- nothing

17  comes to mind.  That case is not fresh on my mind.

18      What I would tell you is that *Barton* doctrine and the

19  business judgment rule are incompatible, and the appointment

20  of a trustee never involves application of the business

21  judgment rule or deference to the Debtor or another party in

22  terms of making that appointment.

23      The *Barton* doctrine, as it applies to trustees, is viewed

24  as an extension, to some extent, of judicial immunity to the

25  trustee, who is chosen by, selected by the Court and assigned

1  by the Court to carry out certain functions.  That --

2         THE COURT:  Well, let me --

3         MR. BRIDGES:  -- quasi-immunity --

4         THE COURT:  -- stop you there.  You say it's an

5  extension of immunity.  But isn't it, by nature, really a

6  gatekeeping provision?  It's a gatekeeping provision, right?

7  Before you even get to immunity, maybe, in a lawsuit, it's a

8  gatekeeping function that the Supreme Court has blessed, you

9  know, obviously in the context of a receiver, but appellate

10 courts have blessed it in the bankruptcy context.  The

11 Bankruptcy Court can be the gatekeeper on whether the trustee

12 or someone I think in a similar position can get sued or not.

13    And then we had that Fifth Circuit case after *Ondova*.  It

14 begins with a V, *Villegas* or something like that.  Didn't

15 that, I don't know, further ratify, if you will, the whole

16 *Barton* doctrine by saying, oh, just because they're noncore

17 claims, state law or non-bankruptcy law claims, doesn't mean,

18 after *Stern*, the Bankruptcy Court still cannot serve the

19 gatekeeper function.

20    Tell me what you disagree.  That's my kind of combined

21 reading of all of that.

22         MR. BRIDGES:  Your Honor, I have to parse it out.

23 There's a lot to unpack there.  If I can make sure to get in

24 the follow-ups, I can start with saying it's okay for the

25 Court in many instances to act as a gatekeeper.

1          THE COURT:  Okay.

2          MR. BRIDGES:  Both under *Barton* -- under *Barton*, or

3    when the *Barton* exception in 959(a) applies, under the Court's

4    general equitable powers, that gatekeeping functions are not

5    across-the-board prohibited, --

6          THE COURT:  Okay.

7          MR. BRIDGES:  -- and we aren't trying to argue that

8    they're prohibited across the board.

9          THE COURT:  Okay.

10         MR. BRIDGES:  Now, to try to dig into that a little

11   deeper, the order does two things:  gatekeeping as to some

12   claims, and, frankly, discharging or barring other claims.

13   Those are two separate functions.

14      The first one, the gatekeeping, may be, in some

15   circumstances, which we'll come to, many circumstances, may be

16   allowable, may be even mandatory under *Barton*, not even

17   requiring an order from this Court, for the gatekeeping of

18   *Barton* to apply.  But nonetheless, allowable in many instances

19   under the Court's general equity powers under 959(a).  That

20   part is right about gatekeeping.

21      It does not create jurisdiction in this Court where 157(d)

22   deprives this Court of jurisdiction.  Just because it's

23   related to bankruptcy isn't enough to say that the Court

24   therefore has jurisdiction if, one, if mandatory withdrawal of

25   the reference is required.

1        Furthermore, Your Honor, that gatekeeping function, under

2   the equity powers authorized by 959(a), will not allow a court

3   to discharge or -- or deprive, is the word I'm looking for --

4   deprive a litigant of their right to a trial -- a specific

5   kind of trial, a jury trial -- but a trial.  And by crafting

6   an order that says certain kinds of claims that do (garbled)

7   jury rights are barred, rather than just providing a

8   gatekeeper provision, flat-out bars them, that doesn't -- that

9   doesn't comply with 959.

10             THE COURT:  Okay.

11             MR. BRIDGES:  Your Honor, if I could add one last

12  thing.

13             THE COURT:  Go ahead.

14             MR. BRIDGES:  The Supreme Court's *Stern* case points

15  out that -- that it's -- well, actually, it's the *Villegas*

16  case from the Fifth Circuit --

17             THE COURT:  The one I mentioned.

18             MR. BRIDGES:  -- points out that *Stern* -- *Stern* --

19  yes, you did.  *Stern* did not create an exception to the *Barton*

20  doctrine.  And that gives -- that endorses a *Barton* court's

21  ability to perform gatekeeping, even over claims that *Stern*

22  says there would not be jurisdiction over.

23        Contrast that with 959(a), which *Collier on Bankruptcy* and

24  the Fifth Circuit have held is an exception to the *Barton*

25  doctrine.  Because of that exception, *Barton* no longer

1  applies, and what you're using in invoking a gatekeeper order

2  is the Court's inherent equitable powers, its general powers

3  in equity.  And those equity powers are cabined.  They're

4  broad, but they're cabined by 959(a)'s prohibition of doing

5  away with a litigant's right to a trial, a jury trial.

6      Now, I also -- counsel is telling me I should note for the

7  record that Mr. Mark Patrick is here as a representative of

8  our clients.  But Your Honor, I'll -- I will quit now unless

9  you have further questions for me.

10         THE COURT:  All right.  I do not at this time.  Mr.

11  Morris or Mr. Pomerantz, who's going to make the argument?

12         MR. POMERANTZ:  It's me, Your Honor.

13          OPENING STATEMENT ON BEHALF OF THE DEBTOR

14         MR. POMERANTZ:  And I'll start with the jury trial

15  right.  In the last few minutes, we have been able to

16  determine that the Second Amended and Restated Investment

17  Advisory Agreement between the DAF and the Debtor has a broad

18  jury trial waiver under 14(f).  And in addition, as I will

19  include in my discussion, there is no private right of action

20  under the Investment Advisers Act.

21      I think those two points are fatal to Movants' argument,

22  and probably I can get away with not even responding to the

23  others.  But since I prepared a lengthy presentation to

24  address the issues that were raised today, and also the half

25  hour that Mr. Bridges spent with Your Honor on June 8th in

 1    which was his first opening statement on the motion for

 2    reconsideration, I'll now proceed.

 3              THE COURT:  All right.

 4              MR. POMERANTZ:  The arguments that the Movants made

 5    in the original motion essentially boil down to one legal

 6    proposition, that the Court did not have jurisdiction to enter

 7    the July 16th order because those orders impermissibly

 8    stripped the District Court from jurisdiction, in violation of

 9    (inaudible) Supreme Court precedent and 28 U.S.C. Section

10    157(d).

11        As with all things Dondero, the arguments continue to

12    morph, and you heard argument at the contempt hearing on June

13    8th and further argument today that now the prospective

14    exculpation for negligence in the order is also unenforceable

15    and should be modified.

16        Movants continue to try to distance themselves from the

17    January 9th order and argue that it is not relevant because

18    they seek to pursue claims against Mr. Seery as CEO and not as

19    an independent director.  Movants ignore, however, that the

20    January 9th order not only protects Mr. Seery in his role as

21    the independent director, but also as an agent of the board.

22    I will walk the Court through my arguments on that issue in a

23    few moments.

24        Of course, the Movants had no explanation, Your Honor, for

25    the question of why it took them until May of 2021, 10 months

after the entry of the July 16th order that appointed Mr.
Seery as CEO and CRO, and 16 months after the Court appointed
the independent board, with Mr. Dondero's blessing and
consent, as a substitute for what would have surely been the
imminent appointment of a Chapter 11 trustee.

Movants try to distance themselves from the prior orders
by essentially arguing that the DAF is a newcomer to the
Chapter 11 and is not under Mr. Dondero's control but is
rather managed separately and independently by Mr. Patrick,
who recently replaced Mr. Scott.

The Movants admit, as they must, that the DAF is the
parent and the sole shareholder of CLO Holdco and conducts its
business through CLO Holdco, and both entities conduct their
business through one individual.  It was Grant Scott then;
it's Mark Patrick now.  So even if Mr. Dondero does not
control the DAF and CLO Holdco, which issue was the subject of
lengthy testimony in connection with the DAF hearing, both the
DAF and the CLO Holdco are bound by the Debtor's res judicata
argument, which I will discuss shortly.

In any event, I really doubt the Court is convinced that
the DAF operates truly independently of Mr. Dondero any more
than the Court has been convinced that the Advisors, the
Funds, Dugaboy and Get Good, all operate independently from
Mr. Dondero.  The only explanation for the delay is that Mr.
Dondero has been and continues to be unhappy with the Court's

1  rulings and has now hired a new set of lawyers in a desperate

2  attempt to evade this Court's jurisdiction.  Having failed in

3  their attempt to recuse Your Honor from the case, this is

4  essentially their last hope.

5      And these new lawyers, Your Honor, have not only filed

6  this DAF lawsuit in the District Court which is the subject of

7  the contempt motion and today's motion, but they also filed

8  another lawsuit in the District Court on behalf of an entity

9  called PCMG, another Dondero entity, challenging yet another

10  of Mr. Seery's postpetition decisions.

11      And there's no doubt that this is only the beginning.  Mr.

12  Dondero recently told Your Honor at a hearing that there were

13  many more sets of lawyers waiting in the wings.  And as the

14  Court remarked at the hearing on the Trusts' motion to compel

15  compliance with Rule 2015.3, the Trusts were trying through

16  that motion to obtain information about the Debtor's control

17  entities so that they could file more lawsuits against the

18  Debtor, a concern that Mr. Draper unconvincingly denied.

19      I would like to focus the Court preliminarily on exactly

20  what the January 9th and July 16th orders do, because Movants

21  try to confuse things by casting the entire order with a broad

22  brush of their jurisdictional overreach arguments, and they

23  misinterpret Supreme Court and Fifth Circuit precedent.

24      I would like to put up on the screen the language of

25  Paragraph 10 of the January 9th order and Paragraph 35

1    (garbled) of the July 16th.

2         Your Honor is very familiar with these orders, I'm sure,

3    having dealt with them in connection with confirmation and in

4    prior proceedings.  But to recap, the orders essentially do

5    three things.

6         First, they require the parties to first come to the

7    Bankruptcy Court before commencing or pursuing a claim against

8    certain parties.

9         Second, they provided the Court with the sole jurisdiction

10   to make a finding of whether the party has asserted a

11   colorable claim of negligence -- of willful misconduct or

12   gross negligence.

13        And lastly, the orders provided the Court with exclusive

14   jurisdiction over any claims that the Court determined were

15   colorable.

16        The protected parties under the January 9th order are the

17   independent directors, their agents and advisors, which, as I

18   mentioned earlier, includes Mr. Seery -- who, at least as of

19   March 2020, was acting as the agent on the board's behalf as

20   the CEO -- for any actions taken under their direction.

21        The protected parties under the July 16th order are Mr.

22   Seery, as the CEO and CRO, and his agents and advisors.

23        Movants spend a lot of time in their moving papers and

24   reply arguing that the Court may not assert exclusive

25   jurisdiction over any claims that pass through the gate.  They

1  also spend a lot of time arguing that the Bankruptcy Court

2  does not even have jurisdiction at all to assert -- to

3  adjudicate claims against Mr. Seery because such claims are

4  subject to mandatory withdrawal under Section 157(d).

5      The Debtor doesn't agree, and has briefed why mandatory

6  withdrawal of the reference is inapplicable.  The Debtor has

7  also filed in the District Court a motion to enforce the

8  reference in effect in this district which refers cases in

9  this district arising under, arising in, or related to Chapter

10 11 to the Bankruptcy Court.

11     The motion to enforce the reference, Your Honor, which

12 extensively briefs this issue, is contained in Exhibit 3 of

13 the Debtor's exhibits.

14     We were somewhat surprised that the complaint filed in the

15 District Court wasn't automatically referred to this Court

16 under the standing order in effect in this district, given the

17 related bankruptcy case, the Court's prior approval of the

18 HarbourVest settlement, and the appeal in the District Court

19 of the HarbourVest settlement.

20     When we dug a little further, we found out that Movants

21 filed a civil case cover sheet accompanying the complaint in

22 the District Court.  They neglected in that initial filing to

23 point out that there was any related case to the lawsuit they

24 filed.

25     Mr. Bridges fell on his sword at the contempt hearing on

1  June 8th and took complete responsibility for the oversight.

2  I commend him for not trying to argue that the bankruptcy

3  case, the HarbourVest settlement, and the District Court

4  appeal are not related cases that would require disclosure, an

5  argument that surely would have been unsupportable.

6      But as I said at the contempt hearing, I find it curious

7  that such an important issue was overlooked, an issue which

8  would have likely changed the entire trajectory of the

9  proceedings and landed the DAF lawsuit in this Court rather

10  than the District Court.

11     And this Tuesday, Your Honor, Movants filed a revised

12  civil cover sheet with the District Court.  Although they

13  referenced the bankruptcy case as a related case, they didn't

14  bother to mention the appeal already pending in the District

15  Court regarding the HarbourVest settlement -- surely, a

16  related case.

17     Your Honor also asked Mr. Bridges at the June 8th hearing

18  whether it was an oversight or intentional that he didn't

19  mention 28 U.S.C. Section 1334 as a basis for jurisdiction in

20  his complaint.  Mr. Bridges had no answer for Your Honor then,

21  and has given no answer now.  His only comment at the hearing

22  last time was that it must have been Ms. Sbaiti that wrote it

23  because he had no recollection of it.

24     So, Your Honor, it's no surprise that Movants conveniently

25  found themselves in the District Court, which was their

1   ultimate strategy from the get go.

2       In any event, Your Honor, we have briefed the withdrawal

3   of the reference issue.  A response by the Movants is due --

4   CLO Holdco and DAF is due on June 29th.  And we hope the

5   District Court will decide soon thereafter whether to enforce

6   the reference.

7       While I'm happy to argue why Movants' mandatory withdrawal

8   of the reference argument is [not] persuasive, I don't think

9   it's necessary, but I do, again, want to highlight that there

10  is no private right of action under the Investment Advisers

11  Act.

12      Your Honor, it's not really relevant to today's hearing,

13  since we have argued in opposition to the motion before Your

14  Honor that resolving the issue of the Bankruptcy Court's

15  jurisdiction to adjudicate claims contained in the complaint

16  as they relate to Mr. Seery is premature at this point.  The

17  January 9th and July 16th orders first require the Court to

18  determine whether a claim is colorable.  It's not until this

19  Court determines if a claim is colorable that the decision on

20  where the lawsuit should be tried is relevant.

21      Having said that, Your Honor, we read the Movants' reply

22  brief very carefully and noticed in Footnote 6 that the

23  Movants state that modifying the exclusive grant of

24  jurisdiction to adjudicate any claims that pass through the

25  gate to include the language "to the extent permissible by

1    law," in the same way the Debtor modified the plan, would

2    resolve the motion.  So let's look at the provision as it

3    exists in the plans.

4        Ms. Canty, if you can put up the next demonstrative,

5    please.

6        This provision provides that the Bankruptcy Court will

7    have sole and exclusive jurisdiction to determine whether a

8    claim or cause of action is colorable, and, only to the extent

9    legally permissible and provided in Article XI, shall have

10    jurisdiction to determine -- to adjudicate the underlying

11    colorable claim or cause of action.

12        The Movants request in their reply brief in Footnote 6

13    that the July 16th order be given the plan treatment.  That

14    treatment:  sole authority to determine colorability and

15    jurisdiction, and, to the extent legally permissible, to

16    adjudicate underlying claim, only if jurisdiction existed.

17        After reviewing the reply brief and prior to the June 8th

18    hearing, we decided that we would agree to modify both the

19    January 9th and the July 16th orders to provide that the

20    Bankruptcy Court would only have jurisdiction to adjudicate

21    claims that pass through the colorability gate to the extent

22    permissible by law.

23        Prior to the June 8th hearing, Mr. Morris and I had a

24    conversation with Mr. Bridges.  We conferred about a potential

25    resolution and a proposed modification.  Mr. Bridges indicated

1    they were interested in exploring a resolution and wanted to

2    --

3              MR. BRIDGES:  Objection, Your Honor.

4              THE COURT:  There's an objection?

5              MR. BRIDGES:  Objection, Your Honor.  There's a Rule

6    408 settlement discussion.  He's welcome to talk about the

7    results, but he shouldn't be talking about what was -- what

8    was proposed by opposing counsel in a settlement conversation.

9              THE COURT:  Okay.  I overrule.

10             MR. POMERANTZ:  Your Honor, this was not --

11             THE COURT:  I don't think this is a 408 issue.

12   Continue.

13             MR. BRIDGES:  Thank you.

14             MR. POMERANTZ:  The stipulation and order which we

15   provided to counsel is attached to my declaration, which is

16   found at Document 2418, and it was filed in connection with a

17   Notice of Revised Proposed Orders that we filed at Docket

18   2417.  And I would like to put up on the screen the relevant

19   paragraphs of the order that we provided to the Movants.

20        So, you see, we agreed to modify each of the orders at the

21   end to do what the plan says.  The Court would only have

22   jurisdiction for claims passing through the gate if the Court

23   had jurisdiction and it was legally permissible.

24        Movants' counsel, however, responded with a mark-up that

25   went beyond -- went beyond what Movants proposed in Footnote 6

1   and sought to fundamentally change the January 9th and July

2   16th orders in ways that were not acceptable to the Debtor and

3   not even contemplated by the original motion.

4        Ms. Canty, can you put up on the screen the relevant

5   paragraphs of the response we received?

6        Specifically, Your Honor, you see at the first part they

7   wanted to provide that the only -- the order only applied to

8   claims involving injury to the Debtor, presumably as opposed

9   to alleged injuries to affiliated funds or third parties.

10  They also provided that the Court's ability to make the

11  initial colorability determination was also qualified by "to

12  the extent permissible by law" in the way that the Court --

13  that the Debtor agreed to modify the ultimate adjudication

14  jurisdiction provision.

15       Your Honor, Movants haven't even talked about this back

16  and forth.  They haven't talked about their about-face.  And

17  I'll leave it for Your Honor to read their Footnote 6 that

18  said it would resolve their motion, the back and forth, our

19  proposal, and now Mr. Bridges' modified, morphed arguments

20  that now point out other issues.

21       In any event, Your Honor, we made the change, and we think

22  it should resolve the motion, or at least it resolves part of

23  the motion.  There can't be any argument that the Court is

24  trying to exert exclusive jurisdiction on claims that pass

25  through the gate.

1      What apparently remains from the arguments raised by the

2   Movants is the argument that the Court does not even have

3   jurisdiction to act as a gatekeeper in the first place because

4   it doesn't have jurisdiction of the underlying lawsuit.  And

5   on June 8th and today, they've added a new argument, that the

6   orders impermissibly exculpate Mr. Seery and others, violate

7   their jury trial rights, and are contrary to the Fifth Circuit

8   precedent.

9      Movants claims that the orders are a jurisdictional

10   overreach, a violation of constitutional proportions, a

11   violation of due process, and inconsistent with several U.S.

12   Supreme Court cases.  But, of course, they cite no cases whose

13   facts are even remotely similar to this one.  Instead, they

14   are content to rely on general statements regarding bankruptcy

15   jurisdiction, how it is derived from district court

16   jurisdiction and is constitutionally limited, legal

17   propositions which are not terribly controversial or even

18   applicable to these facts.

19      There are several arguments -- I mean, there are several

20   reasons, Your Honor, why Movants' arguments fail.  Initially,

21   Movants have not cited any authority, any statute, or any rule

22   which would allow this Court to revisit the January 9th and

23   July 16th orders.  As I will discuss in a moment, Your Honor,

24   *Republic v. Shoaf*, a case the Court is very familiar in and

25   relied on in connection with plan confirmation, bars a

 1   collateral attack on these orders under the doctrine of res

 2   judicata.

 3       Similarly, as the Court remarked on June 8th, the Supreme

 4   Court's *Espinosa* decision, which rejected an attack based upon

 5   Federal Rule of Civil Procedure 60(b)(4) to a prior order that

 6   may have been unlawful, prohibits the Court from now

 7   reconsidering the January 9th and July 16th orders.

 8       But even if Your Honor rules that res judicata does not

 9   apply, there are two independent reasons why the orders were

10   not an unlawful extension of the Court's jurisdiction.  The

11   first is because the Court had jurisdiction to enter both of

12   those orders as the ability to determine the colorability of

13   claims is within the jurisdiction of the Court.  The second is

14   because the orders are justified by the *Barton* doctrine.

15       Lastly, Your Honor, Movants' argument that the Court may

16   not act as a gatekeeper to determine the colorability of a

17   claim for which it may not have jurisdiction is incorrect, and

18   as Your Honor has mentioned and as Mr. Bridges unconvincingly

19   tried to distinguish, the Fifth Circuit *Villegas v. Schmidt*

20   case is a case on point and resolves that issue.

21       Turning to res judicata, Your Honor, it prevents the Court

22   from revisiting these governance orders.  CLO Holdco had

23   formal notice of the Seery CEO motion and the opportunity to

24   respond.  It failed to do so.  It is clearly bound.

25       As reflected on Debtor's Exhibit 4, CLO Holdco is a

1    wholly-owned subsidiary of the DAF.  The DAF is its sole

2    shareholder.  There is no dispute about that.  Importantly, at

3    the time of both the January and July orders, Grant Scott was

4    the only human being authorized to act on behalf of CLO Holdco

5    and the DAF.  The DAF did not respond to the Seery CEO motion,

6    either.

7         And why is that important, Your Honor?  It's because

8    Movants argue in their reply that the DAF cannot be bound by

9    res judicata because they did not receive notice of the July

10   16th order.  However, Your Honor, that is not the law.  Res

11   judicata binds parties to the dispute and their privies, and

12   the DAF is bound to the prior orders even though it did not

13   receive notice.

14        There are several cases, Your Honor, that stand for this

15   unremarkable proposition.  First I would point Your Honor to

16   the Fifth Circuit's opinion of *Astron Industrial Associates v.*

17   *Chrysler*, found at 405 F.2d 958, a Fifth Circuit case from

18   1968.  In that case, Your Honor, the Fifth Circuit held that

19   the appellant was barred by the doctrine of res judicata from

20   bringing a claim because its parent, which was its sole

21   shareholder, would have been bound by res judicata.

22        *Astron* is consistent with the 1978 Fifth Circuit case of

23   *Pollard v. Cockrell*, 578 F.2d 1002 (1978).  And the Northern

24   District of Texas in 2000 case of *Bank One v. Capital*

25   *Associates*, 2000 U.S. Dist. LEXIS 11652, found that a parent

1  and a sole shareholder of an entity couldn't assert res

2  judicata as a defense when those claims could have been

3  brought against its wholly-owned subsidiary.

4      And lastly, Your Honor, the 2011 Southern District of

5  Texas case, *West v. WRH Energy Partners*, 2011 LEXIS 5183, held

6  that res judicata applied with respect to a partnership's

7  general partner because the general partner was in privity

8  with the partnership.

9      These cases are spot on and make sense.  DAF is CLO

10 Holdco's parent.  Grant Scott was the only live person to

11 represent these entities in any capacity at the relevant

12 times.  Accordingly, just as CLO Holdco is bound, DAF is

13 bound.

14     Allowing DAF to assert a claim when its wholly-owned and

15 controlled subsidiary is barred would allow entities to

16 transfer claims amongst their related entities in order to

17 relitigate them and they would never be finality.  And, of

18 course, Jim Dondero, as we know, consented to the January 9th

19 order, which provided Mr. Seery protection in a variety of

20 capacities.

21     And as Your Honor has pointed out, and as Mr. Bridges

22 didn't have an answer for, neither CLO Holdco nor the DAF or

23 any other party appealed any of the governance orders.  And

24 nobody challenged the validity of these orders at the

25 confirmation hearing, where the terms of these orders were

1   front and center.

2       And importantly, Your Honor, the orders are clear and

3   unambiguous.  They require a Bankruptcy Court [sic] to seek

4   Bankruptcy Court approval before they commence or pursue an

5   action against the independent board, the CEO, CRO, or their

6   agents.  And they clearly and unambiguously set the standard

7   of care for actions prospectively:  gross negligence or

8   willful misconduct.

9       The Bankruptcy Court had jurisdiction to enter the

10  governance orders, which, as expressly indicated in the

11  orders, were core proceedings dealing with the administration

12  of the estate.  No one challenged this finding of core

13  jurisdiction.  And as I will discuss later, the failure to

14  challenge core jurisdiction is waived under applicable Supreme

15  Court and Fifth Circuit precedent.

16      Your Honor, the Court [sic] does not argue that Movants

17  have waived their right to seek adjudication of a lawsuit that

18  passes through the colorability gate by an Article III Court.

19  The issue is not before the Court, but the changes to the

20  order that the Debtor agreed to make clearly -- clearly will

21  provide Mr. Bridges' clients the ability to make that

22  determination.

23      The Debtor is, however, arguing that the Movants have

24  waived their right to contest the core jurisdiction of the

25  Bankruptcy Court to make the determination that the claims are

1  colorable in the first place, and to challenge the exculpation

2  provisions provided to the beneficiaries of those orders.

3      Accordingly, Your Honor, the elements of res judicata are

4  satisfied.  Both proceedings involve the same parties.  The

5  prior judgment was entered by a court of competent

6  jurisdiction.  The prior order was a final judgment on its

7  merits.  And they involved the same causes of action.

8      Importantly, the members of the independent board,

9  including Jim Seery, relied on the protections contained in

10  the January 9th and July 16th orders and would not have

11  accepted these appointments if the protections weren't

12  included.  And how do we know this?  Because each of them,

13  both Mr. Seery and Mr. Dubel, both testified at the

14  confirmation hearing on this very topic.

15      And I would like to put up on the screen an excerpt from

16  Mr. Seery's testimony at confirmation, which is testimony

17  included in the February 2nd, 2021 transcript, which is

18  Exhibit 2 of the Debtor's exhibits.

19          THE COURT:  Okay.

20          MR. POMERANTZ:  And I would like to just read this,

21  Your Honor.

22      "Q   Okay.   You mentioned that there were certain

23      provisions of the January 9th order that were important

24      to you and the other independent directors.  Do I have

25      that right?"

1          MR. POMERANTZ:  A little bit later on, Mr. Seery

2    testifies:

3        "A   And then ultimately there'll be another provision

4         in the agreement here, I don't see it off the top of my

5         head, but a gatekeeper provision.  And that provision"

6         --

7        "Q   Hold on one second, Mr. Seery."

8            MR. POMERANTZ:  Please scroll.

9        "Q   So, Paragraph 4 and 5, were those -- were those --

10        were those provisions put in there at the insistence of

11        the prospective independent directors?

12       "A   Yes.

13       "Q   Okay.  Can we go to Paragraph 10, please?  There

14        you go."

15       Mr. Morris:  Is this the other provision that you were

16    referring to?

17       "A   This is -- it's become to be known as the

18        gatekeeper provision, but it's a provision that I

19        actually got from other cases -- again, another very

20        litigious case -- that I thought it was appropriate to

21        bring it into this case.  And the concept here is that

22        when you are dealing with parties that seem to be

23        willing to engage in decade-long litigation and

24        multiple forums, not only domestically but even

25        throughout the world, it seemed important and prudent

1    to me and a requirement that I set out that somebody

2    would have to come to this Court, the Court with

3    jurisdiction over these matters, and determine whether

4    there was a colorable claim.  And that colorable claim

5    would have to show gross negligence and willful

6    misconduct -- i.e., something that would not otherwise

7    be indemnifiable" --

8        MR. POMERANTZ:  Hold on one second.

9    "A    So, basically, it set an exculpation standard for

10   negligence.    It   exculpates   the   directors   from

11   negligence, and if somebody wants to bring a cause

12   against the directors, they have to come to this Court

13   first to get a finding that there's a colorable claim

14   for gross negligence or willful misconduct."

15   "Q   Would you have accepted the engagement as an

16   independent director without the Paragraphs 4, 5, and

17   10 that we just looked at?

18   "A   No, these were very specific requests.    The

19   language here has been smithed, to be sure, but I

20   provided the original language for Paragraph 10 and

21   insisted on the guaranty provisions above to ensure

22   that the indemnity would have some support.

23   "Q   And ultimately did the Committee and the Debtor

24   agree to provide all the protections afforded by

25   Paragraphs 4, 5, and 10?

1        "A    Yes."

2            MR. POMERANTZ:  So, Your Honor, these -- this

3    testimony also applied to as well as the CEO.

4        The testimony was echoed by Mr. Dubel, another member of

5    the board.  And I'm not going to put his testimony on the

6    screen, but it can be found at Pages 272 to 281 of Exhibit 2,

7    which is the February 2nd transcript.

8        Movants argue, however, that res judicata doesn't apply

9    because the Court didn't have jurisdiction to enter these

10   orders.  And they argue that the order stripped the District

11   Court of this jurisdiction.  As I previously described, the

12   Debtor is prepared to modify the governance orders to provide

13   that the Court shall retain jurisdiction to -- on claims that

14   pass through the gate only to the extent legally permissible.

15   The modification does not appear to be good enough for the

16   Movants.  They continue to argue that the Bankruptcy Court

17   can't even act as the exclusive gatekeeper to determine

18   whether such actions are colorable as a prerequisite for

19   commencing or pursuing an action.

20       The problem Movants run into is the Fifth Circuit's

21   opinion of *Republic v. Shoaf* and various Supreme Court

22   decisions, including *Espinosa*.

23       In *Shoaf*, the Fifth Circuit held that a party cannot

24   subsequently challenge a confirmed plan that clearly and

25   unambiguously released a third party, even if the Bankruptcy

1    Court lacked jurisdiction to approve the release in the first

2    place.  Movants' proper recourse was to appeal the governance

3    orders, not to seek to collaterally attack them.

4         In *Shoaf*, the Fifth Circuit held that the confirmed plan

5    was res judicata with respect to a suit by the creditor

6    against the guarantor.  And in so ruling, the Fifth Circuit

7    says that the prong of res judicata standard that requires an

8    order, prior order to be made by a court of competent

9    jurisdiction is satisfied regardless of whether the issue was

10    actually litigated.  This is because whenever a court enters

11    an order, it does so by implicitly making a finding of its

12    jurisdiction, a determination that can't be attacked.  And in

13    fact, in the January 9th and the July 16th orders, it wasn't

14    implicit, the Court's jurisdiction; it was set out that the

15    Court had core jurisdiction.

16         Movants try to brush *Shoaf* aside, arguing that is the only

17    case the Debtor cites to support res judicata argument and is

18    a narrow opinion that has been questioned and distinguished.

19    That's just not correct, Your Honor.  Movants ignore that we

20    have cited two United States Supreme Court cases, *Stoll v.*

21    *Gottleib* and *Chicot County Drainage District*, upon which the

22    Fifth Circuit based its *Shoaf* decision.  In each case, the

23    U.S. Supreme Court gave res judicata effect to a Bankruptcy

24    Court order that made a ruling party -- that a ruling party

25    later claimed was beyond the Court's jurisdiction to do so.

1   In *Stoll*, it was a release of guaranty without jurisdiction,

2   like *Shoaf*.   In *Chicot*, it was an extinguishment of a bond

3   claim without jurisdiction.

4        Similarly, Your Honor, the U.S. Supreme Court held in

5   *Espinosa* that a party was not entitled to reconsideration of a

6   Bankruptcy Court order under Federal Rule of Civil Procedure

7   60(b)(4) discharging a student loan without making the

8   required statutory finding of undue hardship in an adversary

9   proceeding.   And the Supreme Court reasoned in that opinion as

10  follows:   A judgment is not void, for example, simply because

11  it may have been erroneous.   Similarly, a motion under

12  60(b)(4) is not a substitute for a timely appeal.   Instead,

13  60(b)(4) applies only in the rare instance where a judgment is

14  premised either on a certain type of jurisdictional error or a

15  violation of due process that deprives a party of notice or

16  the opportunity to be heard.

17       Federal courts considering Rule 60(b)(4) motions that

18  assert a judgment is void because of a jurisdictional defect

19  generally have reserved it only for the exceptional case in

20  which the court that rendered the judgment lacked even an

21  arguable basis for jurisdiction.   This case is not the

22  exceptional -- exceptional circumstance that was referred to

23  by *Espinosa*.

24       In addition, we argue in our brief, and I'll get to in a

25  few moments, that both of the orders are justified under the

 1   *Barton* doctrine.

 2        Actually, before I go to that, Your Honor, I think Movants

 3   are really trying to distinguish *Espinosa* by arguing that the

 4   Court's order exculpating Mr. Seery for negligence liability

 5   did not provide people, mom-and-pop investors, with the due

 6   process informing them that they would not be able to assert

 7   duty claims based upon mere negligence.  I think that's the

 8   core of Mr. Bridges' argument, that, hey, you entered an

 9   order, you gave this exculpation, it was inappropriate, and it

10   couldn't be done.

11        There are several problems with Movants' argument.  First,

12   Movants mischaracterize both the facts and the law in

13   connection with the Debtor's relationship with its investors.

14   The Debtor is the registered investment advisor for HCLOF as

15   well as approximately 15 to 18 CLOs.  The only investor in

16   HCLOF other than the Debtor is CLO Holdco.  The investors in

17   the CLOs are the retail funds advised by the Dondero advisors

18   and the other -- and other institutional investors.

19   Accordingly, the thousands of investors, the mom-and-pop

20   investors whose due process rights have allegedly been

21   trampled by the January 9th and July 16th orders, are not

22   investors in any funds managed by the Debtor.

23        And, of course, I have mentioned, as I've mentioned

24   before, no non -- non-Dondero investor, be it a mom-and-pop

25   investor, another institutional investor, anyone unrelated to

1   Mr. Dondero, has ever appeared in this Court to challenge the

2   Debtor's activities.

3       But more fundamentally, Your Honor, the Debtor does not

4   owe fiduciary duties to investors in any of the funds that the

5   Debtor advises.  The fiduciary duty that the Debtor owes is to

6   the funds themselves, not the investors in the funds.

7       And while Movants point to Mr. Seery's prior testimony to

8   support the argument that the Debtor owes a duty to investors,

9   Mr. Seery was not testifying as a lawyer and his testimony

10  just cannot change the law.

11      As to each of the funds that the Debtor manages, HCLOF and

12  the CLOs, they were each provided with actual notice of the

13  January 16th -- the July 16th order and didn't object.  And as

14  Your Honor will recall, the Trustees for the CLOs, the party

15  that could potentially have claims for breach of fiduciary

16  duty, they participated in the January 9th hearing.  They came

17  to the Court and were concerned about the protocols that the

18  Debtor was agreeing to with the Committee.  We revised them.

19  The Trustees didn't object.  They didn't object then; they

20  didn't object now.  And, in fact, they consented to the

21  assumption of the contracts between the Debtor and the CLOs.

22      So the argument that the orders, by having this

23  exculpation for future conduct, violated due process rights of

24  anyone and is the type -- essentially, the type of order that

25  *Espinosa* would have contemplated could be attacked, is --

1    relies on faulty legal and factual premises.  No duty to

2    investors.  No private right of action.  And both -- and all

3    the funds received due process.

4          In addition, Your Honor, as we argue in our brief and I'll

5    get to in a few moments, both of the orders are justified

6    under the *Barton* doctrine, as Mr. Seery is entitled to

7    protection based upon how courts around the country have

8    interpreted the *Barton* doctrine.  As such, Mr. Seery is

9    performing his role both as an agent of the independent board

10   under the January 9th order, as a CEO under the July 16th

11   order, as a quasi-judicial officer.  And as Your Honor

12   examined in the *Ondova* opinion which you mentioned, trustees

13   are entitled to qualified immunity for damage to third parties

14   resulting from simple negligence, provided that the trustee is

15   operating within the scope of his duties and is not acting in

16   an *ultra vires* manner.

17         So, exculpating the independent directors, their agents,

18   and the CEO in the January 9th and July 16th orders was a

19   recognition by this Court that they would be entitled to

20   qualified immunity, much in the same way trustees are.

21         No doubt that Movants contend that this was error and that

22   the Court overreached.  However, the remedy for that overreach

23   was an appeal, not a reconsideration 16 months later.  The

24   Court's orders based upon the determination that in this

25   highly contentious case that these court officers needed to be

1    protected from negligence suits is not the exceptional case

2    where the Court lacked any arguable basis for jurisdiction.

3    Accordingly, this Court must follow *Espinosa*, *Shoaf*, *Stoll*,

4    and *Chicot* and reject the attack on the prior court orders.

5         The only case Movants cite to challenge the Supreme

6    Court's decision -- to challenge the Supreme Court precedent I

7    mentioned and the Fifth Circuit's *Shoaf* decision is the

8    *Applewood* case.  *Applewood* is totally consistent with *Shoaf*.

9    *Applewood* also involved a plan that purported to release a

10   guaranty claim that the guarantor argued was res judicata in

11   subsequent litigation regarding the guaranty.  The Fifth

12   Circuit held in that case that the plan was not res judicata.

13   It made that ruling because the plan did not contain clear and

14   unambiguous language releasing the guaranty.  In that way, the

15   Fifth Circuit distinguished *Shoaf*.

16        *Applewood* and *Shoaf* are consistent.  A Bankruptcy Court

17   order will be given res judicata effect, even if the Court

18   didn't have jurisdiction to enter it, if the order was clear

19   and unambiguous.  In *Shoaf*, the release was.  In *Applewood*, it

20   wasn't.

21        Movants argued on June 8th and argue now that the

22   *Applewood* case really argues -- really deals with prospective

23   exculpation of claims.  I went back and read Mr. Bridges'

24   comments carefully of June 8th.  He said *Applewood*,

25   exculpation.  Well, that's just not correct.  *Applewood* is all

1   about requiring specificity of a (garbled) to give it res

2   judicata effect.  Claims that existed at that time, were they

3   described clearly and unambiguously?  Yes?  *Shoaf* applies.

4   No?  *Applewood* does -- applies.

5       So how should the Court apply these principles here?  The

6   Court approved a procedure for certain claims in the

7   governance orders.  The procedure:  come to Bankruptcy Court

8   before pursuing a claim against the independent directors and

9   Seery or their agents so that the Court can make a

10  colorability determination.  Clear and unambiguous.  The

11  governance orders each provide that the Bankruptcy Court had

12  jurisdiction to enter the orders, and the orders were not

13  appealed.

14      Movants attempt to confuse the Court and argue *Applewood*

15  is on point because the January 9th and July 16th orders do

16  not clearly identify specific claims that Movants now have

17  that are being released.  And because they're not specific,

18  then basically it's an ambiguous release and *Applewood*

19  applies.

20      The problem with the Movants' argument is that neither the

21  January 9th or July 16th orders released claims that existed

22  at that time.  If they did, and if there wasn't an adequate

23  description, I might agree with Mr. Bridges that *Applewood*

24  applied.  But there were no claims.  It was prospective.  It

25  was a standard of care.  The Court clearly and unambiguously

said what the standard of care would be going forward.
Clearly, under *Shoaf* and Supreme Court precedent, they are
entitled to res judicata because it's a clear and unambiguous
provision.  *Applewood* just simply doesn't apply.

Mr. Phillips at the last hearing made an impassioned plea
to the Court for a narrow interpretation of the exculpation
provisions in the January 9th and July 16th orders, and he
argued that the Court could not possibly have intended for the
exculpation for negligence to apply on a go forward basis.  He
thus argued to the Court that the Court should construe the
exculpation narrowly and only apply it to potential claims of
harm caused to the Debtor, as opposed to harm caused to third
parties, which he said included thousands of innocent
investors.

Of course, Mr. Phillips made those arguments unburdened by
the actual facts and the prior proceedings which led to the
entry of these orders, because, as he was the first to admit,
he only became involved in the case a month ago.

As the Court recalls, and as reinforced by Mr. Seery's and
Mr. Dubel's testimony I just mentioned, the exculpation
provisions were included precisely to prevent Mr. Dondero,
through any one of the entities he's owned and controlled, the
Movants being two of those, from asserting baseless claims
against the beneficiaries of those orders, exactly the
situation Mr. Seery now finds himself in.

1    And, again, it bears emphasizing:  throughout this case,

2  not one of the purported public investors Mr. Phillips

3  lamented would be prevented from holding Mr. Seery responsible

4  for his conduct has ever appeared in this case to object about

5  anything.  And none of the directors of the funds, the funds

6  where the Debtor acts as an investment adviser, have ever

7  stepped foot in this court, either.

8    Even if the Court declines to apply res judicata, Your

9  Honor, to prevent challenges to the governance orders, the

10  Court has the jurisdiction, had the jurisdiction to include

11  the gatekeeping provisions in those orders.  The Bankruptcy

12  Court derives its jurisdiction from 28 U.S.C. Section 157, and

13  bankruptcy jurisdiction is divided into two parts:  core

14  matters, which are those arising in or arising under Title 11,

15  and noncore matters, those matters which are related to a

16  Chapter 11 case.

17    Bankruptcy Courts may enter final orders in core

18  proceedings, and with the consent of parties, noncore

19  proceedings.  If a party does not consent to a final judgment

20  in the noncore matters or waives its right to consent, then

21  the Bankruptcy Court -- or does not waive its right to

22  consent, then the Bankruptcy Court issues a report and

23  recommendation to the District Court.

24    The seminal Fifth Circuit case on bankruptcy court

25  jurisdiction is the 1987 case of *Wood v. Wood*, 825 F.2d 90.

1   There, the Fifth Circuit held that the Bankruptcy Court has

2   related to jurisdiction over matters if the outcome of that

3   proceeding could conceivably have any effect on the estate

4   being administered in the bankruptcy.

5       More recently, the Fifth Circuit, in the 2005 case, in

6   *Stonebridge Tech's*, elaborated on when a matter has a

7   conceivable effect on the estate such as to confer Bankruptcy

8   Court jurisdiction.  There, the Fifth Circuit held that an

9   action is related to bankruptcy if the outcome could alter the

10  debtor's rights, liabilities, options, or freedom of action,

11  either positively or negatively, and which in any way impacts

12  upon the handling and the administration of the bankruptcy

13  estate.  It is against this backdrop, Your Honor, that the

14  Court should evaluate its jurisdiction to have entered the

15  orders.

16      So, again, what did the orders do?  They established

17  governance over the Chapter 11 debtor with new independent

18  directors being approved.  They established the procedures and

19  protocols of how transactions were going to be presented to

20  and approved by the Committee.  They vested in the Committee

21  certain related-party claims, and they provided for the

22  procedures parties would have to follow to assert any claims

23  against the independent directors and the CRO and the agents

24  and advisors.

25      Your Honor, it's hard to imagine that there is a more core

1    order than the entry of these orders.  At the time the orders

2    were entered, the Court was well aware of the potential for

3    acrimony from Mr. Dondero and his related entities, and

4    included the gatekeeper provisions to prevent the Debtor's

5    estate from being embroiled in frivolous litigation against

6    the board and the CEO.

7         Such protections were clearly within the Court's

8    jurisdiction, both to protect the administration of the estate

9    but also under applicable Fifth Circuit law dealing with

10   vexatious litigants, as set forth in the *Baum* and *Carroll*

11   cases that the Court cited in its confirmation order.

12        Not that it was hard to predict, but the last several

13   months have reinforced how important the gatekeeping

14   provisions in the order are and how important similar

15   provisions in the plan are.

16        The Court heard extensive testimony at the confirmation

17   hearing regarding the havoc continued litigation by Mr.

18   Dondero and his related entities would cause, which

19   predictions have unfortunately been borne out by the

20   unprecedented blizzard of litigation involving Mr. Dondero and

21   his related entities that has consumed the Court over the last

22   several months and caused the estate to incur millions of

23   dollars in fees that could have been used to pay its

24   creditors.

25        And these attacks are continuing.  As I mentioned before,

1    in addition to the DAF lawsuit, Sbaiti & Co. filed an action

2    against the Debtor on behalf of PCMG, another related entity,

3    alleging postpetition mismanagement of the Select Fund.

4         And to complete the hat trick, they are the lawyers

5    seeking to sue Acis in the Southern District of New York for

6    allegedly post-confirmation matters.

7         The Court knew then and certainly knows now that the

8    potential for sizable indemnification claims could consume the

9    estate.  The Court used that as the potential basis for

10   determining that the orders were within its jurisdiction, just

11   as it used that potential to justify the exculpation

12   provisions in the plan as being consistent with *Pacific*

13   *Lumber*.

14        Movants also ignore the cases -- and we cited in our

15   opposition -- where courts in this district, including Judge

16   Lynn in *Pilgrim's Pride* in 2010 and Judge Houser in the *CHC*

17   *Group* in 2016, approved gatekeeper provisions that provided

18   the Bankruptcy Court with exclusive jurisdiction to adjudicate

19   claims against postpetition fiduciaries.

20        Movants also ignore cases outside this district, including

21   *General Motors* and *Madoff*, which we cited in our brief as

22   examples of cases where Bankruptcy Courts have been used as

23   gatekeepers to determine if claims are colorable or being

24   asserted against the correct entity.

25        And there's another reason, Your Honor, why Movants may

1  now not contest the Court's jurisdiction to have entered those

2  orders.  Each of those orders, as I said before, include a

3  finding that the Court had core jurisdiction to enter the

4  orders.  No party contested that finding or refused to consent

5  to the core jurisdiction.

6      Under well-established Supreme Court precedent, parties

7  can waive their right to challenge the Bankruptcy Court's

8  jurisdiction, core jurisdiction, by failing to object.  In

9  *Wellness v. Sharif* in 2015, the Supreme Court expressly held

10 that Article III was not violated if parties knowingly and

11 voluntarily consented to adjudication of *Stern v. Marshall*-

12 type alter ego claims, and that the consent need not be

13 express, so long as it was knowing and voluntary.

14     And *Wellness* confirmed the pre-*Stern* opinion of the Fifth

15 Circuit in the 1995 *McFarland* case, which held that a person

16 who fails to object to the Bankruptcy Court's assumption of

17 core jurisdiction is deemed to have consented to the entry of

18 a final order by the Bankruptcy Court.

19     Your Honor, I'd now like to turn to the *Barton* doctrine.

20 The Court also has jurisdiction to have entered the orders

21 based upon the *Barton* doctrine.  The *Barton* doctrine dates

22 back to an old United States Supreme Court case and provides

23 as a general rule that, before a suit may be brought against a

24 trustee, consent from the appointing court must be obtained.

25     Movants essentially make two arguments why the *Barton*

1   doctrine doesn't apply.

2        First, Movants, without citing any authority, argue that

3   it does not apply to Mr. Seery because he is not a trustee or

4   receiver and was not appointed by the Court.  Although the

5   doctrine was originally applied to receivers, it has been

6   extended over time to cover various court-appointed

7   fiduciaries and their agents in bankruptcy cases, including

8   debtors in possession, officers and directors of the debtor,

9   and the general partner of the debtor.  And although Mr.

10  Bridges says he couldn't find one case that applied the *Barton*

11  doctrine to a court-retained professional, I will now talk

12  about several such cases.

13       In *Helmer v. Pogue*, a 2012 case cited in our brief, the

14  District Court for the Northern District of Alabama

15  extensively analyzed the *Barton* doctrine jurisprudence from

16  the Eleventh Circuit and beyond and concluded that it applied

17  to debtors in possession.  The *Helmer* Court relied in part on

18  a prior 2000 decision of the Eleventh Circuit in *Carter v.*

19  *Rodgers*, which held that the doctrine applies to both court-

20  appointed and court-approved officers of the debtor, which is

21  consistent with the law in other circuits.

22       And subsequently, the Eleventh Circuit again considered --

23  and in that case, the distinction of a court-appointed as a

24  court-retained professional was -- was not persuasive to the

25  Court, and the Court held that a court-retained professional

1  can still have *Barton* protection, notwithstanding that he

2  wasn't appointed, the argument that Mr. Bridges tries to make.

3      And subsequently, --

4          THE COURT:  I wonder, was that -- was that Judge

5  Clifton Jessup, by chance?  Or maybe Bennett?

6          MR. POMERANTZ:  Your Honor, this was -- this was the

7  Eleventh Circuit *Carter v. Rodgers*, so I think Judge Jessup

8  was --

9          THE COURT:  Oh, I thought you were still talking

10 about the Alabama case.  No?

11         MR. POMERANTZ:  Yeah, the Alabama -- well, the

12 Alabama case referred to the Eleventh Circuit case, *Carter v.*

13 *Rodgers*, --

14         THE COURT:  Okay.

15         MR. POMERANTZ:  -- and the appointment and -- or

16 retention issue was discussed in the *Carter v. Rodgers* case.

17         THE COURT:  Okay.

18         MR. POMERANTZ:  And subsequently, the Eleventh

19 Circuit again considered the contours of the *Barton* doctrine

20 in *CDC Corp.*, a 2015 case, 2015 U.S. App. LEXIS 9718.  In that

21 case, which Your Honor referenced in your *Ondova* opinion,

22 which I will discuss in a few moments, the Eleventh Circuit

23 held that a debtor's general counsel who had been approved by

24 the Court, who was appointed by a chief restructuring officer

25 who was also approved by the Court, was covered by the *Barton*

1    doctrine for acts taken in furtherance of the administration

2    of the estate and the liquidation of the assets.

3        And the Eleventh Circuit last year, in *Tufts v. Hay*, 977

4    F.3d 204, reaffirmed that court-approved counsel who function

5    as the equivalent of court-appointed officers are entitled to

6    protection under *Barton*.  While the Court in that case

7    ultimately ruled that counsel could be sued without first

8    going to the Bankruptcy Court, it did so because it determined

9    that the suit between two sets of lawyers would not have any

10    effect on the administration of the estate.

11        So, Your Honor, not only is there authority, there is

12    overwhelming authority that Mr. Seery is entitled to the

13    protections.

14        In *Gordon v. Nick*, a District -- a case from 1998 from the

15    Fourth Circuit, the Court that the *Barton* doctrine applied to

16    a lawsuit against a general partner who was responsible for

17    administering the bankruptcy estate.

18        And as I mentioned, Your Honor, and as Your Honor

19    mentioned, Your Honor had reason to look at the *Barton*

20    doctrine in length and in depth in the 2017 *Ondova* opinion.

21    And in the course of the opinion, Your Honor discussed one of

22    the policy rationales for the doctrine, which you took from

23    the Seventh Circuit's *Linton* opinion, and you said as follows:

24    "Finally, another policy concern underlying the doctrine is a

25    concern for the overall integrity of the bankruptcy process

1  and the threat of trustees being distracted from or

2  intimidated from doing their jobs.  For example, losers in the

3  bankruptcy process might turn to other courts to try to become

4  winners there by alleging the trustee did a negligent job."

5      Here, the independent board was approved by the Court as

6  an alternative to the appointment of a Chapter 11 trustee.

7  And it and its agent, including Mr. Seery as the CEO, even

8  before the July 16th order, were provided protections in the

9  form of the gatekeeper order and exculpation.

10      I'm sure the Court has a good recollection of the January

11  9th hearing -- we've talked about it a lot in the proceedings

12  before Your Honor -- where the Debtor and the Committee

13  presented the governance resolution to Your Honor.  And as

14  Your Honor will recall, the appointment of the board was a

15  hotly-contested issue among the Debtor and the Committee and

16  was heavily negotiated.  And the appointment of the

17  independent board was even contested by the United States

18  Trustee at a hearing on January 20th, 2020.

19      I refer the Court to the transcripts of the hearings on

20  January 9th and January 20th of 2020, which clearly

21  demonstrate that appointing this board and giving it the

22  rights and protections and its agents the rights and

23  protections was not your typical corporate governance issue,

24  but it was essentially the Court's alternative to appointing a

25  trustee.  And recognizing that the members of the independent

1  board were essentially officers of the Court, the Court

2  approved the gatekeeper provision, requiring parties first to

3  come and seek the Court's permission before suing them, in

4  order to prevent them from being harassed by frivolous

5  litigation.

6      And the independent board was given the responsibility in

7  the January 9th order to retain a CEO it deemed appropriate,

8  and it did so by retaining Mr. Seery.

9      Recognizing the *Barton* doctrine as it applies to Mr. Seery

10  is consistent with a legion of cases throughout the United

11  States, and Movants' argument that Mr. Seery is not court-

12  appointed is just wrong.

13      Second, Your Honor, Movants cite without any authority,

14  argue that even if the *Barton* doctrine applied there is an

15  exception which would allow it to pursue a claim against Mr.

16  Seery without leave of the Court.

17      The Debtor agrees the 28 U.S.C. § 959 is an exception to

18  the *Barton* doctrine.  Section 959(a) provides that trustees,

19  receivers, or managers of any property, including debtors in

20  possession, may be sued without leave of the court appointing

21  them with respect to any of their acts or transactions in

22  carrying on business connected with such property.

23      As the Court also pointed out at the June 8th hearing, and

24  Mr. Bridges alluded to in his argument, the last sentence of

25  959(a) provides that such actions -- clearly referring to

1   actions that may be pursued without leave of the appointing

2   court -- shall be subject to the general equity power of such

3   court, so far as the same may be necessary to the ends of

4   justice.

5       And Mr. Bridges made a plea, saying you can't take away my

6   jury trial right there.  You just cannot do that.  Well, I

7   have two answers to that, Your Honor.  One, they relinquished

8   their jury trial right.  We've established that.  Okay?

9       The second is allowing Your Honor to act as a gatekeeper

10   has nothing to do with their jury trial right.  Allowing Your

11   Honor to act as a gatekeeper allows you to determine whether

12   the action could go forward, and it'll either go forward in

13   Your Honor's court or some other court.

14       And the argument that the exculpation was essentially a

15   violation of 959 is just -- is just -- it just is twisting

16   what happened.  You have an exculpation provision.  We already

17   went through the authority the Court had to give an

18   exculpation.  With respect to these litigants who are before

19   Your Honor -- we're not talking about anyone else who's coming

20   in to try to get relief from the order; we're talking about

21   these litigants -- we've already established that they were

22   here, they're bound by res judicata.  So their 959 argument

23   goes away.

24       And as the Court -- and separate and apart from that, the

25   issue at issue in the District Court litigation is -- is not

1   even subject to 959.

2        Mr. Bridges says, well, of course it is because it deals

3   with the administration of the estate.  I'd like to refer to

4   what the Court said -- this Court said in its *Ondova* opinion:

5   The exception generally applies to situations in which the

6   trustee is operating a business and some stranger to the

7   bankruptcy process might be harmed, such as a negligence claim

8   in a slip-and-fall case, and is inapplicable to suits based

9   upon actions taken to further the administering or liquidating

10  the bankruptcy estate.

11       And your *Ondova* opinion is consistent with the Third and

12  Eleventh Circuit opinions Your Honor cited in your opinion, as

13  well as numerous other --

14       (Interruption.)

15            MR. POMERANTZ:  -- from the -- from around the

16  country, including cases from the First, Second, Sixth,

17  Seventh, and Ninth Circuits.  And I'm not going to give all

18  the cites to those cases, but it's not a -- it's not a

19  remarkable proposition that Your Honor relied on in *Ondova*.

20       In addition, several of these cases, including the

21  Eleventh Circuit's *Carter* opinion, have been cited with

22  approval by the Fifth Circuit in *National Business Association*

23  *v. Lightfoot*, a 2008 unpublished opinion for this very point.

24  The *Barton* exception of 959 does not apply to actions taken in

25  the administration of the case and the liquidation of assets

1    in the estate.

2        Suffice it to say that it's clear that the Section 959

3    exception to *Barton* has no applicability in this case.

4    Movants, hardly strangers to the bankruptcy case, want to sue

5    Mr. Seery for acts taken relating to a settlement of very

6    complex and significant claims against the estate.  They want

7    to sue a court-appointed fiduciary for doing his job,

8    resolving claims against the estate and his management of the

9    bankruptcy estate.  And they want to do this outside of the

10   Bankruptcy Court.

11       Settlement of the HarbourVest claim, which is where this

12   claim arises under -- whether it's a collateral attack now or

13   not, and we say it is, is for another issue -- but it clearly

14   arises in the context of settlement of the HarbourVest claim,

15   is the quintessential act to further the administration and

16   liquidation of the bankruptcy estate, and certainly doesn't

17   fall within the 959 exception.

18       Movants seem to be arguing that 959(a) makes a distinction

19   between claims against Mr. Seery that damaged the Debtor and

20   claims against Mr. Seery that damaged third parties.  However,

21   the Movants make up that distinction, and it's not in the

22   statute, it's not in the case law.  The focus is not on who

23   the conduct damages, but it's rather on whether the conduct

24   was taken in connection with the administration or the

25   liquidation of the estate.

1   And even if the Debtor is wrong, Your Honor, which it's

2   not, the savings clause allows the Court to determine whether

3   leave to be -- sue will be granted.  Given that these claims

4   are asserted by Dondero-related entities, if not controlled

5   entities, no serious argument exists that the equities do not

6   permit this Court to determine if leave to sue is appropriate.

7   Accordingly, Movants' argument that the orders create this

8   tension with 959 is simply an over-dramatization.  And in any

9   event, Your Honor, there's a basis independent of *Barton* that

10  supports the jurisdiction to enter the orders, as I mentioned.

11  But even if the orders only relied on *Barton*, there is an

12  easy fix to Movants' concerns:  let them come to court and

13  argue that the type of suit they are bringing allegedly falls

14  within the exception of 959.

15  Your Honor, Movants argue that the Bankruptcy Court may

16  not act as a gatekeeper if it would not have jurisdiction to

17  deal with the underlying action.  They essentially argue that

18  an Article I judge may not pass on the colorability of a

19  claim, that it should be decided by an Article III judge.

20  This is the same argument, Your Honor, that Your Honor

21  rejected in connection with plan confirmation and which I

22  touched on earlier.

23  And the reason why Your Honor rejected it is because

24  there's no law to support it.  In fact, there is Fifth Circuit

25  law that holds to the contrary.  And we talked about a little

1    bit the Fifth Circuit case decided is *Villegas v. Schmidt* in

2    2015.  And *Villegas* is a simple case.  Schmidt was appointed

3    trustee over a debtor and liquidated its estate and the

4    Bankruptcy Court approved his final fees.  Four years later,

5    Villegas and the prior debtor sued Schmidt in District Court,

6    the district in which the Bankruptcy Court was pending,

7    arguing that he was negligent in the performance of his

8    duties.  The District Court dismissed the case because

9    Villegas failed to obtain Bankruptcy Court approval to bring

10   the suit under the *Barton* doctrine.

11       On appeal, Villegas argued *Barton* didn't apply for two

12   reasons.  First, that *Stern v. Marshall* created an exception

13   to the *Barton* doctrine for claims that the Bankruptcy Court

14   would not have the jurisdiction to adjudicate.  And second,

15   that *Barton* did not apply if the suit is brought in the

16   District Court, which exercises supervisory authority over the

17   Bankruptcy Court that appointed the trustee.  Pretty much the

18   argument that was made by Movants at the contempt hearing.

19       The Fifth Circuit rejected both arguments.  It held that

20   the existence of a *Stern* claim does not impact the Bankruptcy

21   Court's authority because *Stern* did not overrule *Barton* and

22   the Supreme Court had cautioned circuit courts against

23   interpreting later cases as impliedly overruling prior cases.

24       More importantly, the Fifth Circuit pointed to a post-

25   *Stern* 2014 case, *Executive Benefits v. Arkison*, 573 U.S. 25

1   (2014), which held that *Stern* does not decide how a Bankruptcy

2   Court or District Courts should proceed when a *Stern* creditor

3   is identified, as support for the argument that *Barton* is

4   still good law, even dealing with a *Stern* claim.

5       Second, the Fifth Circuit, joining every circuit to have

6   addressed the issue, ruled that the District Court and the

7   Bankruptcy Court are distinct from one another and the

8   Bankruptcy Court has the exclusive authority to determine the

9   colorability of *Barton* claims and that the supervisory

10   District Court does not.

11       Movants didn't address *Villegas* in their reply.  Briefly

12   tried to distinguish it, unconvincingly, today.  The bottom

13   line is *Villegas* is directly applicable.  Your Honor cited it

14   in the *Ondova* opinion for precisely the proposition that

15   *Barton* applies whether or not the Court has authority to

16   adjudicate the claim.

17       Accordingly, Your Honor, it was within the Court's

18   jurisdiction to require a party to seek approval of Your Honor

19   on the colorability of a claim before an action may be

20   commenced or pursued against the protected parties, even if

21   Your Honor wouldn't have authority to adjudicate the claim at

22   the end of the day.

23       In fact, some courts have even addressed the proper

24   procedure for doing so, requiring the putative plaintiff to

25   not only seek leave of Bankruptcy Court but also to provide a

1    draft complaint and a basis for the Court to determine if the

2    claim is colorable.

3         Movants have done neither, and they should not be

4    permitted to modify the final orders of the Court as a

5    workaround.

6         Your Honor, that concludes my presentation.  I'm happy to

7    answer any questions Your Honor may have.

8              THE COURT:  All right.  Not at this time.  All right.

9    I'm going to figure out, do we need a break or not, depending

10   on what Mr. Bridges tells me.  I assume we're just doing this

11   on argument today.  I think that's what I heard.  No witnesses

12   or exhibits.

13             MR. BRIDGES:  That is correct, Your Honor.

14             THE COURT:  Okay.  Mr. Bridges, how long do you

15   expect your rebuttal to take so I can figure out does the

16   Court need a break?

17             MR. BRIDGES:  Fifteen minutes plus whatever it takes

18   to submit agreed-to exhibits.

19             THE COURT:  Okay.  Let's take a five-minute bathroom

20   break.  We'll come back.  It's -- what time is it?  It's 1:11

21   Central time.  We'll come back in five minutes.

22             THE CLERK:  All rise.

23        (A recess ensued from 1:11 p.m. until 1:17 p.m.)

24             THE CLERK:  All rise.

25             THE COURT:  All right.  Please be seated.  We're

1    going back on the record in the Highland matters.

2         Mr. Bridges, time for your rebuttal.  I want to ask you a

3    question right off the bat.  Mr. Pomerantz pointed out

4    something that was on my list that I forgot to ask you when

5    you made your initial presentation.  What is the authority

6    you're relying on?  You did not cite a statute or a rule *per*

7    *se*, but I guess we can probably all agree that Bankruptcy Rule

8    9024 and Federal Rule 60 is the authority that would govern

9    your motion, correct?

10        MR. BRIDGES:  I don't agree, Your Honor.  I don't

11   believe this is a final order that we're contesting here.  And

12   I think that's demonstrated by the Court's final confirmation

13   -- plan -- plan confirmation order that seeks to modify this

14   order or will modify this order upon being -- being effective.

15   So I don't think so.

16        In the alternative, if we are challenging a final order,

17   then I think you're right as to the rules that would be

18   controlling.

19        THE COURT:  All right.  Well, let me back up.  Why

20   exactly do you say this would be an interlocutory order as

21   opposed to a final order?

22        MR. BRIDGES:  Because of its nature, Your Honor.

23   While the appointment in the order or the approval of the

24   appointment in the order might, as a separate component of the

25   order, have -- have finality, the provisions -- the provisions

1    in it relating to gatekeeping and exculpation are, we think,

2    by their very nature, quite obviously interlocutory and not

3    permanent.  They don't seem to indicate an intention by any of

4    the parties that, 30 years from now, if Mr. Seery is still CEO

5    at Highland, long after the bankruptcy case has ended, that

6    nonetheless parties would be prohibited from bringing claims,

7    strangers to this action would be prohibited from bringing

8    claims related to his CEO role.

9         I think the nature of it demonstrates that, the

10   modifications to it, and even the inclusion of it in the final

11   plan confirmation, as well as -- can't read that.

12             THE COURT:  Can you give me some authority?  Because

13   as we know, there's a lot of authority out there in the

14   bankruptcy universe on what discrete orders are interlocutory

15   in nature that a bankruptcy judge might routinely enter and

16   which ones are final.  You know, it would just probably, if I

17   flipped open *Collier's*, I could -- you know, it would be mind-

18   numbing.

19        So what authority can you rely on?  I mean, is there any

20   authority that says an employment order is not a final order?

21   That would be shocking to me if you have cases to that effect,

22   but, I mean, of course, sometimes we do interim on short

23   notice and then final.  But this would be shocking to me if

24   there is case authority to support the argument this is not a

25   final order.  But I learn something new every day, so maybe I

1   would be shocked and there is.

2         MR. BRIDGES:  Your Honor, I'd point you to *In re*

3   *Smyth*, 207 F.3d 758, and *In re Royal Manor*, 525 B.K. 338

4   [sic], for the proposition that retaining a bankruptcy

5   professional is an interlocutory order.

6         THE COURT:  Okay.  Stop for a moment.  The *Smyth*

7   case.  Which court is that?

8         MR. BRIDGES:  Fifth Circuit.

9         THE COURT:  Okay.  So tell me the facts.  I'm

10  surprised I don't know about this case.  But, again, I don't

11  know every case.  So, it held that an employment order is an

12  interlocutory order?

13        MR. BRIDGES:  Appointing counsel.  A professional in

14  the bankruptcy context, Your Honor.

15        THE COURT:  Counsel for a debtor-in-possession?  An

16  order approving counsel was an interlocutory order?

17        MR. BRIDGES:  Yes, or the Trustee's counsel.

18        THE COURT:  Or the Trustee's counsel?  Okay.  What

19  were the circumstances?  Was this on an expedited basis and

20  there wasn't a follow-up final order, or what?

21        MR. BRIDGES:  Your Honor, I don't have -- I don't

22  have that at the tip of my memory.  I'm sorry.

23        THE COURT:  Okay.  And the other one, 525 B.R. 338,

24  what court was that?

25        MR. BRIDGES:  It's a Bankruptcy Court within the

1    Sixth Circuit.  I'm not certain which district.

2            THE COURT:  All right.  Well, maybe one of you two

3    over there can look them up and give me the context, because

4    that is surprising authority.  Or other lawyers on the WebEx

5    maybe can do some quickie research.

6       Okay.  We'll come back to that.  But assuming that this

7    was a final order, which I have just been presuming it was,

8    Rule 60 is the authority you're going under?  9024 and Rule

9    60, correct?

10           MR. BRIDGES:  Your Honor, we have not invoked those

11   rules.  Alternatively, I think you're right that they would

12   control if we are wrong about the interlocutory nature of the

13   order.

14           THE COURT:  Well, you have to be going under certain

15   -- some kind of authority when you file a motion.  So I'm --

16           MR. BRIDGES:  As an alternative --

17           THE COURT:  I'm approaching this exactly, I assure

18   you, as the District Court or a Court of Appeals would.  You

19   know, you start out, what is the legal authority that is being

20   invoked here?

21           MR. BRIDGES:  Well, --

22           THE COURT:  So I just assume Rule 60.  I can't, you

23   know, come up with anything else that would be the authority.

24           MR. BRIDGES:  Yes, Your Honor.  You also have

25   inherent power to modify orders that are in violation of the

1    law.  And we pointed you to --

2            THE COURT:  Now, is that right?  Is that really

3    right?  Why do we have Rule 60 if I can just willy-nilly, oh,

4    I feel like I got that wrong two years ago?  I can't do that,

5    can I?  Rule 60 is the template for when a court can do that.

6    Parties are entitled to rely on orders of courts.  And that's

7    why we have Rule 60, right?  So, --

8            MR. BRIDGES:  Your Honor, I think -- I think that

9    we're miscommunicating.  I'm trying not to rely on Rule 60 in

10   the first instance because in the first instance we view this

11   as not a final order.  So, in the first instance, --

12           THE COURT:  I got that.  And I've got my law clerks

13   looking up your cases to see if they convince me.  But I'm

14   asking you to go to layer two.  Assuming I don't agree with

15   you these are final orders, what is your authority for the

16   relief you're seeking?

17           MR. BRIDGES:  Yes, Your Honor.  Rule 60 would apply

18   in the alternative.

19           THE COURT:  All right.

20           MR. BRIDGES:  That's correct.

21           THE COURT:  So, which provision?  Which provision of

22   Rule 60?  (b) what?

23           MR. BRIDGES:  Your Honor, I'm not prepared to concede

24   any of them.  I don't have the rule in front of me.

25           THE COURT:  You're not prepared to concede what?

1          MR. BRIDGES:  Any of the provisions of Rule 60.  Just

2    (b)(1), (b)(2), especially, but I'm -- I'm -- Rule 60 is our

3    basis, as is the particulars (b)(1), (2), (6) --

4         (Garbled audio.)

5          THE COURT:  Okay.  You're breaking up.  Can you

6    restate?

7          MR. BRIDGES:  (b)(1), (2), and (6), as -- as well as

8    any other provision, Your Honor, of Rule 60.

9          THE COURT:  Okay.  Well, so (1), mistake,

10   inadvertence, surprise, excusable neglect.  Which one of

11   those?

12         MR. BRIDGES:  All of the above, Your Honor.

13         THE COURT:  Surprise?  Who's surprised?

14         MR. BRIDGES:  Your Honor, I think every potential

15   litigant who discovers that your order purports to bar

16   prospective unaccrued claims at the time the order issued

17   would be surprised.

18      Frankly, I think Mr. Seery would be surprised, given his

19   testimony that he owes fiduciary duty -- duties that he must

20   abide by and that he appears to have, as I continue to

21   represent to clients, to advisees, and to the SEC, that those

22   duties are owing.

23         THE COURT:  Okay.  I'm giving you one more chance

24   here to make clear on the record what provision of Rule 60(b)

25   are you relying on, okay?  I need to know.  It's not in your

1    pleading.

2           MR. BRIDGES:  Your Honor, --

3           THE COURT:  So tell me specifically.  I can only --

4           MR. BRIDGES:  -- (b)(1) --

5           THE COURT:  -- come up with a result here if I know

6    exactly what's being presented.

7           MR. BRIDGES:  Your Honor, (b)(1), (b)(2), and (b)(6)

8    --

9           THE COURT:  Which, okay, there are multiple parts to

10   (1).  You're saying somebody's surprised by the ruling.  I

11   don't know who.  Really, all that matters is your client, the

12   Movants.  You're saying, even though they participated, --

13          MR. BRIDGES:  Yes, Your Honor.

14          THE COURT:  -- got notice, they're somehow surprised?

15   Why are they surprised?

16          MR. BRIDGES:  Yes, Your Honor.

17          THE COURT:  Do you have evidence of their surprise?

18          MR. BRIDGES:  Your Honor, our brief shows the

19   intentions of all involved were not the interpretation of that

20   order being advanced at this -- at this point in time.  And

21   so, yes, I believe that is evidence.  The transcripts of the

22   hearings I believe evidence that as well, that the

23   understanding of everyone involved was not that future --

24   unspecified future claims that had not accrued yet would be

25   released under (b)(1).  Yes, Your Honor.

1          THE COURT:  Okay.

2          MR. BRIDGES:  Under (b)(2), --

3          THE COURT:  I don't have any evidence of that.  All I

4    have is the clear wording of the order.  Okay.  Let me just --

5    just let me go through this.

6        Assuming Rule 60 (1) through (6) are what you're arguing

7    here, what about Rule 60(c):  a motion under Rule 60(b) must

8    be made within a reasonable time?  We're now 11 months --

9          MR. BRIDGES:  Your Honor, --

10          THE COURT:  We're now 11 months past the July 2020

11   order.  What is your authority for this being a reasonable

12   time?

13          MR. BRIDGES:  Yes, Your Honor.  If I may back up one

14   step before answering your question.  Under (b)(2), we're

15   relying on newly-discovered evidence that was discovered in

16   late March and caused both the filing of this motion and the

17   filing of the District Court action.

18        Under (b)(4), we believe that the order is --

19          THE COURT:  Let me stop.  Let me stop.  What is my

20   evidence that you're putting in the record that's newly

21   discovered?

22          MR. BRIDGES:  The evidence is detailed in the

23   complaint that is in the record.  You know, --

24          THE COURT:  That's not evidence.

25          MR. BRIDGES:  -- honestly, Your Honor, --

1          THE COURT:  That is not evidence.  Okay?  A lawyer-

2    drafted complaint in another court is not evidence.  Okay?

3          MR. BRIDGES:  Your Honor, I think, to be technical,

4    that there is not a record yet, that we have evidence yet to

5    be admitted on our exhibit list.  I believe in this

6    circumstance -- I understand that, in general, allegations in

7    a pleading are not evidence.  In this instance, when we're

8    talking about whether or not new facts led to the filing of a

9    lawsuit, I do believe that the allegations in the lawsuit are

10   evidence of those new facts.

11         THE COURT:  All right.  Go on.

12         MR. BRIDGES:  Under (b)(4), we believe the order is,

13   in part, void.  It is void because of the jurisdictional and

14   other defects noted in our argument.

15    And also, under (b)(6) (garbled) ground for relief that

16   we're appealing to the equitable powers of this Court to

17   correct errors and manifest injustice towards not just the

18   litigants here but to correct the order of the Court to make

19   it comply with -- with the law, with the statutes promulgated

20   by Congress and to respect the jurisdiction of the District

21   Court.

22         THE COURT:  All right.  Do you agree with Mr.

23   Pomerantz that the case law standard for Rule 60(b)(4) is

24   exceptional circumstances?  It's only applied so that a

25   judgment is voided in exceptional circumstances.  Do you

1  disagree with that case authority?

2      MR. BRIDGES:  I would -- I would agree, in part, that

3  unusual circumstances is not the ordinary case.  I'm not

4  entirely sure what you mean by exceptional, but I think we're

5  on the same page.

6      THE COURT:  Okay.  It's not what I mean.  That's just

7  the case law standard.  And I'm asking, do you agree with Mr.

8  Pomerantz that that is the standard set forth in case law when

9  applying 60(b)(4)?  There have to be some sort of exceptional

10  circumstances where there's just basically no chance the Court

11  had authority to do what it did.

12      MR. BRIDGES:  Out of the ordinary would be the phrase

13  I would use, Your Honor.

14      THE COURT:  Okay.  So I guess then I'll go from

15  there.  Is it your argument that gatekeeping provisions in the

16  bankruptcy world are out of the ordinary?

17      MR. BRIDGES:  The exculpation of Mr. Seery for

18  liability falling short of gross negligence or intentional

19  wrongdoing in connection with his continuing to conduct the

20  business of the Debtor as an investment advisor subject to the

21  Advisers Act, yes, I would say that is out of the ordinary,

22  that it is extraordinary, that it is --

23      THE COURT:  Okay.  What is your authority or evidence

24  on that?  Because this Court approves exculpation provisions

25  regularly in connection with employment orders, and pretty

 1   much every judge I know does.  In fact, I'm wondering why this

 2   isn't just a term of compensation.  You know, he's going to do

 3   x, y, z in the case.  His compensation is going to be a, b, c,

 4   d, e.  And by the way, we're going to set a standard of

 5   liability for his performance as CEO or investment banker,

 6   financial advisor, whatever, so that no one can sue him

 7   regarding his performance of his job duties unless it rises to

 8   the level of gross negligence, willful misconduct.

 9        It's a term of employment that, from my vantage point,

10   seems to be employed all the time.  So it would be anything

11   but exceptional circumstances.  Do you have authority or

12   evidence --

13           MR. BRIDGES:  Your Honor, frankly, --

14           THE COURT:  -- to the contrary?

15           MR. BRIDGES:  Your Honor, frankly, I'm astonished at

16   your view of that situation, that it would merely be a term of

17   his employment, that vitiates the entire fiduciary duty

18   standard created by the Advisers Act that tells him, with

19   hundreds of millions of dollars of assets under management for

20   people he's advising as a registered investment advisor,

21   people he's advising who believe that he has a fiduciary duty

22   to them and that it's enforceable, that the SEC, who monitors,

23   believes he has an enforceable fiduciary duty to those people,

24   and that he's testified that he has fiduciary duties to those

25   people, and that Your Honor is saying no, just as a regular

1   term of employment we have undone the Advisers Act's

2   imposition of an unwaivable fiduciary duty.

3        Your Honor, the order is void to the extent that it

4   attempts to do so.

5        This is not an ordinary employment agreement, Your Honor.

6   This is an attempt to exculpate someone from the key thing

7   that our entire investment system depends upon, regulation by

8   the SEC and the requirement in investment advisors to act as

9   fiduciaries when they manage the money of another.

10       It would be the equivalent of telling lawyers who are

11  appointed in a bankruptcy proceeding that they don't have any

12  duties to their client, or at least not fiduciary duties.

13  That the lawyers merely owe a duty not to be grossly negligent

14  to their clients.  That's not an ordinary term of employment,

15  Your Honor.

16            THE COURT:  All right.  So I guess we're back to my

17  question, was this brought within a reasonable time under Rule

18  60(c)?

19            MR. BRIDGES:  It was brought very quickly after the

20  new evidence was discovered at the end of March, Your Honor,

21  yes.

22            THE COURT:  Okay.  Well, I guess I'll just ask you

23  one more question before you continue on with your rebuttal

24  argument.  I mean, again, I want your best argument of why

25  *Villegas* doesn't absolutely permit the gatekeeping provisions

1  that you're challenging.  And many cases were cited by Mr.

2  Pomerantz in his brief where courts have extended the *Barton*

3  doctrine to persons other than trustees.  And so what is your

4  best rebuttal to that?

5         MR. BRIDGES:  Your Honor, we've already given it.

6  I'm afraid --

7         THE COURT:  Okay.  If you don't want to say more, --

8         MR. BRIDGES:  -- what I have is not --

9         THE COURT:  -- I'm not going to make you say more.

10        MR. BRIDGES:  I --

11        THE COURT:  I'm just telling you what's on my brain.

12        MR. BRIDGES:  I do.  I want to -- I am apologizing in

13 advance for repeating, but yes, *Villegas*, *Villegas*, however

14 that case is pronounced, says that *Stern* is not an exception

15 to the *Barton* doctrine.

16        THE COURT:  Uh-huh.

17        MR. BRIDGES:  959(a) is an exception to the *Barton*

18 doctrine.  You are not operating under the *Barton* doctrine

19 here.  Even counsel's brief, the Debtor's brief, doesn't say

20 *Barton* applies.  It says it's consistent with *Barton*.

21     Your Honor, in our previous hearing, you directed me to

22 the second sentence of 959(a) because you believe it's what

23 empowers you to do the gatekeeping.  It limits the gatekeeping

24 that you can do by protecting jury rights, the right to trial,

25 says you cannot discharge, undo, deprive a litigant of their

1   right to a trial, a jury trial.

2           THE COURT:  Well, you mentioned it again, jury trial

3   rights.  Do you have any argument --

4           MR. BRIDGES:  Yes, Your Honor.

5           THE COURT:  -- of why that hasn't flown out the

6   window?

7           MR. BRIDGES:  Yes, Your Honor.  I am told that

8   Section 14(f) that counsel for the Debtor referred to is not a

9   waiver of jury rights at all.  It is an arbitration agreement.

10  Your Honor is probably familiar how arbitration agreements

11  work, is that they need not be elected.  They need not be

12  invoked by the parties.  When they are, they create a

13  situation where arbitration may be required.  But a waiver of

14  a jury right outside of arbitration is not part of this

15  arbitration clause, or of any.  The issue is not briefed or in

16  evidence before the Court.  We're relying on representations

17  of counsel as to what that provision contains.  That Mr. Seery

18  wasn't even a party to that agreement, the advisory agreement,

19  with the Charitable DAF.  The arbitration agreement is subject

20  to defenses that are not at issue here before the Court.  That

21  Movants' rights, their contractual rights to invoke the

22  arbitration clause, also appear to be terminated by the

23  orders' assertion of sole jurisdiction in this matter.

24      Your Honor, yes, our jury rights survive Section 14(f) in

25  the advisory agreement with the DAF for all of those potential

 1  reasons.

 2      On top of that, it doesn't go to all of our causes of

 3  action.  It goes to the contract cause of action.  And to the

 4  extent they can argue that the other claims are subject to

 5  arbitration, that also is a defense and -- defensible and

 6  complex issue requiring the application of the Federal

 7  Arbitration Act, requiring consideration of the Federal

 8  Arbitration Act, which this Court doesn't have jurisdiction to

 9  do under 157(d).

10           THE COURT:  What?  Repeat that.

11           MR. BRIDGES:  Yes.  This Court does not have

12  jurisdiction to determine whether or not arbitration --

13  arbitration is enforceable due to the mandatory withdrawal of

14  the reference provisions of 157(d).

15           THE COURT:  That's just not consistent with Fifth

16  Circuit authority.  *National Gypsum*.  What are some of these

17  other arbitration cases?  I've written an article on it.  I

18  can't remember them.  That's just not right.  Bankruptcy

19  courts look at arbitration clauses all the time.  Motions to

20  compel arbitration.

21           MR. BRIDGES:  Your Honor, under 157(d), in the

22  circumstances of this case, if the Court is going to take into

23  consideration an arbitration clause under the Federal

24  Arbitration Act, when that clause is not in evidence and is

25  not before the Court, then Movants respectfully move to

 1   withdraw the reference of your consideration of that issue and

 2   of any proceeding and ask that you would issue only a report

 3   and recommendation rather than an order on that issue.

 4           THE COURT:  Okay.  I regret that we even got off on

 5   this trail.  I'm sorry.  So just proceed with your rebuttal

 6   argument as you had envisioned it, Mr. Bridges.

 7           MR. BRIDGES:  Thank you, Your Honor.

 8       Debtor's counsel says there's no private right of action

 9   under the Advisers Act.  That is both inaccurate and

10   misleading.  The Advisory Act creates, imposes fiduciary

11   duties that state law provides the cause of action for.  It is

12   a state law breach of fiduciary duty claim regarding --

13   regarding fiduciary duties imposed as a matter of law by the

14   Investment Advisers Act that is Count One in the District

15   Court action.

16       Furthermore, that Act does create a private right of

17   action for rescission.  That would be rescission of the

18   advisory agreement with the Charitable DAF, not rescission of

19   the HarbourVest settlement.

20       Second, Your Honor, the notion that this Court has related

21   to jurisdiction is irrelevant and beside the point.  I would

22   like to note for the record that the District Court civil

23   cover sheet that omitted to state that this was a related

24   action has been corrected, has been amended, and that that has

25   taken place.

 1          Counsel for the Debtor also appears to agree with us that

 2     the order ought to be modified for having asserted exclusive

 3     jurisdiction over colorable claims to the extent it's not

 4     legally permissible to do.  And in trying to invoke the

 5     discussions between us as to how the orders might be fixed,

 6     what counsel does is tries to cabin the legally-permissible

 7     caveat to just the second half of the paragraph at issue.  It

 8     is both -- both portions, the gatekeeping and the subsequent

 9     hearing of the claims, that should be limited to the extent it

10     would be impermissible legally for this Court to make those

11     decisions.

12          On top of that, Your Honor, merely stating "to the extent

13     legally permissible" would result in a considerable amount of

14     ambiguity in the order that would lead it, I fear, to be

15     unenforceable as a matter of law.

16          Next, Your Honor, when Debtor's counsel talks about the

17     authority in this case, it feels like we're ships passing in

18     the night.  He says that we're wrong in asserting that no case

19     we can find involves both the *Barton* doctrine and the

20     application of the business judgment rule where the Court is

21     asked to defer, and he mentions cases that apply the *Barton*

22     doctrine to an approval rather than an appointment.  The Court

23     is asked to --

24          (Garbled audio.)

25              THE COURT:  I lost you for a moment.  Could you

1   repeat the last 30 seconds?

2          MR. BRIDGES:  Thank you, Your Honor.  Yes.  He points

3   -- opposing counsel points us to case law where the *Barton*

4   doctrine has been applied despite the Bankruptcy Court having

5   merely approved rather than appointed the trustee or the, I'm

6   sorry, the professional.  But in doing so, he doesn't

7   reference any case that has done so in the context of business

8   judgment rule deference.  It's like we're ships passing in the

9   night.

10      What we're saying isn't that a mere approval can never

11  rise to the level of the *Barton* doctrine.  What we're saying

12  is that, in combination with the business judgment rule

13  deference, the two cannot go together.  There's no authority

14  for saying that they do.

15      We -- I further feel like we're ships passing in the night

16  when he talks about *Shoaf*.  Counsel says that in *Shoaf* there

17  was a confirmed final plan and it specifically identified the

18  released guaranty.  And yeah, that distinguishes it from this

19  case, just as it distinguished -- just as the *Applewood Chair*

20  case distinguished it when there's not that specific

21  identification.  And here, we don't even have a final plan

22  confirmation at the time these orders are being issued.

23  Without that express -- express notion of what the claims are

24  being discharged, *Shoaf* doesn't apply.

25      There, there was a guaranty to a party on a specific

1    indebtedness that was listed, identified with specificity, and

2    disappeared as a result of the judgment, as a result of the

3    judgment in the underlying case.  Here, we're talking about

4    any potential claim that might arise in the future.  As of the

5    July order's issuance, it didn't apply on its -- either it

6    didn't apply to future claims that had not yet accrued or else

7    in violation of *Applewood Chair*, it was releasing claims

8    without identifying them.

9        Who does Seery owe a fiduciary duty to?  Is it, as

10   Debtor's counsel says, only to the funds and not to the

11   investors, or does he also owe those duties to the investors

12   as well?  Your Honor, that is going to be a hotly-contested

13   issue in this litigation, and it involves -- it requires

14   consideration of the Advisers Act and the multitude of

15   accompanying regulations.  To just state that his fiduciary

16   duties are limited in a way that couldn't affect anyone that

17   is -- whose claims are precluded by the July order is both

18   wrong on the law and is invoking something that will be a

19   hotly-contested issue that falls under 157(d), where, again,

20   this Court doesn't have the jurisdiction to decide that, other

21   than in a report and recommendation.

22       The order is legally infirm because it's issued without

23   jurisdiction for doing that as well.

24       Finally, Your Honor, I think (garbled) wrong direction

25   with a statement that suggests that Mr. Seery is an agent of

1   the independent directors under the January order.  He is, in

2   fact, not an independent agent -- not an agent of any of the

3   independent directors, but, at most, of the company that is

4   controlled by the board, not -- not of individual directors

5   who could confer on him -- who could confer on him any

6   immunity that they have obtained from the January order just

7   by having appointed him.

8        The proposed order from the other side failed to address

9   either the ambiguity in the order or its attempt to exculpate

10  Mr. Seery from the liability, including liability for which

11  there is a jury trial right, and it is not a fix to the

12  problem for that reason.

13       In order to make the order enforceable and to fix its

14  infirmities, the Court would have to do significantly more.

15  It would have to both apply the caveat from the final

16  confirmation plan order, rope that caveat to the first part of

17  the relevant paragraph, as well as the second part, and it

18  would have to provide directive clarity to be enforceable

19  rather than too vague.

20       Your Honor, I think that's all I have.

21            THE COURT:  Okay.  Just FYI, my law clerk pulled the

22  *Smyth* case from 21 years ago from the Fifth Circuit.  And

23  while it more prominently deals with the issue of whether

24  trustees -- in this case, it was a Chapter 11 trustee -- could

25  be subjected to personal liability for damages to the

1    bankruptcy estate --

2        (Echoing.)

3        THE COURT:  Someone, put your phone on mute.  I don't

4    know who that is.

5        It dealt with, you know, the standard of liability, that

6    the trustee could not be sued for matters not to the level of

7    gross negligence.

8        But it does say, in the very last paragraph, to my shock

9    and amazement, that -- it's just one sentence in a 10-page

10   opinion -- orders appointing counsel -- and it was talking

11   about the trustee's lawyer he hired to handle appeals to the

12   Fifth Circuit -- orders appointing counsel under the

13   Bankruptcy Code are interlocutory and are not generally

14   considered final and appealable.  And it cites one case from

15   1993, the Middle District of Florida.  Live and learn.  There

16   is one sentence in that opinion that says that.  But I don't

17   know that it's hugely impactful here, but I did not know about

18   that opinion and I'm rather surprised.

19       All right.  You were going to walk me through evidence,

20   you said?

21       MR. BRIDGES:  Well, do I -- Your Honor, do you want

22   to do that first before I submit --

23       THE COURT:  Yes, please.

24       MR. BRIDGES:  -- my rebuttal argument?

25       THE COURT:  Please.

1              MR. BRIDGES:  Okay.

2              THE COURT:  Uh-huh.

3              MR. BRIDGES:  Your Honor, we would submit and offer

4  Exhibits 1 through 44, with the exception of those that have

5  been withdrawn, that are 2, 13 --

6              THE COURT:  Okay.  Slow down.  Slow down.  I need to

7  get to the docket entry number we're talking about.  Are we

8  talking -- are your -- the Debtor's exhibits are at 2412.  But

9  Nate, I misplaced my notes.  Where are Charitable DAF and

10  Holdco's?

11             THE CLERK:  I have 2411.

12             THE COURT:  2411?  Is that it?

13             MR. BRIDGES:  2420, Your Honor.

14             THE COURT:  2420?  Okay.  Give me a minute.  (Pause.)

15  2420?

16             MR. BRIDGES:  Yes, Your Honor.

17             THE COURT:  Okay, I'm there.  And it's which

18  exhibits?

19             MR. BRIDGES:  It's Exhibits 1 through 44, Your

20  Honor, with four exceptions.  We have agreed to withdraw

21  Exhibit 2, 13, 14, and 29.

22             THE COURT:  All right.

23             MR. BRIDGES:  Also, Your Honor, we'd like to submit

24  Debtor's Exhibit 1, which is under Exhibit 49 on our list,

25  would be anything offered by the other side.  But we'd like

1   to make sure that Debtor's Exhibit 1 gets in the record as

2   well.

3            THE COURT:  Let me back up.  When I pull up the

4   docket entry you just told me, I have Exhibits 44, 45, and 46

5   only.  Am I misreading this?

6            MR. BRIDGES:  I have a chart showing Exhibits 1

7   through 49 titled Docket 2420 filed 6/7/21.

8            THE COURT:  Okay.  The docket entry number you told

9   me, 2420, it only has three exhibits:  44, 45, and 46.  So,

10  first off, I understand -- are you offering 45 and 46 or not?

11           MR. BRIDGES:  No, Your Honor.

12           THE COURT:  Okay.  So you said you were offering 1

13  through 44 minus certain ones.  44 is here.

14           MR. BRIDGES:  Yes.

15           THE COURT:  But I've got to go back to a different

16  docket number.

17           THE CLERK:  It's actually 2411.

18           THE COURT:  It's at 2411.  That has all the others?

19           THE CLERK:  Yes.

20           THE COURT:  Okay.

21      So, Mr. Pomerantz, do you have any objection to Exhibits

22  1 through 44, which he's excepted out 2, 13, 14, and 29, and

23  then he's added Debtor's Exhibit 1?  Any objection?

24           MR. POMERANTZ:  I don't believe so.  I just would

25  confirm with John Morris, who has been focused on the

1    exhibits, just to confirm.

2              THE COURT:  Mr. Morris?

3              MR. MORRIS:  No objection, Your Honor.  It's fine.

4              THE COURT:  Okay.  They're admitted.

5        (Movants' Exhibits 1, 3 through 12, 15 through 28, and 30

6    through 44 are received into evidence.  Debtor's Exhibit 1 is

7    received into evidence.)

8              THE COURT:  So, any --

9              MR. BRIDGES:  Thank you, Your Honor.

10             THE COURT:  Anything you wanted to call to my

11   attention about these?

12             MR. BRIDGES:  Your Honor, the things that we

13   mentioned in the argument, for sure, but especially that the

14   word "trustee" is not used in the January hearing's

15   transcript, nor is it under discussion in that transcript

16   that it would be a trustee-like role being played by the

17   Strand directors, as well as the transcript of the July

18   hearing on the order at issue here, Your Honor, where you are

19   asked to defer both in that transcript and in the motion, the

20   motion that was at issue in that hearing, you are asked to

21   defer to the business judgment of the company.

22       And finally, Your Honor, I'd ask you to look at the

23   allegations in the District Court complaint.

24             THE COURT:  All right.

25       Mr. Pomerantz or Morris, let's see what exhibits you're

1  wanting the Court to consider.  Your exhibits, it looks like,

2  are at Docket Entry 2412.

3          MR. MORRIS:  As subsequently amended at 2423.

4          THE COURT:  Oh.  All right.  So which ones are you

5  offering?

6          MR. MORRIS:  We're offering all of the exhibits on

7  2423, which is 1 through 17.

8      (Echoing.)

9          THE COURT:  Whoops.  We got some distortion there.

10 Say again?

11         MR. MORRIS:  Yeah.  All of the exhibits that are on

12 2423, which are Exhibits 1 through 17.  But I want to make

13 sure that, as I did earlier, that that has the exhibits that

14 we're relying on.  Does that --

15     (Pause.)

16         THE COURT:  Okay.  Let me make sure I know what's

17 going on here.  You're double-checking your exhibits, Mr.

18 Morris?

19         MR. MORRIS:  Yes, Your Honor.

20         THE COURT:  Okay.

21     (Pause.)

22         MR. MORRIS:  Your Honor, we start with Docket No.

23 2419, --

24         THE COURT:  Okay.

25         MR. MORRIS:  -- which was the amended exhibit list.

1    And that actually had Exhibits 1 through 17.  And then that

2    was amended at Docket 2423.  So, the exhibits on both of

3    those lists.

4              THE COURT:  Well, they're one and the same, it looks

5    like, right?

6              MR. MORRIS:  Yes.

7              THE COURT:  Okay.  So you're offering those?

8              MR. MORRIS:  I think -- yeah.

9              THE COURT:  Any objection?

10             MR. BRIDGES:  No objection.

11             THE COURT:  All right.  They're admitted.

12        (Debtor's Exhibits 1 through 17 are received into

13   evidence.)

14             MR. POMERANTZ:  Your Honor, if I may take a few

15   moments to respond to Mr. Bridges' reply?

16             THE COURT:  All right.  Is he still within his hour

17   and a half?

18             THE CLERK:  At an hour and one minute.

19             THE COURT:  Okay.  All right.  You have a little

20   time left, so go ahead.

21             MR. POMERANTZ:  Thank you, Your Honor.

22        So look, I -- it sort of was really not fair to us.  Mr.

23   Bridges was really making things up on the fly.  He was

24   changing the theories of his case and responding to Your

25   Honor.  But I'm going to do my best to respond to the

1    arguments made, many of which I sort of anticipated.

2         I'll first start with the issue that Your Honor raised,

3    which was whether this is under Rule 60 or not.  Mr. Bridges

4    identified a couple of cases, said that the order was

5    interlocutory, said that somehow the orders have anything to

6    do with a plan confirmation order.  They do not.  Your Honor

7    didn't hear that argument at the plan confirmation.  The

8    January 9th and July 16th orders are old and cold.  There's

9    an exculpation provision in the plan.  There's a gatekeeper

10   in the plan.  The provisions do not overlap entirely.  The

11   gatekeeper applies prospectively.  The exculpation provision

12   includes additional parties.

13        So the arguments that basically the plan had anything to

14   do -- and the fact that the plan is not a final order -- has

15   anything to do with the January 9th and July 16th orders is

16   just wrong.  It's just wrong.

17        More fundamentally, Your Honor, as Your Honor pointed

18   out, the *Smyth* case is a professional employment order.  And

19   ironically, if you abide by the *Smyth* case, that order is

20   never appealable because it's interlocutory.

21        But more fundamentally, Your Honor, that's dealing with

22   327 professionals.  And again, there's not much analysis in

23   the *Smyth* case, but we're not dealing with a 327

24   professional.  We're dealing with orders that were approved

25   under 363.

1    So the premise of the argument that Rule 60(b) -- 60

2  doesn't apply and they have other arguments just doesn't make

3  any sense.

4    Okay.  So now that gets us to Rule 60.  And Your Honor,

5  Your Honor hit the nail on the head.  They haven't presented

6  any evidence.  Allegations in a complaint aren't evidence.

7  They can't stand up there and say surprise evidence.  They

8  had the opportunity -- and this hearing's been continued a

9  few weeks -- they had the opportunity to bring it up, and

10  it's -- they had the opportunity to claim that there was

11  surprise, but they just didn't.  Okay?

12    So to go on to the Rule 60 arguments.  Surprise.

13  Surprise and reasonable delay are really -- go hand in hand

14  with Mr. Bridges' argument.  He says, well, we didn't find

15  out that -- months after the order was entered that he

16  violated a duty to us, so we are surprised by that, and it's

17  a reasonable time.  Well, Your Honor, the order provided for

18  an exculpation.  CLO Holdco and DAF knew that it applied to

19  an exculpation.  They were bound.  They knew based upon that

20  order that they would not be able to bring claims for normal

21  negligence.  There is no surprise.

22    If you take Mr. Bridges' argument to its conclusion, he

23  could wait until the end of the statute of limitations after

24  an order and have come in four years from now and say, Your

25  Honor, we just found out facts so we should go back four

1 years before.  That, Your Honor, that's not how the surprise

2 works.  That's not how the reasonable time works.

3     Mr. Bridges did not contest that they're bound by res

4 judicata.  He did not contest that the exculpation itself was

5 clear and unambiguous.  Of course he argued Your Honor

6 couldn't enter an order saying there was exculpation, again,

7 with no authority.  And he seemed surprised, as I suspect he

8 should, since he's not a bankruptcy lawyer, that retention

9 orders, whether it's investment bankers, financial advisors,

10 include exculpations all the time.  So there's no grounds

11 under surprise.

12     There's no grounds -- the motions are late under 60(c).

13     And they're not void.  I went through a painstaking

14 analysis, Your Honor, and I described in detail what the

15 *Espinosa* case held, and the exceptional circumstances which

16 Mr. Bridges tried to get away from as much as he could.

17 Maybe he can try to get away from language in a district

18 Court opinion, in a Bankruptcy Court opinion, in a Circuit

19 Court opinion.  You can't get away from language in a Supreme

20 Court opinion.  The Supreme Court opinion said exceptional

21 circumstances, where there was arguably no basis for

22 jurisdiction for what the Court did.  They have not even come

23 close to convincing Your Honor that there was absolutely no

24 basis.

25     Now, they disagree.  We granted, we think it's a good-

1   faith disagreement, but they haven't come close to

2   establishing the *Espinosa* standard, so their motion under 60

3   does not -- it fails.

4       And I don't think -- look, these are good lawyers.  Mr.

5   Bridges and Mr. Sbaiti are good lawyers.  They didn't just

6   inadvertently not mention Rule 60.  They never mentioned it

7   because they knew they had no claim under Rule 60.

8       Your Honor, Mr. Bridges has made comments about the

9   fiduciary duty of Mr. Seery, about what the Investor's Act

10  provides.  He's just wrong on the law.  Now, Your Honor

11  doesn't have to decide that.  Whichever court adjudicates the

12  DAF lawsuit will have to decide it.  But there is no private

13  cause of action for damages.  There are no fiduciary duties to

14  the investors.

15      And what Mr. Bridges doesn't even mention, in that the

16  investment agreement that's so prominent in his complaint,

17  they waived claims other than willful misconduct and gross

18  negligence against Highland.  They waived those claims.  So

19  for Mr. Bridges to come in here and argue that there's some

20  surprise, when he hasn't even bothered to look at the document

21  that's underlying the contractual relationship between the DAF

22  and the Debtor, is -- you know, I'll just say it's

23  inadvertence.

24      Your Honor, Mr. Bridges tried to argue that Mr. Seery is

25  not a beneficiary of the January 9th order.  He's not an

1   agent.  Well, again, Your Honor, Mr. Bridges wasn't there.

2   Your Honor and we were.  On January 9th, an independent board

3   was picked, and at the time Mr. Dondero ceased to become the

4   CEO.  So you have three gentlemen coming in -- Mr. Seery, Mr.

5   Dubel, and Mr. Nelms -- coming in to run Highland, in a very

6   chaotic time.  They had to act through their agents.  There

7   was no expectation that this board was going to actually run

8   the day-to-day operations of the Debtor.  Of course not.  They

9   needed someone to run.  And they picked Mr. Seery.  And the

10   argument that well, he's an agent of the company, he's not an

11   agent of the board, that just doesn't make sense.  The

12   independent board had to act.  The directors had to act.  And

13   the directors, how do they deal with that?  They acted through

14   Mr. Seery.  So he is most certainly governed by the January

15   9th order.

16       Your Honor, I want to talk about the jury trial right.

17   Mr. Bridges said that Paragraph 14 is an arbitration clause

18   and not a jury trial waiver.  Now, again, I will forgive Mr.

19   Bridges because I assume he didn't read the provision, okay,

20   and he -- somebody told him that, and that person just got it

21   wrong.  But what I would like to do is read for Your Honor

22   Paragraph 14(f).  It doesn't have to do with arbitration.

23   It's a waiver of jury trial.  14(f), Jurisdiction Venue,

24   Waiver of Jury Trial.  The parties hereby agree that any

25   action, claim, litigation, or proceeding of any kind

1   whatsoever against any other party in any way arising from or

2   relating to this agreement and all contemplated transactions,

3   including claims sounding in contract, equity, tort, fraud,

4   statute defined as a dispute shall be submitted exclusively to

5   the U.S. District Court for the Northern District of Texas, or

6   if such court does not have subject matter jurisdiction, the

7   courts of the State of Texas, City of Dallas County, and any

8   appellate court thereof, defined as the enforcement court.

9   Each party ethically and unconditionally submits to the

10  exclusive personal and subject matter jurisdiction of the

11  enforcement court for any dispute and agrees to bring any

12  dispute only in the enforcement court.  Each party further

13  agrees it shall not commence any dispute in any forum,

14  including administrative, arbitration, or litigation, other

15  than the enforcement court.  Each party agrees that a final

16  judgment in any such action, litigation, or proceeding is

17  conclusive and may be enforced through other jurisdictions by

18  suit on the judgment or in any manner provided by law.

19       And then the kick, Your Honor, all caps, as jury trial

20  waiver always are:  Each party irrevocably and unconditionally

21  waives to the fullest extent permitted by law any right it may

22  have to a trial by jury in any legal action, proceeding, cause

23  of action, or counterclaim arising out of or relating to this

24  agreement, including any exhibits, schedules, and appendices

25  attached to this agreement or the transactions contemplated

1    hereby.  Each party certifies and acknowledges that no

2    representative of the owner of the other party has represented

3    expressly or otherwise that the other party won't seek to

4    enforce the foregoing waiver in the event of a legal action.

5    It has considered the implications of this waiver, it makes

6    this waiver knowingly and voluntarily, and it has been induced

7    to enter into this agreement by, among other things, the

8    mutual waivers and certifications in this section.

9         Your Honor, I will forgive Mr. Bridges.  I assume he just

10   did not read that.  But to represent to the Court that that

11   language does not contain a jury trial waiver is -- is just

12   wrong.

13             THE COURT:  All right.  I'm going to stop right

14   there.  And you were reading from the Second Amended and

15   Restated Shared Services Agreement between Highland --

16             MR. POMERANTZ:  Not shared services.  I'm reading

17   from the Second Amended and Restated Investment Advisory

18   Agreement --

19             THE COURT:  Investment --

20             MR. POMERANTZ:  -- between the Charitable DAF, the

21   Charitable DAF GP, and Highland Capital Management.  The

22   agreement whereby the Debtor was the investment advisor to the

23   Charitable DAF Fund and the Charitable DAF GP.

24             THE COURT:  All right.  Well, Mr. Bridges, I'm going

25   to bounce quickly back to you.  This is your chance to defend

1   your honor.

2           MR. BRIDGES:  Yeah, we're -- we're looking at a

3   different agreement, where -- where literally the words that

4   were read to you are not in the agreement in front of us and

5   it is news to me.  So, Your Honor, this is a problem --

6           THE COURT:  What is the agreement you're looking at?

7           MR. BRIDGES:  It is the Amended -- I assume that

8   means First Amended -- Restated Advisory Agreement.

9           MR. POMERANTZ:  Your Honor, we are happy to file this

10  agreement with the Court so the Court has the benefit of it in

11  connection with Your Honor's ruling.

12          THE COURT:  Okay.  I would like you to do that.  Uh-

13  huh.

14          MR. BRIDGES:  I'd like -- I'd like to request -- I'll

15  withdraw that.

16          THE COURT:  Okay.  Go on, Mr. Pomerantz.

17          MR. POMERANTZ:  Mr. Bridges, if you could put us on

18  mute.  If you could put us on mute, Mr. Bridges, so I don't

19  hear your feedback.  Thank you.

20      Mr. Bridges also complains about the language "to the

21  extent permissible by law."  As Your Honor knows and as has

22  been my practice over 30 years, that language is probably in

23  every plan where there's a retention of jurisdiction:  to the

24  extent permissible by law.  And Mr. Bridges says that this

25  will create ambiguity in the order that couldn't be enforced.

1   There's no basis for that.  Our including the language "to the

2   extent permissible by law" in the orders, as we are prepared

3   to do, is consistent with the plan confirmation order where we

4   addressed that issue.  And we addressed that issue because we

5   didn't want to put Your Honor in a position where thereby Your

6   Honor may have an action before Your Honor that passes the

7   colorability gate that Your Honor may not be able to assert

8   jurisdiction.  And since jurisdiction can't be waived in that

9   regard, we will agree to amend that.

10       There's nothing ambiguous about that, and there's no

11   reason, though, that clause has to modify the Court's ability

12   to act as a gatekeeper, because, as we've argued *ad nauseam*,

13   gatekeeper provisions where the Court has that ability is not

14   only part of general bankruptcy jurisprudence but also part of

15   the Bankruptcy Code.

16       Counsel says that *Barton* doesn't apply because the

17   business judgment of Your Honor was used in retaining Mr.

18   Seery as opposed to in some other capacity.  There's no basis

19   for that, Your Honor.  A court-appointed -- a court-approved

20   CEO, CRO, professional, they are all entitled to protection

21   under the *Barton* act.  And the argument -- and again, this is

22   separate and apart from whether he's entitled to protection

23   under the January 9th order. But the argument that because it

24   was the business judgment -- again, business judgment in doing

25   something that Your Honor expressly contemplated under the

1  January 9th corporate governance order -- there's just no law

2  to support that.  And I guess he's trying to get around the

3  plethora of cases that deal with the situation where *Barton*

4  has been extended.

5       Your Honor, Mr. Bridges, again, in arguing that we're

6  ships passing in the night on *Shoaf* and *Applewood* and

7  *Espinosa*, no, we're not ships passing in the night.  We have a

8  difference in agreement on what these cases stand for.  These

9  cases stand for the proposition that a clear and unambiguous

10 provision, plain and simple, if it's clear and unambiguous, it

11 will be given res judicata effect.  The release in *Shoaf*,

12 clear and unambiguous.  The release in *Applewood*, not.  The

13 issue here is the exculpation language.  That was clear and

14 unambiguous.  It applied prospectively.  The argument makes no

15 sense that we didn't identify -- we didn't identify claims

16 that might arise in the future, so therefore an exculpation

17 clause doesn't apply?  That doesn't make any sense.

18      Your Honor clearly exculpated parties.  Mr. Dondero knew

19 it.  CLO Holdco knew it.  The DAF knew it.  So the issue Your

20 Honor has to decide is whether that exculpation was a clear

21 and unambiguous provision such that it should be entitled to

22 res judicata effect.  And we submit that the answer is

23 unequivocally yes.

24      That's all I have, Your Honor.

25           THE COURT:  All right.  Well, --

1          MR. MORRIS:  Your Honor?  I apologize.

2          THE COURT:  Okay.

3          MR. MORRIS:  This is John Morris.

4          THE COURT:  Yes?

5          MR. MORRIS:  I just want to, with respect to the

6    exhibits, I know there was no objection, but I had cited to

7    Docket Nos. 2419 and 2423.  The original exhibit list is at

8    Docket No. 2412.  So it's the three of those lists together.

9    2412, as amended by 2419, as amended by 2423.  Thank you very

10   much.

11         THE COURT:  All right.  Thank you.  All right.

12         MR. BRIDGES:  Your Honor, I still have no objection

13   to that, but may I have the last word on my motion?

14         THE COURT:  Is there time left?

15         THE CLERK:  Yes.

16         THE COURT:  Okay.  Go ahead.

17         MR. BRIDGES:  I just need a minute, Your Honor.  They

18   agreed to change the order.  They proposed it to us.  They

19   proposed it in a proposed order to you.  They can't also say

20   that it cannot be changed.

21      Secondly, Your Honor, in *Milic v. McCarthy*, 469 F.Supp.3d

22   580, the Eastern District of Virginia points out that the

23   Fourth Circuit treats appointment of estate professionals as

24   interlocutory orders as well.

25      That's all.  Thank you, Your Honor.

1          THE COURT:  All right.  Here's what we're going to

2     do.  We've been going a very long time.  I'm going to take a

3     break to look through these exhibits, see if there's anything

4     in there that I haven't looked at before and that might affect

5     the decision here.  So we will come back at 3:00 o'clock

6     Central Time -- it's 2:22 right now -- and I will give you my

7     bench ruling on this.  All right.

8        So, Mike, they can all stay on the line, right?

9        Okay.  You can stay on, and we'll be back at 3:00 o'clock.

10          THE CLERK:  All rise.

11        (A recess ensued from 2:22 p.m. to 3:04 p.m.)

12          THE CLERK:  All rise.

13          THE COURT:  All right.  Please be seated.  All right.

14     Everyone presented and accounted for.  We're going back on the

15     record.

16          MR. POMERANTZ:  Your Honor, before you start, this is

17     Jeff Pomerantz.  We had sent to your clerk, and hopefully it

18     got to you, a copy of the Second Amended and Restated

19     Investment Advisory Agreement.  We also copied Mr. Sbaiti with

20     it as well.  And we would also like to move that into

21     evidence, just so that it's part of the Court's record.

22          THE COURT:  All right.

23          MR. BRIDGES:  We would object to that, Your Honor.

24     We haven't had an opportunity to even verify its authenticity

25     yet.

1          THE COURT:  All right.  Well, I'll tell you what.

2    I'm going to address this in my ruling.  So it's not going to

3    be part of the record for this decision, and yet -- well, I'll

4    get to it.

5         All right.  So we're back on the record in Case Number 19-

6    34054, Highland Capital.  The Court has deliberated, after

7    hearing a lot of argument and allowing in a lot of documentary

8    evidence, and the Court concludes that the motion of CLO

9    Holdco, Ltd. and The Charitable DAF to modify the retention

10   order of James Seery, which was entered almost a year ago, on

11   July 16th, 2020, should be denied.

12        This is the Court's oral bench ruling, but the Court

13   reserves discretion to supplement or amend in a more fulsome

14   written order what I'm going to announce right now, pursuant

15   to Rule 7052.

16        First, what is the Movants' authority to request the

17   modification of a bankruptcy court order that has been in

18   place for so many months, which was issued after reasonable

19   notice to the Movants, and after a hearing, which was not

20   objected to by the Movants, or appealed, when the Movants were

21   represented by sophisticated counsel, I might add, and which

22   order was relied upon by parties in this case, most notably

23   Mr. Seery and the Debtor, and in fact was entered after

24   significant negotiations involving a sophisticated court-

25   appointed Unsecured Creditors' Committee with sophisticated

1    professionals and sophisticated members, and after negotiation

2    with an independent board of directors, court-appointed, one

3    of whose members is a retired bankruptcy judge?  What is the

4    Movants' authority?

5        Movants fumbled a little on that question, in that the

6    exact authority wasn't set forth in the motion.  But Movants'

7    primary argument is that Movants think the Seery retention

8    order was an interlocutory order and that the Court simply has

9    the inherent authority to modify it as an interlocutory order.

10       The Court disagrees with this analysis.  I do not think

11   the Fifth Circuit's *Smyth* case dictates that the Seery

12   retention order is still interlocutory.  The Seery retention

13   order was an order entered pursuant to Section 363 of the

14   Bankruptcy Code, not a Section 327 professionals to a debtor-

15   in-possession, professionals to a trustee employment order

16   such as the one involved in the *Smyth* case.

17       But even if the Seery retention order is interlocutory --

18   the Court feels strongly that it's not, but even if it is --

19   the Court believes it would be an abuse of this Court's

20   inherent discretion or authority to modify that order almost a

21   year after the fact and under the circumstances of this case.

22       Now, assuming Rule 60(b) applies to the Movants' request,

23   the Court determines that the Movants have not made their

24   motion anywhere close to within a reasonable time, as Rule

25   60(c) requires, nor do I think the Movants have demonstrated

1    any exceptional circumstances to declare the order or any of

2    its provisions void.  The Movants have put on no evidence that

3    constitutes surprise or constitutes newly-disputed evidence.

4    So why are there no exceptional circumstances here such that

5    the Court might find, you know, a void order or void

6    provisions of an order?

7        First, this Court concludes that there's no credible

8    argument that the Court overreached its jurisdiction with the

9    gatekeeping provisions in the order.  Gatekeeping provisions

10   are not only very common in the bankruptcy world -- in

11   retention orders and in plan confirmation orders, for example

12   -- but they are wholly consistent with the *Barton* case, the

13   U.S. Supreme Court's *Barton's* case, and its progeny that has

14   become known collectively as the *Barton* doctrine.  Gatekeeping

15   provisions are wholly consistent with 28 U.S.C. Section

16   959(a)'s complete language.

17       The Fifth Circuit has blessed gatekeeping provisions in

18   all sorts of contexts.  It has blessed them in the situation

19   of when *Stern* claims are involved in the *Villegas* case.  It

20   even blessed Bankruptcy Courts' gatekeeping functions a long

21   time ago, in 1988, in a case that I don't think anyone

22   mentioned in the briefing, but as I've said, my brain

23   sometimes goes down trails, and I'm thinking of the *Louisiana*

24   *World Exposition* case in 1988, when the Fifth Circuit blessed

25   there a procedure where an unsecured creditors' committee can

1  bring causes of action against persons, such as officers and

2  directors or other third parties, if they first come to the

3  Bankruptcy Court and show a colorable claim.  They have to

4  come to the Bankruptcy Court, show they have a colorable claim

5  and they're the ones that should be able to pursue them.  Not

6  exactly on point, but it's just one of many cases that one

7  could cite that certainly approve gatekeeper functions of

8  various sorts of Bankruptcy Courts.

9      It doesn't matter which court might ultimately adjudicate

10 the claims; the Bankruptcy Court can be the gatekeeper.

11     And the Court agrees with the many cases cited from

12 outside this circuit, such as the case in Alabama, in the

13 Eleventh Circuit, and there was another circuit-level case, at

14 least one other, that have held that the *Barton* doctrine

15 should be extended to other types of case fiduciaries, such as

16 debtor-in-possession management, among others.

17     Finally, as I pointed out in my confirmation ruling in

18 this case, gatekeeping provisions are commonplace for all

19 types of courts, not just Bankruptcy Courts, when vexatious

20 litigants are involved.  I have commented before that we seem

21 to have vexatious litigation behavior with regard to Mr.

22 Dondero and his many controlled entities.

23     Now, as far as the Movants' argument that there was not

24 just improper gatekeeping provisions but actually an improper

25 discharge in the Seery retention order of negligence claims or

1    other claims that don't rise to the level of gross negligence

2    or willful misconduct, again, I reiterate there's nothing

3    exceptional in the bankruptcy world about exculpation

4    provisions like this.  They absolutely are a term of

5    employment very often.  Just like compensation, they're

6    frequently requested, negotiated, and approved.  They are

7    normal in the corporate governance world, generally.  They are

8    normal in corporate contracts between sophisticated parties.

9    And most importantly of all, even if this Court overreached

10    with the exculpation provisions in the Seery retention order,

11    even if it did, res judicata bars the attack of these

12    provisions at this late stage, under cases such as *Shoaf,*

13    *Republic Supply v. Shoaf* from the Fifth Circuit, the *Espinosa*

14    case from the U.S. Supreme Court, and even *Applewood*, since

15    the Court finds the language in this order was clear,

16    specific, and unambiguous with regard to the gatekeeping

17    provisions and the exculpation provisions.

18        Last, and this is the part where I said I'm going to get

19    to this agreement that has been submitted, the Second Amended

20    and Restated Investment Advisor Agreement or whatever the

21    title is.  I am more than a little disturbed that so much of

22    the theme of the Movants' pleadings and arguments, and I think

23    even representations to the District Court, have been they

24    have these sacred jury trial rights, these inviolate jury

25    trial rights, and an Article I Court like this Court should

1    have no business through a gatekeeping provision impinging on

2    the possible pursuit of an action where there's a jury trial

3    right.

4         I was surprised initially when I thought about this.  I

5    thought, wow, I've seen so many agreements over the months.  I

6    can't say every one of them waived the jury trial right, but I

7    just remembered seeing that a lot, and seeing arbitration

8    provisions, and so that's why I asked.  It just was lingering

9    in my brain.  So I'm going to look at what is submitted.  I'm

10   not relying on that as part of my ruling.  As you just heard,

11   I had a multi-part ruling, and whether there's a jury trial

12   right or not is irrelevant to how I'm choosing to rule on this

13   motion.  But I do want to see the agreement, and then I want

14   Movants within 10 days to respond with a post-hearing trial

15   brief either saying you agree that this is the controlling

16   document or you don't agree and explain the oversight, okay?

17   Because it feels like a gross omission here to have such a

18   strong theme in your argument -- we have a jury trial right,

19   we have a jury trial right, by God, the gatekeeping

20   provisions, among other things, impinge on our sacred pursuit

21   of our jury trial right -- and then maybe it was very

22   conspicuous in the controlling agreement that you'd waived

23   that, the Movants had waived that.

24        So, anyway, I'm requiring some post-hearing briefing, if

25   you will, on whether omissions, misrepresentations were made

1    to the Court.

2         Anyway, so I reserve the right to supplement or amend this

3    ruling with a more fulsome written order.  I am asking Mr.

4    Pomerantz to upload a form of order that is consistent with

5    this ruling, and --

6              MR. POMERANTZ:  Your Honor, we will do so.  I do have

7    one thing to bring to the Court's attention, unrelated to the

8    motion, before Your Honor leaves the bench.

9              THE COURT:  All right.  So just a couple of follow-up

10   things.  Have you -- I'm not clear I heard what you said about

11   this agreement.  Did you email it to my courtroom deputy or

12   did you file it on the docket?

13             MR. POMERANTZ:  We emailed it to your courtroom

14   deputy.  We're happy to file it on the docket.  And we also

15   provided a copy to Mr. Sbaiti.

16        I would note for the Court that it's signed both by The

17   Charitable DAFs by Grant Scott, just for what it's worth.

18             THE COURT:  Okay.  All right.  Well, I'm trying to

19   think what I want -- I do want you to file it on the docket,

20   and I'm trying to think of what you label it.  Just call it

21   Post-Hearing Submission or something and link it to the motion

22   that we adjudicated here today.  And then, again, you've got

23   10 days, Mr. Bridges, to say whatever you want to say about

24   that agreement.

25        I guess the last thing I wanted to say is we sure devoted

1   a lot of time to this motion today.  We have -- this is a

2   recurring pattern, I guess you can say.  We have a lot of

3   things that we devote a lot of time to in this case that I get

4   surprised, but it is what it is.  You file a motion.  I'm

5   going to give it all the attention Movants and Respondents

6   think it warrants.  I'm going to develop a full record,

7   because, you know, there's a recurring pattern of appeals

8   right now, 11 or 12 appeals, I think, not to mention motions

9   to withdraw the reference.  If we're going to have higher

10   courts involved in the administration of this case, I'm going

11   to make a very thorough record so nobody is confused about

12   what we did, what I considered, what my reasoning was.

13       So I kind of think it's unfortunate for us to have to

14   spend case resources and so much time and fees on things like

15   this, but I'm going to make sure a Court of Appeals is not

16   ever confused about what happened and what we did.  So that's

17   just the way it's going to be.  And I feel like we have no

18   choice, given, again, the pattern of appeals.

19       All right.  So, with that, Mr. Pomerantz, you had one

20   other case matter, you said?

21          MR. POMERANTZ:  Yes.  But before I get to that, Your

22   Honor, I assume that, in response to the Movants' submission

23   on the agreement, that we would have right at four or seven

24   days to respond if we deem it's appropriate?

25          THE COURT:  I think that's reasonable.  That's

1   reasonable.

2          MR. POMERANTZ:  Okay.  Thank you, Your Honor.

3          THE COURT:  So let me think of how I want to do this.

4   I'll just do a short scheduling order of sorts that just, it

5   says in one or two paragraphs, at the hearing on this motion,

6   the Court raised questions about the jury trial rights and the

7   Debtor has now submitted the controlling agreements, I'm

8   giving the Movants 10 days to respond to whether this is

9   indeed a controlling agreement, and why, if it is, the Movants

10   have heretofore taken the position they have jury trial

11   rights.  And then I will give you seven days thereafter to

12   reply, and then the Court will set a further status conference

13   if it determines it's necessary.  Okay?

14      So, Nate, we'll do a short little order to that effect.

15   Okay?

16          MR. POMERANTZ:  Thank you, Your Honor.

17      I -- again, before I raise the other issue, I want to pick

18   up on a comment Your Honor just made towards the end.  I know

19   the Court has been frustrated with the time and effort we've

20   been spending.  The Debtor and the creditors have been

21   extremely frustrated, because in addition to the time and

22   effort everyone's spending, we're spending millions of

23   dollars, millions of dollars on litigation that --

24          THE COURT:  It's one of the reasons you needed an

25   exit loan, right?

1          MR. POMERANTZ:  Right.  No, exactly.  That's

2    frivolous, that we think is made in bad faith.

3          And Your Honor, and everyone else who's hearing this on

4    behalf of Mr. Dondero, should understand we're looking into

5    what appropriate authority Your Honor would have to shift some

6    of the costs.  Your Honor did that in the contempt motion.

7    Your Honor can surely do that in connection with the notes

8    litigation.  But all this other stuff that is requiring us to

9    spend hundreds and hundreds of hours and spend millions of

10   dollars, we are clearly looking into whether it would be

11   appropriate and what authority there is.  I just wanted to let

12   Your Honor know that.

13         And in connection with that, the last point, Your Honor, I

14   can't actually even believe I'm saying this, but there was

15   another lawsuit filed -- we just found out in the break -- on

16   Wednesday night by the Sbaiti firm on behalf of Dugaboy in the

17   District Court.

18         Now, to make matters worse, Your Honor, the litigation

19   relates to alleged improper management by the Debtor of Multi-

20   Strat.  If Your Honor will recall, at many times I've told

21   this Court what Dugaboy's claims they filed in this case.

22   Dugaboy has a claim that is filed in this case for

23   mismanagement postpetition of Multi-Strat.  Now the Sbaiti

24   firm, in addition to representing CLO Holdco, in addition to

25   representing the DAF, and whatever the Plaintiffs' lawyers are

1   in that other District Court, PCMG, and in connection with the

2   Acis matter, they've decided they haven't had enough.  They've

3   now filed another motion that -- you know, why they filed it

4   in District Court and there's a proof of claim on the same

5   issues, I don't know.  But I thought Your Honor should know.

6   I'm not asking Your Honor to do anything about it.  But we

7   will act aggressively, strongly, and promptly.

8        Thank you, Your Honor.

9        THE COURT:  All right.  Well, you've reminded me of

10  what came out earlier today about the entity -- I left my

11  notepad in my chambers -- PMC or PMG or something.

12      Mr. Bridges, we're not going to have a hearing right now

13  on me doing anything, but what are you thinking?  What are you

14  doing?

15      MR. BRIDGES:  Your Honor, I'm not trying to duck your

16  question.  I literally have no involvement with any other

17  claim, and we would have to ask Mr. Sbaiti to answer your

18  questions.

19      THE COURT:  All right.  Is he there?

20      MR. BRIDGES:  He is.

21      THE COURT:  I'll listen.

22      MR. BRIDGES:  I'll switch seats and give him this

23  chair.

24      MR. SBAITI:  Sorry, Your Honor.  We had two computers

25  going and weren't able to use the sound on one, so we ended up

1    turning that off.

2          Your Honor, I'm not sure what the question is about when

3    you say what are we thinking.  We have a client that's asked

4    us to file something, and when we're advised by bankruptcy

5    counsel that it's not prohibited for us to do so, and don't

6    know why we're precluded from doing so, and when the time

7    comes I'm sure we'll be able to explain to Your Honor --

8    someone will be able to explain to Your Honor why what we're

9    doing, despite Mr. Pomerantz's exacerbation, or excuse me,

10   exasperation, why that wasn't improper.  It's our belief that

11   it wasn't improper or a violation of the Court's rule.

12          THE COURT:  Just give me a quick shorthand *Readers'*

13   *Digest* of why you don't think it's improper.

14          MR. SBAITI:  Sure.  My understanding is, Your Honor,

15   there's not a rule that says we can't file it against the

16   Debtor for postpetition actions.  So that, that's as -- that's

17   as much as I understand.  And I'm going to -- I'm not trying

18   to duck it, either.  And if I'm wrong about that and someone

19   wants to correct me on our side offline and if we have to

20   explain to the Court why that's so or what rule has been

21   violated, I'm sure we'll be able to put together something for

22   that.  But that's what I've been advised.

23          THE COURT:  Have you done thorough --

24          MR. POMERANTZ:  Your Honor, I think what --

25          MR. SBAITI:  (garbled), Your Honor.

1          THE COURT:  Have you done thorough research yourself?

2     Your Rule 11 signature is on the line, not some bankruptcy

3     counsel you talked to.  Have you done the research yourself?

4          MR. SBAITI:  Well, Your Honor, I've relied on the

5     research and advice of people who are experts, and I believe

6     my Rule 11 obligations also allow me to do that, so yes.

7          MR. POMERANTZ:  Your Honor, I think we're entitled to

8     know if it's Mr. Draper's firm who has been representing

9     Dugaboy.  He's the bankruptcy counsel.  I don't think it's an

10    attorney-client privilege issue.  If Mr. Sbaiti is going to be

11    here and sort of say, hey, bankruptcy counsel said it was

12    okay, I think we would like to know and I'm sure Your Honor

13    would like to know who is that bankruptcy counsel.

14         THE COURT:  Yes.  Fair enough.  Mr. Sbaiti?

15         MR. SBAITI:  Your Honor, in consultation with Mr.

16    Draper and with consultation with other counsel that we've

17    spoken to, that has been our understanding.

18         THE COURT:  Who's the other counsel?

19         MR. SBAITI:  Well, we've talked to Mr. Rukavina about

20    some of these things for the PCMG and the Acis case.  We've

21    talked to the people who, when they tell us you can't do this

22    because they're bankruptcy counsel for our client, then we

23    don't do something.  So, and I'm not trying to throw anybody

24    under the bus, but my understanding of what goes on in

25    Bankruptcy Court is incredibly limited, so, you know, and if

1    it's a mistake then I'll own it, if I have a mistaken

2    understanding, but I also wasn't anticipating having to make a

3    presentation about this right here right now, so --

4              THE COURT:  Well, you're filing lawsuits that involve

5    this bankruptcy case during the hearing, so --

6              MR. SBAITI:  Oh, we didn't file it during the

7    hearing, Your Honor.  It was filed last night, I believe.

8              THE COURT:  Okay.  Well, I assume that you're going

9    to go back and hit the books, hit the computer, and be

10   prepared to defend your actions, because your bankruptcy

11   experts, they may think they know a lot, but the judge is not

12   very happy about what she's hearing.

13             MR. POMERANTZ:  Your Honor, if I may ask when Your

14   Honor intends to issue the contempt ruling in connection with

15   the June 8th hearing?  I strongly believe -- and, obviously,

16   this has nothing to do with the contempt hearing; this

17   happened after -- but I strongly believe that sending a

18   message that Your Honor is inclined to hold counsel in

19   contempt, which obviously is one of the violators we said

20   should be held in contempt, it may be important to do that

21   sooner rather than later so that people know that Your Honor

22   is serious.

23             THE COURT:  All right.  Well, I understand and

24   respect that request.  And let me tell you all, I had a seven-

25   day -- okay.  You all were here on that motion June 8th.  I

1    had a seven-day, all-day, every-day, 9:00 to 5:00, 45-minute

2    lunch break, in-person hearing with a dozen or so live

3    witnesses that I just finished Tuesday at 5:00 o'clock.  So

4    you all were here on the 8th, and then -- what day was that --

5    what was -- Tuesday, I finished.  Tuesday was the 22nd.  So I

6    started on the 14th, okay?  So you all were here on the 8th

7    and I had a live jury trial -- I mean, not jury trial, a live

8    bench trial -- live human beings in the courtroom, beginning

9    June 14th.  So you're here the 8th.  June 14th through 22nd, I

10   did my trial.  And here we are on the 25th.  And guess what, I

11   have another live human-being bench trial next week, Monday

12   through Friday.

13       So we've been working in other things like this in between

14   those two.  So I'm telling you that not to whine, I'm just

15   telling you that, that's the only reason I didn't get out a

16   quick ruling on this, okay?

17           MR. POMERANTZ:  And Your Honor, I was not at all

18   making that comment to imply anything about the Court.

19           THE COURT:  Well, --

20           MR. POMERANTZ:  The time and effort that you have

21   given to this case is extraordinary, --

22           THE COURT:  Okay.

23           MR. POMERANTZ:  -- so please don't misunderstand my

24   comment.

25           THE COURT:  Okay.  And I didn't mean to express

1   annoyance or anything like that.  I guess what I'm trying to

2   do is I don't want anyone to mistake the delay in ruling on

3   the contempt motion to mean I'm just not that -- you know, I'm

4   not prioritizing it, other things are more serious to me or

5   important to me, or I'm going to take two months to get to it.

6   It's literally been I've been in trial almost all day long

7   every day since you were here.  But trust me, I'm about as

8   upset as upset can be about what I heard on June 8th, and I'm

9   going to get to that ruling, and I know what I'm going to do.

10  And, well, like I said, it's just a matter of figuring out

11  dollars and whom, okay?  There's going to be contempt.  I just

12  haven't put it on paper because I've been in court all day and

13  I haven't come up with a dollar figure.  Okay?

14      So I hope -- I don't know if that matters very much, but

15  it should.

16      All right.  We stand adjourned.

17      (Proceedings concluded at 3:35 p.m.)

18                          --oOo--

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                        **06/29/2021**

24  _____     _____
    Kathy Rehling, CETD-444                    Date
25  Certified Electronic Court Transcriber

122

INDEX<br>
*Excerpt*<br>
*11:33 a.m. to 3:35 p.m.*

PROCEEDINGS                                                          3

OPENING STATEMENTS

- By Mr. Bridges                                                     3
- By Mr. Pomerantz                                                 23

WITNESSES

-none-

EXHIBITS

Movants' Exhibits 1, 3 through 12, 15 through      Received 91
28, and 30 through 44

Debtor's Exhibit 1                                 Received 91
Debtor's Exhibits 1 through 17                     Received 93

RULINGS                                                           106

END OF PROCEEDINGS                                                121

INDEX                                                             122

# EXHIBIT 28

**SUMMARY OF DONDERO AND RELATED ENTITIES MOTIONS TO CONTINUE, STAY, OR ABATE**

## ADVERSARY PROCEEDING TO ENJOIN DONDERO FROM INTERFERING WITH HIGHLAND'S BANKRUPTCY ESTATE AND RELATED CONTEMPT PROCEEDING[1]

| Motion | Court | Movant |
|---|---|---|
| *Motion to Continue Contempt Hearing*, Adv. Proc. No. 21-3190-sgj-11, D.I. 102 (Bankr. N.D. Tex. Feb. 17, 2021) | Bankruptcy Court | Dondero |
| *Motion to Continue  Further Contempt Hearing*, Adv. Proc. No. 21-3190-sgj-11, D.I. 119 (Bankr. N.D. Tex. Mar. 2, 2021) | Bankruptcy Court | Dondero |
| *Motion for Continuance of Contempt Hearing*, Adv. Proc. No. 21-3190-sgj-11 (Bankr. N.D. Tex. Mar. 10, 2021) | Bankruptcy Court | Dondero |
| *Defendant's Emergency Motion to Stay Proceedings Pending Resolution of Defendant's Petition for Writ of Mandamus or, Alternatively, Motion to Continue Trial Setting,* Adv. Proc. No. 21-3190-sgj-11, D.I. 154 (Bankr. N.D. Tex. Apr. 30, 2021) | Bankruptcy Court | Dondero |
| *Motion to Stay Permanent Injunction Proceedings Pending Resolution of Mandamus*, Case No. 21-10219 (5th Cir. May 6, 2021) | Fifth Circuit | Dondero |
| *Defendant's Emergency Motion for Stay Pending Appeal and for Approval of Supersedeas Bond or Other Security,* Adv. Proc. No. 21-3190-sgj-11, D.I. 196 (Bankr. N.D. Tex. June 15, 2021) | Bankruptcy Court | Dondero |

## ADVERSARY PROCEEDING TO COLLECT ON CERTAIN DEMAND AND TERM NOTES ISSUED TO DONDERO AND HIS RELATED ENTITIES

| Motion | Court | Movant |
|---|---|---|
| *Defendant James Dondero's Emergency Motion to Continue Docket Call and Trial and/or Amend Scheduling Order*, Adv. Proc. No. 21-03003-sgj-11, D.I.8 (Bankr. N.D. Tex. Mar. 26, 2021) | Bankruptcy Court | Dondero |

---

[1] This chart excludes the seven motions filed in the Bankruptcy Court, the District Court, and the Fifth Circuit Court of Appeals by the Dondero Entities to stay the effective date of the Confirmation Order pending appeal.

**SUMMARY OF DONDERO AND RELATED ENTITIES MOTIONS TO CONTINUE, STAY, OR ABATE**

| | | |
|---|---|---|
| *James Dondero's Motion to Stay Pending the Motion to Withdraw the Reference of Plaintiff's Complaint*, Adv. Proc. No. 21-03003-sgj-11, D.I. 22 (Bankr. N.D. Tex. Apr. 15, 2021) | Bankruptcy Court | Dondero |
| *Defendant's Expedited Motion to Stay Pending Resolution of Motion to Withdraw the Reference of Adversary Proceeding*, Adv. Proc. No. 21-03006-sgj-11, D.I. 23 (Bankr. N.D. Tex. June 3, 2021) | Bankruptcy Court | Highland Capital Management Services, Inc. |
| *Defendant's Expedited Motion to Stay Pending Resolution of Motion to Withdraw the Reference of Adversary Proceeding*, Adv. Proc. No. 21-03006-sgj-11, D.I. 26 (Bankr. N.D. Tex. June 4, 2021) | Bankruptcy Court | Highland Capital Management Services, Inc. |
| *Defendant's Motion to Stay Pending Resolution of Motion to Withdraw the Reference of Adversary Proceeding*, Adv. Proc. No. 21-03007-sgj-11, D.I. 24 (Bankr. N.D. Tex. June 3, 2021) | Bankruptcy Court | HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) |
| *Defendant's Motion to Stay Pending Resolution of Motion to Withdraw the Reference of Adversary Proceeding*, Adv. Proc. No. 21-03007-sgj-11, D.I. 27 (Bankr. N.D. Tex. June 3, 2021) | Bankruptcy Court | HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) |

## CHAPTER 11 BANKRUPTCY PROCEEDING OF HIGHLAND CAPITAL MANAGEMENT, L.P.

| Motion | Court | Movant |
|---|---|---|
| *Motion to Continue Hearing on Debtor's Third Omnibus Objection to Certain No Liability Claims*, Case No. 19-34054-sgj-11, D.I. 2226 (Bankr. N.D. Tex. Apr. 20, 2021) | Bankruptcy Court | CPCM, LLC[2] |

---

[2] CPCM, LLC, is an entity created, on information and belief, by Scott Ellington and James Dondero to purchase the claims of former Highland employees in order to litigate those claims against Highland.

## SUMMARY OF DONDERO AND RELATED ENTITIES MOTIONS TO CONTINUE, STAY, OR ABATE

### DISTRICT COURT PROCEEDINGS FILED BY APPELLANTS AND OTHER DONDERO RELATED ENTITIES TO SUE HIGHLAND FOR ALLEGED MISMANAGEMENT OF ITS ESTATE DURING ITS BANKRUPTCY

| Motion | Court | Movant |
|---|---|---|
| *Plaintiff's Motion to Stay All Proceedings*, Case No. 3:21-cv-01710-N, D.I. 6 (N.D. Tex. Aug. 26, 2021) | District Court | DAF |
| *Plaintiff's Motion to Stay All Proceedings*, Case No. 3:21-cv-00842-B, D.I. 55 (N.D. Tex. Aug. 26, 2021) | District Court | Appellants |
| *Plaintiff's Motion to Stay All Proceedings*, Case No. 3:21-cv-01169-N, D.I. 6 (N.D. Tex. Aug. 26, 2021) | District Court | PCMG Trading Partners XXIII, L.P.[3] |
| *Appellants' Opposed Motion to Stay or Abate Appeal*, Case No. 3:21-cv-01585-S, D.I. 10 (N.D. Tex. Sept. 22, 2021) | District Court | Appellants |
| *Partially Opposed Motion for Extension of Time to File Appellants' Opening Brief*, Case No. 3:21-cv-01585-S, D.I. 13 (N.D. Tex. Sept. 29, 2021) | District Court | Appellants |

---

[3] PCMG Trading Partners XXIII, L.P., is an entity majority owned indirectly by Dondero which was used to invest in certain investment vehicles managed by Highland.

# EXHIBIT 29

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

————————

No. 3:21-CV-01585-S

————————

**IN RE: HIGHLAND CAPITAL MANAGEMENT, L.P.,**
**Debtors.**

**THE CHARITABLE DAF FUND, L.P. AND CLO HOLDCO, LTD.,**

**Appellants,**

**v.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**

**Appellee.**

————————

**PARTIALLY OPPOSED MOTION FOR EXTENSION OF TIME**
**TO FILE APPELLANTS' OPENING BRIEF**
————————

APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS, CASE NO. 19-34054-sgj11

Mazin A. Sbaiti
Jonathan Bridges
SBAITI & COMPANY PLLC
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367
MAS@sbaitilaw.com
JEB@sbaitilaw.com

*Counsel for Appellants The Charitable DAF Fund, L.P. and CLO Holdco, Ltd.*

CLO Holdco, Ltd. and The Charitable DAF Fund, L.P. (collectively, "Appellants") move this Court for an extension of time in which to file their Appellants' Opening Brief on the Merits in this appeal of the bankruptcy court's refusal to modify an order approving Appellee/Debtor Highland Capital Management, L.P.'s ("Appellee") retention of its Chief Restructuring Officer and Chief Executive Officer James P. Seery, Jr. Appellants request thirty (30) days, until and including November 8, 2021, in which to file their opening brief in this appeal.

## BACKGROUND

This appeal arises out of a long and complicated Chapter 11 bankruptcy involving Appellee, a global investment adviser registered with the SEC pursuant to the Investment Advisers Act of 1940 and which managed billions of dollars of third-party assets. *See generally* ROA.672, 831. Charitable DAF Fund, L.P. ("DAF") and CLO Holdco, Ltd. ("CLO Holdco") are two investors for whom Appellee performed services. *Id.*

In January 2020, as part of the ongoing Chapter 11 proceedings, the bankruptcy court entered an order that approved the appointment of three new independent directors to govern Highland Capital's general partner, Strand Advisors, Inc. ROA.505-10. One of those new independent board members was Mr. James Seery. *Id.* Key to this appeal, in July 2020, the bankruptcy court approved Highland Capital's request to appoint Mr. Seery as its new Chief Executive Officer

2

and Chief Restructuring Officer (the "Approval Order"). ROA.510-42; ROA.543-54. The Approval Order, like the January predecessor, contained gate-keeper and injunctive provisions that required parties seeking to sue Mr. Seery to first seek the bankruptcy court's determination that the suing party had a viable claim for willful misconduct or gross negligence only. ROA.544-45. And if such a viable claim were determined to exist, the bankruptcy court would have "sole jurisdiction to adjudicate any such claim[.]" *See id.*

This appeal involves a challenge to the bankruptcy court's refusal to modify its Approval Order and more specifically, the gate-keeping, exculpatory, and sole jurisdiction clauses in that order. Appellants timely filed this appeal and the record was filed (albeit with some deficiencies related to Appellee's designations) on September 8, 2021. Appellants' opening brief is currently due on October 8, 2021.

## **REASONS FOR EXTENSION**

Appellants respectfully request a 60-day extension, up to and including December 7, 2021, by which to file their merits brief in this appeal, for the following reasons:

*First*, Appellants have filed a motion to stay or abate this appeal pending the resolution of a direct appeal to the Fifth Circuit arising out of the same bankruptcy proceeding. *See NexPoint Advisors, L.P. et al. v. Highland Capital Management, L.P.*, No. 21-10449 (5th Cir. 2021) [hereafter "*NexPoint Advisors* appeal"]. In that

appeal, several parties have challenged the Plan Confirmation Order, which also contains exculpatory and injunctive provisions similar to those contained in the Approval Order at issue in this appeal. The Fifth Circuit's resolution of that direct appeal may therefore narrow or even eliminate certain issues that would otherwise be raised here. This Court has issued a briefing schedule. Thus, Appellants request an extension of time given the pending motion for stay before this Court to avoid unnecessary briefing.

*Second*, there are very complex issues implicating application of 100-year-old doctrines with bankruptcy jurisdiction and federal securities law.

*Third*, Appellants' counsel are engaged in other matters with pressing deadlines, commitments, and ongoing work, including the following:

1. Trial in *JRJR, Inc. and Agel Enterprises, Inc. v. Michael A. Bishop, et al,* Cause No. DC-17-15206, 116th Judicial District Court, Dallas, County, Texas, on October 11-15, 2021;

2. Appellants' opening brief deadline in *The Charitable DAF Fund, L.P., CLO Holdco, Ltd., Mark Patrick, Sbaiti & Company PLLC, Mazin A. Sbaiti, and Jonathan Bridges v. Highland Capital Management, L.P.,* Case No. 3:22-cv-01974-X, United States District Court, Northern District of Texas, on October 27, 2021;

4

3. Trial/arbitration in *In the Matter of the Arbitration Between: SBV-Atlanta-Concord Chase, LLC, et al and FPA Multifamily, LLC, et al,* JAMS Reference No. 1410008753, in Atlanta, Georgia, on November 30 – December 3, 2021.

Finally, counsel for Appellee has stated that Appellee is only agreeable to a ten-day extension of Appellants' brief deadline to October 18.

## CONCLUSION AND REQUEST FOR RELIEF

For the above reasons, Appellants respectfully request that this motion for extension of time be granted and that the time for filing their opening merits brief in this appeal be extended by 30 days until and including November 8, 2021. Appellants request any and all further relief to which they may be entitled.

Dated: September 29, 2021        Respectfully submitted,

                                 **SBAITI & COMPANY PLLC**

                                 */s/ Mazin A. Sbaiti*
                                 **Mazin A. Sbaiti**
                                 Texas Bar No. 24058096
                                 **Jonathan Bridges**
                                 Texas Bar No. 24028835
                                 JPMorgan Chase Tower
                                 2200 Ross Avenue – Suite 4900W
                                 Dallas, TX 75201

5

T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com
  jeb@sbaitilaw.com


*Counsel for Appellants The Charitable*
*DAF Fund, L.P. and CLO Holdco, Ltd.*


## <u>CERTIFICATE OF CONFERENCE</u>

I hereby certify that on September 28 and 29, 2021, counsel for Appellants conferred with counsel for Appellee, who stated that Appellee is agreeable to only a ten-day extension of Appellants' brief deadline to October 18, 2021.


*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti


## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 29, 2021, I caused a copy of the foregoing document to be served by Electronic Case Filing System for the United States District Court for the Northern District of Texas.


*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti


6

# EXHIBIT 30

Case No. 21-10449

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

In the Matter of: Highland Capital Management, L.P.,

     Debtor.

---

NexPoint Advisors, L.P.; Highland Capital Management Fund Advisors, L.P.;
Highland Income Fund; NexPoint Strategic Opportunities Fund; Highland Global
Allocation Fund; NexPoint Capital, Incorporated; James Dondero; The Dugaboy
Investment Trust; Get Good Trust,

     Appellants,

v.

Highland Capital Management, L.P.,

     Appellee.

---

## OPENING BRIEF OF APPELLANTS NEXPOINT ADVISORS, L.P.
## AND HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.

---

Direct Appeal from the United States Bankruptcy Court for
the Northern District of Texas, the Honorable Stacey G.C. Jernigan

Davor Rukavina, Esq.
Julian P. Vasek, Esq.
**MUNSCH HARDT KOPF & HARR, P.C.**
500 North Akard St., Ste. 3800
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**ATTORNEYS FOR APPELLANTS NEXPOINT
ADVISORS, L.P. AND HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.**

Case No. 21-10449

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

In the Matter of: Highland Capital Management, L.P.,

      Debtor.

---

NexPoint Advisors, L.P.; Highland Capital Management Fund Advisors, L.P.; Highland Income Fund; NexPoint Strategic Opportunities Fund; Highland Global Allocation Fund; NexPoint Capital, Incorporated; James Dondero; The Dugaboy Investment Trust; Get Good Trust,

      Appellants,

v.

Highland Capital Management, L.P.,

      Appellee.

## CERTIFICATE OF INTERESTED PERSONS

    The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1. **Appellants filing this brief:**

   **NexPoint Advisors, L.P.**
       Owned by:
           The Dugaboy Investment Trust
           NexPoint Advisors GP, LLC
           Owned by:
               James Dondero

i

**Highland Capital Management Fund Advisors, L.P.**
Owned by:
Highland Capital Management Services, Inc.
Strand Advisors XVI, Inc.
Okada Family Revocable Trust

Counsel:
Davor Rukavina, Esq.
Julian P. Vasek, Esq.
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, # 3800
Dallas, Texas 75201-6659

**2.      Other Appellants:**

**Highland Income Fund, NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and NexPoint Capital, Incorporated**

Counsel:
David R. Fine, Esq.
K & L Gates, LLP
17 N. 2nd Street
Harrisburg, PA 17101

A. Lee Hogewood, Esq.
Emily K. Mather, Esq.
K & L Gates, LLP
4350 Lassiter at North Hills Avenue, Suite 300
Raleigh, NC 27609

**James Dondero**

Counsel:
Clay Marshall Taylor, Esq.
Bryan Christopher Assink, Esq.
Bonds, Ellis, Eppich, Schafer Jones, LLP
420 Throckmorton, St., Ste. 1000
Fort Worth, TX 76102

Appx.000726

**The Dugaboy Investment Trust and Get Good Trust**

    <u>Counsel</u>:
Douglas Scott Draper, Esq.
Heller, Draper & Horn, LLC
650 Poydras Street, Suite 2500
New Orleans, LA 70130

3.    **<u>Appellee</u>:**

**Highland Capital Management, L.P.**

    <u>Counsel</u>:
Melissa Sue Hayward, Esq.
Zachery Z. Annable, Esq.
Hayward P.L.L.C.
10501 N. Central Expy. Ste. 106
Dallas, TX 75231

Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067

4.    **<u>Other Interested Parties</u>:**

**Official Committee of Unsecured Creditors**
    Members:
        Redeemer Committee of Highland Crusader Fund
        Meta-e Discovery
        UBS Securities LLC
        UBS AG London Branch
        Acis Capital Management, L.P.
        Acis Capital Management GP, LLC
        Josh Terry

**All creditors in Highland Capital Management, L.P. bankruptcy**

        By:  /s/ Davor Rukavina
           Davor Rukavina, Esq.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The Appellants believe that oral argument would benefit the Court.  The issues this appeal will resolve are particularly important to bankruptcy jurisprudence.  For example, this brief will focus on the proper application of the Absolute Priority Rule, which, despite the rule's historic origins and critical importance, continues to evade definitive delimitation.  Likewise, the Bankruptcy Court went to great lengths to work around applicable precedent in an manner that warrants discussion. Accordingly, the Appellants respectfully request oral argument.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................vi

I.      STATEMENT OF JURISDICTION ..............................................1

II.     STATEMENT OF THE ISSUES ..................................................2

III.    STATEMENT OF THE CASE ....................................................3

        A.    THE PARTIES ..........................................................................3
        B.    THE PLAN ...............................................................................5

               1.   The Absolute Priority Rule Violation ..........................5
               2.   The Plan's Assumption of the PMAs .........................8
               3.   The Plan's Impermissible Exculpations and Injunctions ..........10
               4.   The Debtor's Violation of a Mandatory Bankruptcy Rule .......15

IV.     SUMMARY OF THE ARGUMENT ...........................................16

V.      ARGUMENT ...........................................................................18

        A.    STANDARD OF APPELLATE REVIEW ......................................18
        B.    THE PLAN VIOLATES THE ABSOLUTE PRIORITY RULE .........18
        C.    THIS COURT'S PRECEDENT PROHIBITS PLAN'S
              NON-CONSENSUAL RELEASES AND INJUNCTIONS ................25

               1.   The Plan's Broad Exculpation is Impermissible .....................27
               2.   The Plan's Broad Permanent Injunction is Impermissible .......32
               3.   The Plan's Gatekeeper Injunction is Impermissible ................33
               4.   The Bankruptcy Court's Attempt to Distinguish
                    *Pacific Lumber* Actually Eviscerated its Holding ...................38

        D.    THE DEBTOR ADMITTED IT DID NOT COMPLY
              WITH THE BANKRUPTCY CODE, BUT THE COURT
              CONFIRMED THE PLAN ANYWAY .........................................40

VI.     CONCLUSION .........................................................................42

Appx.000729

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*Adler v. Lehman Bros. Holdings (In re Lehman Bros. Holdings)*,
   855 F.3d 459 (2d Cir. 2017) ...............................................................19

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle St. P'ship*,
   526 U.S. 434 (1999)...........................................................18, 21, 24

*Bank of. La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores
   of Tex., Inc.)*, 266 F.3d 388 (5th Cir. 2001)...........................17, 28, 36

*Bank of New York Trust Co., N.A. v. Official Unsecured Creditors'
   Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009).................*passim*

*Boudreaux v. U.S.*, 280 F.3d 461 (5th Cir. 2002) ....................................18

*Century Indem. Co. v. NGC Settlement Trust (In re Nat'l
   Gypsum Co.)*, 208 F.3d 498 (5th Cir. 2000) ................................29, 32

*DeBold v. Case (In re Tri-River Trading, LLC)*, 329 B.R. 252
   (B.A.P. 8th Cir. 2005)...........................................................22

*Electric Reliability Council of Tex. Inc. v. May (In the Matter of Texas
   Comm. Energy)*, 607 F.3d 153 (5th Cir. 2010)....................................18

*Feld v. Zale Corp. (In re Zale Corp.)*,
   62 F.3d 746 (5th Cir. 1995).....................................25, 26, 31, 33, 34

*First Inv. Corp. v. Fujian Mawei Shipbuilding Ltd.*, 703 F.3d 742
   (5th Cir. 2012).......................................................................37

*In re Edmonds*, 273 B.R. 527 (Bankr. E.D. Mich. 2000) .......................21

*In re Greystone III Joint Venture*, 995 F.2d 1274 (5th Cir. 1991) ..........19

*In re Insilco Techs., Inc.*, 480 B.R. 212 (3d Cir. 2007) ..........................22

*In re Introgen Therapeutics*, 429 B.R. 570 (Bankr. W.D. Tex. 2010) ...................23

Appx.000730

*In re Landing Assocs., Ltd.*, 157 B.R. 791 (Bankr. W.D. Tex. 1993) ....................40

*In re Mangia Pizza Invs., LP*, 480 B.R. 669 (Bankr. W.D. Tex. 2012) .................21

*In re Mcorp Fin., Inc.*, 137 B.R. 219 (Bankr. S.D. Tex. 1992) ..............................23

*In re Seatco, Inc.*, 257 B.R. 469 (Bankr. N.D. Tex. 2001) ......................................40

*In re Tex. Star Refreshments, LLC*, 494 B.R. 684 (Bankr. N.D. Tex. 2013)...........19

*In re Vaughan*, 429 B.R. 14 (Bankr. D.N.M. 2010) .................................................41

*In re W. Real Fund*, 922 F.2d 592 (10th Cir. 1990) .........................................26, 31

*In re Waterways Barge P'ship*, 104 B.R. 776 (Bankr. N.D. Miss. 1989) ..............22

*Mandel v. Thrasher (In re Mandel)*, No. 20-40026, 2021 U.S. App.
   LEXIS 24489 (5th Cir. Aug. 17, 2021) .................................................................42

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988).............................21, 24

*Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1051 (5th Cir. 1987) .....................31

*Scott v. Schedler*, 826 F.3d 207 (5th Cir. 2016)......................................................33

*Segal v. Rochelle*, 382 U.S. 375 (1966) ..................................................................21

*United States v. Dison*, 573 F.3d 204 (5th Cir. 2009) ............................................24

*Villegas v. Schmidt*, 788 F.3d 156, 158 (5th Cir. 2015) .........................................35

## Statutes and Rules

11 U.S.C. § 524 .................................................................................................2, 25, 26

11 U.S.C. § 704 .........................................................................................................41

11 U.S.C. § 1106 .......................................................................................................41

11 U.S.C. § 1107 .......................................................................................................41

11 U.S.C. § 1129 .......................................................................8, 19, 25, 40

28 U.S.C. § 158 ......................................................................................1

28 U.S.C. § 959 ....................................................................................34

28 U.S.C. § 1927 ..................................................................................39

Fᴇᴅ. R. Bᴀɴᴋʀ. P. 2015.3 ....................................................................41

## Other Sources

7 Collier on Bankruptcy ¶ 1129.02[2] (16th ed. 2021) ...........................40

7 Collier on Bankruptcy ¶ 129.03[2] (15th ed. 2000) .............................40

## OPENING BRIEF OF APPELLANTS NEXPOINT ADVISORS, L.P. AND HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.

NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P., two of the appellants in this bankruptcy appeal (collectively, the "Appellants"), hereby submit this *Opening Brief of Appellants NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P.*, in support of which they would respectfully state as follows:

## I.    STATEMENT OF JURISDICTION

On February 22, 2021, the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") entered its *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* (the "Confirmation Order"),[1] by which the Bankruptcy Court confirmed the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, (as further modified the "Plan"),[2] submitted by Highland Capital Management, L.P. (the "Debtor" or "Appellee").  On June 7, 2021, this Court authorized a direct appeal of the Confirmation Order.  The Court therefore has jurisdiction to hear this direct appeal under 28 U.S.C. § 158(d)(2).

---

[1]      ROA.14.

[2]      ROA.105.

## II.   <u>STATEMENT OF THE ISSUES</u>

1.      Did the Bankruptcy Court err as a matter of law in confirming the Plan under the Absolute Priority Rule codified by 11 U.S.C. § 1129(b)(2)(B) because the Plan provides that the holders of equity interests, in the form of limited partnership interests in the Debtor, retain or receive property under the Plan even though Class 8 under the Plan, a class of unsecured creditors, will not be paid in full on the effective date and rejected the Plan?

2.      Did the Bankruptcy Court err as a matter of law in confirming the Plan because the exculpation provisions of the Plan effectuated non-consensual third-party releases in violation of this Court's *Pacific Lumber* precedent and section 524(e) of the Bankruptcy Code?

3.      Did the Bankruptcy Court err as a matter of law in confirming the Plan because the permanent injunctions contained in the Plan are legally improper, effectuate non-consensual third-party releases, violate due process rights, were entered without jurisdiction, and are overly broad and impermissibly vague?

4.      Did the Bankruptcy Court err as a matter of law in confirming the Plan because the Debtor failed to satisfy the 11 U.S.C. § 1129(a)(2) element for confirmation requiring the Debtor to have complied with all applicable provisions of the Bankruptcy Code, which the Debtor admittedly failed to do because it utterly failed to comply with Bankruptcy Rule 2015.3?

### III.   STATEMENT OF THE CASE

### A.   THE PARTIES

The Debtor was a global investment adviser registered with the SEC pursuant

to the Investment Advisers Act of 1940, and managed billions of dollars of third-

party assets.[3]   Under that Act, the Debtor owes strict fiduciary duties to the funds

that it manages and to the investors whose investments it manages.[4]   Among other

things, the Debtor manages more than $1 billion in investments in various

collateralized loan obligations ("CLOs") pursuant to portfolio management

agreements (the "PMAs") in exchange for various fees paid by the CLOs.[5]

The Appellants are also registered investment advisors and owe fiduciary

duties to the funds and other investment vehicles they advise and manage.[6]   The

Appellants manage and advise various publicly traded funds, including the following

three: Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint

Capital, Inc.,[7] which collectively have invested approximately $140 million in the

CLOs the Debtor manages.[8]   These funds are co-appellants in this Appeal.   Under at

---

[3]     ROA.19.

[4]     ROA.747 (Tr. 179:8-15).

[5]     ROA.758 (Tr. 190:7-12).

[6]     ROA.686 (beginning on line 10).

[7]     *See Id.* (beginning on line 20).   Although the Appellants manage and advise these funds on a daily basis, these funds are ultimately controlled by independent boards.   ROA.918 (Tr. 55:6-13).

[8]     ROA.918 (beginning on line 1).

least three PMAs, the funds may remove the Debtor as CLO manager "for cause" because the funds hold the requisite percentage of shares.[9]  There are various other CLOs where the funds do not hold enough shares but are still able to vote their shares along with other shareholders.[10]  Thus, should the Debtor, as manager, act inappropriately, the funds, and the Appellants acting on their behalf, have the ability to protect themselves and their investors by removing the Debtor, but for the Plan.

The Appellants are also unsecured and administrative creditors of the Debtor, holding tens of millions of dollars in unliquidated claims.[11]  The Debtor has also sued the Appellants in various proceedings claiming, among other things, tens of millions of dollars in liabilities under various alleged promissory notes from the Appellants to the Debtor.[12]

The Appellants are managed and controlled by James Dondero ("Dondero"), and directly or indirectly owned by Dondero to various degrees (together with third

---

[9]   *Compare* ROA.1466 (showing cumulative majority interest in Grayson, Greenbriar, and Stratford) *with*, *e.g.*, ROA.1462 (Grayson PMA permitting appointment of successor services at the written direction of a majority of the preference shares).

[10]   ROA.1466 (listing interests in various CLOs).

[11]   ROA.1352-62 (unsecured claims); ROA.32 (Confirmation Order recognizing existence of administrative expense claims).

[12]   ROA.16861 (Dkt. No. 1692, adversary proceeding commenced against Appellants and various other entities); ROA.16878 (Dkt. Nos. 1801, 1802, and 1803, three adversary proceedings commenced against the Appellants and others).

parties).[13]   Prior to his resignation from the Debtor, Dondero also managed and controlled the Debtor, having founded the Debtor in 1993.[14]

## B.   THE PLAN

The Debtor filed the Plan (as an amendment of prior versions) on January 22, 2021.[15]   The Appellants, along with numerous other creditors and parties, filed objections to the Plan.  The Bankruptcy Court held a hearing on the Plan on February 2 and 3, 2021, whereafter the Bankruptcy Court issued an oral ruling confirming the Plan on February 8, 2021,[16] and ultimately entered its Confirmation Order on February 22, 2021.[17]

### 1.    The Absolute Priority Rule Violation

The Plan divides creditors and equity security holders into eleven classes. One of the classes entitled to vote was Class 8, consisting of general unsecured creditors.[18]  The Plan proposed to satisfy claims in Class 8 by creating a "Claimant Trust."[19]  Each creditor in Class 8 receives its *pro rata* share of the "Claimant Trust

---

[13]      ROA.29-30.

[14]      ROA.19-20.

[15]      ROA.3287 (Dkt. No. 1808).

[16]      ROA.1121-71.

[17]      ROA.14-174.

[18]      *Id.*

[19]      ROA.115 (definition of "Claimant Trust").

Interests"[20] in full satisfaction of its claim. The "Claimant Trustee"[21] will then monetize the "Claimant Trust Assets"[22] for the benefit of these creditors and make distributions to them as appropriate.[23]

Of importance for this Appeal, the Plan does not propose to pay Class 8 unsecured creditors in full. Rather, the Debtor estimates that it will pay Class 8 from distributions from the Claimant Trust worth up to 71.32 percent of their claims under the Plan.[24] Nor was there ever a time when the Debtor projected paying Class 8 creditors in full.[25] In fact, the projected return to Class 8 actually diminished over time from 87.44 percent in November 2020 to 71.32 percent in February 2021.[26] No one ever expected the Debtor to pay Class 8 Creditors in full under its nonconsensual Plan, and the Plan does not require it.[27] In fact, the Bankruptcy Court expressly found that Class 8 would be paid at least approximately 71% under the Plan.[28]

---

[20]    ROA.115-16 (definition of "Claimant Trust Interests").

[21]    ROA.115 (definition of "Claimant Trustee").

[22]    *Id.* (definition of "Claimant Trust Assets").

[23]    ROA.137.

[24]    ROA.4158.

[25]    ROA.4428-4432 (Testimony by the Debtor's Chief Executive Officer regarding the projections changing over time).

[26]    *See id.*

[27]    ROA.132 (treatment of Class 8 devoid of any reference to payment in full, acknowledging that Class 8 is impaired).

[28]    ROA.54.

The Plan also contains two classes of equity interests: Classes 10 and 11, which consisted of the limited partnership interests held in the Debtor.[29]  With respect to these classes of equity interests, the Plan grants the holders of these interests "Contingent Claimant Trust Interests," meaning interests in the Claimant Trust that would be entitled to distributions from the Claimant Trust only if and when unsecured creditors, including Class 8, would be paid in full.[30]  The Debtor's CEO admitted that these contingent trust interests are "property" interests, which may have some value in the future.[31]  The Debtor's counsel also confirmed that these contingent trust interests are property: "They are property.  No doubt they are property."[32]  In subsequent briefing, the Debtor once again acknowledged that the contingent trust interests are "property."[33]

Unsurprisingly, Class 8 rejected the Plan.[34]  A majority of creditors voted against confirmation, with twenty-seven rejecting the Plan and only seventeen accepting it.[35]  Thus, the Bankruptcy Court proceeded to consider confirmation of

---

[29]   ROA.128 (describing various classes and entitlement to vote); ROA.116 (definitions of "Class A Limited Partnership Interest" and "Class B/C Limited Partnership Interest").

[30]   ROA.133-34 (describing treatment of Classes 10 and 11).

[31]   ROA.4393-94 (Tr. 177:10 – 178:25).

[32]   ROA.4758 (Tr. 242:20-21).

[33]   ROA.1622 (the Debtor admitted it was "not arguing that the Contingent Claimant Trust Interests are not a property right or might not, at some point, have value.").

[34]   ROA.4202.

[35]   *Id.*

the Plan under the "cramdown" provisions of 11 U.S.C. § 1129(b), including the "Absolute Priority Rule."[36]  As discussed at length below, the Absolute Priority Rule provides that, where a class of unsecured creditors has rejected the Plan and is not paid in full under the Plan on the effective date, as is the case here, no junior class (in this case equity interests) can receive or retain any "property" under the Plan. The Appellants argued that, because Classes 10 and 11 were being provided with the contingent trust interests under the Plan, which the Debtor admitted to be "property" with potential future value, the Plan violated the Absolute Priority Rule on its face.

The Bankruptcy Court rejected this argument, concluding that, because the contingent trust interests would not be paid unless and until unsecured creditors were first paid in full, the Absolute Priority Rule was satisfied.

## 2.    <u>The Plan's Assumption of the PMAs</u>

Under the Plan, the Debtor assumed the PMAs, such that the Debtor will continue to manage and control the CLOs, under which the Debtor manages more than $1 billion of third-party assets,[37] including the various CLOs in which the Appellants and the funds they advise have invested approximately $140 million.[38]

As the Appellants and others informed the Bankruptcy Court, the Appellants believed that the Debtor would be incapable of faithfully exercising its fiduciary

---

[36]     ROA.57 (¶ 60).

[37]     ROA.758 (Tr. 190:7-12).

[38]     ROA.918 (beginning on line 1).

duties under the PMAs owed to the CLOs, because the Debtor has been liquidating the CLOs even though they do not need liquidity, and will liquidate the CLOs in approximately 18 to 24 months.[39]  This goes against the wishes of the beneficial interest holders in the CLOs and, at a minimum, subjects the Debtor to potential future claims and causes of action for how it manages or mismanages $1 billion of other peoples' investments.  Simply put, how the Debtor manages the CLOs post-confirmation is of significant concern to many investors, including the Appellants and the funds that they manage, and, if the Debtor breaches its fiduciary duties, mismanages, or engages in other actionable conduct regarding its management of the CLOs, it faces potentially serious non-bankruptcy liabilities.

This is important for this Appeal because, upon the Debtor's assumption of the PMAs, the Debtor became obligated to comply with the PMAs in all respects, and all rights of parties under the PMAs, and the related CLO indentures, are reinstated and preserved with respect to all post-confirmation matters and liabilities. In other words, post-confirmation, the Appellants and the funds would normally have rights to remove the Debtor as manager of the CLOs, in some instances alone while in other instances with others, and in some instances for "cause" while in others for no "cause."[40]  This is of further importance to the discussion below

---

[39]     ROA.3530-31; ROA.3542-43.

[40]     *E.g.* ROA.8048 (¶ 12(c), providing for removal without cause).

because, among other things, and notwithstanding the law that preserves all counterparty rights under an assumed contract, the Bankruptcy Court enjoined the Appellants, the funds, and others from exercising those rights post-confirmation.

### 3. The Plan's Impermissible Exculpations and Injunctions

The Plan contains broad and sweeping exculpation and injunction provisions barring and limiting claims and causes of action against the Debtor and numerous non-debtor persons and parties not only for actions or inactions taken during the bankruptcy case and prior to confirmation, but for post-confirmation actions, inactions, and potential liabilities.

Article IX of the Plan contains the following exculpation provision (the "Exculpation Provision"):

> Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); provided, however, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to

10

acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.[41]

"Exculpated Parties," in turn, means, collectively:

(i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."[42]

Article IX of the Plan also contains an injunction provision (the "<u>Injunction</u>"),

which provides, in pertinent part, as follows:

Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from

---

[41]   ROA.157.

[42]   ROA.119.

Appx.000743

taking any actions to interfere with the implementation or consummation of the Plan.

* * *

Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; provided, however, the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.[43]

"Enjoined Parties," in turn, is defined to mean:

(i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest,

---

[43]     ROA.160.

(iv) any Related Entity, and (v) the Related Persons of each of the foregoing.[44]

And "Protected Parties" means, collectively:

(i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."[45]

The Appellants are therefore expressly subject to the Injunction. The Injunction prohibits the Appellants from taking any action to "interfere with the implementation or consummation of the Plan," whatever that means. As the evidence at the confirmation hearing made clear, the Debtor considers this injunction to prohibit the Appellants from advising the funds or others to cause them to remove

---

[44]    ROA.118.

[45]    ROA.123.

the Debtor as CLO manager.[46]  As also made clear at the confirmation hearing, the Injunction applies to the Debtor's post-confirmation operations, including its management of the CLOs.[47]  Thus, the Plan prohibits the Appellants from fully exercising their fiduciary duties to the funds and it prevents the Appellants and the funds from exercising their contractual rights under the assumed PMAs or from asserting claims and causes of action against the Debtor and many others related to how they manage the CLOs or other assets.

These concerns regarding potential mismanagement, potential liabilities, and exculpation are not academic.  As of the confirmation hearing, the Debtor testified that, during its bankruptcy case, it had already lost approximately $200 million in value, at least $100 million of which the Debtor blamed on the Debtor's prior (yet post-bankruptcy) manager.[48]

Simply put, it is remarkable and unprecedented that the Bankruptcy Court would exculpate, and protect by permanent injunction, a registered investment advisor, managing billions in other peoples' investments and subject to strict federal statutory and contractual obligations and fiduciary duties, from past and future claims and liabilities, especially when the Debtor already admitted that it lost $200 million just during the course of its bankruptcy case.  If the Debtor did not wish to

---

[46]     ROA.766 (Tr. 198:12-25).

[47]     *Id.*

[48]     ROA.663-66 (Tr. 95:17-98:6); ROA.768 (Tr. 200:16-19).

face such potential claims and liabilities, it could have simply rejected the PSAs. But once the Debtor assumed the PSAs, the Debtor became subject to all provisions thereof, and obligations and liabilities thereunder.

### 4.   The Debtor's Violation of a Mandatory Bankruptcy Rule

Bankruptcy Rule 2015.3 requires a debtor to file periodic financial reporting for each entity "in which the estate holds a substantial or controlling interest."[49]  In this case, the Debtor holds about 40 percent of its assets through subsidiaries.[50] During his testimony, the Debtor's Chief Executive Officer acknowledged he is familiar with Bankruptcy Rule 2015.3.[51]   The Debtor's CEO also admitted the Debtor never filed any such reports.[52]   His excuse for noncompliance was that complying with the rule would be "difficult," and "it fell through the cracks."[53]

Given that nearly half of the Debtor's assets are held in only nine subsidiaries,[54] the Appellants argued that the Debtor's failure to disclose their finances precluded plan confirmation because the Debtor had failed to comply with

---

[49]   FED. R. BANKR. P. 2015.3(a).

[50]   *Compare* ROA.17401, 17408 (showing equity method investments of $167,226,227.63) *with* ROA.17398 (showing total assets of $410,104,783.30).

[51]   ROA.4564 (Tr. 48:12-14).

[52]   *Id.* (Tr. 48:15-17).

[53]   ROA.1564 (Tr. 49:5-21).

[54]   *Compare* ROA.17401, 17408 (showing equity method investments of $167,226,227.63) *with* ROA.17398 (showing total assets of $410,104,783.30).

Appx.000747

all requirements of the Bankruptcy Code—a necessary element of confirmation.[55] The Bankruptcy Court wholly ignored this argument and did not address it in either its oral ruling or Confirmation Order.[56]

## IV.   <u>SUMMARY OF THE ARGUMENT</u>

The Bankruptcy Court erred as a matter of law in at least three important respects.   First, the Plan plainly violates the Absolute Priority Rule because unsecured creditors rejected the Plan and the Plan does not pay them in full on the effective date, yet the Plan provides junior equity interest holders with property in the nature of contingent trust interests.   The Bankruptcy Court's "workaround" is incompatible with the statute and violates clear Supreme Court precedent.   Second, the Exculpation Provision and the Injunction clearly violate this Court's *Pacific Lumber* precedent.   The Bankruptcy Court's belief that this Court would revisit *Pacific Lumber* is not proper grounds for the Bankruptcy Court not to apply that precedent.   Third, the Debtor's inexcusable, inexplicable, yet nonchalant failure to comply with Bankruptcy Rule 2015.3—a critically important rule of transparency— prevented confirmation as a matter of law.

Taking a step back, though, why have the Plan at all?   The Debtor can liquidate just fine through Chapter 11 or Chapter 7, the Bankruptcy Code provides

---

[55]     ROA.4704-05 (Tr. 188:7 – 189:1).

[56]     ROA.14 (beginning of Confirmation Order); ROA.1121 (beginning of oral ruling).

it with all the tools that it needs, and the Debtor admitted that the Plan does not give it anything that it lacks in order to liquidate its assets and pay its creditors.  But the Debtor, its management, and its professionals are accountable for their management or mismanagement during a case.  Not so under the Plan.  That, then, is the answer to the question of why: the Plan, through its Exculpation Provision and Injunction, is little more than a "get out of jail free" card, relieving the Debtor, its management, and its professionals of their obligations and liabilities under assumed contracts and federal securities laws, including for all *future* claims.

But that is not the point of Chapter 11.  This Court has previously articulated the point of confirming a plan:

> [o]nce the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval.  The firm also is without the protection of the bankruptcy court.  It may not come running to the bankruptcy judge every time something unpleasant happens.

*Bank of. La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001).

Yet the Bankruptcy Court has ordered precisely the opposite of this, in violation of the Bankruptcy Code, in violation of *Bank of New York Trust Co., N.A. v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009), and in violation of fundamental due process rights.

Expediency is not the rule of Chapter 11 plan confirmation. Strict statutory requirements must be met. The Supreme Court's precedent and this Court's precedent must be followed. A debtor must earn its plan and its discharge by complying with its duties and with the law—not use the same as a cloak for its management and professionals to avoid present and *future* obligations. Whatever ills the Debtor imagined to justify the Plan, violating clear and well-established law was not the correct response.

## V.   ARGUMENT

### A.   STANDARDS OF APPELLATE REVIEW

This Court reviews the Bankruptcy Court's findings of fact for "clear error," while conclusions of law are reviewed *de novo*. *See Electric Reliability Council of Tex. Inc. v. May (In the Matter of Texas Comm. Energy)*, 607 F.3d 153, 158 (5th Cir. 2010). "A finding is clearly erroneous if a review of the record leaves a definite and firm conviction that a mistake has been committed." *Boudreaux v. U.S.*, 280 F.3d 461, 466 (5th Cir. 2002) (internal quotation omitted).

### B.   THE PLAN VIOLATES THE ABSOLUTE PRIORITY RULE

The Absolute Priority Rule is straightforward and grounded in equity: if unsecured creditors reject a plan, then they must either be paid in full on the plan effective date or no one junior to them can retain anything. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 441-42 (1999).

"As every bankruptcy practitioner knows, the absolute priority rule is a bedrock principle of chapter 11 practice." *In re Tex. Star Refreshments, LLC*, 494 B.R. 684, 703 (Bankr. N.D. Tex. 2013); *accord Adler v. Lehman Bros. Holdings (In re Lehman Bros. Holdings)*, 855 F.3d 459, 470 (2d Cir. 2017).  This Court previously observed that the Absolute Priority Rule is strict by Congress's design, and courts must take it seriously.  *See In re Greystone III Joint Venture*, 995 F.2d 1274, 1283 (5th Cir. 1991) ("Congress acted knowledgeably in codifying a strict absolute priority rule").

Because Class 8 rejected the Plan, the Plan could only be confirmed on "cramdown."  11 U.S.C. § 1129(a)(8) & 1129(b)(1).  This requires that the Plan be "fair and equitable" to the rejecting class.  11 U.S.C. § 1129(b)(1).  When the rejecting class is a class of unsecured creditors, as is the case here, this triggers the Absolute Priority Rule.  Either:

> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property ….

11 U.S.C. § 1129(b)(2)(B).

Here, the Plan will pay unsecured creditors only 71%, over time.[57]  It does not give them property worth 100% of their claims on the effective date.  Therefore, the only way to confirm the Plan over Class 8's rejection was for the Plan to provide that Classes 10 and 11 "will not receive or retain under the plan on account of such junior claim or interest any property."  Yet the Plan does not provide so.  On the contrary, these classes receive contingent trust interests which, if and when unsecured creditors are paid in full, will share in distributions and recoveries.[58]

There can be no question that these contingent trust interests are provided to Classes 10 and 11 "on account of" their existing equity interests (*i.e.*, limited partnership interests):

> On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10[/11] Claim, *in full satisfaction, settlement, discharge and release of, and in exchange for*, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests ....[59]

There can also be no question that the contingent trust interests provided to Classes 10 and 11 are "property."  The Debtor admitted that these interests were property both through testimony and during closing arguments.[60]  As a matter of law, an interest in a trust, even one subject to a contingency that may never happen, is

---

[57]    ROA.4158.

[58]    ROA.117 (definition of Contingent Claimant Trust Interests); ROA.15615 (¶ 5.1(c)).

[59]    ROA.133-34 (emphasis added).

[60]    ROA.4393-94 (Tr. 177:10 – 178:25); ROA.4758 (Tr. 242:20-21) ("They are property.  No doubt they are property.").

"property."  *See In re Edmonds*, 273 B.R. 527, 529 (Bankr. E.D. Mich. 2000).  The

Debtor even admitted that these property interests may have value in the future.[61]

Regardless, it does not matter that these property interests have little or no

present value, nor that they may never have value:

> Respondents further argue that the absolute priority rule has no
> application in this case, where the property which the junior interest
> holders wish to retain has no value to the senior unsecured creditors. . .
> We join with the overwhelming consensus of authority which has
> rejected this 'no value' theory. . . Whether the value is present or
> prospective, for dividends or only for purposes of control a retained
> equity interest is a property interest. . . And while the Code itself does
> not define what 'property' means as the term is used in § 1129(b), the
> relevant legislative history suggests that Congress' meaning was quite
> broad.  Property includes both tangible and intangible property.

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207-08 (1988) (internal

quotations and citations omitted); *accord Segal v. Rochelle*, 382 U.S. 375, 379

(1966) (holding that contingent loss-carryback refund was "property" under former

Bankruptcy Act").   Indeed, even something as amorphous as merely retaining

control of a debtor—which the Debtor's CEO does here post-confirmation—

constitutes "property" under the Absolute Priority Rule.  *See 203 N. Lasalle*, 526

U.S. 434;  *In re Mangia Pizza Invs., LP*, 480 B.R. 669, 699-700 (Bankr. W.D. Tex.

2012).

---

[61]      ROA.1622.

Various courts have gone so far as to say that, in order to satisfy the Absolute Priority Rule, junior classes must receive "nothing." *See In re Insilco Techs., Inc.*, 480 B.R. 212, 218 n.10 (3d Cir. 2007) ("Even in the flexible world of Chapter 11 reorganizations, the absolute priority rule, 11 U.S.C. § 1129(b)(2)(B), requires that equity holders receive nothing unless all creditors are paid in full."); *DeBold v. Case (In re Tri-River Trading, LLC)*, 329 B.R. 252, 266 (B.A.P. 8th Cir. 2005) ("The rule provides that in a Chapter 11 reorganization equity should receive nothing unless senior classes are paid in full."); *In re Waterways Barge P'ship*, 104 B.R. 776, 786 (Bankr. N.D. Miss. 1989) ("The absolute priority rule is clear.  If the dissenting unsecured creditor class is not being paid in full . . . then a junior class may retain or receive nothing.").

The Plan therefore violates the Absolute Priority Rule on its face: Class 8 unsecured creditors rejected the Plan, and Class 8 is not paid in full under the Plan on the effective date, while junior classes of equity interest holders in Classes 10 and 11 receive property under the Plan in the nature of contingent trust interests.

The Bankruptcy Court disagreed, concluding that, because Classes 10 and 11 would not be paid on account of the contingent trust interests unless unsecured creditors were first paid in full, the Absolute Priority Rule was preserved.  This is a fundamental misreading of the Absolute Priority Rule.  The rule does not provide that equity interests cannot be paid unless unsecured creditors are first paid in full;

it provides that equity interests cannot receive any property at all unless unsecured creditors are paid in full on the effective date.  There is no dispute that the Plan does not propose to pay Class 8 in full on the effective date.  The analysis begins and ends with whether the contingent trust interests provided to Classes 10 and 11 are property.  If they are property, as the Debtor admitted they are, then the Plan violates the Absolute Priority Rule and the Plan could not have been confirmed.

The Bankruptcy Court relied on *In re Introgen Therapeutics*, 429 B.R. 570 (Bankr. W.D. Tex. 2010) for its conclusion, which opinion permitted the same type of contingent trust interest as in the Plan.  Before discussing the merits of this opinion, however, *Introgen* is easily distinguishable because, unlike here, in that case the debtor anticipated paying unsecured creditors in full over time.  *See id*. at 576 and 585.  Notwithstanding this fact, the bankruptcy court inexplicably embarked on a lengthy analysis of the Absolute Priority Rule anyway.  *Id.* at 585.  Thus, its opinion is *dicta*, at best.

Either way, *Introgen* is deeply flawed and this Court should soundly reject it. First, it directly contradicts the statute, which looks only to whether the class of equity interest holders receive property.  Second, Congress considered, but excluded from the Bankruptcy Code, a similar mechanism that would have provided for a waterfall to all stakeholders when a junior one would not be paid until a senior one was paid in full.  *See In re Mcorp Fin., Inc.*, 137 B.R. 219, 235 (Bankr. S.D. Tex.

---

23

1992).  Third, the opinion looked to the present value of what was being retained, something directly foreclosed by the Supreme Court's opinion in *Ahlers*, 485 U.S. at 207-08.  Fourth, the opinion fails to take into account the Supreme Court's opinion in *203 N. Lasalle*, 526 U.S. 434, in which the Supreme Court equated the exclusive opportunity to bid on new equity under a plan as itself "property" that was being granted or retained in violation of the Rule: "[t]his opportunity should, first of all, be treated as an item of property in its own right." *Id*. at 455.  If an exclusive opportunity is "property" for purposes of the Absolute Priority Rule, then so is an "opportunity" to share in a future recovery.

The Plan gives equity interest holders in Classes 10 and 11 "property" even though unsecured creditors in Class 8 rejected the Plan and are not paid in full under the Plan on the effective date.  That is all that matters for the Absolute Priority Rule. It is not for the Debtor or the Bankruptcy Court to rewrite the statute in order to obtain confirmation: as the Supreme Court cautioned, when others attempted such work-arounds, "an absolute priority rule so variable would not be much of an absolute." *203 N. Lasalle*, 526 U.S. at 450.  Instead the Court must apply the statute's plain language unless doing so leads to an absurd result. *See, e.g., United States v. Dison*, 573 F.3d 204, 207 (5th Cir. 2009).  Leaving nothing for equity when unsecured creditors are not paid in full is hardly an absurd result; indeed, that is the whole purpose of the Absolute Priority Rule.

The Court should therefore reverse the Confirmation Order and render judgment that, as a matter of law, the Plan violates the Absolute Priority Rule and could not therefore have been confirmed under 11 U.S.C. §§ 1129(a)(8) and 1129(b)(2)(B)(ii).

## C.   THIS COURT'S PRECEDENT PROHIBITS PLAN'S NON-CONSENSUAL RELEASES AND INJUNCTIONS

In *Pacific Lumber*, 584 F.3d at 253, this Court broadly foreclosed nonconsensual releases and exculpations of third-party claims; *i.e.* a claim held by a non-debtor against a non-debtor. The *Pacific Lumber* plan proposed to exculpate the debtor's management and professionals for actions (or omissions) they took during the Chapter 11 case. *See id*. at 251. The Court found this exculpation impermissible:

> this court has held Section 524(e) only releases the debtor, not co-liable third parties. These cases seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions. . . the essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose.

*Id*. at 252 (internal citations omitted).

Nor can a crafty debtor effectuate a release of third-party claims through an injunction, because "[s]ection 524 prohibits the discharge of debts of nondebtors." *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760 (5th Cir. 1995). "Accordingly, [the Court] must overturn a § 105 injunction if it effectively

discharges a nondebtor." *Id.* A plan may impose no such injunction on a permanent basis:

> the stay may not be extended post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to the creditor. Not only does such a permanent injunction improperly insulate nondebtors in violation of section 524(e), it does so without any countervailing justification of debtor protection.

*Id.* at 760 (*quoting In re W. Real Fund*, 922 F.2d 592, 601-02 (10th Cir. 1990)).

Here, the Plan violates these dictates in three substantial ways: (i) it exculpates claims for negligence that may be held by the Appellants and others against numerous non-debtor parties;[62] (ii) it enjoins the Appellants and others from exercising their contractual rights after confirmation under contracts that are assumed;[63] and (iii) it subjects any non-exculpated claim that the Appellants and others may have against the foregoing to a "gatekeeper injunction" where the Bankruptcy Court, reserving "exclusive jurisdiction," must first determine that a "colorable claim" exists.[64] And, what is most problematic and utterly unsupportable under any theory is that the Exculpation Provision and Injunction both apply to future, post-confirmation liabilities—a perpetual "get out of jail free" card.

---

[62]    ROA.157 (C. Exculpation).

[63]    ROA.160 (F. Injunction).

[64]    *Id.*

## 1.     __The Plan's Broad Exculpation is Impermissible__

With respect to the Plan's exculpation provisions, "Exculpated Parties" include non-debtor managed funds, employees, the Debtor's general partner, the Debtor's management and professionals, and the affiliates of the foregoing; *i.e.,* numerous non-debtor parties.[65]  Subject to various limitations, the Plan exculpates against negligence liabilities and provides that:

> no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of [a laundry list of circumstances] ….[66]

On its face, these provisions directly and unmistakably violate *Pacific Lumber*.  But these provisions are particularly egregious because they also apply to, and exculpate, potential *prospective* liability incurred after the confirmation of the Plan, because these provisions also apply to "the implementation of the Plan."[67] The "implementation of the Plan" will take between two to three years[68] and involves the Debtor managing more than $1 billion of other peoples' investments.[69]  This is unprecedented, a federal court immunizing fiduciaries against future claims.

---

[65]     ROA.119.

[66]     ROA.87.

[67]     *Id.* (sub. iv).

[68]     ROA.757 (Tr. 189:3-9).

[69]     ROA.758 (Tr. 190:7-9).

This also violates the fundamental premise of what it means to *exit* bankruptcy:

> Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval. The firm also is without the protection of the bankruptcy court. It may not come running to the bankruptcy judge every time something unpleasant happens.

*Craig's Stores*, 266 F.3d at 390.

It is the equivalent of a bankruptcy court prospectively releasing General Motors from liability for cars it manufactures after exiting bankruptcy. And this concern is not merely academic. As the Debtor's CEO testified at the confirmation hearing, the Debtor lost approximately $200 million in value during its bankruptcy case, at least $100 million of which the CEO blamed on the Debtor's prior (yet post-bankruptcy) manager.[70]

Not only does the Exculpation Provision violate *Pacific Lumber*, but it also violates fundamental bankruptcy laws regarding the assumption of executory contracts. The PMAs, pursuant to which the Debtor manages more than $1 billion in other peoples' investments, are executory contracts assumed under the Plan.[71] The effect of assumption is that "the debtor must continue to perform . . . the debtor accepts both the obligations and the benefits of the executory contract." *Century*

---

[70]    ROA.663-66 (Tr. 95:17-98:6); ROA.768 (Tr. 200:16-19).

[71]    ROA.171 (Schedule of CLO Management Agreements and Related Contracts to Be Assumed).

*Indem. Co. v. NGC Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 505-06 (5th Cir. 2000).  The Exculpation Provision violates this fundamental rule.

The Bankruptcy Court justified the Exculpation Provision, in part, based on *res judicata* and the "law of the case" doctrines, because the Bankruptcy Court had previously entered two orders allegedly exculpating the Debtor and its management (the January 9, 2020 order and July 16, 2020 order).  The Bankruptcy Court erred in applying either doctrine substantially for the reasons briefed by appellants Highland Income Fund, NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and NexPoint Capital, Inc. in their opening brief (pp. 25-29), which the Appellants hereby incorporate.  Like these co-appellants, the Appellants are not parties to the January 9 or July 16 orders and there is no evidence or argument that the Bankruptcy Court had either personal jurisdiction or subject matter jurisdiction to make these orders applicable to the Appellants.  The Appellants add two additional reasons why the Bankruptcy Court erred as a matter of law.[72]

---

[72]   It is arguable whether either order provides for any exculpation of negligence claims at all. Neither order mentions exculpation or negligence.  Rather, each order provides that no claim may be filed, unless the Bankruptcy Court first determines that the claim is a colorable claim for gross negligence or willful misconduct, which the Debtor reads as a *de facto* exculpation against negligence claims, which view the Bankruptcy Court apparently agreed with.  The Appellants do not believe that the orders provide for exculpation and they suggest that, had something as important as exculpation against negligence been contemplated or ordered, it would have been express, specific, and explicit, consistent with notions of fundamental due process.

First, each order is far more limited with respect to the persons exculpated than the Exculpation Provision in the Plan.  Any exculpation in the January 9 order applies only to the Debtor's independent directors and the agents or advisors of the independent directors.[73]  The July 16 order, if it exculpates anyone, exculpates only James Seery, the Debtor's chief executive officer and chief financial officer.[74]  Second, neither order can be read to apply post-confirmation.  Any fair reading of either order makes it clear that the orders are to apply only to the bankruptcy case itself, and not to any actions or liabilities arising after the bankruptcy case.  The July 16 order expressly notes that the "agreement" it approves with respect to Mr. Seery terminates upon the confirmation of a plan.

Second, more than anything, it is inconceivable that the Bankruptcy Court, a court of limited jurisdiction, would have intended for a simple order entered on a simple motion to provide for exclusive future jurisdiction, *ad infinitum* and as against the world, over post-confirmation claims.  As this Court has made it clear, whatever jurisdiction the Bankruptcy Court has to protect non-debtor entities is *temporary* only during the bankruptcy case: "While a temporary stay prohibiting a creditor's suit against a nondebtor during the bankruptcy proceeding may be permissible to facilitate the reorganization process . . . the stay may not be extended

---

[73]     ROA.12409.

[74]     ROA.12621.

Appx.000762

post-confirmation." *Zale Corp.*, 62 F.3d at 760 (quoting *In re W. Real Estate Fund*, 922 F.2d 592, 601-02 (10th Cir. 1990)).

Here, the Plan applies to exculpate negligence, including of many additional persons and entities not mentioned in the January 9 or July 16 orders, and the exculpation extends to post-confirmation matters. Thus, the Plan differs in scope, protected persons, and timing. None of these issues were addressed or decided in connection with the January 9 or July 16 orders, and the parties to those orders and the present dispute are not identical, meaning that *res judicata* cannot apply as a matter of law. *See Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1051 (5th Cir. 1987). The Debtor's resort to *res judicata* is just a transparent after-the-fact justification for what was never possible to begin with. Indeed, the Appellants submit that, had the Debtor on January 9, 2020 told the Bankruptcy Court that it intended for the order to apply for all time, after confirmation, to many other people, to many other claims, and to limit the rights of those who own the billions of dollars in investments the Debtor manages, the Bankruptcy Court would have been incredulous.

The Court should therefore reverse the Confirmation Order and render judgment that the Plan cannot be confirmed or, alternatively, strike the Exculpation Provision from the Plan.

Appx.000763

## 2.    **The Plan's Broad Permanent Injunction is Impermissible**

Next, the Plan contains a sweeping, permanent injunction: "all Enjoined Parties[75] are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan."[76]  Of immediate relevance to and effect on the Appellants, this means that the Appellants are enjoined from advising or causing their clients, including the funds, to remove the Debtor as the manager of the CLOs, even though the Debtor assumed the PMAs and even if the Debtor mismanages the CLOs.[77]

As with exculpations, *Pacific Lumber* broadly forecloses non-consensual "permanent injunctions."  *Pacific Lumber*, 584 F.3d at 252-53.  More technically, the assumption of the PMAs means that the Debtor is obligated to perform under them, and all rights of the counterparty are preserved and may be enforced.  *See Nat'l Gypsum*, 208 F.3d at 505-06 ("[w]here the debtor assumes an executory contract, it must assume the entire contract, cum onere – the debtor accepts both the obligations and the benefits of the executory contract").  The Debtor here found a clever way around this fundamental rule by simply obtaining an injunction that permanently enjoins and alters contract rights and obligations, in direct violation of the Bankruptcy Code.  It goes without saying, however, that the Bankruptcy Court's

---

[75]    The Appellants are "Enjoined Parties."  *See* ROA.118.

[76]    ROA.160 (F. Injunction).

[77]    *See* ROA.766 (Tr. 198:12-25).

broad equitable powers, including under section 105(a) of the Bankruptcy Code—the justification for the Injunction—cannot be used to actually contradict or subvert an express provision of the Bankruptcy Code. *See Zale Corp.*, 62 F.3d at 760.

This injunction, prohibiting "any actions to interfere with the implementation or consummation of the Plan," is also both overbroad and vague. *See Scott v. Schedler*, 826 F.3d 207, 211-12 (5th Cir. 2016) ("an injunction is overly vague if it fails to satisfy the specificity requirements . . . and it is overbroad if it is not narrowly tailored to remedy the specific action"). The Appellants should not be subjected to potential contempt actions when the Plan fails to define with any reasonable specificity what it means to "interfere" with the "implementation or consummation" of the Plan, a process that could take years.

Thus, the Court should strike the Injunction against any act "to interfere with the implementation or consummation of the Plan" or, at a minimum, strike this provision to the extent that it could be read to prevent anyone from exercising any contract, statutory, or other legal right under any contract assumed under the Plan, including the PMAs.

### 3. The Plan's Gatekeeper Injunction is Impermissible

With respect to the "gatekeeper injunction," the Appellants are included within the "Enjoined Parties" subject to that injunction, which prohibits the Appellants from taking various actions, including to sue any of the "Protected

Parties."[78]  The "Protected Parties" include the same entities that are exculpated as discussed above.[79]  Like the exculpation provision, this injunction effectuates a non-consensual, non-debtor release prohibited by *Pacific Lumber* because the Appellants are enjoined from suing the Protected Parties *even for* claims based on "bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence."[80] *See Pacific Lumber*, 584 F.3d at 252-53.

First, this portion of the Injunction directly contradicts 28 U.S.C. § 959(a), which provides that "debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property."  The general rule is therefore that no leave from the Bankruptcy Court is necessary, meaning that the imposition of any such requirement through section 105(a) of the Bankruptcy Code is improper as that section cannot be used to contradict a statute.  *See In re Zale Corp.*, 62 F.3d at 760. That said, section 959(a) does provide that "[s]uch actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury."  28 U.S.C. § 959(a).  While this may be read to grant the Bankruptcy Court some authority over actions against a debtor-in-possession, this cannot possibly extend to any post-

---

[78]     ROA.118 ("Enjoined Parties"); ROA.123 ("Protected Parties"); ROA.160 (F. Injunction).

[79]     ROA.123.

[80]     ROA.160-61.

confirmation action because, after confirmation, there is no more debtor-in-possession.  And, after confirmation, all jury rights against a debtor or others are fully reinstated; a right that the Injunction violates.

Second, the Bankruptcy Court's reliance on the *Barton* doctrine to justify the gatekeeper injunction also fails as a matter of law.  That doctrine requires leave of the appointing court before a receiver or trustee can be sued.  *See, e.g., Villegas v. Schmidt*, 788 F.3d 156, 158 (5th Cir. 2015).  The Debtor, however, is neither a receiver or trustee.  Nor are any of the other parties protected by the injunction (including the Debtor's general partner, that general partner's directors, the Debtor's affiliates, and the Debtor's professionals).  Nor is there any support for the application of this doctrine prospectively, to apply after confirmation when there is no longer an estate being administered subject to the jurisdiction of the Bankruptcy Court where the receiver or trustee can be deemed an agent of the appointing court.  The *Barton* Doctrine simply has no application.

There is no redemption in the fact that the Bankruptcy Court may grant relief from the injunction if it first determines that an Enjoined Party has a "colorable claim" against a "Protected Party."  Nothing in the Bankruptcy Code possibly permits the Bankruptcy Court to require a non-debtor to come forth and prove that it has a viable claim against another non-debtor before it can assert that claim, or else be in contempt of court.  And this, too, applies *prospectively* to actions the

Debtor will take in the next two to three years during the "wind down of the business of the Debtor or Reorganized Debtor" and the "the administration of the Claimant Trust."[81]  This is unprecedented, it violates due process, it is a taking, and it is prohibited by *Pacific Lumber*.

The Bankruptcy Court also impermissibly reserved to itself the "sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable."[82] It is black-letter law that the Bankruptcy Court has no such jurisdiction between non-debtors today and will certainly have no such jurisdiction in the future as the Plan is implemented.  *See Craig's Stores*, 266 F.3d at 390 ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan.").  And it is certainly black-letter law that the Bankruptcy Court cannot confer onto itself jurisdiction that it does not have.

The problem is a simple one.  Post-confirmation, if the Appellants wish to file a lawsuit against any of the protected parties, they will have to come to the Bankruptcy Court and prove that the claim is "colorable," presumably meaning that the claim has a valid basis in law, *i.e.* a Rule 12(b)(6) analysis, and is supported by *prima facie* evidence.  The Bankruptcy Court will decide this question, even though

---

[81]     *Id.*

[82]     *Id.*

it will have no jurisdiction at all to do so. If the Bankruptcy Court finds the claim to be colorable, then presumably all is well and the Bankruptcy Court's finding will be entitled to collateral estoppel, even though the Bankruptcy Court had no jurisdiction. But if the Bankruptcy Court determines that the claim is not colorable, then the Appellants will not be able to proceed and a court with no jurisdiction will have made a dispositive finding. And the right to have a jury determine any contested issue of fact will have been violated.

That is the fundamental problem: a court with no jurisdiction to consider the merits of the underlying claim cannot possibly determine whether any subset of that claim is met, such as whether the claim is at least colorable. This is also a fundamental problem of due process. The Appellants have a due process right of access to a court with jurisdiction over them and their claims. *See, e.g., First Inv. Corp. v. Fujian Mawei Shipbuilding Ltd.*, 703 F.3d 742, 749 (5th Cir. 2012).

The end result is that the Appellants, and many others, are enjoined *permanently* from exercising their legal and contractual rights; that potential present and *prospective* claims they have against non-debtors are released and exculpated; and that they are required to prove a "colorable" claim for any present or *prospective* claim they may have against non-debtors before they may assert that claim, while the Debtor and its management, officers, and others are free to manage billions of dollars of innocent investors' funds, taking exorbitant fees for themselves,

effectively free from the fiduciary duties imposed on them by the federal securities laws.  This is precisely what *Pacific Lumber* prohibits, and this case aptly proves the wisdom of *Pacific Lumber's* prohibition.

### 4.     The Bankruptcy Court's Attempt to Distinguish *Pacific Lumber* Actually Eviscerated its Holding

Cognizant of *Pacific Lumber's* holding, the Bankruptcy Court attempted to distinguish it.[83]  In doing so, the Bankruptcy Court went as far as to state its belief that this Court would "extend the holding of *Pacific Lumber*" with respect to the proper scope of an exculpation provision.[84]  But if the Court must extend *Pacific Lumber*'s holding, then it cannot be merely distinguishable.  Indeed, the pertinent facts are overwhelming similar, and the Bankruptcy Court struggled to find a workaround.

Unfortunately (but inevitably), the Bankruptcy Court eviscerated *Pacific Lumber* by creating an exception "where there's a real risk … of burdensome and vexatious litigation going forward …."[85]  This exception fails for obvious reasons. There is always a risk of litigation when a debtor reenters the world after bankruptcy, especially in the Debtor's business where it manages billions of dollars of other peoples' investments as a fiduciary.  Otherwise, there would never be a desire for

---

[83]     ROA.65-66.

[84]     ROA.1432 (Tr. 70:10-24).

[85]     *Id.* (Tr. 70:10-24).

injunctions and exculpations.  Litigation is always burdensome.  That is undoubtedly why the Plan's effectiveness was contingent on obtaining satisfactory directors' and officers' insurance.[86]  And, the law already punishes vexatious litigation.  28 U.S.C. § 1927.  Thus, there are already sufficient safeguards in the law to protect the reorganized Debtor against frivolous litigation without the need for an extraordinary, permanent, anti-filing injunction while, if the litigation is not frivolous, the Debtor must cope with it the same as any other business.

If the desire to avoid burdensome and expensive litigation—something that every reorganized debtor would want—sufficed, then every Chapter 11 plan may as well have gatekeeper injunctions in order to "facilitate" a confirmed plan.  Or, perhaps a debtor that does not want to face such potential actions and liabilities should simply exit the business, as indeed this Debtor could have done by rejecting the PMAs.  Either way, *Pacific Lumber* controls and the Bankruptcy Court erred by declining to follow it.  The alternative is that any company might as well file Chapter 11, obtain confirmation, and then, in order to avoid burdensome and expensive litigation, obtain a permanent federal gatekeeper injunction that would make the federal bankruptcy courts the arbiters of whether anyone in the world held a colorable claim against the reorganized entity or anyone associated with it.  This

---

[86]     ROA.155-56 (A. Conditions Precedent to the Effective Date).

result is so obviously absurd that it does not require elaboration, but that is the inevitable result if the bankruptcy courts are permitted to eviscerate *Pacific Lumber*.

The Court should therefore reverse the Confirmation Order and render judgment that the Plan cannot be confirmed or, alternatively, strike the Exculpation and the Injunction.

## D. THE DEBTOR ADMITTED IT DID NOT COMPLY WITH THE BANKRUPTCY CODE, BUT THE COURT CONFIRMED THE PLAN ANYWAY

One of the many things the Bankruptcy Code required the Debtor to prove in connection with confirming the Plan was, "The proponent of the plan [*i.e.*, the Debtor] complies with the applicable provisions of this title [*i.e.*, the Bankruptcy Code]." 11 U.S.C. § 1129(a)(2). "Applicable" provisions of the Bankruptcy Code certainly include the disclosure requirements in section 1125. 7 Collier on Bankruptcy ¶ 1129.02[2] (16th ed. 2021) (collecting cases). "Courts have split somewhat, however, on the range of other 'applicable' provisions." *Id.*

"More sensible are those interpretations that read 'complies with the applicable provisions of this title' to mean 'complies with the provisions of this title applicable to reorganization.'" *In re Seatco, Inc.*, 257 B.R. 469, 479 (Bankr. N.D. Tex. 2001) (quoting 7 Collier on Bankruptcy ¶ 129.03[2] (15th ed. 2000)). "Certainly, serious violations of the Bankruptcy Code by a Debtor can and should result in a denial of confirmation of a plan under § 1129(a)(2)." *In re Landing Assocs., Ltd.*, 157 B.R. 791, 810 (Bankr. W.D. Tex. 1993).

Here, the Debtor's statutory duties include that the Debtor "shall … if the business of the debtor is authorized to be operated, file with the court … periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires …."   11 U.S.C. §§ 704(a)(8); 1106(a)(1); 1107(a).   The Bankruptcy Rules, in turn, require that the "debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest."  FED. R. BANKR. P. 2015.3(a).

During his testimony, the Debtor's Chief Executive Officer acknowledged he is familiar with Bankruptcy Rule 2015.3.[87]  He also admitted the Debtor never filed any required reports.[88]  His excuse for noncompliance was that complying with the rule would be "difficult," and "it fell through the cracks."[89]  Yet Rule 2015.3 was particularly important in a case such as this, where the Debtor held $167 million in assets through subsidiary corporations,[90] over which the creditors were consequently provided no transparency.  *See, e.g., In re Vaughan*, 429 B.R. 14, 29 (Bankr. D.N.M. 2010) ("for a chapter 11 debtor-in-possession, absolute transparency is required").

---

[87]     ROA.4564 (Tr. 48:12-14).

[88]     *Id.* (Tr. 48:15-17).

[89]     ROA.1564 (Tr. 49:5-21).

[90]     ROA.17401, 17408 (showing equity method investments of $167,226,227.63).

The Appellants argued that the Debtor's failure to disclose its subsidiaries' finances precluded Plan confirmation.[91]  The Bankruptcy Court overruled this objection without discussion or analysis, thereby sweeping the Debtor' inexplicable failure to comply with its own duties aside, not to mention ratifying the Debtor's cavalier and nonchalant disregard of those duties.

The Court should not permit a Debtor to conceal its assets in bankruptcy but still confirm a plan.  After all, material noncompliance with rule 2015.3 is serious enough to justify denying an individual a discharge.  *See Mandel v. Thrasher (In re Mandel)*, No. 20-40026, 2021 U.S. App. LEXIS 24489 (5th Cir. Aug. 17, 2021) (debtor persisted in material nondisclosure after being ordered to comply with rule 2015.3).  There is no reason the Court should apply a lesser standard to a more sophisticated debtor where $167 million dollars of assets were parked in non-debtor subsidiaries, and the explanation for the failure to comply with the rule was that it would have been difficult.

## VI.  <u>CONCLUSION</u>

The Plan violates the Absolute Priority Rule; the Plan contains impermissible exculpations, releases, and injunctions; and the Debtor failed to fulfill mandatory statutory duties.  Expediency and convenience do not justify violating these important, bedrock legal requirements.  Any one of these alone should have

---

[91]    ROA.4704-05 (Tr. 188:7 – 189:1).

prevented confirmation of the Plan. This Court should therefore reverse the Confirmation Order and render a decision denying confirmation of the Plan.

**RESPECTFULLY SUBMITTED** this 23rd day of August, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By:  /s/ Davor Rukavina
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
500 N. Akard St., Ste. 3800
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: drukavina@munsch.com
Email: jvasek@munsch.com

**ATTORNEYS FOR APPELLANTS
NEXPOINT ADVISORS, L.P. AND
HIGHLAND CAPITAL MANAGE-
MENT FUND ADVISORS, L.P.**

Appx.000775

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this the 23rd day of August, 2021, a true and a correct copy of the foregoing document was served on the counsel of record listed below via electronic service.

Melissa Sue Hayward, Esq.
Email: mhayward@haywardfirm.com
Hayward, P.L.L.C.
10501 N. Central Expressway, Ste. 106
Dallas, TX 75231-0000

Zachery Z. Annable, Esq.
Email: zannable@haywardfirm.com
Hayward, P.L.L.C.
10501 N. Central Expressway, Ste. 106
Dallas, TX 75231-0000

Jeffrey N. Pomerantz
Email: jpomerantz@pszjlaw.com
Pachulski Stang Ziehl & Jones, L.L.P.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Douglas Scott Draper, Esq.
Email: ddraper@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130-0000

Bryan Christopher Assink
Email: bryan.assink@bondsellis.com
Bonds Ellis Eppich Schafer Jones, LLP
420 Throckmorton Street, Suite 1000
Fort Worth, TX 76102

Clay Marshall Taylor
Email: clay.taylor@bondsellis.com
Bonds Ellis Eppich Schafer Jones, LL.
420 Throckmorton Street, Suite 1000
Fort Worth, TX 76102

A. Lee Hogewood
Email: lee.hogewood@klgates.com
K&L Gates
Suite 300
4350 Lassiter at North Hills Avenue
Raleigh, NC 27609

Emily K. Mather
Email: emily.mather@klgates.com
K&L Gates
Suite 300
4350 Lassiter at North Hills Avenue
Raleigh, NC 27609

David R. Fine, Esq.
Email: david.fine@klgates.com
K & L Gates, L.L.P.
17 N. 2nd Street
Harrisburg, PA 17101-0000

By:  /s/ Davor Rukavina
Davor Rukavina, Esq.

Appx.000776

## CERTIFICATE OF COMPLIANCE WITH RULE
## 32(a)'s TYPE-VOLUME LIMITATION, TYPEFACE
## <u>LIMITATION, AND TYPE-STYLE REQUIREMENTS</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,093 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman, 14 pt. font.

Dated:  August 23, 2021.

By:  /s/ Davor Rukavina
Davor Rukavina, Esq.